**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

☑ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended April 1, 2023

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number: 1-5256



# V. F. CORPORATION

*(Exact name of registrant as specified in its charter)*

| Pennsylvania | 23-1180120 |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. employer identification number)* |

**1551 Wewatta Street**
**Denver, Colorado 80202**
*(Address of principal executive offices)*

**(720) 778-4000**
*(Registrant's telephone number, including area code)*

Securities registered pursuant to Section 12(b) of the Act:

| *(Title of each class)* | *(Trading Symbol(s))* | *(Name of each exchange on which registered)* |
|---|---|---|
| Common Stock, without par value, stated capital $.25 per share | VFC | New York Stock Exchange |
| 0.625% Senior Notes due 2023 | VFC23 | New York Stock Exchange |
| 4.125% Senior Notes due 2026 | VFC26 | New York Stock Exchange |
| 0.250% Senior Notes due 2028 | VFC28 | New York Stock Exchange |
| 4.250% Senior Notes due 2029 | VFC29 | New York Stock Exchange |
| 0.625% Senior Notes due 2032 | VFC32 | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑        Accelerated filer ☐
Non-accelerated filer ☐          Smaller reporting company ☐

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☑

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☑

The aggregate market value of Common Stock held by non-affiliates of V.F. Corporation on October 1, 2022, the last day of the registrant's second fiscal quarter, was approximately $10,438,000,000 based on the closing price of the shares on the New York Stock Exchange.

As of April 29, 2023, there were 388,677,307 shares of Common Stock of the registrant outstanding.

**Documents Incorporated By Reference**

Portions of the definitive Proxy Statement for the Annual Meeting of Shareholders to be held on July 25, 2023 (Item 1 in Part I and Items 10, 11, 12, 13 and 14 in Part III), which definitive Proxy Statement shall be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates.

This document (excluding exhibits) contains 106 pages.

VF CORPORATION
TABLE OF CONTENTS

|  |  | PAGE NUMBER |
|---|---|---|
| **FORWARD-LOOKING STATEMENTS** |  | 1 |
| **PART I** |  |  |
| ITEM 1. | Business | 1 |
| ITEM 1A. | Risk Factors | 10 |
| ITEM 1B. | Unresolved Staff Comments | 21 |
| ITEM 2. | Properties | 22 |
| ITEM 3. | Legal Proceedings | 22 |
| ITEM 4. | Mine Safety Disclosures | 22 |
| **PART II** |  |  |
| ITEM 5. | Market for VF's Common Equity, Related Stockholder Matters and Issuer Purchase of Equity Securities | 23 |
| ITEM 6. | [Reserved] | 24 |
| ITEM 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| ITEM 7A. | Quantitative and Qualitative Disclosures about Market Risk | 43 |
| ITEM 8. | Financial Statements and Supplementary Data | 43 |
| ITEM 9. | Change in and Disagreements with Accountants on Accounting and Financial Disclosures | 43 |
| ITEM 9A. | Controls and Procedures | 44 |
| ITEM 9B. | Other Information | 44 |
| ITEM 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 44 |
| **PART III** |  |  |
| ITEM 10. | Directors, Executive Officers and Corporate Governance | 45 |
| ITEM 11. | Executive Compensation | 45 |
| ITEM 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholders Matters | 45 |
| ITEM 13. | Certain Relationships and Related Transactions, and Director Independence | 45 |
| ITEM 14. | Principal Accounting Fees and Services | 45 |
| **PART IV** |  |  |
| ITEM 15. | Exhibits and Financial Statement Schedules | 46 |
| ITEM 16. | 10-K Summary | 49 |
|  | Signatures | 50 |

## FORWARD-LOOKING STATEMENTS

Certain statements contained herein, as well as in other filings that VF makes with the Securities and Exchange Commission ("SEC") and other written and oral information VF releases, regarding VF's future performance constitute "forward-looking statements" within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are made based on VF's current expectations and beliefs concerning future events impacting VF and therefore involve risks and uncertainties. You can identify these statements by the fact that they use words such as "will," "anticipate," "estimate," "expect," "should," and "may," and other words and terms of similar meaning or use of future dates. However, the absence of these words or similar expressions does not mean that a statement is not forward-looking. All statements regarding VF's plans, objectives, projections and expectations relating to VF's operations or financial performance, and assumptions related thereto are forward-looking statements. VF undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law. Known or unknown risks, uncertainties or other factors that could cause the actual results of operations or financial condition of VF to differ materially from those expressed or implied by such forward-looking statements include, but are not limited to, those described as "Risk Factors" in Item 1A of this Annual Report on Form 10-K and other reports VF files with the SEC.

## PART I

## ITEM 1.   BUSINESS.

V.F. Corporation, founded in 1899, is one of the world's largest apparel, footwear and accessories companies connecting people to the lifestyles, activities and experiences they cherish most through a family of iconic outdoor, active and workwear brands. Unless the context indicates otherwise, the terms "VF," the "Company," "we," "us," and "our" used herein refer to V.F. Corporation and its consolidated subsidiaries. All references to "Fiscal 2023" relate to VF's current fiscal year which ran from April 3, 2022 through April 1, 2023.

Unless otherwise noted, all discussion below, including amounts and percentages for all periods, reflect the results of operations and financial condition of VF's continuing operations. As such, the Occupational Workwear business that was sold on June 28, 2021 has been excluded.

VF's diverse portfolio meets consumer needs across a broad spectrum of activities and lifestyles. Our ability to connect with consumers creates a unique platform for sustainable, long-term growth. Our long-term growth strategy is focused on four strategic choices:

- **Find and amplify consumer tailwinds.** Innovate within our existing brand portfolio while also strategically expanding into adjacencies that complement our current brands and tap into consumer growth spaces.

- **Build brands on multiple growth horizons.** Gain market share through building and managing our brands at different stages of growth across the portfolio, as well as through mergers and acquisitions and business development to benefit both individual brands and the enterprise.

- **Leverage platforms for speed to scale and efficiency.** Leveraging our strategic platforms, which provide a unique set of large-scale capabilities to enable our brands to connect more directly with consumers and operate more efficiently, including consumer data and analytics, direct-to-consumer centric supply chain, digitally-enabled seamless consumer experience and international platforms.

- **Resource for portfolio agility and performance.** Managing our business with organizational agility and dynamically

allocate capital and deploy people to drive our highest-priority strategic and growth-focused initiatives.

VF is diversified across brands, product categories, channels of distribution, geographies and consumer demographics. We own a broad portfolio of brands in the outerwear, footwear, apparel, backpack, luggage and accessories categories. Our largest brands are *Vans®, The North Face®, Timberland®* and *Dickies®*.

Our products are marketed to consumers through our wholesale channel, primarily in specialty stores, national chains, mass merchants, department stores, independently-operated partnership stores and with strategic digital partners. Our products are also marketed to consumers through our own direct-to-consumer operations, which include VF-operated stores, concession retail stores, brand e-commerce sites and other digital platforms. Revenues from the direct-to-consumer business represented 45% of VF's total Fiscal 2023 revenues. In addition to selling directly into international markets, many of our brands also sell products through licensees, agents and distributors. In Fiscal 2023, VF derived 58% of its revenues from the Americas, 29% from Europe and 13% from Asia-Pacific.

To provide diversified products across multiple channels of distribution in different geographic areas, we rely on our global sourcing of finished goods from independent contractors. Our highly sophisticated and diversified supply chain utilizes leading technologies for inventory replenishment that enable us to match our assortment of products to consumer demand. Through an increasingly localized approach, we have established three main regional sourcing hubs which has led to reduced lead times by moving production closer to end consumption.

VF's chief operating decision maker allocates resources and assesses performance based on a global brand view which represents VF's operating segments. Global brands have been combined into reportable segments based on similar economic characteristics and qualitative factors. The reportable segments for financial reporting purposes have been identified as: Outdoor, Active and Work.

The following table summarizes VF's brands by reportable segment:

| REPORTABLE SEGMENT | BRANDS | PRIMARY PRODUCTS |
|---|---|---|
| Outdoor | *The North Face*® | High performance outdoor apparel, footwear, equipment, accessories |
| | *Timberland*® | Outdoor, adventure-inspired lifestyle footwear, apparel, accessories |
| | *Smartwool*® | Performance merino wool and other natural fibers-based apparel and accessories |
| | *Altra*® | Performance-based footwear |
| | *Icebreaker*® | High performance apparel and accessories based on natural fibers |
| Active | *Vans*® | Youth culture/action sports-inspired footwear, apparel, accessories |
| | *Supreme*® | Streetwear apparel, footwear, accessories |
| | *Kipling*® | Handbags, luggage, backpacks, totes, accessories |
| | *Napapijri*® | Premium outdoor-inspired apparel, footwear, accessories |
| | *Eastpak*® | Backpacks, luggage |
| | *JanSport*® | Backpacks, luggage |
| Work | *Dickies*® | Work and work-inspired lifestyle apparel and footwear |
| | *Timberland PRO*® | Protective work footwear, work and work-inspired lifestyle apparel |

Financial information regarding VF's reportable segments is included in Note 20 to the consolidated financial statements.

## OUTDOOR SEGMENT

Our Outdoor segment is a group of authentic outdoor-based lifestyle brands. Product offerings include performance-based and outdoor apparel, footwear and equipment.

*The North Face*® is the largest brand in our Outdoor segment. *The North Face*® brand features performance-based apparel, outerwear, sportswear and footwear for men, women and children. Its equipment line includes tents, sleeping bags, backpacks and accessories. Many of *The North Face*® products are designed for extreme winter sport activities, such as high altitude mountaineering, skiing, snowboarding, and ice and rock climbing. *The North Face*® products are marketed globally, primarily through specialty outdoor and premium sporting goods stores, department stores, independent distributors, independently-operated partnership stores, concession retail stores, approximately 230 VF-operated stores, on websites with strategic digital partners and online at www.thenorthface.com.

T h e *Timberland*® brand offers outdoor, adventure-inspired lifestyle footwear, apparel and accessories that combine performance benefits and versatile styling for men, women and children. We sell *Timberland*® products globally through chain, department and specialty stores, independent distributors and licensees, independently-operated partnership stores, concession retail stores, approximately 170 VF-operated stores, on websites with strategic digital partners and online at www.timberland.com.

The *Smartwool*® brand offers active outdoor consumers a premium, technical layering system of merino wool socks, apparel and accessories that are designed to work together in fit, form and function. *Smartwool*® products are sold globally through specialty outdoor and premium sporting goods stores, independent distributors, on websites with strategic digital partners and online at www.smartwool.com.

*Altra*® is a performance-based footwear brand primarily in the road and trail running categories. *Altra*® products are sold globally through premium outdoor and specialty stores, independent distributors, on websites with strategic digital partners and online at www.altrarunning.com.

The *Icebreaker*® brand specializes in performance apparel and accessories based on natural fibers, including merino wool and plant-based fibers. *Icebreaker*® products are sold globally through specialty outdoor and premium sporting goods stores, concession retail stores, independent distributors, approximately 25 VF-operated stores, on websites with strategic digital partners and online at www.icebreaker.com.

Key drivers of long-term growth in our Outdoor segment are expected to be a continued focus on product innovation, extension of our brands into new product categories, profitable growth in our direct-to-consumer business including our digital presence, expansion of wholesale channel partnerships, geographical diversification and development, as well as the potential for the acquisition of additional brands.

## ACTIVE SEGMENT

Our Active segment is a group of activity-based lifestyle brands. Product offerings include active apparel, footwear, backpacks, luggage and accessories.

*Vans*® is the largest brand in our Active segment. The *Vans*® brand offers performance and casual footwear and apparel targeting younger consumers that sit at the center of action sports, art, music and street fashion. *Vans*® products are available globally through chain stores, specialty stores, independent distributors and licensees, independently-operated partnership stores, concession retail stores, approximately 750 VF-operated stores, on websites with strategic digital partners and online at www.vans.com.

*Supreme*® is a leading streetwear brand that offers apparel, accessories and footwear. *Supreme*® products are available globally through approximately 15 VF-operated stores, select partner retail stores and online at www.supremenewyork.com.

*Kipling*® branded handbags, luggage, backpacks, totes and accessories are sold globally through department, specialty and luggage stores, independently-operated partnership stores, independent distributors, concession retail stores, approximately 40 VF-operated stores, on websites with strategic digital partners and online at www.kipling.com.

The *Napapijri*® brand offers outdoor-inspired casual outerwear, sportswear and accessories at a premium price with a focus on marketing to men, women and children in Europe. Products are sold in department and specialty stores, independently-operated partnership stores, concession retail stores, independent distributors, approximately 25 VF-operated stores, on websites with strategic digital partners and online at www.napapijri.com.

*Eastpak*® backpacks, travel bags and luggage are sold primarily through department and specialty stores across Europe, on websites with strategic digital partners, throughout Asia by distributors and online at www.eastpak.com.

*JanSport*® backpacks and accessories are sold primarily in North America, through department, office supply and chain stores, as well as sports specialty stores and independent distributors. *JanSport*® products are also sold on websites with strategic digital partners and online at www.jansport.com.

Key drivers of long-term growth in our Active segment are expected to be our continued focus on product innovation, extension of our brands into new product categories, profitable growth of our direct-to-consumer business including our digital presence, enhancement of wholesale channel partnerships, geographical diversification and development, as well as the potential for the acquisition of additional brands.

## WORK SEGMENT

Our Work segment consists of work and work-inspired lifestyle brands with product offerings that include apparel, footwear and accessories.

*Dickies*® is the largest brand in our Work segment. The *Dickies*® brand is a leader in authentic, functional, durable and affordable workwear and has expanded to produce work-inspired, casual-use products. *Dickies*® products are available globally through mass merchants, specialty stores, independent distributors and licensees, independently-operated partnership stores, concession retail stores, approximately 15 VF-operated stores, on websites with strategic digital partners and online at www.dickies.com.

The *Timberland PRO*® brand offers work and work-inspired products that provide comfort, durability and performance. *Timberland PRO*® products are available through specialty stores, chain stores, independent distributors, on websites with strategic digital partners and online at www.timberland.com. *Timberland PRO*® products are also available in most U.S. VF-operated *Timberland*® stores.

We believe there is a strategic opportunity for growth in our Work segment in both existing and future markets, and in all channels and geographies. We expect growth will be driven by an increased presence in the retail workwear market, additional work-inspired lifestyle product offerings and by continuing to innovate products that address workers' desires for increased comfort and performance.

## DIRECT-TO-CONSUMER OPERATIONS

Our direct-to-consumer business includes VF-operated retail stores, brand e-commerce sites, concession retail locations and other digital platforms. Direct-to-consumer revenues were 45% of total VF revenues in Fiscal 2023.

Our full-price retail stores allow us to display a brand's full line of products with fixtures and imagery that support the brand's positioning and promise to consumers. These experiences provide high visibility for our brands and products and enable us to stay close to the needs and preferences of our consumers. The complete and impactful presentation of products in our stores also helps to increase sell-through of VF products at our wholesale customers due to increased brand awareness, education and visibility. VF-operated full-price stores generally provide gross margins that are well above other channels.

In addition, VF operates outlet stores in both premium outlet malls and more traditional value-based locations. These outlet stores carry merchandise that is specifically designed for sale in our outlet stores and serve an important role in our overall inventory management and profitability by also allowing VF to sell a significant portion of excess, discontinued and out-of-season products at better prices than otherwise available from outside parties, while maintaining the integrity of our brands.

Our global direct-to-consumer operations included 1,265 stores at the end of Fiscal 2023. We operate retail store locations for the following brands: *Vans*®, *The North Face*®, *Timberland*®, *Kipling*®, *Icebreaker*®, *Napapijri*®, *Dickies*® and *Supreme*®. Approximately 60% of our stores are located in the Americas (53% in the U.S.), 25% in Europe and 15% in Asia-Pacific. Additionally, we sell certain of our branded products through

approximately 900 concession retail stores located principally in Europe and Asia.

E-commerce represented approximately 43% of our direct-to-consumer business and 19% of total VF revenues in Fiscal 2023. All VF brands are marketed online. We continue to expand our omni-channel approach and integrated marketplace strategies in the Europe and Asia-Pacific regions, in order to engage with consumers at every touch point with innovative assets and by focusing on local relevance. We also continue to increase focus on digital innovation and growth across other third-party digital platforms that are reported within our direct-to-consumer business.

We expect our direct-to-consumer business to gain share in our revenue mix as we leverage strategic platforms that enable our brands to more directly connect with consumers.

In addition to our direct-to-consumer operations, independent parties own and operate approximately 2,400 partnership stores. Sales to these partners are reported in our wholesale channel. These are primarily mono-brand retail locations selling VF products that have the appearance of VF-operated stores. Most of these partnership stores are located in Europe and in Asia, and are concentrated amongst *The North Face*®, *Timberland*®, *Vans*®, *Dickies*®, *Kipling*® and *Napapijri*® brands.

## LICENSING ARRANGEMENTS

As part of our strategy of expanding market penetration of VF-owned brands, we enter into licensing agreements with independent parties for specific apparel and complementary product categories when such arrangements provide more effective sourcing, distribution and marketing than could be achieved internally. We provide support to these business partners and ensure the integrity of our brand names by taking an active role in the design, quality control, advertising, marketing and distribution of licensed products.

Licensing arrangements relate to a broad range of VF brands and are for fixed terms of generally 3 to 5 years, with conditional renewal options, outside of certain licensing arrangements for the *Dickies*® brand that have longer terms. Each licensee pays royalties to VF based on its sales of licensed products, with most agreements providing for a minimum royalty requirement. Royalties generally range from 4% to 10% of the licensing partners' net licensed product sales. Royalty income was $75.0 million in Fiscal 2023 (less than 1% of total revenues), primarily from the *Vans*®, *Dickies*® and *Timberland*® brands.

## SOURCING AND DISTRIBUTION

Product design and innovation, including fit, fabric, finish and quality, are important elements across our businesses. These functions are performed by employees located in our global supply chain organization and our branded business units across the globe.

VF's centralized global supply chain organization is responsible for procuring and delivering products to support our brands and businesses. VF is skilled in managing the complexities associated with our global supply chain. In Fiscal 2023, VF sourced approximately 362 million units spread across our brands. Our products were primarily obtained from approximately 340 independent contractor manufacturing facilities in approximately 35 countries. Additionally, we operate 21 distribution centers and 1,265 retail stores across the globe. We also utilize distribution centers managed by third parties, as necessary, for certain brands and locations. Managing this complexity is made possible by the use of a network of information systems for product development, forecasting, order management and warehouse management, along with our core enterprise resource management platforms.

Products obtained from contractors in the Western Hemisphere generally have a higher cost than products obtained from contractors in Asia. However, contracting in the Western Hemisphere gives us greater flexibility, shorter lead times and allows for lower inventory levels for the U.S. market. The use of contracted production with different geographic regions and cost structures, provides a flexible approach to product sourcing. We will continue to manage our supply chain from a global perspective and adjust as needed to changes in the global production environment.

Independent contractors generally own the raw materials and ship finished, ready-for-sale products to VF. These contractors are engaged through VF's sourcing hub in Singapore (with

satellite offices across Asia), and to a lesser extent, VF's sourcing hubs in Panama and Switzerland. These hubs are responsible for managing the procurement of product, supplier oversight, product quality assurance, sustainability within the supply chain, responsible sourcing and transportation and shipping functions. In addition, our hubs leverage proprietary knowledge and technology to enable certain contractors to more effectively control costs and improve labor efficiency.

Management continually monitors political risks and developments related to duties, tariffs and quotas. We limit VF's sourcing exposure through, among other measures: (i) diversifying production among countries and contractors, (ii) sourcing production to merchandise categories where product is readily available, and (iii) sourcing from countries with tariff preference and free trade agreements. VF does not directly or indirectly source products from suppliers in countries that are prohibited by the U.S. State Department.

No single supplier represented more than 6% of our total cost of goods sold during Fiscal 2023.

All independent contractor facilities that manufacture VF products, are subject to VF's Global Compliance Principles. These principles, consistent with international labor standards, are a set of strict standards covering legal and ethical business practices, worker age, work hours, health and safety conditions, environmental standards and compliance with local laws and regulations.

VF, through its contractor monitoring program, audits the activities of the independent businesses and contractors that produce VF products at locations across the globe. Independent contractor facilities, including those serving our independent licensees, are subject to pre-certification before producing VF products. This pre-certification includes passing a factory

inspection and signing a VF Terms of Engagement agreement. We maintain an ongoing audit program to ensure compliance with these requirements by using dedicated internal staff and externally contracted firms. Additional information about VF's Code of Business Conduct, Global Compliance Principles, Terms of Engagement and Environmental Compliance Guidelines, along with a Global Compliance Report, is available on the VF website at www.vfc.com.

COVID-19 has impacted some of VF's suppliers, including the resurgence of COVID-19 lockdowns in key sourcing countries that resulted in additional manufacturing constraints and logistical challenges during Fiscal 2023. VF has worked with its suppliers to minimize disruption and employed expedited freight as needed. VF has and will continue to work to offset any increases in product costs through (i) the continuing shift in the mix of its business to higher margin brands, geographies and channels of distribution, (ii) increases in the prices of its

products, and (iii) cost reduction efforts. The loss of any one supplier or contractor would not have a significant adverse effect on our business.

Product is shipped from our independent suppliers to distribution centers around the world. In some instances, product is shipped directly to our customers. Most distribution centers are operated by VF, and most support more than one brand.

Our largest distribution centers by region are located in Visalia, California, Prague, Czech Republic and Kunshan, China. In total, we operate 21 owned or leased distribution centers primarily in the U.S., but also in the Czech Republic, United Kingdom, the Netherlands, China, Canada, Mexico, Belgium, Israel and France. In addition, VF leases a distribution center in Ontario, California, that will be operational in early-Fiscal 2024 and will become VF's largest distribution center.

## SEASONALITY

VF's quarterly operating results vary due to the seasonality of our individual brands, and are historically stronger in the second half of the calendar year. This variation results primarily from the seasonal influences on revenues of our Outdoor segment, where revenues are historically weighted towards the second and third fiscal quarters. On a quarterly basis in Fiscal 2023, revenues ranged from a low of 19% of full year revenues in the first fiscal quarter to a high of 30% in the third fiscal quarter, with corresponding operating margins of 3% in the first fiscal quarter and 15% in the third fiscal quarter. This variation results primarily from the seasonal influences on revenues of our Outdoor segment, where 14% of the segment's revenues occurred in the first fiscal quarter compared to 35% in the third

fiscal quarter of Fiscal 2023. With changes in our mix of business and the growth of our retail operations, historical quarterly revenue and profit trends may not be indicative of future trends.

Working capital requirements vary throughout the year. Working capital typically increases early in the calendar year as inventory builds to support peak shipping periods and then moderates later in the calendar year as those inventories are sold and accounts receivable are collected. Historically, cash provided by operating activities is substantially higher in the second half of the calendar year due to higher net income during that period and reduced working capital requirements, particularly during the fourth quarter of the calendar year.

## ADVERTISING, CUSTOMER SUPPORT AND COMMUNITY OUTREACH

During Fiscal 2023, our advertising and promotion expense was $861.8 million, representing 7% of total revenues. We advertise in consumer and trade publications and through digital initiatives, including social media and mobile platforms on the Internet. We also participate in cooperative advertising on a shared cost basis with major retailers in print and digital media, radio and television. We sponsor sporting, musical and special events, as well as athletes and personalities who promote our products. We employ marketing sciences to optimize the impact of advertising and promotional spending, and to identify the types of spending that provide the greatest return on our marketing investments.

We provide advertising support to our wholesale customers, including independent partnership stores, in the form of point-of-sale fixtures and signage to enhance the presentation and brand image of our products. We also participate in shop-in-shops and concession retail arrangements, which are separate sales areas dedicated to a specific VF brand within our customers' stores and other locations, to help differentiate and enhance the presentation of our products.

We contribute to incentive programs with our wholesale customers, including cooperative advertising funds, discounts and allowances. We also offer sales incentive programs directly to consumers in the form of discounts, rebates and coupon offers that are eligible for use in certain VF-operated stores, brand e-commerce sites and concession retail locations. VF also offers loyalty programs for certain brands that provide a range of benefits to consumers.

In addition to sponsorships and activities that directly benefit our products and brands, VF and its associates actively support our communities and various charities. For example, *The North Face*® brand has committed to programs that encourage and enable outdoor participation, such as *The North Face Explore Fund*™ program, and provide trailblazing athletes with funding, gear, education and mentorship to accelerate their progress through its "Athlete Development Program". The *Timberland*® brand has a strong heritage of volunteerism, including the *Path of Service*™ program, which celebrated its 30-year anniversary in Fiscal 2023, offering full-time employees paid time off to serve their local communities through global service events such as Earth Day in the spring and "Serv-a-palooza" in the fall. In Fiscal 2023, the *Vans*® brand supported programs and nonprofits committed to equality, mental health support and empowering everyone to use creativity to discover themselves.

## SUSTAINABILITY AND RESPONSIBILITY

VF and our portfolio of brands strive to be more than just an apparel and footwear company. Collectively, we work to be a leading global citizen, setting a high bar for corporate sustainability and responsibility. Our enterprise-wide sustainability and responsibility strategy focuses on key areas including people, the planet and our products.

### People

- VF is a people-focused company. Our associates are a force for good in the world, sparking global movements that genuinely make a difference. We have a responsibility to protect and lift-up all who work across our operations and supply chain.

### Planet

- The well-being of people and the planet are inextricably connected. Through our sustainability efforts, we are taking bold action on climate change to protect the planet for generations to come.

### Product

- VF brands touch millions of lives every year – from the people that design and make apparel and footwear to the consumers who purchase them. Innovation and responsible product stewardship is infused at every step.

VF prioritizes sustainable materials, circularity, and sustainable packaging to drive scalable change by working to reduce our environmental impact. Other critical components of our sustainability strategy include reducing greenhouse gas ("GHG") emissions, increasing responsible sourcing of materials, reducing waste, implementing green building design, increasing renewable energy use and improving operational efficiency across both our direct operations and supply chain.

VF's President and Chief Executive Officer, as well as the Company's Executive Leadership Team ("ELT") and Board of Directors are responsible for the oversight of VF's sustainability and responsibility strategies and targets. VF's ELT Corporate Responsibility Working Group, comprised of executive leaders and subject matter experts from across the enterprise, address salient environmental and social issues. Progress updates and key outcomes of the ELT Corporate Responsibility Working Group are presented to the Governance and Corporate Responsibility Committee of the Board of Directors on a biannual cadence.

In alignment with the Taskforce on Climate-Related Financial Disclosures ("TCFD"), VF has completed an analysis of potential climate-related risks and opportunities. 'Climate Change & Sustainability' has been established as a VF enterprise risk and embedded in our enterprise risk management framework. Updates on enterprise risks, and progress towards associated targets, are provided to the Audit Committee of the Board of Directors quarterly.

VF's science-based targets include the following:

- Reduce absolute Scope 1 and 2 GHG emissions 55% by 2030 from a Fiscal 2017 baseline; and

- Reduce absolute Scope 3 GHG emissions from purchased goods and services and upstream transportation 30% by 2030 from a Fiscal 2017 baseline.

Other planet- and product-related goals include the following:

- Utilize 100% renewable energy across our owned-and-operated facilities by Fiscal 2026, to be primarily achieved through off-site renewable energy investments, including renewable energy credits.

- Source 50% of our polyester from recycled materials by Fiscal 2026.

- Key packaging materials shall be reduced and originate from more sustainable sources by Fiscal 2031.

VF is currently on course with its internal milestones, tracking progress towards these targets and goals.

In Fiscal 2023, VF issued its second €500.0 million green bond; the inaugural green bond was issued in Fiscal 2020. VF has dedicated an amount equivalent to the green bond net proceeds to support projects that align with key United Nations' Sustainable Development Goals, deliver meaningful environmental benefits and drive progress toward its science-based targets.

Additional information regarding VF's sustainability and responsibility strategy and actions can be found within our latest sustainability and responsibility report within our "Responsibility" page on www.vfc.com. Also included on that webpage are downloads of our Sustainability Accounting Standards Board ("SASB") and Global Reporting Initiative ("GRI") indices. Information contained on our website or in our sustainability and responsibility reports or related supplemental information is not incorporated by reference into this or any other report we file with the SEC.

## HUMAN CAPITAL MANAGEMENT

As a performance-driven company that is committed to its purpose, VF leverages the strength of our business and the capabilities of our people to drive profitable growth and create value for shareholders and stakeholders. Our purpose is to power movements of sustainable and active lifestyles for the betterment of people and our planet. This purpose, combined with a laser focus on performance and delivering on our commitments, allows us to offer a unique value proposition to our associates – a place where you can do well and do good at the same time.

We consider the talent and capabilities of our people as essential to our business strategy and execution, and, as such, put in place strategies to acquire, develop and retain highly diverse talent with the skills and passion to build our brands for our consumers around the globe. Our Human Capital Management ("HCM") practices are designed to promote inclusion, diversity and equity; provide development opportunities for associates across the organization; offer competitive rewards and benefits; and sponsor programs that support wellbeing in an engaging work environment built on enduring guiding principles and longstanding values.

We believe that having an engaged, diverse and committed workforce not only enhances our business performance but also our culture. Initiatives to promote overall alignment with our performance, purpose, guiding principles, and strategy are therefore important and include internal communications and education about our programs, townhalls across various parts of our business, and a listening strategy that engages associates in providing input and feedback on a variety of topics.

Our Board of Directors and its Committees provide governance and oversight on a broad range of VF's human capital management efforts. The Board's oversight includes review of CEO and executive officer performance, compensation and succession planning and inclusion, and diversity and belonging programs and initiatives. The Talent and Compensation Committee works with management on executive compensation and compensation risks, and regularly reviews our progress on company-wide HCM priorities, including inclusion, diversity and equity, benefits, wellbeing, succession planning and talent development strategies. VF's Audit Committee monitors current and emerging risks, including HCM risks, and VF's health and safety program. The Governance and Corporate Responsibility Committee is responsible for conducting Board succession planning and the selection of nominees to the Board, and reviews VF's Code of Business Conduct and VF's sustainability policies, goals and programs. These Committees provide recommendations to the Board and are part of the broader framework that guides how VF acquires, develops, and retains a workforce that aligns with VF's values and supports its business strategies and performance objectives. In addition, VF's ELT is regularly engaged in the development and management of key talent systems, guiding our culture, employee value proposition and talent development programs. The sections that follow provide further background on our associate base, as well as examples of our key programs and initiatives that are focused on the achievement of our objectives.

### Associate Base

VF had approximately 33,000 employees at the end of Fiscal 2023. Of VF's total employees, approximately 60% were full-time and approximately 57% were located in the U.S. In international markets, certain employees are covered by trade-sponsored or governmental bargaining arrangements. Employee relations are considered to be good.

### Inclusion, Diversity, Equity, Action ("IDEA")

IDEA is fundamental to our business as we aim to sustain a workplace that celebrates the diversity of our associates. We strive to provide an environment that allows our associates to bring their authentic selves to work every day, and we're determined to foster a workplace that is free of discrimination and harassment, and promotes allyship, advocacy and belonging. Our Global Inclusion, Diversity and Equity Council sets global goals and strategic direction in alignment with VF's global IDEA strategy. Our Council to Advance Racial Equity ("CARE") oversees our commitments on actions that promote: increasing Black, Indigenous and People of Color ("BIPOC") representation at the director and above population in the U.S.; diverse candidate slates; pay equity; leader compensation tied to successful implementation of our IDEA strategy; mentorship and sponsorship of BIPOC employees and members of the community; and elevating our commitment to education, listening and learning.

These actions are consistent and aligned with VF's IDEA Statement, committing to equal opportunity for all employees and candidates. At the end of Fiscal 2023, approximately 19% of our U.S. director and above workforce self-identified as BIPOC.

VF is a member of the Paradigm for Parity coalition, which has pledged to promote organizational gender parity globally in leadership roles by 2030. At the end of Fiscal 2023, approximately 53% of the overall VF workforce and approximately 42% of director and above roles self-identified as women. VF aims to remove barriers to uplifting women and has added and expanded resources to support women in the workplace, including career advancement workshops, community building activities through our Employee Resource Groups ("ERGs"), and a suite of benefits designed to promote wellbeing and provide support for parents and families, including paid parental leave.

Our dedication to inclusion and diversity is further reflected in programs sponsored by our ERGs. Our ERGs enhance our culture of belonging by creating a safe space for learning and dialogue for underrepresented groups, establishing a sense of community among associates and providing platforms to collect and share insights to support business imperatives. We currently have various ERGs for women, BIPOC, Veterans and LGBTQ+ communities. VF is committed to maximizing inclusion, diversity and equity not only within the Company, but within the communities where we live and work, while also being a positive influence within the apparel and footwear sector, and society at large.

### Culture and Engagement

Our culture is built on our five Guiding Principles: Live with Integrity, Act with Empathy, Be Curious, Persevere, and Act Courageously. We have codified this culture through the lens of "what we do", "what we see" and "how we feel", and we measure our culture and Employee Net Promoter Score ("eNPS") via semiannual surveys. Results are evaluated, shared with associates and used to guide management focus and attention. Recent actions have included our Workplace Next initiative, which is focused on 1) driving flexibility for associates where they work, 2) creating engaging work environments that bring associates together to collaborate and innovate, and 3) equipping leaders to manage in a complex, hybrid environment. VF also conducts periodic pulse check surveys for interim feedback on specific topics such as ethics and compliance, safety, communications, and related topics.

### Talent Management

Talent Management includes the acquisition, development, skilling and upskilling, and deployment of our talent. We utilize a range of tools and programs including diverse candidate slates, talent reviews, performance coaching and development, succession planning, access to volunteering opportunities, IDEA training and hundreds of online learning modules that are available to all associates.

### Associate Wellbeing and Safety

VF endeavors to support the diverse wellbeing needs of our associates and their families. We define wellbeing as not only physical health, but also mental, emotional, social, financial and career wellbeing. We offer a comprehensive and competitive benefits program to our full-time associates that is designed to provide choices and flexibility to meet their needs now and in the

future. These include health and welfare programs, retirement programs, paid parental leave, reproductive and adoption assistance, paid time off, tuition reimbursement, product discounts, fitness facilities or programs, childcare and educational resources and various on-site services, employee assistance program, and regular wellbeing programming, as culturally appropriate throughout the geographies in which we operate.

Associate safety rests at the heart of our decisions. Nothing is more fundamental than providing people with an environment where they feel safe, secure and supported. Our mission is simple: Foster a culture of safety that enables a workplace free of hazards and sends every employee home safely. Our goal is zero workplace injuries within our operations. We're using our scale, influence and insight to help establish safe, stable

working environments in the factories producing our products, while simultaneously improving the lives of those in local communities beyond the factory walls.

**Ethics and Compliance**

VF's Code of Business Conduct sets forth business policies and principles for all directors, officers and associates of VF. The key principles of our code are as follows: we will lead with integrity; we will treat everyone with dignity and respect; we will compete fairly and honestly; we will follow the law everywhere we do business; and we will strive to make our communities better. Our global Ethics and Compliance program provides VF associates with the tools they need to understand our expectations for ethical business conduct and the courage to speak up and raise concerns without fear of retaliation.

## OTHER MATTERS

**Competitive Factors**

Our business depends on our ability to stimulate consumer demand for VF's brands and products. As a leader in the industry with a portfolio of iconic brands, VF is well-positioned to compete in its target markets for apparel, footwear, and accessories. Our brands support the active lifestyles of their consumers through the development of innovative and differentiated products and experiences. We support our brands in meeting their commitments to consumers by leveraging our platforms and capabilities to innovate and ensure sufficient availability of high-quality products when and where consumers choose to engage with our brands, and to communicate and maintain long-lasting relationships.

**Intellectual Property**

Trademarks, trade names, patents and domain names, as well as related logos, designs and graphics, provide substantial value in the development and marketing of VF's products, and are important to our continued success. We have registered this intellectual property in the U.S. and in other countries where our products are manufactured and/or sold. We vigorously monitor and enforce VF's intellectual property against counterfeiting, infringement and violations of other rights where and to the extent legal, feasible and appropriate. In addition, we grant licenses to other parties to manufacture and sell products utilizing our intellectual property in product categories and geographic areas in which VF does not operate.

**Customers**

VF products are sold on a wholesale basis to specialty stores, national chains, mass merchants, department stores, independently-operated partnership stores and strategic digital partners. In addition, we sell products on a direct-to-consumer basis through VF-operated stores, concession retail stores, brand e-commerce sites and other digital platforms. Our international sales represented 48% of our total revenues in the year ended March 2023, with Europe being the largest international market.

Sales to VF's ten largest customers amounted to approximately 15% of total revenues in Fiscal 2023. Sales to the five largest customers amounted to approximately 9% of total revenues in Fiscal 2023. Sales to VF's largest customer totaled approximately 2% of total revenues in Fiscal 2023.

**Backlog**

The dollar amount of VF's order backlog as of any date is not indicative of actual future shipments and, accordingly, is not material to an understanding of the business taken as a whole.

## INFORMATION ABOUT OUR EXECUTIVE OFFICERS

The following are the executive officers of VF Corporation as of May 25, 2023. The executive officers are generally elected annually and serve at the pleasure of the Board of Directors. None of the VF Corporation executive officers have any family relationship with one another or with any of the directors of VF Corporation.

**Benno Dorer**, 59, has been Interim President and Chief Executive Officer of VF since December 2022 and a Director of VF since 2017. Mr. Dorer served as VF's Lead Independent Director from July 2021 until December 2022.

**Matthew H. Puckett**, 49, has been Executive Vice President and Chief Financial Officer of VF since June 2021. He served as Vice President — Global Financial Planning & Analysis from June 2019 until May 2021, Vice President — Chief Financial Officer of VF International from April 2015 until May 2019, Vice President – Chief Financial Officer Timberland from October 2011 until March 2015 and Vice President — Chief Financial Officer VF Sportswear April 2009 until October 2011. Mr. Puckett joined VF in 2001.

**Kevin D. Bailey**, 62, has been Global Brand President, *Vans*® since March 2022. He served as Executive Vice President and President, APAC and Emerging Brands from August 2020 until February 2022 (Emerging Brands) and June 2022 (APAC), Executive Vice President and Group President, APAC from January 2017 until August 2020, President Action Sports & VF CASA from March 2016 until December 2016, President Action Sports and the *Vans*® brand from April 2014 until February 2016, Global President of the *Vans*® brand from June 2009 until March 2014 and Vice President Direct-to-Consumer for the *Vans*® brand from June 2002 until November 2007. Mr. Bailey joined VF in 2004 with the *Vans*® acquisition.

**Martino Scabbia Guerrini**, 58, has been Executive Vice President, and President, EMEA and Emerging Brands since March 2022, and President, APAC since November 2022. He served as Executive Vice President and Group President — EMEA from January 2018 until March 2022. He served as President — VF EMEA from April 2017 until December 2017, Coalition President — Jeanswear, Sportswear and Contemporary International from January 2013 until November 2017, President — Sportswear and Contemporary EMEA from February 2009 until December 2012 and President — Sportswear and Packs from August 2006 until January 2009. Mr. Guerrini joined VF in 2006.

**Bryan H. McNeill**, 61, has been Vice President — Controller and Chief Accounting Officer since April 2015. He served as Controller and Supply Chain Chief Financial Officer of VF International from January 2012 until March 2015 and Controller of VF International from May 2010 until December 2011. Mr. McNeill joined VF in 1993.

**Nicole Otto**, 52, has been Global Brand President, *The North Face*® since June 2022. She also served as President, APAC from July 2022 until November 2022. Ms. Otto joined VF in June 2022.

**Jennifer S. Sim**, 49, has been Executive Vice President, General Counsel and Secretary since May 2022. She served as Vice President, Deputy General Counsel from 2019 until May 2022, Vice President, General Counsel — Americas West from 2016 until 2019 and Vice President, General Counsel — Outdoor & Action Sports Americas from 2013 until 2016. Ms. Sim joined VF in 2013.

Additional information is included under the caption "Election of Directors" in VF's definitive Proxy Statement for the Annual Meeting of Shareholders to be held July 25, 2023 ("2023 Proxy Statement") that will be filed with the Securities and Exchange Commission within 120 days after the close of our fiscal year ended April 1, 2023, which information is incorporated herein by reference.

## AVAILABLE INFORMATION

All periodic and current reports, registration statements and other filings that VF has filed or furnished to the SEC, including our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) of the Exchange Act, are available free of charge from the SEC's website (www.sec.gov) and on VF's website at www.vfc.com. Such documents are available as soon as reasonably practicable after electronic filing of the material with the SEC. Copies of these reports may also be obtained free of charge upon written request to the Secretary of VF Corporation, P.O. Box 13919, Denver, CO 80201.

The following corporate governance documents can be accessed on VF's website: VF's Corporate Governance Principles, Code of Business Conduct, and the charters of our Audit Committee, Talent and Compensation Committee, Finance Committee and Governance and Corporate Responsibility Committee. Copies of these documents also may be obtained by any shareholder free of charge upon written request to the Secretary of VF Corporation, P.O. Box 13919, Denver, CO 80201.

After VF's 2023 Annual Meeting of Shareholders, VF intends to file with the New York Stock Exchange ("NYSE") the certification regarding VF's compliance with the NYSE's corporate governance listing standards as required by NYSE Rule 303A.12. Last year, VF filed this certification with the NYSE on August 2, 2022.

## ITEM 1A.   RISK FACTORS.

The following risk factors should be read carefully in connection with evaluating VF's business and the forward-looking statements contained in this Form 10-K. Any of the following risks could materially adversely affect VF's business, its operating results and its financial condition.

### ECONOMIC AND INDUSTRY RISKS

***VF's revenues and profits depend on the level of consumer spending for apparel and footwear, which is sensitive to global economic conditions and other factors. A decline in consumer spending could have a material adverse effect on VF.***

The success of VF's business depends on consumer spending on apparel and footwear, and there are a number of factors that influence consumer spending, including actual and perceived economic conditions, disposable consumer income, interest rates, consumer credit availability, inflationary pressures, recessions or economic slowdowns, unemployment, stock market performance, weather conditions and natural disasters (including potential effects from climate change), energy prices, public health issues (including the coronavirus (COVID-19) pandemic), geopolitical instability (such as the current conflict between Russia and Ukraine and related economic and other retaliatory measures taken by the United States, European Union and others, and the current tensions between the U.S. and China), consumer discretionary spending patterns and tax rates in the international, national, regional and local markets where VF's products are sold. Decreased consumer spending could result in reduced demand for our products, reduced orders from customers for our products, order cancellations, lower revenues, higher discounts, increased inventories and lower gross margins. The uncertain state of the global economy continues to impact businesses around the world, most acutely in emerging markets and developing economies. If global economic and financial market conditions do not improve, adverse economic trends or other factors could negatively impact the level of consumer spending, which could have a material adverse impact on VF.

***The apparel and footwear industries are highly competitive, and VF's success depends on its ability to gauge consumer preferences and product trends, and to respond to constantly changing markets.***

VF competes with numerous apparel and footwear brands and manufacturers. Competition is generally based upon brand name recognition, the price, design, quality and selection of product, service and purchasing convenience. Some of our competitors are larger and have more resources than VF in some product categories and regions. In addition, VF competes directly with the private label brands of its wholesale customers. VF's ability to compete within the apparel and footwear industries depends on our ability to:

- anticipate and respond to changing consumer preferences and product trends in a timely manner;

- develop attractive, innovative and high quality products that meet consumer needs;

- maintain strong brand recognition;

- price products appropriately;

- provide best-in-class marketing support and intelligence and optimize and react to available consumer data;

- ensure product availability and optimize supply chain efficiencies;

- obtain sufficient retail store space and effectively present our products at retail;

- produce or procure quality products on a consistent basis; and

- adapt to a more digitally driven consumer landscape.

In addition, our ability to compete is also dependent on our ability to reach consumers effectively and efficiently in an evolving media landscape, including digital, which is subject to evolving and increasingly restrictive privacy requirements. Failure to compete effectively or to keep pace with rapidly changing consumer preferences, markets, technology, business model and product trends could have a material adverse effect on VF's business, financial condition and results of operations. Moreover, there are significant shifts underway in the wholesale and retail (e-commerce and retail store) channels, which have been accelerated because of the COVID-19 pandemic. VF may not be able to manage its brands within and across channels sufficiently, which could have a material adverse effect on VF's business, financial condition and results of operations.

***The retail industry has experienced financial difficulty that could adversely affect VF's business.***

Recently there have been consolidations, reorganizations, restructurings, bankruptcies and ownership changes in the retail industry. These events individually, and together, could have a material, adverse effect on VF's business. These changes could impact VF's opportunities in the market and increase VF's reliance on a smaller number of large customers. In the future, retailers are likely to further consolidate, undergo restructurings or reorganizations or bankruptcies, realign their affiliations or reposition their stores' target markets. In addition, consumers have continued to transition away from traditional wholesale retailers to large online retailers. These developments could result in a reduction in the number of stores that carry VF's products, an increase in ownership concentration within the retail industry, an increase in credit exposure to VF or an increase in leverage by VF's customers over their suppliers.

Further, the global economy periodically experiences recessionary conditions with rising unemployment, reduced availability of credit, increased savings rates and declines in real estate and securities values. These recessionary conditions could have a negative impact on retail sales of apparel, footwear and other consumer products. The lower sales volumes, along with the possibility of restrictions on access to the credit markets, could result in our customers experiencing financial difficulties including reduced access to credit, bankruptcies or liquidations. This could result in higher credit risk to VF relating to receivables from our customers who are experiencing these financial difficulties. If these developments occur, our inability to shift sales to other customers or to collect on VF's trade accounts receivable could have a material adverse effect on VF's financial condition and results of operations.

***VF's profitability may decline as a result of increasing pressure on margins.***

The apparel industry is subject to significant pricing pressure caused by many factors, including intense competition, consolidation in the retail industry, rising commodity and conversion costs, inflation, rising freight costs, rising labor costs, pressure from retailers to reduce the costs of products, changes in consumer demand and shifts to online shopping and purchasing. Customers may increasingly seek markdown allowances, incentives and other forms of economic support. If these factors cause us to reduce our sales prices to retailers and consumers, and we fail to sufficiently reduce our product costs or operating expenses, VF's profitability will decline. This could have a material adverse effect on VF's results of operations, liquidity and financial condition.

## BUSINESS AND OPERATIONAL RISKS

***VF's business and the success of its products could be harmed if VF is unable to maintain the images of its brands.***

VF's success to date has been due in large part to the growth of its brands' images and VF's consumers' connection to its brands. If we are unable to timely and appropriately respond to changing consumer demand, the names and images of our brands may be impaired. Even if we react appropriately to changes in consumer preferences, consumers may consider our brands' images to be outdated or associate our brands with styles that are no longer popular. In addition, brand value is based in part on consumer perceptions on a variety of qualities, including merchandise quality, corporate integrity, and environmental, social and governance ("ESG") practices, including with respect to human rights, diversity, equity and inclusion, and our impact on the environment. Negative claims or publicity regarding VF, its brands or its products, including licensed products, or its culture and values, or its employees, endorsers, sponsors or suppliers could adversely affect our reputation and sales regardless of whether such claims are accurate. The rapidly changing media environment, including our increasing reliance on social media and online marketing, which accelerates the dissemination of information, can increase the challenges of responding to negative claims. In addition, we have sponsorship contracts with a number of athletes, musicians and celebrities and feature those individuals in our advertising and marketing efforts. Failure to continue to obtain or maintain high-quality sponsorships and endorsers could harm our business. In addition, actions taken by those individuals associated with our products could harm their reputations, which could adversely affect the images of our brands. Our reputation and brand image also could be damaged as a result of our support of, association with or lack of support or disapproval of certain political or social issues or catastrophic events, as well as any decisions we make to continue to conduct, or change, certain of our activities in response to such considerations.

***VF's revenues and cash requirements are affected by the seasonal nature of its business.***

VF's business is seasonal, with a higher proportion of revenues and operating cash flows generated during the second half of the calendar year, which includes the fall and holiday selling seasons. Poor sales in the second half of the calendar year would have a material adverse effect on VF's full year operating results and cause higher inventories. In addition, fluctuations in sales and operating income in any fiscal quarter are affected by the timing of seasonal wholesale shipments and other events affecting retail sales.

***We may be adversely affected by weather conditions, including any potential effects from climate change.***

Our business is adversely affected by unseasonable weather conditions, including those resulting from climate change. A significant portion of the sales of our products is dependent in part on the weather and is likely to decline in years in which weather conditions do not favor the use of these products. For example, periods of unseasonably warm weather in the fall or winter can lead to reduced consumer spending that negatively impacts VF's direct-to-consumer business, and inventory accumulation by our wholesale customers, which can, in turn, negatively affect orders in future seasons. In addition, abnormally harsh or inclement weather can also negatively impact retail traffic and consumer spending. As the effects of climate change increase, we expect the frequency and impact of weather and climate related events and conditions to increase as well. Any and all of these risks may have a material adverse effect on our financial condition, results of operations or cash flows.

***VF may not succeed in its business strategy.***

One of VF's key strategic objectives is growth. Currently, we are prioritizing growth through organic means and, to a lesser extent, through acquisitions. We seek to grow by building our lifestyle brands, expanding our share with winning customers, stretching VF's brands to new regions, leveraging our supply chain and information technology capabilities across VF and expanding our direct-to-consumer business, including opening new stores, remodeling and expanding our existing stores and growing our e-commerce business. However, we may not be able to grow our business. For example:

- We may not be able to find and amplify consumer tailwinds by innovating within our existing brand portfolio while also strategically expanding into adjacencies that complement our current brands and tap into consumer growth spaces.

- We may not be able to transform our model to be more digitally focused.

- We may not be able to expand our market share with winning customers, or our wholesale customers may encounter financial difficulties and thus reduce their purchases of VF products.

- We may not be able to successfully meet evolving consumer needs to unlock growth opportunities for our brands or expand in other geographies, including in Asia.

- We may not be able to effectively deploy resources and allocate capital towards investments in new and organic businesses and capabilities in order to drive strategic objectives.

- We may not be able to achieve the expected results from our supply chain initiatives and establish and maintain effective supply chain systems, data, and capabilities, infrastructure, and the sourcing strategy necessary to optimally meet current and future business needs, including direct-to-consumer needs.

- We may have difficulty recruiting, developing or retaining qualified employees.

- We may not be able to achieve our direct-to-consumer expansion goals, including in e-commerce or other new channels, manage our growth effectively, successfully integrate the planned new stores into our operations, operate our new, remodeled and expanded stores profitably, adapt our business model or develop relationships with consumers for e-commerce or other new channels.

- We may not be able to offset rising commodity or conversion costs in our product costs with pricing actions or efficiency improvements.

- We may have difficulty completing acquisitions or dispositions to reshape our portfolio, and we may not be able to successfully integrate a newly acquired business or achieve the expected growth, cost savings or synergies from such integration, or it may disrupt our current business.

Failure to implement our strategic objectives may have a material adverse effect on VF's business.

Further, organizational effectiveness, agility and execution are important to VF's success. Failure to create an agile and efficient operating model and organizational structure or to effectively define, prioritize, and align on clear achievable and appropriately resourced strategic priorities could result in an inability to remain competitive in a rapidly changing marketplace and lead to increase in costs, inefficient resource allocation, reduced productivity, organizational confusion, and reduced employee morale.

Our supply chain may be disrupted due to factors such as political instability, inflationary pressures, macroeconomic conditions, and other factors including reduced freight availability and increased costs, port disruption, distribution center closures, severe weather, natural disasters, military conflicts, or labor supply shortages or stoppages. Any significant disruption in our supply chain could impair our ability to procure or distribute our products, which would adversely affect our business and results of operations.

***VF relies significantly on information technology. Any inadequacy, interruption, integration failure or security failure of this technology could harm VF's ability to effectively operate its business.***

Our ability to effectively manage and operate our business depends significantly on information technology systems. We rely heavily on information technology to track sales and inventory and manage our supply chain. We are also dependent on information technology, including the Internet, for our direct-to-consumer sales, including our e-commerce operations and retail business credit card transaction authorization. Despite our preventative efforts, our systems and those of our third-party service providers may be vulnerable to damage, failure or interruption due to viruses, data security incidents, technical malfunctions, natural disasters or other causes, or in connection

with upgrades to our system or the implementation of new systems. The failure of these systems to operate effectively or remain innovative, problems with transitioning to upgraded or replacement systems, difficulty in integrating new systems or systems of acquired businesses or a breach in security of these systems could adversely impact the operations of VF's business, including our reputation, management of inventory, ordering and replenishment of products, sourcing and distribution of products, e-commerce operations, retail business credit card transaction authorization and processing, corporate email communications and our interaction with the public on social media. Moreover, failure to provide effective digital (including omni-channel) capabilities and information technology infrastructure could result in an inability to meet current and future business needs and a resulting loss of brand competitiveness, leading to loss of revenue and market share and decreased business agility.

***VF is subject to data and information security and privacy risks that could negatively affect its business operations, results of operations or reputation.***

In the normal course of business, we often collect, retain and transmit certain sensitive and confidential consumer information, including credit card information and employee information, over public networks. There is a significant concern by consumers and employees over the security of personal information collected, retained or transmitted over the Internet, identity theft and user privacy. Data and information security breaches are increasingly sophisticated, and can be difficult to detect for long periods of time. Accordingly, if unauthorized parties gain access to our networks or databases, or those of our third-party service providers, they may be able to steal, publish, delete, hold ransom or modify our private and sensitive information, including credit card information, personal information, and confidential or other proprietary business information. We have implemented systems and processes designed to protect against unauthorized access to or use of personal information and other confidential information, and rely on encryption and authentication technology to effectively secure transmission of such information, including credit card information. Despite these security measures, there is no guarantee that they will prevent all unauthorized access to our systems and information, and our facilities and systems and those of our third-party service providers may be vulnerable and unable to anticipate or detect security breaches and data loss.

In addition, we face amplified data security risks as a result of more employees working remotely, including increased demand on our information technology resources and systems, increased phishing and other cybersecurity attacks, and an increase in the number of points of potential attack, such as laptops and mobile devices. Employees may intentionally or inadvertently cause data security breaches that result in the unauthorized release of personal or confidential information. VF and its consumers could suffer harm if valuable business data, or employee, consumer and other confidential and proprietary information were corrupted, lost or accessed or misappropriated by third parties due to a security failure in VF's systems or due to one of our third-party service providers or our employees. It could require significant expenditures to remediate any such failure or breach, severely damage our reputation, confidence in our e-commerce platforms and our relationships with consumers and employees, result in business disruption, unwanted and negative media attention and lost sales, and expose us to risks of litigation, liability and increased scrutiny from regulatory entities. In

addition, as a result of recent security breaches at a number of prominent retailers, the media and public scrutiny of information security and privacy has become more intense and the regulatory environment has become increasingly uncertain, rigorous and complex. As a result, we may incur significant costs to comply with laws regarding the privacy and security of personal information and we may not be able to comply with new data protection laws and regulations being adopted around the world. Any failure to comply with the laws and regulations and consumer expectations surrounding the privacy and security of personal information could subject us to legal and reputational risk, including significant fines and/or litigation for non-compliance in multiple jurisdictions, negative media coverage, diminished consumer confidence and decreased attraction to our brands, any of which could have a negative impact on revenues and profits. In addition, while we maintain cyber insurance policies, those existing insurance policies may not adequately protect VF from all of the adverse effects and damages that could be caused by a security breach. Moreover, if our associates or vendors, intentionally or inadvertently, misuse consumer data or are not transparent with consumers about how we use their data, our brands, reputation and relationships with consumers could be damaged.

***There are risks associated with VF's acquisitions and portfolio management.***

Any acquisitions or mergers by VF will be accompanied by the risks commonly encountered in acquisitions of companies. These risks include, among other things, higher than anticipated acquisition costs and expenses, the difficulty and expense of integrating the operations, systems and personnel of the companies, the loss of key employees and consumers as a result of changes in management, and slower progress toward ESG goals given challenges with data acquisition and integration, and integration of ESG initiatives overall. In addition, geographic distances may make integration of acquired businesses more difficult. We may not be successful in overcoming these risks or any other problems encountered in connection with any acquisitions. Moreover, failure to effectively manage VF's portfolio of brands in line with growth targets and shareholder expectations, including acquisition choices, integration approach and divestiture timing could result in unfavorable impacts to growth and value creation.

Our acquisitions may cause large one-time expenses or create goodwill or other intangible assets that could result in significant impairment charges, such as the recent impairment charges related to the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset. We also make certain estimates and assumptions in order to determine purchase price allocation and estimate the fair value of assets acquired and liabilities assumed. If our estimates or assumptions used to value these assets and liabilities are not accurate, we may be exposed to losses that may be material.

The *Supreme*® brand employs a different business model than the rest of our brands and is subject to unique risks because of its focus on frequent, weekly and limited product drops through the direct-to-consumer channel. The Supreme business model has different characteristics from the business models which VF and its brands have historically employed. These different characteristics may include product volume requirements, product seasonality, product design and production rates, and consumer concentrations and demand. VF's failure to make the necessary adaptations to its operations to address these

different characteristics, complexities and market dynamics could adversely affect VF's revenue, business condition and results of operations.

***VF uses third-party suppliers and manufacturing facilities worldwide for its raw materials and finished products, which poses risks to VF's business operations.***

During Fiscal 2023, VF's products were sourced from independent manufacturers primarily located in Asia. Any of the following could impact our ability to source or deliver VF products, or our cost of sourcing or delivering products and, as a result, our profitability:

- political or labor instability in countries where VF's contractors and suppliers are located;

- inflationary pressures or changes in local economic conditions in countries where VF's contractors and suppliers are located;

- public health issues, such as the COVID-19 pandemic, have resulted in (or could continue to result in) closed factories, reduced workforces, scarcity of raw materials and scrutiny or embargoing of goods produced in infected areas;

- political or military conflict could cause a delay in the transportation of products to VF and an increase in transportation costs;

- disruption at ports of entry, could cause delays in product availability and increase transportation times and costs;

- heightened terrorism security concerns could subject imported or exported goods to additional, more frequent or lengthier inspections, leading to delays in deliveries or impoundment of goods for extended periods;

- increased risk of detention by customs officials of raw materials or goods used by our suppliers in the manufacture of certain of our products, and increased risk of detention of our products;

- decreased scrutiny by customs officials for counterfeit goods, leading to more counterfeit goods and reduced sales of VF products, increased costs for VF's anti-counterfeiting measures and damage to the reputation of its brands;

- disruptions at manufacturing or distribution facilities or in shipping and transportation locations caused by natural and man-made disasters;

- imposition of regulations and quotas relating to imports and our ability to adjust timely to changes in trade regulations could limit our ability to source products in cost-effective countries that have the required labor and expertise;

- imposition of duties, taxes and other charges on imports; and

- imposition or the repeal of laws that affect intellectual property rights.

Although no single supplier and no one country is critical to VF's production needs, if we were to lose a supplier it could result in interruption of finished goods shipments to VF, cancellation of orders by customers and termination of relationships. This, along with the damage to our reputation, could have a material

adverse effect on VF's revenues and, consequently, our results of operations.

In addition, although we audit our third-party material suppliers and contracted manufacturing facilities and set strict compliance standards, actions by a third-party supplier or manufacturer that fail to comply could result in such third-party supplier failing to manufacture products that consistently meet our quality standards or engaging in unfavorable labor practices or providing unfavorable working conditions that negatively impact worker health, safety and wellness. Such noncompliance could expose VF to claims for damages, financial penalties and reputational harm, any of which could have a material adverse effect in our business and operations.

*A significant portion of VF's revenues and gross profit is derived from a small number of large customers. The loss of any of these customers or the inability of any of these customers to pay VF could substantially reduce VF's revenues and profits.*

A few of VF's customers account for a significant portion of revenues. Sales to VF's ten largest customers were approximately 15% of total revenues in Fiscal 2023, with our largest customer accounting for approximately 2% of revenues. Sales to our customers are generally on a purchase order basis and not subject to long-term agreements. A decision by any of VF's major customers to significantly decrease the volume of products purchased from VF could substantially reduce revenues and have a material adverse effect on VF's financial condition and results of operations.

*Talent acquisition, management, engagement and retention are important factors in VF's success. Turnover in VF's leadership or other key positions may have a material adverse effect on VF.*

Our future success also depends on our ability to acquire, develop, and retain talent needed to mobilize VF against our current and future needs, and sustain our culture as a performance-driven company that is committed to its purpose. Competition for experienced, well-qualified and diverse personnel is intense and we may not be successful in attracting, developing, and retaining such personnel, which could impact VF's ability to remain competitive. Our ability to acquire, develop and retain personnel has been, and may continue to be impacted by, challenges and structural shifts in the labor market, which has experienced and may continue to experience wage inflation, labor shortages, increased employee turnover, changes in availability of the workforce and a shift toward remote work. Additionally, changes to our office environments, the adoption of new work models, and our requirements and/or expectations about when or how often certain employees work on-site or remotely may not meet the expectations of our employees. As businesses increasingly operate remotely, traditional geographic competition for talent may change in ways that we cannot presently predict. If our employment proposition is not perceived as favorable compared to other companies, it could negatively impact our ability to acquire and retain our employees. If we are unable to retain, acquire, and engage talented employees with the appropriate skill sets, or if changes to our organizational structure, operating results, or business model adversely affect morale or retention, we may not achieve our objectives, our relationships with our customers, consumers or other third parties may be disrupted, and our results of operations could be adversely impacted.

VF depends on the services and management experience of its executive officers and business leaders who have substantial experience and expertise in VF's business, and in developing and retaining employees. This loss of experience and expertise can be mitigated through successful hiring and transition, but there can be no assurance that we will be successful in such efforts. Acquiring and retaining qualified senior leadership may be more challenging under adverse business conditions. The unexpected loss of services of one or more of these individuals or the inability to effectively identify a suitable successor to a key role could have a material adverse effect on VF.

On December 2, 2022, VF's Board of Directors appointed Benno Dorer, a member of the Board, as Interim President and Chief Executive Officer, effective immediately following the retirement of Steve Rendle, VF's then President and Chief Executive Officer. VF's Board has retained a search firm to assist in identifying a permanent President and Chief Executive Officer. This recent change in our executive leadership team, along with other changes in the roles and responsibilities among our executive officers, and any future changes resulting from the hiring or departure of executive officers, could disrupt our business and negatively affect our ability to recruit and retain talent. Such leadership transitions can be inherently difficult to manage, and an inadequate transition may cause disruption to our business, including to our relationships with our associates and other third parties. Further, this change also increases our dependency on other members of our executive leadership team who remain with us, and the departure of any remaining executive officer could be particularly disruptive in light of the recent leadership transitions.

*VF's direct-to-consumer business includes risks that could have an adverse effect on its results of operations.*

VF sells merchandise direct to consumer through VF-operated stores and e-commerce sites. Its direct-to-consumer business is subject to numerous risks that could have a material adverse effect on its results. Risks include, but are not limited to, (i) U.S. or international resellers purchasing merchandise and reselling it overseas outside VF's control, (ii) failure or interruption of the systems that operate the stores and websites, and their related support systems, including due to computer viruses, theft of customer information, privacy concerns, telecommunication failures, electronic break-ins and similar disruptions, technical malfunctions, and natural disasters or other causes (iii) credit card fraud, (iv) risks related to VF's direct-to-consumer distribution centers and processes, and (v) shift in consumer preferences away from retail stores. Risks specific to VF's e-commerce business also include (i) diversion of sales from VF stores or wholesale customers, (ii) difficulty in recreating the in-store experience through direct channels, (iii) liability for online content, (iv) changing patterns of consumer behavior, and (v) intense competition from online retailers. VF's failure to successfully respond to these risks might adversely affect sales in its e-commerce business, as well as damage its reputation and brands.

Our VF-operated stores and e-commerce business require substantial fixed investments in equipment and leasehold improvements, information systems, inventory and personnel. We have entered into substantial operating lease commitments for retail space. Due to the high fixed-cost structure associated with our direct-to-consumer operations, a decline in sales or the closure of or poor performance of individual or multiple stores could result in significant lease termination costs, write-offs of

equipment and leasehold improvements and employee-related costs.

***VF's net sales depend on the volume of traffic to its stores and the availability of suitable lease space.***

A significant portion of our revenues are direct-to-consumer sales through VF-operated stores. In order to generate consumer traffic, we locate many of our stores in prominent locations within successful retail shopping centers or in fashionable shopping districts. Our stores benefit from the ability of the retail center and other attractions in an area to generate consumer traffic in the vicinity of our stores. Part of our future growth is significantly dependent on our ability to operate stores in desirable locations with capital investment and lease costs providing the opportunity to earn a reasonable return. We cannot control the development of new shopping centers or districts; the availability or cost of appropriate locations within existing or new shopping centers or districts; competition with other retailers for prominent locations; or the success of individual shopping centers or districts. Further, if we are unable to renew or replace our existing store leases or enter into leases for new stores on favorable terms, or if we violate the terms of our current leases, our growth and profitability could be harmed. All of these factors may impact our ability to meet our growth targets and could have a material adverse effect on our financial condition or results of operations.

***VF may be unable to protect its trademarks and other intellectual property rights.***

VF's trademarks and other intellectual property rights are important to its success and its competitive position. VF is susceptible to others copying its products and infringing its intellectual property rights, especially with the shift in product mix to higher priced brands and innovative new products in recent years. Some of VF's brands, such as *Vans*®, *The North Face*®, *Timberland*®, *Dickies*® and *Supreme*® enjoy significant worldwide consumer recognition, and the higher pricing of certain of the brands' products creates additional risk of counterfeiting and infringement.

VF's trademarks, trade names, patents, trade secrets and other intellectual property are important to VF's success. Counterfeiting of VF's products or infringement on its intellectual property rights could diminish the value of our brands and adversely affect VF's revenues. Actions we have taken to establish and protect VF's intellectual property rights may not be adequate to prevent copying of its products by others or to prevent others from seeking to invalidate its trademarks or block sales of VF's products as a violation of the trademarks and intellectual property rights of others. In addition, unilateral actions in the U.S. or other countries, including changes to or the repeal of laws recognizing trademark or other intellectual property rights, such as the Russian government's announcements that it would not protect intellectual property rights, including patent rights and rights that could block parallel imports of gray market goods, as a result of the sanctions imposed on Russia in connection with the Russia-Ukraine conflict, could have an impact on VF's ability to enforce those rights.

The value of VF's intellectual property could diminish if others assert rights in or ownership of trademarks and other intellectual property rights of VF, or trademarks that are similar to VF's trademarks, or trademarks that VF licenses from others.

We may be unable to successfully resolve these types of conflicts to our satisfaction. In some cases, there may be trademark owners who have prior rights to VF's trademarks because the laws of certain foreign countries may not protect intellectual property rights to the same extent as do the laws of the U.S. In other cases, there may be holders who have prior rights to similar trademarks.

There have been, and there may in the future be, opposition and cancellation proceedings from time to time with respect to some of VF's intellectual property rights. In some cases, litigation may be necessary to protect or enforce our trademarks and other intellectual property rights. Furthermore, third parties may assert intellectual property claims against us, and we may be subject to liability, required to enter into costly license agreements, if available at all, required to rebrand our products and/or prevented from selling some of our products if third parties successfully oppose or challenge our trademarks or successfully claim that we infringe, misappropriate or otherwise violate their trademarks, copyrights, patents or other intellectual property rights. Bringing or defending any such claim, regardless of merit, and whether successful or unsuccessful, could be expensive and time-consuming and have a negative effect on VF's business, reputation, results of operations and financial condition.

***If VF encounters problems with its distribution system, VF's ability to deliver its products to the market could be adversely affected.***

VF relies on owned or leased VF-operated and third party-operated distribution facilities to warehouse and ship product to VF customers. VF's distribution system includes computer-controlled and automated equipment, which may be subject to a number of risks related to security or computer viruses, the proper operation of software and hardware, power interruptions or other system failures. Because substantially all of VF's products are distributed from a relatively small number of locations, VF's operations could also be interrupted by earthquakes, floods, fires or other natural disasters or other events outside VF's control affecting its distribution centers, including political or labor instability. We maintain business interruption insurance under our property and cyber insurance policies, but it may not adequately protect VF from the adverse effects that could be caused by significant disruptions in VF's distribution facilities. In addition, VF's distribution capacity is dependent on the timely performance of services by third parties, including the transportation of product to and from its distribution facilities. If we encounter problems with our distribution system, our ability to meet customer expectations, manage inventory, complete sales and achieve operating efficiencies could be materially adversely affected.

***VF's business and operations could be materially and adversely affected if it fails to create systems of monitoring, prevention, response, crisis management, continuity and recovery to mitigate natural or man-made economic, public health, political or environmental disruptions.***

Business resiliency is important to VF's success because there are a variety of risks generally associated with doing business on a global basis that may involve natural or man-made economic, public health (including the COVID-19 pandemic), political or environmental disruptions. Disruptions, and government responses to any disruption, could cause, among other things, a decrease in consumer spending that would negatively impact our sales, delays in the fulfillment or cancellation of customer

orders or disruptions in the manufacture and shipment of products, increased costs and a negative impact on our reputation and long-term growth plans. The impact of disruptions may vary based on the length and severity of the disruption. VF's failure to create and implement systems of

monitoring, prevention, response, crisis management, continuity and recovery to anticipate, prepare, prevent, mitigate, and respond to potential threats impacting its business, people, processes and facilities could result in extended disruptions and unpredictability.

## LEGAL, REGULATORY AND COMPLIANCE RISKS

***VF's operations and earnings may be affected by legal, regulatory, political and economic uncertainty and risks.***

Our ability to maintain the current level of operations in our existing markets and to capitalize on growth in existing and new markets is subject to legal, regulatory, political and economic uncertainty and risks. These include the burdens of complying with U.S. and international laws and regulations, and changes in regulatory requirements.

Changes in regulatory, geopolitical policies and other factors may adversely affect VF's business or may require us to modify our current business practices. While enactment of any such change is not certain, if such changes were adopted or if we failed to anticipate and mitigate the impact of such changes, our costs could increase, which would reduce our earnings. For example, on January 31, 2020, the United Kingdom ceased to be a member state of the European Union (commonly referred to as "Brexit"). The United Kingdom and the European Union subsequently reached a provisional post-Brexit Trade and Cooperation Agreement that contains new rules governing the relationship between the United Kingdom and Europe, including with respect to trade, travel and immigration. Brexit could adversely affect European and worldwide economic and market conditions and could contribute to instability in global financial and foreign exchange markets. Any of these effects of Brexit, and others we cannot anticipate could adversely affect our business, results of operations and financial condition.

Beginning in February 2022, in response to the military conflict between Russia and Ukraine, the U.S. and other North Atlantic Treaty Organization member states, as well as non-member states, announced targeted economic sanctions on Russia, including certain Russian citizens and enterprises, and the continuation of the conflict may trigger additional economic and other sanctions. To date, we have experienced revenue impacts due to business model changes in Russia, currency devaluation, and costs associated with compliance with sanctions and other regulations. For example, we have closed all VF-operated retail stores, terminated all leases and ceased all direct-to-consumer e-commerce operations in Russia. In addition, as of April 1, 2023, there was approximately $36.5 million of cash in Russia that, although it can be used without limits within Russia, is currently limited on movement out of Russia. Further impacts of the conflict could include macro financial impacts resulting from the exclusion of Russian financial institutions from the global banking system, volatility in foreign exchange rates and interest rates, inflationary pressures on raw materials and energy, heightened cybersecurity threats, harm to employee health and safety, reputational harm, increase in counterfeiting and intellectual property activity, nationalization of our assets, and additional costs associated with compliance with sanctions and other regulations and risks associated with failure to comply with the same. Although our operations in Russia are not significant, the conflict could escalate and result in broader economic and security concerns, including in other geographies, which could in turn adversely affect our business, financial condition or results of operations.

As a result of our global operations, we are subject to a number of risks impacting our employees working outside the U.S., including regulations that may differ from or be more stringent than analogous U.S. regulations, political or economic instability, cross-border political tensions and challenges in effectively managing employees in foreign jurisdictions. VF is subject to increased tax and regulatory risks related to employees working remotely or otherwise in a tax location other than their normal work location or residential state or country. These changes have created, and continue to create, challenges in managing our tax and regulatory compliance as well as acquiring and retaining cross-border talent, which could adversely affect our business, results of operations and financial condition.

***Changes to U.S. or international trade policy, tariff and import/export regulations or our failure to comply with such regulations may have a material adverse effect on our reputation, business, financial condition and results of operations.***

Changes in U.S. or international social, political, regulatory and economic conditions or in laws and policies governing foreign trade, manufacturing, development and investment in the territories or countries where we currently sell our products or conduct our business, as well as any negative sentiment toward the U.S. as a result of such changes, could adversely affect our business. For example, the U.S. government has instituted changes in trade policies imposing higher tariffs on imports into the U.S. from China. Tariffs and other changes in U.S. trade policy have in the past and could continue to trigger retaliatory actions by affected countries, and certain foreign governments have instituted, considered or are considering imposing retaliatory measures on certain U.S. goods. VF, similar to many other multinational corporations, does a significant amount of business that would be impacted by changes to the trade policies of the U.S. and foreign countries (including governmental action related to tariffs, international trade agreements, or economic sanctions). Such changes have the potential to adversely impact the U.S. economy or certain sectors thereof, our industry and the global demand for our products, and as a result, could have a material adverse effect on our business, financial condition and results of operations. In addition, the Uyghur Forced Labor Prevention Act and other similar laws may lead to greater supply chain compliance costs and delays to us and to our suppliers and customers.

***Changes in tax laws could increase our worldwide tax rate and tax liabilities and materially affect our financial position and results of operations.***

We are subject to taxation in the U.S. and numerous foreign jurisdictions. On December 22, 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act, which included a broad range of tax reform proposals affecting businesses, including a reduction in the U.S. federal corporate tax rate from 35% to 21%, a one-time mandatory deemed repatriation tax on earnings of certain foreign subsidiaries that were previously tax-deferred, and a

new minimum tax on certain foreign earnings. Taxes related to the one-time mandatory deemed repatriation of foreign earnings due over a period of time could be accelerated upon certain triggering events, including failure to pay such taxes when due. In addition, the current U.S. Presidential Administration could take further action, including through its proposal of a higher U.S. federal corporate tax rate and increased taxation of offshore income. Such action could have a material effect on our financial position and results of operations.

In addition, many countries in the European Union ("EU") and around the globe have adopted and/or proposed changes to current tax laws. Further, organizations such as the Organisation for Economic Co-operation and Development ("OECD") have published action plans that, if adopted by countries where we do business, could increase our tax obligations and compliance costs in these countries. More specifically, the OECD has released rules to address tax challenges arising from the digitalization of the economy (i.e., Global Anti Base Erosion ("GloBE") model rules or "Pillar Two"). Member countries are expected to implement these rules into local law in the coming year. The new rules could be effective for companies as early as tax years beginning on or after January 1, 2024. The ultimate outcome of these rules that are enacted into law in each country may result in a material financial impact to VF.

Due to the large scale of our U.S. and international business activities, many of these enacted and proposed changes to the taxation of our activities could increase our worldwide effective tax rate and harm our financial position and results of operations.

***We may have additional tax liabilities from new or evolving government or judicial interpretation of existing tax laws.***

As a global company, we determine our income tax liability in various tax jurisdictions based on an analysis and interpretation of U.S. and international tax laws and regulations. This analysis requires a significant amount of judgment and estimation and is often based on various assumptions about the future actions of tax authorities. These determinations are the subject of periodic U.S. and international tax audits and court proceedings. In particular, tax authorities and the courts have increased their focus on income earned in no- or low-tax jurisdictions or income that is not taxed in any jurisdiction. Tax authorities have also become skeptical of special tax rulings provided to companies offering lower taxes than may be applicable in other countries.

For example, VF was granted a ruling which lowered the effective income tax rate on taxable earnings for years 2010 through 2014 under Belgium's excess profit tax regime. During 2015, the EU investigated and announced its decision that the ruling was illegal and/or ordered that tax benefits granted under the ruling should be collected from the affected companies, including VF Europe, BVBA, a subsidiary of VF. Requests for annulment were filed by Belgium and VF Europe BVBA, individually. During 2017 and 2018, VF Europe BVBA was assessed and paid €35.0 million in tax and interest, which was recorded as an income tax receivable based on the expected success of the requests for annulment. During 2019, the General Court annulled the EU decision and the EU subsequently appealed the General Court's annulment. In September 2021, the General Court's judgment was set aside by the Court of Justice of the EU and the case was sent back to the General Court to determine whether the excess profit tax regime

amounted to illegal State aid. The case remains open and unresolved. If this matter is adversely resolved, the tax and interest amounts paid by VF will not be collected by VF.

Also, as previously reported, VF petitioned the U.S. Tax Court (the "Court") to resolve an Internal Revenue Service ("IRS") dispute regarding the timing of income inclusion associated with VF's acquisition of The Timberland Company in September 2011. While the IRS argues that all such income should have been immediately included in 2011, VF has reported periodic income inclusions in subsequent tax years. Both parties moved for summary judgment on the issue, and on January 31, 2022, the Court issued its opinion in favor of the IRS and on July 14, 2022 issued its final decision. VF believes the opinion of the Court was in error based on the technical merits and filed a notice of appeal on October 7, 2022. On October 19, 2022, VF paid $875.7 million related to the 2011 taxes and interest being disputed, which was recorded as a tax receivable based on the technical merits of our position with regards to the case and will accrue interest income. VF continues to believe its timing and treatment of the income inclusion is appropriate and VF is vigorously defending its position. However, should the Court opinion ultimately be upheld on appeal, this income tax receivable will not be collected by VF. If the Court opinion is upheld, VF should be entitled to a refund of taxes paid on the periodic inclusions that VF has reported. However, any such refund could be substantially reduced by potential indirect tax effects resulting from application of the Court opinion. Deferred tax liabilities, representing VF's future tax on annual inclusions, would also be released. The net impact to tax expense is estimated to be up to $730.0 million, plus the reversal of any interest income accrued on the payment, which was approximately $12.0 million at March 2023.

Although we accrue for uncertain tax positions, our accrual may be insufficient to satisfy unfavorable findings. Unfavorable audit findings, or court interpretations (involving VF or other companies with similar tax profiles) may result in payment of taxes, fines and penalties for prior periods and higher tax rates in future periods, which may have a material adverse effect on our financial condition, results of operations or cash flows.

***Our business is subject to national, state and local laws and regulations for environmental, consumer protection, corporate governance, competition, employment, privacy, safety and other matters. The costs of compliance with, or the violation of, such laws and regulations by VF or by independent suppliers who manufacture products for VF could have an adverse effect on our operations and cash flows, as well as on our reputation.***

Our business is subject to comprehensive national, state and local laws and regulations on a wide range of environmental, climate change, consumer protection, social, employment, privacy, safety and other matters. VF could be adversely affected by costs of compliance with or violations of those laws and regulations. In addition, while we do not control their business practices, we require third-party suppliers to operate in compliance with applicable laws, rules and regulations regarding working conditions, safety, employment practices and environmental compliance. The costs of products purchased by VF from independent contractors could increase due to the costs of compliance by those contractors.

Failure by VF or its third-party suppliers to comply with such laws and regulations, as well as with ethical, social, product, safety, labor and environmental standards, or related political

considerations, could result in a material adverse effect on our financial condition, results of operations or cash flows, including resulting in interruption of finished goods shipments to VF, extensive remediation efforts, cancellation of orders by customers and termination of relationships. If VF or one of our independent contractors violates labor or other laws, implements improper labor or other business practices or takes other actions that are generally regarded as unethical, it could result in unwanted or negative media attention, jeopardize our reputation and potentially lead to various adverse consumer actions, including boycotts that may reduce demand for VF's merchandise. Damage to VF's reputation or loss of consumer confidence for any of these or other reasons could have a material adverse effect on VF's results of operations, financial condition and cash flows, as well as require additional resources to rebuild VF's reputation.

Our operations are also subject to compliance with the U.S. Foreign Corrupt Practices Act (the "FCPA") and other anti-bribery laws applicable to our operations. Although we have policies and procedures to address compliance with the FCPA and similar laws, there can be no assurance that all of our employees, agents and other partners will not take actions in violation of our policies. Any such violation could subject us to sanctions or other penalties that could negatively affect our reputation, business and operating results.

***Climate change and increased focus by governmental and non-governmental organizations, customers, consumers and investors on sustainability issues, including those related to climate change and socially responsible activities, may adversely affect our business and financial results and damage our reputation.***

Climate change is occurring around the world and may impact our business in numerous ways. Failure to monitor, adapt, build resilience, and develop solutions against the physical and transitional impacts from climate change may lead to revenue loss, market share loss, business interruptions, physical damage to our facilities, and rising costs. Climate change could lead to increased volatility due to physical impacts of climate change on the supply chain, including the availability, quality and cost of raw materials. Increased frequency and severity of extreme weather events (such as storms and floods) could cause increased incidence of disruption to the production and distribution of our products, increased costs for our business, including maintenance, repair, utilities and insurance costs, and an adverse impact on consumer demand and spending.

Investor advocacy groups, certain institutional investors, investment funds, other market participants, shareholders, and other stakeholders, including non-governmental organizations, employees, and consumers, have focused increasingly on ESG and related sustainability practices of companies. These parties have placed increased importance on the implications of the social cost of their investments and/or have higher expectations

of corporate conduct. If our ESG practices do not meet investor or other stakeholder expectations and standards, including related to climate change, sustainability, social impact, and human rights, and do not meet related regulations and expectations for increased transparency, which continue to evolve, our brands, reputation and employee retention may be negatively impacted. In addition, governmental and self-regulatory organizations, including the SEC and NYSE, promulgate rapidly changing rules and regulations addressing ESG topics. These rules and regulations continue to evolve in scope and complexity and have resulted in, and are likely to continue to result in, increased expenses and increased management time and attention spent complying with or meeting such rules and regulations. For example, collection of ESG data, developing and acting on initiatives within the scope of ESG, and collecting, measuring and reporting ESG related information and targets can be costly, difficult and time consuming and is subject to evolving reporting standards, including the SEC's recently proposed climate-related disclosure requirements, and similar proposals and laws by other international regulatory bodies. If our ESG related data, information, processes or reporting are incomplete or inaccurate, our reputation, business, financial performance and growth could be adversely affected. For example, customer expectations with respect to our ability to meet rapidly evolving ESG reporting standards in the EU member states and other countries may impact our ability to do business with customers, or otherwise present barriers to entry, which could result in an adverse impact on our business, financial performance and growth.

It is possible that stakeholders may oppose our ESG practices or disagree with them. It is also possible that stakeholders may not be satisfied with our ESG practices or the speed of their adoption. While we may announce voluntary ESG targets, we may not be able to meet such targets in the manner or on such a timeline as initially contemplated, including, but not limited to as a result of unforeseen costs or technical difficulties associated with achieving such results. Achieving ESG targets will require significant efforts from us and other stakeholders, such as our suppliers and other third parties, and also require capital investment, additional costs, and the development of technology that may not currently exist. In addition, we could be criticized for the scope or nature of such targets, or for any revision to those targets. We could also incur additional costs and require additional resources to monitor, report, and comply with various ESG practices and regulations. Also, our failure, or perceived failure, to manage reputational threats and meet stakeholder expectations or shifting consumer preferences with respect to environmentally or socially responsible activities and products and packaging and sustainability commitments and regulations could negatively impact our brand, image, reputation, credibility, employee retention, and the willingness of our customers and suppliers to do business with us.

## FINANCIAL RISKS

*VF's balance sheet includes a significant amount of intangible assets and goodwill. A decline in the fair value of an intangible asset or of a business unit could result in an asset impairment charge, such as the recent impairment charges related to the Supreme® reporting unit goodwill and indefinite-lived trademark intangible asset.*

VF's policy is to evaluate indefinite-lived intangible assets and goodwill for possible impairment as of the beginning of the fourth quarter of each year, or whenever events or changes in circumstances indicate that the fair value of such assets may be below their carrying amount. In addition, intangible assets that are being amortized are tested for impairment whenever events or circumstances indicate that their carrying value may not be recoverable. For these impairment tests, we use various valuation methods to estimate the fair value of our business units and intangible assets. If the fair value of an asset is less than its carrying value, we would recognize an impairment charge for the difference.

During the second quarter of Fiscal 2023, due to continued increases in the federal funds rate and strengthening of the U.S. dollar relative to other currencies, VF determined that a triggering event had occurred requiring impairment testing of the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset. As a result of the impairment testing performed, VF recorded impairment charges of $229.0 million and $192.9 million to the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset, respectively. The impairment primarily related to an increase in the market-based discount rates used in the valuations and the negative impact of foreign currency exchange rate changes on financial projections.

During the fourth quarter of Fiscal 2023, in connection with its annual impairment testing, VF performed a quantitative analysis of the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset. As a result of the impairment testing performed, VF recorded impairment charges of $165.1 million and $148.0 million to the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset, respectively. The impairment related to lower financial projections and increased risk of achieving management's forecasts.

It is possible that we could have another impairment charge for goodwill or trademark and trade name intangible assets in future periods if (i) the businesses do not perform as projected, (ii) overall economic conditions in Fiscal 2024 or future years vary from our current assumptions (including changes in discount rates and foreign currency exchange rates), (iii) business conditions or our strategies for a specific business unit change from our current assumptions, (iv) investors require higher rates of return on equity investments in the marketplace, or (v) enterprise values of comparable publicly traded companies, or of actual sales transactions of comparable companies, were to decline, resulting in lower comparable multiples of revenues and earnings before interest, taxes, depreciation and amortization and, accordingly, lower implied values of goodwill and intangible assets. Any future impairment charge for goodwill or intangible assets could have a material effect on our consolidated financial position or results of operations.

*Fluctuations in wage rates and the price, availability and quality of raw materials and finished goods could increase costs.*

Fluctuations in the price, availability and quality of purchased finished goods or the fabrics, leather, cotton or other raw materials used therein could have a material adverse effect on VF's cost of goods sold or its ability to meet its customers' demands. Prices of purchased finished products may depend on wage rate increases required by legal or industry standards in Asia and other geographic areas where our independent contractors are located, as well as increasing freight costs from those regions. Inflation, including as a result of inflationary pressures related to global supply chain disruptions, can also have a long-term impact on us because increasing costs of materials and labor may impact our ability to maintain satisfactory margins. For example, the cost and availability of the materials that are used in our products, such as oil-related commodity prices and other raw materials, such as cotton, dyes and chemical and other costs, such as fuel, energy and utility costs, can fluctuate significantly as a result of inflation in addition to many other factors, including general economic conditions and demand, crop yields, energy prices, weather patterns, water supply quality and availability, public health issues (such as the COVID-19 pandemic) and speculation in the commodities markets. A significant portion of our products also are manufactured in other countries and declines in the values of the U.S. dollar may result in higher manufacturing costs. In the future, VF may not be able to offset cost increases with other cost reductions or efficiencies or to pass higher costs on to its customers. This could have a material adverse effect on VF's results of operations, liquidity and financial condition.

*VF's business is exposed to the risks of foreign currency exchange rate fluctuations. VF's hedging strategies may not be effective in mitigating those risks.*

A growing percentage of VF's total revenues (approximately 48% in Fiscal 2023) is derived from markets outside the U.S. VF's international businesses operate in functional currencies other than the U.S. dollar. Changes in currency exchange rates affect the U.S. dollar value of the foreign currency-denominated amounts at which VF's international businesses purchase products, incur costs or sell products. In addition, for VF's U.S.-based businesses, the majority of products are sourced from independent contractors located in foreign countries. As a result, the costs of these products are affected by changes in the value of the relevant currencies. Furthermore, much of VF's licensing revenue is derived from sales in foreign currencies. Changes in foreign currency exchange rates could have an adverse impact on VF's financial condition, results of operations and cash flows.

In accordance with our operating practices, we hedge a significant portion of our foreign currency transaction exposures arising in the ordinary course of business to reduce risks in our cash flows and earnings. Our hedging strategy may not be effective in reducing all risks, and no hedging strategy can completely insulate VF from foreign exchange risk.

Further, our use of derivative financial instruments may expose VF to counterparty risks. Although VF only enters into hedging contracts with counterparties having investment grade credit ratings, it is possible that the credit quality of a counterparty could be downgraded or a counterparty could default on its

obligations, which could have a material adverse impact on VF's financial condition, results of operations and cash flows.

***Our ability to obtain financing on favorable terms, if needed, could be adversely affected by geopolitical risk and volatility in the capital markets, including interest rate risks.***

Any disruption in the capital markets could limit the availability of funds or the ability or willingness of financial institutions to extend capital in the future. Future volatility in the financial and credit markets, including adverse interest rates, could make it more difficult for us to obtain financing or refinance existing debt when the need arises, including upon maturity, or on terms that would be acceptable to us. This disruption or volatility could adversely affect our liquidity and funding resources or significantly increase our cost of capital. An inability to access capital and credit markets may have an adverse effect on our business, results of operations, financial condition and cash flows. In addition, if the U.S. government were to default on its debt obligations, the U.S. and global capital markets would be adversely affected and our liquidity and cost of capital would be adversely impacted.

***VF's indebtedness could have a material adverse effect on its business, financial condition and results of operations and prevent VF from fulfilling its financial obligations, and VF may not be able to maintain its current credit ratings, may not continue to pay dividends or repurchase its common stock and may not remain in compliance with existing debt covenants.***

As of April 1, 2023, VF had approximately $6.6 billion of debt outstanding. VF's debt and interest payment requirements have important consequences on its business, financial condition and results of operations. For example, it could:

- require VF to dedicate a substantial portion of its cash flow from operations to repaying its indebtedness, which would reduce the availability of its cash flow to fund working capital requirements, capital expenditures, future acquisitions, dividends, repurchase VF's common stock and for other general corporate purposes;

- limit VF's flexibility in planning for or reacting to general adverse economic conditions or changes in its business and the industries in which it operates;

- place VF at a competitive disadvantage compared to its competitors that have less indebtedness outstanding; and

- negatively affect VF's credit ratings and limit, along with the financial and other restrictive covenants in VF's debt documents and its ability to borrow additional funds.

VF's credit ratings may impact the cost and availability of future borrowings. As a result of recent downgrades by S&P Global Inc. and Moody's Investor Services, Inc., certain of VF's outstanding senior notes and VF's global credit facility were subject to interest rate adjustments. In addition, VF may incur substantial additional indebtedness in the future to fund acquisitions, repurchase common stock or fund other activities for general business purposes. If VF incurs additional indebtedness, it may limit VF's ability to access the debt capital markets or other forms of financing in the future and may result in increased borrowing costs.

Although VF has historically declared and paid quarterly cash dividends on its common stock and has been authorized to repurchase its stock subject to certain limitations under its

share repurchase programs, any determinations by the Board of Directors to continue to declare and pay cash dividends on VF's common stock or to repurchase VF's common stock will be based primarily upon VF's financial condition, results of operations and business requirements, its access to debt capital markets or other forms of financing, the price of its common stock in the case of the repurchase program and the Board of Directors' continuing determination that the repurchase programs and the declaration and payment of dividends are in the best interests of VF's shareholders and are in compliance with all laws and agreements applicable to the repurchase and dividend programs. Our cash dividend payments may change from time to time, and we cannot provide assurance that we will increase our cash dividend payment or declare cash dividends in any particular amount or at all. A reduction in the amount or suspension of our cash dividend payments or a reduction in the level or discontinuation of our share repurchases could have a negative effect on VF's stock price. Beginning in the fourth quarter of Fiscal 2023, we reduced the cash dividend, which is expected to support the return to VF's target leverage ratio and provide additional financial flexibility.

VF is required to comply with certain financial and other restrictive debt covenants in its debt documents. Failure by VF to comply with these covenants could result in an event of default that, if not cured or waived, could have a material adverse effect on VF if the lenders declare any outstanding obligations to be immediately due and payable.

***VF is subject to the risk that its licensees may not generate expected sales or maintain the value of VF's brands.***

During Fiscal 2023, $75.0 million of VF's revenues were derived from licensing royalties. Although VF generally has significant control over its licensees' products and advertising, we rely on our licensees for, among other things, operational and financial controls over their businesses. Failure of our licensees to successfully market licensed products or our inability to replace existing licensees, if necessary, could adversely affect VF's revenues, both directly from reduced royalties received and indirectly from reduced sales of our other products. Risks are also associated with a licensee's ability to:

- obtain capital;

- manage its labor relations;

- maintain relationships with its suppliers;

- manage its credit risk effectively;

- maintain relationships with its customers; and

- adhere to VF's Global Compliance Principles.

In addition, VF relies on its licensees to help preserve the value of its brands. Although we attempt to protect VF's brands through approval rights over design, production processes, quality, packaging, merchandising, distribution, advertising and promotion of our licensed products, we cannot completely control the use of licensed VF brands by our licensees. The misuse of a brand by a licensee, including through the marketing of products under one of our brand names that do not meet our quality standards, could have a material adverse effect on that brand and on VF.

***Volatility in securities markets, interest rates and other economic factors could substantially increase VF's defined benefit pension costs.***

VF currently has obligations under its defined benefit pension plans. The funded status of the pension plans is dependent on many factors, including returns on investment assets and the discount rates used to determine pension obligations. Unfavorable impacts from returns on plan assets, decreases in discount rates, changes in plan demographics or revisions in the applicable laws or regulations could materially change the timing and amount of pension funding requirements, which could reduce cash available for VF's business.

VF's operating performance also may be negatively impacted by the amount of expense recorded for its pension plans. Pension expense is calculated using actuarial valuations that incorporate assumptions and estimates about financial market, economic and demographic conditions. Differences between estimated and actual results give rise to gains and losses that are deferred and amortized as part of future pension expense, which can create volatility that adversely impacts VF's future operating results.

***The spin-off of Kontoor Brands, Inc. could result in substantial tax liability to us and our shareholders.***

We received opinions of tax advisors substantially to the effect that, for U.S. Federal income tax purposes, the May 22, 2019 spin-off of our Jeans business, Kontoor Brands, Inc. ("Kontoor Brands") and certain related transactions qualify for tax-free treatment under certain sections of the Internal Revenue Code.

However, if the factual assumptions or representations made by us in connection with the delivery of the opinions are inaccurate or incomplete in any material respect, including those relating to the past and future conduct of our business, we will not be able to rely on the opinions. Furthermore, the opinions are not binding on the IRS or the courts. If, notwithstanding receipt of the opinions, the spin-off transaction and certain related transactions are determined to be taxable, we would be subject to a substantial tax liability. In addition, if the spin-off transaction is taxable, each holder of our common stock who received shares of Kontoor Brands in connection with the spin-off would generally be treated as receiving a taxable distribution of property in an amount equal to the fair market value of the shares received.

Even if the spin-off otherwise qualifies as a tax-free transaction, the distribution would be taxable to us (but not to our shareholders) in certain circumstances if future significant acquisitions of our stock or the stock of Kontoor Brands are deemed to be part of a plan or series of related transactions that included the spin-off. In this event, the resulting tax liability could be substantial. In connection with the spin-off, we entered into a tax matters agreement with Kontoor Brands, pursuant to which Kontoor Brands agreed to not enter into any transaction that could cause any portion of the spin-off to be taxable to us without our consent and to indemnify us for any tax liability resulting from any such transaction. In addition, these potential tax liabilities may discourage, delay or prevent a change of control of us.

## GENERAL RISKS

***Regional epidemics or global pandemics may materially and adversely affect our business, financial condition and results of operations.***

The occurrence of regional epidemics or a global pandemic may adversely affect our business, financial condition and results of operations. For example, the COVID-19 pandemic has and could continue to materially and adversely affect our business, financial condition and results of operation. Our business has been, and could continue to be, impacted by the effects of the COVID-19 pandemic in countries and territories where we operate and where our employees, suppliers, third-party service providers, consumers or customers are located. Our operations may be closed again or experience operational restrictions if and where there is a resurgence in COVID-19 or new variants of the virus emerge. We may continue to experience significant reductions in demand and significant volatility in demand for our products by consumers and customers, resulting in reduced orders, order cancellations, lower revenues, higher discounts, increased inventories, decreased value of inventories and lower gross margins. We may be negatively impacted by significant uncertainty and turmoil in global economic and financial market conditions causing, among other things: decreased consumer

confidence and decreased consumer spending, inability to access financing in the credit and capital markets (including the commercial paper market) at reasonable rates (or at all), increased exposure to fluctuations in foreign currency exchange rates relative to the U.S. Dollar, and volatility in the availability and prices for commodities and raw materials we use for our products and in our supply chain. We may continue to fail to meet our consumers' and customers' needs for inventory production and fulfillment due to disruptions in our supply chain and increased costs associated with mitigating the effects of the pandemic.

These impacts have placed, and could continue to place limitations on our ability to execute our business plan and materially and adversely affect our business, financial condition and results of operations. Measures to contain a global pandemic, including COVID-19, may exacerbate other risks discussed in this "Risk Factors" section, any of which could have a material effect on us. The extent of the impact of the COVID-19 pandemic will depend on future developments, including the duration, severity and any resurgences of COVID-19, which are uncertain and cannot be predicted.

## ITEM 1B.    UNRESOLVED STAFF COMMENTS.

None.

## ITEM 2.   PROPERTIES.

The following is a summary of VF Corporation's principal owned and leased properties as of April 1, 2023.

VF's global headquarters are located in a 285,000 square foot, leased facility in Denver, Colorado. In addition, we lease facilities in Stabio, Switzerland and lease offices in Shanghai, China, which serve as our European and Asia-Pacific regional headquarters, respectively. We also own or lease brand headquarter facilities throughout the world.

VF owns a 236,000 square foot facility in Appleton, Wisconsin that serves as a shared service center for certain brands in North America. We own a 180,000 square foot facility in Greensboro, North Carolina that serves as a corporate shared service center. We own and lease shared service facilities in Antwerp, Belgium; Kuala Lumpur, Malaysia and Dalian, China that support our European and Asia-Pacific operations. Our sourcing hubs are located in Singapore, Panama City, Panama, and Stabio, Switzerland.

Our largest distribution centers by region are located in Visalia, California, Prague, Czech Republic and Kunshan, China. In total, we operate 21 owned or leased distribution centers primarily in the U.S., but also in the Czech Republic, United Kingdom, the Netherlands, China, Canada, Mexico, Belgium, Israel and France. In addition, VF leases a distribution center in Ontario, California, that will be operational in early-Fiscal 2024 and will become VF's largest distribution center.

In addition to the principal properties described above, we lease many offices worldwide for sales and administrative purposes. We operate 1,265 retail stores across the Americas, Europe and Asia-Pacific regions. Retail stores are generally leased under operating leases and include renewal options. We believe all facilities and machinery and equipment are in good condition and are suitable for VF's needs.

## ITEM 3.   LEGAL PROCEEDINGS.

Other than the IRS dispute in the U.S. Tax Court discussed in Note 21 — Commitments and Contingencies, there are no pending material legal proceedings, other than ordinary, routine litigation incidental to the business, to which VF or any of its subsidiaries is a party or to which any of their property is the subject.

SEC regulations require us to disclose certain information about proceedings arising under federal, state or local environmental regulations if we reasonably believe that such proceedings may result in monetary sanctions above a stated threshold. Pursuant to SEC regulations, VF uses a threshold of $1 million for purposes of determining whether disclosure of any such proceedings is required. VF believes that this threshold is reasonably designed to result in disclosure of any such proceedings that are material to VF's business or financial condition. Applying this threshold, there are no such proceedings to disclose for this period.

## ITEM 4.   MINE SAFETY DISCLOSURES.

Not applicable.

PART II

ITEM 5.   MARKET FOR VF'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

VF's Common Stock is listed on the New York Stock Exchange under the symbol "VFC". As of April 29, 2023 there were 2,780 shareholders of record. Quarterly dividends on VF Common Stock, when declared, are paid on or about the 20th day of June, September, December and March.

## PERFORMANCE GRAPH:

The following graph compares the cumulative total shareholder return on VF Common Stock with that of the Standard & Poor's ("S&P") 500 Index and the S&P 1500 Apparel, Accessories & Luxury Goods Subindustry Index ("S&P 1500 Apparel Index") for Fiscal 2019 through Fiscal 2023. The S&P 1500 Apparel Index at the end of Fiscal 2023 consisted of Capri Holdings Limited, Carter's, Inc., Columbia Sportswear Company, G-III Apparel Group, Ltd., Hanesbrands Inc., Kontoor Brands, Inc., Movado

Group, Inc., Oxford Industries, Inc., PVH Corp., Ralph Lauren Corporation, Tapestry, Inc., Under Armour, Inc. and VF Corporation. The graph assumes that $100 was invested at the end of Fiscal 2017 in each of VF Common Stock, the S&P 500 Index and the S&P 1500 Apparel Index, and that all dividends were reinvested. The graph plots the respective values on the last trading day of Fiscal 2017 through Fiscal 2023. Past performance is not necessarily indicative of future performance.



COMPARISON OF FIVE-YEAR CUMULATIVE TOTAL RETURN OF VF COMMON STOCK,
S&P 500 INDEX AND S&P 1500 APPAREL INDEX

VF Common Stock closing price on April 1, 2023 was $22.91

| Company / Index | Base Period 12/30/17 | 3/30/19 | 3/28/20 | 4/3/21 | 4/2/22 | 4/1/23 |
|---|---|---|---|---|---|---|
| VF Corporation | $     100.00 | $     120.93 | $     87.43 | $     123.39 | $     90.37 | $     38.59 |
| S&P 500 Index | 100.00 | 108.67 | 99.37 | 159.91 | 183.40 | 168.65 |
| S&P 1500 Apparel, Accessories & Luxury Goods | 100.00 | 101.34 | 53.51 | 105.47 | 89.06 | 70.21 |

## ISSUER PURCHASES OF EQUITY SECURITIES:

The following table sets forth VF's repurchases of our Common Stock during the fiscal quarter ended April 1, 2023 under the share repurchase program authorized by VF's Board of Directors in 2017.

| Fiscal Period | Total Number of Shares Purchased | Weighted Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs | Dollar Value of Shares that May Yet be Purchased Under the Program |
|---|---|---|---|---|
| January 1, 2023 — January 28, 2023 | — | $ — | — | $ 2,486,971,057 |
| January 29, 2023 — February 25, 2023 | — | — | — | 2,486,971,057 |
| February 26, 2023 — April 1, 2023 | — | — | — | 2,486,971,057 |
| Total | — | — | — | |

## ITEM 6. [RESERVED]

Not applicable.

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

### OVERVIEW

VF Corporation (together with its subsidiaries, collectively known as "VF" or the "Company") is a global leader in the design, procurement, marketing and distribution of branded lifestyle apparel, footwear and accessories. VF's diverse portfolio meets consumer needs across a broad spectrum of activities and lifestyles. Our long-term growth strategy is focused on four drivers — find and amplify consumer tailwinds, build brands on multiple growth horizons, leverage platforms for speed to scale and efficiency, and resource for portfolio agility and performance.

VF is diversified across brands, product categories, channels of distribution, geographies and consumer demographics. We own a broad portfolio of brands in the outerwear, footwear, apparel,

backpack, luggage and accessories categories. Our products are marketed to consumers through our wholesale channel, primarily in specialty stores, national chains, mass merchants, department stores, independently-operated partnership stores and with strategic digital partners. Our products are also marketed to consumers through our own direct-to-consumer operations, which include VF-operated stores, concession retail stores, brand e-commerce sites and other digital platforms.

VF is organized by groupings of brands and businesses represented by its reportable segments for financial reporting purposes. The three reportable segments are Outdoor, Active and Work.

### BASIS OF PRESENTATION

VF operates and reports using a 52/53 week fiscal year ending on the Saturday closest to March 31 of each year. All references to the years ended March 2023 ("Fiscal 2023"), March 2022 ("Fiscal 2022") and March 2021 ("Fiscal 2021") relate to the 52-week fiscal years ended April 1, 2023 and April 2, 2022, and the 53-week fiscal year ended April 3, 2021, respectively.

The following discussion and analysis focuses on our financial results for the years ended March 2023 and 2022 and year-to-year comparisons between these years. A discussion of our results of operations for the year ended March 2022 compared to the year ended March 2021 is included in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" of our Annual Report on Form 10-K for the year ended April 2, 2022 filed with the SEC on May 26, 2022, and is incorporated by reference into this Form 10-K.

All per share amounts are presented on a diluted basis. All percentages shown in the tables below and the discussion that follows have been calculated using unrounded amounts.

References to the year ended March 2023 foreign currency amounts and impacts below reflect the changes in foreign exchange rates from the year ended March 2022 when

translating foreign currencies into U.S. dollars. VF's most significant foreign currency exposure relates to business conducted in euro-based countries. Additionally, VF conducts business in other developed and emerging markets around the world with exposure to foreign currencies other than the euro.

On June 28, 2021, VF completed the sale of its Occupational Workwear business. The Occupational Workwear business was comprised primarily of the following brands and businesses: *Red Kap®*, *VF Solutions®*, *Bulwark®*, *Workrite®*, *Walls®*, *Terra®*, *Kodiak®*, *Work Authority®* and *Horace Small®*. The business also included the license of certain *Dickies®* occupational workwear products that have historically been sold through the business-to-business channel. The results of the Occupational Workwear business and the related cash flows have been reported as discontinued operations in the Consolidated Statements of Operations and Consolidated Statements of Cash Flows, respectively, through the date of sale. These changes have been applied to all periods presented. Refer to Note 4 for additional information on discontinued operations.

Unless otherwise noted, amounts, percentages and discussion for all periods included below reflect the results of operations and financial condition from VF's continuing operations.

## RECENT DEVELOPMENTS

### Executive Leadership Transition

On December 2, 2022, the Board of Directors appointed Benno Dorer, a member of the Board, as Interim President and Chief Executive Officer of the Company, effective immediately. In addition, Richard Carucci, a member of the Board, was appointed as Interim Chair of the Board on the same date. Mr. Dorer and Mr. Carucci succeed Steve Rendle, who, by mutual agreement with the Board, retired as President and Chief Executive Officer of the Company and Chair of the Board on the same date. The Company's search for a permanent successor to the President and Chief Executive Officer role is ongoing.

### Dividend Update

During the fourth quarter of Fiscal 2023, the Board of Directors declared a quarterly dividend of $0.30 per share that was paid during the fourth quarter of Fiscal 2023, which represented a 41% reduction when compared to the dividend of $0.51 per share paid in the third quarter of Fiscal 2023. The decrease in the dividend was an action taken to strengthen the Company's financial position, accelerate the return to target leverage ratios and provide additional financial flexibility to navigate the current macroeconomic challenges and maintain investments to advance its greatest value creation opportunities. On May 16, 2023, the Board of Directors declared a quarterly dividend of $0.30 per share that is payable during the first quarter of Fiscal 2024. Subject to approval by its Board of Directors, VF intends to continue to pay quarterly dividends.

### Macroeconomic Environment

The macroeconomic environment continues to dynamically evolve. Global trends, including inflationary pressures, are weakening consumer sentiment, negatively impacting consumer spending behavior and creating variable traffic patterns across channels. These conditions have led to elevated inventories in certain markets and an increased promotional environment. Additionally, the strong U.S. dollar has resulted in unfavorable foreign currency exchange rate changes, which have significantly impacted the results of our international businesses. The Company is also operating in a higher interest rate environment, resulting in increased borrowing costs. There is ongoing uncertainty around the global economy and macroeconomic environment, which we expect to continue and may cause disruption and near-term challenges for our business.

### Russia-Ukraine Conflict

In response to the ongoing conflict in Ukraine, all VF-operated retail locations within Russia are permanently closed. Limited wholesale shipments to both Russia and Ukraine have resumed. Revenues in Russia and Ukraine represented less than 1% of VF's total Fiscal 2023 revenue. While we are not able to determine the ultimate length and severity of the conflict, we currently do not expect significant disruption to our business.

### Impact of COVID-19 and Supply Chain Update

The coronavirus ("COVID-19") pandemic has significantly impacted global economic conditions, as well as VF's business operations and financial performance, which continued into Fiscal 2023.

VF-operated retail stores across the globe were impacted due to COVID-19, including temporary closures for varying periods. In Fiscal 2023, the impacts were most notable in the Asia-Pacific region, including Mainland China. VF is continuing to monitor the COVID-19 outbreak globally and will comply with guidance from government entities and public health authorities to prioritize the health and well-being of its employees, customers, trade partners and consumers. As COVID-19 uncertainty continues, retail store closures may recur.

COVID-19 also impacted some of VF's suppliers, including raw material suppliers, third-party manufacturers, logistics providers and other vendors. The resurgence of COVID-19 lockdowns in key sourcing countries resulted in additional manufacturing capacity constraints and logistical challenges during Fiscal 2023. VF worked with its suppliers to minimize disruption and employed expedited freight as needed. Although the situation has improved over time, lead times across the supply chain coupled with higher volatility on the distribution and logistics network, particularly in the Americas, and event-driven spikes in demand, led to inconsistent on-time delivery performance and higher cancellations with our wholesale partners and inefficiencies in support of our direct-to-consumer business during certain timeframes in Fiscal 2023.

VF's distribution centers are operational in accordance with local government guidelines.

The COVID-19 pandemic is dynamic in nature and may result in ongoing disruption to our business.

For additional information regarding recent developments, see "Item 1A. Risk Factors."

## HIGHLIGHTS OF THE YEAR ENDED MARCH 2023

- Revenues decreased 2% to $11.6 billion compared to the year ended March 2022, including a 5% unfavorable impact from foreign currency.

- Outdoor segment revenues increased 6% to $5.6 billion compared to the year ended March 2022, including a 6% unfavorable impact from foreign currency.

- Active segment revenues decreased 9% to $4.9 billion compared to the year ended March 2022, including a 4% unfavorable impact from foreign currency.

- Work segment revenues decreased 6% to $1.1 billion compared to the year ended March 2022, including a 2% unfavorable impact from foreign currency.

- Direct-to-consumer revenues were down 3% compared to the year ended March 2022, including a 4% unfavorable impact from foreign currency. Direct-to-consumer revenues accounted for 45% of VF's total revenues in the year ended March 2023. E-commerce revenues decreased 6% in the year ended March 2023 compared to the year ended March 2022, including a 5% unfavorable impact from foreign currency.

- International revenues decreased 2% compared to the year ended March 2022, including a 10% unfavorable impact from foreign currency. Revenues in Europe were flat, including a 12% unfavorable impact from foreign currency. Greater China (which includes Mainland China, Hong Kong and Taiwan) revenues were down 14%, including a 7% unfavorable impact from foreign currency. International revenues represented 48% of VF's total revenues in the year ended March 2023.

- Gross margin decreased 200 basis points to 52.5% in the year ended March 2023 compared to the year ended March 2022, primarily driven by higher promotional activity, and higher material and labor costs, partially offset by price increases and lower freight costs.

- Earnings per share decreased to $0.31 in the year ended March 2023 from $3.10 in the year ended March 2022. The most significant individual driver of the decrease was the Supreme reporting unit goodwill and intangible asset impairment charges, which totaled $735.0 million on a pre-tax basis and reduced earnings per share by $1.72.

- VF paid $702.8 million in cash dividends in the year ended March 2023.

## ANALYSIS OF RESULTS OF OPERATIONS

### Consolidated Statements of Operations

The following table presents a summary of the changes in net revenues for the year ended March 2023 compared to the year ended March 2022:

| (In millions) | | Year Ended March |
|---|---|---|
| Net revenues — 2022 | $ | 11,841.8 |
| Organic | | 331.6 |
| Impact of foreign currency | | (560.9) |
| Net revenues — 2023 | $ | 11,612.5 |

*Year Ended March 2023 Compared to Year Ended March 2022*

VF reported a 2% decrease in revenues in Fiscal 2023 compared to Fiscal 2022. The revenue decrease was primarily driven by declines in the Active segment and a 5% unfavorable impact from foreign currency in the year ended March 2023. Revenues in the Active segment during Fiscal 2023 were impacted by weakness in the Americas region, primarily driven by declines in the *Vans®* brand. Revenues in the Active segment during the year ended March 2023 were also impacted by declines in the Asia-Pacific region, which was negatively impacted by COVID-19 resurgence that caused disruption and consumption pressure in the region, particularly in Mainland China. The revenue decrease in Fiscal 2023 was also due to declines in the Work segment. The decrease in Fiscal 2023 was partially offset by global growth in the Outdoor segment driven by increases in *The North Face®* brand across all regions and broad-based operational strength in the Europe region.

Additional details on revenues are provided in the section titled "Information by Reportable Segment".

The following table presents the percentage relationship to net revenues for components of the Consolidated Statements of Operations:

| | Year Ended March | |
|---|---|---|
| | **2023** | 2022 |
| Gross margin (net revenues less cost of goods sold) | 52.5 % | 54.5 % |
| Selling, general and administrative expenses | 43.4 | 40.7 |
| Impairment of goodwill and intangible assets | 6.3 | — |
| **Operating margin** | **2.8 %** | 13.8 % |

*Year Ended March 2023 Compared to Year Ended March 2022*

Gross margin decreased 200 basis points to 52.5% in Fiscal 2023 compared to 54.5% in Fiscal 2022. The decrease in gross margin in Fiscal 2023 was driven by increased discounts and other promotional activity, and higher material and labor costs, partially offset by price increases and lower freight costs.

Selling, general and administrative expenses as a percentage of total revenues increased 270 basis points in Fiscal 2023 compared to Fiscal 2022. Selling, general and administrative expenses increased $210.7 million in Fiscal 2023 compared to Fiscal 2022, including the impact of a $150.0 million decrease in the estimated fair value of the contingent consideration liability associated with the Supreme acquisition, which reduced selling, general and administrative expenses in the year ended March 2022. The increase was also due to higher corporate restructuring charges and investments in information technology.

VF recorded goodwill and intangible asset impairment charges of $394.1 million and $340.9 million, respectively, in the year ended March 2023 related to the Supreme reporting unit. During the second quarter of Fiscal 2023, due to continued increases in the federal funds rate and strengthening of the U.S. dollar relative to other currencies, VF determined that a triggering event had occurred requiring a quantitative analysis of the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset. As a result of the impairment testing performed, VF recorded impairment charges of $229.0 million and $192.9 million to the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset, respectively. The impairment primarily related to an increase in the market-based discount rates used in the valuations and the negative impact of foreign currency exchange rate changes on financial projections. During the fourth quarter of Fiscal 2023, in connection with its annual impairment testing, VF performed a quantitative analysis of the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset. As a result of the impairment testing performed, VF recorded additional impairment charges of $165.1 million and $148.0 million to the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset, respectively. The impairment related to lower financial projections and increased risk of achieving management's forecasts.

In Fiscal 2023, operating margin decreased to 2.8% from 13.8% in Fiscal 2022, primarily due to the items described above.

Net interest expense increased $33.2 million to $164.6 million in Fiscal 2023. The increase in net interest expense was primarily due to higher short-term commercial paper borrowings, borrowings under the delayed draw Term Loan Agreement (the

"DDTL Agreement") and an increase in borrowing rates. The increase was partially offset by repayment of $1.0 billion in aggregate principal of the 2.050% Senior Notes due April 2022. Total outstanding interest-bearing debt averaged $6.2 billion and $5.6 billion for Fiscal 2023 and Fiscal 2022, respectively, with short-term borrowings representing 16.8% and 1.1% of average debt outstanding for the respective years. The weighted average interest rate on outstanding debt was 2.6% in Fiscal 2023 and 2.1% in Fiscal 2022.

Loss on debt extinguishment of $3.6 million was recorded in Fiscal 2022 as a result of the early redemption of $500.0 million in aggregate principal amount of VF's outstanding 2.050% Senior Notes due April 2022.

Other income (expense), net primarily consists of components of net periodic pension cost (excluding the service cost component), certain foreign currency and hedging gains and losses and other non-operating gains and losses. Other income (expense) netted to $(119.8) million and $26.2 million in Fiscal 2023 and Fiscal 2022, respectively. Other income (expense), net in Fiscal 2023 included a $91.8 million pension settlement charge, which resulted from the purchase of a group annuity contract and transfer of a portion of the assets and liabilities associated with the U.S. qualified defined benefit pension plan to an insurance company and $23.0 million of foreign currency and hedging losses. Other income (expense), net in Fiscal 2022 included $21.6 million of net periodic pension income driven by the expected return on plan assets and a $6.8 million gain related to certain insurance recoveries.

The effective income tax rate was (174.0)% in Fiscal 2023 compared to 20.2% in Fiscal 2022. The Fiscal 2023 effective income tax rate included a net discrete tax benefit of $96.8 million, which primarily related to the Internal Revenue Service ("IRS") examinations for tax year 2017 and short-tax year 2018 resulting in a $94.9 million favorable adjustment to VF's transition tax liability under the Tax Cuts and Jobs Act ("U.S. Tax Act"). The $96.8 million net discrete tax benefit in Fiscal 2023 decreased the effective income tax rate by 223.5% compared to an unfavorable 6.9% impact of discrete items for Fiscal 2022. Excluding discrete items, the effective tax rate during Fiscal 2023 increased by approximately 36.2%, primarily due to the jurisdictional mix of earnings and goodwill impairment in Fiscal 2023.

As a result of the above, income from continuing operations in Fiscal 2023 was $118.6 million ($0.31 per diluted share), compared to $1.2 billion ($3.10 per diluted share) in Fiscal 2022.

Refer to additional discussion in the "Information by Reportable Segment" section below.

### Information by Reportable Segment

VF's reportable segments are: Outdoor, Active and Work. We have included an Other category in the tables below for purposes of reconciliation of revenues and profit, but it is not considered a reportable segment. Other primarily includes sourcing activities related to transition services.

The primary financial measures used by management to evaluate the financial results of VF's reportable segments are segment revenues and segment profit. Segment profit comprises the operating income and other income (expense), net line items of each segment.

Refer to Note 20 to the consolidated financial statements for a summary of results of operations by segment, along with a reconciliation of segment profit to income before income taxes.

*Year Ended March 2023 Compared to Year Ended March 2022*

The following tables present a summary of the changes in segment revenues and profit in the year ended March 2023 compared to the year ended March 2022 and revenues by region for our Top 4 brands for the years ended March 2023 and 2022:

**Segment Revenues:**

| (In millions) | Year Ended March | | | | |
| | Outdoor | Active | Work | Other | Total |
|---|---|---|---|---|---|
| Segment revenues — 2022 | $ 5,327.6 | $ 5,380.3 | $ 1,133.1 | $ 0.8 | $ 11,841.8 |
| Organic | 629.1 | (251.2) | (45.7) | (0.7) | 331.6 |
| Impact of foreign currency | (309.2) | (224.5) | (27.2) | — | (560.9) |
| Segment revenues — 2023 | $ 5,647.5 | $ 4,904.6 | $ 1,060.2 | $ 0.1 | $ 11,612.5 |

**Segment Profit (Loss):**

| (In millions) | Year Ended March | | | | |
| | Outdoor | Active | Work | Other | Total |
|---|---|---|---|---|---|
| Segment profit (loss) — 2022 | $ 795.5 | $ 979.7 | $ 193.5 | $ (0.5) | $ 1,968.2 |
| Organic | 50.5 | (274.6) | (69.4) | (0.1) | (293.8) |
| Impact of foreign currency | (60.6) | (50.4) | (2.9) | 0.1 | (113.7) |
| Segment profit (loss) — 2023 | $ 785.4 | $ 654.7 | $ 121.2 | $ (0.5) | $ 1,560.7 |

Note: Amounts may not sum due to rounding.

**Top Brand Revenues:**

| (In millions) | Year Ended March 2023 | | | | |
| | Vans® | The North Face® | Timberland® (a) | Dickies® | Total |
|---|---|---|---|---|---|
| Americas | $ 2,380.5 | $ 1,896.4 | $ 933.6 | $ 513.6 | $ 5,724.1 |
| Europe | 838.3 | 1,198.7 | 632.4 | 107.4 | 2,776.8 |
| Asia-Pacific | 464.1 | 517.6 | 218.7 | 104.2 | 1,304.6 |
| Global | $ 3,682.9 | $ 3,612.7 | $ 1,784.7 | $ 725.2 | $ 9,805.5 |

| (In millions) | Year Ended March 2022 | | | | |
| | Vans® | The North Face® | Timberland® (a) | Dickies® | Total |
|---|---|---|---|---|---|
| Americas | $ 2,640.8 | $ 1,707.8 | $ 944.1 | $ 604.3 | $ 5,897.0 |
| Europe | 917.7 | 1,129.9 | 628.4 | 89.5 | 2,765.5 |
| Asia-Pacific | 603.4 | 422.1 | 250.6 | 143.9 | 1,420.0 |
| Global | $ 4,161.9 | $ 3,259.7 | $ 1,823.1 | $ 837.7 | $ 10,082.5 |

(a)  The global Timberland brand includes *Timberland*®, reported within the Outdoor segment and *Timberland PRO*®, reported within the Work segment.

Note: Amounts may not sum due to rounding.

The following sections discuss the changes in revenues and profitability by segment. For purposes of this analysis, royalty revenues have been included in the wholesale channel for all periods.

**Outdoor**

| (Dollars in millions) | Year Ended March | | Percent Change |
|---|---|---|---|
| | **2023** | 2022 | |
| Segment revenues | $        5,647.5 | $        5,327.6 | 6.0 % |
| Segment profit | 785.4 | 795.5 | (1.3) % |
| Operating margin | 13.9 % | 14.9 % | |

The Outdoor segment includes the following brands: *The North Face®, Timberland®, Smartwool®, Altra® and Icebreaker®.*

*Year Ended March 2023 Compared to Year Ended March 2022*

Global revenues for Outdoor increased 6% in Fiscal 2023 compared to Fiscal 2022, including a 6% unfavorable impact due to foreign currency. Revenues in the Americas region increased 6% in Fiscal 2023, including a 1% unfavorable impact from foreign currency. Revenues in the Europe region increased 4%, including a 13% unfavorable impact from foreign currency. Revenues in the Asia-Pacific region increased 9% in Fiscal 2023, including an 8% unfavorable impact from foreign currency.

Global revenues for *The North Face®* brand increased 11% in Fiscal 2023, including a 6% unfavorable impact from foreign currency. The increase reflects growth in all regions and channels compared to the prior year. Revenues in the Americas region increased 11% in the year ended March 2023, including a 1% unfavorable impact from foreign currency. Revenues in the Europe region increased 6% in Fiscal 2023, including a 13% unfavorable impact from foreign currency. Revenues in the Asia-Pacific region increased 23% in Fiscal 2023, including an 8% unfavorable impact from foreign currency.

Global revenues for the *Timberland®* brand decreased 5% in Fiscal 2023, driven by a 6% unfavorable impact from foreign

currency. Revenues in the Europe region increased 1% in the year ended March 2023, including a 12% unfavorable impact from foreign currency. Revenues in the Americas region decreased 8% in the year ended March 2023, including a 1% unfavorable impact from foreign currency. Revenues in the Asia-Pacific region decreased 13% in Fiscal 2023, including an 8% unfavorable impact from foreign currency.

Global direct-to-consumer revenues for Outdoor increased 7% in Fiscal 2023, including a 5% unfavorable impact from foreign currency. The increase was primarily due to strength in *The North Face®* brand and e-commerce growth. Global wholesale revenues increased 6% in Fiscal 2023, including a 6% unfavorable impact from foreign currency.

Operating margin decreased in Fiscal 2023 compared to Fiscal 2022, primarily due to increased discounts and other promotional activity, higher material and labor costs and increased advertising expenses, partially offset by lower freight costs and price increases.

**Active**

| (Dollars in millions) | Year Ended March | | Percent Change |
|---|---|---|---|
| | **2023** | 2022 | **Percent Change** |
| Segment revenues | $ 4,904.6 | $ 5,380.3 | (8.8)% |
| Segment profit | 654.7 | 979.7 | (33.2)% |
| Operating margin | 13.3 % | 18.2 % | |

The Active segment includes the following brands: *Vans*®, *Supreme*®, *Kipling*®, *Napapijri*®, *Eastpak*® and *JanSport*®.

*Year Ended March 2023 Compared to Year Ended March 2022*

Global revenues for Active decreased 9% in Fiscal 2023 compared to Fiscal 2022, including a 4% unfavorable impact from foreign currency. Revenues in the Americas region decreased 8% in Fiscal 2023. Revenues in the Europe region decreased 6% in the year ended March 2023, driven by an 11% unfavorable impact from foreign currency. Revenues in the Asia-Pacific region decreased 18% in Fiscal 2023, including an 8% unfavorable impact from foreign currency, and a 36% decrease in Greater China including a 4% unfavorable impact from foreign currency.

*Vans*® brand global revenues decreased 12% in Fiscal 2023, including a 4% unfavorable impact from foreign currency. The overall decline in Fiscal 2023 was primarily attributed to a 10% decrease in the Americas region, driven by the performance in the direct-to-consumer channel. Revenues in the Europe region decreased 9% in Fiscal 2023, driven by an 11% unfavorable impact from foreign currency. Revenues in the Asia-Pacific region decreased 23% in the year ended March 2023, including a 5% unfavorable impact from foreign currency.

Global direct-to-consumer revenues for Active decreased 10% in Fiscal 2023, including a 4% unfavorable impact from foreign currency. The decrease was primarily due to declines in the Americas region, which decreased 10% in Fiscal 2023. Global wholesale revenues for Active decreased 7% in Fiscal 2023, and included a 5% unfavorable impact from foreign currency. The decrease in Fiscal 2023 was primarily due to a 25% decrease in the Asia-Pacific region, including a 4% unfavorable impact from foreign currency. Wholesale revenues in the Americas region decreased 2% in the year ended March 2023. Wholesale revenues in the Europe region decreased 6% in the year ended March 2023, driven by an 11% unfavorable impact from foreign currency.

Operating margin decreased in Fiscal 2023 compared to Fiscal 2022,reflecting lower leverage of operating expenses due to decreased revenues. The decrease was also impacted by increased discounts and other promotional activity, and higher material and labor costs, partially offset by price increases.

**Work**

| (Dollars in millions) | Year Ended March | | Percent Change |
|---|---|---|---|
| | **2023** | 2022 | **Percent Change** |
| Segment revenues | $ 1,060.2 | $ 1,133.1 | (6.4)% |
| Segment profit | 121.2 | 193.5 | (37.4)% |
| Operating margin | 11.4 % | 17.1 % | |

The Work segment includes the following brands: *Dickies*® and *Timberland PRO*®.

*Year Ended March 2023 Compared to Year Ended March 2022*

Global Work revenues decreased 6% in Fiscal 2023 compared to Fiscal 2022, including a 2% unfavorable impact from foreign currency. Revenues in the Americas region decreased 6% in Fiscal 2023, including a 1% unfavorable impact from foreign currency. Revenues in the Europe region increased 20%, including a 14% unfavorable impact from foreign currency, due to lower revenues in the prior year resulting from strategic business model changes. Revenues in the Asia-Pacific region decreased 28%, including an 8% unfavorable impact from foreign currency.

*Dickies*® brand global revenues decreased 13% in Fiscal 2023, including a 2% unfavorable impact from foreign currency. The

decline was primarily driven by a decrease of 15% in the Americas,reflecting a more conservative inventory posture by the brand's largest U.S. customer and weakness in other key U.S. wholesale customers. The decline in the year ended March 2023 was also attributed to a decrease in the Asia-Pacific region of 28%, including an 8% unfavorable impact from foreign currency. Revenues in the Europe region increased 20% in the year ended March 2023, including a 14% unfavorable impact from foreign currency.

Operating margin decreased in Fiscal 2023 compared to Fiscal 2022, primarily due to higher material and labor costs, and lower leverage of operating expenses due to decreased revenues. The decrease was partially offset by price increases.

**Reconciliation of Segment Profit to Consolidated Income Before Income Taxes**

There are four types of costs necessary to reconcile total segment profit to consolidated income from continuing operations before income taxes. These costs are (i) impairment of goodwill and indefinite-lived intangible assets, which is excluded from segment profit because these costs are not part of the ongoing operations of the respective businesses, (ii) corporate and other expenses, which are excluded from segment profit to the extent they are not allocated to the segments, (iii) interest expense, net, and (iv) loss on debt

extinguishment, which are excluded from segment profit because substantially all financing costs are managed at the corporate office and are not under the control of segment management. Impairment of goodwill and indefinite-lived intangible assets, net interest expense and loss on debt extinguishment are discussed in the "Consolidated Statements of Operations" section, and corporate and other expenses are discussed below.

| | Year Ended March | |
|---|---|---|
| (In millions) | **2023** | **2022** |
| Impairment of goodwill and intangible assets | $ 735.0 | $ — |
| Corporate and other expenses | 617.8 | 309.8 |
| Interest expense, net | 164.6 | 131.5 |
| Loss on debt extinguishment | — | 3.6 |

Corporate and other expenses are those that have not been allocated to the segments for internal management reporting, including (i) information systems and shared service costs, (ii) corporate headquarters costs, and (iii) certain other income and expenses.

*Information Systems and Shared Services*

These costs include management information systems and the centralized finance, supply chain and human resources functions that support worldwide operations. The costs also include software system implementations and upgrades and other strategic projects. Operating costs of information systems and shared services are charged to the segments based on utilization of those services. Costs to develop new software and related applications are generally not allocated to the segments.

*Corporate Headquarters' Costs*

Headquarters' costs include compensation and benefits of corporate management and staff, legal and professional fees, and general and administrative expenses that have not been allocated to the segments.

**International Operations**

International revenues decreased 2% in Fiscal 2023 compared to Fiscal 2022. Foreign currency had an unfavorable impact of 10% on international revenues in Fiscal 2023.

Revenues in the Europe region were flat in Fiscal 2023, driven by a 12% unfavorable impact from foreign currency. In the Asia-Pacific region, revenues decreased 7% in Fiscal 2023, including

**Direct-to-Consumer Operations**

Direct-to-consumer revenues decreased 3% in Fiscal 2023 over Fiscal 2022, driven by a 4% unfavorable impact from foreign currency.

VF's e-commerce business declined 6% in Fiscal 2023, including a 5% unfavorable impact from foreign currency. The decrease was primarily driven by declines in the Active segment e-commerce business, partially offset by growth in the Outdoor segment.

*Other*

This category includes (i) costs of corporate programs or corporate-managed decisions that are not allocated to the segments, (ii) costs of registering, maintaining and enforcing certain of VF's trademarks, and (iii) miscellaneous consolidated activities, the most significant of which is related to VF's centrally-managed U.S. defined benefit pension plans.

Corporate and other expenses increased $308.0 million in Fiscal 2023 when compared to the prior year. The increase was driven by an increase in corporate restructuring charges of $61.0 million, an increase in information technology costs of $38.8 million and a $91.8 million pension settlement charge recorded in the first quarter of Fiscal 2023. Additionally, the increase in the year ended March 2023 when compared to the 2022 period was driven by a $150.0 million decrease in the estimated fair value of the contingent consideration liability associated with the Supreme acquisition, which reduced expenses in the year ended March 2022. The increase in Fiscal 2023 was partially offset by lower employee compensation expenses compared to Fiscal 2022.

an 8% unfavorable impact from foreign currency. Revenues in Greater China decreased 14% in Fiscal 2023, which was negatively impacted by COVID-19 resurgence in Mainland China and included a 7% unfavorable impact from foreign currency.

International revenues were 48% of total VF revenues in both Fiscal 2023 and Fiscal 2022.

Revenues from VF-operated retail stores decreased 2% in Fiscal 2023, including a 3% unfavorable impact from foreign currency. VF opened 63 stores in Fiscal 2023, bringing the total number of VF-owned retail stores to 1,265 at March 2023, which also reflects 120 store closures during the period. There were 1,322 VF-owned retail stores at March 2022. Direct-to-consumer revenues were 45% of total VF revenues in Fiscal 2023 compared to 46% in Fiscal 2022.

## ANALYSIS OF FINANCIAL CONDITION

### Balance Sheets

The following discussion refers to significant changes in balances for continuing operations at March 2023 compared to March 2022:

- *Increase in accounts receivable* — primarily due to the timing of collections.

- *Increase in inventories* — driven by increased in-transit inventory of $253.7 million resulting from the modification of terms with the majority of our suppliers to take ownership of inventory near point of shipment rather than destination, with the remaining increase resulting primarily from the impact of COVID-19 related challenges in the supply chain where prolonged manufacturing and logistics lead times forced earlier buy commitments, and softening consumer demand.

- *Decrease in intangible assets* —primarily due to $340.9 million of impairment charges related to the *Supreme®* indefinite-lived trademark intangible asset recorded in Fiscal 2023.

- *Decrease in goodwill*— primarily due to $394.1 million of impairment charges related to the Supreme reporting unit recorded in Fiscal 2023.

- *Increase in other assets* — primarily due to the $875.7 million payment related to the 2011 taxes and interest being disputed in The Timberland Company court case, which was recorded as an income tax receivable based on the technical merits of our position with regards to the case.

- *Decrease in short-term borrowings* — primarily due to a decrease in commercial paper borrowings.

- *Increase in the current portion of long-term debt* — due to the reclassification of €850.0 million ($923.4 million) of long-term notes due in September 2023, partially offset by the repayment of $500.0 million of long-term notes in April 2022.

- *Increase in accounts payable* — primarily due to the modification of terms with the majority of our suppliers to take ownership of inventory near point of shipment rather than destination and timing of payments.

- *Decrease in accrued liabilities* — primarily due to lower accrued income taxes, lower accrued compensation and the payout of the contingent consideration liability associated with the Supreme acquisition.

- *Increase in long-term debt* — due to the issuance of $500.0 million euro-denominated 4.125% fixed-rate notes maturing in March 2026 and €500.0 million euro-denominated 4.250% fixed-rate notes maturing in March 2029, and borrowings of $1.0 billion under the DDTL Agreement in Fiscal 2023, partially offset by the reclassification of €850.0 million ($923.4 million) of long-term notes due in September 2023.

- *Decrease in other liabilities* — primarily due to a $94.9 million favorable adjustment to VF's transition tax liability under the U.S. Tax Act pursuant to IRS examinations, lower pension liabilities and lower deferred compensation.

### Liquidity and Cash Flows

We consider the following to be measures of our liquidity and capital resources:

| (Dollars in millions) | March 2023 | March 2022 |
|---|---|---|
| Working capital | $1,606.9 | $1,272.7 |
| Current ratio | 1.5 to 1 | 1.4 to 1 |
| Net debt to total capital | 71.6% | 61.0% |

The increase in working capital and the current ratio at March 2023 compared to March 2022 was primarily due to a net increase in current assets driven by higher inventories. The overall increase was partially offset by a net increase in current liabilities driven by a higher current portion of long-term debt and higher accounts payable, which were partially offset by lower short-term borrowings and lower accrued liabilities for the periods compared as discussed in the "Balance Sheets" section above.

For the ratio of net debt to total capital, net debt is defined as short-term and long-term borrowings, in addition to operating lease liabilities, net of unrestricted cash. Total capital is defined as net debt plus stockholders' equity. The increase in the net debt to total capital ratio at March 2023 compared to March 2022 was primarily driven by an increase in net debt at March 2023 and a decrease in stockholders' equity. The increase in net debt was primarily attributed to the issuance of €1.0 billion euro-denominated fixed rate notes and $1.0 billion of borrowings

under the DDTL Agreement in Fiscal 2023, as discussed in the "Balance Sheet" section above. The increase in net debt at March 2023 compared to March 2022 was partially offset by the repayment of $500.0 million of long-term notes in April 2022. The decrease in stockholders' equity at March 2023 compared to March 2022 was primarily driven by payments of dividends, partially offset by net income in the period.

VF's primary source of liquidity is its expected annual cash flow from operating activities. Cash from operations is typically lower in the first half of the calendar year as inventory builds to support peak sales periods in the second half of the calendar year. Cash provided by operating activities in the second half of the calendar year is substantially higher as inventories are sold and accounts receivable are collected. Additionally, direct-to-consumer sales are highest in the fourth quarter of the calendar year. VF's additional sources of liquidity include available borrowing capacity against its Global Credit Facility, available cash balances and international lines of credit.

In summary, our cash flows from continuing operations were as follows:

| (In millions) | Year Ended March | |
| --- | --- | --- |
| | 2023 | 2022 |
| Cash provided (used) by operating activities | $ (655.8) | $ 858.2 |
| Cash provided (used) by investing activities | (188.1) | 904.3 |
| Cash provided (used) by financing activities | 463.9 | (1,268.8) |

### Cash Provided (Used) by Operating Activities

Cash flows related to operating activities are dependent on net income, adjustments to net income and changes in working capital. The decrease in cash provided by operating activities in Fiscal 2023 compared to Fiscal 2022 was primarily due to an increase in net cash used by working capital and lower earnings for the periods compared. The increase in cash used by working capital was primarily driven by higher inventory balances and the $875.7 million payment related to the 2011 taxes and interest being disputed in The Timberland Company court case.

### Cash Provided (Used) by Investing Activities

The decrease in cash provided by investing activities in Fiscal 2023 compared to Fiscal 2022 was primarily due to $616.9 million of net proceeds from the sale of the Occupational Workwear business and $598.8 million of proceeds from the sale of short-term investments in Fiscal 2022. Capital expenditures decreased $79.5 million and software purchases increased $12.5 million in Fiscal 2023 compared to the Fiscal 2022 period. The decrease in capital expenditures was primarily driven by higher spending in the prior year related to a new distribution center in the Americas region. Fiscal 2023 also includes $99.5 million of proceeds from sale of assets, primarily related to certain office real estate and related assets.

### Cash Provided (Used) by Financing Activities

The increase in cash provided by financing activities in Fiscal 2023 compared to Fiscal 2022 was primarily due to the issuance of €1.0 billion euro-denominated fixed rate notes and borrowings of $1.0 billion under the DDTL Agreement in Fiscal 2023. The increase was also due to a $350.0 million decrease in share repurchases and a $70.4 million decrease in dividends paid for the periods compared, partially offset by a net decrease in short-term borrowings of $648.4 million for the periods compared and the $57.0 million payment of Supreme contingent consideration in Fiscal 2023.

### Share Repurchases

VF did not purchase shares of its Common Stock in the open market during Fiscal 2023. During Fiscal 2022, VF purchased 4.8 million shares of its Common Stock in open market transactions at a total cost of $350.0 million (average price per share of $72.84) under the share repurchase program authorized by VF's Board of Directors.

As of the end of Fiscal 2023, VF had $2.5 billion remaining for future repurchases under its share repurchase authorization. VF's capital deployment priorities in the near-to-medium term will be focused on optimizing and driving the performance of the current portfolio, reducing leverage and returning capital to shareholders in the form of dividends.

### Revolving Credit Facility and Short-term Borrowings

VF relies on its ability to generate cash flows to finance its ongoing operations. In addition, VF has significant liquidity from its available cash balances and credit facilities. VF maintains a $2.25 billion senior unsecured revolving line of credit (the "Global Credit Facility") that expires in November 2026. VF may request an unlimited number of one year extensions so long as each extension does not cause the remaining life of the Global Credit Facility to exceed five years, subject to stated terms and conditions. The Global Credit Facility may be used to borrow funds in U.S. dollars or any alternative currency (including euros and any other currency that is freely convertible into U.S. dollars, approved at the request of the Company by the lenders) and has a $75.0 million letter of credit sublimit. In addition, the Global Credit Facility supports VF's U.S. commercial paper program for short-term, seasonal working capital requirements and general corporate purposes, including dividends, acquisitions and share repurchases. Outstanding short-term balances may vary from period to period depending on the level of corporate requirements.

VF has restrictive covenants on its Global Credit Facility, including a consolidated net indebtedness to consolidated net capitalization financial ratio covenant, as defined in the agreement as amended in February 2023, starting at 70% with future step downs. The calculation of consolidated net indebtedness is net of unrestricted cash and the calculation of consolidated net capitalization permits certain addbacks, including non-cash impairment charges, as defined in the amended agreement. The covenant calculation also excludes consolidated operating lease liabilities. As of March 2023, VF was in compliance with all covenants.

VF has a commercial paper program that allows for borrowings up to $2.25 billion to the extent that it has borrowing capacity under the Global Credit Facility. As of March 2023, there were no commercial paper borrowings. Standby letters of credit issued as of March 2023 were $7.7 million, leaving approximately $2.2 billion available for borrowing against the Global Credit Facility at March 2023. Additionally, VF had approximately $814.9 million of cash and equivalents at March 2023.

VF has $84.6 million of international lines of credit with various banks, which are uncommitted and may be terminated at any time by either VF or the banks. Total outstanding balances under these arrangements were $11.5 million at March 2023. Borrowings under these arrangements had a weighted average interest rate of 39.1% at March 2023.

### Senior Notes Issuance

In March 2023, VF issued €500.0 million of 4.125% euro-denominated fixed-rate notes maturing in March 2026 and €500.0 million of 4.250% euro-denominated fixed-rate notes maturing in March 2029. The 2029 notes were issued as a green bond, and thus an amount equal to the net proceeds has been

dedicated to projects that focus on VF's key environmental sustainability initiatives.

*Maturity*

On April 25, 2022, VF repaid the remaining $500.0 million in aggregate principal amount of its outstanding 2.050% Senior Notes due April 2022, in accordance with the terms of the notes.

*Term Debt Facility*

In August 2022, the Company entered into a DDTL Agreement. Under the DDTL Agreement, the lenders agreed to provide up to three separate delayed draw term loans (each, a "Delayed Draw") to the Company in an aggregate principal amount of up to $1.0 billion (which may be increased to $1.1 billion subject to the terms and conditions of the DDTL Agreement). The DDTL Agreement has a stated termination date of December 14, 2024. Subject to the terms and conditions of the DDTL Agreement, the Company may request extensions of the termination date.

During the third quarter of Fiscal 2023, VF completed two draws under the DDTL Agreement totaling $1.0 billion, all of which will mature on December 14, 2024. The weighted average interest rate on these borrowings at March 2023 was 5.73%.

*Supply Chain Financing Program*

During the first quarter of Fiscal 2023, VF reinstated its voluntary supply chain finance ("SCF") program. The SCF program enables a significant portion of our suppliers of inventory to leverage VF's credit rating to receive payment from participating financial institutions prior to the payment date specified in the terms between VF and the supplier. The SCF program is administered through third-party platforms that allow participating suppliers to track payments from VF and elect which VF receivables, if any, to sell to the financial institutions. The transactions are at the sole discretion of both the suppliers and financial institutions, and VF is not a party to the agreements and has no economic interest in the supplier's decision to sell a receivable. The terms between VF and the supplier, including the amount due and scheduled payment dates, are not impacted by a supplier's participation in the SCF program. Amounts due to suppliers who voluntarily participate in the SCF program are included in the accounts payable line item in VF's Consolidated Balance Sheets and VF payments made under the SCF program are reflected in cash flows from operating activities in VF's Consolidated Statements of Cash Flows. VF has been informed by the participating financial institutions that amounts payable to them for suppliers who voluntarily participated in the SCF program and included in the accounts payable line item in VF's Consolidated Balance Sheet was $161.4 million at March 2023. The amounts settled through the SCF program were $989.8 million during the year ended March 2023.

In the second quarter of Fiscal 2023, VF extended its payment terms with eligible suppliers under the SCF program. The extended payment terms had a positive impact on Fiscal 2023 cash flows from operating activities of approximately $95.0 million and VF also expects a positive impact in Fiscal 2024; however, the change is not expected to have a material impact on VF's long-term overall liquidity or capital resources.

*Rating Agencies*

VF's credit agency ratings allow for access to additional liquidity at competitive rates. At the end of March 2023, VF's long-term debt ratings were 'BBB+' by Standard & Poor's ("S&P") Global Ratings and 'Baa2' by Moody's Investors Service ("Moody's"), and commercial paper ratings by those rating agencies were 'A-2' and 'P-2', respectively. VF's credit rating outlook at the end of March 2023 was 'negative' by S&P and 'stable' by Moody's.

None of VF's long-term debt agreements contain acceleration of maturity clauses based solely on changes in credit ratings. However, if there were a change in control of VF and, as a result of the change in control the notes were rated below investment grade by recognized rating agencies, then VF would be obligated to repurchase the notes at 101% of the aggregate principal amount, plus any accrued and unpaid interest, if required by the respective holders of the notes. The change of control provision applies to all notes, except for the 2033 notes.

*Dividends*

Cash dividends totaled $1.81 per share in Fiscal 2023 compared to $1.98 in Fiscal 2022. The dividend payout ratio was 592.8% of diluted earnings per share in Fiscal 2023 compared to 56.0% in Fiscal 2022. The Company has declared a dividend of $0.30 per share that is payable in the first quarter of Fiscal 2024. Subject to approval by its Board of Directors, VF intends to continue to pay quarterly dividends.

*Other Matters*

As previously reported, VF petitioned the U.S. Tax Court (the "Court") to resolve an IRS dispute regarding the timing of income inclusion associated with VF's acquisition of The Timberland Company in September 2011. While the IRS argues that all such income should have been immediately included in 2011, VF has reported periodic income inclusions in subsequent tax years. Both parties moved for summary judgment on the issue. On January 31, 2022, the Court issued its opinion in favor of the IRS and on July 14, 2022 issued its final decision. VF believes the opinion of the Court was in error based on the technical merits and filed a notice of appeal on October 7, 2022. On October 19, 2022, VF paid $875.7 million related to the 2011 taxes and interest being disputed, which was recorded as an income tax receivable based on the technical merits of our position with regards to the case and will accrue interest income. VF continues to believe its timing and treatment of the income inclusion is appropriate and VF is vigorously defending its position. However, should the Court opinion ultimately be upheld on appeal, this income tax receivable will not be collected by VF. If the Court opinion is upheld, VF should be entitled to a refund of taxes paid on the periodic inclusions that VF has reported. However, any such refund could be substantially reduced by potential indirect tax effects resulting from application of the Court opinion. Deferred tax liabilities, representing VF's future tax on annual inclusions, would also be released. The net impact to tax expense is estimated to be up to $730.0 million, plus the reversal of any interest income accrued on the payment, which was approximately $12.0 million at March 2023.

*Contractual Obligations*

Following is a summary of VF's material contractual obligations and commercial commitments at the end of March 2023 that will require the use of funds:

| (In millions) | Total | Payment Due or Forecasted by Fiscal Year | | | | | | |
| | | 2024 | 2025 | 2026 | 2027 | 2028 | Thereafter |
|---|---|---|---|---|---|---|---|
| Recorded liabilities: | | | | | | | |
| Long-term debt [1] | $ 6,682 | $ 925 | $ 1,002 | $ 1,295 | $ 2 | $ 1,045 | $ 2,414 |
| Operating leases [2] | 1,575 | 363 | 309 | 232 | 189 | 123 | 360 |
| Unrecorded commitments: | | | | | | | |
| Interest payment obligations [3] | 1,110 | 192 | 173 | 128 | 105 | 92 | 421 |
| Inventory obligations [4] | 2,294 | 2,225 | 68 | — | — | — | — |
| | $ 11,661 | $ 3,705 | $ 1,551 | $ 1,655 | $ 295 | $ 1,260 | $ 3,195 |

Note: Amounts may not sum due to rounding.

[1]   Long-term debt consists of required undiscounted principal payments on long-term debt and finance lease obligations.

[2]   Operating leases represent required undiscounted lease payments during the noncancelable lease term. Variable payments for occupancy-related costs, real estate taxes, insurance and contingent rent are not included above. In addition, $73.7 million of leases (on an undiscounted basis) that have not yet commenced with terms of 2 to 12 years beginning in Fiscal 2024 are not included above.

[3]   Interest payment obligations represent required interest payments on long-term debt. Amounts exclude amortization of debt issuance costs, debt discounts and acquisition costs that would be included in interest expense in the consolidated financial statements.

[4]   Inventory obligations represent binding commitments to purchase finished goods and raw materials that are payable upon VF taking ownership of the inventory. This obligation excludes the amount included in accounts payable at March 2023 related to inventory purchases.

VF had other financial commitments at the end of Fiscal 2023 that are not included in the above table but may require the use of funds under certain circumstances:

- $110.9 million of surety bonds, custom bonds, standby letters of credit and international bank guarantees are not included in the table above because they represent contingent guarantees of performance under self-insurance and other programs and would only be drawn upon if VF were to fail to meet its other obligations.

- Purchase orders for goods or services in the ordinary course of business are not included in the above table because they represent authorizations to purchase rather than binding commitments.

Management believes that VF's cash and equivalents balances and expected funds to be provided by operating activities, as well as its Global Credit Facility, additional borrowing capacity and access to capital markets, taken as a whole, provide (i) adequate liquidity to meet all of its current and long-term obligations when due, (ii) adequate liquidity to fund capital expenditures and pay quarterly dividends, and (iii) flexibility to meet investment opportunities that may arise. There continues to be uncertainty about the duration and extent of the impact of the challenging macroeconomic environment and COVID-19 pandemic. However, management believes that VF has sufficient liquidity and flexibility to continue to operate during and after the disruptions caused by the challenging macroeconomic environment and COVID-19 pandemic, and meet its current and long-term obligations as they become due.

VF does not participate in transactions with unconsolidated entities or financial partnerships that are reasonably likely to have a material impact on the Company.

### Risk Management

VF is exposed to risks in the ordinary course of business. Management regularly assesses and manages exposures to these risks through operating and financing activities and, when appropriate, by (i) taking advantage of natural hedges within VF, (ii) purchasing insurance from commercial carriers, or (iii) using derivative financial instruments. Some potential risks are discussed below:

*Insured risks*

VF is self-insured for a significant portion of its employee medical, workers' compensation, vehicle and general liability exposures. VF purchases insurance from highly-rated commercial carriers to cover other risks, including directors and officers, cyber, property, stock throughput, employment practices, wage and hour and umbrella, and to establish stop-loss limits on self-insurance arrangements.

*Cash and equivalents risks*

VF had $814.9 million of cash and equivalents at the end of Fiscal 2023. Management continually monitors the credit ratings of the financial institutions with whom VF conducts business and geopolitical risks that may impact countries where VF has cash balances. Management also monitors the credit quality of cash equivalents.

*Defined benefit pension plan risks*

At the end of Fiscal 2023, VF's defined benefit pension plans were overfunded by a net total of $90.4 million. The overfunded status includes a $71.8 million liability related to our U.S. unfunded supplemental defined benefit plan, $19.0 million of net liabilities related to our non-U.S. defined benefit plans, and a $181.2 million net asset related to our U.S. qualified defined

benefit plan. VF will continue to evaluate the funded status and future funding requirements of these plans, which depends in part on the future performance of the plans' investment portfolios. Management believes that VF has sufficient liquidity to make any required contributions to the pension plans in future years.

VF's reported earnings are subject to risks due to the volatility of its pension cost (income), which has ranged in recent years from cost of $101.9 million in the year ended March 2023 to income of $7.3 million in the year ended March 2022. These fluctuations are primarily due to differences in the amount of settlement charges recorded in the respective periods. The changes are also impacted by varying amounts of actuarial gains and losses that are deferred and amortized to future years' pension cost (income). The assumptions that impact actuarial gains and losses include the rate of return on investments held by the pension plans, the discount rate used to value participant liabilities and demographic characteristics of the participants.

VF has taken a series of steps to manage the risk and volatility in the pension plans and their impact on the financial statements, including the following:

- The U.S. qualified and supplemental defined benefit plans were closed to new entrants at the end of 2004 and all future benefit accruals were frozen as of December 31, 2018.

- During the year ended March 2020, VF offered former employees in the U.S. qualified plan a lump-sum option to receive a distribution of their deferred vested benefits. The U.S. qualified plan participants were reduced by 10% as a result of this offer. No additional funding of the pension plan was required as all distributions were paid out of existing plan assets, and the plan's funded status remained materially unchanged.

- During the year ended March 2023, VF entered into an agreement with The Prudential Insurance Company of America ("Prudential") to purchase an irrevocable group annuity contract relating to approximately $330 million of the U.S. qualified defined benefit pension plan obligations. The transaction closed on June 30, 2022 and was funded entirely by existing assets of the plan. Under the group annuity contract, Prudential assumed responsibility for benefit payments and annuity administration for approximately 17,700 retirees and beneficiaries.

The investment strategy of the U.S. qualified plan continues to define dynamic asset allocation targets that are dependent upon changes in the plan's funded status, capital market expectations, and risk tolerance. Management will continue to evaluate actions that may help to reduce VF's risks related to its defined benefit plans.

*Interest rate risks*

VF limits the risk of interest rate fluctuations by managing the mix of fixed and variable interest rate debt. In addition, VF may use derivative financial instruments to manage risk. Since most of VF's long-term debt has fixed interest rates, the exposure primarily relates to changes in interest rates on variable rate short-term borrowings (which averaged approximately $1.0 billion at a 3.6% rate during Fiscal 2023). Additionally, VF entered into a DDTL Agreement during Fiscal 2023, which has a variable interest rate. VF entered into floating-to-fixed interest rate swap contracts to hedge a portion of the cash flow risk

associated with the DDTL Agreement. Any change in interest rates would also affect interest income earned on VF's cash equivalents. Based on the average amount of variable rate borrowings and cash equivalents during Fiscal 2023, the effect of a hypothetical 1% increase in interest rates would be a decrease in reported net income of approximately $8.9 million and a hypothetical 1% decrease in interest rates would be an increase in reported net income of approximately $8.9 million. The calculation does not take into account the impact of our interest rate swap.

*Foreign currency exchange rate risks*

VF is a global enterprise subject to the risk of foreign currency fluctuations. Approximately 48% of VF's revenues in the year ended March 2023 were generated in international markets. Most of VF's foreign businesses operate in functional currencies other than the U.S. dollar. In periods where the U.S. dollar strengthens relative to the euro or other foreign currencies where VF has operations, there is a negative impact on VF's operating results upon translation of those foreign operating results into the U.S. dollar. As discussed later in this section, management hedges VF's investments in certain foreign operations and foreign currency transactions.

The reported values of assets and liabilities in these foreign businesses are subject to fluctuations in foreign currency exchange rates. For net advances to and investments in VF's foreign businesses that are considered to be long-term, the impact of changes in foreign currency exchange rates on those long-term advances is deferred as a component of accumulated OCI in stockholders' equity. The U.S. dollar value of net investments in foreign subsidiaries fluctuates with changes in the underlying functional currencies. In March 2023, VF issued €1.0 billion of euro-denominated fixed-rate notes, in February 2020, VF issued €1.0 billion of euro-denominated fixed-rate notes, and in September 2016, VF issued €850.0 million of euro-denominated fixed-rate notes. These notes have been designated as net investment hedges of VF's investment in certain foreign operations. Because this debt qualified as a nonderivative hedging instrument, foreign currency transaction gains or losses on the debt are deferred in the foreign currency translation and other component of accumulated OCI as an offset to the foreign currency translation adjustments on the hedged investments. Any amounts deferred in accumulated OCI will remain until the hedged investment is sold or substantially liquidated.

VF monitors net foreign currency market exposures and enters into derivative foreign currency contracts to hedge the effects of exchange rate fluctuations for a significant portion of forecasted foreign currency cash flows or specific foreign currency transactions (relating to cross-currency inventory purchases, product sales, operating costs and intercompany royalty payments). VF's practice is to buy or sell foreign currency exchange contracts that cover up to 80% of foreign currency exposures for periods of up to 24 months. Currently, VF uses only foreign exchange forward contracts but may use options or collars in the future. This use of financial instruments allows management to reduce the overall exposure to risks from exchange rate fluctuations on VF's cash flows and earnings, since gains and losses on these contracts will offset a portion of losses and gains on the transactions being hedged.

For cash flow hedging contracts outstanding at the end of Fiscal 2023, a hypothetical 10% decrease and 10% increase in foreign

currency exchange rates compared to rates at the end of Fiscal 2023, would result in an increase in the unrealized net gain of approximately $39.7 million and a decrease in the unrealized net gain of approximately $32.3 million, respectively. However, any change in the fair value of the hedging contracts would be substantially offset by a change in the fair value of the underlying hedged exposure impacted by the currency rate changes.

*Counterparty risks*

VF is exposed to credit-related losses in the event of nonperformance by counterparties to derivative hedging instruments. To manage this risk, we have established counterparty credit guidelines and only enter into derivative transactions with financial institutions that have 'A minus/A3' investment grade credit ratings or better. VF continually monitors the credit rating of, and limits the amount hedged with, each counterparty. Additionally, management utilizes a portfolio of financial institutions to minimize exposure to potential counterparty defaults and adjusts positions as necessary. VF also monitors counterparty risk for derivative contracts within the defined benefit pension plans.

*Commodity price risks*

VF is exposed to market risks for the pricing of cotton, leather, rubber, wool and other materials, primarily due to the impact on the cost of sourced finished goods from independent contractors. To manage risks of commodity price changes, management negotiates prices of finished goods in advance when possible. VF has not historically managed commodity price exposures by using derivative instruments.

*Deferred compensation and related investment security risks*

VF has nonqualified deferred compensation plans in which liabilities to the plans' participants are based on the market values of the participants' selection of a hypothetical portfolio of investment funds. VF invests in a portfolio of securities and variable life insurance contracts that substantially mirror the participants' investment selections. The increases and decreases in deferred compensation liabilities are substantially offset by corresponding increases and decreases in the market value of VF's investments, resulting in an insignificant net exposure to operating results and financial position.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

VF has chosen accounting policies that management believes are appropriate to accurately and fairly report VF's operating results and financial position in conformity with accounting principles generally accepted in the U.S. VF applies these accounting policies in a consistent manner. Significant accounting policies are summarized in Note 1 to the consolidated financial statements.

The application of these accounting policies requires that VF make estimates and assumptions about future events and apply judgments that affect the reported amounts of assets, liabilities, revenues, expenses, contingent assets and liabilities, and related disclosures. These estimates, assumptions and judgments are based on historical experience, current trends and other factors believed to be reasonable under the circumstances. Management evaluates these estimates and assumptions on an ongoing basis. Because VF's business cycle

is relatively short (i.e., from the date inventory is purchased until that inventory is sold and payment is collected), actual results related to most estimates are known within a few months after any balance sheet date. In addition, VF may retain outside specialists to assist in valuations of business acquisitions and impairment testing of goodwill and intangible assets. If actual results ultimately differ from previous estimates, the revisions are included in results of operations when the actual amounts become known.

VF believes the following accounting policies involve the most significant management estimates, assumptions and judgments used in preparation of the consolidated financial statements or are the most sensitive to change from outside factors. The application of these critical accounting policies and estimates is discussed with the Audit Committee of the Board of Directors.

### Business Combinations

VF accounts for business combinations using the acquisition method of accounting. Under the acquisition method, the consolidated financial statements reflect the operations of an acquired business starting from the closing date of the acquisition. All assets acquired and liabilities assumed are recorded at fair value as of the acquisition date. VF allocates the purchase price of an acquired business to the fair values of the tangible and identifiable intangible assets acquired and liabilities assumed, with any excess purchase price recorded as goodwill. Contingent consideration, if any, is included within the purchase price and is recognized at its fair value on the acquisition date.

The application of the acquisition method of accounting for business combinations and determination of fair value requires management to make judgments and may involve the use of significant estimates, including assumptions related to estimated future revenues, growth rates, cash flows, discount rates and royalty rates, among other items. VF generally evaluates fair value at acquisition using three valuation techniques - the replacement cost, market and income methods

- and weights the valuation methods based on what is most appropriate in the circumstances. The process of assigning fair values, particularly to acquired intangible assets, is highly subjective. VF also utilizes third-party valuation specialists to assist management in the determination of the fair value of assets acquired and liabilities assumed. Management estimates of fair value are based on assumptions believed to be reasonable, but are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. If the actual results differ from the estimates and judgments used, the amounts recorded in the consolidated financial statements may be exposed to potential impairment of the intangible assets and goodwill, as discussed in the "Long-Lived Assets, Including Intangible Assets and Goodwill" section below.

During the measurement period, which is up to one year from the acquisition date, adjustments to the assets acquired and liabilities assumed may be recorded, with the corresponding offset to goodwill.

During the fourth quarter of Fiscal 2021, VF completed the acquisition of Supreme Holdings, Inc. ("Supreme") for $2.4 billion. Management allocated the purchase price of the acquired Supreme business to the estimated fair values of the acquired assets and assumed liabilities at the date of acquisition, which resulted in excess purchase price of $1.25 billion that was recorded as goodwill. The acquired assets included the estimated fair value of $1.20 billion for the *Supreme*® trademark, which is an identifiable intangible asset management believes to have an indefinite life. The estimated fair value of the *Supreme*® trademark was determined using the relief-from-royalty method of the income valuation approach, which required the use of significant estimates and assumptions, including future revenues, growth rates, royalty rate, tax rates and discount rate associated with the acquired intangible asset.

Management's estimates and assumptions utilized internal forecasts of Supreme's future business performance and relevant market information. Management also utilized a third-party valuation specialist to assist in the determination of the estimated fair value of the *Supreme*® trademark.

Management believes the assumptions used in determining the estimated fair value of the *Supreme*® trademark were reasonable, but inherently uncertain and unpredictable. As a result, actual results have differed from estimates. Refer to the "Long-Lived Assets, Including Intangible Assets and Goodwill" section below for additional discussion regarding impairment considerations during Fiscal 2023 related to the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset.

**Long-Lived Assets, Including Intangible Assets and Goodwill**

*Definite-Lived Assets*

VF's depreciation policies for property, plant and equipment reflect judgments on the estimated economic lives and residual values, if any. VF's amortization policies for definite-lived intangible assets reflect judgments on the estimated amounts and duration of future cash flows expected to be generated by those assets. In evaluating the amortizable life for customer relationship intangible assets, management considers historical attrition patterns for various groups of customers. In determining the lease term used to amortize operating lease right-of-use assets, VF considers initial terms and any renewal or termination options that may exist. When deemed reasonably certain, the renewal and termination options are included in the determination of lease term.

VF's policy is to review property, plant and equipment, definite-lived intangible assets and operating lease right-of-use assets for potential impairment whenever events or changes in circumstances indicate the carrying value of an asset or asset group may not be recoverable. VF tests for potential impairment at the asset or asset group level, which is the lowest level for which there are identifiable cash flows that are largely independent. VF measures recoverability of the carrying value of an asset or asset group by comparison to the estimated pre-tax undiscounted cash flows expected to be generated by the asset. If the forecasted pre-tax undiscounted cash flows to be generated by the asset are not expected to be adequate to recover the asset's carrying value, a fair value analysis is performed, and an impairment charge is recorded if there is an excess of the asset's carrying value over its estimated fair value.

When testing property, plant and equipment for potential impairment, VF uses the income-based discounted cash flow method using the estimated cash flows of the respective asset or asset group. The estimated pre-tax undiscounted cash flows of the asset or asset group through the end of its useful life are compared to its carrying value. If the pre-tax undiscounted cash flows of the asset or asset group exceed its carrying value, there is no impairment charge. If the pre-tax undiscounted cash flows of the asset or asset group are less than its carrying value, the estimated fair value of the asset or asset group is calculated based on the after-tax discounted cash flows using an appropriate weighted average cost of capital ("WACC"), and an impairment charge is recognized for the difference between the estimated fair value of the asset or asset group and its carrying value.

When testing customer relationship intangible assets for potential impairment, management considers historical customer attrition rates and projected revenues and profitability related to customers that existed at acquisition. Management uses the multi-period excess earnings method, which is a specific application of the discounted cash flow method, to value customer relationship assets. The estimated pre-tax undiscounted cash flows of the asset through the end of its useful life are compared to its carrying value. If the pre-tax undiscounted cash flows of the asset exceed its carrying value, there is no impairment charge. If the pre-tax undiscounted cash flows of the asset are less than its carrying value, the estimated fair value of the asset is calculated based on the present value of the after-tax cash flows expected to be generated by the customer relationship asset after deducting contributory asset charges, and an impairment charge is recognized for the difference between the estimated fair value of the asset and its carrying value.

When testing operating lease right-of-use assets for potential impairment, VF uses the income-based discounted cash flow method using the estimated cash flows of the respective asset or asset group. The estimated pre-tax undiscounted cash flows of the asset or asset group through the end of its useful life are compared to its carrying value. If the pre-tax undiscounted cash flows of the asset exceed its carrying value, there is no impairment charge. If the pre-tax undiscounted cash flows of the asset or asset group are less than its carrying value, the estimated fair value of the asset or asset group is calculated considering what a market participant would pay to lease the asset for its highest and best use, and an impairment charge is recognized for the difference between the estimated fair value of the asset or asset group and its carrying value. The impairment loss is allocated to the long-lived assets of the group on a pro-rata basis using the relative carrying amounts of those assets.

*Indefinite-Lived Intangible Assets and Goodwill*

Fair value for acquired intangible assets is generally based on the present value of expected cash flows. Indefinite-lived trademark or trade name intangible assets (collectively referred to herein as "trademarks") represent individually acquired trademarks, some of which are registered in multiple countries. Goodwill represents the excess of cost of an acquired business over the fair values of the tangible and identifiable intangible assets acquired and liabilities assumed, and is assigned at the reporting unit level.

VF's policy is to evaluate indefinite-lived intangible assets and goodwill for possible impairment as of the beginning of the fourth quarter of each fiscal year, or whenever events or changes in circumstances indicate that the fair value of such assets may be below their carrying amount. As part of its annual impairment testing, VF may elect to assess qualitative factors as a basis for determining whether it is necessary to perform quantitative impairment testing. If management's assessment of these qualitative factors indicates that it is more likely than not that the fair value of the intangible asset or reporting unit is more than its carrying value, then no further testing is required. Otherwise, the intangible asset or reporting unit is quantitatively tested for impairment.

An indefinite-lived intangible asset is quantitatively tested for possible impairment by comparing the estimated fair value of the asset to its carrying value. Fair value of an indefinite-lived trademark is based on an income approach using the relief-from-royalty method. Under this method, forecasted revenues for products sold with the trademark are assigned a royalty rate that would be charged to license the trademark (in lieu of ownership), and the estimated fair value is calculated as the present value of those forecasted royalties avoided by owning the trademark. The discount rate is based on the reporting unit's WACC that considers market participant assumptions and is adjusted, as appropriate, to factor in the risk of the intangible asset. The royalty rate is selected based on consideration of (i) royalty rates included in active license agreements, if applicable, (ii) royalty rates received by market participants in the apparel and footwear industry, and (iii) the current performance of the reporting unit. If the estimated fair value of the trademark intangible asset exceeds its carrying value, there is no impairment charge. If the estimated fair value of the trademark is less than its carrying value, an impairment charge is recognized for the difference.

Goodwill is quantitatively evaluated for possible impairment by comparing the estimated fair value of a reporting unit to its carrying value. Reporting units are businesses with discrete financial information that is available and reviewed by management.

For goodwill impairment testing, VF estimates the fair value of a reporting unit using both income-based and market-based valuation methods. The income-based approach is based on the reporting unit's forecasted future cash flows that are discounted to present value using the reporting unit's WACC, as discussed above. For the market-based approach, management uses both the guideline company and similar transaction methods. The guideline company method analyzes market multiples of revenues and earnings before interest, taxes, depreciation and amortization ("EBITDA") for a group of comparable public companies. The market multiples used in the valuation are based on the relative strengths and weaknesses of the reporting unit compared to the selected guideline companies. Under the similar transactions method, valuation multiples are calculated utilizing actual transaction prices and revenue/EBITDA data from target companies deemed similar to the reporting unit. Management typically assigns more weight to the income-based valuation method. Management also evaluates the fair value estimates of reporting units in the context of VF's total enterprise market value.

Based on the range of estimated fair values developed from the income and market-based methods, VF determines the estimated fair value for the reporting unit. If the estimated fair

value of the reporting unit exceeds its carrying value, the goodwill is not impaired and no further review is required. However, if the estimated fair value of the reporting unit is less than its carrying value, VF calculates the impairment loss as the difference between the carrying value of the reporting unit and the estimated fair value.

The income-based fair value methodology requires management's assumptions and judgments regarding economic conditions in the markets in which VF operates and conditions in the capital markets, many of which are outside of management's control. At the reporting unit level, fair value estimation requires management's assumptions and judgments regarding the effects of overall economic conditions on the specific reporting unit, along with assessment of the reporting unit's strategies and forecasts of future cash flows. Forecasts of individual reporting unit cash flows involve management's estimates and assumptions regarding:

- Annual cash flows, on a debt-free basis, arising from future revenues and profitability, changes in working capital, capital spending and income taxes for a forecast period.

- A terminal growth rate for years beyond the forecast period. The terminal growth rate is selected based on consideration of growth rates used in the forecast period, historical performance of the reporting unit and economic conditions.

- A discount rate that reflects the risks inherent in realizing the forecasted cash flows. A discount rate considers the risk-free rate of return on long-term treasury securities, the risk premium associated with investing in equity securities of comparable companies, the beta obtained from comparable companies and the cost of debt for investment grade issuers. In addition, the discount rate may consider any company-specific risk (at the reporting unit level) in achieving the prospective financial information.

Under the market-based fair value methodology, judgment is required in evaluating market multiples and recent transactions. Management believes that the assumptions used for its impairment tests are representative of those that would be used by market participants performing similar valuations of VF's reporting units.

### Fiscal 2023 Impairment Testing

During the second quarter of Fiscal 2023, management determined that continued increases in the federal funds rate and strengthening of the U.S. dollar relative to other currencies, was a triggering event that required impairment testing of the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset. See additional discussion of the testing in the "Supreme Reporting Unit and Indefinite-Lived Intangible Asset Impairment Analysis" section below.

Management performed its annual goodwill and indefinite-lived intangible asset impairment testing as of the beginning of the fourth quarter of Fiscal 2023. VF elected to bypass the qualitative analysis for the Supreme, Timberland and Icebreaker reporting unit goodwill and indefinite-lived trademark intangible asset. See additional discussion in the "Supreme Reporting Unit and Indefinite-Lived Intangible Asset Impairment Analysis", "Timberland Reporting Unit and Indefinite-Lived Intangible Asset Impairment Analysis" and "Icebreaker Reporting Unit and

Indefinite-Lived Intangible Asset Impairment Analysis" sections below. Management performed a qualitative analysis for all other reporting units and trademark intangible assets, as discussed below in the "Other Reporting Units - Qualitative Impairment Analysis" section. The carrying values of the reporting unit goodwill and indefinite-lived trademark intangible assets subject to qualitative assessment at the testing date of January 1, 2023, were $663.7 million and $638.6 million, respectively.

***Supreme Reporting Unit and Indefinite-Lived Intangible Asset Impairment Analysis***

Supreme was acquired by VF in Fiscal 2021. Supreme is a global streetwear leader that sells apparel, accessories and footwear under its namesake brand, *Supreme*®. Products are sold globally through VF-operated stores and websites. The Supreme reporting unit is included in the Active reportable segment.

*Interim Impairment Testing*

During the second quarter of Fiscal 2023, due to continued increases in the federal funds rate and strengthening of the U.S. dollar relative to other currencies, management performed a quantitative impairment analysis of both the Supreme reporting unit goodwill and the indefinite-lived trademark intangible asset. The carrying values of the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset at the October 1, 2022 testing date were $1.21 billion and $1.19 billion, respectively. As a result of the impairment testing performed, VF recorded impairment charges of $229.0 million and $192.9 million related to the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset, respectively, in the Consolidated Statement of Operations for the year ended March 2023.

The fair values of the Supreme reporting unit and indefinite-lived trademark intangible asset were estimated using valuation techniques consistent with those discussed in the "Indefinite-Lived Intangible Assets and Goodwill" section above, and utilized significant unobservable inputs (Level 3). The impairment related to an increase in the market-based discount rates used in the valuations and the negative impact of foreign currency exchange rate changes on financial projections.

Management's revenue and profitability forecasts used in the Supreme reporting unit and indefinite-lived trademark intangible asset valuations considered recent and historical performance, strategic initiatives and industry trends. Assumptions used in the valuations were similar to those that would be used by market participants performing independent valuations of the business.

Key assumptions developed by management and used in the interim quantitative analysis of the Supreme reporting unit and indefinite-lived trademark intangible asset included:

- Financial projections and future cash flows reflecting results lower than prior forecasts primarily driven by the negative impacts of foreign currency exchange rate changes. The projections assumed revenue growth and profitability improvement throughout the forecast period reflecting the long-term strategy for the business which was largely unchanged from the business combination valuation, and terminal growth rates based on the expected long-term growth rate of the business;

- Tax rates based on the statutory rates for the countries in which the brand operates and the related intellectual property is domiciled;

- Royalty rates based on market data as well as active license agreements with similar VF brands;

- Market-based discount rates reflecting increases in the federal funds rate; and,

- Market approach reflecting lower recent historical financial measures for and valuation multiples.

*Annual Impairment Testing*

In conjunction with VF's annual goodwill and indefinite-lived intangible asset impairment testing as of the beginning of the fourth quarter of Fiscal 2023, management performed a quantitative impairment analysis of both the Supreme reporting unit goodwill and the indefinite-lived trademark intangible asset. The decision to bypass the optional qualitative impairment assessment and proceed directly to a quantitative impairment analysis was based on the recent impairment results from the interim quantitative analysis, weakness in recent Supreme financial performance including the results from the latest season and the overall significance of the related assets.

As a result of the quantitative impairment analysis, VF recorded additional impairment charges of $165.1 million and $148.0 million to the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset, respectively, in the Consolidated Statement of Operations for the year ended March 2023. The remaining carrying values of the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset, after the impairment charges, were $825.9 million and $852.0 million, respectively.

The fair values of the Supreme reporting unit and indefinite-lived trademark intangible asset were estimated using valuation techniques consistent with those discussed in the "Indefinite-Lived Intangible Assets and Goodwill" section above, and utilized significant unobservable inputs (Level 3). The impairment related to lower financial projections and increased risk of achieving management's forecasts.

Management's revenue and profitability forecasts used in the Supreme reporting unit and indefinite-lived trademark intangible asset valuations considered historical performance, strategic initiatives and industry trends. Assumptions used in the valuations were similar to those that would be used by market participants performing independent valuations of the business.

Key assumptions developed by management and used in the quantitative analysis of the Supreme reporting unit and indefinite-lived trademark intangible asset included:

- Financial projections and future cash flows, including a base year reflecting actual results lower than forecasts used in the second quarter of Fiscal 2023, primarily driven by weakness in the North America region, and a longer recovery timeline, revenue growth and profitability improvement throughout the forecast period that reflects the long-term strategy for the business, including geographic expansion, and terminal growth rates based on the expected long-term growth rate of the business;

- Tax rates based on the statutory rates for the countries in which the brand operates and the related intellectual property is domiciled;

- Royalty rates based on market data as well as active license agreements with similar VF brands;

- Market-based discount rates, including consideration of additional risk of achievement of the financial projections based on recent financial performance; and,
- Market approach reflecting lower recent historical financial measures for Supreme.

The annual and interim Supreme valuation models used by management assume revenue growth and profitability improvement, and execution of Supreme's long-term growth strategy, including expansion into new markets. If the brand is unable to achieve the financial projections, additional impairment of the reporting unit goodwill and indefinite-lived trademark intangible asset could occur in the future.

*Timberland Reporting Unit and Indefinite-Lived Intangible Asset Impairment Analysis*

In conjunction with VF's annual goodwill and indefinite-lived intangible asset impairment testing as of the beginning of the fourth quarter of Fiscal 2023, management performed a quantitative impairment analysis of both the Timberland reporting unit goodwill, which includes the *Timberland®* brand, and the Timberland indefinite-lived trademark intangible asset, which includes both the *Timberland®* and *Timberland PRO®* brands. The decision to bypass the optional qualitative impairment assessment and proceed directly to a quantitative impairment analysis was based on management's overall assessment of current events and circumstances including macroeconomic conditions, industry and market considerations, brand-specific performance and the overall significance of the related assets. Based on the analysis, management concluded the Timberland reporting unit goodwill and indefinite-lived trademark intangible asset were not impaired. For goodwill, the estimated fair value of the reporting unit exceeded the carrying value by 12%. The estimated fair value of the indefinite-lived trademark intangible asset exceeded its carrying value by a significant amount. The carrying values of the Timberland reporting unit goodwill and indefinite-lived trademark intangible asset at the January 1, 2023 testing date were $407.0 million and $999.5 million, respectively.

The *Timberland®* brand, acquired in 2011, offers outdoor, adventure-inspired lifestyle footwear, apparel and accessories that combine performance benefits and versatile styling for men, women and children. Products are sold globally through chain, department and specialty stores, independent distributors and licensees, independently-operated partnership stores, concession retail stores, VF-operated stores and websites and on websites with strategic digital partners. The Timberland reporting unit is included in the Outdoor reportable segment.

The fair values of the Timberland reporting unit and indefinite-lived trademark intangible asset were estimated using valuation techniques consistent with those discussed in the "Indefinite-Lived Intangible Assets and Goodwill" section above, and utilized significant unobservable inputs (Level 3).

Management's revenue and profitability forecasts used in the Timberland reporting unit and indefinite-lived trademark intangible asset valuations considered recent and historical performance, strategic initiatives and industry trends. Assumptions used in the valuations were similar to those that would be used by market participants performing independent valuations of the business.

Key assumptions developed by management and used in the quantitative analysis of the Timberland reporting unit and indefinite-lived trademark intangible asset included:

- Financial projections and future cash flows, including a base year that considered recent actual results lower than previous internal forecasts, revenue growth and profitability improvement throughout the forecast period that reflects the long-term strategy for the business, and terminal growth rates based on the expected long-term growth rate of the business;
- Tax rates based on the statutory rates for the countries in which the brand operates and the related intellectual property is domiciled;
- Royalty rates based on market data as well as active license agreements for the brand and similar VF brands; and
- Market-based discount rates.

The Timberland valuation model used by management in the impairment testing assumes revenue growth and profitability improvement and execution of its long-term growth strategy. If the brand is unable to achieve the financial projections, including recovery from the current macroeconomic environment, an impairment of the reporting unit goodwill or indefinite-lived trademark intangible asset could occur in the future.

Management performed a sensitivity analysis on the impairment model used to test the Timberland reporting unit goodwill. In doing so, management determined that individual changes of a 200 basis point decrease in the compound annual growth rate for EBITDA, or a 100 basis point increase in the discount rate, used in the discounted cash flow model did not cause the estimated fair value of the reporting unit to decline below its carrying value.

*Icebreaker Reporting Unit and Indefinite-Lived Intangible Asset Impairment Analysis*

In conjunction with VF's annual goodwill and indefinite-lived intangible asset impairment testing as of the beginning of the fourth quarter of Fiscal 2023, management performed a quantitative impairment analysis of the Icebreaker reporting unit goodwill and indefinite-lived trademark intangible asset. The decision to bypass the optional qualitative impairment assessment and proceed directly to a quantitative impairment analysis was based on management's overall assessment of current events and circumstances including macroeconomic conditions, industry and market considerations and brand-specific performance. Based on the analysis, management concluded the Icebreaker reporting unit goodwill and indefinite-lived trademark intangible asset were not impaired. For goodwill, the estimated fair value of the reporting unit exceeded the carrying value by 8%. The estimated fair value of the indefinite-lived trademark intangible asset exceeded its carrying value by a significant amount. The carrying values of the Icebreaker reporting unit goodwill and indefinite-lived trademark intangible asset at the January 1, 2023 testing date were $80.7 million and $60.5 million, respectively.

The *Icebreaker®* brand, acquired in Fiscal 2019, specializes in high-performance apparel based on natural fibers, including merino wool and plant-based fibers. The *Icebreaker®* brand is included in the Outdoor reportable segment.

The fair values of the Icebreaker reporting unit and indefinite-lived trademark intangible asset were estimated using valuation

techniques consistent with those discussed in the "Indefinite-Lived Intangible Assets and Goodwill" section above, and utilized significant unobservable inputs (Level 3).

Management's revenue and profitability forecasts used in the Icebreaker reporting unit and indefinite-lived trademark intangible asset valuations considered recent and historical performance, strategic initiatives and industry trends. Assumptions used in the valuations were similar to those that would be used by market participants performing independent valuations of the business.

Key assumptions developed by management and used in the quantitative analysis of the Icebreaker reporting unit and indefinite-lived trademark intangible asset included:

- Financial projections and future cash flows, including a base year that considered recent actual results lower than previous internal forecasts, revenue growth and profitability improvement throughout the forecast period that reflects the long-term strategy for the business, and terminal growth rates based on the expected long-term growth rate of the business;

- Tax rates based on the statutory rates for the countries in which the brand operates and the related intellectual property is domiciled;

- Royalty rates based on market data as well as active license agreements for similar VF brands; and

- Market-based discount rates.

The Icebreaker valuation model used by management in the impairment testing assumes revenue growth and profitability improvement and execution of its long-term growth strategy. If the brand is unable to achieve the financial projections, including recovery from the current macroeconomic environment, an impairment of the reporting unit goodwill or indefinite-lived trademark intangible asset could occur in the future.

Management performed a sensitivity analysis on the impairment model used to test the Icebreaker reporting unit goodwill. In doing so, management determined that individual changes of a 100 basis point decrease in the compound annual growth rate for EBITDA, or a 50 basis point increase in the discount rate, used in the discounted cash flow model did not cause the estimated fair value of the reporting unit to decline below its carrying value.

### Other Reporting Units - Qualitative Impairment Analysis

For all other reporting units, VF elected to perform a qualitative assessment during the annual goodwill and indefinite-lived

### Income Taxes

As a global company, VF is subject to income taxes and files income tax returns in over 100 U.S. and foreign jurisdictions each year. Due to economic and political conditions, tax rates in various jurisdictions may be subject to significant change. The Company could be subject to changes in its tax rates, the adoption of new U.S. or international tax legislation or changes in interpretation of existing tax laws and regulations or rulings by courts or government authorities leading to exposure to additional tax liabilities. In particular, tax authorities and the courts have increased their focus on income earned in no- or low-tax jurisdictions or income that is not taxed in any jurisdiction. Tax authorities have also become skeptical of

intangible asset impairment testing to determine whether it was more likely than not that the goodwill and indefinite-lived trademark intangible assets in those reporting units were impaired. In this qualitative assessment, VF considered relevant events and circumstances for each reporting unit, including (i) current year results and performance versus management's annual and strategic plans, (ii) financial outlook based on the latest strategic plan, (iii) changes in the reporting unit carrying value since prior year and the amounts relative to the size of the respective business, (iv) industry and market conditions in which the reporting unit operates, (v) macroeconomic conditions, including discount rate and foreign exchange rate changes, and (vi) changes in products or services offered by the reporting unit. If applicable, performance in recent years was compared to forecasts included in prior valuations. Based on the results of the qualitative assessment, VF concluded it was more likely than not the carrying values of the goodwill and indefinite-lived trademark intangible assets were less than their fair values, and that further quantitative testing was not necessary.

### Management's Use of Estimates and Assumptions

Management made its estimates based on information available as of the date of our assessments, using assumptions we believe market participants would use in performing an independent valuation of the businesses. Although management believes the estimates and assumptions used in the impairment testing are reasonable and appropriate, it is possible that VF's assumptions and conclusions regarding impairment or recoverability of goodwill or indefinite-lived trademark intangible assets in any reporting unit could change in future periods. There can be no assurance that the estimates and assumptions, particularly our long-term financial projections, used in our goodwill and indefinite-lived intangible asset impairment testing will prove to be accurate predictions of the future, if, for example, (i) the businesses do not perform as projected, (ii) overall economic conditions in Fiscal 2024 or future years vary from current assumptions (including changes in discount rates and foreign currency exchange rates), (iii) business conditions or strategies for a specific reporting unit change from current assumptions, including loss of major customers or channels, (iv) investors require higher rates of return on equity investments in the marketplace, or (v) enterprise values of comparable publicly traded companies, or actual sales transactions of comparable companies, were to decline, resulting in lower multiples of revenues and EBITDA.

A future impairment charge of goodwill or indefinite-lived intangible assets could have a material effect on VF's consolidated financial position and results of operations.

special tax rulings provided to companies offering lower taxes than may be applicable in other countries. VF makes an ongoing assessment to identify any significant exposure related to increases in tax rates in the jurisdictions in which VF operates.

Furthermore, VF was granted a ruling which lowered the effective income tax rate on taxable earnings for years 2010 through 2014 under Belgium's excess profit tax regime. During 2015, the European Union Commission ("EU") investigated and announced its decision that these rulings were illegal and ordered the tax benefits to be collected from affected companies, including VF. Requests for annulment were filed by

Belgium and VF Europe BVBA individually. During 2017 and 2018, VF Europe BVBA was assessed and paid €35.0 million tax and interest, which was recorded as an income tax receivable and is included in the other current assets line item in VF's Consolidated Balance Sheets, based on the expected success of the requests for annulment. During 2019, the General Court annulled the EU decision and the EU subsequently appealed the General Court's annulment. In September 2021, the General Court's judgment was set aside by the Court of Justice of the EU and the case was sent back to the General Court to determine whether the excess profit tax regime amounted to illegal State aid. The case remains open and unresolved. If this matter is adversely resolved, these amounts will not be collected by VF.

The calculation of income tax liabilities involves uncertainties in the application of complex tax laws and regulations, which are subject to legal interpretation and significant management judgment. VF's income tax returns are regularly examined by federal, state and foreign tax authorities, and those audits may result in proposed adjustments. VF has reviewed all issues raised upon examination, as well as any exposure for issues that may be raised in future examinations. VF has evaluated these potential issues under the "more-likely-than-not" standard of the accounting literature. A tax position is recognized if it meets this standard and is measured at the largest amount of benefit that has a greater than 50% likelihood of being realized. Such judgments and estimates may change based on audit settlements, court cases and interpretation of tax laws and regulations. Income tax expense could be materially affected to the extent VF prevails in a tax position or when the statute of limitations expires for a tax position for which a liability for unrecognized tax benefits or valuation allowances has been established, or to the extent VF is required to pay amounts greater than the established liability for unrecognized tax benefits. Under the more-likely-than-not standard, VF does not currently anticipate any material impact on earnings from the ultimate resolution of income tax uncertainties. There are no accruals for general or unknown tax expenses.

As previously reported, VF petitioned the U.S. Tax Court (the "Court") to resolve an IRS dispute regarding the timing of income inclusion associated with VF's acquisition of The Timberland Company in September 2011. While the IRS argues that all such income should have been immediately included in 2011, VF has reported periodic income inclusions in subsequent tax years. Both parties moved for summary judgment on the issue. On January 31, 2022, the Court issued its opinion in favor of the IRS and on July 14, 2022 issued its final decision. VF believes the opinion of the Court was in error based on the technical merits and filed a notice of appeal on October 7, 2022. On October 19, 2022, VF paid $875.7 million related to the 2011 taxes and interest being disputed, which was recorded as an income tax receivable based on the technical merits of our position with regards to the case and will accrue interest income. VF continues to believe its timing and treatment of the income inclusion is appropriate and VF is vigorously defending its position. However, should the Court opinion ultimately be upheld on appeal, this income tax receivable will not be collected by VF. If the Court opinion is upheld, VF should be entitled to a refund of taxes paid on the periodic inclusions that VF has reported. However, any such refund could be substantially reduced by potential indirect tax effects resulting from application of the Court opinion. Deferred tax liabilities, representing VF's future tax on annual inclusions, would also be released. The net impact to tax expense is estimated to be up to $730.0 million, plus the reversal of any interest income accrued on the payment, which was approximately $12.0 million at March 2023.

As of March 2023, VF had $497.8 million of gross deferred income tax assets related to operating loss, credit and capital loss carryforwards, and $424.0 million of valuation allowances against those assets. Realization of deferred tax assets related to operating loss, credit and capital loss carryforwards is dependent on future taxable income in specific jurisdictions, the amount and timing of which are uncertain, and on possible changes in tax laws. If management believes that VF will not be able to generate sufficient taxable income or capital gains to offset losses or credits during the carryforward periods, VF records valuation allowances to reduce those deferred tax assets to amounts expected to be ultimately realized. If in a future period management determines that the amount of deferred tax assets to be realized differs from the net recorded amount, VF would record an adjustment to income tax expense in that future period.

### Recently Issued and Adopted Accounting Standards

Refer to Note 1 to the consolidated financial statements for discussion of recently issued and adopted accounting standards.

## ITEM 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.

A discussion of VF's market risks is incorporated by reference to "Risk Management" in Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this Annual Report.

## ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.

See "Index to Consolidated Financial Statements and Financial Statement Schedule" on page F-1 of this Annual Report for information required by this Item 8.

## ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.

Not applicable.

## ITEM 9A.   CONTROLS AND PROCEDURES.

### CONCLUSION REGARDING THE EFFECTIVENESS OF DISCLOSURE CONTROLS AND PROCEDURES

Under the supervision of the Interim Chief Executive Officer and the Chief Financial Officer, VF conducted an evaluation of the effectiveness of the design and operation of VF's "disclosure controls and procedures" as defined in Rules 13a-15(e) or 15d-15(e) of the Securities Exchange Act of 1934 (the "Exchange Act") as of April 1, 2023. These require that VF ensure that information required to be disclosed by VF in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that information required to be disclosed in the reports filed or submitted under the Exchange Act is accumulated and communicated to VF's management, including the principal executive officer and principal financial officer, to allow timely decisions regarding required disclosures. Based on VF's evaluation, the principal executive officer and the principal financial officer concluded that VF's disclosure controls and procedures were effective as of April 1, 2023.

### MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

See page F-2 of this Annual Report for "Management's Report on Internal Control Over Financial Reporting."

### REPORT OF REGISTERED PUBLIC ACCOUNTING FIRM

See page F-3 of this Annual Report for the "Report of Independent Registered Public Accounting Firm."

### CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING

There were no changes in VF's internal control over financial reporting that occurred during its last fiscal quarter that have materially affected, or are reasonably likely to materially affect, VF's internal control over financial reporting.

## ITEM 9B.   OTHER INFORMATION.

Not applicable.

## ITEM 9C.   DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS.

Not applicable.

# PART III

## ITEM 10.   DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.

Information regarding VF's Executive Officers required by Item 10 of this Part III is set forth in Item 1 of Part I of this Annual Report under the caption "Executive Officers of VF." Information required by Item 10 of Part III regarding VF's Directors is included under the caption "Election of Directors" in VF's 2023 Proxy Statement that will be filed with the Securities and Exchange Commission within 120 days after the close of our fiscal year ended April 1, 2023, which information is incorporated herein by reference.

Information regarding compliance with Section 16(a) of the Exchange Act of 1934 is included under the caption "Delinquent Section 16(a) Reports" (to the extent reported therein) in VF's 2023 Proxy Statement that will be filed with the Securities and Exchange Commission within 120 days after the close of our fiscal year ended April 1, 2023, which information is incorporated herein by reference.

Information regarding the Audit Committee is included under the caption "Corporate Governance at VF — Board Committees and Their Responsibilities — Audit Committee" in VF's 2023 Proxy Statement that will be filed with the Securities and Exchange Commission within 120 days after the close of our fiscal year ended April 1, 2023, which information is incorporated herein by reference.

VF has adopted a written code of ethics, "VF Corporation Code of Business Conduct," that is applicable to all VF directors, officers and employees, including VF's interim chief executive officer, chief financial officer, chief accounting officer and other executive officers identified pursuant to this Item 10 (collectively, the "Selected Officers"). The code is posted on VF's website, www.vfc.com. VF will disclose any changes in or waivers from its code of ethics applicable to any Selected Officer or director on its website at www.vfc.com.

The Board of Directors' Corporate Governance Principles, the Audit Committee, Governance and Corporate Responsibility Committee, Talent and Compensation Committee and Finance Committee charters and other corporate governance information, including the method for interested parties to communicate directly with nonmanagement members of the Board of Directors, are available on VF's website. These documents, as well as the VF Corporation Code of Business Conduct, will be provided free of charge to any shareholder upon request directed to the Secretary of VF Corporation at P.O. Box 13919, Denver, CO 80201.

## ITEM 11.   EXECUTIVE COMPENSATION.

Information required by Item 11 of this Part III is included under the captions "Corporate Governance at VF" and "Executive Compensation" in VF's 2023 Proxy Statement that will be filed with the Securities and Exchange Commission within 120 days after the close of our fiscal year ended April 1, 2023, which information is incorporated herein by reference.

## ITEM 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.

Information required by Item 12 of this Part III is included under the captions "Security Ownership of Certain Beneficial Owners and Management" and "Executive Compensation" in VF's 2023 Proxy Statement that will be filed with the Securities and Exchange Commission within 120 days after the close of our fiscal year ended April 1, 2023, which information is incorporated herein by reference.

## ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

Information required by Item 13 of this Part III is included under the caption "Corporate Governance at VF" in VF's 2023 Proxy Statement that will be filed with the Securities and Exchange Commission within 120 days after the close of our fiscal year ended April 1, 2023, which information is incorporated herein by reference.

## ITEM 14.   PRINCIPAL ACCOUNTING FEES AND SERVICES.

Information required by Item 14 of this Part III is included under the caption "Professional Fees of PricewaterhouseCoopers LLP" in VF's 2023 Proxy Statement that will be filed with the Securities and Exchange Commission within 120 days after the close of our fiscal year ended April 1, 2023, which information is incorporated herein by reference.

PART IV

## ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.

(a) The following documents are filed as a part of this Fiscal 2023 report:

| 1. Financial statements | PAGE NUMBER |
|---|---|
| Management's Report on Internal Control Over Financial Reporting | F-2 |
| Report of Independent Registered Public Accounting Firm | F-3 |
| Consolidated Balance Sheets | F-6 |
| Consolidated Statements of Operations | F-7 |
| Consolidated Statements of Comprehensive Income | F-8 |
| Consolidated Statements of Cash Flows | F-9 |
| Consolidated Statements of Stockholders' Equity | F-11 |
| Notes to Consolidated Financial Statements | F-12 |

| 2. Financial statement schedules | PAGE NUMBER |
|---|---|
| Schedule II — Valuation and Qualifying Accounts | F-53 |

All other schedules for which provision is made in the applicable accounting regulations of the Securities and Exchange Commission are not required under the related instructions or are inapplicable and therefore have been omitted.

3. Exhibits

| NUMBER | DESCRIPTION |
|---|---|
| 2. | Plan of acquisition, reorganization, arrangement, liquidation or succession |
| (A)[1] | Agreement and Plan of Merger dated as of November 8, 2020 among V.F. Corporation, New Ross Acquisition Corp., Supreme Holdings, Inc. and TC Group VI, L.P. (Incorporated by reference to Exhibit 2.1 to the Current Report on Form 8-K filed by VF with the SEC on November 9, 2020) |
| 3. | Articles of incorporation and bylaws: |
| (A) | Articles of Incorporation, restated as of October 21, 2013 (Incorporated by reference to Exhibit 3(i) to Form 8-K filed October 21, 2013) |
| (B) | Amended and Restated By-Laws of V.F. Corporation, effective January 24, 2023 (Incorporated by reference to Exhibit 3.1 to Form 8-K filed January 25, 2023) |
| 4. | Instruments defining the rights of security holders, including indentures: |
| (A) | A specimen of VF's Common Stock certificate (Incorporated by reference to Exhibit 4(A) to Form 10-K for the year ended January 3, 1998) |
| (B) | Indenture between VF and United States Trust Company of New York, as Trustee, dated September 29, 2000 (Incorporated by reference to Exhibit 4.1 to Form 10-Q for the quarter ended September 30, 2000) |
| (C) | Form of 6.00% Note due October 15, 2033 for $297,500,000 (Incorporated by reference to Exhibit 4.2 to Form S-4 Registration Statement No. 110458 filed November 13, 2003) |
| (D) | Indenture between VF and The Bank of New York Trust Company, N.A., as Trustee, dated October 15, 2007 (Incorporated by reference to Exhibit 4.1 to Form S-3ASR Registration Statement No. 333-146594 filed October 10, 2007) |
| (E) | First Supplemental Indenture between VF and The Bank of New York Trust Company, N.A., as Trustee, dated October 15, 2007 (Incorporated by reference to Exhibit 4.2 to Form 8-K filed October 25, 2007) |
| (F) | Form of 6.45% Note due 2037 for $350,000,000 (Incorporated by reference to Exhibit 4.4 to Form 8-K filed October 25, 2007) |
| (G) | Third Supplemental Indenture between VF, The Bank of New York Mellon Trust Company, N.A., as Trustee, and The Bank of New York Mellon, London Branch, as Paying Agent, dated as of September 20, 2016 (Incorporated by reference to Exhibit 4.2 to Form 8-K filed September 20, 2016) |
| (H) | Form of 0.625% Senior Notes due 2023 (Incorporated by reference to Exhibit 4.3 to Form 8-K filed September 20, 2016) |
| (I) | Fourth Supplemental Indenture between VF, The Bank of New York Mellon Trust Company, N.A., as Trustee, and The Bank of New York Mellon, London Branch, as Paying Agent dated as of February 25, 2020 (Incorporated by reference to Exhibit 4.2 to Form 8-K filed February 25, 2020) |
| (J) | Form of 0.250% Senior Notes due 2028 (Incorporated by reference to Exhibit 4.3 to Form 8-K filed February 25, 2020) |
| (K) | Form of 0.625% Senior Notes due 2032 (Incorporated by reference to Exhibit 4.4 to Form 8-K filed February 25, 2020) |

| NUMBER | | DESCRIPTION |
|---|---|---|
| | (L) | Fifth Supplemental Indenture between VF and The Bank of New York Mellon Trust Company, N.A., as Trustee, dated as of April 23, 2020 (Incorporated by reference to Exhibit 4.2 to Form 8-K filed April 23, 2020) |
| | (M) | Form of 2.400% Senior Notes due 2025 (Incorporated by reference to Exhibit 4.4 to Form 8-K filed April 23, 2020) |
| | (N) | Form of 2.800% Senior Notes due 2027 (Incorporated by reference to Exhibit 4.5 to Form 8-K filed April 23, 2020) |
| | (O) | Form of 2.950% Senior Notes due 2030 (Incorporated by reference to Exhibit 4.6 to Form 8-K filed April 23, 2020) |
| | (P) | Sixth Supplemental Indenture between VF and The Bank of New York Mellon Trust Company, N.A., as Trustee, dated as of March 7, 2023 (Incorporated by reference to Exhibit 4.2 to Form 8-K filed March 7, 2023) |
| | (Q) | Form of 4.125% Senior Notes due 2026 (Incorporated by reference to Exhibit 4.3 to Form 8-K filed March 7, 2023) |
| | (R) | Form of 4.250% Senior Notes due 2029 (Incorporated by reference to Exhibit 4.4 to Form 8-K filed March 7, 2023) |
| | (S) | Description of Securities |
| 10. | | Material contracts: |
| | (A) | 1996 Stock Compensation Plan, as amended and restated as of February 10, 2015 (Incorporated by reference to Appendix B to the 2015 Proxy Statement filed March 19, 2015)* |
| | (B) | Form of VF Corporation 1996 Stock Compensation Plan Non-Qualified Stock Option Certificate (Incorporated by reference to Exhibit 10(B) to 10-K for the year ended January 2, 2010)* |
| | (C) | Form of VF Corporation 1996 Stock Compensation Plan Non-Qualified Stock Option Certificate for Non-Employee Directors (Incorporated by reference to Exhibit 10(C) to Form 10-K for the year ended December 31, 2011)* |
| | (D) | Form of Award Certificate for Performance-Based Restricted Stock Units (Incorporated by reference to Exhibit 10.1 to Form 10-Q for the quarter ended September 26, 2020)* |
| | (E) | Form of Award Certificate for Restricted Stock Units for Non-Employee Directors (Incorporated by reference to Exhibit 10(F) to Form 10-K for the year ended March 28, 2020)* |
| | (F) | Form of Award Certificate for Restricted Stock Units (for awards granted prior to Fiscal 2021) (Incorporated by reference to Exhibit 10(I) to Form 10-K for the year ended March 28, 2020)* |
| | (G) | Form of Award Certificate for Restricted Stock Units Special Award (for awards granted prior to Fiscal 2021) (Incorporated by reference to Exhibit 10(J) to Form 10-K for the year ended March 28, 2020)* |
| | (H) | Form of Award Certificate for Restricted Stock Units (Incorporated by reference to Exhibit 10(K) to Form 10-K for the year ended March 28, 2020)* |
| | (I) | Form of Award Certificate for Restricted Stock Units Special Award (Cliff Vesting) (Incorporated by reference to Exhibit 10(L) to Form 10-K for the year ended March 28, 2020)* |
| | (J) | Form of Award Certificate for Restricted Stock Units Special Award (Split Vesting) (Incorporated by reference to Exhibit 10(M) to Form 10-K for the year ended March 28, 2020)* |
| | (K) | Form of Award Certificate for Restricted Stock Award (for awards granted prior to Fiscal 2021) [Incorporated by reference to Exhibit 10.2 to Form 8-K filed February 22, 2011]* |
| | (L) | Form of Award Certificate for Restricted Stock Award for Executive Officers (for awards granted prior to Fiscal 2021) [Incorporated by reference to Exhibit 10(J) to Form 10-K for the year ended December 29, 2012]* |
| | (M) | Form of Award Certificate for Restricted Stock Special Award (Cliff Vesting) (Incorporated by reference to Exhibit 10(P) to Form 10-K for the year ended March 28, 2020)* |
| | (N) | Form of Award Certificate for Restricted Stock Special Award (Split Vesting) (Incorporated by reference to Exhibit 10(Q) to Form 10-K for the year ended March 28, 2020)* |
| | (O) | Deferred Compensation Plan, as amended and restated as of December 31, 2001 (Incorporated by reference to Exhibit 10(A) to Form 10-Q for the quarter ended March 30, 2002)* |
| | (P) | Executive Deferred Savings Plan, as amended and restated as of December 31, 2001 (Incorporated by reference to Exhibit 10(B) to Form 10-Q for the quarter ended March 30, 2002)* |
| | (Q) | Executive Deferred Savings Plan II, as amended and restated January 1, 2020 (Incorporated by reference to Item 10.1 to Form 10-Q for the quarter ended December 28, 2019)* |
| | (R) | Amendment to Executive Deferred Savings Plan (Incorporated by reference to Exhibit 10(b) to Form 8-K filed December 17, 2004)* |
| | (S) | Amended and Restated Second Supplemental Annual Benefit Determination under the Amended and Restated Supplemental Executive Retirement Plan for Mid-Career Senior Management (Incorporated by reference to Exhibit 10.2 to Form 10-Q for the quarter ended April 1, 2006)* |
| | (T) | Amended and Restated Fourth Supplemental Annual Benefit Determination under the Amended and Restated Supplemental Executive Retirement Plan for Participants in VF's Deferred Compensation Plan (Incorporated by reference to Exhibit 10.3 to Form 10-Q for the quarter ended April 1, 2006)* |

| NUMBER | DESCRIPTION |
|---|---|
| (U) | Amended and Restated Seventh Supplemental Annual Benefit Determination under the Amended and Restated Supplemental Executive Retirement Plan for Participants in VF's Executive Deferred Savings Plan (Incorporated by reference to Exhibit 10.5 to Form 10-Q for the quarter ended April 1, 2006)* |
| (V) | Amended and Restated Eighth Supplemental Annual Benefit Determination under the Amended and Restated Supplemental Executive Retirement Plan (Incorporated by reference to Exhibit 10.6 to Form 10-Q for the quarter ended April 1, 2006)* |
| (W) | Amended and Restated Ninth Supplemental Annual Benefit Determination under the Amended and Restated Supplemental Executive Retirement Plan relating to the computation of benefits for Senior Management (Incorporated by reference to Exhibit 10.7 to Form 10-Q for the quarter ended April 1, 2006)* |
| (X) | Amended and Restated Tenth Supplemental Annual Benefit Determination under the Amended and Restated Supplemental Executive Retirement Plan for Participants in VF's Mid-Term Incentive Plan (Incorporated by reference to Exhibit 10.8 to Form 10-Q for the quarter ended April 1, 2006)* |
| (Y) | Eleventh Supplemental Annual Benefit Determination Pursuant to the Amended and Restated Supplemental Executive Retirement Plan (Incorporated by reference to Exhibit 10.9 to Form 10-Q for the quarter ended April 1, 2006)* |
| (Z) | Twelfth Supplemental Benefit Determination Pursuant to the VF Corporation Amended and Restated Supplemental Executive Retirement Plan (Incorporated by reference to Exhibit 10.1 to Form 10-Q for the quarter ended September 27, 2014)* |
| (AA) | Amended and Restated Supplemental Executive Retirement Plan (Incorporated by reference to Exhibit 10.10 to Form 10-Q for the quarter ended April 1, 2006)* |
| (BB) | Resolution of the Board of Directors dated December 3, 1996 relating to lump sum payments under VF's Supplemental Executive Retirement Plan (Incorporated by reference to Exhibit 10(N) to Form 10-K for the year ended January 4, 1997)* |
| (CC) | 2012 Form of Change in Control Agreement with Certain Senior Management of VF or its Subsidiaries (Incorporated by reference to Exhibit 10(W) to Form 10-K for the year ended December 31, 2011)* |
| (DD) | 2019 Form of Change in Control Agreement with Certain Senior Management of VF or its Subsidiaries (Incorporated by reference to Exhibit 10(HH) to Form 10-K for the year ended March 28, 2020)* |
| (EE) | Amended and Restated Deferred Savings Plan for Non-Employee Directors (Incorporated by reference to Exhibit 10(W) to Form 10-K for the year ended January 3, 2009)* |
| (FF) | Form of Indemnification Agreement with each of VF's Non-Employee Directors (Incorporated by reference to Exhibit 10.2 of the Form 10-Q for the quarter ended September 27, 2008)* |
| (GG) | 2004 Mid-Term Incentive Plan, a subplan under the 1996 Stock Compensation Plan, as amended and restated as of October 18, 2017 (Incorporated by reference to Exhibit 10.1 to Form 10-Q for the quarter ended September 30, 2017)* |
| (HH) | Annual Incentive Plan (effective prior to May 15, 2023) (Incorporated by reference to Exhibit 10(HH) to Form 10-K for the year ended April 2, 2022)* |
| (II) | Annual Incentive Plan (effective May 15, 2023)* |
| (JJ) | Form of Non-Competition, Non-Solicitation and Confidentiality Agreement for Equity Plan Participants |
| (KK) | Retirement and General Release Agreement dated December 2, 2022 (Incorporated by reference to Exhibit 10.1 to Form 10-Q for the quarter ended December 31, 2022)* |
| (LL) | Five-Year Revolving Credit Agreement by and among V.F. Corporation and VF International Sagl, as borrowers, the lenders named therein, JPMorgan Chase Bank, N.A., as Administrative Agent, JPMorgan Chase Bank, N.A., BofA Securities, Inc., Barclays Bank PLC, HSBC Securities (USA) Inc., U.S. Bank National Association and Wells Fargo Securities, LLC, as Joint-Lead Arrangers and Joint Bookrunners, Bank of America, N.A., Barclays Bank PLC, HSBC Bank USA, National Association, U.S. Bank National Association and Wells Fargo Bank, National Association, as Syndication Agents, and ING Bank N.V., Dublin Branch, PNC Bank, N.A., TD Bank, N.A. and Morgan Stanley Bank, N.A., as Documentation Agents, dated November 24, 2021 (Incorporated by reference to Exhibit 10.1 to Form 8-K filed November 24, 2021) |
| (MM) | Amendment No. 1 to Revolving Credit Agreement, dated February 16, 2023, by and among V.F. Corporation, JPMorgan Chase Bank, N.A., as Administrative Agent, the Lenders party thereto and the other parties thereto (Incorporated by reference to Exhibit 10.1 to Form 8-K filed February 16, 2023) |
| (NN) | Amendment No. 2 to Revolving Credit Agreement, dated May 19, 2023, by and among V.F. Corporation, JPMorgan Chase Bank, N.A., as Administrative Agent, the Lenders party thereto and the other parties thereto |
| (OO) | Term Loan Agreement by and among V.F. Corporation, as borrower, the lenders named therein, JPMorgan Chase Bank, N.A., as Administrative Agent, Wells Fargo Securities, LLC, as Syndication Agent, and PNC Bank National Association, TD Bank, N.A., Truist Bank and U.S. Bank National Association, as Documentation Agents, dated August 11, 2022 (Incorporated by reference to Exhibit 10.1 to Form 8-K filed August 11, 2022) |
| (PP) | Amendment No. 1 to Term Loan Agreement, dated February 16, 2023, by and among V.F. Corporation, as borrower, JP Morgan Chase Bank, N.A., as Administrative Agent, the Lenders party thereto and the other parties thereto (Incorporated by reference to Exhibit 10.2 to Form 8-K filed February 16, 2023) |

| NUMBER | | DESCRIPTION |
|---|---|---|
| | (QQ) | Separation and Distribution Agreement dated May 22, 2019 (Incorporated by reference to Exhibit 2.1 to Form 8-K filed May 23, 2019) |
| | (RR) | Tax Matters Agreement dated May 22, 2019 (Incorporated by reference to Exhibit 10.1 to Form 8-K filed May 23, 2019) |
| | (SS) | Transition Services Agreement dated May 22, 2019 (Incorporated by reference to Exhibit 10.2 to Form 8-K filed May 23, 2019) |
| | (TT) | VF Intellectual Property License Agreement dated May 17, 2019 (Incorporated by reference to Exhibit 10.3 to Form 8-K filed May 23, 2019) |
| | (UU) | Kontoor Intellectual Property License Agreement dated May 17, 2019 (Incorporated by reference to Exhibit 10.4 to Form 8-K filed May 23, 2019) |
| | (VV) | Employee Matters Agreement dated May 22, 2019 (Incorporated by reference to Exhibit 10.5 to Form 8-K filed May 23, 2019) |
| 21. | | Subsidiaries of the Corporation |
| 23. | | Consent of independent registered public accounting firm |
| 24. | | Power of attorney |
| 31.1 | | Certification of the principal executive officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | | Certification of the principal financial officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | | Certification of Chief Executive Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | | Certification of Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS | | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
| 101.SCH | | XBRL Taxonomy Extension Schema Document |
| 101.CAL | | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | | XBRL Taxonomy Extension Presentation Linkbase Document |
| 104. | | Cover Page Interactive Data File - the cover page interactive data file does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |

All other exhibits for which provision is made in the applicable regulations of the Securities and Exchange Commission are not required under the related instructions or are inapplicable and therefore have been omitted.

[1] Certain schedules, exhibits, and amendments have been omitted pursuant to Item 601(b)(2) of Regulation S-K. VF hereby agrees to furnish a copy of any omitted schedule, exhibit, or amendment to the SEC upon request.

\* Management compensation plans

## ITEM 16.    FORM 10-K SUMMARY.

None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, VF has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

V.F. CORPORATION

By:     /s/ Benno Dorer
        _____
        Benno Dorer
        Interim President, Chief Executive Officer and Director
        (Principal Executive Officer)

By:     /s/ Matthew H. Puckett
        _____
        Matthew H. Puckett
        Executive Vice President and Chief Financial Officer
        (Principal Financial Officer)

By:     /s/ Bryan H. McNeill
        _____
        Bryan H. McNeill
        Vice President, Controller and Chief Accounting Officer
        (Principal Accounting Officer)

May 25, 2023

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of VF and in the capacities and on the dates indicated:

| | |
|---|---|
| Richard T. Carucci* | Interim Chair of the Board and Director |
| Alexander K. Cho* | Director |
| Juliana L. Chugg* | Director |
| Mark S. Hoplamazian* | Director |
| Laura W. Lang* | Director |
| W. Rodney McMullen* | Director |
| Clarence Otis, Jr.* | Director |
| Carol L. Roberts* | Director |
| Matthew J. Shattock* | Director |

*By:    /s/ Jennifer S. Sim
        _____
        Jennifer S. Sim, Attorney-in-Fact

May 25, 2023

VF CORPORATION
Index to Consolidated Financial Statements
and Financial Statement Schedule
March 2023

| | PAGE NUMBER |
|---|---|
| Management's Report on Internal Control Over Financial Reporting | F-2 |
| Report of Independent Registered Public Accounting Firm (PCAOB ID238) | F-3 |
| Consolidated Balance Sheets | F-6 |
| Consolidated Statements of Operations | F-7 |
| Consolidated Statements of Comprehensive Income | F-8 |
| Consolidated Statements of Cash Flows | F-9 |
| Consolidated Statements of Stockholders' Equity | F-11 |
| Notes to Consolidated Financial Statements | F-12 |
| Schedule II — Valuation and Qualifying Accounts | F-53 |

**V.F. Corporation**

**Management's Report on Internal Control Over Financial Reporting**

Management of V.F. Corporation ("VF") is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). VF's management conducted an assessment of VF's internal control over financial reporting based on the framework described in *Internal Control — Integrated Framework (2013),* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, VF's management has determined that VF's internal control over financial reporting was effective as of April 1, 2023.

The effectiveness of VF's internal control over financial reporting as of April 1, 2023 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of V. F. Corporation

*Opinions on the Financial Statements and Internal Control over Financial Reporting*

We have audited the accompanying consolidated balance sheets of V. F. Corporation and its subsidiaries (the "Company") as of April 1, 2023 and April 2, 2022, and the related consolidated statements of operations, of comprehensive income, of stockholders' equity and of cash flows for each of the three years in the period ended April 1, 2023, including the related notes and schedule of valuation and qualifying accounts for each of the three years in the period ended April 1, 2023 listed in the index appearing under Item 15(a)2 (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of April 1, 2023, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of April 1, 2023 and April 2, 2022, and the results of its operations and its cash flows for each of the three years in the period ended April 1, 2023 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of April 1, 2023, based on criteria established in Internal Control - Integrated Framework (2013) issued by the COSO.

*Basis for Opinions*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

*Definition and Limitations of Internal Control over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*Critical Audit Matters*

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Interim and Annual Goodwill and Indefinite-Lived Intangible Asset Impairment Analyses - Supreme, Timberland and Icebreaker Reporting Units and Indefinite-Lived Trademark Intangible Assets*

As described in Notes 1, 8, 9, and 23 to the consolidated financial statements, the goodwill and indefinite-lived trademark intangible assets associated with the Supreme, Timberland and Icebreaker reporting units make up a significant portion of the Company's consolidated goodwill and indefinite-lived intangible assets balances of $2.0 billion and $2.6 billion as of April 1, 2023, respectively. Management evaluates indefinite-lived intangible assets and goodwill for possible impairment as of the beginning of the fourth quarter of each fiscal year, or whenever events or changes in circumstances indicate that the fair value of such assets may be below their carrying amount. If management determines that it is more likely than not that the fair value of an asset or reporting unit is less than its carrying value, it is quantitatively evaluated for possible impairment by comparing the estimated fair value with its carrying value. An impairment charge is recorded if the carrying value exceeds its estimated fair value. As disclosed by management, during the second quarter of fiscal 2023, due to continued increases in the federal funds rate and strengthening of the U.S. dollar relative to other currencies, management performed a quantitative impairment analysis of both the Supreme reporting unit goodwill and the indefinite-lived trademark intangible asset, resulting in impairment charges of $229.0 million and $192.9 million, respectively, for the year ended April 1, 2023. During the annual goodwill and indefinite-lived intangible asset impairment analysis, management performed a quantitative impairment analysis of the Supreme, Timberland and Icebreaker reporting unit goodwill and indefinite-lived trademark intangible assets, resulting in impairment charges of $165.1 million and $148.0 million to the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset, respectively, for the year ended April 1, 2023 and no impairment to the Timberland and Icebreaker reporting units and indefinite-lived trademark intangible assets. Management estimates the fair value of the reporting units using both income-based and market-based valuation methods and the fair value of the indefinite-lived trademark intangible assets is based on an income approach using the relief from-royalty method. The income-based fair value methodology requires management to make assumptions and judgments and is based on management's estimate of financial projections and future cash flows, which include significant assumptions related to revenue growth and profitability improvement throughout the forecast period, terminal growth rates, tax rates, royalty rates and market-based discount rates.

The principal considerations for our determination that performing procedures relating to the interim and annual goodwill and indefinite-lived intangible asset impairment analyses for the Supreme, Timberland and Icebreaker reporting units and indefinite-lived trademark intangible assets is a critical audit matter are (i) the significant judgment by management when developing the fair value estimates of the reporting units and the indefinite-lived trademark intangible assets; (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating management's significant assumptions related to revenue growth throughout the forecast period and market-based discount rates for the Supreme, Timberland and Icebreaker reporting units and indefinite-lived trademark intangible assets and royalty rates for the Supreme, Timberland and Icebreaker indefinite-lived trademark intangible assets; and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's interim and annual goodwill and indefinite-lived intangible assets impairment analyses, including controls over the valuation of the Supreme, Timberland and Icebreaker reporting units and indefinite-lived trademark intangible assets. These procedures also included, among others (i) testing management's process for developing the fair value estimates of the Supreme, Timberland and Icebreaker reporting units and indefinite-lived trademark intangible assets; (ii) evaluating the appropriateness of the income-based valuation methods for the reporting units and the indefinite-lived trademark intangible assets; (iii) testing the completeness and accuracy of underlying data used in the income-based valuation methods; and (iv) evaluating the reasonableness of the significant assumptions used by management related to revenue growth throughout the forecast period and market-based discount rates for the Supreme, Timberland and Icebreaker reporting units and indefinite-lived trademark intangible assets and royalty rates for the Supreme, Timberland and Icebreaker indefinite-lived trademark intangible assets. Evaluating management's assumptions related to the revenue growth throughout the forecast period involved evaluating whether the assumptions used by management were reasonable considering (i) the current and past performance of the Supreme, Timberland and Icebreaker reporting units and products sold with the Supreme, Timberland and Icebreaker trademarks; (ii) the consistency with external market and industry data; and (iii) whether these assumptions were consistent with evidence obtained in other areas of the audit. Professionals with specialized skill and knowledge were used to assist in the evaluation of (i) the appropriateness of the Company's income-based valuation methods for the reporting units and the indefinite-lived trademark intangible assets and (ii) the reasonableness of the royalty rate and market-based discount rate significant assumptions.

*The Timberland Company Income Inclusion - Uncertain Tax Position*

As described in Note 19 to the consolidated financial statements, the Company files a consolidated U.S. federal income tax return, as well as separate and combined income tax returns in numerous state and international jurisdictions. On July 14, 2022, the U.S. Tax Court issued its final decision regarding the timing of income inclusion associated with the Company's acquisition of The Timberland Company. On October 19, 2022, the Company paid $875.7 million related to the 2011 taxes and interest being disputed, which was recorded as an income tax receivable and will accrue interest income. These amounts are included in the other assets line item in the Company's consolidated balance sheet as of April 1, 2023. Based on management's assessment of the position under the more-likely-than-not standard of the accounting literature, As disclosed by management, the calculation of income tax liabilities involves uncertainties in the application of complex tax laws and regulations, which are subject to legal interpretation and significant management judgment. The Company's income tax returns are regularly examined by federal, state and foreign tax authorities, and those audits may result in proposed adjustments.

The principal considerations for our determination that performing procedures relating to the uncertain tax position associated with The Timberland Company income inclusion is a critical audit matter are (i) the significant judgment by management with regards to the application and legal interpretation of complex tax laws and regulations in order to conclude that the technical merits of the case support the Company's more-likely-than-not threshold; (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating the facts and assumptions made by management in connection with the recognition of the uncertain tax position; and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to the identification, measurement, and recognition of uncertain tax positions. These procedures also included, among others (i) evaluating the reasonableness of management's assessment of the technical merits of the tax position; (ii) evaluating the status and results of the U.S. Tax Court's final decision and other correspondence with relevant tax authorities; and (iii) evaluating the sufficiency of the Company's uncertain tax position disclosures. Professionals with specialized skill and knowledge were used to assist in evaluating the reasonableness of management's assessment of whether the tax position is more-likely-than-not of being sustained, the impact to the consolidated financial statements and the application and legal interpretation of relevant complex tax laws and regulations.

/s/ PricewaterhouseCoopers LLP
Greensboro, North Carolina
May 25, 2023

We have served as the Company's auditor since 1995.

VF CORPORATION

Consolidated Balance Sheets

(In thousands, except share amounts)

| | March 2023 | March 2022 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and equivalents | $ 814,887 | $ 1,275,943 |
| Accounts receivable, less allowance for doubtful accounts of: March 2023 - $28,075; March 2022 - $27,959 | 1,610,295 | 1,467,842 |
| Inventories | 2,292,790 | 1,418,673 |
| Other current assets | 434,737 | 425,622 |
| Total current assets | 5,152,709 | 4,588,080 |
| Property, plant and equipment, net | 942,440 | 1,041,777 |
| Intangible assets, net | 2,642,821 | 3,000,351 |
| Goodwill | 1,978,413 | 2,393,807 |
| Operating lease right-of-use assets | 1,372,182 | 1,247,056 |
| Other assets | 1,901,923 | 1,071,137 |
| **TOTAL ASSETS** | $ 13,990,488 | $ 13,342,208 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Short-term borrowings | $ 11,491 | $ 335,462 |
| Current portion of long-term debt | 924,305 | 501,051 |
| Accounts payable | 936,319 | 562,992 |
| Accrued liabilities | 1,673,651 | 1,915,892 |
| Total current liabilities | 3,545,766 | 3,315,397 |
| Long-term debt | 5,711,014 | 4,584,261 |
| Operating lease liabilities | 1,171,941 | 1,023,759 |
| Other liabilities | 651,054 | 888,436 |
| **Total liabilities** | 11,079,775 | 9,811,853 |
| Commitments and contingencies | | |
| **Stockholders' equity** | | |
| Preferred Stock, par value $1; shares authorized, 25,000,000; no shares outstanding at March 2023 or March 2022 | — | — |
| Common Stock, stated value $0.25; shares authorized, 1,200,000,000; shares outstanding at March 2023 - 388,665,531; March 2022 - 388,298,375 | 97,166 | 97,075 |
| Additional paid-in capital | 3,775,979 | 3,916,384 |
| Accumulated other comprehensive income (loss) | (1,019,518) | (926,579) |
| Retained earnings | 57,086 | 443,475 |
| **Total stockholders' equity** | 2,910,713 | 3,530,355 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 13,990,488 | $ 13,342,208 |

See notes to consolidated financial statements.

VF CORPORATION

Consolidated Statements of Operations

| (In thousands, except per share amounts) | | Year Ended March | | | | |
|---|---|---|---|---|---|---|
| | | 2023 | | 2022 | | 2021 |
| Net revenues | $ | 11,612,475 | $ | 11,841,840 | $ | 9,238,830 |
| Costs and operating expenses | | | | | | |
| Cost of goods sold | | 5,515,796 | | 5,386,393 | | 4,370,780 |
| Selling, general and administrative expenses | | 5,033,977 | | 4,823,243 | | 4,240,058 |
| Impairment of goodwill and intangible assets | | 735,009 | | — | | 20,361 |
| Total costs and operating expenses | | 11,284,782 | | 10,209,636 | | 8,631,199 |
| Operating income | | 327,693 | | 1,632,204 | | 607,631 |
| Interest income | | 9,758 | | 5,006 | | 9,155 |
| Interest expense | | (174,390) | | (136,469) | | (135,655) |
| Loss on debt extinguishment | | — | | (3,645) | | — |
| Other income (expense), net | | (119,774) | | 26,154 | | (24,659) |
| Income from continuing operations before income taxes | | 43,287 | | 1,523,250 | | 456,472 |
| Income tax expense (benefit) | | (75,297) | | 306,981 | | 101,566 |
| Income from continuing operations | | 118,584 | | 1,216,269 | | 354,906 |
| Income from discontinued operations, net of tax | | — | | 170,672 | | 52,963 |
| Net income | $ | 118,584 | $ | 1,386,941 | $ | 407,869 |
| Earnings per common share - basic | | | | | | |
| Continuing operations | $ | 0.31 | $ | 3.12 | $ | 0.91 |
| Discontinued operations | | — | | 0.44 | | 0.14 |
| Total earnings per common share - basic | $ | 0.31 | $ | 3.55 | $ | 1.05 |
| Earnings per common share - diluted | | | | | | |
| Continuing operations | $ | 0.31 | $ | 3.10 | $ | 0.91 |
| Discontinued operations | | — | | 0.43 | | 0.14 |
| Total earnings per common share - diluted | $ | 0.31 | $ | 3.53 | $ | 1.04 |
| Weighted average shares outstanding | | | | | | |
| Basic | | 387,763 | | 390,291 | | 389,655 |
| Diluted | | 388,370 | | 392,411 | | 392,121 |

See notes to consolidated financial statements.

VF CORPORATION
Consolidated Statements of Comprehensive Income

| (In thousands) | Year Ended March | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| **Net income** | $ 118,584 | $ 1,386,941 | $ 407,869 |
| **Other comprehensive income (loss)** | | | |
| Foreign currency translation and other | | | |
| Losses arising during the period | (106,527) | (17,355) | (36,114) |
| Reclassification of foreign currency translation losses | — | — | 42,364 |
| Income tax effect | (1,492) | (34,104) | 31,286 |
| Defined benefit pension plans | | | |
| Current period actuarial gains (losses), including plan amendments and curtailments | (25,211) | 12,927 | (9,181) |
| Amortization of net deferred actuarial losses | 16,395 | 11,310 | 11,911 |
| Amortization of deferred prior service credits | (453) | (440) | (81) |
| Reclassification of net actuarial loss from settlement charges | 93,731 | 7,466 | 1,584 |
| Reclassification of deferred prior service cost due to curtailments | — | — | 920 |
| Income tax effect | (21,864) | (3,806) | (428) |
| Derivative financial instruments | | | |
| Gains (losses) arising during the period | 53,533 | 71,494 | (122,244) |
| Income tax effect | (8,554) | (11,741) | 21,796 |
| Reclassification of net (gains) losses realized | (110,160) | 54,326 | (24,848) |
| Income tax effect | 17,663 | (7,656) | 4,993 |
| **Other comprehensive income (loss)** | (92,939) | 82,421 | (78,042) |
| **Comprehensive income** | $ 25,645 | $ 1,469,362 | $ 329,827 |

See notes to consolidated financial statements.

VF CORPORATION
Consolidated Statements of Cash Flows

| (In thousands) | Year Ended March | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| **OPERATING ACTIVITIES** | | | |
| Net income | $ 118,584 | $ 1,386,941 | $ 407,869 |
| Income from discontinued operations, net of tax | — | 170,672 | 52,963 |
| Income from continuing operations, net of tax | 118,584 | 1,216,269 | 354,906 |
| Adjustments to reconcile net income to cash provided (used) by operating activities: | | | |
| Impairment of goodwill and intangible assets | 735,009 | — | 20,361 |
| Depreciation and amortization | 262,324 | 266,935 | 269,081 |
| Reduction in the carrying amount of right-of-use assets | 383,199 | 410,132 | 427,594 |
| Stock-based compensation | 60,354 | 91,358 | 70,823 |
| Provision for doubtful accounts | 3,532 | (716) | 20,673 |
| Pension expense in excess of (less than) contributions | 79,197 | (41,309) | (23,424) |
| Deferred income taxes | (53,554) | (157,489) | (39,812) |
| Loss on extinguishment of debt | — | 3,645 | — |
| Other, net | (11,433) | (12,007) | 12,412 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (147,331) | (202,526) | 70,471 |
| Inventories | (890,173) | (380,851) | 314,315 |
| Accounts payable | 377,433 | 105,357 | 20,106 |
| Income taxes | (1,148,610) | 201,391 | (35,586) |
| Accrued liabilities | (91,650) | 88,213 | 101,142 |
| Operating lease right-of-use assets and liabilities | (379,963) | (444,125) | (375,278) |
| Other assets and liabilities | 47,287 | (286,079) | 25,470 |
| Cash provided (used) by operating activities - continuing operations | (655,795) | 858,198 | 1,233,254 |
| Cash provided by operating activities - discontinued operations | — | 6,090 | 79,971 |
| **Cash provided (used) by operating activities** | **(655,795)** | **864,288** | **1,313,225** |
| **INVESTING ACTIVITIES** | | | |
| Business acquisitions, net of cash received | — | 3,760 | (2,009,151) |
| Proceeds from sale of businesses, net of cash sold | — | 616,928 | — |
| Proceeds from sale of assets | 99,499 | 32,542 | 11,748 |
| Purchases of short-term investments | — | — | (800,000) |
| Proceeds from sale and maturities of short-term investments | — | 598,806 | 200,000 |
| Capital expenditures | (165,925) | (245,449) | (198,658) |
| Software purchases | (95,326) | (82,871) | (75,542) |
| Other, net | (26,301) | (19,456) | (20,382) |
| Cash provided (used) by investing activities - continuing operations | (188,053) | 904,260 | (2,891,985) |
| Cash used by investing activities - discontinued operations | — | (525) | (3,633) |
| **Cash provided (used) by investing activities** | **(188,053)** | **903,735** | **(2,895,618)** |
| **FINANCING ACTIVITIES** | | | |
| Contingent consideration payment | (56,976) | — | — |
| Net increase (decrease) in short-term borrowings | (323,972) | 324,404 | (1,217,764) |
| Payments on long-term debt | (501,051) | (504,200) | (1,664) |
| Payment of debt issuance costs | (6,796) | (2,496) | (21,438) |
| Proceeds from long-term debt | 2,058,341 | — | 2,996,090 |
| Share repurchases | — | (350,004) | — |
| Cash dividends paid | (702,846) | (773,205) | (756,784) |
| Proceeds from issuance of Common Stock, net of payments for tax withholdings | (2,794) | 36,654 | 54,438 |
| **Cash provided (used) by financing activities** | **$ 463,906** | **$ (1,268,847)** | **$ 1,052,878** |

Continued on next page.
See notes to consolidated financial statements.

VF CORPORATION
Consolidated Statements of Cash Flows

| (In thousands) | Year Ended March | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| Effect of foreign currency rate changes on cash, cash equivalents and restricted cash | $ (80,822) | $ (73,299) | $ (30,603) |
| Net change in cash, cash equivalents and restricted cash | **(460,764)** | 425,877 | (560,118) |
| Cash, cash equivalents and restricted cash — beginning of period | **1,277,082** | 851,205 | 1,411,323 |
| Cash, cash equivalents and restricted cash — end of period | $ **816,318** | $ 1,277,082 | $ 851,205 |
| | | | |
| **Balances per Consolidated Balance Sheets:** | | | |
| Cash and cash equivalents | $ 814,887 | $ 1,275,943 | $ 815,750 |
| Other current assets | 1,305 | 1,109 | 1,198 |
| Current assets of discontinued operations | — | — | 34,132 |
| Other assets | 126 | 30 | 125 |
| Total cash, cash equivalents and restricted cash | $ **816,318** | $ 1,277,082 | $ 851,205 |

See notes to consolidated financial statements.

VF CORPORATION

Consolidated Statements of Stockholders' Equity

| (In thousands, except share amounts) | Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Total |
|---|---|---|---|---|---|---|
| | Shares | Amounts | | | | |
| **Balance, March 2020** | **388,812,158** | **$ 97,203** | **$ 4,183,780** | **$ (930,958)** | **$ 7,309** | **3,357,334** |
| Net income | — | — | — | — | 407,869 | 407,869 |
| Dividends on Common Stock ($1.94 per share) | — | — | (564,904) | — | (191,880) | (756,784) |
| Stock-based compensation, net | 3,129,319 | 782 | 158,769 | — | (33,764) | 125,787 |
| Foreign currency translation and other | — | — | — | 37,536 | — | 37,536 |
| Defined benefit pension plans | — | — | — | 4,725 | — | 4,725 |
| Derivative financial instruments | — | — | — | (120,303) | — | (120,303) |
| **Balance, March 2021** | **391,941,477** | **97,985** | **3,777,645** | **(1,009,000)** | **189,534** | **3,056,164** |
| Net income | — | — | — | — | 1,386,941 | 1,386,941 |
| Dividends on Common Stock ($1.98 per share) | — | — | (2,597) | — | (770,608) | (773,205) |
| Share repurchases | (4,805,093) | (1,201) | — | — | (348,803) | (350,004) |
| Stock-based compensation, net | 1,161,991 | 291 | 141,336 | — | (13,589) | 128,038 |
| Foreign currency translation and other | — | — | — | (51,459) | — | (51,459) |
| Defined benefit pension plans | — | — | — | 27,457 | — | 27,457 |
| Derivative financial instruments | — | — | — | 106,423 | — | 106,423 |
| **Balance, March 2022** | **388,298,375** | **97,075** | **3,916,384** | **(926,579)** | **443,475** | **3,530,355** |
| Net income | — | — | — | — | 118,584 | 118,584 |
| Dividends on Common Stock ($1.81 per share) | — | — | (203,394) | — | (499,452) | (702,846) |
| Stock-based compensation, net | 367,156 | 91 | 62,989 | — | (5,521) | 57,559 |
| Foreign currency translation and other | — | — | — | (108,019) | — | (108,019) |
| Defined benefit pension plans | — | — | — | 62,598 | — | 62,598 |
| Derivative financial instruments | — | — | — | (47,518) | — | (47,518) |
| **Balance, March 2023** | **388,665,531** | **$ 97,166** | **$ 3,775,979** | **$ (1,019,518)** | **$ 57,086** | **$ 2,910,713** |

See notes to consolidated financial statements.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| | | PAGE NUMBER |
|---|---|---|
| NOTE 1 | Summary of Significant Accounting Policies | F-13 |
| NOTE 2 | Revenues | F-19 |
| NOTE 3 | Acquisition | F-20 |
| NOTE 4 | Discontinued Operations | F-21 |
| NOTE 5 | Accounts Receivable | F-22 |
| NOTE 6 | Inventories | F-22 |
| NOTE 7 | Property, Plant and Equipment | F-23 |
| NOTE 8 | Intangible Assets | F-23 |
| NOTE 9 | Goodwill | F-24 |
| NOTE 10 | Leases | F-24 |
| NOTE 11 | Other Assets | F-26 |
| NOTE 12 | Short-term Borrowings | F-26 |
| NOTE 13 | Accrued Liabilities | F-27 |
| NOTE 14 | Long-term Debt | F-27 |
| NOTE 15 | Other Liabilities | F-29 |
| NOTE 16 | Retirement and Savings Benefit Plans | F-30 |
| NOTE 17 | Capital and Accumulated Other Comprehensive Income (Loss) | F-34 |
| NOTE 18 | Stock-based Compensation | F-36 |
| NOTE 19 | Income Taxes | F-39 |
| NOTE 20 | Reportable Segment Information | F-43 |
| NOTE 21 | Commitments and Contingencies | F-45 |
| NOTE 22 | Earnings Per Share | F-46 |
| NOTE 23 | Fair Value Measurements | F-46 |
| NOTE 24 | Derivative Financial Instruments and Hedging Activities | F-49 |
| NOTE 25 | Supplemental Cash Flow Information | F-51 |
| NOTE 26 | Restructuring | F-51 |
| NOTE 27 | Subsequent Event | F-52 |

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

## NOTE 1 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Description of Business

VF Corporation (together with its subsidiaries, collectively known as "VF" or the "Company") is a global apparel, footwear and accessories company based in the United States. VF designs, procures, markets and distributes a variety of branded products, including outerwear, footwear, apparel, backpacks, luggage and accessories for consumers of all ages. Products are marketed under VF-owned brand names.

### Basis of Presentation

The consolidated financial statements and related disclosures are presented in accordance with generally accepted accounting principles in the U.S. ("GAAP"). The consolidated financial statements include the accounts of VF and its controlled subsidiaries, after elimination of intercompany transactions and balances.

On June 28, 2021, VF completed the sale of its Occupational Workwear business. The Occupational Workwear business was comprised primarily of the following brands and businesses: *Red Kap*®, *VF Solutions*®, *Bulwark*®, *Workrite*®, *Walls*®, *Terra*®, *Kodiak*®, *Work Authority*® and *Horace Small*®. The business also included the license of certain *Dickies*® occupational workwear products that have historically been sold through the business-to-business channel. The results of the Occupational Workwear business and the related cash flows have been reported as discontinued operations in the Consolidated Statements of Operations and Consolidated Statements of Cash Flows, respectively, through the date of sale. These changes have been applied to all periods presented.

Unless otherwise noted, discussion within these notes to the consolidated financial statements relates to continuing operations. Refer to Note 4 for additional information on discontinued operations.

### Fiscal Year

VF operates and reports using a 52/53 week fiscal year ending on the Saturday closest to March 31 of each year. VF's current fiscal year ran from April 3, 2022 through April 1, 2023 ("Fiscal 2023"). All references to the periods ended March 2023, March 2022 and March 2021 relate to the 52-week fiscal years ended April 1, 2023 and April 2, 2022 ("Fiscal 2022"), and the 53-week fiscal year ended April 3, 2021 ("Fiscal 2021"), respectively. Certain foreign subsidiaries reported using a March 31 year-end for Fiscal 2023, 2022 and 2021 due to local statutory requirements. The impact to VF's consolidated financial statements is not material.

### Recent Developments and Uncertainties

There is ongoing uncertainty around the global economy and macroeconomic environment, which we expect to continue and cause disruption and near-term challenges for our business. Macroeconomic conditions include inflationary pressures, foreign exchange rate fluctuations, higher interest rates and weakening consumer sentiment. These conditions have led to elevated inventories in certain markets and an increased promotional environment, impacts on the results of our international businesses and increased borrowing costs. Global economic conditions are also impacted by the coronavirus ("COVID-19") pandemic, which resulted in retail store closures primarily in the Asia-Pacific region, and supply chain disruption. In response to the ongoing conflict in Ukraine, all VF-operated retail locations within Russia are permanently closed, while limited wholesale shipments to both Russia and Ukraine have resumed. VF has considered the impact of these developments on the estimates and assumptions used when preparing the consolidated financial statements and accompanying notes. The duration and severity of these recent developments, and the related impacts on VF's business are subject to uncertainty; however, the estimates and assumptions made by management are based on available information.

### Use of Estimates

In preparing the consolidated financial statements in accordance with GAAP, management makes estimates and assumptions that affect amounts reported in the consolidated financial statements and accompanying notes. Actual results may differ from those estimates.

### Foreign Currency Translation and Transaction

The financial statements of most foreign subsidiaries are measured using the foreign currency as the functional currency. Assets and liabilities denominated in a foreign currency are translated into U.S. dollars using exchange rates in effect at the balance sheet date, and revenues and expenses are translated at average exchange rates during the period. Resulting translation gains and losses, and transaction gains and losses on long-term advances to foreign subsidiaries, are reported in the Consolidated Statements of Comprehensive Income.

Foreign currency transactions are denominated in a currency other than the functional currency of a particular entity. These transactions generally result in receivables or payables that are fixed in the foreign currency. Transaction gains or losses arise when exchange rate fluctuations either increase or decrease the functional currency cash flows from the originally recorded transaction. Foreign currency transaction gains and losses reported in the Consolidated Statements of Operations, were a net loss of $16.9 million and $6.7 million in the years ended March 2023 and March 2022, respectively, and a net gain of $2.6 million in the year ended March 2021.

### Business Combinations

VF accounts for business combinations using the acquisition method of accounting. Under the acquisition method, the consolidated financial statements reflect the operations of an acquired business starting from the closing date of the acquisition. All assets acquired and liabilities assumed are recorded at fair value as of the acquisition date. VF allocates the purchase price of an acquired business to the fair values of the tangible and identifiable intangible assets acquired and liabilities assumed, with any excess purchase price recorded as goodwill. Contingent consideration, if any, is included within the purchase price and is recognized at its fair value on the acquisition date. In subsequent reporting periods, any contingent consideration liabilities are remeasured at fair value with changes recognized in operating income. During the measurement period, which is

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

up to one year from the acquisition date, adjustments to the assets acquired and liabilities assumed may be recorded, with the corresponding offset to goodwill.

### Cash and Equivalents

Cash and equivalents are demand deposits, receivables from third-party credit card processors and highly liquid investments that mature within three months of their purchase dates. Highly liquid investments considered cash equivalents were $439.5 million and $326.0 million at March 2023 and 2022, respectively, consisting of money market funds and short-term time deposits.

### Accounts Receivable

Trade accounts receivable are recorded at invoiced amounts, less contractual allowances for trade terms, sales incentive programs and discounts. Royalty receivables are recorded at amounts earned based on the licensees' sales of licensed products, subject in some cases to contractual minimum royalties due from individual licensees. VF maintains an allowance for doubtful accounts for estimated losses that will result from the inability of customers and licensees to make required payments. The allowance is determined based on review of specific customer accounts where collection is doubtful, as well as an assessment of the collectability of total receivables, which are grouped based on similar risk characteristics, considering historical trends, adjusted for current economic conditions and reasonable and supportable forecasts when appropriate. The allowance represents the current estimate of lifetime expected credit losses for all outstanding accounts receivable and reflects the Company's ongoing evaluation of collectability, customer creditworthiness, historical levels of credit losses and future expectations. Receivables are written off against the allowance when it is determined that the amounts will not be recovered.

### Inventories

Inventories are stated at the lower of cost or net realizable value. Cost is determined on the first-in, first-out method, includes all costs incurred to purchase the finished goods and is net of discounts or rebates received from vendors. A detailed review of all inventories is performed, at least quarterly, to identify slow moving or excess products, discontinued and to-be-discontinued products and off-quality merchandise. Management performs an evaluation to estimate net realizable value using a systematic and consistent methodology of forecasting future demand, market conditions and selling prices less costs of disposal. If the estimated net realizable value is less than cost, VF provides an allowance to reflect the lower value of that inventory. This methodology recognizes inventory exposures at the time such losses are evident rather than at the time goods are actually sold. Historically, these estimates of future demand and selling prices have not varied significantly from actual results due to VF's timely identification and ability to typically dispose of these distressed inventories at amounts either above or not significantly below cost.

Existence of physical inventory is verified through periodic physical inventory counts and ongoing cycle counts at most locations throughout the year, and an estimate of inventory losses that have likely occurred since the last physical inventory date is recorded. Historically, physical inventory shrinkage has not been material.

### Long-lived Assets, Including Intangible Assets and Goodwill

Property, plant and equipment, intangible assets and goodwill are initially recorded at cost. VF capitalizes improvements to property, plant and equipment that substantially extend the useful life of the asset, and interest cost incurred during construction of major assets. Repair and maintenance costs are expensed as incurred.

Cost for acquired intangible assets represents the fair value at acquisition date, which is generally based on the present value of expected cash flows. Trademark intangible assets represent individual acquired trademarks, some of which are registered in multiple countries. Customer relationship intangible assets are based on the value of relationships with wholesale customers in place at the time of acquisition.

Goodwill represents the excess of cost of an acquired business over the fair value of net tangible assets and identifiable intangible assets acquired. Goodwill is assigned at the reporting unit level.

Depreciation of property, plant and equipment is computed using the straight-line method over the estimated useful lives of the assets, ranging from 3 to 10 years for machinery and equipment and up to 40 years for buildings. Amortization expense for leasehold improvements and assets under finance leases is recognized over the shorter of their estimated useful lives or the lease terms, and is included in depreciation expense.

Intangible assets determined to have indefinite lives, consisting of major trademarks and trade names, are not amortized. Other intangible assets determined to have a finite life primarily consist of customer relationships, which are amortized over their estimated useful lives ranging from 11 to 24 years using an accelerated method consistent with the timing of benefits expected to be received.

Depreciation and amortization expense related to obtaining finished goods inventories is included in cost of goods sold, and other depreciation and amortization expense is included in selling, general and administrative expenses.

VF's policy is to review property, plant and equipment and amortizable intangible assets for possible impairment whenever events or changes in circumstances indicate that the carrying amount of an asset or asset group may not be recoverable. If forecasted pre-tax undiscounted cash flows to be generated by the asset are not expected to recover the asset's carrying value, an impairment charge is recorded for the excess of the asset's carrying value over its estimated fair value.

VF's policy is to evaluate indefinite-lived intangible assets and goodwill for possible impairment as of the beginning of the fourth quarter of each fiscal year, or whenever events or changes in circumstances indicate that the fair value of such assets may be below their carrying amount. VF may first assess qualitative factors as a basis for determining whether it is necessary to perform quantitative impairment testing. If VF determines that it is more likely than not that the fair value of an asset or reporting unit is more than its carrying value, then no further testing is required. Otherwise, the assets must be quantitatively tested for impairment.

An indefinite-lived intangible asset is quantitatively evaluated for possible impairment by comparing the estimated fair value of the asset with its carrying value. An impairment charge is recorded if the carrying value of the asset exceeds its estimated fair value.

Goodwill is quantitatively evaluated for possible impairment by comparing the estimated fair value of a reporting unit with its carrying value, including the goodwill assigned to that reporting unit. An impairment charge is recorded if the carrying value of the reporting unit exceeds its estimated fair value.

*Leases*

VF determines if an arrangement is or contains a lease at contract inception and determines its classification as an operating or finance lease at lease commencement. The Company leases certain retail locations, office space, distribution facilities, machinery and equipment, and vehicles. While the substantial majority of these leases are operating leases, one of VF's distribution centers is a finance lease.

Leases for real estate typically have initial terms ranging from 3 to 15 years, generally with renewal options. Leases for equipment typically have initial terms ranging from 2 to 5 years and vehicle leases typically have initial terms ranging from 1 to 5 years. In determining the lease term used in the lease right-of-use asset and lease liability calculations, the Company considers various factors such as market conditions and the terms of any renewal or termination options that may exist. When deemed reasonably certain, the renewal and termination options are included in the determination of the lease term and calculation of the lease right-of-use assets and lease liabilities. The Company has made an accounting policy election to not recognize right-of-use assets and lease liabilities for leases with terms of 12 months or less.

Most leases have fixed rental payments. Many of the real estate leases also require additional variable payments for occupancy-related costs, real estate taxes and insurance, as well as other payments (i.e., contingent rent) owed when sales at individual retail store locations exceed a stated base amount. Variable lease payments are excluded from the measurement of the lease liability and are recognized in profit and loss in the period in which the event or conditions that triggers those payments occur.

Certain leases contain both lease and non-lease components. For leases associated with specific asset classes, including certain real estate, vehicles and IT equipment, VF has elected the practical expedient which permits entities to account for separate lease and non-lease components as a single component. For all other lease contracts, the Company accounts for each lease component separately from the non-lease components of the contract. When applicable, VF will measure the consideration to be paid pursuant to the agreement and allocate this consideration to the lease and non-lease components based on relative standalone prices.

VF estimates the amount it expects to pay to the lessor under a residual value guarantee and includes it in lease payments used to measure the lease liability only for amounts probable of being owed by VF at the commencement date.

VF calculates lease liabilities as the present value of lease payments over the lease term at commencement date. Lease right-of-use assets are calculated based on the initial measurement of the respective lease liabilities adjusted for any lease payments made to the lessor at or before the commencement date, lease incentives received and initial direct costs incurred. When readily determinable, the Company uses the implicit rate to determine the present value of lease payments, which generally does not happen in practice. As the rate implicit in the majority of the Company's leases is not readily determinable, the Company uses its incremental borrowing rate based on the information available at the lease commencement date, including the lease term, currency, country specific risk premium and adjustments for collateralized debt.

Operating lease expense is recorded as a single lease cost on a straight-line basis over the lease term. For finance leases, right-of-use asset amortization and interest on lease liabilities are presented separately in the Consolidated Statements of Operations. The Company does not have material subleases.

The Company assesses whether a sale leaseback transaction qualifies as a sale when the transaction occurs. For transactions qualifying as a sale, VF derecognizes the underlying asset and recognizes the entire gain or loss at the time of the sale. The corresponding lease entered into with the buyer-lessor is accounted for as an operating lease. During the year ended March 2023, the Company entered into a sale leaseback transaction for certain office real estate and related assets. The transaction qualified as a sale, and thus the Company recognized a gain of $13.2 million in the selling, general and administrative expenses line item in VF's Consolidated Statement of Operations for the year ended March 2023.

*Supply Chain Financing Program*

During the first quarter of Fiscal 2023, VF reinstated its voluntary supply chain finance ("SCF") program. The SCF program enables a significant portion of our suppliers of inventory to leverage VF's credit rating to receive payment from participating financial institutions prior to the payment date specified in the terms between VF and the supplier. The SCF program is administered through third-party platforms that allow participating suppliers to track payments from VF and elect which VF receivables, if any, to sell to the financial institutions. The transactions are at the sole discretion of both the suppliers and financial institutions, and VF is not a party to the agreements and has no economic interest in the supplier's decision to sell a receivable. The terms between VF and the supplier, including the amount due and scheduled payment dates, are not impacted by a supplier's participation in the SCF program. Amounts due to suppliers who voluntarily participate in the SCF program are included in the accounts payable line item in VF's Consolidated Balance Sheets and VF payments made under the SCF program are reflected in cash flows from operating activities in VF's Consolidated Statements of Cash Flows. VF has been informed by the participating financial institutions that amounts payable to them for suppliers who voluntarily participated in the SCF program and included in the accounts payable line item in VF's Consolidated Balance Sheet was $161.4 million at March 2023. The amounts settled through the SCF program were $989.8 million during the year ended March 2023.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

*Defined Benefit Pension Plans*

VF sponsors various defined benefit pension plans in the U.S. and in certain international jurisdictions. The Company's U.S. plans, including a noncontributory qualified defined benefit pension plan and an unfunded supplemental defined benefit pension plan, were frozen for all future benefit accruals, effective December 31, 2018.

The funded status of defined benefit pension plans is recorded as a net asset or liability in the Consolidated Balance Sheets based on the difference between the projected benefit obligations and the fair value of plan assets, which is assessed on a plan-by-plan basis. The changes in funded status of defined benefit pension plans, primarily related to actuarial gains and losses arising from differences between actual experience and actuarial assumptions, are recognized in the year in which the changes occur and reported in the Consolidated Statements of Comprehensive Income.

VF reports the service component of net periodic pension cost (income) within operating income and the other components of net periodic pension cost, which include interest cost, expected return on plan assets, settlement charges, curtailments and amortization of deferred actuarial losses and prior service credits, in the other income (expense), net line item of the Consolidated Statements of Operations.

*Derivative Financial Instruments*

Derivative financial instruments are measured at fair value in the Consolidated Balance Sheets. Unrealized gains and losses are recognized as assets and liabilities, respectively, and classified as current or noncurrent based on the derivatives' maturity dates. The accounting for changes in the fair value of derivative instruments (i.e., gains and losses) depends on the intended use of the derivative, whether the Company has elected to designate a derivative in a hedging relationship and apply hedge accounting and whether the hedging relationship has satisfied the criteria necessary to apply hedge accounting. To qualify for hedge accounting treatment, all hedging relationships must be formally documented at the inception of the hedges and must be highly effective in offsetting changes to future cash flows of hedged transactions. VF's hedging practices are described in Note 24, which primarily relate to cash flow hedges. VF does not use derivative instruments for trading or speculative purposes. Hedging cash flows are classified in the Consolidated Statements of Cash Flows in the same category as the items being hedged.

VF formally documents hedging instruments and hedging relationships at the inception of each contract. Further, at the inception of a contract and on an ongoing basis, as necessary, VF assesses whether the hedging instruments are highly effective in offsetting the risk of the hedged transactions. When hedging instruments are determined to not be highly effective, hedge accounting treatment is discontinued, and any future changes in fair value of the instruments are recognized immediately in net income. Unrealized gains or losses related to hedging instruments remain in accumulated other comprehensive income ("OCI") until the hedged forecasted transaction occurs and impacts earnings. If the hedged forecasted transaction is deemed probable of not occurring, any unrealized gains or

losses in accumulated OCI are immediately recognized in net income.

VF also uses derivative contracts to manage foreign currency exchange risk on certain assets and liabilities. These contracts are not designated as hedges, and are measured at fair value in the Consolidated Balance Sheets with changes in fair value recognized directly in net income.

The counterparties to the derivative contracts are financial institutions having at least A-rated investment grade credit ratings. To manage its credit risk, VF continually monitors the credit risks of its counterparties, limits its exposure in the aggregate and to any single counterparty, and adjusts its hedging positions as appropriate. The impact of VF's credit risk and the credit risk of its counterparties, as well as the ability of each party to fulfill its obligations under the contracts, is considered in determining the fair value of the derivative contracts. Credit risk has not had a significant effect on the fair value of VF's derivative contracts. VF does not have any credit risk-related contingent features or collateral requirements with its derivative contracts.

*Revenue Recognition*

Revenue is recognized when performance obligations under the terms of a contract with the customer are satisfied based on the transfer of control of promised goods or services. The transfer of control typically occurs at a point in time based on consideration of when the customer has (i) an obligation to pay for, (ii) physical possession of, (iii) legal title to, (iv) risks and rewards of ownership of, and (v) accepted the goods or services. The timing of revenue recognition within the wholesale channel occurs either on shipment or delivery of goods based on contractual terms with the customer. The timing of revenue recognition in the direct-to-consumer channel generally occurs at the point of sale within VF-operated or concession retail stores and either on shipment or delivery of goods for e-commerce transactions based on contractual terms with the customer. For finished products shipped directly to customers from our suppliers, the Company's promise to the customer is a performance obligation to provide the specified goods, and thus the Company is the principal in the arrangement and revenue is recognized on a gross basis at the transaction price.

The duration of contractual arrangements with our customers in the wholesale and direct-to-consumer channels is typically less than one year. Payment terms with wholesale customers are generally between 30 and 60 days while direct-to-consumer arrangements have shorter terms. The Company does not adjust the promised amount of consideration for the effects of a significant financing component as it is expected, at contract inception, that the period between the transfer of the promised good or service to the customer and the customer payment for the good or service will be one year or less.

The amount of revenue recognized in both wholesale and direct-to-consumer channels reflects the expected consideration to be received for providing the goods or services to the customer, which includes estimates for variable consideration. Variable consideration includes sales incentive programs, discounts, markdowns, chargebacks and product returns. Estimates of variable consideration are determined at contract inception and reassessed at each reporting date, at a minimum, to reflect any

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

changes in facts and circumstances. The Company utilizes the expected value method in determining its estimates of variable consideration, based on evaluations of specific product and customer circumstances, historical and anticipated trends, and current economic conditions. Allowances for estimates of sales incentive programs, discounts, markdowns, chargebacks and returns are recorded as accrued liabilities in the Consolidated Balance Sheets.

Certain products sold by the Company include an assurance warranty. Product warranty costs are estimated based on historical and anticipated trends, and are recorded as cost of goods sold at the time revenue is recognized.

Revenue from the sale of gift cards is deferred and recorded as a contract liability until the gift card is redeemed by the customer, factoring in breakage as appropriate.

Various VF brands maintain customer loyalty programs where customers earn rewards from qualifying purchases or activities, which are redeemable for discounts on future purchases or other rewards. For its customer loyalty programs, the Company estimates the standalone selling price of the loyalty rewards and allocates a portion of the consideration for the sale of products to the loyalty points earned. The deferred amount is recorded as a contract liability, and is recognized as revenue when the points are redeemed or when the likelihood of redemption is remote.

The Company has elected to treat all shipping and handling activities as fulfillment costs and recognize the costs as selling, general and administrative expenses at the time the related revenue is recognized. Shipping and handling costs billed to customers are included in net revenues. Sales taxes and value added taxes collected from customers and remitted directly to governmental authorities are excluded from the transaction price.

The Company has licensing agreements for its symbolic intellectual property, most of which include minimum guaranteed royalties. Royalty income is recognized as earned over the respective license term based on the greater of minimum guarantees or the licensees' sales of licensed products at rates specified in the licensing contracts. Royalty income related to the minimum guarantees is recognized using a measure of progress with variable amounts recognized only when the cumulative earned royalty exceeds the minimum guarantees.

The Company has applied the practical expedient to recognize incremental costs of obtaining a contract as an expense when incurred if the amortization period of the asset that otherwise would have been recognized is one year or less. The Company has also elected the practical expedients to not disclose the transaction price allocated to remaining performance obligations for (i) variable consideration related to sales-based royalty arrangements, and (ii) contracts with an original expected duration of one year or less.

*Cost of Goods Sold*

Cost of goods sold for purchased finished goods includes the purchase costs and related overhead. Overhead includes all costs related to purchasing finished goods, including costs of planning, purchasing, quality control, depreciation, freight, duties, royalties paid to third parties and shrinkage. For product

lines with a warranty, a provision for estimated future repair or replacement costs, based on historical and anticipated trends, is recorded when these products are sold.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses include costs of product development, selling, marketing and advertising, VF-operated retail stores, concession retail stores, warehousing, distribution, shipping and handling, licensing and administration. Advertising costs are expensed as incurred and totaled $861.8 million, $840.6 million and $608.1 million in the years ended March 2023, 2022 and 2021, respectively. Advertising costs include cooperative advertising payments made to VF's customers as reimbursement for certain costs of advertising VF's products, which totaled $16.5 million, $16.2 million and $11.1 million in the years ended March 2023, 2022 and 2021, respectively. Shipping and handling costs for delivery of products to customers totaled $637.0 million, $634.2 million and $557.5 million in the years ended March 2023, 2022 and 2021, respectively. Expenses related to royalty income were $0.9 million, $0.9 million and $1.7 million in the years ended March 2023, 2022 and 2021, respectively.

*Stock-based Compensation*

VF accounts for all stock-based payments to employees and non-employee directors based on their respective grant date fair values. Compensation cost for all awards expected to vest is recognized over the shorter of the requisite service period or the vesting period, including accelerated recognition for retirement-eligible employees. Awards that do not vest are forfeited. Generally, dividend equivalents accrue without compounding and are payable in additional shares of VF common stock upon vesting.

VF uses a lattice option-pricing model to estimate the fair value of stock options granted to employees and non-employee directors. VF's performance-based awards are based on management achieving both performance and market-based financial targets. The grant date fair value of market conditions is determined using a Monte Carlo simulation technique incorporating option-pricing model inputs.

*Dividends*

Dividends declared on common stock are recorded as a reduction of retained earnings to the extent retained earnings are available at the close of the period prior to the date of the declared dividend. Dividends declared in excess of retained earnings are recorded as a reduction of additional paid-in-capital.

*Self-insurance*

VF is self-insured for a significant portion of its employee medical, workers' compensation, vehicle, property and general liability exposures. Liabilities for self-insured exposures are accrued at the present value of amounts expected to be paid based on historical claims experience and actuarial data for forecasted settlements of claims filed and for incurred but not yet reported claims. Accruals for self-insured exposures are included in current and noncurrent liabilities based on the expected periods of payment. Excess liability insurance has been purchased to limit the amount of self-insured risk on claims.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

*Income Taxes*

Income taxes are provided on pre-tax income for financial reporting purposes. Income taxes are based on amounts of taxes payable or refundable in the current year and on expected future tax consequences of events that are recognized in the consolidated financial statements in different periods than they are recognized in tax returns. As a result of timing of recognition and measurement differences between financial accounting standards and income tax laws, temporary differences arise between amounts of pre-tax financial statement income and taxable income, and between reported amounts of assets and liabilities in the Consolidated Balance Sheets and their respective tax bases. Deferred income tax assets and liabilities reported in the Consolidated Balance Sheets reflect the estimated future tax impact of these temporary differences and net operating loss and net capital loss carryforwards, based on tax rates currently enacted for the years in which the differences are expected to be settled or realized. Realization of deferred tax assets is dependent on future taxable income in specific jurisdictions. Valuation allowances are used to reduce deferred tax assets to amounts considered more-likely-than-not to be realized. All deferred tax assets and liabilities are classified as noncurrent in the Consolidated Balance Sheets

Accrued income taxes in the Consolidated Balance Sheets include unrecognized income tax benefits, along with related interest and penalties, appropriately classified as current or noncurrent. VF has evaluated these potential issues under the more-likely-than-not standard of the accounting literature. A tax position is recognized if it meets this standard and is measured at the largest amount of benefit that has a greater than 50% likelihood of being realized. The provision for income taxes also includes estimated interest and penalties related to uncertain tax positions.

*Earnings Per Share*

Basic earnings per share is computed by dividing net income by the weighted average number of shares of Common Stock outstanding during the period. Diluted earnings per share assumes conversion of potentially dilutive securities such as stock options, restricted stock units and restricted stock.

*Concentration of Risks*

VF markets products to a broad customer base throughout the world. Products are sold at a range of price points through various wholesale and direct-to-consumer channels. VF's ten largest customers accounted for approximately 15% of Fiscal 2023 total revenues. Sales to VF's largest customer accounted for approximately 2% of Fiscal 2023 total revenues. Sales are generally made on an unsecured basis under customary terms that may vary by product, channel of distribution or geographic region. VF continuously monitors the creditworthiness of its customers and has established internal policies regarding customer credit limits. The breadth of product offerings, combined with the large number and geographic diversity of its customers, limits VF's concentration of risks.

*Legal and Other Contingencies*

Management periodically assesses liabilities and contingencies in connection with legal proceedings and other claims that may arise from time to time. When it is probable that a loss has been or will be incurred, an estimate of the loss is recorded in the consolidated financial statements. Estimates of losses are adjusted when additional information becomes available or circumstances change. A contingent liability is disclosed when there is at least a reasonable possibility that a material loss may have been incurred. Refer to Note 21 for additional information.

*Reclassifications*

Certain prior year amounts have been reclassified to conform with the Fiscal 2023 presentation.

*Recently Adopted Accounting Standards*

In November 2021, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2021-10, *"Government Assistance (Topic 832): Disclosures by Business Entities about Government Assistance"*, an update that requires annual disclosures about government assistance, including the types of assistance and the effect on the financial statements. The guidance became effective for VF in the first quarter of Fiscal 2023 and was adopted prospectively, but did not have any impact on VF's disclosures as the amount of government assistance recorded in VF's consolidated financial statements was not material.

*Recently Issued Accounting Standards*

In March 2020, January 2021 and December 2022, the FASB issued ASU No. 2020-04, *"Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting"*, ASU No. 2021-01, *"Reference Rate Reform (Topic 848): Scope"* and ASU No. 2022-06, *"Reference Rate Reform (Topic 848): Deferral of the Sunset Date of Topic 848"*, respectively. This guidance provides optional expedients and exceptions for applying GAAP to contracts, hedging relationships and other transactions affected by reference rate reform if certain criteria are met. The optional guidance is provided to ease the potential burden of accounting for reference rate reform. The guidance is effective and can be adopted no later than December 31, 2024. The Company does not expect this guidance to have a material impact on VF's consolidated financial statements.

In September 2022, the FASB issued ASU No. 2022-04, "*Liabilities — Supplier Finance Programs (Subtopic 405-50): Disclosure of Supplier Finance Program Obligations"*. This guidance requires companies with supplier finance programs to disclose sufficient qualitative and quantitative information about the program to allow a user of the financial statements to understand the nature of, activity in, and potential magnitude of the program. The guidance will be effective for VF in the first quarter of Fiscal 2024, except for certain quantitative disclosures that will be effective in Fiscal 2025. Early adoption is permitted. The Company will adopt the required guidance in the first quarter of Fiscal 2024 and is evaluating the impact of adopting the guidance related to quantitative disclosures.

VF CORPORATION

Notes to Consolidated Financial Statements
March 2023

## NOTE 2 — REVENUES

*Contract Balances*

Contract assets are rights to consideration in exchange for goods or services that have been transferred to a customer when that right is conditional on something other than the passage of time. Once the Company has an unconditional right to consideration under a contract, amounts are invoiced and contract assets are reclassified to accounts receivable. The Company's primary contract assets relate to sales-based royalty arrangements, which are discussed in more detail within Note 1.

Contract liabilities are recorded when a customer pays consideration, or the Company has a right to an amount of consideration that is unconditional, before the transfer of a good or service to the customer and thus represent the Company's obligation to transfer the good or service to the customer at a future date. The Company's primary contract liabilities relate to gift cards, loyalty programs and sales-based royalty arrangements, which are discussed in more detail within Note 1, and order deposits.

The following table provides information about contract assets and contract liabilities:

| (In thousands) | March 2023 | March 2022 |
|---|---|---|
| Contract assets [a] | $ 2,294 | $ 1,065 |
| Contract liabilities [b] | 62,214 | 71,067 |

[a] Included in the other current assets line item in the Consolidated Balance Sheets.
[b] Included in the accrued liabilities line item in the Consolidated Balance Sheets.

For the year ended March 2023, the Company recognized $319.2 million of revenue that was included in the contract liability balance during the year, including amounts recorded as a contract liability and subsequently recognized as revenue as performance obligations were satisfied within the same period, such as order deposits from customers. The change in the contract asset and contract liability balances primarily results from the timing differences between the Company's satisfaction of performance obligations and the customer's payment.

minimum guarantees in effect under its licensing agreements and expects such amounts to be recognized over time based on the contractual terms through March 2031.

As of March 2023, there were no arrangements with transaction price allocated to remaining performance obligations other than contracts for which the Company has applied the practical expedients and the fixed consideration related to future minimum guarantees discussed above.

For the year ended March 2023, revenue recognized from performance obligations satisfied, or partially satisfied, in prior periods was not material.

*Performance Obligations*

As of March 2023, the Company expects to recognize $70.5 million of fixed consideration related to the future

*Disaggregation of Revenue*

The following tables disaggregate our revenues by channel and geography, which provides a meaningful depiction of how the nature, timing and uncertainty of revenues are affected by economic factors.

| (In thousands) | Outdoor | Active | Work | Other | Total |
|---|---|---|---|---|---|
| | | | Year Ended March 2023 | | |
| **Channel revenues** | | | | | |
| Wholesale | $ 3,375,343 | $ 2,082,875 | $ 847,729 | $ 148 | $ 6,306,095 |
| Direct-to-consumer | 2,252,958 | 2,791,936 | 186,462 | — | 5,231,356 |
| Royalty | 19,225 | 29,811 | 25,988 | — | 75,024 |
| Total | $ 5,647,526 | $ 4,904,622 | $ 1,060,179 | $ 148 | $ 11,612,475 |
| | | | | | |
| **Geographic revenues** | | | | | |
| Americas | $ 2,921,383 | $ 2,912,666 | $ 848,524 | $ 148 | $ 6,682,721 |
| Europe | 1,960,485 | 1,343,796 | 107,414 | — | 3,411,695 |
| Asia-Pacific | 765,658 | 648,160 | 104,241 | — | 1,518,059 |
| Total | $ 5,647,526 | $ 4,904,622 | $ 1,060,179 | $ 148 | $ 11,612,475 |

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

| (In thousands) | Year Ended March 2022 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Outdoor | Active | Work | Other | Total |
| **Channel revenues** | | | | | |
| Wholesale | $ 3,194,881 | $ 2,256,444 | $ 919,080 | $ 785 | $ 6,371,190 |
| Direct-to-consumer | 2,115,056 | 3,102,231 | 186,788 | — | 5,404,075 |
| Royalty | 17,631 | 21,663 | 27,281 | — | 66,575 |
| **Total** | $ 5,327,568 | $ 5,380,338 | $ 1,133,149 | $ 785 | $ 11,841,840 |
| | | | | | |
| **Geographic revenues** | | | | | |
| Americas | $ 2,748,935 | $ 3,155,870 | $ 899,706 | $ 785 | $ 6,805,296 |
| Europe | 1,877,502 | 1,432,260 | 89,537 | — | 3,399,299 |
| Asia-Pacific | 701,131 | 792,208 | 143,906 | — | 1,637,245 |
| **Total** | $ 5,327,568 | $ 5,380,338 | $ 1,133,149 | $ 785 | $ 11,841,840 |

| (In thousands) | Year Ended March 2021 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Outdoor | Active | Work | Other | Total |
| **Channel revenues** | | | | | |
| Wholesale | $ 2,363,575 | $ 1,970,699 | $ 734,921 | $ 4,372 | $ 5,073,567 |
| Direct-to-consumer | 1,753,923 | 2,167,929 | 191,409 | 321 | 4,113,582 |
| Royalty | 10,103 | 22,228 | 19,350 | — | 51,681 |
| **Total** | $ 4,127,601 | $ 4,160,856 | $ 945,680 | $ 4,693 | $ 9,238,830 |
| | | | | | |
| **Geographic revenues** | | | | | |
| Americas | $ 2,058,020 | $ 2,357,295 | $ 677,222 | $ — | $ 5,092,537 |
| Europe | 1,430,402 | 1,075,489 | 107,339 | 4,693 | 2,617,923 |
| Asia-Pacific | 639,179 | 728,072 | 161,119 | — | 1,528,370 |
| **Total** | $ 4,127,601 | $ 4,160,856 | $ 945,680 | $ 4,693 | $ 9,238,830 |

## NOTE 3 — ACQUISITION

On December 28, 2020, VF acquired 100% of the outstanding shares of Supreme Holdings, Inc. ("Supreme") for $2.2 billion in cash, subject to working capital and other adjustments. The transaction also included $0.2 billion of cash acquired by VF. The purchase price was primarily funded with cash on hand. The purchase price decreased by $3.8 million during the year ended March 2022, related to the final working capital adjustment.

The acquisition of Supreme included a contingent arrangement that required additional cash consideration to be paid to the selling shareholders of Supreme ranging from zero to $300.0 million, which was dependent upon the achievement of certain financial targets over the one-year earn-out period ended January 31, 2022. The initial estimated fair value of the contingent consideration liability was $207.0 million and was included in the purchase price. During Fiscal 2022, the contingent consideration liability was remeasured at fair value based on the probability-weighted present value of various future cash payment outcomes resulting from the estimated achievement levels of the financial targets, with changes recognized in the selling, general and administrative expenses line item in the Consolidated Statement of Operations. The

estimated fair value of the contingent consideration liability was $57.0 million as of March 2022 and was paid during the year ended March 2023. Refer to Note 23 for additional information on fair value measurements.

Supreme was a privately-held company based in New York, New York and is a global streetwear leader that sells apparel, accessories and footwear under its namesake brand, *Supreme®*, through direct-to-consumer channels, including digital.

For the years ended March 2023 and March 2022, Supreme contributed revenues of $523.1 million and $561.5 million, respectively, and net income of $64.8 million and $82.4 million, respectively. For the period from December 28, 2020 through April 3, 2021, Supreme contributed revenues of $142.0 million and net income of $21.5 million. The results of Supreme have been reported in the Active segment since the date of acquisition. Total transaction expenses for the Supreme acquisition were $8.7 million, all of which were recognized in the year ended March 2021 in the selling, general and administrative expenses line item in the Consolidated Statement of Operations.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

The following unaudited pro forma summary presents consolidated information of VF as if the acquisition of Supreme had occurred on March 31, 2019:

| (In thousands, except per share amounts) | | Year Ended March 2021 (unaudited) |
|---|---|---|
| Total revenues | $ | 9,677,141 |
| Income from continuing operations | | 457,330 |
| Earnings per common share from continuing operations | | |
| Basic | $ | 1.17 |
| Diluted | | 1.17 |

These pro forma amounts have been calculated after applying VF's accounting policies and adjusting the results of Supreme to reflect the fair value adjustments to intangible assets, property, plant and equipment and inventory. The results of Supreme have also been adjusted for historical interest expense as the acquired business was debt-free on the acquisition date. These changes have been applied from March 31, 2019, with related tax effects.

The pro forma financial information in the year ended March 2021 excludes $30.6 million of expenses related to Supreme's

transaction and deal-related costs, including employee compensation costs and accelerated vesting of stock options, which were directly attributable to the transaction.

Pro forma financial information is not necessarily indicative of VF's operating results if the acquisition had been effected at the date indicated, nor is it necessarily indicative of future operating results. Amounts do not include any marketing leverage or operating efficiencies.

## NOTE 4 — DISCONTINUED OPERATIONS

The Company continuously assesses the composition of its portfolio to ensure it is aligned with its strategic objectives and positioned to maximize growth and return to shareholders.

### Occupational Workwear Business

On January 21, 2020, VF announced its decision to explore the divestiture of its Occupational Workwear business. The Occupational Workwear business was comprised primarily of the following brands and businesses: *Red Kap*®, *VF Solutions*®, *Bulwark*®, *Workrite*®, *Walls*®, *Terra*®, *Kodiak*®, *Work Authority*® and *Horace Small*®. The business also included the license of certain *Dickies*® occupational workwear products that have historically been sold through the business-to-business channel. As of March 28, 2020, the Occupational Workwear business met the held-for-sale and discontinued operations accounting criteria. Accordingly, the Company has reported the results of the Occupational Workwear business and the related cash flows as discontinued operations in the Consolidated Statements of Operations and Consolidated Statements of Cash Flows, respectively, through the date of sale.

On June 28, 2021, VF completed the sale of the Occupational Workwear business. The Company has received proceeds of $616.9 million, net of cash sold, resulting in a final after-tax gain on sale of $146.0 million, which was included in the income from discontinued operations, net of tax line item in the Consolidated Statement of Operations for the year ended March 2022.

The results of the Occupational Workwear business were previously reported in the Work segment. The results of the Occupational Workwear business recorded in the income from discontinued operations, net of tax line item in the Consolidated Statements of Operations were income of $170.7 million (including a final after-tax gain on sale of $146.0 million) and income of $53.0 million for the years ended March 2022 and 2021, respectively.

Under the terms of a transition services agreement, the Company will provide certain support services for periods generally between 12 and 27 months from the closing date of the transaction.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

*Summarized Discontinued Operations Financial Information*

The following table summarizes the major line items for the Occupational Workwear business that are included in the income from discontinued operations, net of tax line item in the Consolidated Statements of Operations:

| | | Year Ended March | | | |
|---|---|---|---|---|---|
| (In thousands) | 2023 [a] | | 2022 | | 2021 |
| Net revenues | $ — | $ | 181,424 | $ | 671,574 |
| Cost of goods sold | — | | 117,193 | | 471,652 |
| Selling, general and administrative expenses | — | | 38,735 | | 143,259 |
| Interest income, net | — | | 194 | | 312 |
| Other income (expense), net | — | | 6 | | 365 |
| Income from discontinued operations before income taxes | — | | 25,696 | | 57,340 |
| Gain on the sale of discontinued operations before income taxes | — | | 133,970 | | — |
| Total income from discontinued operations before income taxes | — | | 159,666 | | 57,340 |
| Income tax expense (benefit) [b] | — | | (11,006) | | 4,377 |
| Income from discontinued operations, net of tax | $ — | $ | 170,672 | $ | 52,963 |

[a] There was no activity during the year ended March 2023.

[b] Income tax benefit for the year ended March 2022 included $12.0 million of deferred tax benefit related to capital and other losses realized upon the sale of the Occupational Workwear business.

## NOTE 5 — ACCOUNTS RECEIVABLE

| (In thousands) | March 2023 | | March 2022 |
|---|---|---|---|
| Trade | $ 1,521,975 | $ | 1,368,550 |
| Other (including royalty) | 116,395 | | 127,251 |
| Total accounts receivable | 1,638,370 | | 1,495,801 |
| Less allowance for doubtful accounts | 28,075 | | 27,959 |
| Accounts receivable, net | $ 1,610,295 | $ | 1,467,842 |

## NOTE 6 — INVENTORIES

| (In thousands) | March 2023 | | March 2022 |
|---|---|---|---|
| Finished products | $ 2,240,215 | $ | 1,353,483 |
| Work-in-process | 39,508 | | 50,774 |
| Raw materials | 13,067 | | 14,416 |
| Total inventories | $ 2,292,790 | $ | 1,418,673 |

During the first quarter of Fiscal 2023, the Company modified terms with the majority of its suppliers to take ownership of inventory near point of shipment rather than destination. Finished products included $321.4 million and $67.7 million of in-transit inventory as of March 2023 and 2022, respectively.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

## NOTE 7 — PROPERTY, PLANT AND EQUIPMENT

| (In thousands) | March 2023 | March 2022 |
|---|---|---|
| Land and improvements | $ 69,401 | $ 91,049 |
| Buildings and improvements | 896,973 | 965,802 |
| Machinery and equipment | 1,051,093 | 1,072,251 |
| Property, plant and equipment, at cost | 2,017,467 | 2,129,102 |
| Less accumulated depreciation and amortization | 1,075,027 | 1,087,325 |
| **Property, plant and equipment, net** | **$ 942,440** | **$ 1,041,777** |

## NOTE 8 — INTANGIBLE ASSETS

| (In thousands) | Weighted Average Amortization Period | Amortization Method | Cost | Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|---|---|
| **March 2023** | | | | | |
| Amortizable intangible assets: | | | | | |
| Customer relationships and other | 19 years | Accelerated | $ 262,818 | $ 173,916 | $ 88,902 |
| Indefinite-lived intangible assets: | | | | | |
| Trademarks and trade names | | | | | 2,553,919 |
| **Intangible assets, net** | | | | | **$ 2,642,821** |

| (In thousands) | Weighted Average Amortization Period | Amortization Method | Cost | Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|---|---|
| **March 2022** | | | | | |
| Amortizable intangible assets: | | | | | |
| Customer relationships and other | 19 years | Accelerated | $ 264,691 | $ 160,988 | $ 103,703 |
| Indefinite-lived intangible assets: | | | | | |
| Trademarks and trade names | | | | | 2,896,648 |
| **Intangible assets, net** | | | | | **$ 3,000,351** |

During the year ended March 2023, VF recorded impairment charges of $40.9 million related to the *Supreme*® indefinite-lived trademark intangible asset. Refer to Note 23 for additional information on fair value measurements.

VF did not record any impairment charges in the year ended March 2022. VF recorded impairment charges of $20.4 million in the year ended March 2021 primarily due to the write-off of

certain trademark and customer relationship balances, which resulted from strategic actions taken by the Company.

Amortization expense for the years ended March 2023, 2022 and 2021 was $14.1 million, $15.6 million and $17.5 million, respectively. Estimated amortization expense for the next five fiscal years is $13.6 million, $13.0 million, $12.1 million, $11.6 million and $10.7 million, respectively.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

## NOTE 9 — GOODWILL

Changes in goodwill are summarized by reportable segment as follows:

| (In thousands) | Outdoor | Active | Work | Total |
|---|---|---|---|---|
| Balance, March 2021 | $ 665,278 | $ 1,645,769 | $ 114,380 | $ 2,425,427 |
| Measurement period adjustment to Supreme acquisition | — | (717) | — | (717) |
| Currency translation | (4,492) | (25,931) | (480) | (30,903) |
| Balance, March 2022 | 660,786 | 1,619,121 | 113,900 | 2,393,807 |
| Impairment charges | — | (394,131) | — | (394,131) |
| Currency translation | (6,999) | (13,746) | (518) | (21,263) |
| Balance, March 2023 | $ 653,787 | $ 1,211,244 | $ 113,382 | $ 1,978,413 |

During the year ended March 2023, VF recorded impairment charges of $394.1 million related to the Supreme reporting unit, which is part of the Active segment. Refer to Note 23 for additional information on fair value measurements. VF did not record any impairment charges in the years ended March 2022 or 2021 based on the results of its goodwill impairment testing.

Accumulated impairment charges for the Outdoor and Active segments were $323.2 million and $394.1 million as of March 2023, respectively, and $323.2 million for the Outdoor segment as of March 2022.

Goodwill decreased by $0.7 million during the year ended March 2022 due to the net impact of a measurement period adjustment for income tax matters and the final working capital adjustment related to the Supreme acquisition.

## NOTE 10 — LEASES

The assets and liabilities related to operating and finance leases were as follows:

| (In thousands) | Location in Consolidated Balance Sheet | March 2023 | March 2022 |
|---|---|---|---|
| Assets: | | | |
| Operating lease assets | Operating lease right-of-use assets | $ 1,372,182 | $ 1,247,056 |
| Finance lease assets | Property, plant and equipment, net | 12,417 | 13,334 |
| Total lease assets | | $ 1,384,599 | $ 1,260,390 |
| | | | |
| Liabilities: | | | |
| Current | | | |
| Operating lease liabilities | Accrued liabilities | $ 322,222 | $ 353,948 |
| Finance lease liabilities | Current portion of long-term debt | 951 | 1,051 |
| Noncurrent | | | |
| Operating lease liabilities | Operating lease liabilities | 1,171,941 | 1,023,759 |
| Finance lease liabilities | Long-term debt | 16,287 | 17,238 |
| Total lease liabilities | | $ 1,521,401 | $ 1,395,996 |

The components of lease costs were as follows:

| | Year Ended March | | |
|---|---|---|---|
| (In thousands) | 2023 | 2022 | 2021 |
| Operating lease cost | $ 418,716 | $ 435,637 | $ 454,324 |
| Finance lease cost – amortization of right-of-use assets | 917 | 917 | 749 |
| Finance lease cost – interest on lease liabilities | 486 | 513 | 462 |
| Short-term lease cost | 22,154 | 17,602 | 8,586 |
| Variable lease cost | 117,189 | 98,052 | 54,460 |
| Impairment | — | 4,279 | 9,177 |
| Gain recognized from sale-leaseback transaction | (13,189) | — | — |
| Total lease cost | $ 546,273 | $ 557,000 | $ 527,758 |

Supplemental cash flow information related to leases was as follows:

| | Year Ended March | | |
|---|---|---|---|
| (In thousands) | 2023 | 2022 | 2021 |
| Cash paid for amounts included in the measurement of lease liabilities: | | | |
| Operating cash flows – operating leases | $ 428,443 | $ 465,249 | $ 425,975 |
| Operating cash flows – finance leases | 486 | 513 | 552 |
| Financing cash flows – finance leases | 1,050 | 1,023 | 1,112 |
| Right-of-use assets obtained in exchange for lease liabilities: | | | |
| Operating leases | 545,856 | 205,811 | 636,613 |
| Finance leases | — | — | — |

Lease terms and discount rates were as follows:

| | March 2023 | March 2022 | March 2021 |
|---|---|---|---|
| Weighted average remaining lease term: | | | |
| Operating leases | 6.60 years | 6.17 years | 6.77 years |
| Finance leases | 13.51 years | 14.51 years | 15.50 years |
| Weighted average discount rate: | | | |
| Operating leases | 2.61 % | 1.78 % | 1.80 % |
| Finance leases | 2.71 % | 2.71 % | 2.71 % |

Maturities of operating and finance lease liabilities for the next five fiscal years and thereafter as of March 2023 were as follows:

| (In thousands) | Operating Leases | Finance Leases | Total |
|---|---|---|---|
| 2024 | $ 362,722 | $ 1,408 | $ 364,130 |
| 2025 | 308,822 | 1,536 | 310,358 |
| 2026 | 231,573 | 1,536 | 233,109 |
| 2027 | 188,707 | 1,664 | 190,371 |
| 2028 | 123,066 | 1,536 | 124,602 |
| Thereafter | 360,215 | 12,931 | 373,146 |
| Total lease payments | 1,575,105 | 20,611 | 1,595,716 |
| Less: present value adjustment | 70,942 | 3,373 | 74,315 |
| Present value of lease liabilities | $ 1,504,163 | $ 17,238 | $ 1,521,401 |

The Company excluded approximately $73.7 million of leases (undiscounted basis) that have not yet commenced. These leases will commence in Fiscal 2024 with lease terms of 2 to 12 years.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

## NOTE 11 — OTHER ASSETS

| (In thousands) | March 2023 | | March 2022 | |
|---|---|---|---|---|
| Income taxes receivable and prepaid income taxes | $ | 1,004,289 | $ | 112,006 |
| Computer software, net of accumulated amortization of: March 2023 - $256,414; March 2022 - $284,880 | | 348,739 | | 316,682 |
| Pension assets (Note 16) | | 183,929 | | 213,820 |
| Investments held for deferred compensation plans (Note 16) | | 120,423 | | 165,825 |
| Deferred income taxes (Note 19) | | 95,117 | | 100,980 |
| Deposits | | 42,746 | | 46,247 |
| Partnership stores and shop-in-shop costs, net of accumulated amortization of: March 2023 - $90,072; March 2022 - $94,872 | | 24,743 | | 31,567 |
| Derivative financial instruments (Note 24) | | 1,556 | | 7,136 |
| Other investments | | 27,542 | | 14,358 |
| Deferred line of credit issuance costs | | 2,689 | | 3,117 |
| Other | | 50,150 | | 59,399 |
| **Other assets** | $ | **1,901,923** | $ | **1,071,137** |

## NOTE 12 — SHORT-TERM BORROWINGS

| (In thousands) | March 2023 | | March 2022 | |
|---|---|---|---|---|
| Commercial paper borrowings | $ | — | $ | 330,000 |
| International borrowing arrangements | | 11,491 | | 5,462 |
| **Short-term borrowings** | $ | **11,491** | $ | **335,462** |

VF maintains a $2.25 billion senior unsecured revolving line of credit (the "Global Credit Facility") that expires in November 2026. VF may request an unlimited number of one year extensions so long as each extension does not cause the remaining life of the Global Credit Facility to exceed five years, subject to stated terms and conditions. The Global Credit Facility may be used to borrow funds in U.S. dollars or any alternative currency (including euros and any other currency that is freely convertible into U.S. dollars, approved at the request of the Company by the lenders) and has a $75.0 million letter of credit sublimit. In addition, the Global Credit Facility supports VF's U.S. commercial paper program for short-term, seasonal working capital requirements and general corporate purposes, including dividends, acquisitions and share repurchases. Borrowings under the Global Credit Facility are priced at a credit spread of 101.5 basis points over the appropriate LIBOR benchmark for each currency. VF is also required to pay a facility fee to the lenders, currently equal to 11.0 basis points of the committed amount of the facility. The credit spread and facility fee are subject to adjustment based on VF's credit ratings. Outstanding short-term balances may vary from period to period depending on the level of corporate requirements. In May 2023, VF entered into an amendment to the Global Credit Facility that amended the LIBOR benchmark interest rate with a benchmark interest rate based on the forward-looking secured overnight financing rate ("Term SOFR") or EURIBOR, plus a credit spread adjustment of 10 basis points for Term SOFR.

The Global Credit Facility contains certain restrictive covenants, which include maintenance of a consolidated net indebtedness to consolidated net capitalization ratio. In February 2023, VF entered into an amendment to the Global Credit Facility that amended the restrictive covenant calculation of consolidated net

indebtedness to consolidated net capitalization ratio to permit certain addbacks, including noncash impairment charges and material impacts resulting from adverse legal rulings relating to certain pending legal proceedings, in an amount up to $850.0 million for the specified timeframes. Additionally, as amended, the consolidated net indebtedness to consolidated net capitalization ratio financial covenant, as of the last day of any fiscal quarter, cannot be greater than 0.70 to 1.00 through the last day of the fiscal quarter ending on or about September 30, 2024, then 0.65 to 1.00 through the last day of the fiscal quarter ending on or about September 30, 2025, and 0.60 to 1.00 thereafter. As of March 2023, VF was in compliance with all covenants.

VF's commercial paper program allows for borrowings of up to $2.25 billion to the extent it has borrowing capacity under the Global Credit Facility. As of March 2023, there were no commercial paper borrowings. Outstanding commercial paper borrowings totaled $330.0 million at March 2022 and had a weighted average interest rate of 0.64%. The Global Credit Facility also had $7.7 million and $24.3 million of outstanding standby letters of credit issued on behalf of VF as of March 2023 and 2022, respectively, leaving $2.2 billion and $1.9 billion as of March 2023 and 2022, respectively, available for borrowing against this facility.

VF has $84.6 million of international lines of credit with various banks, which are uncommitted and may be terminated at any time by either VF or the banks. Total outstanding balances under these arrangements were $11.5 million and $5.5 million at March 2023 and 2022, respectively. Borrowings under these arrangements had a weighted average interest rate of 39.1% and 26.0% at March 2023 and 2022, respectively.

## NOTE 13 — ACCRUED LIABILITIES

| (In thousands) | March 2023 | March 2022 |
|---|---|---|
| Current portion of operating lease liabilities (Note 10) | $ 332,222 | $ 353,948 |
| Income taxes | 314,465 | 424,135 |
| Compensation | 141,437 | 227,862 |
| Customer discounts and allowances | 220,614 | 216,823 |
| Other taxes | 151,621 | 157,009 |
| Restructuring (Note 26) | 43,121 | 26,392 |
| Contract liabilities (Note 2) | 62,214 | 71,067 |
| Contingent consideration (Note 23) | — | 56,976 |
| Advertising | 41,338 | 54,162 |
| Freight, duties and postage | 57,271 | 52,669 |
| Interest | 60,504 | 52,278 |
| Derivative financial instruments (Note 24) | 59,995 | 24,267 |
| Insurance | 15,501 | 16,871 |
| Product warranty claims (Note 15) | 11,308 | 11,742 |
| Pension liabilities (Note 16) | 20,727 | 16,927 |
| Deferred compensation (Note 16) | 18,936 | 14,698 |
| Other | 122,377 | 138,066 |
| **Accrued liabilities** | **$ 1,673,651** | **$ 1,915,892** |

## NOTE 14 — LONG-TERM DEBT

| (In thousands) | March 2023 | March 2022 |
|---|---|---|
| 2.050% notes, due April 2022 ("2022 notes") | $ — | $ 499,910 |
| 0.625% notes, due September 2023 ("2023 notes") | 923,354 | 936,824 |
| Delayed Draw Term Loan Agreement, due December 2024 | 999,269 | — |
| 2.400% notes, due April 2025 ("2025 notes") | 746,933 | 745,517 |
| 4.125% notes, due March 2026 ("2026 notes") | 539,121 | — |
| 2.800% notes, due April 2027 ("2027 notes") | 497,029 | 496,410 |
| 0.250% notes, due February 2028 ("2028 notes") | 538,923 | 546,516 |
| 4.250% notes, due March 2029 ("2029 notes") | 537,809 | — |
| 2.950% notes, due April 2030 ("2030 notes") | 744,246 | 743,528 |
| 0.625% notes, due February 2032 ("2032 notes") | 534,763 | 542,247 |
| 6.000% notes, due October 2033 ("2033 notes") | 271,869 | 271,505 |
| 6.450% notes, due November 2037 ("2037 notes") | 284,765 | 284,566 |
| Finance leases | 17,238 | 18,289 |
| Total long-term debt | 6,635,319 | 5,085,312 |
| Less current portion | 924,305 | 501,051 |
| **Long-term debt, due beyond one year** | **$ 5,711,014** | **$ 4,584,261** |

Notes to Consolidated Financial Statements
March 2023

**Term Debt Facility**

In August 2022, the Company entered into a delayed draw Term Loan Agreement (the "DDTL Agreement"). Under the DDTL Agreement, the lenders agreed to provide up to three separate delayed draw term loans (each, a "Delayed Draw") to the Company in an aggregate principal amount of up to $1.0 billion (which may be increased to $1.1 billion subject to the terms and conditions of the DDTL Agreement). The DDTL Agreement has a termination date of December 14, 2024.

Subject to the terms and conditions of the DDTL Agreement, the Company may request extensions of the termination date. Interest on the borrowings under the DDTL Agreement will generally be at Term SOFR, plus a 10 basis point credit spread adjustment, plus a margin. The margin ranges from 0.70% to 0.875% per annum based on the Company's credit ratings. The Company is permitted at any time to prepay outstanding Delayed Draws without premium or penalty.

During the third quarter of Fiscal 2023, VF completed two draws under the DDTL Agreement totaling $1.0 billion, all of which will mature in December 2024. In connection with the draws, VF elected a base rate of one-month Term SOFR. The weighted average interest rate at March 2023 was 5.73%.

The DDTL Agreement is subject to the same restrictive covenants as the Global Credit Facility. See Note 12 for additional information.

**Senior Notes**

*Debt Issuance*

In March 2023, VF issued €500.0 million of 4.125% euro-denominated fixed-rate notes maturing in March 2026 and €500.0 million of 4.250% euro-denominated fixed-rate notes maturing in March 2029. The 2029 notes were issued as a green bond, and thus an amount equal to the net proceeds has been dedicated to projects that focus on VF's key environmental sustainability initiatives.

*Redemption and Maturity*

In December 2021, VF completed an early redemption of $500.0 million in aggregate principal amount of its outstanding 2.050% Senior Notes due April 2022. The redemption price was equal to the sum of the present value of the remaining scheduled payments of principal and interest discounted to the redemption date at 38.7 basis points, which resulted in a make-whole premium of $3.2 million. Additionally, in connection with the redemption, $0.5 million of unamortized original issue discount and debt issuance costs were recognized. The make-whole premium and amortization were recorded in the loss on debt extinguishment line item in the Consolidated Statement of Operations in the year ended March 2022. On April 25, 2022, VF repaid the remaining $500.0 million in aggregate principal amount of its outstanding 2.050% Senior Notes due April 2022, in accordance with the terms of the notes.

*Other Information*

All notes, along with any amounts outstanding under the Global Credit Facility (Note 12), rank equally as senior unsecured obligations of VF. All notes contain customary covenants and events of default, including limitations on liens and sale-leaseback transactions and a cross-acceleration event of default. The cross-acceleration provision of the 2033 notes is triggered if more than $50.0 million of other debt is in default and has been accelerated by the lenders. For the other notes, the cross-acceleration trigger is $100.0 million. If VF fails in the performance of any covenant under the indentures that govern the respective notes, the trustee or lenders may declare the principal due and payable immediately. As of March 2023, VF was in compliance with all covenants. None of the long-term debt agreements contain acceleration of maturity clauses based solely on changes in credit ratings. However, if there were a change in control of VF and, as a result of the change in control, the notes were rated below investment grade by recognized rating agencies, then VF would be obligated to repurchase those notes at 101% of the aggregate principal amount plus any accrued interest. The change of control provision applies to all notes, except for the 2033 notes.

VF may redeem its notes, in whole or in part, at a price equal to the greater of (i) 100% of the principal amount, plus accrued interest to the redemption date, or (ii) the sum of the present value of the remaining scheduled payments of principal and interest discounted to the redemption date at an adjusted treasury rate, as defined, plus 15 basis points for the 2023, 2028, 2032 and 2033 notes, 25 basis points for the 2026 and 2037 notes, 30 basis points for the 2029 notes, 35 basis points for the 2025 notes and 40 basis points for the 2027 and 2030 notes, plus accrued interest to the redemption date. In addition, the 2023, 2029, 2030 and 2032 notes can be redeemed at 100% of the principal amount plus accrued interest to the redemption date within the three months prior to maturity, the 2027 and 2028 notes can be redeemed at 100% of the principal amount plus accrued interest to the redemption date within two months prior to maturity and the 2025 and 2026 notes can be redeemed at 100% of the principal amount plus accrued interest to the redemption date within one month prior to maturity.

The 2025, 2027 and 2030 notes have a principal balance of $750.0 million, $500.0 million and $750.0 million, respectively, and are recorded net of unamortized original issue discounts and debt issuance costs. Interest expense on the 2025, 2027 and 2030 notes is recorded at an effective annual interest rate of 2.603%, 2.953% and 3.071%, respectively.

The 2023, 2026, 2028, 2029 and 2032 notes have a principal balance of €850.0 million, €500.0 million, €500.0 million, €500.0 million and €500.0 million, respectively, and are recorded net of unamortized original issue discounts and debt issuance costs. Interest expense on the 2023, 2026, 2028, 2029 and 2032 notes is recorded at an effective annual interest rate of 0.712%, 4.339% 0.388% , 4.409% and 0.789%, respectively. The Company has designated these notes as a net investment hedge of VF's investment in certain foreign operations. Refer to Note 24 for additional information.

The 2033 and 2037 notes have a principal balance of $277.0 million and $286.9 million, respectively, and are recorded net of unamortized original issue discounts and debt issuance costs. Interest expense on the 2033 and 2037 notes is recorded at an effective annual interest rate of 6.19% and 6.57%, respectively.

Interest payments are due annually on the 2023, 2026, 2028, 2029 and 2032 notes and semiannually on all other notes.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

The scheduled payments of long-term debt, excluding finance leases (Note 10), at the end of Fiscal 2023 for the next five fiscal years and thereafter are summarized as follows:

| (In thousands) | Notes and Other |
|---|---|
| 2024 | $ 923,586 |
| 2025 | 1,000,000 |
| 2026 | 1,293,450 |
| 2027 | — |
| 2028 | 1,043,450 |
| Thereafter | 2,400,827 |
| | 6,661,313 |
| Less unamortized debt discount | 17,869 |
| Less unamortized debt issuance costs | 25,363 |
| Total long-term debt | 6,618,081 |
| Less current portion | 923,354 |
| **Long-term debt, due beyond one year** | **$ 5,694,727** |

## NOTE 15 — OTHER LIABILITIES

| (In thousands) | March 2023 | March 2022 |
|---|---|---|
| Income taxes | $ 273,955 | $ 394,472 |
| Deferred income taxes (Note 19) | 107,546 | 150,401 |
| Deferred compensation (Note 16) | 77,428 | 114,380 |
| Pension liabilities (Note 16) | 72,825 | 111,173 |
| Product warranty claims | 41,111 | 41,745 |
| Derivative financial instruments (Note 24) | 12,658 | 3,456 |
| Other | 65,531 | 72,809 |
| **Other liabilities** | **$ 651,054** | **$ 888,436** |

VF accrues warranty costs, as cost of goods sold, at the time revenue is recognized. Product warranty costs are estimated based on historical experience and specific identification of the product requirements, which may fluctuate based on product mix. Activity relating to accrued product warranty claims is summarized as follows:

| | Year Ended March | | |
|---|---|---|---|
| (In thousands) | 2023 | 2022 | 2021 |
| Balance, beginning of year | $ 53,487 | $ 62,087 | $ 60,124 |
| Accrual for products sold during the year | 11,086 | 8,815 | 13,844 |
| Repair or replacement costs incurred and other | (12,024) | (17,025) | (12,386) |
| Currency translation | (130) | (390) | 505 |
| Balance, end of year | 52,419 | 53,487 | 62,087 |
| Less current portion (Note 13) | 11,308 | 11,742 | 13,396 |
| **Long-term portion** | **$ 41,111** | **$ 41,745** | **$ 48,691** |

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

## NOTE 16 — RETIREMENT AND SAVINGS BENEFIT PLANS

VF has various retirement and savings benefit plans covering eligible employees. VF retains the right to curtail or discontinue any of the plans, subject to local regulations.

*Defined Benefit Pension Plans*

Defined benefit plans provide pension benefits based on participant compensation and years of service. VF sponsors a noncontributory qualified defined benefit pension plan covering most full-time U.S. employees employed before 2005 (the "U.S. qualified plan") and an unfunded supplemental defined benefit pension plan that provides benefits in excess of limitations imposed by income tax regulations (the "U.S. nonqualified plan"). VF was in a net funded status at the end of Fiscal 2023. The U.S.

qualified plan is fully funded and the majority of underfunded amounts relate to obligations under the unfunded U.S. nonqualified plan. As of December 31, 2018, the U.S. qualified defined benefit pension plan and supplemental defined benefit pension plan were frozen for all future benefit accruals. The U.S. qualified and nonqualified plans comprise 86% of VF's total defined benefit plan assets and 83% of VF's total projected benefit obligations at March 2023, and the remainder relates to non-U.S. defined benefit plans. A March 31 measurement date is used to value plan assets and obligations for all pension plans.

The amounts reported in these disclosures have not been segregated between continuing and discontinued operations.

The components of pension cost (income) for VF's defined benefit plans were as follows:

| | | Year Ended March | |
|---|---|---|---|
| (In thousands) | 2023 | 2022 | 2021 |
| Service cost — benefits earned during the period | $ 10,632 | $ 14,288 | $ 15,747 |
| Interest cost on projected benefit obligations | 44,732 | 37,534 | 47,316 |
| Expected return on plan assets | (63,157) | (77,432) | (83,107) |
| Settlement charges | 93,731 | 7,466 | 1,584 |
| Curtailments | — | — | 920 |
| Amortization of deferred amounts: | | | |
| Net deferred actuarial losses | 16,395 | 11,310 | 11,911 |
| Deferred prior service credits | (453) | (440) | (81) |
| **Net periodic pension cost (income)** | $ 101,880 | $ (7,274) | $ (5,710) |
| Weighted average actuarial assumptions used to determine pension cost (income): | | | |
| Discount rate in effect for determining service cost | 1.42 % | 0.46 % | 1.32 % |
| Discount rate in effect for determining interest cost | 4.09 % | 2.16 % | 2.82 % |
| Expected long-term return on plan assets | 5.24 % | 4.53 % | 4.97 % |
| Rate of compensation increase [(a)] | 1.95 % | 2.01 % | 2.04 % |

(a)   Rate of compensation increase is calculated as the weighted average rate of compensation increase for active plans. Frozen plans are excluded from the calculation.

During the year ended March 2023, VF entered into an agreement with The Prudential Insurance Company of America ("Prudential") to purchase an irrevocable group annuity contract relating to approximately $330.0 million of the U.S. qualified defined benefit pension plan obligations. The transaction closed on June 30, 2022 and was funded entirely by existing assets of the plan. Under the group annuity contract, Prudential assumed responsibility for benefit payments and annuity administration for approximately 17,700 retirees and beneficiaries. The transaction will not change the amount or timing of monthly retirement benefit payments. VF recorded a $91.8 million settlement charge in the other income (expense), net line item in

the Consolidated Statement of Operations during the year ended March 2023 to recognize the related deferred actuarial losses in accumulated OCI.

Additionally, VF recorded $1.9 million, $7.5 million and $1.6 million of settlement charges in the other income (expense), net line item in the Consolidated Statements of Operations for the years ended March 2023, 2022 and 2021, respectively. These settlement charges related to the recognition of deferred actuarial losses resulting from lump-sum payments of retirement benefits in the U.S. nonqualified plan.

The following provides a reconciliation of the changes in fair value of VF's defined benefit plan assets and projected benefit obligations for each period, and the funded status at the end of each period:

| (In thousands) | March 2023 | March 2022 |
|---|---|---|
| Fair value of plan assets, beginning of period | $ 1,643,435 | $ 1,755,414 |
| Actual return on plan assets | (146,068) | (26,855) |
| VF contributions | 22,683 | 34,035 |
| Participant contributions | 5,035 | 5,026 |
| Settlement | (328,412) | — |
| Benefits paid | (79,865) | (118,389) |
| Currency translation | (5,098) | (5,796) |
| Fair value of plan assets, end of period | 1,111,710 | 1,643,435 |
| Projected benefit obligations, beginning of period | 1,557,715 | 1,741,710 |
| Service cost | 10,632 | 14,288 |
| Interest cost | 44,732 | 37,534 |
| Participant contributions | 5,035 | 5,026 |
| Actuarial gain | (183,536) | (117,214) |
| Settlement | (328,412) | — |
| Benefits paid | (79,865) | (118,389) |
| Plan amendments | (478) | — |
| Currency translation | (4,490) | (5,240) |
| Projected benefit obligations, end of period (a) | 1,021,333 | 1,557,715 |
| Funded status, end of period | $ 90,377 | $ 85,720 |

(a) The change in projected benefit obligations in the years ended March 2023 and 2022 were driven by actuarial gains, primarily as a result of changes in discount rates. The change in projected benefit obligations in the year ended March 2023 was also driven by the purchase of an irrevocable group annuity contract relating to approximately $330.0 million of the U.S. qualified defined benefit pension plan obligations.

Pension benefits are reported in the Consolidated Balance Sheets as a net asset or liability based on the overfunded or underfunded status of the defined benefit plans, assessed on a plan-by-plan basis.

| (In thousands) | March 2023 | March 2022 |
|---|---|---|
| Amounts included in Consolidated Balance Sheets: | | |
| Other assets (Note 11) | $ 183,929 | $ 213,820 |
| Accrued liabilities (Note 13) | (20,727) | (16,927) |
| Other liabilities (Note 15) | (72,825) | (111,173) |
| Funded status | $ 90,377 | $ 85,720 |
| Accumulated other comprehensive loss, pretax: | | |
| Net deferred actuarial losses | $ 241,864 | $ 326,929 |
| Net deferred prior service credits | (4,286) | (4,204) |
| Total accumulated other comprehensive loss, pretax | $ 237,578 | $ 322,725 |
| Accumulated benefit obligations | $ 1,005,159 | $ 1,539,593 |
| Weighted average actuarial assumptions used to determine pension obligations: | | |
| Discount rate | 4.89 % | 3.65 % |
| Rate of compensation increase (a) | 2.15 % | 1.95 % |

(a) Rate of compensation increase is calculated as the weighted average rate of compensation increase for active plans. Frozen plans are excluded from the calculation.

The actuarial model utilizes discount rates, which are used to estimate the present value of future cash outflows necessary to meet the projected benefit obligations for VF's defined benefit plans. The discount rates reflect the estimated interest rate that VF could use to settle its projected benefit obligations at the valuation date. The discount rate assumption is based on current market interest rates. VF selects a discount rate for each defined benefit pension plan by matching high quality corporate bond yields to the timing of the projected benefit payments to participants in each plan. VF uses the spot rate approach to measure the projected benefit obligations and service and interest costs. Under the spot rate approach, the full yield curve is applied separately to cash flows for each projected benefit obligation, service cost, and interest cost for a more precise calculation.

Accumulated benefit obligations at any measurement date are the present value of vested and unvested pension benefits earned, without considering projected future compensation increases. Projected benefit obligations are the present value of vested and unvested pension benefits earned, considering projected future compensation increases.

Deferred actuarial gains and losses are changes in the amount of either the benefit obligation or the value of plan assets

resulting from differences between expected amounts for a year using actuarial assumptions and the actual results for that year. These amounts are deferred as a component of accumulated OCI and amortized to pension cost (income) in future years. For the U.S. qualified plan, amounts in excess of 20% of projected benefit obligations at the beginning of the year are amortized over five years; amounts between (i) 10% of the greater of projected benefit obligations or plan assets, and (ii) 20% of projected benefit obligations, are amortized over the expected average life expectancy of all participants; and amounts less than the greater of 10% of projected benefit obligations or plan assets are not amortized. For the U.S. nonqualified plan, amounts in excess of 10% of the pension benefit obligations are amortized on a straight-line basis over the expected average life expectancy of all participants.

Deferred prior service credits related to plan amendments are also recorded in accumulated OCI and amortized to pension cost (income) on a straight-line basis over the average remaining years of service for active employees.

The following provides information for VF's defined benefit plans with projected benefit obligations and accumulated benefit obligations in excess of plan assets:

| (In thousands) | March 2023 | March 2022 |
|---|---|---|
| Projected benefit obligations | $ 186,532 | $ 213,002 |
| Accumulated benefit obligations | 170,357 | 194,879 |
| Fair value of plan assets | 92,980 | 84,902 |

The net amount of projected benefit obligations and plan assets for underfunded defined benefit plans was $93.6 million and $128.1 million as of March 2023 and 2022, respectively, and was reported in accrued liabilities and other liabilities in the Consolidated Balance Sheets.

Management's investment objectives are to invest plan assets in a diversified portfolio of securities to provide long-term growth, minimize the volatility of the value of plan assets relative to plan liabilities, and to ensure plan assets are sufficient to pay the benefit obligations. Investment strategies focus on diversification among multiple asset classes, a balance of long-term investment return at an acceptable level of risk and liquidity to meet benefit payments. The primary objective of the investment strategies is to more closely align plan assets with plan liabilities by utilizing dynamic asset allocation targets dependent upon changes in the plan's funded ratio, capital market expectations and risk tolerance.

Plan assets are primarily composed of common collective trust funds that invest in liquid securities diversified across equity, fixed-income and other asset classes. Fund assets are allocated among independent investment managers who have full discretion to manage their portion of the fund's assets, subject

to strategy and risk guidelines established with each manager. The overall strategy, the resulting allocations of plan assets and the performance of funds and individual investment managers are continually monitored. Derivative financial instruments may be used by investment managers for hedging purposes. There are no direct investments in VF debt or equity securities and no significant concentrations of security risk.

The expected long-term rate of return on plan assets was based on an evaluation of the weighted average expected returns for the major asset classes in which the plans have invested. Expected returns by asset class were developed through analysis of historical market returns, current market conditions, inflation expectations and equity and credit risks. Inputs from various investment advisors on long-term capital market returns and other variables were also considered where appropriate.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

The fair value of investments held by VF's defined benefit plans at March 2023 and March 2022, by asset class, is summarized below. Refer to Note 23 for a description of the three levels of the fair value measurement hierarchy.

| (In thousands) | Total Plan Assets | Fair Value Measurements | | |
| | | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **March 2023** | | | | |
| **Plan assets** | | | | |
| Cash equivalents | $ 983 | $ 983 | $ — | $ — |
| Fixed income securities: | | | | |
| U.S. Treasury and government agencies | 3 | — | 3 | — |
| Insurance contracts | 97,429 | — | 97,429 | — |
| Futures contracts | 6,649 | 6,649 | — | — |
| **Total plan assets in the fair value hierarchy** | 105,064 | $ 7,632 | $ 97,432 | $ — |
| **Plan assets measured at net asset value** | | | | |
| Cash equivalents | 118,114 | | | |
| Equity securities: | | | | |
| Domestic | 34,957 | | | |
| International | 51,577 | | | |
| Fixed income securities: | | | | |
| Corporate and international bonds | 734,455 | | | |
| Alternative investments | 67,543 | | | |
| Total plan assets measured at net asset value | 1,006,646 | | | |
| **Total plan assets** | $ 1,111,710 | | | |

| (In thousands) | Total Plan Assets | Fair Value Measurements | | |
| | | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **March 2022** | | | | |
| **Plan assets** | | | | |
| Cash equivalents | $ 5,761 | $ 5,761 | $ — | $ — |
| Fixed income securities: | | | | |
| U.S. Treasury and government agencies | 4 | — | 4 | — |
| Insurance contracts | 88,574 | — | 88,574 | — |
| Futures contracts | (2,812) | (2,812) | — | — |
| **Total plan assets in the fair value hierarchy** | 91,527 | $ 2,949 | $ 88,578 | $ — |
| **Plan assets measured at net asset value** | | | | |
| Cash equivalents | 73,849 | | | |
| Equity securities: | | | | |
| Domestic | 94,844 | | | |
| International | 77,468 | | | |
| Fixed income securities: | | | | |
| Corporate and international bonds | 1,177,421 | | | |
| Alternative investments | 128,326 | | | |
| Total plan assets measured at net asset value | 1,551,908 | | | |
| **Total plan assets** | $ 1,643,435 | | | |

Cash equivalents include cash held by individual investment managers of other asset classes for liquidity purposes (Level 1), and an institutional fund that invests primarily in short-term U.S. government securities measured at their daily net asset value. The fair values of insurance contracts are provided by the insurance companies and are primarily based on accumulated contributions plus returns guaranteed by the insurers (Level 2). Futures contracts consist of U.S. Treasury bond futures contracts (Level 1).

Equity and fixed-income securities generally represent institutional funds measured at their daily net asset value derived from quoted prices of the underlying investments. Alternative investments are primarily in funds of hedge funds ("FoHFs"), which are comprised of different and independent hedge funds with various investment strategies. The administrators of the FoHFs utilize unobservable inputs to calculate the net asset value of the FoHFs on a monthly basis.

VF makes contributions to its defined benefit plans sufficient to meet minimum funding requirements under applicable laws, plus discretionary amounts as determined by management. VF does not currently plan to make any contributions to the U.S. qualified plan during Fiscal 2024, and intends to make approximately $30.3 million of contributions to its other defined benefit plans during Fiscal 2024. The estimated future benefit payments for all of VF's defined benefit plans, are approximately $78.0 million in Fiscal 2024, $66.5 million in Fiscal 2025, $66.4 million in Fiscal 2026, $69.2 million in Fiscal 2027, $69.0 million in Fiscal 2028 and $359.6 million for Fiscal 2029 through 2033.

### Other Retirement and Savings Plans

VF sponsors a nonqualified retirement savings plan for employees whose contributions to a 401(k) plan would be limited by provisions of the Internal Revenue Code. This plan allows participants to defer a portion of their compensation and to receive matching contributions for a portion of the deferred amounts. Participants earn a return on their deferred compensation based on their selection of a hypothetical portfolio of publicly traded mutual funds. Changes in the fair value of the participants' hypothetical investments are recorded as an adjustment to deferred compensation liabilities and

compensation expense. Expense under this plan was $0.8 million, $1.3 million and $1.4 million in the years ended March 2023, 2022 and 2021, respectively. Deferred compensation, including accumulated earnings, is distributable in cash at participant-specified dates upon retirement, death, disability or termination of employment. VF sponsors a similar nonqualified plan that permits nonemployee members of the Board of Directors to defer their Board compensation. VF also has remaining obligations under other deferred compensation plans, primarily related to acquired companies. At March 2023, VF's liability to participants under all deferred compensation plans was $96.3 million, of which $18.9 million was recorded in accrued liabilities (Note 13) and $77.4 million was recorded in other liabilities (Note 15).

VF has purchased (i) publicly traded mutual funds in the same amounts as most of the participant-directed hypothetical investments underlying the deferred compensation liabilities, and (ii) variable life insurance contracts that invest in institutional funds that are substantially the same as the participant-directed hypothetical investments. These investment securities and earnings thereon are intended to provide a source of funds to meet the deferred compensation obligations, and serve as an economic hedge of the financial impact of changes in deferred compensation liabilities. They are held in an irrevocable trust but are subject to claims of creditors in the event of VF's insolvency. VF also has assets related to deferred compensation plans of acquired companies, which are primarily invested in life insurance contracts. At March 2023, the value of investments held for all deferred compensation plans was $138.9 million, of which $18.5 million was recorded in other current assets and $120.4 million was recorded in other assets (Note 11). Realized and unrealized gains and losses on these deferred compensation assets are recorded in compensation expense in the Consolidated Statements of Operations and substantially offset losses and gains resulting from changes in deferred compensation liabilities to participants.

VF sponsors 401(k) plans as well as other domestic and foreign retirement and savings plans. Expense for these plans totaled $42.6 million, $42.0 million and $34.5 million in the years ended March 2023, 2022 and 2021, respectively.

## NOTE 17 — CAPITAL AND ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS)

### Common Stock

During the years ended March 2023 and 2021, the Company did not purchase shares of Common Stock in open market transactions under its share repurchase program authorized by VF's Board of Directors. During the year ended March 2022, the Company purchased 4.8 million shares of Common Stock in open market transactions for $350.0 million under its share repurchase program authorized by VF's Board of Directors. These purchases were treated as treasury stock transactions.

Common Stock outstanding is net of shares held in treasury which are, in substance, retired. During the year ended March 2022, VF restored 4.8 million treasury shares to an unissued status, after which they were no longer recognized as shares held in treasury. There were no shares held in treasury at the end of March 2023, 2022 or 2021. The excess of the cost of treasury shares acquired over the $0.25 per share stated value of Common Stock is deducted from retained earnings.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

*Accumulated Other Comprehensive Income (Loss)*

Comprehensive income consists of net income and specified components of OCI, which relate to changes in assets and liabilities that are not included in net income under GAAP but are instead deferred and accumulated within a separate component of stockholders' equity in the balance sheet. VF's comprehensive income is presented in the Consolidated Statements of Comprehensive Income. The deferred components of OCI are reported, net of related income taxes, in accumulated OCI in stockholders' equity, as follows:

| (In thousands) | March 2023 | | March 2022 | |
|---|---|---|---|---|
| Foreign currency translation and other | $ | (859,651) | $ | (751,632) |
| Defined benefit pension plans | | (167,692) | | (230,290) |
| Derivative financial instruments | | 7,825 | | 55,343 |
| Accumulated other comprehensive income (loss) | $ | (1,019,518) | $ | (926,579) |

The changes in accumulated OCI, net of related taxes, were as follows:

| (In thousands) | Foreign Currency Translation and Other | | Defined Benefit Pension Plans | | Derivative Financial Instruments | | Total | |
|---|---|---|---|---|---|---|---|---|
| Balance, March 2020 | $ | (737,709) | $ | (262,472) | $ | 69,223 | $ | (930,958) |
| Other comprehensive income (loss) before reclassifications | | (4,828) | | (6,197) | | (100,448) | | (111,473) |
| Amounts reclassified from accumulated other comprehensive income (loss) | | 42,364 | | 10,922 | | (19,855) | | 33,431 |
| Net other comprehensive income (loss) | | 37,536 | | 4,725 | | (120,303) | | (78,042) |
| Balance, March 2021 | | (700,173) | | (257,747) | | (51,080) | | (1,009,000) |
| Other comprehensive income (loss) before reclassifications | | (51,459) | | 13,547 | | 59,753 | | 21,841 |
| Amounts reclassified from accumulated other comprehensive income (loss) | | — | | 13,910 | | 46,670 | | 60,580 |
| Net other comprehensive income (loss) | | (51,459) | | 27,457 | | 106,423 | | 82,421 |
| Balance, March 2022 | | (751,632) | | (230,290) | | 55,343 | | (926,579) |
| Other comprehensive income (loss) before reclassifications | | (108,019) | | (18,596) | | 44,979 | | (81,636) |
| Amounts reclassified from accumulated other comprehensive income (loss) | | — | | 81,194 | | (92,497) | | (11,303) |
| Net other comprehensive income (loss) | | (108,019) | | 62,598 | | (47,518) | | (92,939) |
| Balance, March 2023 | $ | (859,651) | $ | (167,692) | $ | 7,825 | $ | (1,019,518) |

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

Reclassifications out of accumulated OCI were as follows:

| (In thousands) Details About Accumulated Other Comprehensive Income (Loss) Components | Affected Line Item in the Consolidated Statements of Operations | Year Ended March | | |
|---|---|---|---|---|
| | | 2023 | 2022 | 2021 |
| Losses on foreign currency translation and other: | | | | |
| Liquidation of foreign entities | Other income (expense), net | $ — | $ — | $ (42,364) |
| Total before tax | | — | — | (42,364) |
| Tax (expense) benefit | | — | — | — |
| Net of tax | | — | — | (42,364) |
| Amortization of defined benefit pension plans: | | | | |
| Net deferred actuarial losses | Other income (expense), net | (16,395) | (11,310) | (11,911) |
| Deferred prior service credits | Other income (expense), net | 453 | 440 | 81 |
| Pension settlement charges | Other income (expense), net | (93,731) | (7,466) | (1,584) |
| Pension curtailment losses | Other income (expense), net | — | — | (920) |
| Total before tax | | (109,673) | (18,336) | (14,334) |
| Tax benefit | | 28,479 | 4,426 | 3,412 |
| Net of tax | | (81,194) | (13,910) | (10,922) |
| Gains (losses) on derivative financial instruments: | | | | |
| Foreign exchange contracts | Net revenues | (6,843) | (27,382) | 2,596 |
| Foreign exchange contracts | Cost of goods sold | 120,438 | (26,346) | 19,485 |
| Foreign exchange contracts | Selling, general and administrative expenses | 6,695 | (487) | 2,797 |
| Foreign exchange contracts | Other income (expense), net | (10,365) | (219) | (137) |
| Interest rate contracts | Interest expense | 235 | 108 | 107 |
| Total before tax | | 110,160 | (54,326) | 24,848 |
| Tax (expense) benefit | | (17,663) | 7,656 | (4,993) |
| Net of tax | | 92,497 | (46,670) | 19,855 |
| Total reclassifications for the period, net of tax | | $ 11,303 | $ (60,580) | $ (33,431) |

## NOTE 18 — STOCK-BASED COMPENSATION

Pursuant to the amended and restated 1996 Stock Compensation Plan approved by stockholders, VF is authorized to grant nonqualified stock options, restricted stock units ("RSUs") and restricted stock to officers, key employees and nonemployee members of VF's Board of Directors. Substantially all stock-based compensation awards are classified as equity awards, which are accounted for in stockholders' equity in the Consolidated Balance Sheets. On a limited basis, cash-settled stock appreciation rights and RSUs are granted to employees in certain international jurisdictions. These awards are accounted for as liabilities in the Consolidated Balance Sheets and remeasured to fair value each reporting period until the awards are settled. Compensation cost for all awards expected to vest is recognized over the shorter of the requisite service period or the vesting period, including accelerated recognition for retirement-eligible employees. Awards that do not vest are forfeited.

Total stock-based compensation cost and the associated income tax benefits recognized in the Consolidated Statements of Operations are as follows:

| (In thousands) | Year Ended March | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Stock-based compensation cost | $ 60,354 | $ 91,358 | $ 70,823 |
| Income tax benefits | 13,714 | 21,917 | 17,373 |

At the end of March 2023, there was $67.3 million of total unrecognized compensation cost related to all stock-based compensation arrangements that will be recognized over a weighted average period of 1.5 years.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

At the end of March 2023, there were 19,070,828 shares available for future grants of stock options and stock awards under the 1996 Stock Compensation Plan. Shares for option exercises are issued from VF's authorized but unissued Common Stock.

*Stock Options*

Stock options are granted with an exercise price equal to the fair market value of VF Common Stock on the date of grant. Employee stock options vest in equal annual installments over three years, and compensation cost is recognized ratably over the shorter of the requisite service period or the vesting period. Stock options granted to nonemployee members of VF's Board of Directors vest upon grant and become exercisable one year from the date of grant. All options have ten-year terms.

The grant date fair value of each option award was calculated using a lattice option-pricing valuation model, which incorporated a range of assumptions for inputs as follows:

| | Year Ended March | | |
|---|---|---|---|
| | **2023** | 2022 | 2021 |
| Expected volatility | 30% to 46% | 28% to 41% | 28% to 48% |
| Weighted average expected volatility | 39% | 36% | 37% |
| Expected term (in years) | 6.0 to 7.8 | 6.1 to 7.9 | 6.2 to 8.0 |
| Weighted average dividend yield | 2.9% | 2.6% | 2.4% |
| Risk-free interest rate | 1.53% to 4.89% | 0.04% to 1.81% | 0.07% to 1.11% |
| Weighted average fair value at date of grant | $13.46 | $20.17 | $15.81 |

Expected volatility over the contractual term of an option was based on a combination of the implied volatility from publicly traded options on VF Common Stock and the historical volatility of VF Common Stock. The expected term represents the period of time over which vested options are expected to be outstanding before exercise. VF used historical data to estimate option exercise behaviors and to estimate the number of options that would vest. Groups of employees that have historically exhibited similar option exercise behaviors were considered separately in estimating the expected term for each employee group. Dividend yield represents expected dividends on VF Common Stock for the contractual life of the options. Risk-free interest rates for the periods during the contractual life of the option were the implied yields at the date of grant from the U.S. Treasury zero coupon yield curve.

Stock option activity for the year ended March 2023 is summarized as follows:

| | Number of Shares | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | | Aggregate Intrinsic Value (In thousands) |
|---|---|---|---|---|---|---|
| **Outstanding, March 2022** | 8,047,657 | $ | 66.04 | | | |
| Granted | 2,478,515 | | 45.10 | | | |
| Exercised | (53,567) | | 42.57 | | | |
| Forfeited/cancelled | (1,421,277) | | 53.48 | | | |
| **Outstanding, March 2023** | **9,051,328** | **$** | **62.42** | **6.2** | **$** | **—** |
| **Exercisable, March 2023** | **5,973,499** | **$** | **66.08** | **5.0** | **$** | **—** |

The total fair value of stock options that vested during the years ended March 2023, 2022 and 2021 was $3.2 million, $16.6 million and $15.5 million, respectively. The total intrinsic value of stock options exercised during the years ended March 2023, 2022 and 2021, was $0.4 million, $22.9 million and $44.9 million, respectively.

*Restricted Stock Units*

VF grants performance-based RSUs that enable employees to receive shares of VF Common Stock at the end of a three-year period. Each performance-based RSU has a potential final payout ranging from zero to two shares of VF Common Stock. The number of shares earned by participants, if any, is based on achievement of three-year financial targets set by the Talent and Compensation Committee of the Board of Directors. Shares are issued to participants in the year following the conclusion of each three-year performance period.

For performance-based RSUs granted in Fiscal 2023, the financial targets include 50% weighting based on VF's revenue growth and 50% weighting based on VF's gross margin performance over the three-year period compared to financial targets. Additionally, the actual number of shares earned may be adjusted upward or downward by 25% of the target award, based on how VF's total shareholder return ("TSR") over the three-year period compares to the TSR for companies included in the Standard & Poor's 500 Consumer Discretionary Index. The grant date fair value of the TSR-based adjustment related to the performance-based RSU grants was determined using a Monte Carlo simulation technique that incorporates option-pricing model inputs, and was $3.46 per share.

For performance-based RSUs granted in Fiscal 2022 and 2021, the financial targets include 50% weighting based on VF's revenue growth over the three-year period compared to a group

of industry peers and 50% weighting based on VF's TSR over the three-year period compared to the TSR for companies included in the Standard & Poor's 500 Consumer Discretionary Index. The grant date fair value of the TSR portion of the performance-based RSU grants was determined using a Monte Carlo simulation technique that incorporates option-pricing model inputs, and was $101.56 and $81.60 per share for the performance-based RSU grants in the years ended March 2022 and 2021, respectively. Additionally, the actual number of performance-based RSUs earned may be adjusted upward or downward by 25% of the target award, based on VF's gross margin performance over the three-year period.

VF also grants nonperformance-based RSUs to employees as part of its stock compensation program and to nonemployee members of the Board of Directors. Each nonperformance-based RSU entitles the holder to one share of VF Common Stock. The employee nonperformance-based RSUs generally vest over periods of up to four years from the date of grant. The nonperformance-based RSUs granted to nonemployee members of the Board of Directors vest upon grant and will be settled in shares of VF Common Stock one year from the date of grant.

Dividend equivalents on the RSUs accrue without compounding and are payable in additional shares of VF Common Stock when the RSUs vest. Dividend equivalents are subject to the same risk of forfeiture as the RSUs.

RSU activity for the year ended March 2023 is summarized as follows:

| | Performance-based | | Nonperformance-based | |
| --- | --- | --- | --- | --- |
| | Number Outstanding [(a)] | Weighted Average Grant Date Fair Value | Number Outstanding | Weighted Average Grant Date Fair Value |
| Outstanding, March 2022 | 912,963 | $    80.75 | 901,956 | $    71.42 |
| Granted | 364,192 | 45.23 | 1,103,228 | 38.31 |
| Issued as Common Stock | (248,203) | 84.27 | (207,011) | 64.42 |
| Forfeited/cancelled | (165,024) | 53.78 | (220,133) | 59.46 |
| Outstanding, March 2023 | 863,928 | $    69.92 | 1,578,040 | $    50.85 |
| Vested, March 2023 | 551,338 | $    72.68 | 112,197 | $    67.09 |

[(a)] Reflects activity at target level of awards and has not been adjusted for performance and market conditions.

The weighted average fair value of performance-based RSUs granted during the year ended March 2023 was $45.23 per share, based on the fair market value of the underlying VF Common Stock on each grant date. The weighted average fair value of performance-based RSUs granted during the years ended March 2022 and March 2021 was $89.65 and $70.88 per share, respectively, based on the weighting of the TSR and the fair market value of the underlying VF Common Stock on each grant date. The total market value of awards outstanding at the end of March 2023 was $19.8 million. Awards earned and vested for the three-year performance period ended in March 2022 and distributed in early Fiscal 2023 totaled 92,848 shares of VF

Common Stock having a value of $4.4 million. Similarly, 135,562 shares of VF Common Stock having a value of $11.6 million were earned for the performance period ended in March 2021 and distributed in early Fiscal 2022.

The weighted average fair value of nonperformance-based RSUs granted during the years ended March 2023, 2022 and 2021 was $38.31, $75.29 and $63.99 per share, respectively, which was equal to the fair market value of the underlying VF Common Stock on each grant date. The total market value of awards outstanding at the end of March 2023 was $36.2 million.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

*Restricted Stock*

VF grants restricted shares of VF Common Stock to certain members of management. The fair value of the restricted shares, equal to the fair market value of VF Common Stock at the grant date, is recognized ratably over the vesting period. Restricted shares vest over periods of up to four years from the date of grant. Dividends accumulate in the form of additional restricted shares and are subject to the same risk of forfeiture as the restricted stock. Restricted stock activity during Fiscal 2023 included vesting of a portion of the shares of VF Common Stock deposited in escrow in connection with the Supreme acquisition, which for accounting purposes, are considered stock-based compensation.

Restricted stock activity for the year ended March 2023 is summarized below:

| | Nonvested Shares Outstanding | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Nonvested shares, March 2022 | 854,410 | $ | 79.43 |
| Granted | 125,981 | | 35.72 |
| Dividend equivalents | 15,587 | | 30.52 |
| Vested | (377,702) | | 82.99 |
| Forfeited | (20,141) | | 65.30 |
| Nonvested shares, March 2023 | 598,135 | $ | 67.17 |

Nonvested shares of restricted stock had a market value of $13.7 million at the end of March 2023. The market value of the shares that vested during the years ended March 2023, 2022 and 2021 was $11.1 million, $5.0 million and $27.9 million, respectively.

## NOTE 19 — INCOME TAXES

The provision for income taxes was computed based on the following amounts of income from continuing operations before income taxes:

| | Year Ended March | | | | | |
|---|---|---|---|---|---|---|
| (In thousands) | | **2023** | | 2022 | | 2021 |
| Domestic | $ | (885,562) | $ | 518,386 | $ | (152,073) |
| Foreign | | 928,849 | | 1,004,864 | | 608,545 |
| **Income before income taxes** | **$** | **43,287** | **$** | **1,523,250** | **$** | **456,472** |

The provision for income taxes consisted of:

| | Year Ended March | | | | | |
|---|---|---|---|---|---|---|
| (In thousands) | | **2023** | | 2022 | | 2021 |
| Current: | | | | | | |
| Federal | $ | (114,772) | $ | 231,469 | $ | 6,373 |
| Foreign | | 106,192 | | 196,540 | | 109,543 |
| State | | (13,163) | | 36,461 | | 25,462 |
| | | (21,743) | | 464,470 | | 141,378 |
| Deferred: | | | | | | |
| Federal and state | | (46,677) | | (177,381) | | (24,133) |
| Foreign | | (6,877) | | 19,892 | | (15,679) |
| | | (53,554) | | (157,489) | | (39,812) |
| **Income tax expense (benefit)** | **$** | **(75,297)** | **$** | **306,981** | **$** | **101,566** |

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

On May 19, 2019, Switzerland voted to approve the Federal Act on Tax Reform and AHV Financing ("Swiss Tax Act"). Provisions of the Swiss Tax Act were enacted for Swiss federal purposes during the second quarter of Fiscal 2020, and later enacted for certain cantons during the fourth quarter. These provisions resulted in adjustments to deferred tax assets and liabilities such that a net tax benefit of $93.6 million was recorded for the year ended March 2020. In the fourth quarter of Fiscal 2022, $67.4 million net tax expense was recorded related to changes to these previously recorded deferred tax assets.

On December 22, 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act ("U.S. Tax Act"), which included a transition tax under Section 965. The income tax payable attributable to the transition tax is due over an 8-year period that began in 2018. At the end of Fiscal 2023, a noncurrent income tax payable of approximately $113.0 million attributable to the transition tax is reflected in the other liabilities line item of the Consolidated Balance Sheet.

The differences between income taxes computed by applying the statutory federal income tax rate and income tax expense (benefit) reported in the consolidated financial statements are as follows:

| (In thousands) | | Year Ended March | | | |
| | | **2023** | 2022 | | 2021 |
| Tax at federal statutory rate | $ | 9,090 | $ | 319,882 | $ | 95,859 |
| State income taxes, net of federal tax benefit | | (17,301) | | 16,641 | | 13,771 |
| Foreign rate differences | | (38,609) | | (62,928) | | (5,605) |
| Tax reform | | (94,877) | | 67,358 | | — |
| Goodwill impairment | | 74,624 | | — | | 2,631 |
| Stock compensation (federal) | | 2,304 | | (1,977) | | (4,783) |
| Non-taxable contingent consideration adjustments | | — | | (28,090) | | — |
| Interest on tax receivable | | (11,972) | | — | | — |
| Other | | 1,444 | | (3,905) | | (307) |
| **Income tax expense (benefit)** | $ | (75,297) | $ | 306,981 | $ | 101,566 |

Income tax expense (benefit) in the year ended March 2023 includes a $94.9 million favorable adjustment to VF's transition tax liability under the U.S. Tax Act pursuant to the Internal Revenue Service ("IRS") examinations for tax year 2017 and short-tax year 2018. Income tax expense (benefit) also includes tax benefits of $10.6 million, $2.2 million and $3.6 million in the years ended March 2023, 2022 and 2021, respectively, from other favorable audit outcomes on certain tax matters and from expiration of statutes of limitations.

VF was granted a ruling which lowered the effective income tax rate on taxable earnings for years 2010 through 2014 under Belgium's excess profit tax regime. During 2015, the European Union Commission ("EU") investigated and announced its decision that these rulings were illegal and ordered the tax benefits to be collected from affected companies, including VF. Requests for annulment were filed by Belgium and VF Europe BVBA individually. During 2017 and 2018, VF Europe BVBA was assessed and paid €35.0 million tax and interest, which was recorded as an income tax receivable and is included in the other current assets line item in VF's Consolidated Balance

Sheets, based on the expected success of the requests for annulment. During 2019, the General Court annulled the EU decision and the EU subsequently appealed the General Court's annulment. In September 2021, the General Court's judgment was set aside by the Court of Justice of the EU and the case was sent back to the General Court to determine whether the excess profit tax regime amounted to illegal State aid. The case remains open and unresolved. If this matter is adversely resolved, these amounts will not be collected by VF.

In addition, VF has been granted a lower effective income tax rate on taxable earnings in one foreign jurisdiction that expired at the end of June 2020 and another foreign jurisdiction that will expire in March 2026. These lower rates, when compared with the country statutory rates, resulted in income tax reductions of $57.8 million ($0.15 per diluted share) in the year ended March 2023, $0.4 million ($0.00 per diluted share) in the year ended March 2022 and $3.8 million ($0.01 per diluted share) in the year ended March 2021.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

Deferred income tax assets and liabilities consisted of the following:

| (In thousands) | March 2023 | March 2022 |
|---|---|---|
| Deferred income tax assets: | | |
| Inventories | $ 74,395 | $ 38,661 |
| Deferred compensation | 24,557 | 32,349 |
| Other employee benefits | — | 16,870 |
| Stock compensation | 27,589 | 27,610 |
| Operating lease liabilities | 361,676 | 327,668 |
| Other accrued expenses | 109,050 | 105,978 |
| Interest expense limitation carryforward | 3,932 | 1,711 |
| Capital loss carryforwards | 166,587 | 166,622 |
| Operating loss and credit carryforwards | 331,167 | 539,157 |
| Gross deferred income tax assets | 1,098,953 | 1,256,626 |
| Valuation allowances | (424,932) | (616,533) |
| Net deferred income tax assets | 674,021 | 640,093 |
| Deferred income tax liabilities: | | |
| Depreciation | 26,303 | 10,768 |
| Intangible assets | 277,473 | 361,182 |
| Operating lease right-of-use assets | 330,235 | 295,227 |
| Other employee benefits | 3,707 | — |
| Other deferred tax liabilities | 48,732 | 22,337 |
| Deferred income tax liabilities | 686,450 | 689,514 |
| Net deferred income tax assets (liabilities) | $ (12,429) | $ (49,421) |
| Amounts included in the Consolidated Balance Sheets: | | |
| Other assets (Note 11) | $ 95,117 | $ 100,980 |
| Other liabilities (Note 15) | (107,546) | (150,401) |
| | $ (12,429) | $ (49,421) |

At the end of Fiscal 2023, the Company is not asserting indefinite reinvestment with regards to short-term liquid assets of its foreign subsidiaries. All other foreign earnings, including basis differences of certain foreign subsidiaries, continue to be considered indefinitely reinvested. As of the end of Fiscal 2023, there was approximately $346.0 million of undistributed earnings of international subsidiaries which could result in additional U.S. income or other taxes. The Company has not determined the deferred tax liability associated with these undistributed earnings and basis differences, as such determination is not practicable.

VF has potential tax benefits totaling $295.4 million for foreign operating loss carryforwards, of which $106.0 million have an unlimited carryforward life. In addition, there are $166.6 million of potential tax benefits for capital loss carryforwards that begin to expire in 2026 and $20.5 million of potential tax benefits for state operating loss and credit carryforwards that expire between 2024 and 2040.

A valuation allowance has been provided where it is more likely than not that the deferred tax assets related to those operating loss carryforwards will not be realized. Valuation allowances totaled $262.5 million for available foreign operating loss carryforwards, $151.5 million for available state operating loss and credit carryforwards, and $0.9 million for other foreign deferred income tax assets. During Fiscal 2023, VF had a net decrease in valuation allowances of $0.6 million related to capital loss carryforwards, a net increase of $5.6 million related to state operating loss and credit carryforwards and a decrease of $196.6 million related to foreign operating loss carryforwards and other foreign deferred tax assets, inclusive of foreign currency effects.

VF CORPORATION

Notes to Consolidated Financial Statements

March 2023

A reconciliation of the change in the accrual for unrecognized income tax benefits is as follows:

| (In thousands) | Unrecognized Income Tax Benefits | | Accrued Interest and Penalties | | Unrecognized Income Tax Benefits Including Interest and Penalties | |
|---|---|---|---|---|---|---|
| Balance, March 2020 | $ | 184,723 | $ | 30,612 | $ | 215,335 |
| Additions for current year tax positions | | 6,609 | | — | | 6,609 |
| Additions for prior year tax positions | | 20,950 | | 8,064 | | 29,014 |
| Reductions for prior year tax positions | | (2,073) | | (1,399) | | (3,472) |
| Reductions due to statute expirations | | (761) | | (216) | | (977) |
| Payments in settlement | | (3,464) | | (650) | | (4,114) |
| Additions due to acquisitions | | 17,066 | | 1,673 | | 18,739 |
| Currency translation | | (40) | | 57 | | 17 |
| Balance, March 2021 | | 223,010 | | 38,141 | | 261,151 |
| Additions for current year tax positions | | 28,098 | | — | | 28,098 |
| Additions for prior year tax positions(a) | | 112,850 | | 32,642 | | 145,492 |
| Reductions for prior year tax positions | | (895) | | (532) | | (1,427) |
| Reductions due to statute expirations | | (5,803) | | (840) | | (6,643) |
| Payments in settlement | | (21,278) | | (730) | | (22,008) |
| Decrease due to divestiture | | (506) | | (340) | | (846) |
| Currency translation | | 186 | | (43) | | 143 |
| Balance, March 2022 | | 335,662 | | 68,298 | | 403,960 |
| Additions for current year tax positions | | 22,319 | | — | | 22,319 |
| Additions for prior year tax positions | | 13,324 | | 20,577 | | 33,901 |
| Reductions for prior year tax positions | | (3,747) | | (951) | | (4,698) |
| Reductions due to statute expirations | | (15,369) | | (1,699) | | (17,068) |
| Payments in settlement | | (3,847) | | (1,608) | | (5,455) |
| Currency translation | | (172) | | (10) | | (182) |
| Balance, March 2023 | $ | 348,170 | $ | 84,607 | $ | 432,777 |

(a)   The year ended March 2022 included an increase resulting from updated estimates related to intellectual property transfers completed in a prior period.

| (In thousands) | March 2023 | | March 2022 | |
|---|---|---|---|---|
| Amounts included in the Consolidated Balance Sheets: | | | | |
| Unrecognized income tax benefits, including interest and penalties | $ | 432,777 | $ | 403,960 |
| Less deferred tax benefits | | 135,175 | | 126,179 |
| Total unrecognized tax benefits | $ | 297,602 | $ | 277,781 |

The unrecognized tax benefits of $297.6 million at the end of Fiscal 2023, if recognized, would reduce the annual effective tax rate.

VF files a consolidated U.S. federal income tax return, as well as separate and combined income tax returns in numerous state and international jurisdictions. In the U.S., the IRS examinations for tax years through 2015 have been effectively settled.

As previously reported, VF petitioned the U.S. Tax Court (the "Court") to resolve an IRS dispute regarding the timing of income inclusion associated with VF's acquisition of The

Timberland Company in September 2011. While the IRS argues that all such income should have been immediately included in 2011, VF has reported periodic income inclusions in subsequent tax years. Both parties moved for summary judgment on the issue. On January 31, 2022, the Court issued its opinion in favor of the IRS and on July 14, 2022 issued its final decision. VF believes the opinion of the Court was in error based on the technical merits and filed a notice of appeal on October 7, 2022. VF continues to believe its timing and treatment of the income inclusion is appropriate and VF is vigorously defending its position. On October 19, 2022, VF paid $875.7 million related to the 2011 taxes and interest being disputed, which was recorded

as an income tax receivable and will accrue interest income. These amounts are included in the other assets line item in VF's Consolidated Balance Sheet at March 2023, based on our assessment of the position under the more-likely-than-not standard of the accounting literature. Refer to Note 21 for additional details on this matter.

In addition, VF is currently subject to examination by various state and international tax authorities. Management regularly assesses the potential outcomes of both ongoing and future examinations for the current and prior years and has concluded that VF's provision for income taxes is adequate. The outcome of any one examination is not expected to have a material impact on VF's consolidated financial statements. Management believes that some of these audits and negotiations will conclude during the next 12 months. Management also believes that it is

reasonably possible that the amount of unrecognized income tax benefits may decrease by $281.4 million within the next 12 months due to settlement of audits and expiration of statutes of limitations, primarily comprised of tax payments related to intellectual property transfers completed in a prior period. The overall decrease of unrecognized tax benefits would reduce income tax expense by $23.7 million.

On August 16, 2022, the U.S. enacted the Inflation Reduction Act of 2022, which, among other things, implements a 15% minimum tax on book income of certain large corporations, a 1% excise tax on net stock repurchases and several tax incentives to promote clean energy. Based on the current analysis of the provisions, the Company does not expect this legislation to have a material impact on VF's income tax accounts.

## NOTE 20 — REPORTABLE SEGMENT INFORMATION

The chief operating decision maker allocates resources and assesses performance based on a global brand view which represents VF's operating segments. The operating segments have been evaluated and combined into reportable segments because they meet the similar economic characteristics and qualitative aggregation criteria set forth in the relevant accounting guidance. Based on this assessment, the Company's reportable segments have been identified as: Outdoor, Active and Work.

Below is a description of VF's reportable segments and the brands included within each:

| REPORTABLE SEGMENT | BRANDS |
| --- | --- |
| **Outdoor** - Outdoor apparel, footwear and equipment | The North Face® |
| | Timberland® |
| | Smartwool® |
| | Altra® |
| | Icebreaker® |
| **Active** - Active apparel, footwear and accessories | Vans® |
| | Supreme® |
| | Kipling® |
| | Napapijri® |
| | Eastpak® |
| | JanSport® |
| **Work** - Work and work-inspired lifestyle apparel and footwear | Dickies® |
| | Timberland PRO® |

**Other** - included in the tables below for purposes of reconciliation of revenues and profit, but it is not considered a reportable segment. Other primarily includes sourcing activities related to transition services.

The Company continuously assesses the composition of its portfolio to ensure it is aligned with its strategic objectives and positioned to maximize growth and return to shareholders. In doing so, it evaluates whether changes may need to be made to our internal reporting structure to better support and assess the operations of our business going forward. If changes are made, we will assess the resulting effect on our reportable segments, operating segments and reporting units, if any. The primary financial measures used by management to evaluate the financial results of VF's reportable segments are segment revenues and segment profit. Segment profit comprises the operating income and other income (expense), net line items of each segment.

Accounting policies used for internal management reporting at the individual segments are consistent with those in Note 1,

except as stated below. Corporate costs (other than common costs allocated to the segments), goodwill and indefinite-lived intangible asset impairment charges, net interest expense and loss on debt extinguishment are not controlled by segment management and therefore are excluded from the measurement of segment profit. Common costs such as information systems processing, retirement benefits and insurance are allocated from corporate costs to the segments based on appropriate metrics such as usage or employment. Corporate costs that are not allocated to the segments consist of corporate headquarters expenses (including compensation and benefits of corporate management and staff, certain legal and professional fees and administrative and general costs), costs of corporate programs or corporate-managed decisions, and other expenses which include a portion of defined benefit pension costs, development

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

costs for management information systems, costs of registering, maintaining and enforcing certain of VF's trademarks and miscellaneous consolidated costs. Defined benefit pension plans in the U.S. are centrally managed. The current year service cost component of pension cost is allocated to the segments, while the remaining pension cost components are reported in corporate and other expenses.

Segment assets, for internal management purposes, are those used directly in or resulting from the operations of each

business, which are accounts receivable and inventories. Segment assets included in the Other category represent balances primarily related to corporate activities, and are provided for purposes of reconciliation as the Other category is not considered a reportable segment. Total expenditures for additions to long-lived assets are not disclosed as this information is not regularly provided to the chief operating decision maker at the segment level.

Financial information for VF's reportable segments is as follows:

| (In thousands) | Year Ended March | | | | | |
|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2021 | |
| Segment revenues: | | | | | | |
| Outdoor | $ | 5,647,526 | $ | 5,327,568 | $ | 4,127,601 |
| Active | | 4,904,622 | | 5,380,338 | | 4,160,856 |
| Work | | 1,060,179 | | 1,133,149 | | 945,680 |
| Other | | 148 | | 785 | | 4,693 |
| **Total segment revenues** | $ | **11,612,475** | $ | **11,841,840** | $ | **9,238,830** |
| Segment profit (loss): | | | | | | |
| Outdoor | $ | 785,431 | $ | 795,523 | $ | 342,212 |
| Active | | 654,691 | | 979,746 | | 648,467 |
| Work | | 121,157 | | 193,492 | | 27,141 |
| Other | | (536) | | (586) | | (5,410) |
| **Total segment profit** | | **1,560,743** | | **1,968,175** | | **1,012,410** |
| Impairment of goodwill and indefinite-lived intangible assets [(a)] | | (735,009) | | — | | (12,400) |
| Corporate and other expenses | | (617,815) | | (309,817) | | (417,038) |
| Interest expense, net | | (164,632) | | (131,463) | | (126,500) |
| Loss on debt extinguishment | | — | | (3,645) | | — |
| **Income from continuing operations before income taxes** | $ | **43,287** | $ | **1,523,250** | $ | **456,472** |

[(a)] Excluded $8.0 million of impairment charges related to definite-lived intangible assets in the year ended March 2021, which were primarily recorded in the Work segment.

| (In thousands) | March 2023 | | March 2022 | |
|---|---|---|---|---|
| Segment assets: | | | | |
| Outdoor | $ | 1,936,090 | $ | 1,307,244 |
| Active | | 1,341,142 | | 1,110,691 |
| Work | | 610,798 | | 436,765 |
| Other | | 15,055 | | 31,815 |
| Total segment assets | | 3,903,085 | | 2,886,515 |
| Cash and equivalents | | 814,887 | | 1,275,943 |
| Property, plant and equipment, net | | 942,440 | | 1,041,777 |
| Intangible assets and goodwill | | 4,621,234 | | 5,394,158 |
| Operating lease right-of-use assets | | 1,372,182 | | 1,247,056 |
| Other assets | | 2,336,660 | | 1,496,759 |
| **Consolidated assets** | $ | **13,990,488** | $ | **13,342,208** |

| (In thousands) | Year Ended March | | | | | |
|---|---|---|---|---|---|---|
| | **2023** | | 2022 | | 2021 | |
| Depreciation and amortization expense: | | | | | | |
| Outdoor | $ | 94,448 | $ | 95,860 | $ | 94,841 |
| Active | | 81,106 | | 87,235 | | 80,245 |
| Work | | 12,524 | | 14,439 | | 20,785 |
| Other | | 74,246 | | 69,401 | | 73,210 |
| | $ | 262,324 | $ | 266,935 | $ | 269,081 |

Supplemental information (with revenues by geographic area primarily based on the origin of the shipment) is as follows:

| (In thousands) | Year Ended March | | | | | |
|---|---|---|---|---|---|---|
| | **2023** | | 2022 | | 2021 | |
| Total revenues: | | | | | | |
| U.S. | $ | 6,043,359 | $ | 6,178,300 | $ | 4,635,704 |
| Foreign | | 5,569,116 | | 5,663,540 | | 4,603,126 |
| | $ | 11,612,475 | $ | 11,841,840 | $ | 9,238,830 |
| Property, plant and equipment: | | | | | | |
| U.S. | $ | 707,035 | $ | 716,952 | | |
| Foreign | | 235,405 | | 324,825 | | |
| | $ | 942,440 | $ | 1,041,777 | | |

No single customer accounted for 10% or more of the Company's total revenues in the years ended March 2023, 2022 and 2021.

## NOTE 21 — COMMITMENTS AND CONTINGENCIES

### Commitments

VF is obligated under noncancelable operating leases. Refer to Note 10 for additional information related to future lease payments.

In the ordinary course of business, VF has entered into purchase commitments for finished products and raw materials. Total payments required under these agreements, which primarily relate to finished products, are $2.2 billion, $68.1 million and $0.1 million for Fiscal 2024 through 2026, respectively, and no commitments thereafter.

VF has entered into commitments for (i) capital spending, (ii) service and maintenance agreements related to its management information systems, and (iii) other obligations. Future payments under these agreements are $160.4 million, $68.2 million, $54.3 million, $32.7 million and $3.5 million for Fiscal 2024 through 2028, respectively, and no commitments thereafter.

Surety bonds, customs bonds, standby letters of credit and international bank guarantees, all of which represent contingent guarantees of performance under self-insurance and other programs, totaled $110.9 million as of March 2023. These commitments would only be drawn upon if VF were to fail to meet its claims or other obligations.

### Contingencies

As previously reported, VF petitioned the U.S. Tax Court (the "Court") to resolve an IRS dispute regarding the timing of income inclusion associated with VF's acquisition of The Timberland Company in September 2011. While the IRS argues

that all such income should have been immediately included in 2011, VF has reported periodic income inclusions in subsequent tax years. Both parties moved for summary judgment on the issue. On January 31, 2022, the Court issued its opinion in favor of the IRS and on July 14, 2022 issued its final decision. VF believes the opinion of the Court was in error based on the technical merits and filed a notice of appeal on October 7, 2022. On October 19, 2022, VF paid $875.7 million related to the 2011 taxes and interest being disputed, which was recorded as an income tax receivable based on the technical merits of our position with regards to the case and will accrue interest income. VF continues to believe its timing and treatment of the income inclusion is appropriate and VF is vigorously defending its position. However, should the Court opinion ultimately be upheld on appeal, this income tax receivable will not be collected by VF. If the Court opinion is upheld, VF should be entitled to a refund of taxes paid on the periodic inclusions that VF has reported. However, any such refund could be substantially reduced by potential indirect tax effects resulting from application of the Court opinion. Deferred tax liabilities, representing VF's future tax on annual inclusions, would also be released. The net impact to tax expense is estimated to be up to $730.0 million, plus the reversal of any interest income accrued on the payment, which was approximately $12.0 million at March 2023.

The Company is currently involved in other legal proceedings that are ordinary, routine litigation incidental to the business, the resolution of which is not currently expected to have a material adverse impact on the Company's financial position, results of operations or cash flows.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

## NOTE 22 — EARNINGS PER SHARE

|  (In thousands, except per share amounts) | Year Ended March | | |
|---|---|---|---|
|  | 2023 | 2022 | 2021 |
| Earnings per share — basic: | | | |
| Income from continuing operations | $ 118,584 | $ 1,216,269 | $ 354,906 |
| Weighted average common shares outstanding | 387,763 | 390,291 | 389,655 |
| **Earnings per share from continuing operations** | **$ 0.31** | **$ 3.12** | **$ 0.91** |
| Earnings per share — diluted: | | | |
| Income from continuing operations | $ 118,584 | $ 1,216,269 | $ 354,906 |
| Weighted average common shares outstanding | 387,763 | 390,291 | 389,655 |
| Incremental shares from stock options and other dilutive securities | 607 | 2,120 | 2,466 |
| Adjusted weighted average common shares outstanding | 388,370 | 392,411 | 392,121 |
| **Earnings per share from continuing operations** | **$ 0.31** | **$ 3.10** | **$ 0.91** |

Outstanding options to purchase approximately 9.3 million, 3.2 million and 3.4 million shares of Common Stock were excluded from the calculations of diluted earnings per share in the years ended March 2023, 2022 and 2021, respectively, because the effect of their inclusion would have been antidilutive to those years. In addition, 0.6 million, 0.5 million and 0.6 million shares of performance-based RSUs were excluded from the calculations of diluted earnings per share in the years ended March 2023, 2022 and 2021, respectively, because these units were not considered to be contingent outstanding shares in those years.

## NOTE 23 — FAIR VALUE MEASUREMENTS

Financial assets and financial liabilities measured and reported at fair value are classified in a three-level hierarchy that prioritizes the inputs used in the valuation process. A financial instrument's categorization within the valuation hierarchy is based on the lowest level of any input that is significant to the fair value measurement. The hierarchy is based on the observability and objectivity of the pricing inputs, as follows:

• Level 1 — Quoted prices in active markets for identical assets or liabilities.

• Level 2 — Significant directly observable data (other than Level 1 quoted prices) or significant indirectly observable

data through corroboration with observable market data. Inputs would normally be (i) quoted prices in active markets for similar assets or liabilities, (ii) quoted prices in inactive markets for identical or similar assets or liabilities, or (iii) information derived from or corroborated by observable market data.

• Level 3 — Prices or valuation techniques that require significant unobservable data inputs. These inputs would normally be VF's own data and judgments about assumptions that market participants would use in pricing the asset or liability.

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

*Recurring Fair Value Measurements*

The following table summarizes financial assets and financial liabilities that are measured and recorded in the consolidated financial statements at fair value on a recurring basis:

| (In thousands) | Total Fair Value | Fair Value Measurement Using [a] | | |
| --- | --- | --- | --- | --- |
| | | Level 1 | Level 2 | Level 3 |
| **March 2023** | | | | |
| Financial assets: | | | | |
| Cash equivalents: | | | | |
| Money market funds | $ 418,304 | $ 418,304 | $ — | $ — |
| Time deposits | 21,233 | 21,233 | — | — |
| Derivative financial instruments | 49,688 | — | 49,688 | — |
| Deferred compensation | 99,200 | 99,200 | — | — |
| Financial liabilities: | | | | |
| Derivative financial instruments | 72,653 | — | 72,653 | — |
| Deferred compensation | 96,364 | — | 96,364 | — |

| (In thousands) | Total Fair Value | Fair Value Measurement Using [a] | | |
| --- | --- | --- | --- | --- |
| | | Level 1 | Level 2 | Level 3 |
| **March 2022** | | | | |
| Financial assets: | | | | |
| Cash equivalents: | | | | |
| Money market funds | $ 324,868 | $ 324,868 | $ — | $ — |
| Time deposits | 1,100 | 1,100 | — | — |
| Derivative financial instruments | 79,046 | — | 79,046 | — |
| Deferred compensation | 125,323 | 125,323 | — | — |
| Financial liabilities: | | | | |
| Derivative financial instruments | 27,723 | — | 27,723 | — |
| Deferred compensation | 129,078 | — | 129,078 | — |
| Contingent consideration | 56,976 | — | — | 56,976 |

[a] There were no transfers among the levels within the fair value hierarchy during the years ended March 2023 or 2022.

The following table presents the activity related to the contingent consideration liability designated as Level 3:

| (In thousands) | Year Ended March | |
| --- | --- | --- |
| | 2023 | 2022 |
| **Beginning Balance** | $ 56,976 | $ 207,000 |
| Change in fair value | — | (150,024) |
| Cash payout | (56,976) | — |
| **Ending Balance** | $ — | $ 56,976 |

VF's cash equivalents include money market funds and time deposits with maturities within three months of their purchase dates, that approximate fair value based on Level 1 measurements. The fair value of derivative financial instruments, which consist of foreign exchange forward contracts and interest rate swap contracts, is determined based on observable market inputs (Level 2), including spot and forward exchange rates for foreign currencies and interest rate forward curves, and considers the credit risk of the Company and its counterparties. VF's deferred compensation assets primarily represent investments held within plan trusts as an economic hedge of the related deferred compensation liabilities (Note 16). These investments primarily include mutual funds (Level 1) that are valued based on quoted prices in active markets. Liabilities related to VF's deferred compensation plans are recorded at amounts due to participants, based on the fair value of the participants' selection of hypothetical investments.

The contingent consideration liability represented the amount of additional cash consideration paid to the selling shareholders of Supreme, which was dependent upon the achievement of certain financial targets over the one year earn-out period ended January 31, 2022. The estimated fair value of the contingent consideration liability, which could range from zero to $300.0 million and initially estimated as $207.0 million, was $57.0 million as of March 2022 and was paid during Fiscal 2023. During Fiscal 2022, the contingent consideration liability was remeasured at fair value based on probability-weighted present value of various future cash payment outcomes resulting from

the estimated achievement levels of the financial targets, with changes recognized in the selling, general and administrative expenses line item in the Consolidated Statements of Operations. Refer to Note 3 for additional information on the acquisition of Supreme.

All other significant financial assets and financial liabilities are recorded in the consolidated financial statements at cost, except life insurance contracts which are recorded at cash surrender value. These other financial assets and financial liabilities include cash held as demand deposits, accounts receivable, short-term borrowings, accounts payable and accrued liabilities. At March 2023 and 2022, their carrying values approximated their fair values. Additionally, at March 2023 and 2022, the carrying values of VF's long-term debt, including the current portion, were $6,635.3 million and $5,085.3 million, respectively, compared with fair values of $6,244.4 million and $5,042.5 million at those respective dates. Fair value for long-term debt is a Level 2 estimate based on quoted market prices or values of comparable borrowings.

*Nonrecurring Fair Value Measurements*

Certain non-financial assets, primarily property, plant and equipment, goodwill and intangible assets, and operating lease right-of-use assets, are not required to be measured at fair value on a recurring basis and are reported at carrying value. However, these assets are required to be assessed for impairment whenever events or circumstances indicate their carrying value may not be fully recoverable, and at least annually for goodwill and indefinite-lived intangible assets. In the event an impairment is required, the asset is adjusted to its estimated fair value, using market-based assumptions.

The Company recorded $3.0 million, $6.4 million and $14.8 million of impairments in the years ended March 2023, 2022 and 2021, respectively, related to retail store assets, associated lease right-of-use assets and other fixed assets. These impairments were recorded in the selling, general and administrative expenses line item in the Consolidated Statements of Operations.

*Goodwill and Intangible Asset Impairment Testing*

During the second quarter of Fiscal 2023, due to continued increases in the federal funds rate and strengthening of the U.S. dollar relative to other currencies, management performed a quantitative impairment analysis of both the Supreme reporting unit goodwill and the indefinite-lived trademark intangible asset. As a result of the interim impairment testing performed, VF recorded impairment charges of $229.0 million and $192.9 million to the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset, respectively, in the Consolidated Statement of Operations for the year ended March 2023.

In addition, management performed its annual impairment testing of goodwill and indefinite-lived intangible assets as of the beginning of the fourth quarter of Fiscal 2023. Management performed a quantitative impairment analysis of the Supreme, Timberland and Icebreaker reporting unit goodwill and indefinite-lived trademark intangible assets. A qualitative analysis was performed for all other reporting units and indefinite-lived trademark intangible assets. As a result of the annual impairment testing, VF recorded additional impairment

charges of $165.1 million and $148.0 million to the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset, respectively, in the Consolidated Statement of Operations for the year ended March 2023. The remaining carrying values of the Supreme reporting unit goodwill and indefinite-lived trademark intangible asset, after the impairment charges, were $825.9 million and $852.0 million, respectively. No other impairment charges were recorded as a result of the annual impairment testing.

No impairment charges of goodwill or indefinite-lived trademark intangible assets were recorded in the year ended March 2022. VF recorded intangible asset impairment charges of $20.4 million in the year ended March 2021 primarily due to the write-off of certain trademark and customer relationship balances, which resulted from strategic actions taken by the Company.

Our impairment testing of goodwill and indefinite-lived trademark intangible assets utilizes significant unobservable inputs (Level 3) to determine fair value.

The fair value of reporting units for goodwill impairment testing is determined using a combination of two valuation methods: an income approach and a market approach. The income approach is based on projected future (debt-free) cash flows that are discounted to present value. The appropriate discount rate is based on the reporting unit's weighted average cost of capital ("WACC") that takes market participant assumptions into consideration. For market approach, management uses both the guideline company and similar transaction methods. The guideline company method analyzes market multiples of revenues and earnings before interest, taxes, depreciation and amortization ("EBITDA") for a group of comparable public companies. The market multiples used in the valuation are based on the relative strengths and weaknesses of the reporting unit compared to the selected guideline companies. Under the similar transactions method, valuation multiples are calculated utilizing actual transaction prices and revenue/EBITDA data from target companies deemed similar to the reporting unit. Management typically assigns more weight to the income-based valuation method.

Management uses the income-based relief-from-royalty method to value indefinite-lived trademark intangible assets. Under this method, revenues expected to be generated by the trademark are multiplied by a selected royalty rate. The royalty rate is selected based on consideration of (i) royalty rates included in active license agreements, if applicable, (ii) royalty rates received by market participants in the apparel industry, and (iii) the current performance of the reporting unit. The estimated after-tax royalty revenue stream is then discounted to present value using the reporting unit's WACC adjusted, as appropriate, to factor in the risk of the intangible asset.

Management's revenue and profitability forecasts used in the reporting unit and intangible asset valuations were developed in conjunction with management's forecast and plan review, which includes management's overall assessment of events and circumstances, including macroeconomic conditions and industry and market considerations, and the resulting outlook for the businesses, considering recent performance and trends and strategic initiatives. Assumptions used in the valuations are similar to those that would be used by market participants performing independent valuations of these businesses.

**NOTE 24 — DERIVATIVE FINANCIAL INSTRUMENTS AND HEDGING ACTIVITIES**

*Summary of Derivative Financial Instruments*

VF's outstanding derivative financial instruments include foreign currency exchange forward contracts and interest rate swap contracts. Although derivatives meet the criteria for hedge accounting at the inception of the hedging relationship, a limited number of derivative contracts intended to hedge assets and liabilities are not designated as hedges for accounting purposes.

The notional amounts of all outstanding foreign currency exchange forward contracts were $3.4 billion and $2.9 billion at March 2023 and 2022, respectively, consisting primarily of contracts hedging exposures to the euro, British pound,

Canadian dollar, Swiss franc, Mexican peso, Chinese renminbi, South Korean won, Swedish krona, Polish zloty and Japanese yen. These derivative contracts have maturities up to 20 months.

During the year ended March 2023, VF entered into interest rate swap contracts to hedge the cash flow risk of interest payments on its variable-rate DDTL Agreement. The notional amount of VF's outstanding interest rate swap contracts was $500.0 million at March 2023. Refer to Note 14 for additional information on the debt agreement.

The following table presents outstanding derivatives on an individual contract basis:

| | Fair Value of Derivatives with Unrealized Gains | | Fair Value of Derivatives with Unrealized Losses | |
|---|---|---|---|---|
| (In thousands) | March 2023 | March 2022 | March 2023 | March 2022 |
| **Derivatives Designated as Hedging Instruments:** | | | | |
| Foreign exchange contracts | $ 46,752 | $ 79,046 | $ (71,052) | $ (27,678) |
| Interest rate contracts | — | — | (1,140) | — |
| Total derivatives designated as hedging instruments | 46,752 | 79,046 | (72,192) | (27,678) |
| **Derivatives Not Designated as Hedging Instruments:** | | | | |
| Foreign exchange contracts | 2,936 | — | (461) | (45) |
| **Total derivatives** | **$ 49,688** | **$ 79,046** | **$ (72,653)** | **$ (27,723)** |

VF records and presents the fair values of all of its derivative assets and liabilities in the Consolidated Balance Sheets on a gross basis, even though they are subject to master netting agreements. If VF were to offset and record the asset and liability balances on a net basis in accordance with the terms of its master netting agreements, the amounts presented in the Consolidated Balance Sheets as of March 2023 and 2022 would be adjusted from the current gross presentation to the net amounts as detailed in the following table:

| | March 2023 | | March 2022 | |
|---|---|---|---|---|
| (In thousands) | Derivative Asset | Derivative Liability | Derivative Asset | Derivative Liability |
| Gross amounts presented in the Consolidated Balance Sheets | $ 49,688 | $ (72,653) | $ 79,046 | $ (27,723) |
| Gross amounts not offset in the Consolidated Balance Sheets | (26,470) | 26,470 | (18,721) | 18,721 |
| **Net amounts** | **$ 23,218** | **$ (46,183)** | **$ 60,325** | **$ (9,002)** |

Derivatives are classified as current or noncurrent based on maturity dates, as follows:

| (In thousands) | | | |
|---|---|---|---|
| **Derivative Instruments** | **Balance Sheet Location** | March 2023 | March 2022 |
| Foreign exchange contracts | Other current assets | $ 48,132 | $ 71,910 |
| Foreign exchange contracts | Accrued liabilities (Note 13) | (59,995) | (24,267) |
| Foreign exchange contracts | Other assets (Note 11) | 1,556 | 7,136 |
| Foreign exchange contracts | Other liabilities (Note 15) | (11,518) | (3,456) |
| Interest rate contracts | Other liabilities (Note 15) | (1,140) | — |

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

*Cash Flow Hedges*

VF primarily uses foreign currency exchange forward contracts to hedge a portion of the exchange risk for its forecasted sales, inventory purchases, operating costs and certain intercompany transactions, including sourcing and management fees and royalties. The company also uses interest rate swap contracts to hedge against a portion of the exposure related to its variable-rate debt. The effects of cash flow hedging included in VF's Consolidated Statements of Operations and Consolidated Statements of Comprehensive Income are summarized as follows:

| (In thousands) | Gain (Loss) on Derivatives Recognized in OCI Year Ended March | | |
|---|---|---|---|
| **Cash Flow Hedging Relationships** | **2023** | **2022** | **2021** |
| Foreign exchange contracts | $ 54,546 | $ 71,494 | $ (122,244) |
| Interest rate contracts | (1,013) | — | — |
| **Total** | **$ 53,533** | **$ 71,494** | **$ (122,244)** |

| (In thousands) | | Gain (Loss) Reclassified from Accumulated OCI into Income Year Ended March | | |
|---|---|---|---|---|
| **Cash Flow Hedging Relationships** | **Location of Gain (Loss)** | **2023** | **2022** | **2021** |
| Foreign exchange contracts | Net revenues | $ (6,843) | $ (27,382) | $ 2,596 |
| Foreign exchange contracts | Cost of goods sold | 120,438 | (26,346) | 19,485 |
| Foreign exchange contracts | Selling, general and administrative expenses | 6,695 | (487) | 2,797 |
| Foreign exchange contracts | Other income (expense), net | (10,365) | (219) | (137) |
| Interest rate contracts | Interest expense | 235 | 108 | 107 |
| **Total** | | **$ 110,160** | **$ (54,326)** | **$ 24,848** |

*Derivative Contracts Not Designated as Hedges*

VF uses foreign currency exchange contracts to manage foreign currency exchange risk on third-party accounts receivable and payable, as well as intercompany borrowings. These contracts are not designated as hedges, and are recorded at fair value in the Consolidated Balance Sheets. Changes in the fair values of these instruments are recognized directly in earnings. Gains or losses on these contracts largely offset the net transaction losses or gains on the related assets and liabilities. In the case of derivative contracts executed on foreign currency exposures that are no longer probable of occurring, VF de-designates these hedges and the fair value changes of these instruments are also recognized directly in earnings.

The impact of de-designated derivative contracts and changes in the fair value of derivative contracts not designated as hedges, recognized as gains or losses in VF's Consolidated Statements of Operations were not material for the years ended March 2023, 2022 and 2021.

*Other Derivative Information*

At March 2023, accumulated OCI included $27.8 million of pre-tax net deferred gains for foreign currency exchange contracts

that are expected to be reclassified to earnings during the next 12 months. The amounts ultimately reclassified to earnings will depend on exchange rates in effect when outstanding derivative contracts are settled.

*Net Investment Hedge*

The Company has designated its euro-denominated fixed rate notes, which represent €2.850 billion in aggregate principal, as a net investment hedge of VF's investment in certain foreign operations. Because this debt qualified as a nonderivative hedging instrument, foreign currency transaction gains or losses of the debt are deferred in the foreign currency translation and other component of accumulated OCI as an offset to the foreign currency translation adjustments on the hedged investments. During the years ended March 2023, 2022 and 2021, the Company recognized an after-tax gain of $5.2 million, an after-tax gain of $99.5 million and an after-tax loss of $91.5 million, respectively, in OCI related to the net investment hedge transaction. Any amounts deferred in accumulated OCI will remain until the hedged investment is sold or substantially liquidated.

## NOTE 25 — SUPPLEMENTAL CASH FLOW INFORMATION

| (In thousands) | 2023 | 2022 | 2021 |
|---|---|---|---|
| | Year Ended March | | |
| Income taxes paid, net of refunds [a][b] | $ 1,113,940 | $ 263,733 | $ 188,271 |
| Interest paid, net of amounts capitalized | 160,272 | 123,476 | 89,807 |
| Noncash transactions: | | | |
| Property, plant and equipment expenditures included in accounts payable or accrued liabilities | 44,151 | 45,235 | 39,774 |
| Computer software costs included in accounts payable or accrued liabilities | 28,519 | 33,997 | 25,848 |

[a]   The year ended March 2023, includes the payment related to the ongoing IRS dispute associated with VF's acquisition of The Timberland Company in September 2011. Refer to Notes 19 and 21 for additional information.
[b]   Includes both continuing and discontinued operations.

## NOTE 26 — RESTRUCTURING

The Company incurs restructuring charges related to strategic initiatives and cost optimization of business activities, primarily related to severance and employee-related benefits.

Of the $75.7 million of restructuring charges recognized in the year ended March 2023, $70.9 million were reflected in selling, general and administrative expenses and $4.8 million in cost of goods sold. Of the $20.0 million of restructuring charges recognized in the year ended March 2022, $18.3 million were reflected in selling, general and administrative expenses and $1.7 million in cost of goods sold. Of the $119.0 million of restructuring charges recognized in the year ended March 2021,

$75.1 million were reflected in selling, general and administrative expenses and $43.9 million in cost of goods sold. The Company has not recognized any significant incremental costs related to the accruals for the year ended March 2022 or prior periods.

Of the total restructuring accrual at March 2023, $43.1 million is expected to be paid out within the next 12 months and is classified within accrued liabilities (Note 13). The remaining $2.2 million will be paid out beyond the next 12 months and thus is classified within other liabilities.

The components of the restructuring charges are as follows:

| (In thousands) | 2023 | 2022 | 2021 |
|---|---|---|---|
| | Year Ended March | | |
| Severance and employee-related benefits | $ 57,433 | $ 12,283 | $ 64,972 |
| Asset impairments | — | — | 23,087 |
| Accelerated depreciation | 8,016 | 7,016 | 11,266 |
| Inventory write-downs | — | — | 10,658 |
| Contract termination and other | 10,289 | 703 | 9,023 |
| Total restructuring charges | $ 75,738 | $ 20,002 | $ 119,006 |

Restructuring costs by business segment are as follows:

| (In thousands) | 2023 | 2022 | 2021 |
|---|---|---|---|
| | Year Ended March | | |
| Outdoor | $ 1,088 | $ 4,523 | $ 14,081 |
| Active | 1,478 | 1,008 | 20,958 |
| Work | 9 | 2,315 | 31,907 |
| Corporate and other | 73,163 | 12,156 | 52,060 |
| Total | $ 75,738 | $ 20,002 | $ 119,006 |

VF CORPORATION
Notes to Consolidated Financial Statements
March 2023

The activity in the restructuring accrual was as follows:

| (In thousands) | Severance | | Other | | Total | |
|---|---|---|---|---|---|---|
| **Accrual at March 2021** | $ | **59,810** | $ | **6,944** | $ | **66,754** |
| Charges | | 12,283 | | 703 | | 12,986 |
| Cash payments and settlements | | (43,886) | | (5,694) | | (49,580) |
| Adjustments to accruals | | (2,320) | | (647) | | (2,967) |
| Impact of foreign currency | | (247) | | (95) | | (342) |
| **Accrual at March 2022** | | **25,640** | | **1,211** | | **26,851** |
| Charges | | 57,433 | | 5,190 | | 62,623 |
| Cash payments and settlements | | (41,338) | | (345) | | (41,683) |
| Adjustments to accruals | | (3,236) | | 40 | | (3,196) |
| Impact of foreign currency | | 222 | | 449 | | 671 |
| **Accrual at March 2023** | $ | **38,721** | $ | **6,545** | $ | **45,266** |

## NOTE 27 — SUBSEQUENT EVENT

On May 16, 2023, VF's Board of Directors declared a quarterly cash dividend of $0.30 per share, payable on June 20, 2023 to shareholders of record on June 12, 2023.

**Schedule II — Valuation and Qualifying Accounts**

| | COL. A | COL. B | COL. C | | COL. D | COL. E |
|---|---|---|---|---|---|---|
| | | | ADDITIONS | | | |
| | Description | Balance at Beginning of Period | (1) Charged to Costs and Expenses | (2) Charged to Other Accounts | Deductions | Balance at End of Period |
| (In thousands) | | | | | | |
| Year Ended March 2023 | | | | | | |
| Allowance for doubtful accounts | | $ 27,959 | $ 3,532 | $ — | $ 3,416 (a) | $ 28,075 |
| Valuation allowance for deferred income tax assets | | 616,533 | — | — | 191,601 (b) | 424,932 |
| Year Ended March 2022 | | | | | | |
| Allowance for doubtful accounts | | 33,654 | (716) | — | 4,979 (a) | 27,959 |
| Valuation allowance for deferred income tax assets | | 500,601 | — | 115,932 (c) | — | 616,533 |
| Year Ended March 2021 | | | | | | |
| Allowance for doubtful accounts | | 37,099 | 20,673 | — | 24,118 (a) | 33,654 |
| Valuation allowance for deferred income tax assets | | 172,912 | — | 327,689 (c) | — | 500,601 |

(a)   Deductions include accounts written off, net of recoveries, the effects of foreign currency translation and reclassifications.

(b)   Deductions primarily related to changes in circumstances which decrease the amount of deferred income tax assets that will, more likely than not, be realized and the effect of foreign currency translation.

(c)   Additions primarily related to circumstances where it is more likely than not that deferred income tax assets will not be realized and the effects of foreign currency translation.

Exhibit 4(S)

### DESCRIPTION OF SECURITIES

V.F. Corporation ("VF," the "Company," "we," "us," or "our") has six classes of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). VF's common stock is registered under Section 12(b) of the Exchange Act and is listed on the New York Stock Exchange under the symbol "VFC". VF's (i) 0.625% Senior Notes due 2023, (ii) 4.125% Senior Notes due 2026, (iii) 0.250% Senior Notes due 2028, (iv) 4.250% Senior Notes due 2029 and (v) 0.625% Senior Notes due 2032 are also registered under Section 12(b) of the Exchange Act and are listed on the New York Stock Exchange under the symbols "VFC23," "VFC26," "VFC28," "VFC29" and "VFC32," respectively.

#### *Capital Stock*

The following description of our capital stock is based upon our articles of incorporation, which were restated as of October 21, 2013 (the "Articles of Incorporation"), our amended and restated by-laws, which were amended as of January 24, 2023 (the "By-laws"), and applicable provisions of law. We have summarized certain portions of the Articles of Incorporation and By-laws below. The summary is not complete. The Articles of Incorporation and By-laws are filed as exhibits to our most recent Annual Report on Form 10-K and are incorporated by reference herein. Holders should read the Articles of Incorporation and By-laws for the provisions that are important to them.

Certain provisions of the Pennsylvania Business Corporation Law, as amended (the "BCL"), the Articles of Incorporation and By-laws could have the effect of delaying, deferring or preventing a tender offer, change in control or the removal of existing management that a shareholder might consider in its best interests, including those attempts that might result in a premium over the market price for its shares.

**Authorized Capital Stock**

Our Articles of Incorporation authorize us to issue 1,200,000,000 shares of common stock, without par value, and 25,000,000 shares of preferred stock, par value $1.00 per share.

**Common Stock**

As of April 1, 2023, there were 388,665,531 shares of common stock issued and outstanding, which were held of record by 2,856 shareholders. The holders of common stock are entitled to one vote per share (which is non-cumulative) on all matters to be voted upon by the shareholders. Subject to preferences that may be applicable to any outstanding preferred stock, the holders of common stock are entitled to receive dividends, if any, as may be declared from time to time by the board of directors out of funds legally available therefor. In the event of the liquidation, dissolution or winding up of VF, the holders of common stock are entitled to share ratably in all assets remaining after payment of liabilities, subject to prior distribution rights of preferred stock, if any, then outstanding. The common stock has no preemptive or conversion rights or other subscription rights. There are no redemption or sinking fund provisions applicable to the common stock. All outstanding shares of common stock are fully paid and non-assessable. The common stock is listed on the New York Stock Exchange. The transfer agent and registrar for the common stock is Computershare Trust Company, N.A., P.O. Box 43126, Providence, Rhode Island 02940.

**Preferred Stock**

Under the Articles of Incorporation, the board of directors is authorized to provide for the issuance of up to 25,000,000 shares of preferred stock, par value $1.00 per share, in one or more series, with such voting powers, full or limited and the number of votes per share, or without voting powers, and with such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be established in or pursuant to the resolution or resolutions providing for the issuance thereof to be adopted by the board of directors. Prior to the issuance of each series of preferred stock, the board of directors will adopt

resolutions creating and designating such series as a series of preferred stock. As of April 1, 2023, there were no shares of preferred stock outstanding.

**Certain Provisions of the Articles of Incorporation, the By-laws and Pennsylvania Law**

*Advance Notice and Proxy Access Provisions*

Notices of shareholder proposals and nominations for election of directors at the Company's annual meeting of shareholders may be made by any shareholder entitled to vote only if written notice is given by the shareholder and received by the Secretary of the Company not more than 150 days and not less than 120 days before the anniversary of the date the Company mailed its proxy materials for the prior year's annual meeting of shareholders.

Our By-laws contain proxy access provisions that permit a shareholder, or a group of up to 20 shareholders, owning 3% or more of the outstanding shares of the Company's common stock continuously for at least three years, to nominate and include in the Company's annual meeting proxy materials director nominees constituting up to the greater of two nominees or 25% of the board or directors, subject to certain limitations and provided that the requirements set forth in the By-Laws are satisfied. Proper notice of a proxy access nomination must be received by the Secretary of the Company no earlier than 150 days and no later than 120 days before the anniversary of the date the Company mailed its proxy materials for the prior year's annual meeting of shareholders.

*Supermajority Voting Provisions*

Certain provisions of our Articles of Incorporation and By-laws require a greater percentage shareholders' vote than a majority of the shares cast at a meeting at which a quorum of shareholders is present. For example, removal of directors requires approval by 80% of the votes that all shareholders would be entitled to cast at any election of directors. Our By-laws and Articles of Incorporation may only be amended, altered, repealed or new By-laws or Articles adopted upon approval by at least 80% of the votes entitled to be cast by shareholders, unless the change was proposed by a majority of the "disinterested directors" (as defined in the By-laws), in which case only a majority approval vote is required, or unless the change was approved by a majority vote of the disinterested directors.

**Certain Anti-Takeover Effects of Pennsylvania Law**

We are subject to Subchapter F of Chapter 25 of the BCL. Subchapter F applies to a transaction between a publicly traded corporation and an interested shareholder (defined generally to be any beneficial owner of 20% or more of the corporation's voting stock). Subchapter F prohibits such a corporation from engaging in a "business combination" (as defined in the BCL) with an interested shareholder unless (i) the board of directors of such corporation gives approval to the proposed transaction or gives approval to the interested shareholder's acquisition of 20% of the shares entitled to vote in an election of directors of such corporation, in either case prior to the date on which the shareholder first becomes an interested shareholder (the "Share Acquisition Date"); (ii) the interested shareholder owns at least 80% of the stock of such corporation entitled to vote in an election of directors of such corporation, and no earlier than three months after such interested shareholder reaches such 80% level, the majority of the remaining shareholders approve the proposed transaction, shareholders receive a minimum "fair price" for their shares (as set forth in the BCL) in the transaction and the other conditions of Subchapter F are met; (iii) holders of all outstanding shares of common stock of the corporation approve the transaction; (iv) no earlier than five years after the Share Acquisition Date, a majority of the holders of the remaining shares entitled to vote in an election of directors approve the transaction; or (v) no earlier than five years after the Share Acquisition Date, a majority of all holders of the shares of the corporation approve the transaction, all shareholders receive a minimum "fair price" for their shares (as set forth in the BCL) and the other conditions of Subchapter F are met.

Under certain circumstances, Subchapter F of the BCL makes it more difficult for an interested shareholder to effect various business combinations with a corporation by imposing additional time delays and higher voting requirements with respect to such transactions. The provisions of Subchapter F should encourage persons interested in acquiring us to negotiate in advance with our board of directors, since the five-year delay and higher shareholder

2

voting requirements would not apply if such person, prior to acquiring 20% of our voting shares, obtained the approval of our board for such acquisition or for the proposed business combination transaction.

Subchapter F of the BCL will not prevent a hostile takeover of VF. It may, however, make more difficult or discourage a takeover of VF or the acquisition of control of VF by a significant shareholder and thus the removal of incumbent management. Some shareholders may find this disadvantageous in that they may not be afforded the opportunity to participate in takeovers that are not approved as required by Subchapter F but in which shareholders might receive, for at least some of their shares, a substantial premium above the market price at the time of a tender offer or other acquisition transaction.

We are also subject to Section 2538 of Subchapter D of Chapter 25 of the BCL and Subchapter E of Chapter 25 of the BCL. Section 2538 requires the approval of a majority of the disinterested shareholders with respect to certain transactions between an "interested shareholder" (as defined in Section 2538) and a publicly traded corporation unless certain procedural requirements are satisfied. Subchapter E of Chapter 25 of the BCL requires a "controlling person," defined generally as a person who acquires 20% or more of the voting shares of a publicly traded corporation, to offer to purchase the shares of all other shareholders at "fair value" (determined as provided in Subchapter E). Fair value for this purpose is defined as a value not less than the highest price paid per share by the controlling person during the 90-day period ending on and including the date the controlling person acquired 20% or more of the voting shares of the corporation, plus any control premium that is not already reflected in such price.

Subchapter G of Chapter 25 of the BCL also contains certain provisions applicable to a publicly traded corporation pursuant to which, under certain circumstances, "control shares" (as defined in the BCL) lose voting rights until restored by a vote of a majority of disinterested shares and a majority of the outstanding shares. The corporation may redeem the control shares if the acquiring person does not request restoration of voting rights. Subchapter H of Chapter 25 of the BCL requires the disgorgement of profits realized from the disposition of certain stock occurring 18 months after a person or group becomes a "controlling person" or group (as defined in the BCL). Subchapter I of Chapter 25 of the BCL mandates severance compensation for eligible employees whose employment is terminated within a certain period following a restoration of voting rights to control shares under Subchapter G of Chapter 25. We have opted out of the provisions contained in Subchapters G, H and I of Chapter 25 of the BCL.

### *Notes*

**General**

The following is a description of the material terms and conditions of our (i) 0.625% Senior Notes due 2023 (the "2023 Notes"), (ii) 4.125% Senior Notes due 2026 (the "2026 Notes"), (iii) 0.250% Senior Notes due 2028 (the "2028 Notes"), (iv) 4.250% Senior Notes due 2029 (the "2029 Notes") and (v) 0.625% Senior Notes due 2032 (the "2032 Notes" and, collectively with the 2023 Notes, the 2026 Notes, the 2028 Notes and the 2029 Notes, the "Notes"). Each series of Notes has been issued under an Indenture which we entered into with The Bank of New York Mellon Trust Company, N.A., formerly known as The Bank of New York Trust Company, N.A., as trustee (the "Trustee"), on October 15, 2007 (the "Base Indenture"), as supplemented by the third supplemental indenture, in the case of the 2023 Notes, which we entered into with the Trustee, as trustee, and The Bank of New York Mellon, London Branch, as paying agent on September 20, 2016 (the "Third Supplemental Indenture"), as supplemented by the fourth supplemental indenture, in the case of the 2028 Notes and the 2032 Notes, which we entered into with the Trustee, as trustee, and The Bank of New York Mellon, London Branch, as paying agent on February 25, 2020 (the "Fourth Supplemental Indenture"), and as supplemented by the sixth supplemental indenture, in the case of the 2026 Notes and the 2029 Notes, which we entered into with the Trustee, as trustee, and The Bank of New York Mellon, London Branch, as paying agent on March 7, 2023 (the "Sixth Supplemental Indenture" and, together with the Third Supplemental Indenture and the Fourth Supplemental Indenture, the "Supplemental Indentures" and, together with the Base Indenture, the "Indenture"), and are our unsecured obligations. As of April 1, 2023, there were $923.4 million aggregate principal amount of the 2023 Notes outstanding, $539.1 million aggregate principal amount of the 2026 Notes outstanding, $538.9 million aggregate principal amount of the 2028 Notes outstanding, $537.8 million aggregate principal amount of the 2029 Notes outstanding and $534.8 million

3

aggregate principal amount of the 2032 Notes outstanding. Capitalized terms used but not defined in this section have the meanings assigned in the Base Indenture or the applicable Supplemental Indenture.

We have summarized certain portions of the Indenture below.  The summary is not complete. The Base Indenture and the Supplemental Indentures are filed as exhibits to our most recent Annual Report on Form 10-K. Holders should read the Base Indenture and the Supplemental Indentures for the provisions that are important to them. The Indenture is subject to and governed by the Trust Indenture Act of 1939, as amended, and the laws of the State of New York.  We have also included references in parentheses to certain sections of the Base Indenture. Because this section is a summary, it does not describe every aspect of each series of Notes. This summary is subject to and qualified in its entirety by reference to all of the provisions of the Base Indenture, the Third Supplemental Indenture,  the Fourth Supplemental Indenture, and the Sixth  Supplemental Indenture, including definitions of certain terms used in the Indenture.

### Ranking

The Notes are not secured by any of our property or assets. Accordingly, holders are unsecured creditors of the Company.  The Notes are not subordinated to any of the Company's other debt obligations and therefore rank equally with all of the Company's other unsecured and unsubordinated indebtedness.

The Notes effectively rank junior to any of our existing and future secured indebtedness to the extent of the assets securing such indebtedness, and are structurally subordinated to any existing or future indebtedness and liabilities of our subsidiaries, none of which guarantee the Notes. Indebtedness of our subsidiaries and obligations and liabilities of our subsidiaries are structurally senior to the Notes since, in the event of a bankruptcy, liquidation, dissolution, reorganization or other winding up, the assets of our subsidiaries will be available to pay the Notes only after the subsidiaries' indebtedness and other obligations and liabilities are paid in full. If that happens, we may not have sufficient assets remaining to pay the amounts due on any or all of the applicable series of Notes then outstanding. The Indenture does not limit our ability or the ability of any of our subsidiaries to issue additional debt.

As of April 1, 2023, we had total outstanding indebtedness of $6.6 billion, and an additional $2.2 billion of unutilized capacity under our senior unsecured revolving line of credit, after giving effect to standby letters of credit of $7.7 million.

The Indenture does not limit the incurrence of indebtedness by the Company or any of its subsidiaries. The Company and its subsidiaries may be able to incur substantial amounts of additional indebtedness in certain circumstances. Such indebtedness may be senior indebtedness and, subject to certain limitations, may be secured. See "-Covenants-Restrictions on Mortgages and Other Liens" below. The Notes of each series are effectively subordinated to all of our existing and future secured debt and structurally subordinated to all existing and future liabilities of our subsidiaries. This may affect the ability of holders to receive payments on the applicable series of Notes.

### Principal, Maturity and Interest

The Notes are our general, unsecured obligations. We issued each series of Notes in minimum denominations of €100,000 and integral multiples of €1,000 in excess thereof. We limited the initial aggregate principal amount of the 2023 Notes to €850,000,000, the 2026 Notes to €500,000,000, the 2028 Notes to €500,000,000, the 2029 Notes to €500,000,000 and the 2032 Notes to €500,000,000. However, the Indenture does not limit the aggregate principal amount of Notes of each series that we may issue, and we may issue additional notes of each series in amounts that exceed the initial amount at any time having identical terms and conditions as the applicable series of Notes, other than the date of issuance and, under certain circumstances, the first interest payment date and the date from which interest thereon will begin to accrue, without holder consent and without notifying holders; provided, however, that, if such additional notes are not fungible with the applicable series of Notes for U.S. federal income tax purposes, such additional notes will have one or more separate CUSIP numbers, ISINs and/or Common Codes from such series of Notes. Under the Indenture, the Notes of each series and any such additional notes we may issue will be treated as a single series for all purposes under the Indenture, including waivers, amendments, redemptions and offers to purchase. We also may, without the consent of the holders, issue

other series of debt securities under the Indenture in the future on terms and conditions different from each series of the Notes.

The 2023 Notes will mature on September 20, 2023, the 2026 Notes will mature on March 7, 2026, the 2028 Notes will mature on February 25, 2028, the 2029 Notes will mature on March 7, 2029 and the 2032 Notes will mature on February 25, 2032, unless redeemed in whole or in part as described below under "-Optional Redemption." The Notes of each series are not be subject to any mandatory redemption or sinking fund payments.

We may at any time and from time to time acquire each series of Notes by means other than a redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws, so long as such acquisition does not otherwise violate the terms of the Indenture.

The 2023 Notes bear interest at the rate of 0.625% per annum from September 20, 2016, payable annually in arrears on September 20 of each year, commencing September 20, 2017, to the persons in whose names the 2023 Notes are registered at the close of business on the business day next preceding the relevant interest payment date, or in the event the 2023 Notes cease to be held in the form of one or more global notes, at the close of business on the September 5 immediately prior to that interest payment date, whether or not a business day. The 2026 Notes bear interest at the rate of 4.125% per annum from March 7, 2023, payable annually in arrears on March 7 of each year, commencing March 7, 2024, to the persons in whose names the 2026 Notes are registered at the close of business on the business day next preceding the relevant interest payment date, or in the event the 2026 Notes cease to be held in the form of one or more global notes, at the close of business on the February 20 immediately prior to that interest payment date, whether or not a business day. The 2028 Notes bear interest at the rate of 0.250% per annum from February 25, 2020, payable annually in arrears on February 25 of each year, commencing February 25, 2021, to the persons in whose names the 2028 Notes are registered at the close of business on the business day next preceding the relevant interest payment date, or in the event the 2028 Notes cease to be held in the form of one or more global notes, at the close of business on the February 10 immediately prior to that interest payment date, whether or not a business day. The 2029 Notes bear interest at the rate of 4.250% per annum from March 7, 2023, payable annually in arrears on March 7 of each year, commencing March 7, 2024, to the persons in whose names the 2029 Notes are registered at the close of business on the business day next preceding the relevant interest payment date, or in the event the 2029 Notes cease to be held in the form of one or more global notes, at the close of business on the February 20 immediately prior to that interest payment date, whether or not a business day. The 2032 Notes bear interest at the rate of 0.625% per annum from February 25, 2020, payable annually in arrears on February 25 of each year, commencing February 25, 2021, to the persons in whose names the 2032 Notes are registered at the close of business on the business day next preceding the relevant interest payment date, or in the event the 2032 Notes cease to be held in the form of one or more global notes, at the close of business on the February 10 immediately prior to that interest payment date, whether or not a business day. Interest on each series of Notes is computed on the basis of the actual number of days in the period for which interest is being calculated and the actual number of days from and including the last date on which interest was paid on the applicable series of Notes, to but excluding the next scheduled interest payment date. This payment convention is referred to as ACTUAL/ACTUAL (ICMA) as defined in the rulebook of the International Capital Market Association.

We pay the principal of and interest on each Note of each series to the registered holder in euros in immediately available funds. Notwithstanding anything to the contrary in this summary, so long as the Notes of each series are in book-entry form, we will make payments of principal and interest through the paying agent.

**Issuance in Euro; Payments on the Notes**

Initial holders were required to pay for the applicable series of Notes in euro, and all payments of principal of, the redemption price (if any), the repurchase price upon a Change of Control Repurchase Event (as defined below, if any), and interest and additional amounts (as defined below, if any), on the applicable series of Notes, will be payable in euros, provided, that if on or after the original issue date of the applicable series of Notes, the euro is unavailable to us due to the imposition of exchange controls or other circumstances beyond our control or if the euro is no longer being used by the then member states of the European Monetary Union that have adopted the euro as their currency or for the settlement of transactions by public institutions of or within the international banking community, then all payments in respect of the applicable series of Notes will be made in U.S. dollars until the euro is again available to us or so used. In such circumstances, the amount payable on any date in euro with respect to

5

the applicable series of Notes will be converted into U.S. dollars at the rate mandated by the U.S. Federal Reserve Board as of the close of business on the second business day prior to the relevant payment date or, in the event the U.S. Federal Reserve Board has not mandated a rate of conversion, on the basis of the then most recent U.S. dollar/euro exchange rate available on or prior to the second business day prior to the relevant payment date as determined by us in our sole discretion. Any payment in respect of the applicable series of Notes so made in U.S. dollars will not constitute an event of default under the applicable series of Notes or the Indenture. Neither the trustee nor the paying agent shall have any responsibility for any calculation or conversion in connection with the foregoing. Any references in this summary to payments being made in euros notwithstanding, payments shall be made in U.S. dollars to the extent set forth under this heading "-Issuance in Euro; Payments on the Notes."

The March 31, 2023 closing euro/U.S. dollar exchange rate was €1.00 = U.S. $1.0869, as published by Bloomberg L.P. Holders are subject to foreign exchange risks as to payments of principal and interest that may have important economic and tax consequences to them.

**Listing**

The Notes are listed on The New York Stock Exchange. We have no obligation to maintain such listing, and we may delist any series of Notes at any time.

**Paying Agent and Registrar**

The Bank of New York Mellon, London Branch, acts as paying agent for the Notes. The Bank of New York Mellon Trust Company, N.A. acts as registrar for the Notes. Upon notice to the Trustee, we may change any paying agent or registrar.

**Business Day**

The term "business day" means any day, other than a Saturday or Sunday, (1) which is not a day on which banking institutions in the City of New York or London are authorized or required by law, regulation or executive order to close and (2) for any payments to be made under the Indenture, such day shall also be a day on which the Trans-European Automated Real-time Gross Settlement Express Transfer payment system is open for the settlement of payments.

**Optional Redemption**

We may redeem any series of Notes in whole or in part at any time. If the 2023 Notes are redeemed before June 20, 2023, if the 2026 Notes are redeemed before February 7, 2026, if the 2028 Notes are redeemed before December 25, 2027, if the 2029 Notes are redeemed before December 7, 2028 or if the 2032 Notes are redeemed before November 25, 2031 (in each case other than the 2026 Notes, the date three months prior to the maturity date of the applicable series of Notes, and with respect to the 2026 Notes, the date one month prior to the maturity date of such series of Notes (the "Make Whole Call Date")), the redemption price will equal the greater of:

- 100% of the principal amount being redeemed; and
- The sum calculated by the Company of the present value of the remaining scheduled payments of principal and interest on the applicable series of Notes to be redeemed if such series of Notes matured on the applicable Make Whole Call Date (excluding any portion of such payments of interest accrued as of the date of redemption), discounted to the date of redemption on an annual basis (assuming ACTUAL/ACTUAL (ICMA)) at the applicable Comparable Government Bond Rate (as defined below), plus 15 basis points (with respect to the 2023 Notes and the 2028 Notes), 20 basis points (with respect to the 2032 Notes), 25 basis points (with respect to the 2026 Notes) or 30 basis points (with respect to the 2029 Notes), plus, in each case, accrued and unpaid interest, to, but excluding, the date of redemption.

If the applicable series of Notes are redeemed on or after the applicable Make Whole Call Date, the redemption price for the Notes of such series will equal 100% of the principal amount of the Notes of such series

then outstanding to be redeemed. The redemption price for the Notes of such series will include accrued interest on the Notes of such series being redeemed, to, but excluding, the date of redemption.

Installments of interest on the applicable series of Notes being redeemed that are due and payable on interest payment dates falling on or prior to a redemption date shall be payable on the interest payment date to the holders as of the close of business on the relevant regular record date according to the applicable Notes and the Indenture.

Notice of any redemption will be mailed (or delivered by electronic transmission in accordance with the applicable procedures of Euroclear and Clearstream) at least 30 days but not more than 60 days before the redemption date to each holder of the applicable series of Notes to be redeemed.

Unless we default in payment of the redemption price on or after the redemption date, interest will cease to accrue on the applicable series of Notes called for redemption on the date of such redemption.

If less than all of the applicable series of Notes are to be redeemed, the applicable series of Notes to be redeemed shall be selected by the trustee pro rata or by lot, or otherwise in accordance with the applicable procedures of Clearstream and Euroclear.

The Notes of each series are also subject to redemption prior to maturity if certain events occur involving U.S. taxation. If any of these special tax events do occur, the applicable series of Notes will be redeemed at a redemption price of 100% of their principal amount plus accrued and unpaid interest to, but excluding, the date of redemption. See "-Redemption for Taxation Reasons."

### *Definitions*

"*Comparable Government Bond*" means, in relation to any Comparable Government Bond Rate calculation, at the discretion of an independent investment bank selected by us, a German government bond whose maturity is closest to the maturity of the applicable series of Notes (assuming, for this purpose, that such series of Notes matures on the Make Whole Call Date), or if such independent investment bank in its discretion determines that such similar bond is not in issue, such other German government bond as such independent investment bank may, with the advice of three brokers of, and/or market makers in, German government bonds selected by us, determine to be appropriate for determining the Comparable Government Bond Rate.

"*Comparable Government Bond Rate*" means the yield-to-maturity, expressed as a percentage (rounded to three decimal places, with 0.0005 being rounded upwards), on the third business day prior to the date fixed for redemption of the Comparable Government Bond on the basis of the middle market price of the Comparable Government Bond prevailing at 11:00 a.m. (London time) on such business day as determined by an independent investment bank selected by us.

### Payment of Additional Amounts

With respect to each series of Notes, we will, subject to the exceptions and limitations set forth below, pay such additional amounts on the applicable series of Notes as are necessary in order that the net payment by us of the principal of, premium, if any, and interest on the applicable series of Notes to a beneficial owner who is not a United States person (as defined below), after withholding or deduction for any present or future tax, assessment or other governmental charge imposed by the United States or a taxing authority in the United States, will not be less than the amount provided in the applicable series of Notes to be then due and payable; provided, however, that the foregoing obligation to pay additional amounts shall not apply:

(1)    to any tax, assessment or other governmental charge that is imposed by reason of the holder of a Note (or the beneficial owner for whose benefit such holder holds such Note), or a fiduciary, settlor, beneficiary, member or shareholder of the holder if the holder is an estate, trust, partnership or corporation, or a person holding a power over an estate or trust administered by a fiduciary holder, being considered as:

7

(a)      having a current or former connection with the United States (other than a connection arising solely as a result of the ownership of the Notes, the receipt of any payment thereon or the enforcement of any rights under the Indenture or the Notes), including being or having been a citizen or resident of the United States, being or having been engaged in a trade or business in the United States or having or having had a permanent establishment in the United States;

(b)      being or having been a personal holding company, a passive foreign investment company or a controlled foreign corporation for United States income tax purposes or a corporation that has accumulated earnings to avoid United States federal income tax;

(c)      being or having been a "10-percent shareholder" of the Company as defined in Section 871(h)(3) of the United States Internal Revenue Code of 1986, as amended to the date hereof (the "Code"), or any successor provision; or

(d)      being a bank receiving payments on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business;

(2)      to any holder that is not the sole beneficial owner of the applicable series of Notes, or a portion of such Notes, or that is a fiduciary, partnership or limited liability company, but only to the extent that a beneficial owner with respect to the holder, a beneficiary or settlor with respect to the fiduciary, or a beneficial owner or member of the partnership or limited liability company would not have been entitled to the payment of additional amounts had the beneficiary, settlor, beneficial owner or member received directly its beneficial or distributive share of the payment;

(3)      to any tax, assessment or other governmental charge that would not have been imposed but for the failure of the holder or beneficial owner of the applicable series of Notes to comply, to the extent it is legally able to do so, with certification, identification or information reporting requirements concerning the nationality, residence, identity or connection with the United States of the holder or beneficial owner of the applicable series of Notes, if compliance is requested with proper notice and required by statute, by regulation of the United States or any taxing authority therein or by an applicable income tax treaty to which the United States is a party as a precondition to exemption from such tax, assessment or other governmental charge;

(4)      to any tax, assessment or other governmental charge that is imposed otherwise than by withholding by us or a paying agent from the payment;

(5)      to any estate, inheritance, gift, sales, excise, transfer, wealth, capital gains or personal property tax or similar tax, assessment or other governmental charge;

(6)      to any tax, assessment or other governmental charge required to be withheld by any paying agent from any payment of principal of or interest on any Note of the applicable series of Notes, if such payment can be made without such withholding by presenting such Note (where presentation is required) to at least one other paying agent;

(7)      to any tax, assessment or other governmental charge that would not have been imposed but for the presentation by the holder of any Note of the applicable series of Notes, where presentation is required, for payment on a date more than 30 days after the date on which payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(8)      to any tax, assessment or other governmental charge imposed under Sections 1471 through 1474 of the Code (or any amended or successor provisions), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the Code or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such sections of the Code; or

(9)      in the case of any combination of items (1), (2), (3), (4), (5), (6), (7) and (8).

Each series of Notes are subject in all cases to any tax, fiscal or other law or regulation or administrative or judicial interpretation applicable to such Notes. Except as specifically provided under this heading "-Payment of Additional Amounts," we will not be required to make any payment for any tax, assessment or other governmental charge imposed by any government or a political subdivision or taxing authority of or in any government or political subdivision.

As used under this heading "-Payment of Additional Amounts" and under the heading "-Redemption for Taxation Reasons", the term "United States" means the United States of America, the states of the United States, and the District of Columbia, and the term "United States person" means any individual who is a citizen or resident of the United States for U.S. federal income tax purposes, a corporation, partnership or other entity created or organized in or under the laws of the United States, any state of the United States or the District of Columbia, or any estate or trust the income of which is subject to United States federal income taxation regardless of its source.

Any references in this summary to principal, premium, interest or any other amount payable in respect of the applicable series of Notes shall be deemed to include additional amounts, as the context shall require. If we shall be obligated to pay any additional amounts with respect to any payment under or with respect to the applicable series of Notes, we will deliver to the trustee a certificate of an officer stating that such additional amounts shall be payable and the amounts so payable and setting forth such other information as is necessary to enable the trustee or other paying agent to pay such additional amounts to the holders of such applicable series of Notes on the payment date. We will make copies of such certificate, as well as copies of tax receipts or other documentation evidencing the payment of the associated taxes or other charges, available to the holders or beneficial owners of the applicable series of Notes upon written request.

**Redemption for Taxation Reasons**

If, as a result of any change in, or amendment to, the laws (or any regulations or rulings promulgated under the laws) of the United States (or any taxing authority in the United States), or any change in, or amendment to, an official position regarding the application or interpretation of such laws, regulations or rulings, which change or amendment is announced or becomes effective on or after September 13, 2016, in the case of the 2023 Notes, or February 18, 2020, in the case of the 2028 Notes and the 2032 Notes, or February 23, 2023, in the case of the 2026 Notes and the 2029 Notes, we become or, based upon a written opinion of independent counsel selected by us, will become obligated to pay additional amounts as described herein under the heading "-Payment of Additional Amounts" with respect to any series of Notes and such obligation cannot be avoided by the use of reasonable measures available to us, then we may at any time at our option redeem, in whole, but not in part, the such series of Notes on not less than 30 nor more than 60 days prior notice, at a redemption price equal to 100% of their principal amount, together with accrued and unpaid interest on such series of Notes to, but excluding, the date fixed for redemption.

**Repurchase upon Change of Control Repurchase Event**

If a Change of Control Repurchase Event (as defined below) occurs with respect to any series of Notes, unless we have exercised our right to redeem all the applicable series of Notes as described above, we will make an offer to each holder of the applicable series of Notes to repurchase all or any part (in integral multiples of €1,000) of that holder's Notes of such series at a repurchase price in cash equal to 101% of the aggregate principal amount of such Notes repurchased plus any accrued and unpaid interest on such Notes repurchased, to, but excluding, the date of repurchase. Within 30 days following any Change of Control Repurchase Event or, at our option, prior to any Change of Control (as defined below), but after the public announcement of an impending Change of Control, we will mail (or deliver by electronic transmission in accordance with the applicable procedures of Euroclear and Clearstream) a notice to each holder, with a copy to the trustee, describing the transaction or transactions that constitute or may constitute the Change of Control Repurchase Event and offering to repurchase such Notes on the payment date specified in the notice, which date will be no earlier than 30 days and no later than 60 days from the date such notice is mailed (or delivered by electronic transmission in accordance with the applicable procedures of Euroclear and Clearstream). The notice will, if mailed (or delivered by electronic transmission in accordance with the applicable procedures of Euroclear and Clearstream) prior to the date of consummation of the Change of Control, state that the offer to repurchase is conditioned on the Change of Control Repurchase Event occurring on or prior to the payment date specified in the notice.

We will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder, to the extent those laws and regulations are applicable in connection with the repurchase of the applicable series of Notes as a result of a Change of Control Repurchase Event. To the extent that the provisions of any securities laws or regulations conflict with the Change of Control Repurchase Event provisions of such series of Notes, we will comply with the applicable securities laws and regulations and will not be deemed to have breached our obligations under the Change of Control Repurchase Event provisions of such series of Notes by virtue of such conflict.

On the Change of Control Repurchase Event payment date with respect to a series of Notes, we will, to the extent lawful:

• accept for payment all Notes or portions of Notes of the applicable series (in integral multiples of €1,000) properly tendered pursuant to our offer;

• deposit with the paying agent an amount equal to the aggregate repurchase price in respect of all Notes or portions of Notes of the applicable series properly tendered; and

• deliver or cause to be delivered to the trustee the Notes of the applicable series properly accepted, together with an officers' certificate stating the aggregate principal amount of such Notes being purchased by us.

The trustee will promptly mail (or deliver by electronic transmission in accordance with the applicable procedures of Euroclear and Clearstream) to each holder of the applicable series of Notes properly tendered the repurchase price for such Notes, and the trustee will promptly authenticate and mail (or cause to be transferred by book-entry) to each holder a new Note of the applicable series equal in principal amount to any unpurchased portion of any Notes of the applicable series surrendered; provided, that each new Note of the applicable series will be in minimum denominations of €100,000 and integral multiples of €1,000 in excess thereof.

We will not be required to make an offer to repurchase the applicable series of Notes upon a Change of Control Repurchase Event if a third party makes such an offer in the manner, at the times and otherwise in compliance with the requirements for an offer made by us, and such third party purchases all Notes of the applicable series properly tendered and not withdrawn under its offer. In addition, the Company will not be required to make an offer to repurchase the Notes of the applicable series upon a Change of Control Repurchase Event if such Notes have been or are called for redemption by the Company prior to it being required to deliver notice of the Change of Control Repurchase Event, and thereafter redeems all such Notes called for redemption in accordance with the terms set forth in such redemption notice. Notwithstanding anything to the contrary contained herein, a revocable offer to repurchase the applicable series of Notes upon a Change of Control Repurchase Event may be made in advance of a Change of Control Repurchase Event, conditioned upon the consummation of the relevant Change of Control Repurchase Event, if a definitive agreement is in place for the applicable Change of Control at the time such offer to repurchase is made.

The definition of Change of Control includes a phrase relating to the direct or indirect sale, transfer, conveyance or other disposition of "all or substantially all" of our and our subsidiaries' properties or assets taken as a whole. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of this phrase under applicable law. Accordingly, the ability of a holder of an applicable series of Notes to require us to repurchase such holder's Notes as a result of a sale, transfer, conveyance or other disposition of less than all of our and our subsidiaries' assets taken as a whole to another person or group may be uncertain.

***Definitions***

"*Below Investment Grade Rating Event*" means, with respect to each series of Notes, that the applicable series of Notes are rated below Investment Grade by each of the Rating Agencies on any date from the date of the public notice of an arrangement that could result in a Change of Control until the end of the 60-day period following public notice of the occurrence of a Change of Control (which period shall be extended so long as the rating of such Notes is under publicly announced consideration for possible downgrade by any of the Rating Agencies); provided that a Below Investment Grade Rating Event otherwise arising by virtue of a particular reduction in rating shall not

10

be deemed to have occurred in respect of a particular Change of Control (and thus shall not be deemed a Below Investment Grade Rating Event for purposes of the definition of Change of Control Repurchase Event hereunder) if the Rating Agencies making the reduction in rating to which this definition would otherwise apply do not announce or publicly confirm or inform the trustee in writing at its request that the reduction was the result, in whole or in part, of any event or circumstance composed of or arising as a result of, or in respect of, the applicable Change of Control (whether or not the applicable Change of Control shall have occurred at the time of the Below Investment Grade Rating Event).

"*Change of Control*" means the occurrence of any of the following: (1) the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of VF and its subsidiaries taken as a whole to any "person" (as that term is used in Section 13(d)(3) of the Exchange Act), other than VF or one of its subsidiaries; (2) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as that term is used in Section 13(d)(3) of the Exchange Act) becomes the beneficial owner (as such term is used in Rules 13d-3 and 13d-5 of the Exchange Act), directly or indirectly, of more than 50% of the then-outstanding number of shares of VF's Voting Stock; (3) the consummation by VF of a consolidation with, or merger with or into, any person or entity, or the consummation by any person or entity of a consolidation with, or merger with or into, VF, in any such event pursuant to a transaction in which any of the outstanding Voting Stock of VF is converted into or exchanged for cash, securities or other property, other than any such transaction where the Voting Stock of VF outstanding immediately prior to such transaction constitute, or are converted into or exchanged for, a majority of the Voting Stock of the surviving person or entity immediately after giving effect to such transaction; or (4) the adoption of a plan relating to the liquidation or dissolution of VF.

"*Change of Control Repurchase Event*" means the occurrence of both a Change of Control and a Below Investment Grade Rating Event.

"*Fitch*" means Fitch Inc., and its successors or any successor to its rating agency business.

"*Investment Grade*" means a rating of Baa3 or better by Moody's (or its equivalent under any successor rating categories of Moody's); a rating of BBB- or better by S&P (or its equivalent under any successor rating categories of S&P); and a rating of BBB- or better by Fitch (or its equivalent under any successor rating categories of Fitch); or the equivalent investment grade credit rating from any additional Rating Agency or Rating Agencies selected by us.

"*Moody's*" means Moody's Investors Service, Inc. or any successor to its rating agency business.

"*Rating Agency*" means (1) each of Fitch, Moody's and S&P; and (2) if any of Fitch, Moody's or S&P ceases to rate the applicable series of Notes or fails to make a rating of such Notes publicly available for reasons outside of our control, a "nationally recognized statistical rating organization" within the meaning of Section 3(a)(62) of the Exchange Act, selected by us as a replacement agency for Fitch, Moody's or S&P, as the case may be.

"*S&P*" means S&P Global Ratings, a division of S&P Global Inc. or any successor to its rating agency business.

"*Voting Stock*" means, with respect to any specified person, capital stock of any class or kind the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such person, even if the right so to vote has been suspended by the happening of such a contingency.

**Modification and Waiver**

There are three types of changes that can be made to the Indenture and the Notes of any series:

- *Changes requiring holder approval.* First, the consent of each affected Note holder is required to:

  - change the stated maturity of the principal or interest on a Note;

- reduce any amounts due on a Note;

- reduce the amount of principal payable upon acceleration of the maturity of a Note following a default;

- change the place or currency of payment on a Note;

- impair a holder's right to sue for payment;

- reduce the percentage of holders of Notes whose consent is needed to modify or amend the Indenture;

- reduce the percentage of holders of Notes whose consent is needed to waive compliance with certain provisions of the Indenture or to waive certain defaults; or

- modify any other aspect of the provisions dealing with modification and waiver of the Indenture. *(See Section 9.02 of the Base Indenture)*

- *Changes requiring a majority vote.* The second type of change to the Indenture and the Notes requires a vote in favor by holders of Notes owning a majority of the outstanding aggregate principal amount of each series of Notes affected. Most changes fall into this category. A majority vote would also be required for us to obtain a waiver of all or part of the restrictive covenants described below, or a waiver of a past default. However, we cannot obtain a waiver of a payment default or any other aspect of the Indenture or the Notes listed in the first category described above under "-Changes requiring holder approval" unless we obtain individual holder consent to the waiver. *(See Sections 5.13 and 9.02 of the Base Indenture)*

- *Changes not requiring holder approval.* The third type of change does not require any vote by holders of Notes. This type is limited to clarifications and certain other changes that would not adversely affect holders of the Notes. *(See Section 9.01 of the Base Indenture)*

Notes of any series will not be considered outstanding, and therefore will not be eligible to vote on any matter, if we have deposited or set aside in trust for holders thereof money for their payment or redemption. Notes will also not be eligible to vote if they have been fully defeased as described under "-Defeasance-Full Defeasance."

We will generally be entitled to set any day as a record date for the purpose of determining the holders of outstanding Notes that are entitled to vote or take other action under the Indenture. In certain limited circumstances, the trustee will be entitled to set a record date for action by holders. If we or the trustee set a record date for a vote or other action to be taken by holders of a particular series, that vote or action may be taken only by persons who are holders of outstanding Notes of that series on the record date and must be taken within 180 days following the record date. We may shorten or lengthen (but not beyond 180 days) this period from time to time. *(See Section 1.04 of the Base Indenture)*

### Covenants

In the Indenture, we agree to restrictions that limit our and our Subsidiaries' (as defined below) ability to create liens or enter into sale and leaseback transactions.

#### *Restrictions on Mortgages and Other Liens*

We will not, nor will we permit any Subsidiary to, issue, assume or guarantee any debt secured by a Mortgage (as defined below) upon any Principal Property (as defined below) or on any shares of stock or indebtedness of any Restricted Subsidiary (as defined below) without providing that the Notes (together with, if we so determine, any other indebtedness of or guaranteed by us or such Restricted Subsidiary ranking equally with the notes then existing or thereafter created) will be secured equally and ratably with such debt, except that the foregoing restrictions do not apply to:

12

(i) Mortgages on property, shares of stock or indebtedness of or guaranteed by any corporation existing at the time such corporation becomes a Restricted Subsidiary;

(ii) Mortgages on property existing at the time of acquisition thereof, or to secure the payment of all or part of the purchase price of such property, or to secure debt incurred or guaranteed for the purpose of financing all or part of the purchase price of such property or construction or improvements thereon, which debt is incurred or guaranteed prior to, at the time of, or within 120 days after the later of such acquisition, completion of such improvements or construction, or commencement of full operation of such property;

(iii) Mortgages securing debt owing by any Restricted Subsidiary to the Company or another Restricted Subsidiary;

(iv) Mortgages on property of a corporation existing at the time such corporation is merged into or consolidated with us or a Restricted Subsidiary or at the time of a purchase, lease or other acquisition of the property of a corporation or firm as an entirety or substantially as an entirety by us or a Restricted Subsidiary;

(v) Mortgages on our property or that of a Restricted Subsidiary in favor of the United States or any state or political subdivision thereof, or in favor of any other country or political subdivision thereof, to secure certain payments pursuant to any contract or statute or to secure any indebtedness incurred or guaranteed for the purpose of financing all or any part of the purchase price or the cost of construction of the property subject to such Mortgages (including, but not limited to, Mortgages incurred in connection with pollution control industrial revenue bond or similar financing);

(vi) Mortgages existing on the date of the Indenture; and

(vii) any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any Mortgage referred to in any of the foregoing clauses.

Notwithstanding the above, we or our Subsidiaries may, without securing the Notes, issue, assume or guarantee secured debt which would otherwise be subject to the foregoing restrictions, provided that after giving effect thereto the aggregate amount of debt which would otherwise be subject to the foregoing restrictions then outstanding (not including secured debt permitted under the foregoing exceptions) does not exceed 15% of the shareholders' equity of the Company and its consolidated Subsidiaries as of the end of the previous fiscal year. *(See Section 10.08 of the Base Indenture)*

### *Restrictions on Sale and Leaseback Transactions*

Sale and leaseback transactions by us or any Restricted Subsidiary of any Principal Property (whether now owned or hereafter acquired) are prohibited unless:

(i) the Company or such Restricted Subsidiary would be entitled under the Indenture to issue, assume or guarantee debt secured by a Mortgage upon such Principal Property at least equal in amount to the Attributable Debt (as defined below) in respect of such transaction without equally and ratably securing the Notes, provided that such Attributable Debt shall thereupon be deemed to be debt subject to the provisions described above under "-Restrictions on Mortgages and Other Liens," or

(ii) the Company applies, within 90 days of the effective date of such sale and leaseback transaction, an amount in cash equal to such Attributable Debt to the retirement (other than mandatory retirement or by way of payment at maturity) of non-subordinated debt of the Company or a Restricted Subsidiary which by its terms matures at, or is extendable or renewable at the sole option of the obligor without requiring the consent of the obligee, to a date more than twelve months after the date of the creation of such debt. *(See Section 10.09 of the Base Indenture)*

The restrictions described above do not apply to:

(i)       such transactions involving leases with a term of up to three years,

(ii)      leases between the Company and a Restricted Subsidiary or between Restricted Subsidiaries, or

(iii)     leases of any Principal Property entered into within 120 days after the later of the acquisition, completion of construction or commencement of full operation of such Principal Property.

### Definitions

"*Attributable Debt*" means the present value (discounted at the rate of interest implicit in the terms of the lease) of the obligation of a lessee for net rental payments during the remaining term of any lease (including any period for which such lease has been extended or may, at the option of the lessor, be extended).

"*Mortgage*" means any mortgage, pledge, lien or other encumbrance.

"*Principal Property*" means any manufacturing plant or facility located within the United States (other than its territories and possessions) owned by the Company or any Subsidiary, except any such plant or facility which, in the opinion of the board of directors of the Company, is not of material importance to the business conducted by the Company and its Subsidiaries, taken as a whole.

"*Restricted Subsidiary*" means a Subsidiary which owns or leases any Principal Property.

"*Subsidiary*" means any corporation, partnership or other legal entity of which, in the case of a corporation, more than 50% of the outstanding voting stock is owned, directly or indirectly, by the Company or by one or more other Subsidiaries, or by the Company and one or more other Subsidiaries or, in the case of any partnership or other legal entity, more than 50% of the ordinary equity capital interests is directly or indirectly owned or controlled by the Company or by one or more other Subsidiaries or by the Company and one or more other Subsidiaries.

*(See Section 1.01 of the Base Indenture)*

### Mergers and Similar Events

We may not consolidate with or merge into any other person (as defined in Section 1.01 of the Base Indenture) or convey, transfer or lease our properties and assets substantially as an entirety, unless:

(i)       the successor person is a corporation, partnership or trust organized and validly existing under the laws of the United States of America, any state thereof or the District of Columbia, and expressly assumes our obligations on the Notes and under the Indenture;

(ii)      immediately after giving effect to such transaction, no event of default, and no event which, after notice or lapse of time or both, would become an event of default, would occur and be continuing; and

(iii)     after giving effect to such transaction, neither we nor the successor person, as the case may be, would have outstanding indebtedness secured by any mortgage or other encumbrance prohibited by the provisions of our restrictive covenant relating to liens or, if so, shall have secured the Notes equally and ratably with (or prior to) any indebtedness secured thereby. *(See Section 8.01 of the Base Indenture)*

## Defeasance

### Full Defeasance

If there is a change in U.S. federal income tax law or an Internal Revenue Service ruling, as described below, we can legally release ourselves from any payment or other obligations on the Notes of any series (this is called "full defeasance") if, among other things:

14

- we deposit in trust for the benefit of all direct holders of the Notes cash in euros or euro-denominated European Government Obligations (defined below) or a combination thereof that, in the opinion of a nationally recognized firm of independent public accountants, will generate enough cash to make interest, principal and any other payments on the Notes as such payments become due;

- there is a change in U.S. federal income tax law or an Internal Revenue Service ruling that permits us to make the above deposit without causing the beneficial owners of the Notes to be taxed on the Notes any differently than if we did not make the deposit and simply repaid the Notes; and

- we deliver to the trustee a legal opinion of our counsel confirming the tax law change described above.

If we accomplish full defeasance, holders would have to rely solely on the trust deposit for all payments on the Notes. Holders could not look to us for payment in the event of any shortfall. Conversely, the trust deposit would most likely be protected from claims of our lenders and other creditors if we became bankrupt or insolvent. *(See Sections 13.02 and 13.04 of the Base Indenture)*

### *Covenant Defeasance*

Under current U.S. federal income tax law, if we make the type of trust deposit described above, we can be released from some of the restrictive covenants in the Indenture. This is called "covenant defeasance." In that event, holders would lose the benefit of those restrictive covenants but would gain the protection of having cash in euros or euro-denominated European Government Obligations or a combination thereof set aside in trust to repay the Notes of any series. In order to achieve covenant defeasance, we must:

- deposit in trust for the benefit of all direct holders of the Notes cash in euros or euro-denominated European Government Obligations or a combination thereof that, in the opinion of a nationally recognized firm of independent public accountants, will generate enough cash to make interest, principal and any other payments on the Notes as such payments become due; and

- deliver to the trustee a legal opinion of our counsel confirming that under current U.S. federal income tax law we may make the above deposit without causing the beneficial owners of the Notes to be taxed on the notes any differently than if we did not make the deposit and simply repaid the notes.

If we accomplish covenant defeasance, the following provisions of the Indenture and the Notes would no longer apply:

- our obligations regarding the conduct of our business described above under "-Covenants," and any other covenants applicable to the Notes described in this summary;

- the conditions to our engaging in a merger or similar transaction, as described above under "-Covenants-Mergers and Similar Events"; and

- the events of default relating to breaches of covenants, certain events in bankruptcy, insolvency or reorganization, and acceleration of the maturity of other debt, described below under "-Events of Default."

If we accomplish covenant defeasance, holders can still look to us for repayment of the Notes in the event of a shortfall in the trust deposit. In fact, if one of the remaining events of default occurred (such as our bankruptcy) and the Notes become immediately due and payable, such a shortfall could arise. Depending on the event causing the default, holders may not be able to obtain payment of the shortfall. *(See Sections 13.03 and 13.04 of the Base Indenture)*

"*European Government Obligations*" means any security that is (1) a direct obligation of the Federal Republic of Germany or any country that is a member of the European Monetary Union whose long-term debt is

15

rated "A-1" or higher by Moody's or "A+" or higher by S&P or the equivalent rating category of another internationally recognized rating agency on the date of the Indenture, for the payment of which the full faith and credit of the Federal Republic of Germany or such country, respectively, is pledged or (2) an obligation of a person controlled or supervised by and acting as an agency or instrumentality of the Federal Republic of Germany or any such country the payment of which is unconditionally guaranteed as a full faith and credit obligation by the Federal Republic of Germany or such country, respectively, which, in either case under the preceding clause (1) or (2), is not callable or redeemable at the option of the issuer thereof.

**Events of Default**

Holders will have special rights if an event of default occurs and is not cured, as described later in this subsection. The term "event of default" means any of the following:

- we do not pay interest on a Note within 30 days of its due date;

- we do not pay the principal or any premium on a Note on its due date;

- we remain in breach of a restrictive covenant or any other term of the Indenture for 60 days after we receive a notice of default stating we are in breach. The notice must be sent by the trustee or holders of 10% of the outstanding aggregate principal amount of the Notes;

- we default under any other indebtedness having an aggregate principal amount outstanding of $100,000,000 or more in the aggregate, our obligation to repay is accelerated, and this repayment obligation remains accelerated for ten days after we receive a notice of default under the Notes as described in the previous bullet point; or

- we file for bankruptcy or certain other events of bankruptcy, insolvency or reorganization occur. *(See Section 3.01 of the Base Indenture)*

***Remedies if an Event of Default Occurs***

If an event of default has occurred and has not been cured, the trustee or the holders of 25% in outstanding aggregate principal amount of the Notes may declare the entire principal amount of all the Notes to be due and immediately payable. This is called a "declaration of acceleration of maturity." If an event of default occurs because of certain events of bankruptcy, insolvency or reorganization, the principal amount of all outstanding Notes will be automatically accelerated, without any action by the trustee or any holder. A declaration of acceleration of maturity may be canceled by the holders of a majority in aggregate outstanding principal amount of the Notes. *(See Section 5.02 of the Base Indenture)*

Except in cases of an event of default, where the trustee has some special duties, the trustee is not required to take any action under the Indenture at the request of any holders unless the holders offer the trustee reasonable protection from expenses and liability (an "indemnity"). If reasonable indemnity is provided, the holders of a majority in aggregate principal amount of the outstanding Notes may direct the time, method and place of conducting any lawsuit or other formal legal action seeking any remedy available to the trustee. These majority holders may also direct the trustee in performing any other action under the Indenture. *(See Sections 6.03 and 5.12 of the Base Indenture)*

Before a holder bypasses the trustee and brings the holder's own lawsuit or other formal legal action or take other steps to enforce the holder's rights or protect the holder's interests relating to the Notes, the following must occur:

- the holder must give the trustee written notice that an event of default has occurred and remains uncured;

- the holders of 25% in aggregate principal amount of all the outstanding Notes must make a written request that the trustee take action because of the default, and must offer reasonable indemnity to the trustee against the cost and other liabilities of taking that action;

16

- the holders of a majority in aggregate principal amount of all the outstanding Notes must not have given the trustee any direction inconsistent with that request; and

- the trustee must have not taken action for 60 days after the receipt of the above notice and offer of indemnity. *(See Section 5.07 of the Base Indenture)*

A holder is, however, entitled at any time to bring a lawsuit for the payment of amounts due on the holder's Notes on or after the relevant due date. *(See Section 5.08 of the Base Indenture)*

The trustee, within 90 days after the occurrence of a default (meaning the events specified above without grace periods) with respect to the Notes, will give to the holders of the Notes notice of all uncured defaults known to it, provided that, except in the case of default in the payment of principal of (or premium, if any) or interest, if any, on any Note, or in the deposit of any sinking fund payment with respect to any Notes, the trustee will be protected in withholding such notice if it in good faith determines that the withholding of such notice is in the interest of the holders of the Notes. *(See Section 6.02 of the Base Indenture)*

We furnish to the trustee every year a written statement of certain of our officers certifying that to their knowledge we are in compliance with the Indenture and the Notes, or specifying the nature of any default. We will also notify the trustee if we become aware of the occurrence of any default and the steps to cure such default. *(See Section 10.04 of the Base Indenture)*

**Book-Entry System; Delivery and Form; Global Note**

The Notes of each series were issued in the form of one or more fully registered global notes deposited with, or on behalf of, a common depositary, and registered in the name of the nominee of the common depositary for the accounts of Clearstream and Euroclear. Except under the circumstance described below, the global notes may be transferred, in whole and not in part, only to Euroclear or Clearstream or their respective nominees. A holder may hold the holder's interests in the global notes in Europe through Clearstream or Euroclear, either as a participant in such systems or indirectly through organizations which are participants in such systems. Clearstream and Euroclear hold interests in the global notes on behalf of their respective participating organizations or customers through customers' securities accounts in Clearstream's or Euroclear's names on the books of their respective depositaries. Book-entry interests in the Notes and all transfers relating to the Notes are reflected in the book-entry records of Clearstream and Euroclear.

Any secondary market trading of book-entry interests in the Notes takes place through Clearstream and Euroclear participants and settles in same-day funds. Owners of book-entry interests in the Notes receive payments relating to their Notes in euro, except as described in this summary under "-Issuance in Euro; Payments on the Notes."

Clearstream and Euroclear have established electronic securities and payment transfer, processing, depositary and custodial links among themselves and others, either directly or through custodians and depositaries. These links allow the Notes to be issued, held and transferred among the clearing systems without the physical transfer of certificates. Special procedures to facilitate clearance and settlement have been established among these clearing systems to trade securities across borders in the secondary market.

The policies of Clearstream and Euroclear govern payments, transfers, exchanges and other matters relating to a holder's interest in the Notes held by the holder. We have no responsibility for any aspect of the records kept by Clearstream or Euroclear or any of their direct or indirect participants. We also do not supervise these systems in any way.

Clearstream and Euroclear and their participants perform these clearance and settlement functions under agreements they have made with one another or with their customers. Holders should be aware that they are not obligated to perform or continue to perform these procedures and may modify them or discontinue them at any time.

Except as provided below, owners of beneficial interests in the Notes are not entitled to have the Notes registered in their names, will not receive or be entitled to receive physical delivery of the Notes in definitive form and will not be considered the owners or holders of the Notes under the Indenture, including for purposes of

receiving any reports delivered by us or the trustee pursuant to the Indenture. Accordingly, each person owning a beneficial interest in a Note must rely on the procedures of the depositary and, if such person is not a participant, on the procedures of the participant through which such person owns its interest, in order to exercise any rights of a holder of notes.

We have been advised by Clearstream and Euroclear, respectively, as follows:

*Clearstream*. Clearstream is incorporated under the laws of Luxembourg as a professional depositary. Clearstream holds securities for its participating organizations ("Clearstream Participants") and facilitates the clearance and settlement of securities transactions between Clearstream Participants through electronic book-entry changes in accounts of Clearstream Participants, thereby eliminating the need for physical movement of certificates. Clearstream provides Clearstream Participants with, among other things, services for safekeeping, administration, clearance and establishment of internationally traded securities and securities lending and borrowing. Clearstream interfaces with domestic markets in several countries. As a professional depositary, Clearstream is subject to regulation by the Luxembourg Commission for the Supervision of the Financial Sector (Commission de Surveillance du Secteur Financier). Clearstream Participants are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations, and may include the underwriters. Indirect access to Clearstream is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Clearstream Participant either directly or indirectly.

Distributions with respect to Notes held beneficially through Clearstream are credited to cash accounts of Clearstream Participants in accordance with its rules and procedures.

*Euroclear*. Euroclear was created in 1968 to hold securities for participants of Euroclear ("Euroclear Participants") and to clear and settle transactions between Euroclear Participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. Euroclear includes various other services, including securities lending and borrowing and interfaces with domestic markets in several markets in several countries. Euroclear is operated by Euroclear Bank S.A./N.V. (the "Euroclear Operator"), under contract with Euroclear Clearance Systems S.C., a Belgian cooperative corporation (the "Cooperative"). All operations are conducted by the Euroclear Operator, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear Operator, not the Cooperative. The Cooperative establishes policy for Euroclear on behalf of Euroclear Participants. Euroclear Participants include banks (including central banks), securities brokers and dealers and other professional financial intermediaries and may include the underwriters. Indirect access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear Participant, either directly or indirectly.

The Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System, or the Euroclear Terms and Conditions, and applicable Belgian law govern securities clearance accounts and cash accounts with the Euroclear Operator. Specifically, these terms and conditions govern:

- transfers of securities and cash within Euroclear;

- withdrawal of securities and cash from Euroclear; and

- receipt of payments with respect to securities in Euroclear.

All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the terms and conditions only on behalf of Euroclear Participants and has no record of or relationship with persons holding securities through Euroclear Participants. Distributions with respect to interests in the Notes held beneficially through Euroclear will be credited to the cash accounts of Euroclear Participants in accordance with the Euroclear Terms and Conditions.

The information in this section concerning Clearstream and Euroclear's respective book-entry systems has been obtained from sources that we believe to be reliable, but we take no responsibility for the accuracy of this information.

*Clearance and Settlement Procedures.* We understand that investors that hold their Notes through Clearstream or Euroclear accounts will follow the settlement procedures that are applicable to conventional eurobonds in registered form. Notes will be credited to the securities custody accounts of Clearstream and Euroclear participants on the business day following the settlement date, for value on the settlement date. They will be credited either free of payment or against payment for value on the settlement date.

We understand that secondary market trading between Clearstream and/or Euroclear participants will occur in the ordinary way following the applicable rules and operating procedures of Clearstream and Euroclear. Secondary market trading will be settled using procedures applicable to conventional eurobonds in registered form.

Holders should be aware that holders will only be able to make and receive deliveries, payments and other communications involving the Notes through Clearstream and Euroclear on the days when those clearing systems are open for business. Those systems may not be open for business on days when banks, brokers and other institutions are open for business in the United States.

In addition, because of time-zone differences, there may be problems with completing transactions involving Clearstream and Euroclear on the same business day as in the United States. U.S. investors who wish to transfer their interests in the Notes, or to make or receive a payment or delivery of the Notes, on a particular day, may find that the transactions will not be performed until the next business day in Luxembourg or Brussels, depending on whether Clearstream or Euroclear is used.

Clearstream or Euroclear will credit payments to the cash accounts of Clearstream Participants or Euroclear Participants, as applicable, in accordance with the relevant system's rules and procedures, to the extent received by its depositary. Clearstream or the Euroclear Operator, as the case may be, will take any other action permitted to be taken by a holder under the Indenture on behalf of a Clearstream Participant or Euroclear Participant only in accordance with its relevant rules and procedures.

Clearstream and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of the Notes among participants of Clearstream and Euroclear. However, they are under no obligation to perform or continue to perform those procedures, and they may discontinue those procedures at any time.

*Certificated Notes*

If,

• Clearstream or Euroclear is no longer willing or able to discharge its responsibilities properly, and neither the trustee nor we have approved a qualified successor within 90 days; or

• upon the request of a holder upon the occurrence and continuance of an event of default with respect to the Notes entitling the holders to accelerate the maturity thereof,

we will issue Notes in definitive form in authorized denominations in exchange for, all or part, as the case may be, the registered global note that had been held by the depositary. Any Notes issued in definitive form in exchange for a registered global note will be registered in the name or names that the depositary gives to the trustee or relevant agent of ours or the trustee. It is expected that the depositary's instructions will be based upon directions received by the depositary from participants with respect to ownership of beneficial interests in the registered global note that had been held by the depositary. In addition, we may at any time determine in our discretion that the Notes shall no longer be represented by a global note, in which case we will issue Notes in definitive form in exchange for such global note pursuant to the procedure described above.

## Regarding the Trustee

The trustee's current address is The Bank of New York Mellon Trust Company, N.A., 4655 Salisbury Road, Jacksonville, Florida 32256.

The Indenture provides that, except during the continuance of an event of default, the trustee will perform only such duties as are specifically set forth in the Indenture. During the existence of an event of default, the trustee

will exercise such rights and powers vested in its exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs. *(See Section 6.01 of the Base Indenture)*

The Indenture and provisions of the Trust Indenture Act incorporated by reference therein contain limitations on the rights of the trustee, should it become a creditor of the company, to obtain payment of claims in certain cases or to realize on certain property received by it in respect of any such claim as security or otherwise. The trustee is permitted to engage in other transactions with the Company or any affiliate. If it acquires any conflicting interest (as defined in the Indenture or in the Trust Indenture Act), it must eliminate such conflict or resign. *(See Sections 6.08 and 6.13 of the Base Indenture)*

20

## VF CORPORATION ANNUAL INCENTIVE PLAN

**This VF Corporation Annual Incentive Plan (the "Plan") is hereby amended and restated effective May 15, 2023. This Plan hereby supersedes any prior VF Corporation incentive plans or practices regarding annual incentive awards. VF Corporation reserves the right to amend or discontinue the Plan, or to reduce, suspend or discontinue future contributions or benefits, at any time and for any reason.**

I.    INTRODUCTION. As part of its total compensation program, VF Corporation (the "Company") has adopted the VF Corporation Annual Incentive Plan (the "Plan") to provide an annual incentive bonus opportunity for select employees of the Company based on the achievement of performance measures established by the Compensation Committee each fiscal year for the Company, a Business Unit and/or an individual participant. The Plan is intended to provide an additional means to attract, motivate and retain talented employees, and to link a significant element of each participant's compensation to the attainment of performance measures that enhance shareholder value.

II.    PLAN TERM. The Plan will continue in effect until such time as it is otherwise terminated by the Compensation Committee in accordance with Section VII of the Plan. The Plan supersedes all prior Company bonus plans, including the Company Management Incentive Compensation Plan and the Company Pay for Performance Plan.

III.    DEFINITIONS

A.    ADMINISTRATOR – The Compensation Committee and its delegates (to the extent that the Compensation Committee delegates its authority in accordance with the terms of the Plan) shall administer the Plan.

B.    BOARD OF DIRECTORS – The Board of Directors of the Company.

C.    BUSINESS UNIT – Any majority-owned business organization of the Company or its direct or indirect subsidiaries, including corporations, limited liability companies, partnerships, and any "subsidiary corporation" as defined in Section 424(f) of the Internal Revenue Code (the "Code").

D.    COMPENSATION COMMITTEE – The Talent and Compensation Committee of the Board of Directors, the composition and processes of which are governed by the Committee's Charter.

E.    ELIGIBLE EMPLOYEE –Full-Time regular and Part-Time regular non-sales employees or non-commission-based employees of the Company or any of its Business Units who are employed before January 2nd of each applicable Plan Period and remain employed by the Company on the date of payment of awards under the Plan or alternatively remain employed by the Company through the last day of the applicable Plan Period and either (i) are eligible for severance under the VF Corporation Severance Plan or (ii) are eligible for Retirement as of the last day of the applicable Plan Period. Any distribution center employee, or individual participating in a Company or Business Unit commission plan, distribution center incentive plan or retail incentive plan shall not be an Eligible Employee. An individual who may otherwise be an Eligible Employee may be considered ineligible at any time and for any reason in the Administrator's sole discretion, regardless of whether the individual remains a Full-Time regular or Part-Time regular non-sales employee or non-commission-based employee of the Company or any of its Business Units.

F.    INCENTIVE AWARD – Has the meaning set forth in Section IV.A.

G.    PARTICIPANT – An Eligible Employee who is selected by the Administrator to participate in the Plan in a relevant Plan Period.  Participation in the Plan is at the sole discretion of the Administrator, in consultation with Company management. If a Participant is first employed after the beginning of a Plan Period, the Administrator may, in its sole discretion, prorate a Participant's Target Incentive Award based on the number of calendar days in the Plan Period during which the Participant was employed.

H.    PERFORMANCE OBJECTIVE – The performance objective or objectives established by the Administrator in its sole discretion for each Plan Period, which must be attained as a condition to the earning and payment of an Incentive Award for that Plan Period. Performance Objectives may consist of such specified corporate, Business Unit or divisional levels of performance relating to performance criteria established by the Administrator, as well as individual performance measurements applicable to a Participant, including, but not limited to, one or more of the following performance criteria: (i) earnings per share; (ii) net earnings; (iii) pretax earnings; (iv) operating income; (v) net sales or net revenues; (vi) net sales or net revenues from existing businesses; (vii) net sales or net revenues from acquired businesses; (viii) market share; (ix) balance sheet measurements; (x) cash return on assets; (xi) return on capital; (xii) book value; (xiii) shareholder return, or return on average common equity; or (xiv) such other measurements as the Administrator may establish from time to time.

I.    PLAN PERIOD – Unless otherwise determined by the Administrator, the Company's fiscal year.

J.    RETIREMENT – Separation from the Company or any of its subsidiaries after attaining age 55 and at least 10 years of service with the Company and/or any of its subsidiaries, provided that an employment separation at a time there exists grounds for the Company to terminate the Participant for cause (as determined by the Administrator in its sole discretion) will not constitute a Retirement. Unless otherwise determined by the Administrator, service with a predecessor company (i.e., a company acquired by the Company or a subsidiary) shall be counted towards the calculation of years of service with the Company and/or its subsidiaries for purposes of this Plan.

K.    TARGET INCENTIVE AWARD – The target incentive bonus opportunity established for a Participant for a Plan Period.

IV.    OPERATION OF THE PLAN

A.    ESTABLISHMENT OF TARGET INCENTIVE AWARDS AND PERFORMANCE OBJECTIVES  – The Administrator shall establish a Target Incentive Award for each Participant for the Plan Period.  The Administrator will establish the Performance Objectives, and a range of values for the Performance Objectives for the Plan Period, with each such value corresponding to a percentage of the Target Incentive Award that may be earned for achievement of the Performance Objectives (the "Incentive Awards"). For example, the Administrator may establish a threshold level of achievement of each Performance Objective which, if not attained, will result in no Incentive Award being payable, and the Administrator may likewise establish a "stretch" level of achievement of each Performance Objective which, if attained, will result in an Incentive Award greater than 100% of the Target Incentive Award, up to a maximum of 200% of the Target

2

Incentive Award. In establishing the level of Performance Objectives to be attained and in determining the actual level of achievement of each Performance Objective, the Administrator may disregard or offset the effect of such items of income or expense and such other factors, items or circumstances approved by the Compensation Committee and/or Board of Directors, including, but not limited to, extraordinary and/or nonrecurring items as determined in accordance with generally accepted accounting principles, changes in accounting standards, differences between actual foreign currency exchange rates during a Plan Period and the foreign currency exchange rates assumed in the Company's financial plan for the Plan Period as presented to the Board of Directors and the Compensation Committee, the Company's consolidation entries directly impacting the business units and such other unusual items or circumstances that may be approved by the Compensation Committee and/or Board of Directors.

B.    DETERMINATION OF INCENTIVE AWARDS – Subject to the Administrator's written certification, Incentive Awards will be paid to each Participant based on the actual attainment of the Performance Objectives, as determined in accordance with Section IV.A above, relative to the range of Performance Objective values established for the Plan Period. The Administrator may exercise discretion to increase, or decrease, the amount of the Incentive Award paid to any Participant based on management's assessment of the individual's performance or other considerations deemed relevant by the Administrator.

C.    APPROVAL OF AGGREGATE INCENTIVE AWARDS – The aggregate amount of all Incentive Awards paid for any Plan Period shall be subject to the approval of the Compensation Committee and the Board of Directors.

D.    PAYMENT OF INCENTIVE AWARDS – An Incentive Award is "earned" only after of all of the following have occurred: (1) the Plan Period ends, (2) the Company's audited financial results for Plan Period are completed, (3) the Board of Directors or the Compensation Committee authorizes the payment of the Incentive Awards for the Plan Period, (4) the Participant accomplishes Performance Objectives as defined in Section III(H) for the Plan Period; and (5) the Participant remains employed by the Company on the date of payment of awards under the Plan or alternatively has remain employed by the Company through the last day of the applicable Plan Period and either (a) is eligible for severance under the VF Corporation Severance Plan or (b) is eligible for Retirement as of the last day of the applicable Plan Period; and (6) the Incentive Award is actually paid to a Participant or, if applicable, his or her estate. The Company will abide by all local regulations and any legal or contractual requirements. Payment of Incentive Awards for a Plan Period will be made within 30 days following the Compensation Committee's written certification of the level of Performance Objectives attained for the Plan Period (but not later than seventy-five days following the end of the Plan Period), except to the extent (i) the Compensation Committee specifies that Incentive Awards will be paid on a deferred basis or subject to additional conditions to payment, or (ii) if permitted by the Board of Directors, a Participant has elected to defer payment pursuant to a Company deferred compensation arrangement then in effect. Deferrals under such arrangements (if any) shall be mandated or permitted at the election of the Participant only in compliance with Code Section 409A. The specific rules applicable to the timing of deferral elections and the permitted distribution dates for deferrals are incorporated by reference in this Plan from the 1996 Stock Compensation Plan, as may be amended and restated from time to time.

## V.   CONTINGENCIES

A.   EMPLOYMENT TERMINATION – Unless the Administrator exercises its discretion under Section V.B, a Participant whose employment with the Company or a Business Unit is terminated for any reason (including the Participant's resignation for any reason) prior to the payment of an Incentive Award will result in the forfeiture of any rights or interests to such payments. Subject to Section IV.D above, a Participant who is employed by the Company or a Business Unit at the end of a Plan Period shall not be deemed or considered, solely for that reason, to have accrued any right to or be vested in an Incentive Award for the Plan Period. **An Incentive Award cannot be "earned" unless the Participant is employed by the Company on the date of payment under the Plan, or alternatively remained employed by the Company through the last day of the applicable Plan Period and is otherwise (i) eligible for severance under the VF Corporation Severance Plan or (ii) eligible for Retirement as of the last day of the applicable Plan Period , in each case in accordance with Section IV.D.5, and the award is actually paid to a Participant or, if applicable, his or her estate. The Company will abide by all local regulations and any legal or contractual requirements.**

B.   COMPANY DISCRETION – The Administrator, in its sole discretion, may determine that a terminated employee who had been a Participant for part or all of the Plan Period will be eligible to be paid an Incentive Award for the Plan Period. Subject to the Administrator's discretion under Section IV.B above, any such Incentive Award payment may be calculated as if employment had continued throughout the Plan Period based on the actual attainment of the Performance Objectives for the Plan Period, or payment may be prorated based the Participant's actual length of active service during the Plan Period.

C.   TIMING RULE IN CASE OF AWARDS MADE FOLLOWING TERMINATION – Subject to the terms and conditions of this Plan, Incentive Awards payable to a Participant (or his or her estate) following termination of employment shall be paid at the time that Incentive Awards are payable to continuing Participants generally in respect of the relevant Plan Period, but in any event, not later than seventy-five days following the end of the Plan Period. If the Participant's rights relating to an Incentive Award cause it to be a deferral of compensation under Code Section 409A, no acceleration of the time of payment will be permitted to the extent necessary to comply with applicable rules under Code Section 409A.

D.   ADDITIONAL FORFEITURE CONDITION – Incentive Awards shall be subject to the Company's "Forfeiture Policy For Equity and Incentive Awards In the Event of Restatement of Financial Results" or, if later modified or replaced by a similar policy (regardless of the title of such policy), as in effect thereafter at the time the Participant's Incentive Award was authorized for any such Plan Period. Such Policy imposes conditions on a Participant's right to receive payments under an Incentive Award and right to retain previous payments in settlement of an Incentive Award (a so-called "clawback") in certain circumstances if the Company's financial statements are required to be restated and in other specified circumstances.

## VI.   ADMINISTRATION

The Administrator shall have the discretionary authority and responsibility for all aspects of administration of the Plan, including to:

A.   Interpret and construe the Plan, including all terms defined in the Plan.

B.   Select those Eligible Employees who will participate in the Plan.

C.   Establish or adjust the Performance Objectives and related terms under Section IV.A. for each Plan Period.

D.   Certify the level of each Performance Objective attained for a Plan Period, and that other terms upon which payment of Incentive Awards is conditioned have been satisfied.

E.   Final approval of aggregate payments to Participants.

F.   Correct any defects and omissions in the Plan and in any Incentive Award.

G. Adopt such procedures, rules and regulations to implement and administer the Plan as it deems necessary or appropriate.

The Compensation Committee may delegate to specified officers or employees of the Company authority to perform ministerial functions under the Plan. In furtherance of this authority, unless otherwise limited by further action of the Compensation Committee, the Compensation Committee has delegated to the Chief Executive Officer and the Executive Vice President & Chief People Officer, or any duly authorized officer of the Company, the authority (unless such authority is specifically reserved to the Compensation Committee hereunder) to take actions under the Plan on behalf of the Company relating to Participants who are not executive officers, including the selection of Participants who are not "executive officers" (as defined by the Compensation Committee), the approval of individual payments under the Plan to Participants who are not executive officers and the establishment of Target Incentive Awards for Participants who are not executive officers under Section IV.A. Notwithstanding the foregoing, the approval of the Compensation Committee or the Board of Directors shall be required for approval of the aggregate payments under the Plan; and approval of individual payments under the Plan to the Company's executive officers. The decisions of the Administrator shall be final and binding on all interested parties. Any determinations, approvals or actions in connection with the Plan that are performed or taken by the Administrator, the Compensation Committee, the Board of Directors, the Chief Executive Officer or the Executive Vice President & Chief People Officer, or any other duly authorized officer of the Company, shall be deemed to be performed in the sole discretion of such person or entity.

## VII.   AMENDMENT AND TERMINATION

The Compensation Committee or the Board of Directors shall have the power to amend, modify, suspend or terminate any part of the Plan at any time; provided, however, that any such change to the Plan that is beyond the authority of the Compensation Committee delegated by the Board of Directors shall be subject to the approval of the Board of Directors.

## VIII. GENERAL PROVISIONS

A.   NO RIGHT TO EMPLOYMENT– Eligibility to receive an Incentive Award or the grant or payment of an Incentive Award shall not be construed as giving a Participant the right to be retained in the employ of the Company, nor will it affect in any way the right of the Company or a Participant to terminate such employment at any time, with or without cause. In addition, the Company may at any time dismiss a Participant from employment free from any liability or any claim under the Plan, unless otherwise expressly provided in the Plan.

Exhibit 10(II)

B.    NO LIMIT ON OTHER COMPENSATION ARRANGEMENTS – Nothing contained in the Plan shall prevent the Company from adopting or continuing in effect other or additional compensation arrangements, and such arrangements may be either generally applicable or applicable only in specific cases.

C.    TAX CONSEQUENCES – The Company will deduct from any Incentive Award or other payment to a Participant any federal, state, or local withholding or other tax or charge which the Company is then required to deduct under applicable law. It is the Company's intent that payments made under this Plan should meet the requirements for the "short-term deferral" exception to Code Section 409A. Notwithstanding the foregoing, to the extent that any amounts payable in accordance with the Plan are subject to Code Section 409A, the Plan shall be interpreted and administered in such a way as to comply with Code Section 409A to the maximum extent possible. "Termination of employment," "resignation" or words of similar import, as used in the Plan shall mean, with respect to any payments subject to Code Section 409A, a Participant's "separation from service" as defined by Code Section 409A. If payment of any amount subject to Code Section 409A is triggered by a separation from service that occurs while a Participant is a "specified employee" (as defined by Code Section 409A), and if such amount is scheduled to be paid within six (6) months after such separation from service, the amount shall accrue without interest and shall be paid the first business day after the end of such six-month period, or, if earlier, within 15 days after the Participant's death. Nothing in this Plan shall be construed as a guarantee of any particular tax treatment to any Participant. A Participant shall be solely responsible for the tax consequences with respect to all amounts payable under this Plan.

D.    NON-TRANSFERABILITY – No Participant will have the right to alienate, assign, transfer, pledge or encumber his/her interest in this Plan in favor of any party other than the Company or a subsidiary of Company, and such interest will not (to the extent permitted by law) be subject in any way to the claims of the Participant's creditors or to attachment, execution or other process of law other than in favor of the Company or a subsidiary of Company.

E.    GOVERNING LAW – The validity, construction and effect of the Plan or any Incentive Award hereunder shall be determined in accordance with the laws of the State of Colorado, without regard to its or any other jurisdiction's conflicts of laws provisions. The parties hereby submit and consent to the exclusive jurisdiction of the State of Colorado and agree that any litigation shall be conducted only in the courts of the County of Denver, Colorado.

F.    SEVERABILITY – If any provision of the Plan or any Incentive Award is or becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction or would disqualify the Plan or any Incentive Award under any law deemed applicable by the Compensation Committee, such provision shall be construed or deemed amended to conform to applicable laws, or if it cannot be so construed or deemed amended without, in the determination of the Compensation Committee, materially altering the purpose or intent of the Plan or the Incentive Award, such provision shall be stricken as to such jurisdiction or Incentive Award, and the remainder of the Plan or any such Incentive Award shall remain in full force and effect.

G.    NO TRUST OR FUND CREATED – Neither the Plan nor any Incentive Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company and a Participant or any other person. To the extent that any Participant or other person acquires a right to receive payments from the Company pursuant to the Plan, such right shall be no greater than the right of any unsecured general creditor of the Company.

H.    HEADINGS – Headings are given to the Sections and subsections of the Plan solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of the Plan or any provision thereof.

7

---

**VF CORPORATION**
**NON-COMPETITION, NON-SOLICITATION &**
**CONFIDENTIALITY AGREEMENT FOR EQUITY PLAN PARTICIPANTS**

---

As a condition of the undersigned employee ("Employee") choosing to accept an offer of the opportunity to participate in the V.F. Corporation 1996 Stock Compensation Plan (as amended) (the "Plan"), which participation is not mandatory and is not a condition or term of Employee's employment, and in consideration of the value of such Plan participation, including the potential for Plan participation to provide substantial financial benefits, Employee enters into this Non-Competition, Non-Solicitation & Confidentiality Agreement for Equity Plan Participants (the "Agreement") with VF CORPORATION, and its affiliates, subsidiaries, successors, assigns, or related companies or entities, including but not limited to VF OUTDOOR, LLC and VF SERVICES, LLC (collectively the "Company"), the undersigned employee ("Employee"), and hereby (a) acknowledges the adequacy and sufficiency of such consideration, (b) acknowledges that Employee's participation in the Plan is strictly voluntary and not in any way a condition of Employee's initial or ongoing employment with the Company, and (c) represents and warrants that Employee intends to be legally bound by the terms of this Agreement.

1. **Confidentiality, Non-Disclosure and Non-Use Obligations.**

   (a) Employee agrees that all records and Confidential Information (as defined below) obtained by Employee as a result of Employee's employment with the Company, whether original, duplicated, computerized, memorized, handwritten, or in any other form, and all information contained therein or derived therefrom, are confidential and the sole and exclusive property of the Company.

   (b)   During Employee's employment and thereafter, Employee will not use Confidential Information or remove Confidential Information nor any other records or information belonging to the Company from the premises or computer systems of the Company except for the sole purpose of conducting business on behalf of the Company.

   (c)   Employee further agrees that during Employee's employment and thereafter, Employee will not, without express consent of the Company, divulge or disclose Confidential Information to any third party other than for the purposes of performing Employee's job duties with the Company, and under no circumstances will Employee reveal or permit this information to become known by any competitor of the Company.

   (d)   Employee will promptly notify the Company if Employee becomes aware of or suspects any unauthorized use or disclosure of Confidential Information by Employee or anyone else, whether intentional or accidental.

   (e)   Employee agrees that upon termination of Employee's employment with the Company or at the request of the Company at any time, Employee will immediately deliver to the Company all Confidential Information and other property of the Company, including without limitation all equipment owned or leased by the Company, and all documents, information, records, materials, and all copies thereof in any form (including data or copies contained on hard drives or other computer or electronic storage media), that are related in any way to the Company or its business, or which are otherwise referred to in this Paragraph 1.

(f)   Employee understands that nothing contained in this Agreement restricts or limits Employee's right to discuss Employee's employment or report possible violations of law or regulation with the Equal Employment Opportunity Commission, United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, or other federal government agency or similar state or local agency, or Employee's right to discuss the terms and conditions of Employee's employment with others to the extent expressly permitted by Section 7 of the National Labor Relations Act or to the extent that such disclosure is protected under the applicable provisions of law or regulation, including but not limited to "whistleblower" statutes or other similar provisions that protect such disclosure. Moreover, notwithstanding anything to the contrary in this Agreement, pursuant to United States federal law as set forth in 18 USC Section 1833(b), Employee understands that Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of any Confidential Information that is a trade secret that is made: (1) confidentially to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. If Employee files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Employee may disclose such trade secret to Employee's attorney and use the trade secret information in related court proceedings, provided that Employee files any document containing the trade secret information under seal and does not disclose the trade secret, except pursuant to court order.

**2.   Non-Competition Covenant.**

**A.   Restrictions.**

Employee agrees that during the Restricted Period, within the Restricted Area, Employee shall not violate either of the following separate and severable covenants set forth in Paragraph (a)(i)-(ii) and Paragraph (b) below:

(a)   Employee shall not directly or indirectly work for, be contracted to or contract with, or provide strategic advice to a Competitor in a capacity:

(i)   that is the same as or similar to the capacity(ies) in which Employee worked for the Company at any time during the twenty-four months immediately preceding Employee's termination of employment with the Company; or

(ii)   in which Employee's knowledge of the Company's trade secrets would otherwise be of value in Employee's work for the Competitor; or

(b)   Employee shall not compete with the Company directly or indirectly as an employee, principal, agent, contractor, or otherwise in the sale or licensing of any products or services that at the time the Company seeks to enforce this Agreement, are competitive with the products or services developed, marketed, or sold by the Company and about which products and services Employee's knowledge of the Company's Confidential Information, trade secrets and/or previous establishment of goodwill with Customers or Suppliers would be of value in competing with the Company.

**B.   Additional Consideration for Non-Compete: Non-Competition Payment.**

(a)    As additional mutually agreed-upon consideration for the Non-Competition obligations set forth in this Paragraph 2, if and only if the Company requires Employee to refrain from accepting employment or other work Employee has been offered on the basis that the Company, in its discretion, believes such work would violate Employee's obligations under any of the Non-Competition Covenants in Paragraph 2(A), then the Company shall pay make monthly payments to Employee during the Restricted Period according to the schedule of percentages set forth below, and subject to the terms set forth further below in this Paragraph 2(B) (hereinafter the "Non-Competition Payments"):

(i)    Involuntary Termination Without Cause (100%): If the Company involuntarily terminates Employee's employment without Cause, then monthly payments are to be made in an amount equal to 100% of Employee's monthly base pay as of the date of Employee's termination from the Company, subject to applicable taxes and withholdings;

(ii)    Voluntary Resignation (50%): If Employee voluntarily resigns from employment with the Company, then monthly payments are to be made in an amount equal to 50% of Employee's monthly base pay as of the date of Employee's termination from the Company, subject to applicable taxes and withholdings; or

(iii)    Involuntary Termination for Cause (0%): If the Company terminates Employee's employment for Cause, or if Employee resigns after engaging in conduct that would constitute Cause for termination, then Employee will be entitled to no Non-Competition Payments.

(b)    Non-Competition Payments, if any, will begin only after the Company advises Employee of its belief that Employee's proposed new employment would violate the Employee's non-compete obligations and shall continue throughout the remaining duration of the applicable Restricted Period. The Non-Competition Payment shall be paid in accordance with the Company's customary pay practices in effect at the time each payment is made, and shall be reduced by the amount of severance payment(s), if any, that Employee receives from the Company.

(c)    The Company's obligations to make Non-Competition Payments shall cease immediately and forever upon any one or more of the following: (i) the Company giving Employee written permission to accept employment with a prospective employer about which Employee has provided the Company notice under Paragraph 3 of this Agreement; (ii) the Company releasing Employee (generally, or with respect to a specific employer or position) from Employee's obligations under Paragraph 2(A); (iii) the expiration of the Restricted Period; or (iv) the Company advising Employee that it is cancelling Non-Competition Payments as a result of Employee's failure to comply with the terms of Paragraph 3 below.

## 3.   Notice of Resignation and New Employment.

**A.   Notice Period**.

Employee agrees to provide 30 days' advance notice of Employee's resignation by submitting written notice to Employee's direct supervisor and the Human Resources Department (the first 30 days following submission of a resignation in compliance with this Agreement as outlined herein shall be the "Notice Period").

**B. Duties and Cooperation During Notice Period.**

During the Notice Period, Employee's manager may ask Employee to take steps to help transition responsibility for ongoing projects and/or other job duties. Employee agrees to perform these duties, as Employee's manager in his or her sole discretion may direct, including without limitation any or all of the following: (i) organize files, data and/or notes of any projects for transition; (ii) meet with Employee's managers or their designee to review work in progress, files and other data to help ensure that Company personnel are aware of and understand any files, projects or other business related data; (iii) meet with Employee's manager or his/her designee to review the status of any projects, work, Customers, Suppliers or personnel for which Employee was assigned responsibility, in order to help ensure that business needs may be seamlessly transitioned to and serviced by other Company personnel; (iv) otherwise being available to the Company, as requested by Employee's managers, to provide reasonable assistance to effectuate an orderly transition of files, projects, data, client service or personnel responsibilities, and any other job duties, prior to Employee's last day of employment. The foregoing list is neither intended to be an exhaustive list of the transition-related tasks Employee may be required to perform, nor is it a promise that the Company will have Employee engage in any or all of the listed tasks. There may be times during the Notice Period when the Company is preparing for the transition in a way that does not involve Employee's active engagement, and as such the Company at its sole discretion may instruct Employee not to come into work, not to access Company systems, or not to otherwise enter the Company's premises on some or all days during the Notice Period.

**C. Conduct During Notice Period.**

During the Notice Period, Employee will be a Company employee, will remain on the Company's payroll, will receive the same base rate of pay, and will continue to be eligible for all employee benefits just as in the period prior to Employee's giving notice of resignation to the Company. Employee's primary job duties during the Notice Period will be as set forth above, but during the Notice Period, Employee shall: (i) not discuss or communicate about Employee's impending departure from the Company with Customers, Suppliers, Competitors, members of the public or press, or others who are not employees of the Company unless authorized in writing to do so by Employee's manager; (ii) not take any Company data, records or information off the premises of any Company office or facility, nor copy, export, remove or delete such from Company systems; (iii) not remotely access Company systems (Employee understands that such accessibility may be terminated or limited during the Notice Period); (iv) return to Employee's manager, within one business day of tendering Employee's notice of resignation, all files, data and information relating to Company Customers, Suppliers or business which Employee may have had off premises during the course of Employee's employment; (v) not use any social networking system or function to update any Customers, Suppliers, Competitors or members of the press or public about Employee's employment status with the Company and/or any impending change of such status; and (vi) if Employee has had remote access to Company computer systems or if Employee has ever used a non-Company issued computer or electronic device for work, Employee will, upon the Company's request, make such personal computer(s) or other electronic devices available to the Company and/or its computer forensic experts for imaging and searching to verify that all Company Customer, Supplier or other Company business data and any other non-public information has been removed. Employee understands and agrees that a core purpose of the Notice Period is to enable the orderly transition of files, data and Customer or Supplier responsibility to other Company personnel, and accordingly Employee understands and agrees that the Company is free to and may elect to engage in a variety of transition-related activities, including but not limited to notifying Customers, Suppliers, co-workers or others of Employee's intent to leave the Company, informing Customers, Suppliers, or co-workers of the identity of other Company employees being assigned to work with them, introducing Customers or Suppliers to other Company personnel, and/or holding meetings with Customers or Suppliers or others that may or may not include Employee, as Employee's manager may elect. Employee agrees and understands that during the Notice Period, Employee owes the Company an unmitigated duty of loyalty, and that Employee shall do nothing during the Notice

Period that Employee intends or reasonably expects to further Employee's personal interests or the interests of Employee's new employer to the actual or potential detriment of the Company.

**D.   Notification of Company Regarding Any New Employment.**

Employee acknowledges and agrees that during Employee's employment with the Company and for a period of one (1) year following the date of termination of Employee's employment with the Company, Employee will inform the Company, prior to the acceptance of any employment or any work as an independent contractor, of the identity of any new employer or other entity for which Employee will be providing services, along with Employee's starting date, title, job description, salary, and any other information that the Company may reasonably request to confirm Employee's compliance with the terms of this Agreement.

**E.   Failure to Comply with Provisions of This Paragraph**

If Employee fails to comply with the terms of this Paragraph 3, then Employee may forfeit any Non-Competition Payment described in Paragraph 2(B) to which Employee otherwise may have been entitled; provided however that such forfeiture only takes effect if the Company, in its sole discretion, advises Employee that Employee's rights to receive any Non-Competition Payment have been cancelled for violation of Paragraph 3. Cancellation of such rights for violation of Paragraph 3 does not relieve Employee of Employee's obligation to comply with the Non-Competition obligations set forth in Paragraph 2(A).

**F.   Notice of this Agreement to Any New Employer.**

Employee agrees that Employee will tell any prospective new employer, partner in a business venture, investors and/or any entity seeking to engage Employee's services, prior to accepting employment, engagement as a consultant or contractor, or engaging in a business venture, that this Agreement exists, and further, Employee agrees to provide a true and correct copy of this Agreement to any such individual or entity prior to accepting any such employment or entering into any such engagement or business venture. Employee further authorizes the Company to provide a copy of this Agreement to any such entity(ies) or individual(s).

**4.   Non-Solicitation / Interference with Company Personnel.**

Employee acknowledges that the Company has a legitimate protectable interest in maintaining a stable and undisrupted workforce. Employee agrees that during employment with the Company and, for a period of 1 year following the termination of Employee's employment with the Company, Employee will not, directly or indirectly, on behalf of himself/herself, or on behalf of any other person, entity, or organization, solicit for employment, recruit, or otherwise seek to employ or retain the services of any Company Personnel for another company or entity, or in any way assist or facilitate or participate in any such recruitment, solicitation, or retention effort, including, without limitation, by identifying or targeting the Company Personnel for that purpose. Employee further agrees not to contact any Company Personnel, nor to cause Company Personnel to be contacted, for the purpose or foreseeable effect of causing or inducing such Company Personnel to leave the Company's employment or cease a contractor engagement with the Company.

**5.   Non-Solicitation / Interference - Customers.**

   **A.   Non-Solicitation of Customers.**

Employee agrees that during employment with the Company and for a period of 1 year following the termination of Employee's employment with the Company, Employee will not, directly or indirectly, solicit any Customer for the purpose of (A) providing or selling services or goods and products of a nature being provided or sold by the Company, or (B) entering into or seeking to enter into any contract or other arrangement with any Customer for the performance or sale of services or goods and products of a nature being provided or sold by the Company. Employee's agreement "not to solicit" as set forth in this paragraph means that Employee will not, directly or indirectly, initiate any contact or communication with any Customer for the purpose of soliciting, inviting, encouraging, recommending or requesting any Customer to do business with Employee and/or a Competitor in connection with the performance or sale of services or goods and products of a nature being provided or sold by the Company.

   **B.   Non-Inducement of Customers to Discontinue or Reduce Business Relationship**

Employee agrees that during employment with the Company and for a period of 1 year following the termination of Employee's employment with the Company, Employee shall not, directly or indirectly, engage in any conduct intended or reasonably calculated to induce or urge any Customer to discontinue, in whole or in part, its patronage or business relationship with the Company.

   **C.   Non-Acceptance / Non-Service of Customers.**

Employee agrees that during employment with the Company and for a period of 1 year following the termination of Employee's employment with the Company, Employee shall not, directly or indirectly, accept any business from, provide services to, or do any business with, any Customer in connection with the performance or sale of services or goods and products of a nature being provided or sold by the Company.

**6.   Non-Solicitation / Interference – Suppliers.**

   **A.   Non-Solicitation of Suppliers.**

Employee agrees that during employment with the Company and for a period of 1 year following the termination of Employee's employment with the Company, Employee will not, directly or indirectly, solicit any Supplier for the purpose of such Supplier (A) providing products, or components or materials to be incorporated into any Competitor's products, or (B) contracting to manufacture any Competitor's products or components of a Competitor's products.

Employee's agreement "not to solicit" as set forth in this paragraph means that Employee will not, directly or indirectly, initiate any contact or communication with any Supplier for the purpose of soliciting, inviting, encouraging, recommending or requesting any Supplier to provide products, or components or materials to be incorporated into any Competitor's products, or contracting to manufacture any Competitor's products or components of a Competitor's products.

### B. Non-Inducement of Suppliers to Discontinue or Reduce Business Relationship

Employee agrees that during employment with the Company and for a period of 1 year following the termination of Employee's employment with the Company, Employee will not, directly or indirectly, engage in any conduct intended or reasonably calculated to induce or urge any Supplier to (a) discontinue or reduce, in whole or in part, its business relationship with the Company, or (b) commence a new business relationship with a Competitor.

## 7. Injunctive Relief; Expedited Discovery.

### A. Injunctive Relief.

In the event that Employee breaches or threatens to breach, or the Company reasonably believes Employee is about to breach, any of the restrictive covenants in this Agreement, the Company will be entitled to injunctive relief as well as an equitable accounting of all earnings, profits and other benefits arising from violation of this Agreement, which rights shall be cumulative and in addition to any other rights or remedies to which the Company may be entitled in law or equity. Employee agrees that the Company will suffer immediate and irreparable harm and that money damages will not be adequate to compensate the Company or to preserve the status quo. Therefore, Employee hereby consents to the issuance of a temporary restraining order and other injunctive relief necessary to enforce this Agreement.

Employee hereby agrees that the duration of any injunction shall be increased in an amount equal to any period of time during which Employee failed to comply with the covenants contained in this Agreement.

### B. Expedited Discovery in Aid of Application for Temporary or Preliminary Injunctive Relief.

Employee agrees that in any proceeding alleging breach of this Agreement, the Company and Employee each shall have the right to engage in deposition and document discovery, and the Company shall have the right to conduct forensic examination(s) of any computers and/or electronic devices in Employee's possession or control, if the Company reasonably believes such devices contain Confidential Information or other Company property. The Company and Employee further agree that in connection with any application for injunctive relief to enforce this Agreement (including without limitation any application for temporary and/or preliminary injunctive relief), the foregoing discovery shall be conducted on an expedited basis, including expedited document and deposition discovery.

## 8. Definitions.

*"Cause"* with respect to involuntary termination of employment means a determination by the Company in its sole discretion that Employee has engaged in misconduct warranting termination for Cause, such as but not limited to dishonesty, inadequate work performance, attendance problems, deliberate misconduct or failure to act, destruction of property, significant breach of Company rules, failure to agree to a Company-mandated change in terms and conditions of employment, commission of acts detrimental to or unfavorably reflecting on the Company and similar occurrences.

**"Company Personnel"** means employees or contractors of the Company with whom Employee worked or whom Employee supervised or about whom Employee obtained non-public information, in each case at any time during the twenty-four months preceding termination of Employee's employment with the Company.

*"Competitor"* means any person, entity or organization engaged (or preparing to become engaged) in a business that, at the time the Company seeks to enforce the covenants contained in this Agreement:

    (a)    competes with the Company in the business of researching, developing, designing, manufacturing, marketing, selling and supplying branded lifestyle apparel, equipment, footwear and/or accessories throughout the world; or

    (b)    competes with any other line of business that has been offered or provided by the Company at any time during the 24 months preceding Employee's termination of employment and in relation to which Employee: (i) had responsibility at any time in the last 24 months of employment; and/or (ii) had access to or knowledge of Confidential Information.

*"Confidential Information"* means all confidential and/or proprietary information and trade secrets in any form, whether oral, written, computerized or otherwise, regarding the Company, including but not limited to: designs, drawings, formulas, processes, methods, techniques, systems, models, samples, prototypes, CAD drawings or other technical or artistic renderings of potential products, contracts, reports, letters, notes, computer programs, intellectual property, trade secrets and/or know-how, technical information, financial information and metrics (whether historical, projections or forecasts), and information concerning advertising, catalog mailing lists, pricing, costs, business planning, operations, layout and design and implementation of Customer-specific projects, procedures, services, potential services, products, potential products, products under development, production, manufacturing, supply chain operations, purchasing, marketing plans, merchandising, sales and/or sales techniques, contracts, and licenses, personnel (including identities, contact information, skills, performance, salary and benefits of other employees), training methods, current, former, or prospective customers, vendors, and suppliers, or other information of the Company; any papers, data, records, devices, equipment, compilations, invoices, customer or supplier lists or contact information, compilations of names and addresses, or documents of the Company; any confidential information or trade secrets of any third party provided to the Company in confidence or subject to other use or disclosure restrictions or limitations; and any other information, written, oral, electronic, or retained in Employee's memory, whether existing now or at some time in the future, whether pertaining to current or future developments or prospects, and whether created, revealed or accessed during the Employee's employment, which pertains to the Company's affairs or interests or with whom or how the Company does business. The Company acknowledges and agrees that Confidential Information shall not include information which is or becomes publicly available other than as a result of a disclosure by Employee or through other wrongful means.

*"Customer"* means a customer of the Company (person or entity), provided that Employee had business-related contact with the customer in the last 24 months of employment with the Company or had access to non-public information regarding such customer during such period because of Employee's employment relationship with the Company. Customers include, but are not limited to, retailers who purchase products from the Company for the purpose of reselling those products to end-user consumers (e.g., the Company's wholesale customers).

*"**Restricted Area**"* means the following severable territories:

(a)    those states, districts and territories of the United States in which the Company conducted business in the twelve months prior to Employee's termination of employment with the Company;

(b)    any country in which: (i) the Company conducted business in the twelve months prior to Employee's termination of employment with the Company and that, at any time during the past twelve months, Employee had involvement in or responsibility for; or (ii) Employee could use or disclose the Company's Confidential Information for the benefit of a Competitor; and

(c)    any territory or territories in which Employee has worked and/or for which Employee was responsible for conducting business on behalf of the Company in the last twelve months prior to Employee's termination of employment with the Company.

"***Restricted Period**"* refers to the duration of Employee's employment with the Company, plus:

(a)    if Employee's last position with the Company was at the Director level, the 6-month period immediately following the termination of Employee's employment with the Company;

(b)    if Employee's last position with the Company was at the Senior Director level, the 9-month period immediately following the termination of Employee's employment with the Company; or

(c)    if Employee's last position with the Company was at Vice President level or above, the 1-year period immediately following the termination of Employee's employment with the Company.

*"**Supplier**"* means (a) a person or entity from whom or which the Company purchases either products, or components or materials to be incorporated into Company products, or (b) a person or entity with whom or which the Company contracts to manufacture Company products or components of Company products.

## 9.  Choice of Law, Jurisdiction & Venue

Employee has voluntarily opted to participate in a Plan that was created under the laws of the State of North Carolina and is governed by the laws of the State of North Carolina. As such, Employee and the Company agree that it is reasonable for this Agreement likewise to be governed by the laws of that state. Accordingly, Employee and the Company hereby agree that this Agreement will be governed by, construed, interpreted, and its validity determined under the laws of the State of North Carolina, without regard to such jurisdiction's conflicts of laws principles.

Employee and the Company agree that the courts of North Carolina (state or federal) shall be the sole, exclusive and mandatory venue and jurisdiction for any or all challenges to this Agreement by Employee and are a permissible jurisdiction and venue for any actions by the Company to enforce this Agreement. Employee and the Company hereby irrevocably consent to the jurisdiction and venue of these courts, and both parties hereby waive any objections or defenses to jurisdiction or venue in any proceeding before such courts. Employee specifically covenants and agrees not to file any action relating in any way to this Agreement in any court other than as specified in this paragraph.

**10.    Modification & Severability.**

Each section, provision, paragraph, clause, and subclause (collectively "Provision") of this Agreement shall be severable from each other and, if for any reason, any Provision is held to be invalid or unenforceable, then such invalidity or unenforceability shall not prejudice or in any way affect the validity or enforceability of any other Provision. Moreover, in the event that a court would otherwise hold any Provision unenforceable for any reason, it is the express intention and desire of Employee and the Company that the court modify and reform said Provision to the extent necessary to render the otherwise unenforceable Provision, and the rest of the Agreement, valid and enforceable. If a court is unable to or declines to amend this Agreement as provided herein, the unenforceable or invalid Provision shall be severed, and the invalidity or unenforceability of such Provision shall not affect the validity or enforceability of the remaining Provisions, which shall be enforced as if the offending Provision had not been included in this Agreement.

**11.    Binding Effect and Assignability.**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors, assigns, affiliated entities, and any party-in-interest. Employee agrees that, should the Company be acquired by, merge with, or otherwise combine with another corporation or business entity, the surviving entity will have all rights to enforce the terms of this Agreement as if it were the Company itself enforcing the Agreement. Notwithstanding the foregoing, Employee may not assign this Agreement.

**12.    No Waiver of Rights; Amendment.**

A waiver by the Company of the breach of any of the provisions of this Agreement by Employee shall not be deemed a waiver of any subsequent breach, nor shall recourse to any remedy hereunder be deemed a waiver of any other or further relief or remedy provided for herein. No waiver shall be effective unless made in writing and signed by an officer of the Company. This Agreement can only be amended or modified in a writing signed by both parties. Any subsequent change(s) in Employee's duties, salary, compensation, or benefits will not affect the validity or scope of this Agreement.

**13.    State Specific Terms – Colorado and Massachusetts Employees**

If at the time of Employee's termination of employment with the Company, Employee had been primarily working for the Company in Colorado or Massachusetts, or had been primarily residing in Colorado or Massachusetts while working for the Company, Employee's obligations under this Agreement are modified in accordance with the terms set forth in the Appendix to this Agreement. For Massachusetts, Employee must have been primarily working in Massachusetts for the 30 days up to and including termination of employment, or residing in Massachusetts for the 30 days up to and including termination of employment, for the Appendix terms to be applicable.

**14.    Attorneys' Fees.**
          Employee and the Company agree that in any legal proceeding to enforce this Agreement, the prevailing party shall be entitled to reimbursement of its actual costs and expenses, including without limitation reasonable attorneys' fees, costs, and disbursements.

THE COMPANY ADVISES EMPLOYEE TO CONSULT WITH LEGAL COUNSEL OF EMPLOYEE'S CHOOSING PRIOR TO SIGNING THIS AGREEMENT.

BY SIGNING BELOW, IN ADDITION TO AGREEING TO ALL THE TERMS OF THIS AGREEMENT, EMPLOYEE CERTIFIES THAT EMPLOYEE HAS READ AND UNDERSTANDS THIS AGREEMENT AND THE RESTRICTIONS AND REQUIREMENTS CONTAINED IN PARAGRAPHS 1, 2, 3, 4, 5, AND 6, AND ANY STATE-SPECIFIC TERMS OF THE APPENDIX, AND HAS HAD AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL PRIOR TO SIGNING, AS SUGGESTED BY THE COMPANY. EMPLOYEE ACKNOWLEDGES THAT THIS AGREEMENT MAY BE ACCEPTED AND AGREED TO ELECTRONICALLY BY EMPLOYEE, AND THAT AN ELECTRONIC COPY, HARD COPY OR ACKNOWLEDGMENT IS AS ENFORCEABLE AS AN ORIGINAL. EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS ACCESS TO A PAPER COPY OF THIS AGREEMENT.


**VF CORPORATION**

By: _____

Its: _____

Date: _____

**EMPLOYEE**

Print Name: _____

Signature: _____

Date: _____

| |
|---|
| **Appendix to VF Corporation Non-Competition,**<br>**Non-Solicitation and Confidentiality Agreement**<br>**For Equity Plan Participants**<br>**\*\* State-Specific Provisions \*\*** |

**Colorado Employees and/or Residents**

If at the time of Employee's termination of employment with the Company, Employee had been primarily working for the Company in Colorado or had been primarily residing in Colorado while working for the Company, then the following provisions apply and modify the terms of this Agreement as noted herein:

(a)  <u>Paragraph 2(A)(b) Inapplicable</u>: The terms of Paragraph 2(A)(b) do not apply.

(b)  <u>Earnings Threshold</u>: The restrictions contained in Paragraph 2(A)(a) and the Non-Competition Payment described in Paragraph 2(B), and the Non-Solicitation/Interference with Customers and Non-Solicitation/Interference with Suppliers clauses contained in Paragraphs 5 and 6, shall apply and be enforceable only if, at the time of termination of employment with the Company, Employee had been earning:

(i)   with respect to Paragraph 2 restrictions, an amount of Annualized Cash Compensation equivalent to or greater than the threshold amount to qualify as a Highly Compensated Worker, as the terms Annualized Cash Compensation, Highly Compensated Worker, and Threshold Amount for Highly Compensated Workers are defined in Colorado Revised Statutes Section 8-2-113 or any equivalent Colorado statutory provision that may be in effect at the time of Employee's termination of employment with the Company; and/or

(ii)   with respect to Paragraphs 5 and 6 restrictions, 60% of the amount set forth immediately above in paragraph (a)(i) of this Colorado portion of the Appendix.

(c)  <u>Non-Solicitation of Company Personnel</u>. Paragraph 4 above is deleted and replaced with the following: Employee agrees that during employment with the Company and, for a period of 1 year following the termination of Employee's employment with the Company, Employee will not, directly or indirectly, solicit Company Personnel to leave the Company's employment or cease a contractor engagement with the Company.

(d)  <u>Acknowledgment Regarding Trade Secrets of the Company</u>: Employee hereby agrees and acknowledges that: (i) during the course of Employee's employment with the Company, Employee has had access to, gained knowledge of and/or contributed to the development of trade secret business information of the Company; and (ii) the restrictions contained in Paragraphs 1, 2, 5 and 6 are necessary to, and designed for, the protection of the Company's trade secrets by preventing such trade secrets from being disclosed to a Competitor or used by a Competitor in competition with the Company.

(e)  <u>Acknowledgment Regarding Prior Notice of Covenants and Restrictions</u>: Employee acknowledges receipt of notice of the covenants as well as the terms of the covenants contained in Paragraphs 1, 2, 3, 4, 5 and 6, either (i) prior to acceptance of employment with the Company if the offer of Plan participation was made to Employee prior to Employee's commencement of employment, or (ii) at least fourteen days prior to the earlier of the effective date of the covenant, or the effective date of Employee's participation in the Plan.

(f)  <u>Colorado Law and Jurisdiction</u>: Notwithstanding anything contained in Paragraph 9 above, this Agreement shall be governed, construed and enforced in accordance with Colorado law, and the courts of Colorado shall be the sole and exclusive jurisdiction and venue for resolution of any disputes arising under this Agreement.

**Massachusetts Employees and/or Residents**

If at the time of Employee's termination of employment and for the 30 days immediately preceding termination of employment with the Company, Employee had been primarily working for the Company in Massachusetts or had been primarily residing in Massachusetts for such time period, then the following provisions apply and modify the terms of this Agreement as noted herein:

(a)  <u>Massachusetts Law and Jurisdiction/Venue</u>: Notwithstanding anything contained in Paragraph 9 above, this Agreement shall be governed, construed and enforced in accordance with Massachusetts law. Employee and the Company further specifically and mutually agree that the sole and exclusive jurisdiction and venue for resolution of any disputes arising under this Agreement shall be the Massachusetts Superior Court for Suffolk County, and further agree that both the Company and Employee shall request assignment to the Suffolk County Business Litigation Session.

(b)  <u>Other Mutually Agreed Consideration for Non-Competition</u>: Employee and the Company agree that the regime of Non-Competition Payments set forth in Paragraph 2(B) constitutes other mutually agreed consideration to which Employee and the Company are mutually agreeing as an alternative to the statutory 'garden leave' terms in set forth in the Massachusetts Noncompetition Agreement Act.

(c)  <u>No Right of Cancellation of Non-Competition Payments for Violation of Paragraph 3</u>: The terms of Paragraph 3(E) do not apply.

(d)  <u>Extension of Duration of Non-Competition Covenant Upon Certain Occurrences</u>: Employee and the Company agree that, as authorized in the Massachusetts Noncompetition Agreement Act, in the event Employee breaches Employee's fiduciary duty to the Company, or in the event Employee unlawfully takes, physically or electronically, property belonging to the Company, then definition of *Restricted Period* shall be double the amount of time stated in the Definition of *Restricted Period* set forth in Paragraph 8 above, but in no event more than two years following Employee's termination of employment with the Company.

(e)  <u>Restricted Area of Non-Competition</u>: the Definition of *Restricted Area* contained in Paragraph 8 above is deleted and replaced with the following. *Restricted Area* means "the geographic areas in which Employee, during any time within the last 2 years of employment with the Company, provided services or had a material presence or influence over business activities of the Company."

VF Equity Plan Non-Competition, Non-Solicitation & Confidentiality Agreement
Page 13 of 13

EXECUTION VERSION
Exhibit 10(NN)

AMENDMENT NO. 2 dated as of May 19, 2023 (this "<u>Amendment</u>"), among V.F. Corporation, a Pennsylvania corporation (the "<u>Company</u>"), the LENDERS party hereto and JPMORGAN CHASE BANK, N.A., as Administrative Agent.

Reference is made to the Five-Year Revolving Credit Agreement dated as of November 24, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among V.F. Corporation, a Pennsylvania corporation (the "<u>Company</u>"), VF International Sagl, a limited liability company (*società a garanzia limitata*) incorporated under the laws of Switzerland, with its registered office at Via Laveggio 5, 6855 Stabio, Switzerland and registered with the commercial register under number CHE-111.650.898, the other Borrowing Subsidiaries from time to time party thereto, the Lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "<u>Administrative Agent</u>").

The Company, the Administrative Agent and the Lenders desire to amend the Credit Agreement to replace the LIBO Rate with the Adjusted Term SOFR and to adopt certain changes relating thereto, all as set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  <u>Defined Terms.</u> Capitalized terms used but not otherwise defined herein (including in the recitals hereto) have the meanings assigned to them in the Credit Agreement (where applicable, as amended hereby).

SECTION 2.  <u>Amendments to Credit Agreement.</u>

(a)     Effective as of the Amendment Effective Date (as defined below), the Credit Agreement (excluding, except as set forth below, the Schedules and the Exhibits thereto) is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~ or ~~stricken text~~) and to add the single-underlined text (indicated textually in the same manner as the following example: <u>single-underlined text</u> or <u>single-underlined text</u>) as set forth in the blackline attached as <u>Exhibit A</u> hereto.

(b)     Exhibit B to the Credit Agreement is hereby amended and restated to be in the form of <u>Exhibit B</u> hereto.

(c)     Exhibit D to the Credit Agreement is hereby amended and restated to be in the form of <u>Exhibit D</u> hereto.

SECTION 3.  <u>Representations and Warranties.</u> The Company hereby represents and warrants to the Lenders and the Administrative Agent that:

(a)     the representations and warranties set forth in Article V of the Credit Agreement are true and correct in all material respects on and as of the Amendment Effective Date, with the same effect as though such representations and warranties had been made on and as of such date, except to the extent that such representations and warranties expressly relate to an earlier date (in which case they are true and correct in all material respects on and as of such earlier date) and except that, for purposes of this clause (a), the financial statements referred to in Section 5.04 of the Credit Agreement shall be

1

deemed to be the financial statements most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01(a) or 6.01(b) of the Credit Agreement; and

   (b) as of the Amendment Effective Date, no Default or Event of Default has occurred and is continuing.

   SECTION 4. <u>Effectiveness.</u> This Amendment shall become effective as of the first date (the "<u>Amendment Effective Date</u>") on which the following conditions are satisfied:

   (a) <u>Amendment.</u> The Administrative Agent shall have executed a counterpart of this Amendment and shall have received from the Company and each of the Lenders a counterpart of this Amendment signed on behalf of such Person (which, subject to Section 11.07(b) of the Credit Agreement, may include any Electronic Signatures transmitted by emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page of a counterpart of this Amendment).

   (b) <u>Reimbursement of Expenses.</u> All expenses required to be reimbursed by the Company on the Amendment Effective Date pursuant to the Credit Agreement in connection with this Amendment shall have been paid or reimbursed.

   SECTION 5. <u>Credit Agreement.</u> Except as expressly set forth herein, this Amendment shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Administrative Agent, the L/C Issuers or the Lenders under the Credit Agreement and the other Loan Documents, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, guarantees, covenants or agreements contained in the Credit Agreement or any of the other Loan Documents, all of which are ratified and affirmed in all respects and shall continue in full force and effect. Nothing herein shall be deemed to entitle the Borrowers to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement as amended hereby in similar or different circumstances. On and after the Amendment Effective Date, each reference in the Credit Agreement to "this Agreement", "herein", "hereunder", "hereto", "hereof" and words of similar import shall refer to the Credit Agreement as amended hereby, and each reference to the Credit Agreement in any other Loan Document shall be deemed to be a reference to the Credit Agreement as amended hereby. This Amendment shall constitute a "Loan Document" for all purposes of the Credit Agreement and the other Loan Documents.

   SECTION 6. <u>Applicable Law.</u> THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS EXECUTED, AND TO BE FULLY PERFORMED, IN SUCH STATE.

<div align="center">2</div>

SECTION 7.  <u>Counterparts.</u> This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and it shall not be necessary in making proof of this Amendment to produce or account for more than one such fully-executed counterpart. Delivery of an executed counterpart of a signature page of this Amendment that is an Electronic Signature transmitted by emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Amendment.

SECTION 8.  <u>Incorporation by Reference.</u> The provisions of Sections 1.03, 11.10, 11.12(b), 11.12(c), 11.12(e) and 11.12(f) of the Credit Agreement are hereby incorporated by reference, <u>mutatis</u> <u>mutandis</u>.

[*Remainder of this page intentionally left blank*]

3

[[6082993]]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the date first above written.

V.F. CORPORATION,
by

/s/ Matthew H. Puckett
Name:   Matthew H. Puckett
Title:     Executive Vice President and Chief Financial Officer

By

/s/ Anthony T. Cottonaro
Name:   Anthony T. Cottonaro
Title:   Vice President, Treasurer

[*Signature Page to Amendment No. 2 to Five-Year Revolving Credit Agreement*]

SIGNATURE PAGE TO
AMENDMENT NO. 2 TO
FIVE-YEAR REVOLVING CREDIT AGREEMENT
OF V. F. CORPORATION

JPMORGAN CHASE BANK, N.A.,
as the Administrative Agent, a Lender, a
Swing Line Lender and an L/C Issuer:

by

_/s/ James Kyle O'Donnell_____
Name:   James Kyle O'Donnell
Title:   Vice President

SIGNATURE PAGE TO
AMENDMENT NO. 2 TO
FIVE-YEAR REVOLVING CREDIT AGREEMENT
OF V. F. CORPORATION

Bank of America, N.A., as Lender and L/C Issuer

by

/s/ Michelle L. Walker
Name:   Michelle L. Walker
Title:   Vice President

SIGNATURE PAGE TO
AMENDMENT NO. 2 TO
FIVE-YEAR REVOLVING CREDIT AGREEMENT
OF V. F. CORPORATION

BARCLAYS BANK PLC, as a Lender and L/C Lender

by

/s/ Warren Veech III
Name:   Warren Veech III
Title:   Vice President

HSBC Bank USA, National Association (with any Lender that is a L/C Lender also executing in its capacity as such):

by

/s/ Andrew Wulff
_____
Name:   Andrew Wulff
Title:   Senior Vice President

U.S. Bank National Association (with any Lender that is a L/C Lender also executing in its capacity as such):

by

/s/ Adam J. Kultgen
Name:   Adam J. Kultgen
Title:   Vice President

SIGNATURE PAGE TO
AMENDMENT NO. 2 TO
FIVE-YEAR REVOLVING CREDIT AGREEMENT
OF V. F. CORPORATION

WELLS FARGO BANK, NATIONAL ASSOCIATION (with any Lender that is a L/C Lender also executing in its capacity as such):

by

/s/ Carl Hinrichs
_____
Name:  Carl Hinrichs
Title:  Director

SIGNATURE PAGE TO
AMENDMENT NO. 2 TO
FIVE-YEAR REVOLVING CREDIT AGREEMENT
OF V. F. CORPORATION

ING BANK N.V., DUBLIN BRANCH, as a Lender:

by
/s/ Cormac Langford
Name:   Cormac Langford
Title:   Director


ING BANK N.V., DUBLIN BRANCH, as a Lender:

by
/s/ Sean Hassett
Name:   Sean Hassett
Title:   Director

Morgan Stanley Bank, N.A.:

by

/s/ Tim Kök
Name:   Tim Kök
Title:   Authorized Signatory

SIGNATURE PAGE TO
AMENDMENT NO. 2 TO
FIVE-YEAR REVOLVING CREDIT AGREEMENT
OF V. F. CORPORATION

PNC Bank, National Association:

By

/s/ Stephanie Gray
Name:   Stephanie Gray
Title:   Vice President

TD Bank, N.A.:

By

/s/ Bernadette Collins
Name:   Bernadette Collins
Title:   Senior Vice President

SIGNATURE PAGE TO
AMENDMENT NO. 2 TO
FIVE-YEAR REVOLVING CREDIT AGREEMENT
OF V. F. CORPORATION

BNP Paribas:

by

/s/ Emma Petersen
Name:   Emma Petersen
Title:   Managing Director

BNP Paribas:

By

/s/ David Foster
Name:   David Foster
Title:   Director

SIGNATURE PAGE TO
AMENDMENT NO. 2 TO
FIVE-YEAR REVOLVING CREDIT AGREEMENT
OF V. F. CORPORATION

CITIBANK, N.A. (with any Lender that is a L/C Lender also executing in its capacity as such)

by

/s/ Alex Romero
_____
Name:   Alex Romero
Title:   Vice President, Citibank N.A.

SIGNATURE PAGE TO
AMENDMENT NO. 2 TO
FIVE-YEAR REVOLVING CREDIT AGREEMENT
OF V. F. CORPORATION

DBS BANK LTD.:

by

/s/ Kate Khoo
Name:   Kate Khoo
Title:   Vice President

SIGNATURE PAGE TO
AMENDMENT NO. 2 TO
FIVE-YEAR REVOLVING CREDIT AGREEMENT
OF V. F. CORPORATION

**GOLDMAN SACHS BANK USA,**
as a Lender:

by

/s/ Keshia Leday
Name:   Keshia Leday
Title:   Authorized Signatory

SIGNATURE PAGE TO
AMENDMENT NO. 2 TO
FIVE-YEAR REVOLVING CREDIT AGREEMENT
OF V. F. CORPORATION

STANDARD CHARTERED BANK (with any Lender that is a L/C Lender also executing in its capacity as such):

by

/s/ Kristopher Tracy
Name:   Kristopher Tracy
Title:   Director, Financing Solutions

UniCredit Bank AG, New York Branch:

by

/s/ Kimberly Sousa
Name:   Kimberly Sousa
Title:   Managing Director

For any Lender requiring a second signature block:

By

/s/ Laura Shelmerdine
Name:   Laura Shelmerdine
Title:   Director

TRUIST BANK:

by

/s/ J. Carlos Navarrete
Name:   J. Carlos Navarrete
Title:   Director

SIGNATURE PAGE TO
AMENDMENT NO. 2 TO
FIVE-YEAR REVOLVING CREDIT AGREEMENT
OF V. F. CORPORATION

THE BANK OF NEW YORK MELLON:

by

/s/ Yipeng Zhang
Name:   Yipeng Zhang
Title:   Vice President

Credit Suisse AG, New York Branch:

by    /s/ Doreen Barr
————————————————————————
      Name:   Doreen Barr
      Title:   Authorized Signatory


For any Lender requiring a second signature block:

By    /s/ Wing Yee Lee-Cember
————————————————————————
      Name:   Wing Yee Lee-Cember
      Title:   Authorized Signatory

EXHIBIT A

AMENDMENTS TO CREDIT AGREEMENT

[Attached]

[[6082993]]

ADDED TEXT SHOWN UNDERSCORED
DELETED TEXT SHOWN STRIKETHROUGH

EXHIBIT A

FIVE-YEAR REVOLVING CREDIT AGREEMENT

dated as of

November 24, 2021,

among

V.F. CORPORATION
and
VF INTERNATIONAL SAGL,
as Borrowers

the other BORROWING SUBSIDIARIES party hereto,

the LENDERS party hereto

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

_____

JPMORGAN CHASE BANK, N.A.,
BOFA SECURITIES, INC.,
BARCLAYS BANK PLC,
HSBC SECURITIES (USA) INC.,
U.S. BANK NATIONAL ASSOCIATION
and
WELLS FARGO SECURITIES, LLC,
as Joint-Lead Arrangers and Joint Bookrunners

BANK OF AMERICA, N.A.,
BARCLAYS BANK PLC,
HSBC BANK USA, NATIONAL ASSOCIATION,
U.S. BANK NATIONAL ASSOCIATION
and
WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Syndication Agents

ING BANK N.V., DUBLIN BRANCH
PNC BANK, N.A.,
TD BANK, N.A.
and
MORGAN STANLEY BANK, N.A.
as Documentation Agents

[CS&M No. 06702-022]

TABLE OF CONTENTS

Page

ARTICLE I

Definitions and Terms

SECTION 1.01. Definitions    1
SECTION 1.02. Classification of Loans and Borrowings    ~~40~~38
SECTION 1.03. Rules of Interpretation    ~~40~~39
SECTION 1.04. Currency Translation    ~~42~~40
SECTION 1.05. Interest Rates; Benchmark Notification    ~~42~~41
SECTION 1.06. Divisions    ~~44~~41

ARTICLE II

The Credits

SECTION 2.01. Commitments    ~~44~~42
SECTION 2.02. Loans and Borrowings    ~~45~~42
SECTION 2.03. Requests for Borrowings    ~~46~~43
SECTION 2.04. Swing Line Loans    ~~47~~45
SECTION 2.05. Letters of Credit    ~~49~~47
SECTION 2.06. Funding of Borrowings    ~~58~~56
SECTION 2.07. Interest Elections    ~~59~~57
SECTION 2.08. Termination, Reduction and Increase of Commitments; Redesignation of Commitments    ~~60~~58
SECTION 2.09. Repayment of Loans; Evidence of Debt    ~~63~~61
SECTION 2.10. Prepayment of Loans    ~~64~~62
SECTION 2.11. Fees    ~~65~~63
SECTION 2.12. Interest    ~~66~~64
SECTION 2.13. Payments Generally; Pro Rata Treatment; Sharing of Set-offs    ~~67~~65
SECTION 2.14. Borrowing Subsidiaries    ~~69~~67
SECTION 2.15. Defaulting Lenders    ~~71~~69
SECTION 2.16. Extension Offers    ~~73~~71
SECTION 2.17. Use of Proceeds    ~~75~~73

ARTICLE III

Change in Circumstances

SECTION 3.01. Increased Cost and Reduced Return    ~~75~~73
SECTION 3.02. Alternate Rate of Interest    ~~77~~75
SECTION 3.03. Illegality    ~~81~~79
SECTION 3.04. Compensation    ~~81~~80
SECTION 3.05. Taxes    ~~82~~80

i

SECTION 3.06. Designation and Change of Lending Offices   ~~84~~83
SECTION 3.07. Substitution of Lenders   ~~85~~83

ARTICLE IV

Conditions to Making Loans and Issuing Letters of Credit

SECTION 4.01. Conditions of Closing   ~~85~~84
SECTION 4.02. Conditions of Revolving Loans, Letters of Credit and Swing Line Loans   ~~87~~85
SECTION 4.03. Initial Revolving Loans, Letters of Credit and Swing Line Loans of each New Borrowing Subsidiary   ~~88~~86

ARTICLE V

Representations and Warranties

SECTION 5.01. Corporate Existence and Power   ~~88~~87
SECTION 5.02. Corporate and Governmental Authorization; No Contravention~~89~~87
SECTION 5.03. Binding Effect   ~~89~~87
SECTION 5.04. Financial Information   ~~89~~87
SECTION 5.05. Litigation   ~~89~~88
SECTION 5.06. Compliance with ERISA   ~~89~~88
SECTION 5.07. Environmental Matters   ~~90~~88
SECTION 5.08. Taxes   ~~90~~88
SECTION 5.09. Margin Stock   ~~90~~89
SECTION 5.10. Investment Company   ~~91~~89
SECTION 5.11. Full Disclosure   ~~91~~89
SECTION 5.12. No Consents, Etc   ~~91~~89
SECTION 5.13. Anti-Corruption Laws and Sanctions   ~~91~~89

ARTICLE VI

Affirmative Covenants

SECTION 6.01. Financial Reports, Etc   ~~92~~90
SECTION 6.02. Payment of Taxes   ~~94~~93
SECTION 6.03. Maintenance of Properties; Insurance   ~~94~~93
SECTION 6.04. Compliance with Laws   ~~95~~93
SECTION 6.05. Books and Records   ~~95~~93
SECTION 6.06. Existence   ~~95~~94

ARTICLE VII

Negative Covenants

SECTION 7.01. Financial Covenant   ~~96~~94

ii

SECTION 7.02. Liens   ~~96~~94
SECTION 7.03. Indebtedness of Subsidiaries   ~~97~~95
SECTION 7.04. Consolidations, Mergers and Sales of Assets   ~~98~~96
SECTION 7.05. Use of Proceeds   ~~98~~96

ARTICLE VIII

Events of Default and Acceleration

SECTION 8.01. Events of Default   ~~98~~96
SECTION 8.02. Administrative Agent to Act   ~~101~~99
SECTION 8.03. Cumulative Rights   ~~101~~100
SECTION 8.04. No Waiver   ~~102~~100
SECTION 8.05. Allocation of Proceeds   ~~102~~100

ARTICLE IX

The Administrative Agent

SECTION 9.01. Appointment and Authority   ~~102~~101
SECTION 9.02. Rights as Lenders   ~~103~~101
SECTION 9.03. Exculpatory Provisions   ~~103~~101
SECTION 9.04. Reliance by Administrative Agent   ~~104~~102
SECTION 9.05. Delegation of Duties   ~~104~~103
SECTION 9.06. Resignation of Administrative Agent   ~~105~~103
SECTION 9.07. Acknowledgments of Lenders and L/C Issuers   ~~106~~104
SECTION 9.08. No Other Duties, Etc   ~~108~~106
SECTION 9.09. Administrative Agent May File Proofs of Claim   ~~108~~107
SECTION 9.10. Certain ERISA Matters   ~~109~~107
SECTION 9.11. Posting of Communications   ~~110~~109

ARTICLE X

Guarantee

SECTION 10.01. Guarantee   ~~112~~110
SECTION 10.02. No Subrogation   ~~112~~111
SECTION 10.03. Amendments, etc. with respect to the Obligations   ~~113~~111
SECTION 10.04. Guarantee Absolute and Unconditional   ~~113~~111
SECTION 10.05. Reinstatement   ~~114~~112
SECTION 10.06. Payments   ~~115~~113
SECTION 10.07. Independent Obligations   ~~115~~113

iii

[[6082021]]

ARTICLE XI

Miscellaneous

SECTION 11.01. Assignments and Participations   ~~115~~113
SECTION 11.02. Notices; Effectiveness; Electronic Communication   ~~118~~116
SECTION 11.03. Right of Set-off; Adjustments   ~~120~~119
SECTION 11.04. Survival   ~~121~~119
SECTION 11.05. Expenses   ~~121~~119
SECTION 11.06. Amendments and Waivers   ~~121~~120
SECTION 11.07. Counterparts; Electronic Execution   ~~123~~121
SECTION 11.08. Termination   ~~124~~122
SECTION 11.09. Indemnification; Limitation of Liability   ~~125~~123
SECTION 11.10. Severability   ~~126~~124
SECTION 11.11. Integration   ~~126~~125
SECTION 11.12. Governing Law; Waiver of Jury Trial   ~~127~~125
SECTION 11.13. Confidentiality   ~~129~~127
SECTION 11.14. "Know Your Customer" Checks; Certain Notices   ~~129~~128
SECTION 11.15. Conversion of Currencies   ~~130~~128
SECTION 11.16. Interest Rate Limitation   ~~131~~129
SECTION 11.17. No Fiduciary Relationship   ~~131~~129
SECTION 11.18. Company as Agent of Borrowing Subsidiaries   ~~131~~130
SECTION 11.19. Acknowledgement and Consent to Bail-In of Affected Financial Institutions   ~~132~~130
SECTION 11.20. Limitations for Swiss Borrowers   ~~132~~131
SECTION 11.21. Waiver of Notice Period in Connection with Termination of Existing Credit Agreement   ~~134~~132

iv

[[6082021]]

**<u>Schedules</u>:**

Schedule 2.01      Commitments
Schedule 2.04      Swing Line Commitments
Schedule 2.05A   Existing Letters of Credit
Schedule 2.05B   L/C Commitments

**<u>Exhibits</u>:**

Exhibit A         Form of Assignment and Assumption
Exhibit B         Form of Borrowing Notice
Exhibit C-1       Form of Borrowing Subsidiary Agreement
Exhibit C-2       Form of Borrowing Subsidiary Termination
Exhibit D         Form of Interest Election Request
Exhibit E         Form of L/C Issuer Agreement
Exhibit F         Form of Accession Agreement
Exhibit G         Form of Compliance Certificate

v

FIVE-YEAR REVOLVING CREDIT AGREEMENT dated as of November 24, 2021, among V.F. CORPORATION, a Pennsylvania corporation (the "Company"); VF INTERNATIONAL SAGL, a limited liability company (*società a garanzia limitata*) incorporated under the laws of Switzerland, with its registered office at Via Laveggio 5, 6855 Stabio, Switzerland and registered with the commercial register under number CHE-111.650.898 ("VF International"); the other BORROWING SUBSIDIARIES from time to time party hereto; each LENDER from time to time party hereto; and JPMORGAN CHASE BANK, N.A., as Administrative Agent.

WITNESSETH:

WHEREAS the Borrowers have requested that the Lenders make available to the Borrowers multi-currency revolving credit facilities of up to US$2,250,000,000 (which may be increased to US$3,000,000,000), the proceeds of which are to be used for general corporate purposes, including, without limitation, acquisitions, repurchases of outstanding shares of the Company's common stock and other lawful corporate purposes, a letter of credit facility of up to US$75,000,000, and a swing line facility of up to US$100,000,000; and

WHEREAS the Lenders are willing to make the revolving credit facility, the letter of credit facilities and the swing line facility available to the Borrowers upon the terms and conditions set forth herein.

NOW, THEREFORE, the Borrowers, the Lenders, the L/C Issuers and the Administrative Agent hereby agree as follows:

ARTICLE I

Definitions and Terms

SECTION 1.01 Definitions. For the purposes of this Agreement, in addition to the definitions set forth above, the following terms shall have the respective meanings set forth below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Accession Agreement" has the meaning specified in Section 2.08(d).

"Adjusted Daily Simple SOFR" means an interest rate per annum equal to (a) Daily Simple SOFR plus (b) 0.10% per annum; provided that if Adjusted Daily Simple SOFR as so determined would be less than zero, such rate shall be deemed to be zero.

"Adjusted EURIBO Rate" means, with respect to any EURIBOR Borrowing for any Interest Period, an interest rate per annum ~~(rounded upwards, if necessary, to the next 1/100 of 1%)~~ equal to (a) the EURIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; provided that if ~~such rate~~the Adjusted EURIBO Rate shall be less than zero, such rate shall be deemed to be zero.

"Adjusted ~~LIBO Rate~~Term SOFR" means, ~~with respect to any LIBOR Borrowing~~for any Interest Period, an interest rate per annum ~~(rounded upwards, if necessary, to the next 1/100 of 1%)~~ equal to (a) ~~the LIBO Rate~~Term SOFR for such Interest Period ~~multiplied by~~plus (b) ~~the Statutory Reserve Rate~~0.10% per annum; provided that if ~~such rate shall~~Adjusted Term SOFR as so determined would be less than zero, such rate shall be deemed to be zero.

"Administrative Agent" means JPMorgan, in its capacity as administrative agent for the Lenders hereunder, or any successor appointed in accordance with Section 9.06. Unless the context requires otherwise, the term "Administrative Agent" shall include any Affiliate of JPMorgan through which JPMorgan shall perform any of its obligations in such capacity hereunder or under the other Loan Documents.

"Administrative Questionnaire" means an ~~Administrative Questionnaire~~administrative questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, as to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person. A Person shall be deemed to be "controlled by" any other Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Aggregate Global Tranche Revolving Credit Exposure" means, at any time, the sum of the Global Tranche Revolving Credit Exposures of all the Global Tranche Lenders at such time; provided that, for purposes of this definition, in determining the Global Tranche Revolving Credit Exposure of any Swing Line Lender, the Global Tranche Swing Line Exposure of such Swing Line Lender shall be deemed to equal its Global Tranche Percentage of the aggregate amount of the US Dollar Equivalents of the Global Tranche Swing Line Loans outstanding at such time.

"Aggregate Revolving Credit Exposure" means, at any time, the sum of the Aggregate Global Tranche Revolving Credit Exposure and the Aggregate US Tranche Revolving Credit Exposure at such time.

"Aggregate US Tranche Revolving Credit Exposure" means, at any time, the sum of the US Tranche Revolving Credit Exposures of all the US Tranche Lenders at such time; provided that, for purposes of this definition, in determining the US Tranche Revolving Credit Exposure of any Swing Line Lender, the US Tranche Swing Line

Exposure of such Swing Line Lender shall be deemed to equal its US Tranche Percentage of the aggregate amount of the US Dollar Equivalents of the US Tranche Swing Line Loans outstanding at such time.

"Agreed Currencies" means US Dollars and the Alternative Currencies.

"Agreement" means this Five-Year Revolving Credit Agreement, as the same may hereafter be amended, supplemented or otherwise modified from time to time.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1.00% per annum and (c) the Adjusted ~~LIBO Rate on~~ Term SOFR for a one month Interest Period as published two US Government Securities Business Days prior to such day (or if such day is not a US Government Securities Business Day, the immediately preceding US Government Securities Business Day) ~~for a deposit in US Dollars with a maturity of one month~~ plus 1.00% per annum. For purposes of clause (c) above, the Adjusted ~~LIBO Rate on~~ Term SOFR for any day shall be based on the ~~LIBO Screen~~ Term SOFR Reference Rate at approximately ~~11:00 a.m., London~~ 5:00 a.m., Chicago time, on such day ~~for deposits in US Dollars with a maturity of one month~~ (or any amended publication time for Term SOFR Reference Rate, as specified by the CME Term SOFR Administrator in the Term SOFR Reference Rate methodology). If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 3.02 (for the avoidance of doubt, only until ~~an amendment hereto has become effective~~ the Benchmark Replacement with respect to Term SOFR has been determined pursuant to Section 3.02(b)), then the Alternate Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above~~; provided that~~. If the Alternate Base Rate ~~shall not~~, determined as set forth above, would be less than ~~1%~~ 1.00%, such rate shall be deemed 1.00% for purposes of this Agreement. Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted ~~LIBO Rate~~ Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted ~~LIBO Rate~~ Term SOFR, as the case may be.

"Alternative Currency" means Euro and any other currency (other than US Dollars) (a) that is freely transferable and convertible into US Dollars and (b) that has been approved at the request of the Company by the Administrative Agent, each Lender and each L/C Issuer as an Alternative Currency.

"Alternative Currency Overnight Rate" means, for any day, with respect to any L/C Disbursement, (a) (i) if such L/C Disbursement is denominated in Euro, a rate per annum equal to the Daily Simple ESTR or (ii) if such L/C Disbursement is denominated in any other Alternative Currency, a rate per annum at which overnight deposits in such Alternative Currency would be offered on such day in the principal interbank market for such Alternative Currency, as such rate is determined by the Administrative Agent by such means as the Administrative Agent shall determine to be reasonable, or (b) if, with respect to any L/C Disbursement denominated in any Alternative Currency, the Administrative Agent reasonably determines that it is unable to determine the rate referred to in clause (a) above with respect to such Alternative

Currency, then a rate per annum equal to the Central Bank Rate with respect to such Alternative Currency; <u>provided</u> that, if the Alternative Currency Overnight Rate as so determined would be less than zero, the Alternative Currency Overnight Rate will be deemed to be zero.

"<u>Amendment No. 1</u>" means that certain Amendment No. 1, dated as of February 16, 2023, among the Company, the Lenders party thereto and the Administrative Agent.

"<u>Amendment Effective Date</u>" has the meaning set forth in Amendment No. 1.

"<u>Ancillary Document</u>" has the meaning set forth in Section 11.07(b).

"<u>Anti-Corruption Laws</u>" means all laws, rules, and regulations of any jurisdiction applicable to the Borrowers or any of their Subsidiaries from time to time concerning or relating to bribery or corruption.

"<u>Applicable Lending Office</u>" means, as to any Lender, the office or offices described as such in such Lender's Administrative Questionnaire, or such other office of such Lender (or an Affiliate of such Lender) as such Lender may from time to time specify to the Administrative Agent and the Company by written notice in accordance with the terms hereof as the office by which its Loans of each Class and Type are to be made and maintained.

"<u>Applicable Rate</u>" means, for any day with respect to any ABR Loan (including any Swing Line Loan that is an ABR Loan), ~~LIBOR~~<u>any Term SOFR</u> Loan, <u>any</u> EURIBOR Loan or ~~ESTR~~<u>any RFR</u> Loan or the Facility Fee, as the case may be, the applicable rate per annum set forth under the caption "~~LIBOR/EURIBOR/Daily Simple ESTR~~<u>ABR</u> Spread", "~~ABR~~<u>Term SOFR/EURIBOR/RFR</u> Spread" or "Facility Fee Rate" in the table below, as the case may be, in each case based upon the ratings by S&P and Moody's applicable on such date to the Index Debt:

| Category | Ratings S&P / Moody's | ~~LIBOR~~<u>Term SOFR</u>/ EURIBOR~~Daily Simple ESTR~~<u>RFR</u> Spread | ABR Spread | Facility Fee Rate |
|---|---|---|---|---|
| 1 | AA- / Aa3 | 0.580% | 0.000% | 0.045% |
| 2 | A+ / A1 | 0.695% | 0.000% | 0.055% |
| 3 | A / A2 | 0.810% | 0.000% | 0.065% |
| 4 | A- / A3 | 0.910% | 0.000% | 0.090% |
| 5 | BBB+ / Baa1 | 1.015% | 0.015% | 0.110% |
| 6 | ≤BBB / Baa2 | 1.100% | 0.100% | 0.150% |

For purposes of the foregoing, (i) if either S&P or Moody's shall not have in effect a rating for the Index Debt (other than by reason of the circumstances referred to in the last sentence of this definition), then such rating agency shall be deemed to have established a rating in Category 6, (ii) if the ratings established or deemed to have been established by Moody's and S&P for the Index Debt shall fall within different Categories, the Applicable Rate shall be the applicable rate per annum corresponding to the higher (or numerically lower) of such Categories unless one of the ratings is two or more Categories

lower than the other, in which case the Applicable Rate shall be determined by reference to the Category next below that corresponding to the higher of the two ratings and (iii) if the ratings established or deemed to have been established by S&P and Moody's for the Index Debt shall be changed (other than as a result of a change in the rating system of S&P or Moody's), such change shall be effective as of the date on which it is first announced by the applicable rating agency. Each change in the Applicable Rate shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change. If the rating system of S&P or Moody's shall change, or if either such rating agency shall cease to be in the business of rating corporate debt obligations, the Company and the Lenders shall negotiate in good faith to amend this definition to reflect such changed rating system or the unavailability of ratings from such rating agency and, pending the effectiveness of any such amendment, the Applicable Rate shall be determined by reference to the ratings most recently in effect prior to such change or cessation.

"<u>Applicable Time</u>" means, with respect to any payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be determined by the Administrative Agent or the applicable L/C Issuer, as the case may be, to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"<u>Approved Fund</u>" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"<u>Arrangers</u>" means JPMorgan Chase Bank, N.A., BofA Securities, Inc., Barclays Bank PLC, HSBC Securities (USA) Inc., U.S. Bank National Association and Wells Fargo Securities, LLC, in their capacities as joint lead arrangers and joint bookrunners of the revolving credit facilities provided for herein.

"<u>Assignment and Assumption</u>" means an Assignment and Assumption in the form of Exhibit A hereto (with blanks appropriately filled in) delivered to the Administrative Agent in connection with an assignment of a Lender's interest under this Agreement pursuant to Section 11.01.

"<u>Authorized Representative</u>" means any of the Chairman of the Board of Directors, President, Chief Executive Officer, Chief Financial Officer, Vice President-Treasurer, or any other Vice President of the Company, or any other Person expressly designated by the written authorization of any of the foregoing as an Authorized Representative.

"<u>Availability Period</u>" means the period from and including the Closing Date to but excluding the Termination Date.

"<u>Available Tenor</u>" means, as of any date of determination and with respect to the then-current Benchmark for any Agreed Currency, as applicable, any tenor for such

Benchmark (or component thereof) or payment period for interest calculated with reference to such Benchmark (or component thereof), as applicable, that is or may be used for determining the length of an Interest Period for any term rate or otherwise for determining any frequency of making payments of interest calculated pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 3.02(b)(~~v~~iv).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Event" means, with respect to any Person, that such Person has become the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it; provided that a Bankruptcy Event shall not result solely by virtue of (a) any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority; provided that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any agreements made by such Person, or (b) any Undisclosed Administration.

"Benchmark" means, initially, with respect to any Loan denominated in any Agreed Currency, the Relevant Rate for Loans denominated in such Agreed Currency; provided that if a Benchmark Transition Event~~, a Term SOFR Transition Event, an Early Opt-in Election or an Other Benchmark Rate Election, as applicable,~~ and the related Benchmark Replacement Date have occurred with respect to the applicable Relevant Rate or the then-current Benchmark for such Agreed Currency, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.02(b)(i) ~~or 3.02(b) (ii)~~.

"Benchmark Replacement" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date; provided that, in the case of any Loan denominated in an Alternative Currency ~~or in the case of an Other Benchmark Rate~~

~~Election~~, "Benchmark Replacement" shall mean the alternative set forth in clause (~~3~~2) below:

(1)    in the case of any Loan denominated in US Dollars, the ~~sum of: (a) Term SOFR and (b) the related Benchmark Replacement Adjustment;~~Adjusted Daily Simple SOFR; and

~~(2)    in the case of any Loan denominated in US Dollars, the~~ ~~sum of: (a) Daily Simple SOFR~~ and ~~(b) the related Benchmark Replacement Adjustment;~~

(~~3~~2)    the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Company as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body and/or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for syndicated credit facilities denominated in the applicable Agreed Currency at such time in the United States and (b) the related Benchmark Replacement Adjustment~~;~~.

~~provided that, in the case of clauses (1) and (2), such Unadjusted Benchmark Replacement is displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion;~~ ~~provided~~ ~~further~~ ~~that, in the case of clause (3), when such clause is used to determine the Benchmark Replacement in connection with the occurrence of an Other Benchmark Rate Election, the alternate benchmark rate selected by the Administrative Agent and the Company shall be the term benchmark rate that is used in lieu of a LIBOR-based rate in the relevant other US Dollar-denominated syndicated credit facilities;~~ ~~provided~~ ~~further~~ ~~that, notwithstanding anything to the contrary in this Agreement or in any other Loan Document, upon the occurrence of a Term SOFR Transition Event, and the delivery of a Term SOFR Notice, on the applicable Benchmark Replacement Date the "Benchmark Replacement" shall revert to and shall be deemed to be the sum of (a) Term SOFR and (b) the related Benchmark Replacement Adjustment, as set forth in clause (1) of this definition (subject to the first proviso above).~~

If the Benchmark Replacement as determined pursuant to clause (1)~~,~~ or (2~~) or (3~~) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement~~:~~

, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has

been selected by (1)   for purposes of clauses (1) and (2) of the definition of "Benchmark Replacement", the first alternative set forth in the order below that can be determined by the Administrative Agent:

(a)   the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that has been selected or recommended by the Relevant Governmental Body for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for the applicable Corresponding Tenor;

(b)   the spread adjustment (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that would apply to the fallback rate for a derivative transaction referencing the ISDA Definitions to be effective upon an index cessation event with respect to such Benchmark for the applicable Corresponding Tenor; and

(2)   for purposes of clause (3) of the definition of "Benchmark Replacement", the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Company for the applicable Corresponding Tenor giving due consideration to (ia) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date and/or (iib) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for syndicated credit facilities denominated in the applicable Agreed Currency at such time; in the United States.

provided that, in the case of clause (1) above, such adjustment is displayed on a screen or other information service that publishes such Benchmark Replacement Adjustment from time to time as selected by the Administrative Agent in its reasonable discretion.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement and/or any Term SOFR Loan, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate", the definition of "Alternative Currency Overnight Rate", the definition of "Business Day", the definition of "ESTRRFR Business Day", the definition of "US Government Securities Business Day", the definition of "Interest Period", timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides (in consultation with the Company) may be appropriate to reflect the adoption and implementation of suchthe applicable

Benchmark and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of ~~the~~such Benchmark exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date" means, with respect to any Benchmark, the ~~earliest~~earlier to occur of the following events with respect to such then-current Benchmark:

(1)  in the case of clause (1) or (2) of the definition of "Benchmark Transition Event", the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2)  in the case of clause (3) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date~~.~~.

~~(3)  in the case of a Term SOFR Transition Event, the date that is 30 days after the date a Term SOFR Notice is provided to the Lenders and the Company pursuant to Section 3.02(b)(ii); or~~

~~(4)  in the case of an Early Opt-in Election or an Other Benchmark Rate Election, the sixth Business Day after the date notice of such Early Opt-in Election or Other Benchmark Rate Election, as applicable, is provided to the Lenders, so long as the Administrative Agent has not received, by 5:00 p.m., New York City time, on the fifth Business Day after the date notice of such Early Opt-in Election or Other Benchmark Rate Election, as applicable, is provided to the Lenders, written notice of objection to such Early Opt-in Election or Other Benchmark Rate Election, as applicable, from Lenders comprising the Required Lenders.~~

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark

Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means, with respect to any Benchmark, the occurrence of one or more of the following events with respect to such then-current Benchmark:

(1) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board of Governors, the NYFRB, the CME Term SOFR Administrator, the central bank for the Agreed Currency applicable to such Benchmark, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), in each case, which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

[[6082021]]

"Benchmark Unavailability Period" means, with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to ~~clauses~~clause (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced ~~the~~such then-current Benchmark for all purposes hereunder and under any other Loan Document in accordance with Section 3.02(b) and (y) ending at the time that a Benchmark Replacement has replaced ~~the~~such then-current Benchmark for all purposes hereunder and under any other Loan Document in accordance with Section 3.02(b).

~~"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.~~

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Arrangement" means at any time an employee benefit plan within the meaning of Section 3(3) of ERISA which is not a Plan or a Multiemployer Plan and which is maintained or otherwise contributed to by any member of the ERISA Group.

"Benefit Plan" means (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

~~"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America (or any successor body).~~

"Borrowers" means the Company and each of the Borrowing Subsidiaries.

"Borrowing" means (a) Revolving Loans of the same Class, Type and currency made, converted or continued on the same date and to the same Borrower and, in the case of ~~LIBOR~~Term SOFR Loans or EURIBOR Loans, as to which a single Interest Period is in effect or (b) a Swing Line Loan.

"Borrowing Minimum" means (a) in the case of a Borrowing denominated in US Dollars, US$5,000,000, (b) in the case of a Borrowing denominated in Euro, €5,000,000 and (c) in the case of a Borrowing denominated in any other Alternative Currency, the smallest amount of such Alternative Currency that is an integral multiple of 1,000,000 units of such currency and that has a US Dollar Equivalent of US$5,000,000 or more.

"Borrowing Multiple" means (a) in the case of a Borrowing denominated in US Dollars, US$1,000,000, (b) in the case of a Borrowing denominated in Euro, €1,000,000 and (c) in the case of a Borrowing denominated in any other Alternative Currency, 1,000,000 units of such currency.

"<u>Borrowing Notice</u>" means the notice delivered by the Company in connection with a Borrowing of Revolving Loans or a Swing Line Loan, in the form of Exhibit B hereto.

"<u>Borrowing Subsidiary</u>" means VF International and, at any time, each other Subsidiary that has been designated as a Borrowing Subsidiary by the Company pursuant to Section 2.14, in each case, for so long as such Person has not ceased to be a Borrowing Subsidiary as provided in such Section as of such time.

"<u>Borrowing Subsidiary Agreement</u>" means a Borrowing Subsidiary Agreement substantially in the form of Exhibit C-1.

"<u>Borrowing Subsidiary Termination</u>" means a Borrowing Subsidiary Termination substantially in the form of Exhibit C-2.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; <u>provided</u> that (a) when used in connection with a ~~LIBOR Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in deposits denominated in US Dollars in the London interbank market or any day on which banks in London are not open for business, (b) when used in connection with a~~ ~~EURIBOR Loan~~<u>Term SOFR Loan and any interest rate settings, fundings, disbursements, settlements or payments of any Term SOFR Loan, or any other dealings in respect of Loans referencing Adjusted Term SOFR</u>, the term "Business Day" shall also exclude any day that is not a <u>US Government Securities Business Day, (b) when used in connection with a Loan denominated in Euros and in connection with the calculation or computation of the EURIBO Rate, the term "Business Day" shall also exclude any day that is not a</u> TARGET Day, (c) when used in connection with ~~an ESTR~~<u>a RFR Loan and any interest rate settings, fundings, disbursements, settlements or payments of any RFR Loan, or any other dealings in the applicable Agreed Currency of such RFR</u> Loan, the term "Business Day" shall also exclude any day that is not ~~an ESTR~~<u>a RFR</u> Business Day~~,~~ <u>and</u> (d) when used in connection with ~~a Loan to any Borrower organized in a jurisdiction other than the United States of America or England, the term "Business Day" shall also exclude any day on which commercial banks in the jurisdiction of organization of such Borrower are authorized or required by law to remain closed, and (e) when used in connection with~~ a Swing Line Loan denominated in Euro, the term "Business Day" shall include any day that would be a Business Day under the foregoing provisions of this definition but for the fact that commercial banks in New York City are authorized or required by law to remain closed on such day.

"<u>Capital Leases</u>" means all leases which have been capitalized in accordance with GAAP as in effect, subject to Section 1.03(a), from time to time.

"<u>CBR</u>", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Central Bank Rate.

"CBR Spread" means, with respect to any CBR Loan at any time, the Applicable Rate that would be applicable at such time to the Loan that was converted into such CBR Loan in accordance herewith.

"Central Bank Rate" means (a) the greater of (a) (i) (A) for any Loan or L/C Disbursement denominated in Euro, one of the following three rates as may be selected by the Administrative Agent in its reasonable discretion: (1) the fixed rate for the main refinancing operations of the European Central Bank (or any successor thereto) or, if that rate is not published, the minimum bid rate for the main refinancing operations of the European Central Bank (or any successor thereto), each as published by the European Central Bank (or any successor thereto) from time to time, (2) the rate for the marginal lending facility of the European Central Bank (or any successor thereto), as published by the European Central Bank (or any successor thereto) from time to time or (3) the rate for the deposit facility of the central banking system of the Participating Member States, as published by the European Central Bank (or any successor thereto) from time to time and (B) for any Loan or L/C Disbursement denominated in any other Alternative Currency, a central bank rate as determined by the Administrative Agent in its reasonable discretion and plus (ii) zero; plus (b) the applicable Central Bank Rate Adjustment; and (b) zero.

"Central Bank Rate Adjustment" means, for any day, (a) for any Loan or L/C Disbursement denominated in Euro, a rate equal to the difference (which may be a positive or negative value or zero) of (i) the average of the Adjusted EURIBO Rate for the five most recent Business Days preceding such day for which the EURIBO Screen Rate was available (excluding, from such averaging, the highest and the lowest Adjusted EURIBO Rate applicable during such period of five Business Days) minus (ii) the Central Bank Rate in respect of Euro in effect on the last Business Day in such period and (b) for any Loan or L/C Disbursement denominated in any other Alternative Currency, a Central Bank Rate Adjustment as determined by the Administrative Agent in its reasonable discretion. For purposes of this definition, (x) the term Central Bank Rate shall be determined disregarding clause (b a)(ii) of the definition of such term and (y) the EURIBO Rate on any day shall be based on the EURIBO Screen Rate on such day at approximately the time referred to in the definition of such term for deposits in Euro for a maturity of one month (or, in the case of L/C Disbursements, for overnight deposits in Euro); provided that if such rate shall be less than zero, such rate shall be deemed to be zero.

"Change of Control" means, at any time:

(a) any person or group of persons (within the meaning of Section 13 or 14 of the Exchange Act), other than the Trust, shall have acquired beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act ) of 35% or more of the outstanding shares of Voting Securities of the Company; or

(b) as of any date a majority of the Board of Directors of the Company consists of individuals who were not either (i) directors of the Company as of the corresponding date of the previous year, (ii) selected or nominated to become directors by the Board of Directors of the Company of which a majority consisted of individuals described in clause (i), or (iii) selected or nominated to become

directors by the Board of Directors of the Company of which a majority consisted of individuals described in clauses (i) and (ii).

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any applicable law, rule, regulation or treaty, (b) any change in any applicable law, rule, regulation or treaty or in the interpretation or administration thereof by any Governmental Authority or (c) the making or issuance of any request or directive (whether or not having the force of law) of any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, promulgated or issued.

"Claims" has the meaning specified in Section 2.13(c).

"Class", when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Global Tranche Revolving Loans, US Tranche Revolving Loans, Global Tranche Swing Line Loans or US Tranche Swing Line Loans, (b) any Letter of Credit or L/C Disbursement, refers to whether such Letter of Credit or L/C Disbursement is a US Tranche Letter of Credit or US Tranche L/C Disbursement or a Global Tranche Letter of Credit or Global Tranche L/C Disbursement, (c) any Commitment, refers to whether such Commitment is a US Tranche Commitment or a Global Tranche Commitment, (d) any Revolving Credit Exposure, L/C Exposure or Swing Line Exposure, refers to whether such Revolving Credit Exposure, L/C Exposure or Swing Line Exposure is a Global Tranche Revolving Credit Exposure, Global Tranche L/C Exposure or Global Tranche Swing Line Exposure or a US Tranche Revolving Credit Exposure, US Tranche L/C Exposure or US Tranche Swing Line Exposure and (e) any Lenders, refers to whether such Lenders are Global Tranche Lenders or US Tranche Lenders.

"Closing Date" means the date as of which this Agreement is executed by the parties hereto and on which the conditions set forth in Section 4.01 have been satisfied or waived.

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any regulations promulgated thereunder.

"<u>Commitments</u>" means the Global Tranche Commitments and the US Tranche Commitments. The aggregate amount of the Commitments as of the Closing Date is US$2,250,000,000.

"<u>Communications</u>" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Borrower or the Administrative Agent pursuant to any Loan Document or the transactions contemplated therein that is distributed to or by the Administrative Agent, any Lender or any L/C Issuer by means of electronic communications in accordance with this Agreement, including through the Platform.

"<u>Company</u>" has the meaning specified in the preamble hereto.

"<u>Company Materials</u>" has the meaning specified in Section 6.01.

"<u>Consolidated Net Capitalization</u>" means, as of the last day of any fiscal quarter, the sum of Consolidated Net Indebtedness <u>plus</u> Consolidated Net Worth.

"<u>Consolidated Net Indebtedness</u>" means, as of the last day of any fiscal quarter, all Funded Indebtedness of the Company and its Subsidiaries, determined on a consolidated basis in accordance with GAAP, <u>minus</u> Unrestricted Cash; <u>provided</u> that Consolidated Net Indebtedness shall not be less than zero.

"<u>Consolidated Net Worth</u>" means, as of the last day of any fiscal quarter, (a) for any fiscal quarter ending before September 30, 2026, and the fiscal quarter ending on or about September 30, 2026, (i) the consolidated stockholders' equity of the Company and its Subsidiaries, determined on a consolidated basis in accordance with GAAP plus (ii) solely for purposes of Section 7.01, in determining Consolidated Net Worth as of the last day of the fiscal quarter in which such charges or impacts have been recognized and the last day of each of the four immediately succeeding fiscal quarters (but not as of the last day of any subsequent fiscal quarter), (A) the amount of any non-cash impairment charges recognized by the Company or any of its Subsidiaries (including the non-cash impairment charges recognized by the Company with respect to the Supreme reporting unit goodwill and the Supreme® indefinite-lived trademark intangible asset), commencing with such charges recognized in the fiscal quarter ended on or about September 30, 2022, and (B) the amount of any material impacts resulting from adverse legal rulings relating to those certain pending legal proceedings disclosed by the Company in documents delivered prior to the Amendment Effective Date in connection with Amendment No. 1, to the extent any such charges or impacts reduced such consolidated stockholders' equity; <u>provided</u> that the aggregate amount of all such charges and impacts  with respect to which any amount is added pursuant to clause (a)(ii) may not exceed US$850,000,000 and (b) for any fiscal quarter ending after the fiscal quarter ending on or about September 30, 2026, the consolidated stockholders' equity of the Company and its Subsidiaries, determined on a consolidated basis in accordance with GAAP.

"<u>Corresponding Tenor</u>" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having

approximately the same length (disregarding business day adjustment) as such Available Tenor.

"<u>Daily Simple ESTR</u>" means, for any day (an "<u>ESTR Interest Day</u>"), with respect to any Swing Line Loan or any L/C Disbursement denominated in Euro, an interest rate per annum equal to the greater of (a) ESTR for the day that is one ESTR Business Day prior to (i) if such ESTR Interest Day is an ESTR Business Day, such ESTR Interest Day or (ii) if such ESTR Interest Day is not an ESTR Business Day, the ESTR Business Day immediately preceding such ESTR Interest Day and (b) zero.

"<u>Daily Simple RFR</u>" means, for any day, (a) in the case of any Swing Line Loan denominated in Euro, the Daily Simple ESTR for such day and (b) in the case of any Loan denominated in US Dollars, the Adjusted Daily Simple SOFR for such day.

"<u>Daily Simple SOFR</u>" means, for any day ~~(a "~~SOFR~~, with the conventions for this rate (which may include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for business loans; provided~~ ~~that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.~~ Rate Day"), a rate per annum equal to SOFR for the day that is five US Government Securities Business Days prior to (a) if such SOFR Rate Day is a US Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a US Government Securities Business Day, the US Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website.

"<u>Daily Simple SOFR Borrowing</u>" means any Borrowing comprised of Daily Simple SOFR Loans.

"<u>Daily Simple SOFR Loan</u>" means any Loan bearing interest at a rate determined by reference to Adjusted Daily Simple SOFR.

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"<u>Declining Lender</u>" has the meaning specified in Section 2.16(a).

"<u>Default</u>" means any event or condition which, with the giving or receipt of notice or lapse of time or both, unless cured or waived, would constitute an Event of Default hereunder.

"<u>Defaulting Lender</u>" means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, (i) to fund any portion of its

Loans, (ii) to fund any portion of its participations in Letters of Credit or Swing Line Loans or (iii) to pay to the Administrative Agent, any L/C Issuer or any Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified in such writing, including, if applicable, by reference to a specific Default or Event of Default) has not been satisfied, (b) has notified the Company or the Administrative Agent in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified in such writing, including, if applicable, by reference to a specific Default or Event of Default) to funding a Loan cannot be satisfied), (c) has failed, within three Business Days after request by the Administrative Agent, made in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations to fund prospective Loans and participations in then outstanding Letters of Credit and Swing Line Loans; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the receipt by the Administrative Agent of such certification in form and substance reasonably satisfactory to it, or (d) has become, or has a Lender Parent that has become, the subject of a Bankruptcy Event or a Bail-In Action.

"Dividing Person" has the meaning assigned to such term in the definition of "Division Successor".

"Division" has the meaning specified in Section 1.06.

"Division Successor" means any Person that, upon the consummation of a Division of any other Person (a "Dividing Person"), holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division. A Dividing Person that retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"Documentation Agents" means ING Bank N.V., Dublin Branch, PNC Bank, N.A., TD Bank, N.A. and Morgan Stanley Bank, N.A.

"Domestic Subsidiary" means a Subsidiary that is incorporated or organized in the United States of America or any state or other political subdivision, territory or possession thereof.

"Early Opt-in Election" means, if the then current Benchmark with respect to US Dollars is the LIBO Rate, the occurrence of:

(1) a notification by the Administrative Agent to (or the request by the Company to the Administrative Agent to notify) each of the other parties hereto that at least five currently outstanding US Dollar-denominated syndicated credit facilities at such time contain (as a result of an amendment or

[[6082021]]

~~as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review); and~~

~~(2) the joint election by the Administrative Agent and the Company to trigger a fallback from the LIBO Rate and the provision by the Administrative Agent of written notice of such election to the Company and the Lenders.~~

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any member state of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Signature" means an electronic signature, sound, symbol or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means (a) a Lender and (b) any other Person (other than a natural person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person) approved by (i) the Administrative Agent (which approval shall be subject to the last sentence of Section 11.01(b) and shall not be unreasonably withheld or delayed) and (ii) unless an Event of Default under Section 8.01(a), 8.01(b), 8.01(g) or 8.01(h) has occurred and is continuing, the Company (such approval not to be unreasonably withheld or delayed); provided that, notwithstanding the foregoing, "Eligible Assignee" shall not include the Company or any of its Subsidiaries or other Affiliates.

"EMU Legislation" means (a) the Treaty on European Union (the Treaty of Rome of March 25, 1957, as amended by the Single European Act 1986, the Maastricht Treaty of 1992 and the Amsterdam Treaty of 1998), and (b) legislative measures of the European Council (including without limitation European Council regulations) for the introduction of, changeover to or operation of the Euro, in each case as amended or supplemented from time to time.

"Environmental Laws" means any federal, state, local or foreign statute, law, ordinance, code, rule, regulation, order, decree, permit or license by any

Governmental Authority regulating, relating to, or imposing liability or standards of conduct concerning, any environmental matters or conditions or environmental protection or conservation, including without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended; the Superfund Amendments and Reauthorization Act of 1986, as amended; the Resource Conservation and Recovery Act, as amended; the Toxic Substances Control Act, as amended; the Clean Air Act, as amended; the Clean Water Act, as amended; together with all regulations promulgated thereunder, and any other "Superfund" or "Superlien" law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute and all rules and regulations promulgated thereunder.

"ERISA Group" means the Company, any Subsidiary and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with the Company or any Subsidiary, are treated as a single employer under Section 414 of the Code.

"Erroneous Payment Return Deficiency" has the meaning set forth in Section 9.07(b)(iii).

~~"Erroneous Payment Impacted Loan" has the meaning set forth in Section 9.07(b)(iii).~~

"Erroneous Payment Deficiency Assignment" has the meaning set forth in Section 9.07(b)(iii).

"ESTR" means, with respect to any Business Day, a rate per annum equal to the Euro Short Term Rate for such Business Day published by the ESTR Administrator on the ESTR ~~Administrator~~Administrator's Website.

"ESTR Administrator" means the European Central Bank (or any successor administrator of the Euro Short Term Rate).

"E S T R ~~Administrator~~Administrator's Website" means the European Central Bank's website, currently at http://www.ecb.europa.eu, or any successor source for the Euro Short Term Rate identified as such by the ESTR Administrator from time to time.

"ESTR Borrowing" means any Borrowing comprised of ESTR Loans.

~~"ESTR Business Day" means, for any Swing Line Loan or L/C Disbursement denominated in Euro, any day except for (a) a Saturday, (b) a Sunday or (c) a day on which banks are closed for business in Brussels.~~

~~"ESTR Interest Day" has the meaning set forth in the definition of "Daily Simple ESTR".~~

"ESTR Loan" means any Swing Line Loan that is bearing interest at a rate determined by reference to Daily Simple ESTR.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"EURIBO Rate" means, with respect to any EURIBOR Borrowing for any Interest Period, the EURIBO Screen Rate at approximately 11:00 a.m., Brussels time, two TARGET Days prior to the commencement of such Interest Period.

"EURIBO Screen Rate" means a rate per annum equal to the euro interbank offered rate administered by the European Money Markets Institute (or any other Person which takes over the administration of such rate) for the applicable period displayed (before any correction, recalculation or republication by the administrator) on the Reuters screen page that displays such rate (currently EURIBOR01) (or, in the event such rate does not appear on a page of the Reuters screen, on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion); provided that if such rate shall be less than zero, such rate shall be deemed to be zero.

"EURIBOR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted EURIBO Rate.

"Euro" or "€" means the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"Events of Default" has the meaning set forth in Section 8.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the regulations promulgated thereunder.

"Exchange Rate" means, on any day, for purposes of determining the US Dollar Equivalent of any currency other than US Dollars, the rate at which such other currency may be exchanged into US Dollars at the time of determination on such day as last provided (either by publication or as may otherwise be provided to the Administrative Agent) by the applicable Reuters source on the Business Day (determined based on New York City time) immediately preceding such day of determination. In the event that Reuters ceases to provide such rate of exchange or such rate does not appear on the applicable Reuters source, the Exchange Rate shall be determined by reference to such other publicly available service for displaying such rate of exchange at such time as shall be selected by the Administrative Agent from time to time in its reasonable discretion, in consultation with the Company. Notwithstanding the foregoing provisions of this definition, each L/C Issuer may, solely for purposes of computing the L/C Fronting Fees owed to it under Section 2.11(b), compute the US Dollar Equivalent of the

L/C Exposures attributable to Letters of Credit issued by it by reference to exchange rates determined using any reasonable method customarily employed by it for such purpose.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Lender or the Administrative Agent or required to be withheld or deducted from a payment to any Lender or the Administrative Agent: (a) Taxes imposed on its net income (however denominated), and franchise or similar Taxes (including branch profit Taxes) imposed on it, in each case (i) by the jurisdiction under the laws of which such Lender or the Administrative Agent is organized or in which its principal office (or in the case of a Lender, its Applicable Lending Office) is located or any political subdivision thereof and (ii) by reason of any present or former connection between such Lender or the Administrative Agent and the jurisdiction imposing such Taxes, other than solely as a result of this Agreement or any other Loan Document or any transaction contemplated hereby, (b) in the case of a Lender, any ~~U.S.~~US federal withholding Tax imposed on such payment, but not excluding (i) any portion of such Tax that exceeds the ~~U.S.~~US federal withholding Tax that would have been imposed on such a payment to such Lender under the laws in effect on the date on which such Lender first becomes a party to this Agreement or the date on which such Lender changed its lending office and (ii) any portion of such Tax that does not exceed the amount payable to the assignor of such Lender immediately before such Lender became a party to this Agreement or changed its lending office, (c) any ~~U.S.~~US federal withholding Tax imposed under FATCA and (d) Taxes attributable to such Lender's failure to comply with Section 3.05(e).

"Existing Credit Agreement" means the Five-Year Revolving Credit Agreement dated as of December 17, 2018, among the Company, the borrowing subsidiaries party thereto, the lenders party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent, as amended.

"Existing Letter of Credit" means each letter of credit identified on Schedule 2.05A.

"Existing Stated Termination Date" has the meaning specified in Section 2.16(c).

"Extending Lender" has the meaning specified in Section 2.16(a).

"Extension Agreement" means an Extension Agreement, in form and substance reasonably satisfactory to the Administrative Agent, among the Company, the Administrative Agent and one or more Extending Lenders, effecting an Extension Permitted Amendment and such other amendments hereto and to the other Loan Documents as are contemplated by Section 2.16.

"Extension Offer" has the meaning set forth in Section 2.16(a).

"Extension Permitted Amendment" means an amendment to this Agreement and the other Loan Documents effected in connection with an Extension Offer pursuant to Section 2.16, providing for a one year extension of the Stated

Termination Date applicable to the Loans and/or Commitments of the applicable Extension Request Class (such Loans or Commitments being referred to as the "Extended Loans" or "Extended Commitments", as applicable), so long as after giving effect to such extension, the Stated Termination Date as to the Extended Loans or Extended Commitments shall not be more than five years after the date of effectiveness of the applicable Extension Permitted Amendment, and, in connection therewith, if the parties to such amendment shall so agree, (a) a change in the rate of interest accruing on such Extended Loans, (b) a change in the fees payable to, or the inclusion of new fees to be payable to, the Extending Lenders in respect of such Extension Offer or their Extended Loans or Extended Commitments, (c) an addition of any affirmative or negative covenants applicable to the Company and its Subsidiaries; provided that any such additional covenant with which the Company and its Subsidiaries shall be required to comply for the benefit of the Extending Lenders shall also be for the benefit of all other Lenders, and/or (d) any other amendment to this Agreement or the other Loan Documents to the extent such amendment would otherwise be permitted pursuant to, and is adopted in accordance with the consent requirements of, Section 11.06 and such amendment and the related Extension Agreement comply with Section 2.16(b).

"Extension Request Class" has the meaning set forth in Section 2.16(a).

~~"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any intergovernmental agreements between the United States and another country that modify the provisions of the foregoing or law or regulation in any jurisdiction implementing such intergovernmental agreement.~~

"Facility Fee" has the meaning specified in Section 2.11(a).

"Facility Termination Date" means the date on which all of the following shall have occurred: (a) all of the Commitments shall have expired or shall have been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full and all Letters of Credit shall have expired or shall have been terminated, except for such issued and undrawn Letters of Credit that, with the consent of the applicable L/C Issuer, have been fully cash collateralized in a manner consistent with that set forth in clause (ii) of Section 8.01 or otherwise backstopped in a manner satisfactory to the applicable L/C Issuer, and all L/C Disbursements shall have been reimbursed and (b) the Borrowers shall have fully, finally and irrevocably paid and satisfied in full all Obligations (other than Obligations consisting of continuing indemnities and other contingent Obligations of the Borrowers that may be owing to the Administrative Agent, the Lenders, the L/C Issuers or any of the other Indemnified Parties pursuant to the Loan Documents and expressly survive termination of this Agreement).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1)

[[6082021]]

of the Code and any intergovernmental agreements between the United States and another country that modify the provisions of the foregoing or law or regulation in any jurisdiction implementing such intergovernmental agreement.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depository institutions, as determined in such manner as shall be set forth on the ~~NYFRB~~NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; _provided_ that if such rate shall be less than zero, such rate shall be deemed to be zero for all purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America (or any successor body).

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the Relevant Rate.

"Foreign Borrowing Subsidiary" means any Borrowing Subsidiary that is not a Domestic Subsidiary.

"Foreign Lender" means any Lender that is not a US Person.

"Foreign Subsidiary" means any Subsidiary other than a Domestic Subsidiary.

"Fund" means any Person (other than a natural person or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Funded Indebtedness" means with respect to any Person, without duplication, (a) all indebtedness in respect of borrowed money, (b) all obligations under Capital Leases, (c) the deferred purchase price of any property or services that are in the nature of money borrowed, and (d) indebtedness evidenced by a promissory note, bond, debenture or similar written obligation for the payment of money (including non-contingent, past-due obligations under reimbursement agreements and conditional sales or similar title retention agreements), other than (i) trade payables and accrued expenses incurred in the ordinary course of business, and (ii) indebtedness secured by cash deposits subject to a legal right of set-off and not classified as a liability under GAAP.

"GAAP" means generally accepted accounting principles in the United States, being those principles of accounting set forth in pronouncements of the Financial Accounting Standards Board, the American Institute of Certified Public Accountants, or which have other substantial authoritative support and are applicable in the circumstances, as in effect, subject to Section 1.03(a), from time to time.

"<u>Global Tranche Borrower</u>" means (a) the Company, (b) VF International and (c) any Borrowing Subsidiary that has been designated as a Global Tranche Borrower pursuant to Section 2.14.

"<u>Global Tranche Commitment</u>" means, with respect to each Lender, the commitment, if any, of such Lender to make Global Tranche Revolving Loans and to acquire participations in Global Tranche Letters of Credit and Global Tranche Swing Line Loans hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Global Tranche Revolving Credit Exposure, as such commitment may be reduced or increased from time to time pursuant to Section 2.08 or assignments by or to such Lender pursuant to Section 11.01. The initial amount of each Global Tranche Lender's Global Tranche Commitment is set forth on Schedule 2.01, or in the Assignment and Assumption or the Accession Agreement pursuant to which such Global Tranche Lender shall have assumed or provided its Global Tranche Commitment, as the case may be. The aggregate amount of Global Tranche Commitments on the Closing Date is US$2,250,000,000.

"<u>Global Tranche L/C Disbursement</u>" means an L/C Disbursement in respect of a Global Tranche Letter of Credit.

"<u>Global Tranche L/C Exposure</u>" means, at any time, (a) the sum of the US Dollar Equivalents of the undrawn amounts of all outstanding Global Tranche Letters of Credit at such time <u>plus</u> (b) the sum of the US Dollar Equivalents of the amounts of all Global Tranche L/C Disbursements that have not yet been reimbursed by or on behalf of the applicable Borrowers at such time. The Global Tranche L/C Exposure of any Lender at any time shall be its Global Tranche Percentage of the aggregate Global Tranche L/C Exposure at such time, adjusted to give effect to any reallocation under Section 2.15 of the Global Tranche L/C Exposure of Defaulting Lenders in effect at such time.

"<u>Global Tranche Lender</u>" means a Lender with a Global Tranche Commitment or a Global Tranche Revolving Credit Exposure.

"<u>Global Tranche Lending Office</u>" means, with respect to any Global Tranche Lender, such office(s) as such Lender (or any Affiliate of such Lender) shall have specified from time to time as its "Global Tranche Lending Office(s)" by notice to the Company and the Administrative Agent. A Global Tranche Lender may designate different Global Tranche Lending Offices for Loans to Global Tranche Borrowers in different jurisdictions.

"<u>Global Tranche Letter of Credit</u>" means a Letter of Credit designated as such by the Company in accordance with Section 2.05(b).

"<u>Global Tranche Percentage</u>" means, with respect to any Global Tranche Lender at any time, the percentage of the aggregate Global Tranche Commitments represented by such Global Tranche Lender's Global Tranche Commitment at such time; <u>provided</u> that, in the case of Section 2.15 when a Defaulting Lender shall exist, "Global Tranche Percentage" shall mean the percentage of the total Global Tranche Commitments

(disregarding any Defaulting Lender's Global Tranche Commitment) represented by such Lender's Global Tranche Commitment. If the Global Tranche Commitments have expired or been terminated, the Global Tranche Percentages shall be determined on the basis of the Global Tranche Commitments most recently in effect, giving effect to any assignments.

"Global Tranche Revolving Credit Exposure" means, with respect to any Global Tranche Lender at any time, the sum of (a) the aggregate amount of the US Dollar Equivalents of such Global Tranche Lender's outstanding Global Tranche Revolving Loans, (b) such Global Tranche Lender's Global Tranche L/C Exposure and (c) such Global Tranche Lender's Global Tranche Swing Line Exposure.

"Global Tranche Revolving Loans" means Loans made by the Global Tranche Lenders pursuant to Section 2.01(a).

"Global Tranche Swing Line Exposure" means, at any time, the aggregate amount of the US Dollar Equivalents of the Global Tranche Swing Line Loans outstanding at such time. The Global Tranche Swing Line Exposure of any Lender at any time shall be the sum of (a) its Global Tranche Percentage of the aggregate amount of the US Dollar Equivalents of the Global Tranche Swing Line Loans outstanding at such time (excluding, in the case of any Lender that is a Swing Line Lender, Global Tranche Swing Line Loans made by it and outstanding at such time to the extent that the other Global Tranche Lenders shall not have funded their participations in such Global Tranche Swing Line Loans), adjusted to give effect to any reallocation under Section 2.15 of the Global Tranche Swing Line Exposures of Defaulting Lenders in effect at such time, and (b) in the case of any Lender that is a Swing Line Lender, the aggregate principal amount of all Global Tranche Swing Line Loans made by such Lender and outstanding at such time to the extent that the other Global Tranche Lenders shall not have funded their participations in such Global Tranche Swing Line Loans.

"Global Tranche Swing Line Loan" means a Swing Line Loan designated as such by the Company in accordance with Section 2.04(b).

"Governmental Authority" means any federal, state, municipal, national or other governmental department, commission, board, bureau, court, central bank, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States of America, the United States of America or a foreign entity or government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"Guarantee" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Indebtedness of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or

otherwise) and the purpose of such contracts is to provide credit support in the nature of a guaranty or (b) entered into for the purpose of assuring in any other manner the holder of such Indebtedness of the payment thereof or to protect such holder against loss in respect thereof (in whole or in part); provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"Increasing Lenders" has the meaning specified in Section 2.08(d).

"Indebtedness" means, as to any Person, without duplication, (a) all Funded Indebtedness of such Person, (b) all Funded Indebtedness of any other Person secured by any Lien on any property or asset owned or held by such Person, regardless of whether the indebtedness secured thereby shall have been assumed by such Person or is non-recourse to the credit of such Person, other than indebtedness secured by cash deposits subject to a legal right of set-off and not classified as a liability under GAAP, and (c) all Funded Indebtedness of any other Person Guaranteed by such Person.

"Indemnified Party" has the meaning specified in Section 11.09(a).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower under this Agreement or any other Loan Document and (b) to the extent not otherwise described in clause (a) of this definition, Other Taxes.

"Index Debt" means senior, unsecured, long-term Indebtedness for borrowed money of the Company that is not guaranteed by any other Person or subject to any other credit enhancement.

"Information" has the meaning specified in Section 11.13.

"Interest Election Request" means a request by the Company to convert or continue a Borrowing in accordance with Section 2.07, in the form of Exhibit D hereto.

"Interest Payment Date" means (a) with respect to any ABR Loan (other than a Swing Line Loan), the last day of each March, June, September and December, (b) with respect to any ~~LIBOR~~ Daily Simple SOFR Loan (if applicable pursuant to Section 3.02), each date that is numerically corresponding in each calendar month that is one month after the date of the Borrowing of which such Loan is part (or, if there is no such numerically corresponding day of such month, then the last day of such month)[1], (c) with respect to any Term SOFR Loan or EURIBOR Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a ~~LIBOR or~~ Term SOFR Borrowing or EURIBOR Borrowing with an Interest Period of more than

---

[1] Note to Draft: Monthly interest payments requested as a practical administration matter.

three months' duration, each day prior to the last day of such Interest Period that shall occur at an interval of three months' duration after the first day of such Interest Period and (ed) with respect to any Swing Line Loan, the day that such Loan is required to be repaid.

"Interest Period" means with respect to any LIBORTerm SOFR Borrowing or EURIBOR Borrowing, the period commencing on the date of such Borrowing and ending on (a) the numerically corresponding day in the calendar month that is one, three or six months thereafter, in each case (subject to the availability for the Benchmark applicable to the relevant Borrowing) as the Company may elect; provided that (ia) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and, (iib) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (c) no tenor that has been removed from this definition pursuant to Section 3.02(b)(iv) shall be available for specification in any Borrowing Notice or Interest Election Request. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"JPMorgan" means JPMorgan Chase Bank, N.A. and its successors.

"L/C Commitment" means, with respect to any L/C Issuer, the commitment of such L/C Issuer to issue Letters of Credit hereunder, expressed as an amount representing the maximum aggregate amount of the L/C Exposure that may be attributable to Letters of Credit issued by such L/C Issuer. The initial amount of each L/C Issuer's L/C Commitment is set forth in Schedule 2.05B or, in the case of any L/C Issuer that becomes a L/C Issuer hereunder pursuant to Section 2.05(i) or 2.05(k), in its L/C Issuer Agreement. The L/C Commitment of any L/C Issuer may be increased or reduced by written agreement between such L/C Issuer and the Company; provided that a copy of such written agreement shall have been delivered to the Administrative Agent.

"L/C Disbursement" means a payment made by an L/C Issuer pursuant to a Letter of Credit.

"L/C Exposure" means, at any time, the sum of the Global Tranche L/C Exposure and the US Tranche L/C Exposure at such time. The L/C Exposure of any Lender at any time shall be the sum of such Lender's Global Tranche L/C Exposure and US Tranche L/C Exposure.

"L/C Fronting Fee" has the meaning specified in Section 2.11(b).

"L/C Issuer" means JPMorgan, Bank of America, N.A., Barclays Bank PLC, HSBC Bank USA, National Association, U.S. Bank National Association, Wells Fargo Bank, National Association and such other Lenders as may become L/C Issuers hereunder from time to time by entering into L/C Issuer Agreements with the Company pursuant to Section 2.05(i) or 2.05(k), each in its capacity as an issuer of Letters of Credit hereunder, other than any Person that shall have ceased to be an L/C Issuer as provided in Section 2.05(i). Each L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such L/C Issuer, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate (it being agreed that such L/C Issuer shall cause such Affiliate to comply with the requirements of Section 2.05 with respect to such Letters of Credit).

"L/C Issuer Agreement" means an L/C Issuer Agreement between an L/C Issuer, the Administrative Agent and the Company, substantially in the form of Exhibit E.

"L/C Issuer Fee" has the meaning specified in Section 2.11(b).

"L/C Participation Fee" has the meaning specified in Section 2.11(b).

"Lender Parent" means, with respect to any Lender, any Person as to which such Lender is, directly or indirectly, a subsidiary.

"Lender-Related Person" means the Administrative Agent, each Arranger, each Syndication Agent, each Documentation Agent, each L/C Issuer and each Lender, and each Related Party of any of the foregoing Persons.

"Lenders" means the Persons listed on Schedule 2.01, any other Person that shall have become a Lender pursuant to an Assignment and Assumption or Section 2.08(d), other than any such Person that shall have ceased to be a party hereto pursuant to an Assignment and Assumption. Unless the context otherwise requires, the term "Lenders" includes each Swing Line Lender. For all purposes of Article III, the term "Lender" includes each L/C Issuer.

"Letter of Credit" means (a) a letter of credit issued under this Agreement and (b) each of the Existing Letters of Credit.

"Liabilities" means any losses, claims, damages or liabilities of any kind.

"LIBO Rate" means, with respect to any LIBOR Borrowing for any Interest Period, the LIBO Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"LIBO Screen Rate" means a rate per annum equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in US Dollars for the applicable period, as displayed on the Reuters screen page that displays such rate (currently LIBOR01 or LIBOR02) (or, in the event such rate does not appear on a page of

~~the Reuters screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion); provided that if such rate shall be less than zero, such rate shall be deemed to be zero.~~

~~"LIBOR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.~~

"<u>Lien</u>" means any interest in property securing any obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute or contract, and including but not limited to the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes. For the purposes of this Agreement, the Company and any Subsidiary shall be deemed to be the owner of any property which it has acquired or holds subject to a conditional sale agreement, financing lease, or other arrangement pursuant to which title to the property has been retained by or vested in some other Person for security purposes.

"<u>Loan Documents</u>" means this Agreement, each Borrowing Subsidiary Agreement, each Borrowing Subsidiary Termination, each Accession Agreement, each Extension Agreement and, other than for purposes of Section 11.06, each L/C Issuer Agreement, each Swing Line Agreement and the Notes.

"<u>Loans</u>" means the loans made by the Lenders to the Borrowers pursuant to this Agreement.

"<u>Local Time</u>" means (a) with respect to any Swing Line Loan denominated in US Dollars, New York City time and (b) with respect to any Swing Line Loan denominated in Euro, London time.

"<u>Margin Stock</u>" shall have the meaning specified for such term in Regulation U of the <u>Federal Reserve </u>Board ~~of Governors~~.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, financial position or results of operations of the Company and its Subsidiaries, taken as a whole, (b) the ability of the Company to pay or perform its material obligations, liabilities and indebtedness under the Loan Documents as such payment or performance becomes due and payable in accordance with the terms thereof, or (c) the rights, powers and remedies of the Administrative Agent or any Lender under any Loan Document or the validity, legality or enforceability thereof.

"<u>Material Plan</u>" means, at any time, a Plan or Plans having aggregate Unfunded Liabilities in excess of US$100,000,000.

"<u>Maximum Amount</u>" has the meaning specified in Section 11.20(a).

"MNPI" means material information concerning the Company or any of the Subsidiaries or any of its or their respective securities that has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD under the Exchange Act. For purposes of this definition, "material information" means information concerning the Company, the Subsidiaries or any of its or their respective securities that could reasonably be expected to be material for purposes of the United States federal and state securities laws.

"Moody's" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"Multiemployer Plan" means at any time an employee benefit plan within the meaning of Section 4001(a)(3) of ERISA to which any member of the ERISA Group is then making, or is accruing an obligation to make, contributions or has within the preceding five plan years made contributions, including for these purposes any Person which ceased to be a member of the ERISA Group during such five-year period.

"Non-Defaulting Lender" means, at any time, any Lender that is not a Defaulting Lender at such time.

"Notes" means the promissory notes, if any, executed and delivered pursuant to Section 2.09(e).

"Notice of Objection" has the meaning specified in Section 2.14.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" shall mean the rate for a federal funds transaction quoted at 11:00 a.m., New York City time, on such day received to the Administrative Agent from a Federal funds broker of recognized standing selected by it; provided further that, if any of the aforesaid rates shall be less than zero, such rate shall be deemed to be zero.

"~~NYFRB~~NYFRB's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Obligations" means the obligations, liabilities and Indebtedness of the Company and each other Borrower with respect to (a) the principal on the Loans and reimbursement obligations in respect of the L/C Disbursements, and interest thereon, and (b) the payment and performance of all other obligations, liabilities and Indebtedness of the Borrowers to the Lenders, the L/C Issuers or the Administrative Agent hereunder, under any one or more of the other Loan Documents or otherwise with respect to the Loans or Letters of Credit.

"<u>Organizational Documents</u>" means (a) with respect to any corporation, its certificate or articles of incorporation or organization and its by-laws, (b) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (c) with respect to any general partnership, its partnership agreement, (d) with respect to any limited liability company, its articles of organization or certificate of formation and its operating agreement, and (e) with respect to any other form of entity, such other organizational documents required by local law or customary under the jurisdiction of formation of such entity to document the formation and governance principles of such type of entity.

~~"<u>Other Benchmark Rate Election</u>" means, if the then-current Benchmark is the LIBO Rate, the occurrence of:~~

~~(a) a request by the Company to the Administrative Agent to notify each of the other parties hereto that, at the determination of the Company, US Dollar-denominated syndicated credit facilities at such time contain (as a result of an amendment or as originally executed), in lieu of a LIBOR-based rate, a term benchmark rate as a benchmark rate, and~~

~~(b) the Administrative Agent and the Company jointly elect to trigger a fallback from the LIBO Rate and the provision, as applicable, by the Administrative Agent of written notice of such election to the Company and the Lenders.~~

"<u>Other Taxes</u>" has the meaning specified in Section 3.05(b).

"<u>Overnight Bank Funding Rate</u>" means, for any day, the rate comprised of both overnight federal funds and overnight ~~Eurodollar borrowings~~<u>eurodollar transactions denominated</u> in US Dollars by ~~U.S.-managed~~<u>US-managed</u> banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the ~~NYFRB~~<u>NYFRB's</u> Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"<u>Overnight Rate</u>" means, for any day, (a) with respect to any amount denominated in US Dollars, the NYFRB Rate and (b) with respect to any amount denominated in an Alternative Currency, an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"<u>Participant</u>" has the meaning specified in Section 11.01(d).

"<u>Participant Register</u>" has the meaning specified in Section 11.01(g).

"<u>Participating Member State</u>" means each state so described in any EMU Legislation.

"<u>Payment</u>" has the meaning set forth in Section 9.07(b)(i).

"<u>Payment Notice</u>" has the meaning set forth in Section 9.07(b)(ii).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Person" means an individual, partnership, corporation, limited liability company, limited liability partnership, trust, unincorporated organization, association, joint venture or a Governmental Authority.

"Plan" means at any time an employee pension benefit plan (other than a Multiemployer Plan) which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code or Section 302 of ERISA and either (a) is sponsored, maintained, or contributed to, by any member of the ERISA Group for employees of any member of the ERISA Group or (b) has at any time within the preceding five years been sponsored, maintained, or contributed to, by any Person which was at such time a member of the ERISA Group for employees of any Person which was at such time a member of the ERISA Group.

"Platform" means IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by the Administrative Agent to be its electronic transmission system.

"Prime Rate" means the rate of interest last quoted by *The Wall Street Journal* as the "Prime Rate" in the United States or, if *The Wall Street Journal* ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board ~~of Governors~~ in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent in its reasonable discretion, in consultation with the Company) or any similar release by the Federal Reserve Board ~~of Governors~~ (as determined by the Administrative Agent in its reasonable discretion, in consultation with the Company). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Proceeding" means any claim, litigation, investigation, action, suit, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction.

"PTE" means a prohibited transaction class exemption issued by the ~~U.S.~~US Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning specified in Section 6.01.

"Reference Time" with respect to any setting of the then-current Benchmark means (a) if such Benchmark is the ~~LIBO Rate, 11:00 a.m., London~~Term SOFR, 5:00 a.m., Chicago time, on the day that is two ~~London banking days~~US Government Securities Business Days preceding the date of such setting, (b) if such Benchmark is the EURIBO Rate, 11:00 a.m., Brussels time, two TARGET Days preceding the date of such setting, (c) if such Benchmark is Daily Simple ESTR, then one ~~ESTR~~RFR Business Day prior to such setting, (d) if such Benchmark is Daily Simple SOFR, then four RFR Business Days prior to such setting or (~~d~~e) otherwise, the time

determined by the Administrative Agent in its reasonable discretion.

"Refinancing Indebtedness" means, in respect of any Indebtedness (the "Original Indebtedness"), any Indebtedness that extends, renews or refinances such Original Indebtedness (or any Refinancing Indebtedness in respect thereof); provided that (a) the principal amount of such Refinancing Indebtedness shall not exceed the principal amount of such Original Indebtedness; (b) such Refinancing Indebtedness shall not constitute an obligation (including pursuant to a Guarantee) of any Subsidiary that shall not have been (or, in the case of after-acquired Subsidiaries, shall not have been required pursuant to the terms of the Original Indebtedness to become) an obligor in respect of such Original Indebtedness; and (c) such Refinancing Indebtedness shall not be secured by any Lien on any asset other than the assets that secured such Original Indebtedness (or would have been required to secure such Original Indebtedness pursuant to the terms thereof).

"Register" has the meaning specified in Section 11.01(c).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, partners, trustees, employees, agents and advisors of such Person and of such Person's Affiliates.

"Relevant Governmental Body" means (a) with respect to a Benchmark Replacement in respect of Loans denominated in US Dollars, the Federal Reserve Board of Governors and/or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board of Governors and/or the NYFRB or, in each case, any successor thereto, (b) with respect to a Benchmark Replacement in respect of Loans denominated in Euro, the European Central Bank, or a committee officially endorsed or convened by the European Central Bank or, in each case, any successor thereto and (c) with respect to a Benchmark Replacement in respect of Loans denominated in any other currency, (i) the central bank for the currency in which such Benchmark Replacement is denominated or any central bank or other supervisor which is responsible for supervising either (A) such Benchmark Replacement or (B) the administrator of such Benchmark Replacement or (ii) any working group or committee officially endorsed or convened by (A) the central bank for the currency in which such Benchmark Replacement is denominated, (B) any central bank or other supervisor that is responsible for supervising either (1) such Benchmark Replacement or (2) the administrator of such Benchmark Replacement, (C) a group of those central banks or other supervisors or (D) the Financial Stability Board or any part thereof.

"Relevant Interbank Market" means (a) with respect to US Dollars, the London interbank market and (b) with respect to Euro, the European interbank market.

"Relevant Rate" means (a) with respect to any LIBORTerm SOFR Borrowing, the LIBO Rate, (bAdjusted Term SOFR, (b) with respect to any Daily Simple SOFR Borrowing, the Adjusted Daily Simple SOFR and (c) with respect to any EURIBOR Borrowing, the EURIBO Rate and (ed) with respect to any ESTR Borrowing, the Daily Simple ESTR.

"Relevant Screen Rate" means (a) with respect to any ~~LIBOR~~Term SOFR Borrowing, the ~~LIBO Screen~~Term SOFR Reference Rate and (b) with respect to any EURIBOR Borrowing, the EURIBO Screen Rate.

"Required Lenders" means, at any time, Lenders having Revolving Credit Exposure and unused Commitments representing more than 50% of the Aggregate Revolving Credit Exposure and unused Commitments at such time; provided that for purposes of this definition, (a) in determining the Global Tranche Revolving Credit Exposure of any Swing Line Lender, the Global Tranche Swing Line Exposure of such Lender shall be deemed to equal its Global Tranche Percentage of all outstanding Global Tranche Swing Line Loans, but adjusted to give effect to any reallocation under Section 2.15(c) of the Global Tranche Swing Line Exposures of Defaulting Lenders in effect at such time, (b) in determining the US Tranche Revolving Credit Exposure of any Swing Line Lender, the US Tranche Swing Line Exposure of such Lender shall be deemed to equal its US Tranche Percentage of all outstanding US Tranche Swing Line Loans, but adjusted to give effect to any reallocation under Section 2.15(c) of the US Tranche Swing Line Exposures of Defaulting Lenders in effect at such time, and (c) the unused Commitments of any such Lender shall be determined in a manner consistent with the preceding clauses (a) and (b).

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Restricted Obligations" has the meaning specified in Section 11.20(a).

"Reuters" means Thomson Reuters Corporation, Refinitiv or, in each case, a successor thereto.

"Revolving Borrowing" means a Borrowing comprised of Revolving Loans.

"Revolving Credit Exposure" means a Global Tranche Revolving Credit Exposure or a US Tranche Revolving Credit Exposure.

"Revolving Loan" means a Global Tranche Revolving Loan or a US Tranche Revolving Loan, as applicable.

"RFR Borrowing" means any Borrowing comprised of RFR Loans.

"RFR Business Day" means (a) for any Swing Line Loan or L/C Disbursement denominated in Euro, any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which banks are closed for general business in Brussels, and (b) for any Loan denominated in US Dollars, a US Government Securities Business Day.

"RFR Loan" means any Loan that is bearing interest at a rate determined by reference to the Daily Simple RFR.

"S&P" means S&P Global Ratings, a division of S&P Global Inc., and any successor to its rating agency business.

"Sanctioned Country" means, at any time, a country, region or territory which is the subject or target of comprehensive territorial Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the ~~U.S.~~US Department of the Treasury, the ~~U.S.~~US Department of State, the United Nations Security Council, the European Union, any European Union member state to whose jurisdiction the Company or any Subsidiary of the Company is subject or ~~Her~~His Majesty's Treasury of the United Kingdom, (b) any Person located, organized or resident in a Sanctioned Country or (c) any Person 50% or more owned by any Person or Persons described in the foregoing clause (a) and/or, to the knowledge of the Borrowers, clause (b).

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the Office of Foreign Assets Control of the ~~U.S.~~US Department of the Treasury or the ~~U.S.~~US Department of State or (b) the United Nations Security Council, the European Union, any European Union member state to whose jurisdiction the Company or any Subsidiary of the Company is subject or ~~Her~~His Majesty's Treasury of the United Kingdom.

"Significant Subsidiary" means at any time any Subsidiary, except Subsidiaries which at such time have been designated by the Company (by notice to the Administrative Agent, which may be amended from time to time, which notices shall be made available by the Administrative Agent to the Lenders upon request) as nonmaterial and which, if aggregated and considered as a single Subsidiary, would not meet the definition of "significant subsidiary" in Regulation S-X of the Securities and Exchange Commission.

"SOFR" means~~, with respect to any Business Day,~~ a rate ~~per annum~~ equal to the secured overnight financing rate ~~for such Business Day published~~as administered by the SOFR Administrator ~~on the SOFR Administrator Website on the immediately succeeding Business Day~~.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR ~~Administrator~~Administrator's Website" means the ~~NYFRB~~NYFRB's Website or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"Stated Termination Date" means November 24, 2026, subject to the extension thereof pursuant to Section 2.16; provided, however, that the Stated Termination Date for any Lender that is a Declining Lender in respect of any requested extension pursuant to Section 2.16 shall be the Stated Termination Date in effect

immediately prior to the effective date of the applicable Extension Permitted Amendment for all purposes of this Agreement.

"<u>Statutory Reserve Rate</u>" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves), expressed as a decimal, established by the <u>Federal Reserve</u> Board ~~of Governors~~ to which the Administrative Agent is subject with respect to ~~the Adjusted LIBO Rate or~~ the Adjusted EURIBO Rate for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D). Such reserve percentage shall include those imposed pursuant to Regulation D. ~~LIBOR Loans and~~ EURIBOR Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"<u>subsidiary</u>" means, with respect to any Person, any corporation or other Person in which more than 50% of its outstanding Voting Securities or more than 50% of all equity interests is owned directly or indirectly by such Person and/or by one or more of its Subsidiaries.

"<u>Subsidiary</u>" means any subsidiary of the Company.

"<u>Surviving Company</u>" has the meaning specified in Section 7.04.

"<u>Swing Line Agreement</u>" means an instrument executed by the Company, a Lender and the Administrative Agent under which such Lender agrees to serve as a Swing Line Lender and that sets forth the Swing Line Commitment of such Lender.

"<u>Swing Line Commitment</u>" means, with respect to each Swing Line Lender, the commitment of such Swing Line Lender to make Swing Line Loans pursuant to Section 2.04, expressed as an amount representing the maximum aggregate amount of the US Dollar Equivalents of such Swing Line Lender's outstanding Swing Line Loans hereunder. The initial amount of each Swing Line Lender's Swing Line Commitment is set forth on Schedule 2.04 or in its Swing Line Agreement. The Swing Line Commitment of any Swing Line Lender may be increased or reduced by written agreement between such Swing Line Lender and the Company; <u>provided</u> that a copy of such written agreement shall have been delivered to the Administrative Agent.

"<u>Swing Line Exposure</u>" means, at any time, the sum of the Global Tranche Swing Line Exposure and the US Tranche Swing Line Exposure at such time. The Swing Line Exposure of any Lender at any time shall be the sum of such Lender's Global Tranche Swing Line Exposure and US Tranche Swing Line Exposure.

"<u>Swing Line Lender</u>" means each of JPMorgan, in its capacity as a lender of Swing Line Loans pursuant to Section 2.04, and any other Lender that shall have

agreed to serve in such capacity pursuant to a Swing Line Agreement. Any Swing Line Lender may perform any of its obligations in its capacity as such through one or more of its Affiliates.

"Swing Line Loan" means a Loan made pursuant to Section 2.04.

"Swiss Borrower" means any Borrowing Subsidiary incorporated under the laws of Switzerland.

"Swiss Federal Withholding Tax" means any Taxes levied pursuant to the Swiss Federal Act on Withholding Tax (*Bundesgesetz über die Verrechnungssteuer vom 13. Oktober 1965, SR 642.21*), as amended from time to time.

"Syndication Agents" means Bank of America, N.A., Barclays Bank PLC, HSBC Bank USA, National Association, U.S. Bank National Association and Wells Fargo Bank, National Association.

"TARGET~~T2~~" means the ~~Trans-European Automated Real-time Gross Settlement Express Transfer (TARGET2) payment system (or, if such payment~~ real time gross settlement system operated by the Eurosystem (or, if such system ceases to be operative, such other ~~payment~~ system (if any) determined by the Administrative Agent to be a suitable replacement).

"TARGET Day" means any day on which ~~the TARGET~~T2 is open for the settlement of payments in Euro.

"Taxes" means any and all present or future taxes, duties, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges, in each case in the nature of a tax, imposed by any Governmental Authority, and all liabilities (including penalties, interest, and expenses) with respect thereto.

"Term SOFR" means, with respect to any Term SOFR Borrowing and for any tenor comparable to the applicable Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two US Government Securities Business Days prior to the commencement of such tenor comparable to the applicable Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Borrowing" means any Borrowing comprised of Term SOFR Loans.

"Term SOFR Loan" means any Loan that bears interest at a rate determined by reference to Adjusted Term SOFR (other than solely as a result of clause (c) of the definition of "Alternate Base Rate").

"Term SOFR Reference Rate" means, for any day and time (such day, the "Term SOFR Determination Day") , with respect to any Term SOFR Borrowing and for any tenor comparable to the applicable Interest Period, the rate per annum published by the CME Term SOFR Administrator and identified by the Administrative Agent as the

[[6082021]]

forward-looking term rate based on SOFR. If by 5:00 a.m., Chicago time, two US Government Securities Business Days prior to such Term SOFR Determination Day, the "Term SOFR Reference Rate" for the applicable tenor has not been published by the CME Term SOFR Administrator and a Benchmark Replacement Date with respect to Term SOFR has not occurred, then, so long as such day is otherwise a US Government Securities Business Day, the Term SOFR Reference Rate for such Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding US Government Securities Business Day for which such Term SOFR Reference Rate was published by the CME Term SOFR Administrator, so long as such first preceding US Government Securities Business Day is not more than five US Government Securities Business Days prior to such Term SOFR Determination Day.

"<u>Termination Date</u>" means, as to any Lender, the earliest of (a) the Stated Termination Date applicable to such Lender, (b) the date of termination of the Lenders' obligations pursuant to Section 9.01 upon the occurrence of an Event of Default or (c) the date the Company voluntarily and permanently terminates the Commitments in accordance with Section 2.08.

"<u>Term SOFR</u>" means, for the applicable Corresponding Tenor as of the applicable Reference Time, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"<u>Term SOFR Notice</u>" means a notification by the Administrative Agent to the Lenders and the Company of the occurrence of a Term SOFR Transition Event.

"<u>Term SOFR Transition Event</u>" means the determination by the Administrative Agent that (a) Term SOFR has been recommended for use by the Relevant Governmental Body, (b) the administration of Term SOFR is administratively feasible for the Administrative Agent and (c) a Benchmark Transition Event or an Early Opt-in Election, as applicable, has previously occurred resulting in a Benchmark Replacement in accordance with Section 3.02(b) that is not Term SOFR.

"<u>Transactions</u>" means the execution, delivery and performance by the Company and each Borrowing Subsidiary of each Loan Document to which it is to be a party, the borrowing of the Loans and the issuance of the Letters of Credit.

"<u>Trust</u>" means the respective trusts established under those certain deeds of trust dated August 21, 1951, made by John E. Barbey and under the will of John E. Barbey, deceased.

"<u>Type</u>", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate Term SOFR (other than solely as a result of clause (c) of the definition of "Alternate Base Rate"), the Adjusted Daily Simple SOFR (if applicable pursuant to Section 3.02), the Adjusted EURIBO Rate, the Alternate Base Rate or the Daily Simple ESTR or the Alternate Base Rate.

"UK Financial Institutions" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Undisclosed Administration" means, with respect to any Person, the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the applicable law in the country where such Person is subject to home jurisdiction supervision if the applicable law require that such appointment is not to be publicly disclosed.

"Unfunded Liabilities" means, with respect to any Plan at any time, the amount (if any) by which (a) the value of all benefit liabilities under such Plan, determined on a plan termination basis using the assumptions prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds (b) the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions), all determined as of the then most recent valuation date for such Plan, but only to the extent such excess represents a potential liability of a member of the ERISA Group to the PBGC or any other Person under Title IV of ERISA.

"Unrestricted Cash" means, as of any date of determination, cash and cash equivalents owned on such date by the Company and its Subsidiaries; provided that such cash and cash equivalents do not appear (and in accordance with GAAP would not be required to appear) as "restricted" on any consolidated balance sheet of the Company.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"US Borrower" means any Borrower that is a US Person.

"US Borrowing Subsidiary" means any Borrowing Subsidiary that is a Domestic Subsidiary.

"US Dollar Equivalent" means, on any date of determination, (a) with respect to any amount in US Dollars, such amount, and (b) with respect to any amount in any currency other than US Dollars, the equivalent in US Dollars of such amount,

determined by the Administrative Agent pursuant to Section 1.04 using the Exchange Rate with respect to such currency at the time in effect under the provisions of such Section.

"US Dollars" or "US$" means the lawful currency of the United States of America.

"US Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"US Lender" means any Lender that is a US Person.

"US Person" means a "United States person" as defined in Section 7701(a)(30) of the Code.

"US Tranche Borrower" means (a) the Company and (b) any US Borrowing Subsidiary that has been designated as a US Tranche Borrower pursuant to Section 2.14.

"US Tranche Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make US Tranche Revolving Loans and to acquire participations in US Tranche Letters of Credit and US Tranche Swing Line Loans hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's US Tranche Revolving Credit Exposure, as such commitment may be reduced or increased from time to time pursuant to Section 2.08 or assignments by or to such US Tranche Lender pursuant to Section 11.01. The initial amount of each US Tranche Lender's US Tranche Commitment is set forth on Schedule 2.01, or in the Assignment and Assumption or the Accession Agreement pursuant to which such US Tranche Lender shall have assumed or provided its US Tranche Commitment, as the case may be. The aggregate amount of US Tranche Commitments on the Closing Date is US$0.

"US Tranche L/C Disbursement" means an L/C Disbursement in respect of a US Tranche Letter of Credit.

"US Tranche L/C Exposure" means, at any time, (a) the sum of the US Dollar Equivalents of the undrawn amounts of all outstanding US Tranche Letters of Credit at such time plus (b) the sum of the US Dollar Equivalents of the amounts of all US Tranche L/C Disbursements that have not yet been reimbursed by or on behalf of the applicable Borrowers at such time. The US Tranche L/C Exposure of any Lender at any time shall be its US Tranche Percentage of the aggregate US Tranche L/C Exposure at such time, adjusted to give effect to any reallocation under Section 2.15 of the US Tranche L/C Exposure of Defaulting Lenders in effect at such time.

"US Tranche Lender" means a Lender with a US Tranche Commitment or a US Tranche Revolving Credit Exposure.

"US Tranche Lending Office" means, with respect to any US Tranche Lender, such office(s) as such Lender (or any Affiliate of such Lender) shall have

[[6082021]]

specified from time to time as its "US Tranche Lending Office(s)" by notice to the Company and the Administrative Agent.

"US Tranche Letter of Credit" means a Letter of Credit designated as such by the Company in accordance with Section 2.05(b).

"US Tranche Percentage" means, with respect to any US Tranche Lender at any time, the percentage of the aggregate US Tranche Commitments represented by such US Tranche Lender's US Tranche Commitment at such time; provided that, in the case of Section 2.15 when a Defaulting Lender shall exist, "US Tranche Percentage" shall mean the percentage of the total US Tranche Commitments (disregarding any Defaulting Lender's US Tranche Commitment) represented by such Lender's US Tranche Commitment. If the US Tranche Commitments have expired or been terminated, the US Tranche Percentages shall be determined on the basis of the US Tranche Commitments most recently in effect, giving effect to any assignments.

"US Tranche Revolving Credit Exposure" means, with respect to any US Tranche Lender at any time, the sum of (a) the aggregate amount of the US Dollar Equivalents of such US Tranche Lender's outstanding US Tranche Revolving Loans, (b) such US Tranche Lender's US Tranche L/C Exposure and (c) such US Tranche Lender's US Tranche Swing Line Exposure.

"US Tranche Revolving Loans" means Loans made by the US Tranche Lenders pursuant to Section 2.01(b).

"US Tranche Swing Line Exposure" means, at any time, the aggregate amount of the US Dollar Equivalents of the US Tranche Swing Line Loans outstanding at such time. The US Tranche Swing Line Exposure of any Lender at any time shall be the sum of (a) its US Tranche Percentage of the aggregate amount of the US Dollar Equivalents of the US Tranche Swing Line Loans outstanding at such time (excluding, in the case of any Lender that is a Swing Line Lender, US Tranche Swing Line Loans made by it and outstanding at such time to the extent that the other US Tranche Lenders shall not have funded their participations in such US Tranche Swing Line Loans), adjusted to give effect to any reallocation under Section 2.15 of the US Tranche Swing Line Exposures of Defaulting Lenders in effect at such time, and (b) in the case of any Lender that is a Swing Line Lender, the aggregate principal amount of all US Tranche Swing Line Loans made by such Lender and outstanding at such time to the extent that the other US Tranche Lenders shall not have funded their participations in such US Tranche Swing Line Loans.

"US Tranche Swing Line Loan" means a Swing Line Loan designated as such by the Company in accordance with Section 2.04(b).

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"VF International" has the meaning specified in the preamble hereto.

"<u>Voting Securities</u>" means shares of capital stock issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"<u>Wholly Owned Subsidiary</u>" means any Subsidiary all of the shares of capital stock or other ownership interests of which (except directors' qualifying shares and, in the case of any Subsidiary organized in a jurisdiction outside of the United States, shares not exceeding 5% of total shares) are at the time directly or indirectly owned by the Company.

"<u>Write-Down and Conversion Powers</u>" means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.02. <u>Classification of Loans and Borrowings.</u> For purposes of this Agreement, Loans may be classified and referred to by Class (<u>e.g.</u>, a "Global Tranche Revolving Loan") or by Type (<u>e.g.</u>, a "~~LIBOR~~Term SOFR Revolving Loan") or by Class and Type (<u>e.g.</u>, a "Global Tranche ~~LIBOR~~Term SOFR Revolving Loan"). Borrowings also may be classified and referred to by Class (<u>e.g.</u>, a "Global Tranche Borrowing") or by Type (<u>e.g.</u>, a "~~LIBOR~~Term SOFR Borrowing") or by Class and Type (<u>e.g.</u>, a "Global Tranche ~~LIBOR~~Term SOFR Borrowing").

SECTION 1.03. <u>Rules of Interpretation.</u> (a) All accounting terms not specifically defined herein shall have the meanings assigned to such terms, and shall be interpreted in accordance with, GAAP as in effect from time to time; <u>provided</u> that if the Company notifies the Administrative Agent that the Company wishes to amend any covenant in Article VII (including any defined term as used in such Article) to eliminate the effect of any change in GAAP or in the application thereof on the operation of such covenant (or if the Administrative Agent notifies the Company that the Required Lenders wish to amend any covenant in Article VII (including any defined term as used in such Article) for such purpose), then the Company's compliance with such covenant shall be determined on the basis of GAAP as in effect and applied immediately before the relevant change in GAAP or in the application thereof became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to the Company and the Required Lenders. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving

effect to (i) any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Company or any Subsidiary at "fair value" as defined therein, (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof, and (iii) any treatment of any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) would not have been required to be so treated under GAAP as in effect on December 31, 2017, as a result of the effectiveness of the Financial Accounting Standards Board Accounting Standards Codification 842 (or any other Accounting Standards Codification having a similar result or effect) (and related interpretations).

(b)     The headings, subheadings and table of contents used herein or in any other Loan Document are solely for convenience of reference and shall not constitute a part of any such document or affect the meaning, construction or effect of any provision thereof.

(c)     Except as otherwise expressly provided, references in any Loan Document to articles, sections, paragraphs, clauses, annexes, appendices, exhibits and schedules are references to articles, sections, paragraphs, clauses, annexes, appendices, exhibits and schedules in or to such Loan Document.

(d)     All definitions set forth herein or in any other Loan Document shall apply to the singular as well as the plural form of such defined term, and all references to the masculine gender shall include reference to the feminine or neuter gender, and vice versa, as the context may require.

(e)     When used herein or in any other Loan Document, words such as "hereunder", "hereto", "hereof" and "herein" and other words of like import shall, unless the context clearly indicates to the contrary, refer to the whole of the applicable document and not to any particular article, section, subsection, paragraph or clause thereof.

(f)     References to "including" mean including without limiting the generality of any description preceding such term, and for purposes hereof the rule of *ejusdem generis* shall not be applicable to limit a general statement, followed by or referable to an enumeration of specific matters, to matters similar to those specifically mentioned.

(g)     The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. The word "will" shall be construed to have the same meaning and effect as the word "shall".

(h)     Whenever interest rates or fees are established in whole or in part by reference to a numerical percentage expressed as "%", such arithmetic expression shall be interpreted in accordance with the convention that 1% = 100 basis points.

(i)     Each of the parties to the Loan Documents and their counsel have reviewed and revised, or requested (or had the opportunity to request) revisions to, the Loan Documents, and any rule of construction that ambiguities are to be resolved against the drafting party shall be inapplicable in the construing and interpretation of the Loan Documents and all exhibits, schedules and appendices thereto.

(j)     Any reference to an officer of any Borrower or any other Person by reference to the title of such officer shall be deemed to refer to each other officer of such Person, however titled, exercising the same or substantially similar functions.

(k)     Unless the context otherwise requires, any definition of or reference to any agreement, instrument or other document herein (including to any Loan Document) shall be construed as referring to such agreement or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein).

(l)     Unless the context otherwise requires, any definition of or reference to any statute, rule or regulation shall be construed as referring hereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws).

(m)     Unless the context otherwise requires, any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof.

SECTION 1.04. Currency Translation. The Administrative Agent shall determine the US Dollar Equivalent of any Borrowing denominated in Euro (a) as of the date of the commencement of the initial Interest Period therefor (or, in the case of a Swing Line Loan, as of the date on which such Swing Line Loan is made) and (b) as of the date of the commencement of each subsequent Interest Period therefor (or, in the case of a Swing Line Loan, as of each date that shall occur at intervals of three months' duration after the date on which such Swing Line Loan is made), in each case using the Exchange Rate for Euro in relation to US Dollars, and each such amount shall be the US Dollar Equivalent of such Borrowing until the next required calculation thereof pursuant to this sentence. The Administrative Agent shall determine the US Dollar Equivalent of any Letter of Credit denominated in a currency other than US Dollars as of the date such Letter of Credit is issued or amended to increase its face amount and as of the first Business Day of each subsequent calendar quarter, in each case using the Exchange Rate for such currency in relation to US Dollars, and each such amount shall be the US Dollar

Equivalent of such Letter of Credit until the next required calculation thereof pursuant to this sentence. The Administrative Agent shall notify the Company and the Lenders of each calculation of the US Dollar Equivalent of each Borrowing or Letter of Credit.

SECTION 1.05. Interest Rates; Benchmark Notification. The interest rate on any Loan may be derived from an interest rate benchmark that ~~may be discontinued or~~ is, or may in the future become, the subject of regulatory reform. ~~Regulators have signaled the need to use alternative benchmark reference rates for some of these interest rate benchmarks and, as a result, such interest rate benchmarks may cease to comply with applicable laws and regulations, may be permanently discontinued, and/or the basis on which they are calculated may change. The London interbank offered rate is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market. On March 5, 2021, the U.K. Financial Conduct Authority ("FCA") publicly announced that: (a) immediately after December 31, 2021, publication of all seven Euro London interbank offered rate settings, and the 1-week and 2-month US Dollar London interbank offered rate settings will permanently cease; (b) immediately after June 30, 2023, publication of the overnight and 12-month US Dollar London interbank offered rate settings will permanently cease; and (c) immediately after June 30, 2023, the 1-month, 3-month and 6-month US Dollar London interbank offered rate settings will cease to be provided or, subject to the FCA's consideration of the case, be provided on a synthetic basis and no longer be representative of the underlying market and economic reality they are intended to measure and that representativeness will not be restored. There is no assurance that dates announced by the FCA will not change or that the administrator of the London interbank offered rate and/or regulators will not take further action that could impact the availability, composition, or characteristics of the London interbank offered rate or the currencies and/or tenors for which the London interbank offered rate is published. Each party to this Agreement should consult its own advisors to stay informed of any such developments. Public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of the London interbank offered rate.~~ Upon the occurrence of a Benchmark Transition Event~~, a Term SOFR Transition Event, an Early Opt-in Election or an Other Benchmark Rate Election~~, Section 3.02(b) provides a mechanism for determining an alternative rate of interest. The ~~Administrative Agent will promptly notify the Company, pursuant to Section 3.02(b)(iv), of any change to the reference rate upon which the interest rate on LIBOR Loans and EURIBOR Loans is based. However, the~~ Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to ~~the Daily Simple ESTR, the London interbank offered rate or other rates in the definition of "LIBO Rate" or "EURIBO Rate"~~any interest rate used in place of this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof ~~(including (i) any such alternative, successor or replacement rate implemented pursuant to Section 3.02(b), whether upon the occurrence of a Benchmark Transition Event, a Term SOFR Transition Event, an Early Opt-in Election or an Other Benchmark Rate Election, and (ii) the implementation of any Benchmark Replacement Conforming Changes pursuant to Section 3.02(b)(ii))~~, including whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, ~~the Daily Simple ESTR, the LIBO Rate or the EURIBO Rate~~existing interest rate being replaced or have the same volume or liquidity as did ~~the Relevant Screen Rate~~any existing interest rate prior to its discontinuance or unavailability. The Administrative Agent and its Affiliates and/or other related entities may engage in transactions that affect the calculation of ~~the Daily Simple ESTR,~~any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark

[[6082021]]

Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to any Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any ~~Relevant Rate~~interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

SECTION 1.06. Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws) (a "Division"): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its equity interests at such time.

ARTICLE II

The Credits

SECTION 2.01. Commitments. (a) Global Tranche Commitments. Subject to the terms and conditions set forth herein, each Global Tranche Lender agrees to make Global Tranche Revolving Loans (i) denominated in US Dollars to the Company or any Borrowing Subsidiary that is a Domestic Subsidiary and (ii) denominated in any Alternative Currency to the Company or any Borrowing Subsidiary that is a Foreign Subsidiary, from time to time during the Availability Period in principal amounts at any time outstanding that will not (after giving effect to any prepayment of any Global Tranche Borrowing made with the proceeds of such Loans on the same Business Day) result in (i) the Aggregate Global Tranche Revolving Credit Exposure exceeding the aggregate Global Tranche Commitments, (ii) the Global Tranche Revolving Credit Exposure of any Global Tranche Lender exceeding its Global Tranche Commitment or (iii) the Aggregate Revolving Credit Exposure exceeding the aggregate Commitments. Within the foregoing limits and subject to the terms and conditions set forth herein, the Global Tranche Borrowers may borrow, prepay and reborrow Global Tranche Revolving Loans.

(b)   US Tranche Commitments. Subject to the terms and conditions set forth herein, each US Tranche Lender agrees to make US Tranche Revolving Loans denominated in US Dollars or Alternative Currencies to the US Tranche Borrowers from time to time during the Availability Period in principal amounts

at any time outstanding that will not (after giving effect to any prepayment of any US Tranche Borrowing made with the proceeds of such Loans on the same Business Day) result in (i) the Aggregate US Tranche Revolving Credit Exposure exceeding the aggregate US Tranche Commitments, (ii) the US Tranche Revolving Credit Exposure of any US Tranche Lender exceeding its US Tranche Commitment or (iii) the Aggregate Revolving Credit Exposure exceeding the aggregate Commitments. Within the foregoing limits and subject to the terms and conditions set forth herein, the US Tranche Borrowers may borrow, prepay and reborrow US Tranche Revolving Loans.

SECTION 2.02. <u>Loans and Borrowings.</u> (a) Each Global Tranche Revolving Loan shall be made as part of a Global Tranche Borrowing consisting of Global Tranche Revolving Loans of the same Type and currency made by the Global Tranche Lenders ratably in accordance with their respective Global Tranche Commitments. Each US Tranche Revolving Loan shall be made as part of a US Tranche Borrowing consisting of US Tranche Revolving Loans of the same Type and currency made by the US Tranche Lenders ratably in accordance with their respective US Tranche Commitments. Each Swing Line Loan shall be made in accordance with the procedures set forth in Section 2.04. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; <u>provided</u> that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)     Subject to Sections 3.02 and 3.03, (i) each Revolving Borrowing denominated in US Dollars shall be comprised entirely of (A) LIBORTerm SOFR Loans or (B), ABR Loans, or, if applicable pursuant to Section 3.02, Daily Simple SOFR Loans, in each case, as the Company may request in accordance herewith, (ii) each Revolving Borrowing denominated in Euro shall be comprised entirely of EURIBOR Loans, (iii) each Swing Line Loan denominated in US Dollars shall be an ABR Loan and (iv) each Swing Line Loan denominated in Euro shall be an ESTR Loan. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; <u>provided</u> that any exercise of such option (x) shall not affect the obligation of the applicable Borrower to repay such Loan in accordance with the terms of this Agreement and (y) shall be subject to Section 3.06.

(c)     At the commencement of each Interest Period for any LIBORTerm SOFR Borrowing or EURIBOR Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the applicable Borrowing Multiple and not less than the applicable Borrowing Minimum; <u>provided</u> that any LIBORTerm SOFR Borrowing or EURIBOR Borrowing that results from a continuation of an outstanding Borrowing of such Type may be in an aggregate amount that is equal to such outstanding Borrowing. At the time that each ABR Borrowing (other than a Swing Line Loan) or Daily Simple SOFR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of US$1,000,000 and not less than US$5,000,000. Each Swing Line Loan

denominated in US Dollars shall be in an amount that is an integral multiple of US$100,000 and not less than US$500,000. Each Swing Line Loan denominated in Euro shall be in an amount that is an integral multiple of €100,000 and not less than €500,000. Notwithstanding the foregoing, any Borrowing of any Class may be in an aggregate amount that is equal to the entire unused balance of the Commitments of such Class or, in the case of any ABR Borrowing (including a Swing Line Loan denominated in US Dollars) that is required to finance the reimbursement of an L/C Disbursement as contemplated by Section 2.05(e). Borrowings of more than one Type and Class may be outstanding at the same time; <u>provided</u> that there shall not at any time be more than a total of 20 ~~LIBOR~~<u>Term SOFR Borrowings</u> and EURIBOR Borrowings outstanding.

(d)    Notwithstanding any other provision of this Agreement, no Borrower shall be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Stated Termination Date.

SECTION 2.03. <u>Requests for Borrowings.</u> To request a Revolving Borrowing for any Borrower, the Company shall submit to the Administrative Agent, by email (in .pdf or .tif format), a completed Borrowing Notice signed by an Authorized Representative (a) in the case of a ~~LIBOR or EURIBOR~~<u>Term SOFR</u> Borrowing, not later than 1:00 p.m.<u>, New York City time, three US Government Securities Business Days before the date of the proposed Borrowing, (b) in the case of a EURIBOR Borrowing, not later than 1:00 p.m.</u>, New York City time, three Business Days before the date of the proposed Borrowing ~~and~~ (~~b~~<u>c</u>) in the case of an ABR Borrowing, not later than 12:00 noon, New York City time, on the date of the proposed Borrowing <u>and (d) if applicable pursuant to Section 3.02, in the case of a Daily Simple SOFR Borrowing, not later than 1:00 p.m., New York City time, three US Government Securities Business Days before the date of the proposed Borrowing</u>. Each such Borrowing Notice shall specify the following information in compliance with Section 2.02:

(i)    the applicable Borrower in respect of such Borrowing;

(ii)    whether such Borrowing is to be a US Tranche Borrowing or a Global Tranche Borrowing;

(iii)    the Type of such Borrowing;

(iv)    the currency and the principal amount of such Borrowing;

(v)    the date of such Borrowing, which shall be a Business Day;

(vi)    in the case of a ~~LIBOR~~<u>Term SOFR Borrowing</u> or EURIBOR Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(vii)    the location and number of the relevant Borrower's account to which funds are to be disbursed or, in the case of any ABR Revolving Borrowing requested to finance the reimbursement of an L/C Disbursement as contemplated by Section 2.05(e), the identity of the L/C Issuer that made such L/C Disbursement; and

(viii)   in the case of a Borrowing by a Foreign Borrowing Subsidiary, the jurisdiction from which payments of the principal and interest on such Borrowing will be made.

If no election as to the currency of a Revolving Borrowing is specified, then the requested Borrowing shall be denominated in US Dollars. If no election as to the Type of Revolving Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing if denominated in US Dollars or a EURIBOR Borrowing if denominated in Euro. If no election is specified as to the Class of a Revolving Borrowing with respect to which the applicable Borrower is both a US Tranche Borrower and a Global Tranche Borrower, then the requested Borrowing shall be a US Tranche Borrowing (to the extent unused US Tranche Commitments are available in the amount of such Borrowing) and otherwise a Global Tranche Borrowing. If no Interest Period is specified with respect to any requested ~~LIBOR~~Term SOFR Borrowing or EURIBOR Borrowing, then the applicable Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Notice in accordance with this Section (but in any event, if received not later than 3:00 p.m., New York City time, on the same Business Day such Borrowing Notice is received by the Administrative Agent), the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Revolving Borrowing.

SECTION 2.04.  Swing Line Loans.  (a) Subject to the terms and conditions set forth herein, each Swing Line Lender agrees to make Global Tranche Swing Line Loans and US Tranche Swing Line Loans (i) denominated in US Dollars to the Company or any Borrowing Subsidiary that is a Domestic Subsidiary and (ii) denominated in Euro to the Company or any Borrowing Subsidiary, from time to time during the Availability Period, in an aggregate principal amount at any time outstanding that will not result in (A) the sum of the US Dollar Equivalents of the outstanding Swing Line Loans exceeding US$100,000,000, (B) the sum of the US Dollar Equivalents of the outstanding Swing Line Loans made by any Swing Line Lender exceeding its Swing Line Commitment, (C) the Aggregate Global Tranche Revolving Credit Exposure exceeding the aggregate Global Tranche Commitments, (D) the Global Tranche Revolving Credit Exposure of any Lender (including a Swing Line Lender) exceeding its Global Tranche Commitment, (E) the Aggregate US Tranche Revolving Credit Exposure exceeding the aggregate US Tranche Commitments, (F) the US Tranche Revolving Credit Exposure of any Lender (including a Swing Line Lender) exceeding its US Tranche Commitment and (G) in the event the Stated Termination Date shall have been extended as provided in Section 2.16, the Swing Line Exposure of any Class attributable to Swing Line Loans of such Class maturing after any Existing Stated Termination Date and the L/C Exposure of such Class attributable to Letters of Credit of such Class expiring after such Existing Stated Termination Date exceeding the aggregate Commitments of such Class that shall have been extended to a date after the latest maturity date of such Swing Line Loans of

such Class and the latest expiration date of such Letters of Credit of such Class; <u>provided</u> that no Swing Line Lender shall be required to make a Swing Line Loan to refinance an outstanding Swing Line Loan. Within the foregoing limits and subject to the terms and conditions set forth herein, the Company and the Borrowing Subsidiaries may borrow, prepay and reborrow Swing Line Loans. The failure of any Swing Line Lender to make any Swing Line Loan required to be made by it shall not relieve any other Swing Line Lender of its obligations hereunder; <u>provided</u> that the Swing Line Commitment of each Swing Line Lender is several and no Swing Line Lender shall be responsible for any other Swing Line Lender's failure to make Swing Line Loans as required.

(b)     To request a Swing Line Loan, the Company shall submit to the Administrative Agent, by email (in .pdf or .tif format), a completed Borrowing Notice signed by an Authorized Representative not later than 2:00 p.m., Local Time, on the day of such proposed Swing Line Loan. Each such Borrowing Notice shall be irrevocable and shall specify (i) the requested date (which shall be a Business Day), (ii) the currency and principal amount of the requested Swing Line Loan, (iii) whether such Swing Line Loan is to be a Global Tranche Swing Line Loan or a US Tranche Swing Line Loan, (iv) the applicable Borrower and the applicable Swing Line Lender(s) with respect to such Swing Line Loan, (v) the location and number of the relevant Borrower's account to which funds are to be disbursed or, in the case of any Swing Line Loan requested to finance the reimbursement of an L/C Disbursement as contemplated by Section 2.05(e), the identity of the L/C Issuer that made such L/C Disbursement and (vi) in the case of a Swing Line Loan to be made to a Foreign Borrowing Subsidiary, the jurisdiction from which payments of the principal and interest on such Swing Line Loan will be made. The Administrative Agent will promptly advise each applicable Swing Line Lender of any such notice received by it. Each applicable Swing Line Lender shall make its Swing Line Loan available to the applicable Borrower by remittance of the amount thereof to the account so designated (or, in the case of a Swing Line Loan made to finance the reimbursement of an L/C Disbursement as provided in Section 2.05(e), by remittance to the applicable L/C Issuer) by 3:00 p.m., Local Time, on the requested date of such Swing Line Loan.

(c)     Each Swing Line Lender may by written notice given to the Administrative Agent not later than 12:00 noon, New York City time, on any Business Day (i) require the Global Tranche Lenders to acquire participations on such Business Day in all or a portion of the Global Tranche Swing Line Loans outstanding and (ii) require the US Tranche Lenders to acquire participations on such Business Day in all or a portion of the US Tranche Swing Line Loans outstanding. Such notice shall specify the amounts and currencies of the Swing Line Loans in which the Global Tranche Lenders or US Tranche Lenders, as the case may be, will participate. Promptly upon receipt of such notice, the Administrative Agent will give notice thereof to each Global Tranche Lender or US Tranche Lender, as the case may be, specifying in such notice such Lender's Global Tranche Percentage or US Tranche Percentage of such Swing Line Loan or Loans. Each Lender of the applicable Class hereby unconditionally and irrevocably agrees, upon receipt of notice as provided above, to pay to the

Administrative Agent, for the account of such Swing Line Lender, such Lender's Global Tranche Percentage or US Tranche Percentage, as the case may be, of each such Swing Line Loan in the currency of such Loan. Each Lender acknowledges and agrees that, in making any Swing Line Loan, such Swing Line Lender shall be entitled to rely, and shall not incur any liability for relying, upon the representations of the Company made in the applicable Borrowing Notice or deemed made pursuant to Section 4.02, unless, at least one Business Day prior to the time such Swing Line Loan was made, the Required Lenders shall have notified such Swing Line Lender (with a copy to the Administrative Agent) in writing that, as a result of one or more events or circumstances described in such notice, one or more of the conditions precedent set forth in Section 4.02(b) or 4.02(c) would not be satisfied if such Swing Line Loan were then made (it being understood and agreed that, in the event such Swing Line Lender shall have received any such notice, it shall have no obligation to make any Swing Line Loan until and unless it shall be satisfied that the events and circumstances described in such notice shall have been cured or otherwise shall have ceased to exist). Each Lender of any Class further acknowledges and agrees that its obligation to acquire participations in Swing Line Loans of such Class pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or Event of Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Lender shall comply with its obligations under this paragraph by wire transfer of immediately available funds promptly, in the same manner as provided in Section 2.06 with respect to Loans made by such Lender (and Section 2.06 shall apply, mutatis mutandis, to the payment obligations of the Lenders pursuant to this paragraph), and the Administrative Agent shall promptly pay to such Swing Line Lender the amounts so received by them from the applicable Lenders. The Administrative Agent shall notify the Company of any participations in any Swing Line Loan acquired pursuant to this paragraph, and thereafter payments in respect of such Swing Line Loan shall be made to the Administrative Agent and not to such Swing Line Lender.  Any amounts received by such Swing Line Lender from or on behalf of the Company or any Borrowing Subsidiary in respect of a Swing Line Loan after receipt by such Swing Line Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent; any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the applicable Lenders that shall have made their payments pursuant to this paragraph and to such Swing Line Lender, as their interests may appear; provided that any such payment so remitted shall be repaid to such Swing Line Lender or to the Administrative Agent, as applicable, if and to the extent such payment is required to be refunded to the Company or any Borrowing Subsidiary for any reason. The purchase of participations in a Swing Line Loan pursuant to this paragraph shall not relieve the Company or any Borrowing Subsidiary of any default in the payment thereof.

SECTION 2.05. Letters of Credit. (a) General. Subject to the terms and conditions set forth herein, the Company (i) on behalf of itself or any other US Tranche

Borrower, may request the issuance, amendment or extension of US Tranche Letters of Credit and (ii) on behalf of itself or any other Global Tranche Borrower, may request the issuance, amendment or extension of Global Tranche Letters of Credit, in each case for its own account, the account of the applicable Borrower or the account of any Subsidiary (<u>provided</u> that the Company shall be a co-applicant and co-obligor with respect to each Letter of Credit issued for the account of any Subsidiary that is not a Borrower), in a form reasonably acceptable to the applicable L/C Issuer, at any time and from time to time during the Availability Period. Notwithstanding anything contained in any letter of credit application furnished to any L/C Issuer in connection with the issuance of any Letter of Credit, in the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by a Borrower to, or entered into by a Borrower with, an L/C Issuer relating to any Letter of Credit, the terms and conditions of this Agreement shall control. Existing Letters of Credit will, for all purposes of this Agreement (including paragraphs (d) and (e) of this Section), be deemed to have been issued hereunder on the Closing Date as Global Tranche Letters of Credit, and will, for all purposes of this Agreement, constitute Letters of Credit.

(b)     <u>Notice of Issuance, Amendment, Extension; Certain Conditions.</u> (i) To request the issuance of a Letter of Credit or the amendment or extension of an outstanding Letter of Credit (other than an automatic extension permitted pursuant to paragraph (c) of this Section), the Company shall submit, by email (in .pdf or .tif format), to the applicable L/C Issuer and the Administrative Agent not later than 11:00 a.m., New York City time, at least three Business Days (or five Business Days for Letters of Credit denominated in an Alternative Currency), in advance of the requested date of issuance, amendment or extension or, in either case, such later time as the applicable L/C Issuer shall agree, a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended or extended, and specifying the Borrower on whose behalf such Letter of Credit is requested, the Class of such Letter of Credit, the date of issuance, amendment or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section), the amount of such Letter of Credit, the currency in which such Letter of Credit is to be denominated (which shall be US Dollars or any Alternative Currency), the name and address of the beneficiary thereof and such other information as shall be necessary to enable the applicable L/C Issuer to prepare, amend or extend such Letter of Credit. If requested by such L/C Issuer, the applicable Borrower also shall submit a letter of credit application on such L/C Issuer's standard form in connection with any request for a Letter of Credit.

(ii)     A US Tranche Letter of Credit shall be issued, amended or extended only if, after giving effect to such issuance, amendment or extension, (A) the L/C Exposure shall not exceed US$75,000,000, (B) the amount of the L/C Exposure attributable to Letters of Credit issued by an L/C Issuer will not, unless otherwise agreed by such L/C Issuer, exceed its L/C Commitment, (C) the Aggregate US Tranche Revolving Credit Exposure shall not exceed the aggregate US Tranche Commitments, (D) no US Tranche Lender will have a US Tranche Revolving Credit Exposure greater than its US Tranche

Commitment and (E) in the event the Stated Termination Date shall have been extended as provided in Section 2.16, the US Tranche Swing Line Exposure attributable to US Tranche Swing Line Loans maturing after any Existing Stated Termination Date and the US Tranche L/C Exposure attributable to US Tranche Letters of Credit expiring after such Existing Stated Termination Date will not exceed the aggregate US Tranche Commitments that shall have been extended to a date after the latest maturity date of such US Tranche Swing Line Loans and the latest expiration date of such US Tranche Letters of Credit.

(iii)    A Global Tranche Letter of Credit shall be issued, amended or extended only if, after giving effect to such issuance, amendment or extension, (A) the L/C Exposure shall not exceed US$75,000,000, (B) the amount of the L/C Exposure attributable to Letters of Credit issued by an L/C Issuer will not, unless otherwise agreed by such L/C Issuer, exceed its L/C Commitment, (C) the Aggregate Global Tranche Credit Revolving Exposure shall not exceed the aggregate Global Tranche Commitments, (D) no Global Tranche Lender will have a Global Tranche Revolving Credit Exposure greater than its Global Tranche Commitment and (E) in the event the Stated Termination Date shall have been extended as provided in Section 2.16, the Global Tranche Swing Line Exposure attributable to Global Tranche Swing Line Loans maturing after any Existing Stated Termination Date and the Global Tranche L/C Exposure attributable to Global Tranche Letters of Credit expiring after such Existing Stated Termination Date will not exceed the aggregate Global Tranche Commitments that shall have been extended to a date after the latest maturity date of such Global Tranche Swing Line Loans and the latest expiration date of such Global Tranche Letters of Credit.

(iv)    No L/C Issuer shall be under any obligation to issue (but may issue) any Letter of Credit if (A) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such L/C Issuer from issuing such Letter of Credit, (B) any law applicable to such L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such L/C Issuer shall prohibit, or request that such L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date and which such L/C Issuer in good faith deems material, (C) the issuance of such Letter of Credit shall impose upon such L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which such L/C Issuer in good faith deems material, (D) the issuance of such Letter of Credit would violate one or more policies of such L/C Issuer applicable to letters of credit generally or (E) such Letter of Credit shall be a trade or commercial Letter of Credit.

(c)    Expiration Date. Each Letter of Credit will expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of an extension thereof, one year after such extension) and (ii) the date that is five Business Days prior to the Stated Termination Date (giving effect to any extensions thereof pursuant to Section 2.16); provided that any Letter of Credit may contain customary automatic extension provisions agreed upon by the Company and the applicable L/C Issuer

pursuant to which the expiration date of such Letter of Credit shall automatically be extended for a period of up to 12 months (but not to a date later than the date set forth in clause (ii) above), subject to a right on the part of such L/C Issuer to prevent any such extension from occurring by giving notice to the beneficiary at least a specified time (as agreed upon by the Company and the applicable L/C Issuer) in advance of any such extension.

(d)      Participations. (i) By the issuance of a US Tranche Letter of Credit (or an amendment to a US Tranche Letter of Credit increasing the amount thereof) and without any further action on the part of the applicable L/C Issuer or the US Tranche Lenders, such L/C Issuer hereby grants to each US Tranche Lender, and each US Tranche Lender hereby acquires from such L/C Issuer, a participation in such US Tranche Letter of Credit equal to such Lender's US Tranche Percentage of the aggregate amount available to be drawn under such US Tranche Letter of Credit. In consideration and in furtherance of the foregoing, each US Tranche Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the applicable L/C Issuer, such Lender's US Tranche Percentage of each US Tranche L/C Disbursement made by such L/C Issuer and not reimbursed by the applicable Borrower on the date due as provided in paragraph (e) of this Section, or of any reimbursement payment in respect of a US Tranche L/C Disbursement required to be refunded to the applicable Borrower for any reason.

(ii)      By the issuance of a Global Tranche Letter of Credit (or an amendment to a Global Tranche Letter of Credit increasing the amount thereof) and without any further action on the part of the applicable L/C Issuer or the Global Tranche Lenders, such L/C Issuer hereby grants to each Global Tranche Lender, and each Global Tranche Lender hereby acquires from such L/C Issuer, a participation in such Global Tranche Letter of Credit equal to such Lender's Global Tranche Percentage of the aggregate amount available to be drawn under such Global Tranche Letter of Credit. In consideration and in furtherance of the foregoing, each Global Tranche Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the applicable L/C Issuer, such Lender's Global Tranche Percentage of each Global Tranche L/C Disbursement made by such L/C Issuer and not reimbursed by the applicable Borrower on the date due as provided in paragraph (e) of this Section, or of any reimbursement payment in respect of a Global Tranche L/C Disbursement required to be refunded to the applicable Borrower for any reason, including after the Termination Date.

(iii)      Any payment by the US Tranche Lenders or the Global Tranche Lenders, as applicable, in accordance with the foregoing clauses (i) and (ii) shall be made in the currency of such L/C Disbursement.

(iv)      Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph (d) in respect of US Tranche Letters of Credit or Global Tranche Letters of Credit, as applicable, is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment or extension of any Letter of Credit, the occurrence and continuance of a Default or Event of Default, any reduction or termination of the Commitments, any fluctuation in currency values or any

*force majeure* or other event that under any rule of law or uniform practices to which any Letter of Credit is subject (including Section 3.14 of ISP 98 or any successor publication of the International Chamber of Commerce) permits a drawing to be made under such Letter of Credit after the expiration thereof or of the applicable Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever; <u>provided</u> that on the Facility Termination Date, the Lenders shall cease to have any participation obligations in respect of any undrawn Letters of Credit that shall have been cash collateralized or otherwise backstopped as contemplated by the definition of the term "Facility Termination Date". Each Lender further acknowledges and agrees that, in issuing, amending or extending any Letter of Credit, the applicable L/C Issuer shall be entitled to rely, and shall not incur any liability for relying, upon the representation and warranty of the applicable Borrower deemed made pursuant to Section 4.02 unless, at least one Business Day prior to the time such Letter of Credit is issued, amended or extended (or, in the case of an automatic extension permitted pursuant to paragraph (c) of this Section, at least one Business Day prior to the time by which the election not to extend must be made by the applicable L/C Issuer), a majority in interest of the Lenders that would acquire participations in such Letter of Credit pursuant to this paragraph (d) shall have notified the applicable L/C Issuer (with a copy to the Administrative Agent) in writing that, as a result of one or more events or circumstances described in such notice, one or more of the conditions precedent set forth in Section 4.02(b) or 4.02(c) would not be satisfied if such Letter of Credit were then issued, amended or extended (it being understood and agreed that, in the event any L/C Issuer shall have received any such notice, it shall have no obligation to issue, amend or extend any Letter of Credit until and unless it shall be satisfied that the events and circumstances described in such notice shall have been cured or otherwise shall have ceased to exist).

(e)     <u>Reimbursement.</u> If an L/C Issuer shall make any L/C Disbursement in respect of a Letter of Credit, the applicable Borrower shall reimburse such L/C Disbursement by paying to the Administrative Agent an amount in the currency of such L/C Disbursement equal to such L/C Disbursement not later than 2:00 p.m., New York City time, on the Business Day immediately following the day on which the applicable Borrower shall have received notice of such L/C Disbursement; <u>provided</u> that, if such L/C Disbursement is denominated in US Dollars and is not less than US$1,000,000, subject to the conditions to borrowing set forth herein, the Company may request (i) in accordance with Section 2.03 that such payment be financed with an ABR Revolving Borrowing or (ii) in accordance with Section 2.04 that such payment be financed with a Swing Line Loan, in each case of the applicable Class and in an equivalent amount and, to the extent so financed, such Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Revolving Borrowing or Swing Line Loan, as applicable. If the applicable Borrower fails to make any such reimbursement payment when due, the Administrative Agent shall notify each applicable Lender of such L/C Disbursement, the amount of the payment then due from such Borrower in respect thereof and such Lender's US Tranche Percentage or Global Tranche Percentage, as applicable, thereof. Promptly following receipt of such notice (and, in any event, no later than the immediately following Business Day), each applicable

Lender shall pay to the Administrative Agent on the date such notice is received its US Tranche Percentage or Global Tranche Percentage, as applicable, of the applicable L/C Disbursement payment then due from such Borrower in the currency of such L/C Disbursement and in the same manner as provided in Section 2.06 with respect to Loans made by such Lender (and Section 2.06 shall apply, mutatis mutandis, to the payment obligations of the Lenders pursuant to this paragraph), and the Administrative Agent shall promptly pay to the applicable L/C Issuer the amounts so received by it from such Lenders. Promptly following receipt by the Administrative Agent of any payment from a Borrower pursuant to this paragraph, the Administrative Agent shall distribute such payment to the applicable L/C Issuer or, to the extent that Lenders have made payments pursuant to this paragraph to reimburse such L/C Issuer, then to such Lenders and such L/C Issuer as their interests may appear. Any payment made by a Lender pursuant to this paragraph to reimburse an L/C Issuer for any L/C Disbursement (other than the funding of an ABR Revolving Loan or a Swing Line Loan as contemplated above) shall not constitute a Loan and shall not relieve the applicable Borrower of its obligation to reimburse such L/C Disbursement.

(f)    Obligations Absolute. Each Borrower's obligation to reimburse L/C Disbursements as provided in paragraph (e) of this Section is absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, this Agreement or any other Loan Document, or any term or provision herein or therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by any L/C Issuer under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, (iv) any *force majeure* or other event that under any rule of law or uniform practices to which any Letter of Credit is subject (including Section 3.14 of ISP 98 or any successor publication of the International Chamber of Commerce) permits a drawing to be made under such Letter of Credit after the stated expiration date thereof or of the applicable Commitments or (v) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of set-off against, such Borrower's obligations hereunder. None of the Administrative Agent, the Lenders, the L/C Issuers or any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms, any error in translation or any consequence arising from any other act, failure to act or other event or circumstance; provided that the foregoing shall not be construed to excuse any L/C Issuer from liability to

Borrower to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by each Borrower to the fullest extent permitted by applicable law) suffered by such Borrower that are found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such L/C Issuer's gross negligence or willful misconduct. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented that appear on their face to be in substantial compliance with the terms of a Letter of Credit, the applicable L/C Issuer may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)    Disbursement Procedures. The applicable L/C Issuer shall, within the time allowed by applicable law or the specific terms of such Letter of Credit, examine all documents purporting to represent a demand for payment under a Letter of Credit. The applicable L/C Issuer shall promptly after such examination notify the Administrative Agent and the applicable Borrower by telephone (confirmed by email) of such demand for payment and whether such L/C Issuer has made or will make an L/C Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the applicable Borrower of its obligation to reimburse such L/C Issuer and the applicable Lenders with respect to any such L/C Disbursement.

(h)    Interim Interest. If an L/C Issuer shall make any L/C Disbursement, then, unless the applicable Borrower shall reimburse such L/C Disbursement in full on the date such L/C Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such L/C Disbursement is made to but excluding the date that the applicable Borrower reimburses such L/C Disbursement, (i) in the case of an L/C Disbursement made in US Dollars, at the rate per annum then applicable to ABR Revolving Loans and (ii) in the case of an L/C Disbursement made in any Alternative Currency, the applicable Alternative Currency Overnight Rate plus the Applicable Rate applicable to ~~LIBOR Revolving~~Term SOFR Loans at such time; provided that, if the applicable Borrower fails to reimburse any L/C Disbursement when due and payable pursuant to paragraph (e) of this Section, then Section 2.12(e̶f) shall apply. Interest accrued pursuant to this paragraph shall be paid to the Administrative Agent, for the account of the applicable L/C Issuer (except that interest accrued on and after the date of payment by any applicable Lender pursuant to paragraph (e) of this Section to reimburse such L/C Issuer shall be paid to the Administrative Agent for the account of such Lender), and shall be payable on the date on which the applicable Borrower is required to reimburse the applicable L/C Disbursement (and thereafter on demand).

(i)    Replacement of an L/C Issuer. An L/C Issuer may be replaced at any time by written agreement among the Company, the Administrative Agent,

[[6082021]]

the replaced L/C Issuer and the successor L/C Issuer that agrees to act in such capacity in accordance with Section 2.05(k). The Administrative Agent shall notify the Lenders of any such replacement of an L/C Issuer.  At the time any such replacement shall become effective, the Borrowers shall pay all unpaid fees accrued for the account of the replaced L/C Issuer pursuant to Section 2.11(b). From and after the effective date of any such replacement, (i) the successor L/C Issuer shall have all the rights and obligations of an L/C Issuer under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "L/C Issuer" shall be deemed to refer to such successor or to any previous L/C Issuer, or to such successor and all previous L/C Issuers, as the context shall require. After the replacement of an L/C Issuer hereunder, the replaced L/C Issuer shall remain a party hereto and shall continue to have all the rights and obligations of an L/C Issuer under this Agreement with respect to Letters of Credit issued by it prior to such replacement (including the right to receive fees under Section 2.11(b)), but shall not be required to issue additional Letters of Credit.

(j)    Cash Collateralization. If any Event of Default shall occur and be continuing, on the Business Day that the Company receives notice from the Administrative Agent or the Required Lenders (or, if the maturity of the Loans has been accelerated, Lenders with L/C Exposures representing more than 50% of the L/C Exposure) demanding the deposit of cash collateral pursuant to this paragraph, each Borrower shall deposit in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the applicable Lenders and the L/C Issuers, an amount equal to the portion of the L/C Exposure attributable to each Letter of Credit issued for the account of such Borrower as of such date plus any accrued and unpaid interest thereon in cash and in the currency of such Letter of Credit; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to any Borrower described in Section 8.01(g) or 8.01(h). The Borrowers shall also deposit cash collateral in accordance with this paragraph as and to the extent required by Section 2.15. Such deposit shall be held by the Administrative Agent as collateral for the payment and performance of the Obligations of the applicable Borrower in connection with the applicable Letters of Credit and otherwise as expressly set forth below, and the applicable Borrower hereby creates in favor of the Administrative Agent a security interest in each such deposit to secure such Obligations. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the applicable Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys of a Borrower in such account shall, notwithstanding anything to the contrary in Section 2.13(b), be applied by the Administrative Agent to reimburse the L/C Issuers for L/C Disbursements in respect of Letters of Credit issued for the account of such Borrower (or, in the case of moneys deposited by the

Company, the other Borrowers) for which they have not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of such Borrower (or, in the case of moneys deposited by the Company, the other Borrowers) for the L/C Exposure in respect of Letters of Credit issued for the account of such Borrower (or, in the case of moneys deposited by the Company, the other Borrowers) at such time or, if the maturity of the Loans has been accelerated (but subject to (i) the consent of Lenders with L/C Exposure representing more than 50% of the L/C Exposure and (ii) in the case of any such application at a time when any Lender is a Defaulting Lender (but only if, after giving effect thereto, the remaining cash collateral in respect of the L/C Exposure shall be less than the aggregate L/C Exposure of all the Defaulting Lenders) the consent of each L/C Issuer), be applied to satisfy other obligations of such Borrower (or, in the case of moneys deposited by the Company, the other Borrowers) under this Agreement. If a Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to such Borrower within three Business Days after all Events of Default have been cured or waived. If any Borrower is required to provide an amount of cash collateral hereunder pursuant to Section 2.15, such amount (to the extent not applied as aforesaid) shall be returned to such Borrower as promptly as practicable (and in no event more than three Business Days) to the extent that, after giving effect to such return, no L/C Issuer shall have any exposure in respect of any outstanding Letter of Credit that is not fully covered by the Commitments of the Non-Defaulting Lenders and/or the remaining cash collateral.

(k)     Designation of Additional L/C Issuers. From time to time, the Company may by notice to the Administrative Agent and the Lenders designate as additional L/C Issuers one or more Lenders (or Affiliates of Lenders) that agree to serve in such capacity as provided below. The acceptance by a Lender (or an Affiliate of a Lender) of any appointment as an L/C Issuer hereunder shall be evidenced by an L/C Issuer Agreement, which shall set forth the L/C Commitment of such Lender (or Affiliate) and be executed by such Lender (or Affiliate), the Company and the Administrative Agent and, from and after the effective date of such agreement, (i) such Lender (or Affiliate) shall have all the rights and obligations of an L/C Issuer under this Agreement and the other Loan Documents and (ii) references herein and in the other Loan Documents to the term "L/C Issuer" shall be deemed to include such Lender in its capacity as an L/C Issuer. The L/C Issuer Agreement of any L/C Issuer may limit the currencies in which and the Borrowers for the accounts of which such L/C Issuer will issue Letters of Credit, and any such limitations will, as to such L/C Issuer, be deemed to be incorporated into this Agreement.

(l)     L/C Issuer Reports. Unless otherwise agreed by the Administrative Agent, each L/C Issuer shall report in writing to the Administrative Agent such information as the Administrative Agent shall reasonably request as to the Letters of Credit issued by such L/C Issuer.

(m)   <u>L/C Exposure Determination</u>. For all purposes of this Agreement, (i) the amount of a Letter of Credit that, by its terms or the terms of any document related thereto, provides for one or more automatic increases in the stated amount thereof shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases (other than any such increase consisting of the reinstatement of an amount previously drawn thereunder and reimbursed), whether or not such maximum stated amount is in effect at the time of determination (provided that, at any time of determination, any fees payable pursuant to Section 2.11(b) shall at all times be calculated based on the maximum stated amount of the Letter of Credit rather than the maximum stated amount thereof after giving effect to any such future increases) and (ii) if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Article 29(a) of the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600 (or such later version thereof as may be in effect at the applicable time) or Rule 3.13 or Rule 3.14 of the ISP or similar terms of the Letter of Credit itself, or if compliant documents have been presented but not yet honored, such Letter of Credit shall be deemed to be "outstanding" and "undrawn" in the amount so remaining available to be paid, and the obligations of the applicable Borrower and each Lender of the applicable Class hereunder shall remain in full force and effect until the L/C Issuers and the Lenders shall have no further obligations to make any payments or disbursements under any circumstances with respect to any Letter of Credit.

(n)   <u>Letters of Credit Issued for Account of Subsidiaries</u>. Notwithstanding that a Letter of Credit issued or outstanding hereunder supports any obligations of, or is for the account of, a Subsidiary (other than a Borrowing Subsidiary), or states that a Subsidiary (other than a Borrowing Subsidiary) is the "account party", "applicant", "customer", "instructing party", or the like of or for such Letter of Credit, and without derogating from any rights of the applicable L/C Issuer (whether arising by contract, at law, in equity or otherwise) against such Subsidiary in respect of such Letter of Credit, the Company (i) shall reimburse, indemnify and compensate the applicable L/C Issuer hereunder for such Letter of Credit (including to reimburse any and all drawings thereunder, the payment of interest thereon and the payment of fees due under Section 2.11(b)) as if such Letter of Credit had been issued solely for the account of the Company and (ii) irrevocably waives any and all defenses that might otherwise be available to it as a guarantor or surety of any or all of the obligations of such Subsidiary in respect of such Letter of Credit. Each Borrower hereby acknowledges that the issuance of Letters of Credit for its Subsidiaries inures to the benefit of such Borrower, and that such Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

SECTION 2.06. <u>Funding of Borrowings.</u> (a) Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds in the applicable currency by (i) in the case of a ~~LIBOR~~Term SOFR Borrowing, a EURIBOR Borrowing or ~~EURIBOR~~, if applicable pursuant to Section 3.02, a Daily Simple SOFR Borrowing, 10:00 a.m., New York City

time, and (ii) in the case of an ABR Borrowing, 1:00 p.m., New York City time, in each case to the account of the Administrative Agent most recently designated by the Administrative Agent for such purpose by notice to the applicable Lenders; provided that Swing Line Loans shall be made as provided in Section 2.04. The Administrative Agent will make such Loan proceeds available to the applicable Borrower by promptly remitting the amounts so received, in like funds, to the account designated in the applicable Borrowing Notice; provided that ABR Revolving Loans made to finance the reimbursement of an L/C Disbursement as provided in Section 2.05(e) shall be remitted by the Administrative Agent to the applicable L/C Issuer specified in the applicable Borrowing Notice. If a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, the Administrative Agent shall return the amounts so received to the respective Lenders.

(b)       Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the applicable Borrower on such date a corresponding amount in the required currency. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and such Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to such Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, (A) if denominated in US Dollars, the greater of (x) the NYFRB Rate and (y) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (B) if denominated in any other currency, the greater of (x) the rate reasonably determined by the Administrative Agent to be the cost to it of funding such amount (which determination will be conclusive absent manifest error, it being understood that the Administrative Agent may, in its sole discretion, for such purpose deem its cost of funds to be equal to the Alternative Currency Overnight Rate) and (y) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of such Borrower, the interest rate applicable to the subject Loan pursuant to Section 2.12. If such Borrower and such Lender shall both pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to such Borrower the amount of such interest paid by such Borrower for such period. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing. Any payment by any Borrower shall be without prejudice to any claim such Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.07. Interest Elections. (a) Each Revolving Borrowing initially shall be of the Class and Type specified in the applicable Borrowing Notice and, in the case of a ~~LIBOR~~Term SOFR Borrowing or EURIBOR Borrowing, shall have an

initial Interest Period as specified in such Borrowing Notice or as otherwise provided in Section 2.03. Thereafter, the Company may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a ~~LIBOR~~Term SOFR Borrowing or EURIBOR Borrowing, may elect Interest Periods therefor, all as provided in this Section and on terms consistent with the other provisions of this Agreement. The Company may elect different options with respect to different portions of the applicable affected Revolving Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing and the Loans comprising each such portion shall be considered a separate Borrowing. This Section shall not apply to Swing Line Loans, which may not be converted or continued. Notwithstanding any other provision of this Section, the Company shall not be permitted to change the Class or, except as permitted in Section 3.03, the currency of any Borrowing or elect an Interest Period for a ~~LIBOR~~Term SOFR Borrowing or EURIBOR Borrowing that does not comply with Section 2.02(b).

(b)    To make an election pursuant to this Section, the Company shall submit to the Administrative Agent, by email (in .pdf or .tif format), a completed Interest Election Request signed by an Authorized Representative by the time and date that a Borrowing Notice would be required under Section 2.03 if the Company were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    the Type of the resulting Borrowing; and

(iv)    if the resulting Borrowing is to be a ~~LIBOR~~Term SOFR Borrowing or EURIBOR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If by any such Interest Election Request the Company requests a ~~LIBOR~~Term SOFR Borrowing or EURIBOR Borrowing but does not specify an Interest Period, then the Company shall be deemed to have selected an Interest Period of one month's duration.

(c)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of such Lender's portion of each resulting Borrowing.

(d)    If the Company fails to deliver a timely Interest Election Request with respect to a ~~LIBOR~~Term SOFR Borrowing or EURIBOR Borrowing prior to

the end of the Interest Period applicable thereto, then, unless such Borrowing is prepaid in accordance with the provisions of Section 2.10, at the end of such Interest Period such Borrowing shall be continued as a Borrowing of the applicable Type for an Interest Period of one month.

( e )    Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Company, then, so long as an Event of Default is continuing (i) no outstanding Borrowing denominated in US Dollars may be converted to or continued as a ~~LIBOR~~Term SOFR Borrowing, (ii) unless repaid, each ~~LIBOR~~Term SOFR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto and (iii) subject to Section 3.02, unless repaid, each EURIBOR Borrowing shall be continued as a EURIBOR Borrowing with an Interest Period of one month's duration. The foregoing is without prejudice to the other rights and remedies available hereunder upon an Event of Default.

SECTION 2.08. Termination, Reduction and Increase of Commitments; Redesignation of Commitments. (a) Unless previously terminated, the Commitments shall terminate on the Stated Termination Date.

(b)    The Company may, upon prior written notice to the Administrative Agent specifying the effective date thereof, terminate, or from time to time permanently reduce, the Commitments of any Class; provided that (i) each such reduction of the Commitments of any Class shall be in an amount that is not less than the Borrowing Minimum and an integral multiple of the Borrowing Multiple, in each case for Borrowings denominated in US Dollars (or, if less, the entire remaining amount of the Commitments of such Class), (ii) the Company shall not terminate or reduce the Commitments of any Class if after giving effect to such termination or reduction and to any concurrent payment or prepayment of Loans or L/C Disbursements, (A) the aggregate Revolving Credit Exposure of such Class would exceed the aggregate amount of Commitments of such Class, (B) the Aggregate Revolving Credit Exposure would exceed the aggregate Commitments or (C) the Revolving Credit Exposure of such Class of any Lender would exceed its Commitment of such Class and (iii) if an Event of Default shall have occurred and be continuing, the Company shall not terminate or reduce the Commitments of any Class unless it shall simultaneously and ratably reduce the Commitments of the other Class.

(c)    Promptly following receipt of notice from the Company pursuant to paragraph (b) of this Section, the Administrative Agent shall advise the applicable Lenders of the contents thereof. Each notice delivered by the Company pursuant to this Section shall be irrevocable; provided that a notice of termination of the Commitments of any Class may state that such notice is conditioned upon the effectiveness of other credit facilities or the completion of other transactions, in which case such notice may be revoked or extended by the Company (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied or the satisfaction of such

condition is delayed. Any termination or reduction of the Commitments of any Class shall be permanent. Each reduction of the Commitments of any Class shall be made ratably among the Lenders of such Class in accordance with their respective Commitments of such Class.

(d)    (i)The Company, the Administrative Agent and any Lender or any other Person qualifying as an Eligible Assignee or any combination of such Lenders and such Persons (collectively, "Increasing Lenders"), may (in their sole discretion) enter into one or more amendment agreements substantially in the form of Exhibit F hereto (each an "Accession Agreement") without further approval of the other Lenders or any other Borrower, pursuant to which the Increasing Lenders agree to establish or increase, as the case may be, Global Tranche Commitments or US Tranche Commitments in an aggregate amount for all Commitments so established or increased pursuant to this paragraph during the term of this Agreement not to exceed US$750,000,000; provided that:

(A)    each such increase shall be in an amount equal to US$20,000,000 or an integral multiple of US$5,000,000 in excess thereof;

(B)    each Borrower shall execute and deliver to the Administrative Agent (1) board resolutions of such Borrower certified by its secretary or assistant secretary authorizing such increase and (2) a legal opinion of either the General Counsel of such Borrower or special counsel to such Borrower as to the due authorization, execution and delivery of this Agreement, as modified by such increase, the enforceability thereof and the absence of conflicts with the Organizational Documents and material agreements of such Borrower, all in form and substance substantially similar to such opinions delivered on the Closing Date in satisfaction of Section 4.01(a)(ii);

(C)    the Company shall deliver to the Administrative Agent a certificate of an Authorized Representative certifying that no Default or Event of Default then exists or would arise as a result of any such increase; and

(D)    if such Increasing Lender is not already a Lender hereunder, each Increasing Lender shall be subject to the approval of the Administrative Agent, each L/C Issuer and each Swing Line Lender (in each case, which approval shall not be unreasonably withheld, delayed or conditioned).

(ii)    Upon the execution, delivery and acceptance of the documents required by this Section 2.08(d), each Increasing Lender shall have all the rights and obligations of a Lender under this Agreement. The Administrative Agent shall provide the Lenders with notice of the revised Commitments of the Lenders, including the Increasing Lenders.

Upon the effectiveness of an increase provided for in this Section 2.08(d), if any Loans of a Class affected by such increase are then outstanding, each applicable Borrower shall prepay to certain Lenders amounts of such Loans outstanding (including any additional amounts required pursuant to Section 3.04) and borrow from certain other

Lenders new Loans as necessary so that, after giving effect to such prepayments and borrowings on such date, the percentage of the principal balance of all outstanding Loans of the applicable Class owing to each Lender is equivalent to each such Lender's ratable percentage (based on its Commitment, and the Commitments of the other Lenders, of such Class) of all such outstanding Loans of such Class after giving effect to any nonratable increase in the Commitments of such Class resulting from the exercise of an increase pursuant to this Section 2.08(d).

(e)     Notwithstanding anything in this Agreement to the contrary, any US Tranche Lender (a "Converting Lender") may elect to convert its US Tranche Commitment, in whole but not in part, to a Global Tranche Commitment with the consent of the Company and pursuant to an agreement entered into by such US Tranche Lender, the Administrative Agent and the Company (a " Conversion Agreement"); provided that, after giving effect to such conversion and to the transactions provided for in this Section 2.08(e), (i) the aggregate US Tranche Revolving Credit Exposure will not exceed the aggregate US Tranche Commitments and (ii) the US Tranche Revolving Credit Exposure of any US Tranche Lender will not exceed its US Tranche Commitment. On the effective date of any such conversion (which shall be the date specified in the applicable Conversion Agreement), (A) the US Tranche Commitment of such Converting Lender shall become a Global Tranche Commitment, with the result that the aggregate amount of the Global Tranche Commitments shall be increased and the aggregate amount of the US Tranche Commitments shall be reduced by the amount of the US Tranche Commitment so converted, and (B) such Converting Lender shall, with respect to its converted Commitment, have the rights and obligations of a Global Tranche Lender. Upon the effectiveness of any such conversion, (x) if any Loans are then outstanding, each applicable Borrower shall prepay to certain Lenders the amounts of such Loans outstanding, including all outstanding US Tranche Loans of the Converting Lender (and any additional amounts required pursuant to Section 3.04), and borrow from certain other Lenders new Loans, as necessary so that, after giving effect to such prepayments and borrowings on such date, the percentage of the principal balance of all outstanding Loans of each Class owing to each Lender is equivalent to such Lender's ratable percentage (based on its Commitment of such Class, and the Commitments of the other Lenders of such Class) of all such outstanding Loans of such Class and (y) if any Letters of Credit or Swing Line Loans are then outstanding, the allocation of the participation exposures with respect to such then-existing or any subsequent Letters of Credit or Swing Line Loans of each Class shall be reallocated on a ratable basis (based on each Lender's Commitment, and the Commitments of the other Lenders, of such Class) as between the Lenders of such Class after giving effect to any such conversion.

SECTION 2.09.  Repayment of Loans; Evidence of Debt.

(a) Each Borrower hereby unconditionally promises to pay (i) to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Revolving Loan made by such Lender to such Borrower on the Termination Date and (ii) to each Swing Line Lender the then unpaid principal amount of each Swing Line Loan made by

such Swing Line Lender to such Borrower on the earlier of the Termination Date and the first date after such Swing Line Loan is made that is the 15th day or the last day of a calendar month and that is at least four Business Days after the day on which such Swing Line Loan is made; <u>provided</u> that on each date on which a Borrowing denominated in US Dollars (including any ABR Borrowing) is made to the Company, the Company shall repay all its Swing Line Loans then outstanding.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of each Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type of each such Loan and, in the case of any ~~LIBOR~~Term SOFR Loan or EURIBOR Loan, the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from each Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders or any of them and each Lender's share thereof. The information contained in such accounts will be made available to the Company at reasonable times and upon reasonable request.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be <u>prima facie</u> evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of any Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)     Any Lender may request that Loans of any Class made by it to any Borrower be evidenced by a promissory note. In such event, the applicable Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Company and the Administrative Agent. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 11.01) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.10.  <u>Prepayment of Loans.</u> (a) Each Borrower shall have the right at any time and from time to time to prepay any Borrowing of such Borrower in whole or in part, subject to Section 3.04 (but otherwise without premium or penalty) and the requirements of this Section.

(b)     If, on any date, the Company shall have received notice from the Administrative Agent that (i) the aggregate Revolving Credit Exposure of any

Class shall exceed the aggregate Commitments of such Class or (ii) the Aggregate Revolving Credit Exposure shall exceed the aggregate Commitments, then (A) if any ABR Revolving Borrowing or Swing Line Loan of the applicable Class (in the case of clause (i)), or of either Class (in the case of clause (ii)) shall be outstanding, the Borrowers shall, within three Business Days of receipt of such notice, prepay such ABR Revolving Borrowing or Swing Line Loan and (B) on the last day of any Interest Period for any ~~LIBOR~~Term SOFR Borrowing or EURIBOR Borrowing of the applicable Class (in the case of clause (i)), or of either Class (in the case of clause (ii)), the applicable Borrower shall, if such day is at least three Business Days after receipt of such notice, prepay such ~~LIBOR~~Term SOFR Borrowing or EURIBOR Borrowing, in each case, in an aggregate amount equal to the lesser of (x) the amount necessary to eliminate such excess and (y) the amount of such Borrowing. If, on any date, the Company shall have received notice from the Administrative Agent that (1) the aggregate Revolving Credit Exposure of any Class shall exceed 105% of the aggregate Commitments of such Class or (2) the Aggregate Revolving Credit Exposure shall exceed 105% of the aggregate Commitments, then the Borrowers shall, within three Business Days of receipt of such notice, prepay one or more Borrowings in an aggregate principal amount sufficient to eliminate such excess.

(c)     On the date of any termination or reduction of the Commitments of either Class pursuant to Section 2.08, the Company shall pay or prepay (or shall cause a Borrowing Subsidiary to pay or prepay) so much of the Borrowings of such Class as shall be necessary in order that (i) the aggregate Revolving Credit Exposure of such Class shall not exceed the aggregate Commitments of such Class, (ii) the Aggregate Revolving Credit Exposure shall not exceed the aggregate Commitments and (iii) the Revolving Credit Exposure of such Class of any Lender shall not exceed its Commitment of such Class, in each case after giving effect to such termination or reduction.

(d)     Prior to any optional or mandatory prepayment of Borrowings hereunder, the Company shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (e) of this Section.

(e)     The Company shall notify the Administrative Agent (and, in the case of prepayment of a Swing Line Loan, the Swing Line Lender that made such Swing Line Loan) of any prepayment of a Borrowing hereunder (i) in the case of a ~~LIBOR~~Term SOFR Borrowing or EURIBOR Borrowing, not later than 1:00 p.m., New York City time, three Business Days before the date of such prepayment, (ii) in the case of an ABR Borrowing, not later than 12:00 noon, New York City time, on the date of such prepayment ~~and~~, (iii) in the case of an ESTR Borrowing, not later than 12:00 noon, Local Time, on the date of such prepayment and (iv) in the case of a Daily Simple SOFR Borrowing (if applicable pursuant to Section 3.02), not later than 12:00 noon, New York City time, three Business Days before the date of such prepayment. Each such notice shall be irrevocable, shall be submitted by email (in .pdf or .tif format) and shall specify the prepayment date and the principal amount of each Borrowing or portion

thereof to be prepaid; <u>provided</u> that, if a notice of prepayment is given in connection with a conditional notice of termination of the Commitments as contemplated by Section 2.08, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.08. Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the applicable Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.12.

SECTION 2.11. <u>Fees.</u> (a) The Borrowers agree to pay to the Administrative Agent, in US Dollars, for the account of each Lender, a facility fee (a "<u>Facility Fee</u>"), which shall accrue at the Applicable Rate on the daily amount of each Commitment of such Lender (whether used or unused), in each case during the period from and including the Closing Date to but excluding the date on which such Commitment terminates; <u>provided</u> that, if any Lender continues to have any Revolving Credit Exposure of any Class after its Commitment of such Class terminates, then the Facility Fee shall continue to accrue on the daily amount of such Lender's Revolving Credit Exposure of such Class from and including the date on which such Commitment terminates to but excluding the date on which such Lender ceases to have any Revolving Credit Exposure of such Class. Facility Fees accrued through and including the last day of each March, June, September and December of each year shall be payable in arrears on the 15th Business Day following such last day, commencing on the first such date to occur after the Closing Date, and, with respect to the Facility Fees accrued on Commitments of any Class, on the date on which the Commitments of such Class shall terminate; <u>provided</u> that the Facility Fees accruing on the Revolving Credit Exposure of any Class after the date on which the Commitments of such Class terminate shall be payable on demand. All Facility Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)    The Company agrees to pay (or cause the applicable Borrowing Subsidiary to pay) (i) to the Administrative Agent for the account of each Lender a participation fee (an "<u>L/C Participation Fee</u>") with respect to its participations in Letters of Credit, which shall accrue at the Applicable Rate used in determining the interest rate applicable to ~~LIBOR Revolving~~Term SOFR Loans on the daily amount of such Lender's L/C Exposure (excluding any portion thereof attributable to unreimbursed L/C Disbursements) during the period from and including the Closing Date to but excluding the later of the date on which such Lender's Commitments terminate and the date on which such Lender ceases to have any L/C Exposure, and (ii) to each L/C Issuer, a fronting fee (an "<u>L/C Fronting Fee</u>"), which shall accrue at the rate of 0.125% per annum on the average daily undrawn amount of the outstanding Letters of Credit of each Class issued by such L/C Issuer during the period from and including the Closing Date to but excluding the later of the date of termination of the Commitments and the date on which the last of such Letters of Credit expires, terminates or is drawn in full, as well as such L/C Issuer's standard fees ("<u>L/C Issuer Fees</u>") with respect to the issuance, amendment or extension of any Letter of Credit or processing of drawings thereunder. L/C Participation Fees and L/C Fronting Fees accrued through and including the last day of March, June, September and December of each year shall be payable on the 15th Business Day following such last day,

commencing on the first such date to occur after the Closing Date; <u>provided</u> that all such fees shall be payable on the date on which the Commitments terminate and any such fees accruing after the date on which the Commitments terminate shall be payable on demand. Any other fees payable to any L/C Issuer pursuant to this paragraph shall be payable within 10 days after demand. All L/C Participation Fees and L/C Fronting Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)      The Borrowers agree to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon in writing between the Company and the Administrative Agent.

(d)      The Borrowers agree to pay, through the Administrative Agent, upfront fees in the amounts heretofore communicated to the Lenders by the Company and the Administrative Agent.

(e)      All fees payable hereunder shall be paid on the dates on which due and payable, in immediately available funds, to the Administrative Agent or to any L/C Issuer (in the case of fees payable to it) for distribution, in the case of Facility Fees, L/C Participation Fees and upfront fees, to the Lenders entitled thereto. Fees paid shall not be refundable under any circumstances, absent manifest error.

SECTION 2.12.  <u>Interest.</u> (a) The Loans comprising each ABR Borrowing (including each Swing Line Loan denominated in US Dollars) shall bear interest at the Alternate Base Rate <u>plus</u> the Applicable Rate.

(b)      The Loans comprising each ~~LIBOR~~Term SOFR Borrowing shall bear interest at the Adjusted ~~LIBO Rate~~Term SOFR for the Interest Period in effect for such Borrowing <u>plus</u> the Applicable Rate.

(c)      The Loans comprising each Daily Simple SOFR Borrowing (if such Type of Borrowing is applicable pursuant to Section 3.02) shall bear interest at the Adjusted Daily Simple SOFR plus the Applicable Rate.

(d)      ~~(c)~~The Loans comprising each EURIBOR Borrowing shall bear interest at the Adjusted EURIBO Rate for the Interest Period in effect for such Borrowing <u>plus</u> the Applicable Rate.

(e)      ~~(d)~~Each Swing Line Loan denominated in Euro shall bear interest at Daily Simple ESTR <u>plus</u> the Applicable Rate.

(f)   (e) Notwithstanding the foregoing, if any principal of or interest on any Loan, any reimbursement payment owed in respect of an L/C Disbursement or any fee or other amount payable by any Borrower hereunder is not paid when due and payable, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, to the fullest extent permitted by applicable law, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, any L/C Disbursement or any interest on any Loan or any L/C Disbursement, 2% per annum plus the rate otherwise applicable to such Loan or L/C Disbursement as provided in the preceding paragraphs of this Section or in Section 2.05(h), as applicable, or (ii) in the case of any other amount, 2% per annum plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section.

(g)   (f) Accrued interest on each Loan of any Class shall be payable in arrears on each Interest Payment Date for such Loan and upon the termination of the Commitments of such Class; provided that (i) interest accrued pursuant to paragraph (ef) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Revolving Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any LIBORTerm SOFR Loan or EURIBOR Revolving Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion. All interest shall be payable in the currency in which the applicable Loan is denominated.

(h)   (g) All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and, in each case, shall be payable for the actual number of days elapsed (including the first day but excluding the last day). All interest hereunder on any Loan shall be computed on a daily basis based upon the outstanding principal amount of such Loan as of the applicable date of determination. The applicable Alternate Base Rate, Adjusted LIBO RateTerm SOFR, Adjusted Daily Simple SOFR, Adjusted EURIBO Rate, Daily Simple ESTR or Alternative Currency Overnight Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.13. Payments Generally; Pro Rata Treatment; Sharing of Set-offs. (a) Each Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, fees or reimbursement of L/C Disbursements, or of amounts payable under Sections 3.01, 3.04 or 3.05, or otherwise) (i) in the case of payments in US Dollars, prior to 2:00 p.m., New York City time, on the date when due and (ii) in the case of payments in an Alternative Currency, no later than the Applicable Time on the date when due, in each case, in immediately available funds, without set-off or counterclaim. Any amounts received after such time on any date may be deemed, in the discretion of the Administrative Agent, to have been received on the next succeeding Business Day for purposes of calculating interest thereon. Unless and until otherwise specified, all such payments shall be made to

the Administrative Agent for the account of the applicable Lenders to such account as the Administrative Agent shall from time to time specify in one or more notices delivered to the Company, except that payments to be made directly to an L/C Issuer or a Swing Line Lender shall be so directly made and payments to be made pursuant to Sections 3.01, 3.04, 3.05, 11.05 and 11.09 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. Each such payment shall be made in US Dollars, except that the principal of and interest on any Loan or L/C Disbursement denominated in an Alternative Currency shall be made in such currency. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)      If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed L/C Disbursements, interest and fees then due and payable hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due and payable hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due and payable to such parties and (ii) second, towards payment of principal and unreimbursed L/C Disbursements then due and payable hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed L/C Disbursements then due and payable to such parties.

(c)      If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Revolving Loans, participations in L/C Disbursements or Swing Line Loans or accrued interest on any of the foregoing (collectively "Claims") resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Claims than the proportion received by any other Lender with respect to its Claims, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Claims of the other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amounts of their respective Claims; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, unless the Lender from which such payment is recovered is required to pay interest thereon, in which case each Lender returning funds to such Lender shall pay its pro rata share of such interest and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Company or any Borrowing Subsidiary pursuant to and in accordance with

the express terms of this Agreement or any other Loan Document (for the avoidance of doubt, as it may be amended from time to time), including the last paragraph of Section 2.08(d), Section 2.08(e) and Section 2.16, or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Claims to any assignee or participant, other than to the Company or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Company and each Borrowing Subsidiary consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against it rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Company or such Borrowing Subsidiary in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Company prior to the date on which any payment is due for the account of the Lenders or the L/C Issuers hereunder that the applicable Borrower will not make such payment, the Administrative Agent may assume that such Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the L/C Issuers, as the case may be, the amount due. In such event, if such Borrower has not in fact made such payment, then each of the Lenders or the L/C Issuers, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or such L/C Issuer with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of (i) if denominated in US Dollars, the greater of (x) the NYFRB Rate and (y) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (ii) if denominated in any other currency, the greater of (x) the rate reasonably determined by the Administrative Agent to be the cost to it of funding such amount (which determination will be conclusive absent manifest error, it being understood that the Administrative Agent may, in its sole discretion, for such purpose deem its cost of funds to be equal to the Alternative Currency Overnight Rate) and (y) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it under this Agreement to or for the account of the Administrative Agent, any L/C Issuer or any Swing Line Lender, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by it for the account of such Lender for the benefit of the Administrative Agent, such Swing Line Lender or such L/C Issuer, as the case may be, to satisfy such Lender's obligations to it until all such unsatisfied obligations are fully paid, and/or (ii) hold any such amounts in a segregated account as cash collateral for, and for application to, any future funding obligations of such Lender, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its discretion.

SECTION 2.14. <u>Borrowing Subsidiaries.</u> On or after the Closing Date, the Company may at any time and from time to time designate a Subsidiary as a Borrowing Subsidiary by delivery to the Administrative Agent of a Borrowing Subsidiary Agreement executed by such Subsidiary and the Company. As soon as practicable upon receipt thereof, the Administrative Agent will post a copy of such Borrowing Subsidiary Agreement to the Lenders. Each Borrowing Subsidiary Agreement shall become effective on the date 10 days after it has been posted by the Administrative Agent to the Lenders (subject to the receipt by each Lender, at least five Business Days prior to such effectiveness, of any information reasonably requested by it under the USA PATRIOT Act or other "know-your-customer" laws (including the Beneficial Ownership Regulation) not later than the third Business Day after the posting date of such Borrowing Subsidiary Agreement), unless, in the case of any Foreign Subsidiary, the Administrative Agent shall theretofore have received written notice from any Lender (or shall itself have delivered a notice to the Company) (a) that it is unlawful under Federal or applicable state or foreign law for such Lender or the Administrative Agent, as the case may be, to make Loans or otherwise extend credit to or do business with such Subsidiary as provided herein or (b) that such Lender or the Administrative Agent, as the case may be, is restricted by operational or administrative procedures or other applicable internal policies from extending credit under this Agreement to Persons in the jurisdiction in which such Subsidiary is located (a "<u>Notice of Objection</u>"), in which case such Borrowing Subsidiary Agreement shall not become effective until such time as such Lender or the Administrative Agent, as the case may be, (i) withdraws such Notice of Objection, (ii) in the case of a Lender, ceases to be a Lender hereunder, including pursuant to Section 3.07, or (iii) in the case of a Lender, has its Global Tranche Revolving Loans, at the election of the Company, converted to US Tranche Revolving Loans, on terms and pursuant to procedures to be agreed by the Administrative Agent and the Company consistent with Section 2.08(e). Upon the effectiveness of a Borrowing Subsidiary Agreement as provided in the preceding sentence, the applicable Subsidiary shall for all purposes of this Agreement be a Borrowing Subsidiary and a party to this Agreement. In the event the Company shall have executed and delivered to the Administrative Agent a Borrowing Subsidiary Termination with respect to any Borrowing Subsidiary, such Borrowing Subsidiary shall cease to be a Borrowing Subsidiary and a party to this Agreement; <u>provided</u> that no Borrowing Subsidiary Termination will become effective as to any Borrowing Subsidiary at a time when any principal of or interest on any Loan to such Borrowing Subsidiary shall be outstanding hereunder, any Letters of Credit issued for the account of such Borrowing Subsidiary shall be outstanding hereunder unless such Letters of Credit have been drawn in full or have expired or been cash collateralized in accordance with Section 2.05(j) or any amounts payable by such Borrowing Subsidiary in respect of L/C Disbursements, interest and/or fees (and, to the extent notified by the Administrative Agent or any Lender, any other amounts payable by such Borrowing Subsidiary) shall be outstanding hereunder; <u>provided further</u> that such Borrowing Subsidiary Termination shall be effective to terminate the right of such Borrowing Subsidiary to make further Borrowings under this Agreement. If (x) a Borrowing Subsidiary is to consolidate or merge with or into any other Person or to consummate a Division and (y) the Person surviving such consolidation or merger (the "<u>Surviving Subsidiary</u>") or the Division Successor, as applicable, will not be (1) a Domestic Subsidiary, (2) located in the same jurisdiction as the Borrowing Subsidiary effecting

such consolidation, merger or Division at the time such consolidation, merger or Division is effective, or (3) in the case of a Borrowing Subsidiary that is a Global Tranche Borrower, located in the same jurisdiction as any other Borrowing Subsidiary, at the time such consolidation, merger or Division is effective, then, (A) any principal of or interest on any Loan outstanding to such Borrowing Subsidiary shall be repaid prior to, and a Borrowing Subsidiary Termination will be deemed to become effective as to such Surviving Subsidiary or Division Successor, as applicable, at the time of such merger, consolidation or Division, and (B) at the time of such merger, consolidation or Division, the Company shall automatically be substituted for such Borrowing Subsidiary as the account party on any outstanding Letter of Credit that shall have been issued for the account of such Borrowing Subsidiary, unless, in each case, such Surviving Subsidiary satisfies the foregoing provisions of this Section 2.14.

SECTION 2.15. Defaulting Lenders. Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)     Facility Fees shall continue to accrue on the Commitments of such Defaulting Lender pursuant to Section 2.11(a) only to the extent of the Revolving Credit Exposures of such Defaulting Lender (excluding any portion thereof constituting Swing Line Exposure or L/C Exposure of such Defaulting Lender that (i) is subject to reallocation under clause (c)(i) below or (ii) is prepaid or cash collateralized by the applicable Borrowers in accordance with clause (c)(ii) below);

(b)     the Commitments and the Revolving Credit Exposures of such Defaulting Lender shall not be included in determining whether the Required Lenders or any other requisite Lenders have taken or may take any action hereunder or under any other Loan Document (including any consent to any amendment, waiver or other modification pursuant to Section 11.06); provided that any amendment, waiver or other modification requiring the consent of all Lenders or all Lenders affected thereby shall, except as otherwise provided in Section 11.06, require the consent of such Defaulting Lender in accordance with the terms hereof;

(c)     if any Swing Line Exposure or L/C Exposure of any Class exists at the time such Lender becomes a Defaulting Lender then:

(i)     (A) first, the Swing Line Exposure of such Class of such Defaulting Lender (other than any portion of such Swing Line Exposure (x) referred to in clause (b) of the definition of Global Tranche Swing Line Exposure or US Tranche Swing Line Exposure, as the case may be, or (y) with respect to which such Defaulting Lender shall have funded its participation as contemplated by Section 2.04(c)) shall be reallocated among the Non-Defaulting Lenders with Commitments of such Class ratably in accordance with their respective Commitments of such Class, but only to the extent the sum of all Non-Defaulting Lenders' Revolving Credit Exposures of such Class plus such Defaulting Lender's Swing Line Exposure of such Class (other than any portion thereof referred to in the parenthetical clause above) does not exceed the sum of all Non-Defaulting Lenders' Commitments of such Class; and (B) second, the L/C Exposure of such Class of

such Defaulting Lender (other than any portion thereof attributable to unreimbursed L/C Disbursements with respect to which such Defaulting Lender shall have funded its participation as contemplated by Sections 2.05(d) and 2.05(e)) shall be reallocated among the Non-Defaulting Lenders with Commitments of such Class ratably in accordance with their respective Commitments of such Class, but only to the extent the sum of all Non-Defaulting Lenders' Revolving Credit Exposures of such Class (including any Swing Line Exposures reallocated pursuant to subclause (A) of this clause (i)) plus such Defaulting Lender's L/C Exposure of such Class (other than any portion thereof referred to in the parenthetical clause above) does not exceed the sum of all Non-Defaulting Lenders' Commitments of such Class;

(ii)    if the reallocation described in clause (i) above cannot, or can only partially, be effected, the applicable Borrowers shall within one Business Day following notice by the Administrative Agent (A) first, prepay the portion of such Defaulting Lender's Swing Line Exposure of the applicable Class (other than any portion thereof referred to in the first parenthetical in such clause (i)) that has not been reallocated as set forth in such clause and (B) second, cash collateralize for the benefit of the L/C Issuers the portion of such Defaulting Lender's L/C Exposure of the applicable Class (other than any portion thereof referred to in the second parenthetical in such clause (i)) that has not been reallocated as set forth in such clause in accordance with the procedures set forth in Section 2.05(j) for so long as such L/C Exposure is outstanding;

(iii)    if the Borrowers cash collateralize any portion of such Defaulting Lender's L/C Exposure pursuant to clause (ii) above, the Borrowers shall not be required to pay L/C Participation Fees pursuant to Section 2.11(b) with respect to the portion of such Defaulting Lender's L/C Exposure for so long as such Defaulting Lender's L/C Exposure is cash collateralized;

(iv)    if any portion of the L/C Exposure of such Defaulting Lender is reallocated pursuant to clause (i) above, then the fees payable to the applicable Lenders pursuant to Section 2.11(a) or 2.11(b) shall be adjusted to give effect to such reallocation;

(v)    if all or any portion of such Defaulting Lender's Swing Line Exposure that is subject to reallocation pursuant to clause (i) above is neither reallocated nor reduced pursuant to clause (i) or (ii) above, then, without prejudice to any rights or remedies of the Swing Line Lender or any other Lender hereunder, all Facility Fees that otherwise would have been payable to such Defaulting Lender with respect to such portion of its Swing Line Exposure shall be payable to the Swing Line Lender until and to the extent that such Swing Line Exposure is reallocated and/or reduced to zero; and

(vi)    if all or any portion of such Defaulting Lender's L/C Exposure that is subject to reallocation pursuant to clause (i) above is neither reallocated nor cash collateralized pursuant to clause (i) or (ii) above, then, without prejudice to any rights or remedies of any L/C Issuer or any other Lender hereunder, all Facility Fees that otherwise would have been payable to such Defaulting Lender with respect to such portion of its L/C Exposure, and all L/C Participation Fees payable under Section 2.11(b) with respect to such portion of its L/C Exposure, shall be payable to the L/C Issuers (and allocated among them

ratably based on the amount of such portion of the L/C Exposure of such Defaulting Lender attributable to Letters of Credit issued by each L/C Issuer) until and to the extent that such L/C Exposure is reallocated and/or cash collateralized; and

(d)    so long as such Lender is a Defaulting Lender, no Swing Line Lender shall be required to fund any Swing Line Loan and no L/C Issuer shall be required to issue, amend, renew or extend any Letter of Credit of an applicable Class unless, in each case, it is satisfied that, after giving effect to such funding or issuance, amendment or extension, the Defaulting Lender's Swing Line Exposure (other than any portion thereof referred to in clause (b) of the definition of Global Tranche Swing Line Exposure or US Tranche Swing Line Exposure, as the case may be) or L/C Exposure of each applicable Class will be fully covered by the Commitments of such Class of the Non-Defaulting Lenders, after giving effect to the reallocation of participating interests in any such funded Swing Line Loan or in any such issued, amended, renewed or extended Letter of Credit in accordance with clause (c)(i) above and/or cash collateral in respect of such Letter of Credit is provided by the Borrowers in accordance with clause (c)(ii) above.

In the event that the Administrative Agent, the Company, each Swing Line Lender and each L/C Issuer each agree that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Swing Line Exposure and L/C Exposure of the Lenders of the applicable Class shall be readjusted to reflect the inclusion of such Lender's Commitment of such Class and on such date such Lender shall purchase at par such of the Loans of the applicable Class of the other Lenders, and such funded participations in Swing Line Loans and L/C Disbursement of such Class, as the Administrative Agent shall determine may be necessary in order for the Lenders to hold such Loans and funded participations ratably in accordance with their Commitment of such Class, and such Lender shall thereupon cease to be a Defaulting Lender (but shall not be entitled to receive any fees accrued during the period when it was a Defaulting Lender, and all amendments, waivers or modifications effected without its consent in accordance with the provisions of Section 11.06 and this Section 2.15 during such period shall be binding on it). The rights and remedies against, and with respect to, a Defaulting Lender under this Section 2.15 are in addition to, and cumulative and not in limitation of, all other rights and remedies that the Administrative Agent and each Lender, each Swing Line Lender, each L/C Issuer, the Company or any Borrowing Subsidiary may at any time have against, or with respect to, such Defaulting Lender.

SECTION   2.16. Extension Offers. (a) The Company may, by written notice to the Administrative Agent, make offers (collectively, an "Extension Offer") on equal terms to all the Lenders of one or more Classes (each Class subject to such an Extension Offer being an "Extension Request Class") to enter into an Extension Permitted Amendment pursuant to procedures reasonably specified by the Administrative Agent and reasonably acceptable to the Company. Such notice shall set forth (i) the terms and conditions of the requested Extension Permitted Amendment and (ii) the date on which such Extension Permitted Amendment is requested to become effective (which shall not be fewer than 10 Business Days or more than 30 Business Days after the date of such notice, unless otherwise agreed to by the Administrative Agent). Extension

Permitted Amendments shall become effective (A) only with respect to the Loans and Commitments of the Lenders of the Extension Request Class that accept the applicable Extension Offer (such acceptance being in the sole and individual discretion of each such Lender and such Lenders being called "Extending Lenders", and Lenders of such Class that do not accept such Extension Offer being called "Declining Lenders"), (B) only if Lenders (including any replacement Lenders referred to in the last sentence of paragraph (c) below) representing at least a majority of the Commitments of the Extension Request Class accept such Extension Offer and such Commitments, together with any Commitments of any other Class or Classes that are simultaneously extended pursuant to this Section, represent a majority of the aggregate Commitments and (C) in the case of any Extending Lender, only with respect to such Lender's Loans and Commitments of the Extension Request Class as to which such Lender's acceptance has been made.

(b)    An Extension Permitted Amendment shall be effected pursuant to an Extension Agreement executed and delivered by the Company, each applicable Extending Lender and the Administrative Agent; provided that no Extension Permitted Amendment shall become effective unless (i) the Company shall have delivered to the Administrative Agent a certificate of an Authorized Representative certifying that (A) no Default or Event of Default shall have occurred and be continuing on the date of effectiveness thereof, (B) on the date of effectiveness thereof, the representations and warranties of each Borrower set forth in the Loan Documents shall be true and correct in all material respects on and as of such date, except in the case of any such representation and warranty that specifically relates to an earlier date, in which case such representation and warranty shall be so true and correct in all material respects on and as of such earlier date and except that the financial statements referred to in Section 5.05 shall be deemed to be those financial statements most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01, and (ii) the Borrowers shall have delivered to the Administrative Agent such legal opinions, evidence of authority, officer's certificates and other documents as shall reasonably have been requested by the Administrative Agent in connection therewith. The Administrative Agent shall promptly notify each Lender of the effectiveness of each Extension Agreement. Each Extension Agreement may, without the consent of any Lender other than the applicable Extending Lenders, effect such amendments to this Agreement and the other Loan Documents, including provisions hereof or thereof that would otherwise require the consent of all the Lenders, as may be necessary or appropriate, in the opinion of the Administrative Agent, to give effect to the provisions of this Section, including any amendments necessary to treat the applicable Loans and/or Commitments of the applicable Extending Lenders as a new Class of loans and/or commitments hereunder and as the Company and the applicable Extending Lenders may agree to the extent such amendment would otherwise be permitted pursuant to, and is adopted in accordance with the consent requirements of, Section 11.06; provided that (i) no such Extension Agreement shall effect any amendment or waiver referred to in Section 11.06(a)(ii)(A), (B) or (C) without the consent of each Lender affected thereby and (ii) except as otherwise agreed by each L/C Issuer and each Swing Line Lender, as applicable, (A) the allocation of the participation

exposures with respect to any then-existing or subsequent Letters of Credit or Swing Line Loans of the Extension Request Class shall be made on a ratable basis as between the new Class of Commitments and the remaining Commitments of the Extension Request Class and (B) the Availability Period and the Stated Termination Date, as such terms are used in reference to Letters of Credit or Swing Line Loans, may not be extended without the prior written consent of each L/C Issuer and each Swing Line Lender, as applicable.

(c)     The applicable Commitment of each Declining Lender under the Extension Request Class shall terminate on the Stated Termination Date in effect as to such Lender prior to the effectiveness of any such Extension Permitted Amendment (the "Existing Stated Termination Date"). The principal amount of any outstanding Revolving Loans of the Extension Request Class made by Declining Lenders, together with any accrued interest thereon and any accrued fees and other amounts payable to or for the accounts of such Declining Lenders, shall be due and payable on the Existing Stated Termination Date, and on such date the Borrowers shall also make such other prepayments of Loans as shall be required in order that, after giving effect to the termination of the Commitments of, and all payments to, Declining Lenders pursuant to this sentence, the aggregate Revolving Credit Exposure of the Extension Request Class (or any separate Class comprising the Extending Lenders of such Class) will not exceed the aggregate Commitments of such Class. Notwithstanding the foregoing provisions of this paragraph, the Company shall have the right, pursuant to and in accordance with Section 3.07 and such procedures as the Administrative Agent may reasonably specify, at any time prior to the Existing Stated Termination Date, to replace a Declining Lender with a Lender or other financial institution that will agree to the Extension Permitted Amendment, and any such replacement Lender shall for all purposes constitute an Extending Lender.

SECTION 2.17. <u>Use of Proceeds.</u> The proceeds of the Loans made hereunder shall be used by the Company and the Borrowing Subsidiaries for general working capital needs and other lawful corporate purposes, including, without limitation, the making of acquisitions and, subject to Section 5.10, repurchases of outstanding shares of the Company's common stock.

ARTICLE III

Change in Circumstances

SECTION 3.01. <u>Increased Cost and Reduced Return.</u> (a) If any Change in Law:

(i)     shall impose, modify, or deem applicable any reserve, special deposit, assessment, compulsory loan, insurance charge or similar requirement (other than any reserve requirement taken into account in determining ~~the Adjusted LIBO Rate or~~ the Adjusted EURIBO Rate) relating to any extensions of credit or other assets of, or any deposits with

or other liabilities or commitments of, any Lender (or its Applicable Lending Office), including each Commitment of such Lender hereunder;

(ii)       shall impose on any Lender (or its Applicable Lending Office) or on the ~~London or European~~applicable offshore interbank market any other condition (other than Taxes) affecting this Agreement or any Note or any Loans made by such Lender or any Letter of Credit or participation therein;

(iii)      shall subject any Lender (or its Applicable Lending Office) to any Taxes (other than (A) Indemnified Taxes, (B) Excluded Taxes, (C) reserve, special deposit, assessment compulsory loan, insurance charge or similar requirements, the compensation for which is governed solely by Section 3.01(a)(i) or (D) capital adequacy or liquidity requirements, the compensation for which is governed solely by Section 3.01(b)) on its loans, letters of credit, participations or commitments, or on its assets, deposits, reserves, liabilities or capital, in each case, attributable thereto;

and the result of any of the foregoing is to increase the cost to such Lender (or its Applicable Lending Office) of making, converting into, continuing or maintaining any Loan (or of maintaining its Commitment to make Loans) or issuing or participating in any Letters of Credit (or of maintaining its obligation to issue or participate in any Letter of Credit) or to reduce any sum received or receivable by such Lender (or its Applicable Lending Office) under this Agreement or any Note with respect to any Loan or Letter of Credit, then the Borrowers shall pay to such Lender within 15 days of demand such amount or amounts as will compensate such Lender for such increased cost or reduction. If any Lender requests compensation under this paragraph (a), the Company may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Loans of the Type with respect to which such compensation is requested, or to convert Loans of any other Type into Loans of such Type, until the event or condition giving rise to such request ceases to be in effect; provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(b)      If any Lender shall have determined that any Change in Law regarding capital adequacy or liquidity has or would have the effect of reducing the rate of return on the capital of such Lender or its Lender Parent as a consequence of such Lender's obligations hereunder to a level below that which such Lender or its Lender Parent could have achieved but for such Change in Law (taking into consideration its policies with respect to capital adequacy and liquidity), then from time to time within 15 days after demand by such Lender (with a copy to the Administrative Agent) the Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender or its Lender Parent for such reduction.

(c)      Each Lender shall promptly notify the Company and the Administrative Agent of any event of which it has knowledge which will entitle such Lender to compensation pursuant to this Section 3.01 and will designate a different Applicable Lending Office if such designation will avoid the need for, or reduce the amount of, such compensation and will not, in the judgment of such

Lender, be otherwise disadvantageous to it. Any Lender claiming compensation under this Section 3.01 shall furnish to the Company and the Administrative Agent a statement setting forth the additional amount or amounts to be paid to it hereunder and the calculation thereof in reasonable detail, which shall be conclusive in the absence of manifest error. In determining such amount, such Lender may use any reasonable averaging and attribution methods.

(d)     Failure or delay on the part of any Lender to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that the Borrowers shall not be under any obligation to compensate any Lender under paragraph (a) or (b) above with respect to increased costs or reduction in return on capital with respect to any period prior to the date that is three months prior to such request if such Lender knew or could reasonably have been expected to be aware of the circumstances giving rise to such increased costs or reductions in return on capital and of the fact that such circumstances would in fact result in a claim for increased compensation by reason of such increased costs or reductions in capital; <u>provided</u> <u>further</u> that the foregoing limitation shall not apply to any increased costs or reductions in return on capital arising out of the retroactive application of any Change in Law as aforesaid within such three month period.

(e)     Notwithstanding the foregoing provisions of this Section, no Lender shall be entitled to request compensation under this Section for any costs referred to in paragraph (a)(iii) above or any costs imposed on such Lender under the Dodd-Frank Wall Street Reform and Consumer Protection Act or Basel III unless it shall be the general policy or practice of such Lender to seek compensation under comparable credit facilities the documents for which contain provisions comparable to this Section 3.01.

SECTION 3.02. <u>Alternate Rate of Interest.</u> (a) Subject to Section 3.02(b), if:

(i)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) (A) prior to the commencement of any Interest Period for a ~~LIBOR~~<span style="color:red">Term SOFR</span> Borrowing or a EURIBOR Borrowing, that adequate and reasonable means do not exist for ascertaining the Adjusted ~~LIBO Rate~~<span style="color:red">Term SOFR</span> or the Adjusted EURIBO Rate, as the case may be, for such Interest Period (including because the Relevant Screen Rate is not available or published on a current basis) or (B) at any time, that adequate and reasonable means do not exist for ascertaining the <span style="color:red">applicable </span>Daily Simple ~~ESTR or ESTR~~<span style="color:red">RFR for the applicable Agreed Currency</span>; or

(ii)     the Administrative Agent is advised by the Required Lenders (or, in the case of clause (B) below<span style="color:red"> as to the Daily Simple ESTR</span>, the applicable Swing Line Lender) (A) prior to the commencement of any Interest Period for a ~~LIBOR~~<span style="color:red">Term SOFR</span> Borrowing or a EURIBOR Borrowing, that the Adjusted ~~LIBO Rate~~<span style="color:red">Term SOFR</span> or the Adjusted EURIBO Rate, as the case may be, for such Interest Period will not adequately and fairly

reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period or (B) at any time, that the applicable Daily Simple ~~ESTR~~RFR for the applicable Agreed Currency will not adequately and fairly reflect the cost to such Lenders (or such Swing Line Lender) of making or maintaining their Loans (or its Swing Line Loan) included in any RFR Borrowing;

then the Administrative Agent shall give the Company and the Lenders prompt notice thereof, specifying the affected Loans, periods or currencies, and, until (x) the Administrative Agent notifies the Company and the Lenders that the circumstances giving rise to such notice no longer exist, ~~(A) any request for a Borrowing of an affected LIBOR Borrowing, EURIBOR Borrowing or ESTR Loan shall (1~~ with respect to the relevant Benchmark and (y) in the case of a Revolving Borrowing, the Company delivers a new Interest Election Request in accordance with Section 2.07 or a new Borrowing Notice in accordance with Section 2.03, (A) in the case of Loans denominated in US Dollars, ~~be deemed a request for an ABR Revolving Borrowing or (2) in all other cases, be ineffective (and no Lender shall be obligated to make a Loan on account thereof), (B)~~any Interest Election Request that requests the conversion of any Revolving Borrowing to, or continuation of any Revolving Borrowing as, ~~an affected LIBOR Borrowing or~~a Term SOFR Borrowing and any Borrowing Notice that requests a Term SOFR Borrowing shall instead be deemed to be an Interest Election Request or a Borrowing Notice, as applicable, for (x) a Daily Simple SOFR Borrowing so long as the Adjusted Daily Simple SOFR is not also the subject of Section 3.02(a)(i) or 3.02(a)(ii) above or (y) an ABR Borrowing if the Adjusted Daily Simple SOFR also is the subject of Section 3.02(a)(i) or 3.02(a)(ii) above and (B) in the case of Loans denominated in an Alternative Currency (including any Swing Line Loan denominated in Euro), any Interest Election Request that requests the conversion of any Revolving Borrowing to, or continuation of any Revolving Borrowing as, a EURIBOR Borrowing and any Borrowing Notice that requests a EURIBOR Borrowing or an RFR Borrowing, in each case, for the relevant Benchmark, shall be ineffective, ~~(C) any outstanding affected LIBOR Borrowing~~; provided that if the circumstances giving rise to such notice affect only one Type of Borrowing, then all other Types of Borrowings shall be permitted. Furthermore, if any Term SOFR Loan, EURIBOR Loan or RFR Loan in any Agreed Currency is outstanding on the date of the Company's receipt of the notice from the Administrative Agent referred to in this Section 3.02 (a) with respect to a Relevant Rate applicable to such Term SOFR Loan, EURIBOR Loan or RFR Loan, then until (x) the Administrative Agent notifies the Company and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) in the case of Revolving Loans, the Company delivers a new Interest Election Request in accordance with Section 2.07 or a new Borrowing Notice in accordance with Section 2.03, (A) in the case of Loans denominated in US Dollars, (1) any Term SOFR Loan shall, on the last day of the Interest Period applicable to such ~~Borrowing, convert to an ABR Revolving Borrowing, (D) any outstanding affected EURIBOR Borrowing shall, on~~Loan convert to, and shall constitute, (x) a Daily Simple SOFR Loan so long as the Adjusted Daily Simple SOFR is not also the subject of Section 3.02(a)(i) or 3.02(a)(ii) above on such day and (2) any RFR Loan shall on and from such day convert to, and shall constitute, an ABR Loan and (B) in the case of Loans denominated in an Alternative

Currency (including any Swing Line Loan denominated in Euro), (1) any EURIBOR Loan shall, from and after the last day of the Interest Period applicable to such ~~Borrowing, convert to a CBR Borrowing that bears~~Loan, bear interest at the Central Bank Rate for Euro plus the CBR Spread; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the Central Bank Rate for Euro cannot be determined, such EURIBOR Borrowing shall, at the Company's election prior to such day, either (x) be converted to an ABR Borrowing denominated in US Dollars (in an amount equal to the US Dollar Equivalent as of such date of the aggregate principal amount of such EURIBOR Borrowing) or (y) be prepaid by the applicable Borrower, on the day that the Company receives notice thereof from the Administrative Agent (it being understood that if no election is made by the Company by such day, the Company shall be deemed to have selected clause (x))~~;~~. and (E2) any ~~outstanding affected ESTR~~RFR Loan shall~~, on the date of such notice by the Administrative Agent, convert to a CBR Loan that bears~~ bear interest at the Central Bank Rate for Euro plus the CBR Spread; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the Central Bank Rate for Euro cannot be determined, such ~~outstanding ESTR~~RFR Loan shall, at the Company's election prior to such day, either (x) be converted to an ABR Loan denominated in US Dollars (in an amount equal to the US Dollar Equivalent as of such date of the aggregate principal amount of such ~~ESTR~~RFR Loan) or (y) be prepaid by the applicable Borrower, on the day that the Company receives notice thereof from the Administrative Agent (it being understood that if no election is made by the Company by such day, the Company shall be deemed to have selected clause (x)).

(b)     (i) Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event~~, an Early Opt-in Election or an Other Benchmark Rate Election, as applicable,~~ and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) ~~or (2)~~ of the definition of "Benchmark Replacement" with respect to US Dollars for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any other Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (~~3~~2) of the definition of "Benchmark Replacement" with respect to any Agreed Currency for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any other Loan Document in respect of any Benchmark setting at or after 5:00 p.m., New York City time, on the fifth Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

[[6082021]]

~~(ii) Notwithstanding anything to the contrary herein or in any other Loan Document and subject to the proviso below in this paragraph, with respect to a Loan denominated in US Dollars, if a Term SOFR Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then the applicable Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder or under any other Loan Document in respect of such Benchmark setting and subsequent Benchmark settings, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document; provided that this clause (ii) shall not be effective unless the Administrative Agent has delivered to the Lenders and the Company a Term SOFR Notice. For the avoidance of doubt, the Administrative Agent shall not be required to deliver a Term SOFR Notice after a Term SOFR Transition Event and may do so in its sole discretion.~~

(ii)   ~~(iii) In connection with the implementation of a Benchmark Replacement~~ Notwithstanding anything to the contrary herein or in any other Loan Document, the Administrative Agent ~~and the Company~~ will have the right to make Benchmark Replacement Conforming Changes from time to time (and in consultation with the Company) and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective ~~by written agreement of the Administrative Agent and the Company~~ without any further action or consent of any other party to this Agreement or any other Loan Document.

(iii)   ~~(iv)~~ The Administrative Agent will promptly notify the Company and the Lenders of (A) any occurrence of a Benchmark Transition Event, ~~an Early Opt-in Election or an Other Benchmark Rate Election, as applicable,~~ (B) the implementation of any Benchmark Replacement, (C) the effectiveness of any Benchmark Replacement Conforming Changes, (D) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (~~v~~iv) below and (E) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.02(b), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date, and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.02(b).

(iv)   ~~(v)~~ Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (A) if the then-current Benchmark is a term rate (including Term SOFR, ~~LIBO Rate~~ or EURIBO Rate) and either (1) any tenor for such Benchmark is not displayed on a screen or other information

service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (2) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (B) if a tenor that was removed pursuant to clause (A) above either (1) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (2) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(v) ~~(vi)~~ Upon the Company's receipt of notice of the commencement of a Benchmark Unavailability Period, the applicable Borrower (or the Company on its behalf) may revoke any request for a borrowing of, conversion to or continuation of ~~LIBOR Loans~~Term SOFR Borrowing, EURIBOR ~~Loans or ESTR Loans~~Borrowing or RFR Borrowing to be made, converted or continued during any Benchmark Unavailability Period and, failing that, either (x) the applicable Borrower will be deemed to have converted any request for (1) a ~~LIBOR~~Term SOFR Borrowing into a request for a borrowing of or conversion to (A) a Daily Simple SOFR Borrowing so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (B) an ABR Borrowing if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event or (y) any request for a borrowing of, conversion to or continuation of any EURIBOR Borrowing or ~~ESTR~~RFR Borrowing denominated in an Alternative Currency, as applicable, shall be ineffective. ~~If any LIBOR Borrowing~~Furthermore, if any Term SOFR Loan, EURIBOR ~~Borrowing~~Loan or ~~ESTR~~RFR Loan is outstanding on the date of the Company's receipt of notice of the commencement of a Benchmark Unavailability Period with respect to the Relevant Rate applicable ~~thereto~~to such Loan, then until such time as a Benchmark Replacement for the applicable Agreed Currency is implemented pursuant to this Section 3.02(b), (A) ~~any outstanding LIBOR Borrowing~~in the case of Loans denominated in US Dollars, (1) any Term SOFR Loan shall~~, on the last day of the Interest Period applicable to such Borrowing, convert to an ABR Revolving Borrowing, (B) any outstanding EURIBOR Borrowing shall, on~~Loan convert to, and shall constitute, (x) a Daily Simple SOFR Loan so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (y) an ABR Loan if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event on such day and (2) any RFR Loan shall on and from such day convert to, and shall constitute, an ABR Loan and (B) in the case of Loans denominated in an Alternative Currency, (1) any EURIBOR Loan shall, from and after the last day of the Interest Period applicable to such ~~Borrowing, convert to a CBR Borrowing that bears~~Loan, bear interest at the Central Bank Rate for Euro plus the CBR Spread; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest

error) that the Central Bank Rate for Euro cannot be determined, such outstanding CBREURIBOR Borrowing shall, at the Company's election prior to such day, either (x) be converted to an ABR Borrowing denominated in US Dollars (in an amount equal to the US Dollar Equivalent as of such date of the aggregate principal amount of such EURIBOR Borrowing) or (y) be prepaid by the applicable Borrower, on the day that the Company receives notice thereof from the Administrative Agent, and (C) any outstanding ESTR Loan shall convert to a CBR Loan that bears (it being understood that if no election is made by the Company by such day, the Company shall be deemed to have selected clause (x)); and (2) any RFR Loan shall bear interest at the Central Bank Rate for Euro plus the CBR Spread; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the Central Bank Rate for Euro cannot be determined, such outstanding CBR Loan shallRFR Loan shall, at the Company's election prior to such day, either (x) be converted to an ABR Loan denominated in US Dollars (in an amount equal to the US Dollar Equivalent as of such date of the aggregate principal amount of such RFR Loan) or (y) be prepaid by the applicable Borrower, on the day that the Company receives notice thereof from the Administrative Agent (it being understood that if no election is made by the Company by such day, the Company shall be deemed to have selected clause (x)). During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, shall be deemed to be zerowill not be used in any determination of Alternate Base Rate.

SECTION 3.03. Illegality. Notwithstanding any other provision of this Agreement, in the event that it becomes unlawful for any Lender or its Applicable Lending Office to make, maintain, or fund LIBORTerm SOFR Loans, EURIBOR Loans or ESTRRFR Loans, or to make Loans of any Type to Borrowers in one or more jurisdictions, hereunder, then such Lender shall promptly notify the Company thereof and such Lender's obligation to make or continue any LIBORTerm SOFR Loans, EURIBOR Loans or ESTRRFR Loans, to convert other Types of Loans into LIBORTerm SOFR Loans or to make Loans to Borrowers in such jurisdictions shall be suspended until the circumstances giving rise to suspension no longer exist (in which case such Lender shall again make, maintain, and fund LIBORTerm SOFR Loans, EURIBOR Loans and ESTRRFR Loans to Borrowers in such jurisdictions), and each such LIBORTerm SOFR Loan, EURIBOR Loan or ESTRRFR Loan then outstanding shall (a) in the case of Loans denominated in US Dollars, be converted into ABR Loans on the last day of the then-current Interest Period with respect thereto and (b) in the case of Loans denominated in any Alternative Currency, at the Company's election prior to such day, either (x) be paid on the last day of the then-current Interest Period with respect thereto (or, in the case of an ESTRRFR Loan, on the first Business Day following the date on which the Company receives notice thereof) or (y) be converted into ABR Loans denominated in US Dollars (in an amount equal to the US Dollar Equivalent as of such date of the aggregate principal amount of such Loans in any Alternative Currency) on the last day of the then-current Interest Period with respect thereto (or, in the case of an ESTRRFR Loan, on the

first Business Day following the date on which the Company receives notice thereof) (it being understood that if no election is made by the Company by such day, the Company shall be deemed to have selected clause (y)).

SECTION  3.04.  Compensation.  Upon the request of any Lender (with a copy to the Administrative Agent), the applicable Borrowers shall promptly pay to such Lender such amount or amounts as shall be sufficient (in the reasonable opinion of such Lender) to compensate it for any loss, cost and expense incurred by it as a result of:

(a)  any payment, prepayment, or conversion of a ~~LIBOR~~Term SOFR Loan or EURIBOR Loan for any reason, including, without limitation, the acceleration of the Loans pursuant to Section 8.01, on a date other than the last day of the Interest Period for such Loan; or

(b)  any failure by a Borrower for any reason (including, without limitation, the failure of any condition precedent specified in Article IV to be satisfied) to borrow, convert, continue, or prepay a ~~LIBOR~~Term SOFR Loan or EURIBOR Loan on the date for such borrowing, conversion, continuation, or prepayment specified in the relevant Borrowing Notice, Interest Election Request or notice of prepayment under this Agreement.

~~Such amount payable to any Lender shall equal an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such LIBOR Loan or EURIBOR Loan had such event not occurred, at the Adjusted LIBO Rate or the Adjusted EURIBO Rate that would have been applicable to such Loan (excluding the Applicable Rate that would have been added thereto), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate such Lender would bid, if it were to bid, at the commencement of such period for deposits in the applicable currency of a comparable amount and for a comparable period from other banks in the Relevant Interbank Market.~~

SECTION  3.05.  Taxes.  (a) Any and all payments by any Borrower to or for the account of any Lender or the Administrative Agent hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Taxes, other than as required by applicable law. If any Borrower shall be required by applicable law to deduct or withhold any Taxes from or in respect of any sum payable under this Agreement or any other Loan Document to any Lender or the Administrative Agent, (i) such Borrower shall make such deductions, (ii) such Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law, (iii) if such Tax is an Indemnified Tax, then the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.05) such Lender or the Administrative Agent receives an amount equal to the sum it would have received had no such deductions been made and (iv) within thirty days after the date of such payment,

[[6082021]]

such Borrower shall furnish to the Administrative Agent, at its address referred to in Section 11.02, the original or a certified copy of a receipt evidencing payment thereof or, if such receipt is not legally available, any other document evidencing payment thereof that is reasonably satisfactory to such Lender or the Administrative Agent (as the case may be).

(b)     In addition, the Borrowers agree to pay any and all present or future stamp or documentary Taxes and any other excise or property Taxes which arise from any payment made under this Agreement or any other Loan Document or from the execution or delivery of, or otherwise with respect to, this Agreement or any other Loan Document (hereinafter referred to as "Other Taxes"); provided that, where such Other Taxes arise from a Loan made or Letter of Credit issued to the Company, the Borrowers shall pay only such Other Taxes as shall be imposed by the United States or any political subdivision thereof.

(c)     The Borrowers agree to indemnify each Lender and the Administrative Agent for the full amount of any Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 3.05) payable or paid by such Lender or the Administrative Agent (as the case may be).  Indemnification shall be made within 15 days of the date of demand therefor.

(d)     Each Lender severally agrees to indemnify the Administrative Agent for the full amount of (i) Indemnified Taxes attributable to such Lender (but only to the extent that any Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.01(g) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent hereunder or in connection with any Loan Document. Indemnification shall be made whether or not such Taxes described in clause (i) through (iii) of this paragraph (d) were correctly or legally imposed or asserted by the relevant Governmental Authority and shall be made within 15 days of the date of demand therefor. A certificate as to the amount of such payment or liability delivered to a Lender by the Administrative Agent shall be conclusive absent manifest error.

(e)     Each Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments under this Agreement or any other Loan Document shall, at the reasonable request of the Company or the Administrative Agent, deliver to the Company (with a copy to the Administrative Agent), at such time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law (if any) as is required to permit such payments to be made without withholding or at a reduced rate.

(f)     Without limiting the foregoing, in the case of a US Borrower, (i) any US Lender shall provide upon executing this Agreement (and from time to time thereafter upon any reasonable request of such US Borrower or the

Administrative Agent) a duly executed Internal Revenue Service Form W-9 and (ii) any Foreign Lender shall, to the extent it is legally entitled to do so, provide upon executing this Agreement (and from time to time thereafter upon any reasonable request of such US Borrower or the Administrative Agent) a duly executed applicable Internal Revenue Service Form W-8 (or in the case of a Foreign Lender that is not a bank, other customary documentation reasonably satisfactory to the Borrower establishing eligibility for the portfolio interest exemption).

(g)    If a payment made to a Lender under any Loan Document would be subject to ~~U.S.~~US federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Company and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Company or the Administrative Agent as may be necessary for the Company and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for the purposes of this Section 3.05(g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)    If any Lender receives a refund or credit from a taxation authority (such credit to include any increase in any foreign tax credit) in respect of any Indemnified Taxes for which it has been indemnified by any Borrower or with respect to which any Borrower has paid additional amounts hereunder, it shall within 30 days from the date of such receipt pay over the amount of such refund, credit or other reduction (including any interest paid or credited by the relevant taxing authority or Governmental Authority with respect to such refund, credit or other reduction) to the applicable Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower with respect to the Indemnified Taxes giving rise to such refund or credit), net of all reasonable out-of-pocket third party expenses of such Lender related to claiming such refund or credit and without interest (other than interest paid by the relevant taxation authority with respect to such refund or credit); _provided, however,_ that such Borrower agrees to repay, upon the request of such Lender, the amount paid over to such Borrower (plus penalties, interest or other charges) to such Lender in the event such Lender is required to repay such refund or credit to such taxation authority.

(i)    Notwithstanding anything to the contrary in this Section 3.05, if the Internal Revenue Service determines that a Lender is participating in a conduit financing arrangement as defined in Section 7701(l) of the Code and the regulations thereunder (a "Conduit Financing Arrangement"), then (i) any Taxes that a Borrower is required to withhold from payments to the Lender participating

in the Conduit Financing Arrangement shall be excluded from the additional amounts to be paid under paragraphs (a) or (c) of this Section 3.05 and (ii) such Lender shall indemnify any Borrower in full for any and all Taxes for which a Borrower is held liable under Section 1461 of the Code by virtue of such Conduit Financing Arrangement.

       SECTION 3.06. <u>Designation and Change of Lending Offices.</u> (a) Each Lender and each L/C Issuer agrees that it will endeavor in good faith to designate as the office or offices from which it makes Loans or from which it issues Letters of Credit, as applicable, one or more of its existing offices not known to it to be subject to costs or other requirements for which it would be entitled to seek compensation under Section 3.01, 3.02(a)(ii), 3.03 or 3.05 (or, where such costs cannot be avoided, that will minimize such costs), insofar as such designation would not result, in the sole judgment of such Lender, in economic, legal or regulatory disadvantages to such Lender or any such lending office, and subject to overall policy considerations of such Lender.

       (b)     Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01, 3.02(a)(ii), 3.03 or 3.05 with respect to such Lender, it will, if requested by the Company, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; <u>provided</u> that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage; <u>provided</u> <u>further</u> that nothing in this Section 3.06 shall affect or postpone any of the obligations of any Borrower or the rights of any Lender pursuant to Section 3.01, 3.02(a), 3.03 or 3.05.

       SECTION 3.07. <u>Substitution of Lenders.</u> Upon the receipt by a Borrower from any Lender (an "<u>Affected Lender</u>") of a claim under Section 3.01, 3.02(a)(ii), 3.03 or 3.05, or if any Lender shall (x) become a Defaulting Lender or a Declining Lender or (y) deliver a Notice of Objection pursuant to Section 2.14, the Company may: (a) request one or more of the other Lenders to acquire and assume all or part of such Affected Lender's Loans and Commitments or (b) replace such Affected Lender by designating another Lender or a financial institution that is willing to acquire such Loans and assume such Commitments; <u>provided</u> that (i) such replacement does not conflict with any requirement of law, (ii) the applicable Borrower shall repay (or the replacement Lender or financial institution shall purchase, at par) all Loans, accrued interest and other amounts owing to such replaced Lender prior to the date of replacement, (iii) the applicable Borrowers shall be liable to such replaced Lender under Section 3.04 if any ~~LIBOR~~Term SOFR Loan or EURIBOR Loan owing to such replaced Lender shall be prepaid (or purchased) other than on the last day of the Interest Period relating thereto, (iv) the replacement financial institution, if not already a Lender, shall otherwise qualify as an Eligible Assignee, (v) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 11.01 (<u>provided</u> that the applicable Borrowers or replacement Lender shall be obligated to pay the registration and processing fee) and (vi) the applicable Borrowers shall pay all additional amounts (if

any) required pursuant to Section 3.01, 3.02(b), 3.03 or 3.05, as the case may be, to the extent such additional amounts were incurred on or prior to the consummation of such replacement.

ARTICLE IV

Conditions to Making Loans and Issuing Letters of Credit

SECTION 4.01. <u>Conditions of Closing</u>. The obligations of the Lenders to make Revolving Loans, of the Swing Line Lenders to make Swing Line Loans and of the L/C Issuers to issue Letters of Credit are subject to the conditions precedent that:

(a)     the Administrative Agent shall have received on the Closing Date the following:

(i)     from each party hereto a counterpart of this Agreement signed on behalf of such party (which, subject to Section 11.07(b), may include any Electronic Signatures transmitted by emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page of a counterpart of this Agreement);

(ii)     the written opinion or opinions with respect to the Loan Documents and the transactions contemplated thereby of (A) Laura C. Meagher, General Counsel of the Company, (B) Davis Polk & Wardwell, special counsel to the Company, (C) Ballard Spahr LLP, Pennsylvania counsel for the Company and (D) Baker McKenzie Zurich, Swiss counsel for the Company, in each case, dated the Closing Date, addressed to the Administrative Agent and the Lenders and satisfactory to the Administrative Agent;

(iii)     resolutions of the board of directors or other appropriate governing body (or of the appropriate committee thereof) of each Borrower certified by its secretary or assistant secretary or any Authorized Representative as of the Closing Date, approving and adopting the Loan Documents to be executed by such Borrower and authorizing the execution and delivery thereof;

(iv)     specimen signatures of officers or other appropriate representatives executing the Loan Documents on behalf of each Borrower, certified by its secretary or assistant secretary or any Authorized Representative;

(v)     the Organizational Documents of each Borrower certified as of the Closing Date as true and correct by its secretary or assistant secretary or any Authorized Representative;

(vi)     to the extent applicable and available in the relevant jurisdiction, a certificate issued as of a recent date by the Secretary of State or other appropriate Governmental Authority of the jurisdiction of formation of each Borrower as to the due existence and good standing of such Borrower;

(vii)     [reserved];

(viii)     a certificate of the Company certifying that (A) as of the Closing Date, each of the representations and warranties set forth in Article V is true and correct in all material

respects, (B) after giving effect to the Closing Date and all Loans to be made on the Closing Date, there will be no Default or Event of Default under this Agreement, and (C) except as disclosed in any reports or financial statements publicly filed with the Securities and Exchange Commission prior to the Closing Date, as of the Closing Date there shall not have occurred a material adverse change since April 3, 2021, in the business, financial position or results of operations of the Company and its Subsidiaries, taken as a whole;

(ix)    evidence that the Existing Credit Agreement has been, or concurrently with the Closing Date is being, terminated (and each of the Lenders that is a party to the Existing Credit Agreement hereby waives any requirement of prior notice for such termination), and that all amounts outstanding or accrued for the accounts of the lenders thereunder have been, or concurrently with the Closing Date are being, paid; and

(x)     such other documents, instruments, certificates and opinions as the Administrative Agent or the Required Lenders may reasonably request on or prior to the Closing Date in connection with the consummation of the transactions contemplated hereby;

(b)    any fees and expenses required to be paid on or before the Closing Date shall have been paid, including, to the extent invoiced at least one Business Day prior to the Closing Date, all fees, charges and disbursements of counsel to the Administrative Agent; and

(c)    the Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation, to the extent requested by the Lenders at least three Business Days prior to the Closing Date.

Without limiting the generality of the provisions of Article IX, for purposes of determining satisfaction of the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

SECTION 4.02. <u>Conditions of Revolving Loans, Letters of Credit and Swing Line Loans.</u> The obligations of the Lenders to make any Revolving Loans, the obligation of each Swing Line Lender to make any Swing Line Loan and the obligation of each L/C Issuer to issue or extend any Letter of Credit or to amend any Letter of Credit to increase the stated amount thereof hereunder on or subsequent to the Closing Date are subject to the satisfaction of the following conditions:

(a)    (i) the Administrative Agent, in the case of a Revolving Loan, or the applicable Swing Line Lender, in the case of a Swing Line Loan, shall have received a Borrowing Notice as required by Article II or (ii) the applicable L/C Issuer, in the case of any

issuance or extension or such amendment of a Letter of Credit, shall have received a request for such issuance or extension or such amendment as required by Article II;

(b)      the representations and warranties set forth in Article V (other than those set forth in Section 5.05) shall be true and correct in all material respects on and as of the date of each such Loan or the date of issuance or extension or such amendment of each such Letter of Credit, as applicable, with the same effect as though such representations and warranties had been made on and as of such date, except to the extent that such representations and warranties expressly relate to an earlier date and except that the financial statements referred to in Section 5.04 shall be deemed to be those financial statements most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01 from the date such financial statements are delivered to the Administrative Agent and the Lenders in accordance with such Section; and

(c)      at the time of and after giving effect to each such Loan or the date of issuance or extension or such amendment of each such Letter of Credit, as applicable, no Default or Event of Default shall have occurred and be continuing.

At the time of each Borrowing, each issuance or extension of a Letter of Credit and each amendment of a Letter of Credit that increases the stated amount thereof, the Company and each applicable Borrower shall be deemed to represent that each of the conditions set forth in this Section 4.02 has been satisfied.

        SECTION 4.03. <u>Initial Revolving Loans, Letters of Credit and Swing Line Loans of each New Borrowing Subsidiary.</u> Without limiting the conditions set forth in Section 4.02, the obligation of each Lender and L/C Issuer to make Loans or issue Letters of Credit for the account of any Borrowing Subsidiary designated pursuant to Section 2.14 is subject to the satisfaction of the following conditions:

(a)      The Administrative Agent shall have received such Borrowing Subsidiary's Borrowing Subsidiary Agreement, duly executed by all parties thereto.

(b)      The Administrative Agent shall have received a written opinion of counsel for such Borrowing Subsidiary covering such matters relating to such Borrowing Subsidiary or its Borrowing Subsidiary Agreement as the Administrative Agent shall reasonably request.

(c)      The Administrative Agent shall have received such documents and certificates as the Administrative Agent may reasonably request relating to the organization, existence and good standing of such Borrowing Subsidiary, the authorization of the Transactions insofar as they relate to such Borrowing Subsidiary and any other legal matters relating to such Borrowing Subsidiary, its Borrowing Subsidiary Agreement or such Transactions, all in form and substance satisfactory to the Administrative Agent.

ARTICLE V

Representations and Warranties

The Company represents and warrants with respect to itself and its Subsidiaries that:

SECTION 5.01. <u>Corporate Existence and Power.</u> The Company and each other Borrower is duly organized, validly existing and, to the extent applicable in the relevant jurisdiction, in good standing under the laws of the jurisdiction of its organization, and has all the corporate or other requisite powers and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted, except to the extent that the failure to have any such licenses, authorizations, consents and approvals could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.02. <u>Corporate and Governmental Authorization; No Contravention.</u> The execution, delivery and performance by the Company and each other Borrower of this Agreement and the other Loan Documents to which it is a party are within its corporate or other applicable powers, have been duly authorized by all necessary corporate or other applicable action, require no action by or in respect of, or filing with, any Governmental Authority and do not contravene, or constitute a default under, any provision of applicable law or regulation or of its Organizational Documents or, except to the extent that any such contravention or defaults could not reasonably be expected to result in a Material Adverse Effect, of any agreement, judgment, injunction, order, decree or other instrument binding upon the Company or any of its Subsidiaries or result in the creation or imposition of any Lien on any asset of the Company or any of its Subsidiaries.

SECTION 5.03. <u>Binding Effect.</u> This Agreement constitutes a valid and binding agreement of the Company and each other Borrower, and each other Loan Document, when executed and delivered by any Borrower, will constitute a valid and binding agreement of such Borrower, in each case enforceable in accordance with its terms.

SECTION 5.04. <u>Financial Information.</u> The consolidated balance sheet of the Company and its Subsidiaries as of April 3, 2021, and the related consolidated statements of income, retained earnings and cash flow for the fiscal year then ended, reported on by PricewaterhouseCoopers LLP and set forth in the Company's Form 10-K for the fiscal year then ended, fairly present, in conformity with GAAP, the consolidated financial position of the Company and its Subsidiaries as of such date and their consolidated results of operations and cash flows for such fiscal year.

SECTION 5.05. <u>Litigation.</u> There is no action, suit or proceeding pending against, or, to the knowledge of the Company, threatened against or affecting, the Company or any of its Subsidiaries before any court or arbitrator or any Governmental Authority which could reasonably be expected to result in a Material Adverse Effect, or which in any manner draws into question the validity of this Agreement or the other Loan Documents.

[[6082021]]

SECTION 5.06. <u>Compliance with ERISA.</u> Except to the extent the failure to do so could not reasonably be expected to result in a Material Adverse Effect, each member of the ERISA Group has fulfilled its obligations under the minimum funding standards of ERISA and the Code with respect to each Plan and is in compliance in all material respects with the presently applicable provisions of ERISA and the Code with respect to each Plan. No member of the ERISA Group has (a) sought a waiver of the minimum funding standard under Section 412 of the Code in respect of any Plan or Multiemployer Plan, (b) failed to make any contribution or payment to any Plan or Multiemployer Plan or in respect of any Benefit Arrangement, or made any amendment to any Plan or Benefit Arrangement, which has resulted or could result in the imposition of a Lien or the posting of a bond or other security under ERISA or the Code or (c) incurred any liability under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA, in each case that could reasonably be expected to have a Material Adverse Effect.

SECTION 5.07. <u>Environmental Matters.</u> In the ordinary course of its business, the Company conducts periodic reviews, which it considers prudent and reasonable in light of the nature of the business, of the effect of Environmental Laws on the business, operations and properties of the Company and its Subsidiaries, in the course of which it identifies and evaluates associated liabilities and costs (including, without limitation, any capital or operating expenditures required for clean-up or closure of properties presently or previously owned, any capital or operating expenditures required to achieve or maintain compliance with environmental protection standards imposed by law or as a condition of any license, permit or contract, any related constraints on operating activities, including any periodic or permanent shutdown of any facility or reduction in the level of or change in the nature of operations conducted thereat and any actual or potential liabilities to third parties, including employees, and any related costs and expenses). On the basis of this review, the Company has reasonably concluded that Environmental Laws are unlikely to have a Material Adverse Effect.

SECTION 5.08. <u>Taxes.</u> The Company and its Significant Subsidiaries have filed all United States Federal income tax returns and all other material tax returns required to be filed by them and have paid all taxes due pursuant to such returns or pursuant to any assessment received by the Company or any Significant Subsidiary, except (a) for such amounts as may be contested in good faith by appropriate proceedings or (b) to the extent that any failure to file or pay could not reasonably be expected to result in a Material Adverse Effect. The charges, accruals and reserves on the books of the Company and its Subsidiaries in respect of Taxes or other governmental charges are, in the reasonable opinion of the Company, adequate.

SECTION 5.09. <u>Margin Stock.</u> The proceeds of the borrowings made hereunder will be used by the Company only for the purposes expressly authorized herein. None of such proceeds will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock or for the purpose of reducing or retiring any Indebtedness which was originally incurred to purchase or carry Margin Stock or for any other purpose which might constitute any of the Loans a "purpose" credit within the meaning of Regulation U or Regulation X (12 C.F.R. Part 221) of the Federal Reserve

Board ~~of Governors~~; provided, however, that the Company may purchase (i) its own stock and (ii) Margin Stock so long as, following the application of the proceeds of each borrowing hereunder, not more than 25% of the value of the assets of the Company and its Subsidiaries on a consolidated basis will be Margin Stock.

SECTION  5.10. <u>Investment Company.</u> Neither the Company nor any Borrowing Subsidiary is required to register as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION  5.11. <u>Full Disclosure.</u> All information concerning the Company, the Subsidiaries and the transactions contemplated hereby, other than any forward-looking statements, taken as a whole, that has been or will be made available by the Company to the Administrative Agent or any Lender is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made, and any forward-looking statements that have been or will be made available by the Company to the Administrative Agent or any Lender are or will be, when furnished, based upon assumptions that the Company's management believes to be reasonable at the time such statements are made.

SECTION  5.12. <u>No Consents, Etc.</u> Neither the respective businesses or properties of the Company or any Subsidiary, nor any relationship among the Company or any Subsidiary and any other Person, nor any circumstance in connection with the execution, delivery and performance of the Loan Documents and the transactions contemplated thereby, is such as to require a consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority on the part of the Company or any Borrowing Subsidiary as a condition to the consummation of the Transactions, which, if not obtained or effected, could reasonably be expected to have a Material Adverse Effect, or if so, such consent, approval, authorization, filing, registration or qualification has been duly obtained or effected, as the case may be.

SECTION  5.13. <u>Anti-Corruption Laws and Sanctions.</u> The Borrowers have implemented and maintain in effect policies and procedures reasonably designed to promote compliance by the Borrowers, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrowers, their Subsidiaries and, to the knowledge of the Borrowers, their respective officers, employees, directors and agents, acting in their capacity as such, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) the Borrowers, any Subsidiary or, to the knowledge of the Borrowers, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrowers, any agent of the Borrowers or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

ARTICLE VI

Affirmative Covenants

Until the Facility Termination Date, unless the Required Lenders shall otherwise consent in writing:

SECTION 6.01. <u>Financial Reports, Etc.</u> The Company will deliver to the Administrative Agent, on behalf of the Lenders:

(a)      as soon as available and in any event within 90 days after the end of each fiscal year of the Company, a consolidated balance sheet of the Company and its Subsidiaries as of the end of such fiscal year and the related consolidated statements of income, retained earnings and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all prepared in accordance with GAAP and containing opinions of PricewaterhouseCoopers LLP or other independent certified public accountants of nationally recognized standing, which are unqualified as to the scope of the audit performed and as to the "going concern" status of the Company;

(b)      as soon as available and in any event within 45 days after the end of each of the first three quarters of each fiscal year of the Company, a consolidated balance sheet of the Company and its Subsidiaries as of the end of such quarter and the related consolidated statements of income for such quarter and of income and cash flows for the portion of the Company's fiscal year ended at the end of such quarter, setting forth in each case in comparative form the figures for the corresponding quarter and the corresponding portion of the Company's previous fiscal year, all certified (subject to normal year-end adjustments) as to fairness of presentation and conformity with GAAP by an Authorized Representative;

(c)      simultaneously with the delivery of each set of financial statements referred to in clauses (a) and (b) above, a certificate of an Authorized Representative substantially in the form of Exhibit G hereto (i) setting forth in reasonable detail the calculations required to establish whether the Company was in compliance with the requirements of Sections 7.01, 7.02(j) and 7.03(f) as of the last day of the applicable fiscal year or quarter and (ii) stating whether there exists on the date of such certificate any Default or Event of Default and, if any Default or Event of Default then exists, setting forth the details thereof and the action which the Company is taking or proposes to take with respect thereto;

(d)      forthwith upon the occurrence of any Default or Event of Default, a certificate of an Authorized Representative setting forth the details thereof and the action which the Company is taking or proposes to take with respect thereto;

(e)      promptly upon the mailing thereof to the shareholders of the Company generally, copies of all financial statements, reports and proxy statements so mailed;

(f)      promptly upon the filing thereof, copies of all registration statements (other than the exhibits thereto and any registration statements on Form S-8 or its equivalent) and reports on Forms 10-K, 10-Q and 8-K (or their equivalents) which the Company shall have filed with the Securities and Exchange Commission;

[[6082021]]

(g)        if and when any member of the ERISA Group (i) gives or is required to give notice to the PBGC of any "reportable event" (as defined in Section 4043 of ERISA) with respect to any Plan which might constitute grounds for a termination of such Plan under Title IV of ERISA, or knows that the plan administrator of any Plan has given or is required to give notice of any such reportable event, a copy of the notice of such reportable event given or required to be given to the PBGC; (ii) receives notice that it has incurred complete or partial withdrawal liability under Title IV of ERISA or notice that any Multiemployer Plan is insolvent, has been terminated or is in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), a copy of such notice; (iii) receives notice from the PBGC under Title IV of ERISA of an intent to terminate, impose liability (other than for premiums under Section 4007 of ERISA) in respect of, or appoint a trustee to administer, any Plan, a copy of such notice; (iv) applies for a waiver of the minimum funding standard under Section 412 of the Code, a copy of such application; (v) gives notice of intent to terminate any Plan under Section 404l(c) of ERISA, a copy of such notice and other information filed with the PBGC; (vi) gives notice of withdrawal from any Plan pursuant to Section 4063 of ERISA, a copy of such notice; or (vii) fails to make any payment or contribution to any Plan or Multiemployer Plan or in respect of any Benefit Arrangement or makes any amendment to any Plan or Benefit Arrangement which has resulted or could result in the imposition of a Lien or the posting of a bond or other security, a certificate of an Authorized Representative setting forth details as to such occurrence and the action, if any, which the Company or applicable member of the ERISA Group is required or proposes to take with respect thereto; <u>provided</u> that no such delivery referred to in clauses (i) through (vii) above shall be required unless the event described in the applicable clause could reasonably be expected to result in a Material Adverse Effect;

(h)        promptly following a request therefor, any documentation or other information that a Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation; and

(i)        from time to time such additional information regarding the financial position or business of the Company and its Subsidiaries as the Administrative Agent or any Lender may reasonably request.

Documents required to be delivered pursuant to clauses (a), (b), (f) or (g) of this Section may be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date on which such documents are posted (or a link thereto is provided) (i) on the Company's website on the Internet at <u>www.vfc.com</u> (or such other URL as shall have been specified by the Company to the Administrative Agent in a written notice), (ii) at <u>www.sec.gov</u> or (iii) on the Platform, in each case so long as such documents are generally available without charge to the Administrative Agent and each of the Lenders at such locations; <u>provided</u> that the Company shall notify (which may be by electronic mail) the Administrative Agent of the posting of any such documents and, upon request, provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Company with any

[[6082021]]

such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Company hereby acknowledges that (a) the Administrative Agent will make available to the Lenders and the L/C Issuers materials and/or information provided by or on behalf of the Company or any Borrowing Subsidiary hereunder (collectively, the "Company Materials") by posting the Company Materials on the Platform and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive MNPI and who may be engaged in investment and other market-related activities with respect to securities of the Company or any of its Subsidiaries. The Company hereby agrees that (w) all Company Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Company Materials "PUBLIC", the Company shall be deemed to have authorized the Administrative Agent, the L/C Issuers and the Lenders to treat such Company Materials as not containing any MNPI (provided, however, that to the extent such Company Materials constitute Information, they shall be treated as set forth in Section 11.13); (y) all Company Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Administrative Agent shall be entitled to treat any Company Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor". Notwithstanding the foregoing, the Company shall be under no obligation to mark any Company Materials "PUBLIC".

     SECTION  6.02.  Payment of Taxes.  The Company will pay, and will cause each Significant Subsidiary to pay, all its Tax liabilities, except (a) where the same may be contested in good faith by appropriate proceedings or (b) where the failure to do so could not reasonably be expected to result in a Material Adverse Effect, and the Company will maintain, and will cause each Significant Subsidiary to maintain, to the extent required under GAAP (or, in the case of a foreign Significant Subsidiary, the accounting standards applicable thereto), appropriate reserves for the accrual of the same.

     SECTION  6.03.  Maintenance of Properties; Insurance.  Except to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect, the Company will (a) keep, and will cause each Significant Subsidiary to keep, all material property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted, and (b) maintain, and will cause each Significant Subsidiary to maintain (either in the name of the Company or in such Significant Subsidiary's own name) with financially sound and reputable insurance companies, insurance on all their property in at least such amounts and against at least such risks as are usually insured against in the same general area by companies of established repute engaged in the same or a similar business; provided that the Company shall have the right to self-insure or use a captive insurer in order to meet such insurance requirements so long as the Company or such captive insurer provides the Administrative Agent and the Lenders with reasonable proof of financial responsibility. The Company will furnish to the Administrative Agent and the Lenders, upon written request from the Administrative Agent, full information as to the insurance carried.

SECTION 6.04. <u>Compliance with Laws.</u> The Company will comply, and will cause each Subsidiary to comply, in all material respects with all applicable laws, ordinances, rules, regulations, and requirements of Governmental Authorities (including, without limitation, Environmental Laws, ERISA, the Trading with the Enemy Act and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V), the USA PATRIOT Act, the United States Foreign Corrupt Practices Act of 1977 and, in each case, the rules and regulations thereunder and any other enabling legislation or executive orders relating thereto), except where (a) the necessity of compliance therewith is contested in good faith by appropriate proceedings or (b) failure to comply therewith could not reasonably be expected to result in a Material Adverse Effect. The Company will maintain in effect policies and procedures reasonably designed to promote compliance by the Company, the Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

SECTION 6.05. <u>Books and Records.</u> The Company will maintain proper books of record and account in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Company. The Company will cause the Subsidiaries to maintain books of record and account of all financial transactions and matters involving the assets and business of the Subsidiaries, from which the Company may prepare consolidated financial statements in conformity with GAAP consistently applied.

SECTION 6.06. <u>Existence.</u> The Company will, and will cause each Borrowing Subsidiary (for so long as it shall be a Borrowing Subsidiary) to, do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect its legal existence; <u>provided</u> that the foregoing shall not prohibit any merger, consolidation or other transaction permitted under Section 7.04.

ARTICLE VII

Negative Covenants

Until the Facility Termination Date, unless the Required Lenders shall otherwise consent in writing:

SECTION 7.01. <u>Financial Covenant.</u> The Company will not permit the ratio of Consolidated Net Indebtedness to Consolidated Net Capitalization, as of the last day of any fiscal quarter of the Company, to be greater than (a) on or prior to the fiscal quarter ending on or about September 30, 2024, 0.70 to 1.00, (b) thereafter and on or prior to the fiscal quarter ending on or about September 30, 2025, 0.65 to 1.00 and (c) thereafter, 0.60 to 1.00.

SECTION 7.02. <u>Liens.</u> The Company will not, and will not permit any Subsidiary to, incur, create or permit to exist any Lien with respect to any property or assets now owned or hereafter acquired by the Company or any Subsidiary, other than:

(a)      Liens existing on the date of this Agreement securing Indebtedness outstanding on the date of this Agreement in an aggregate principal amount not exceeding US$50,000,000;

(b)      any Lien existing on any asset of any Person at the time such Person becomes a Subsidiary (other than as a result of a Division) and not created in contemplation of such event;

(c)      any Lien on any asset of any Person existing at the time such Person is merged or consolidated with or into the Company or a Subsidiary and not created in contemplation of such event;

(d)      any Lien existing on any asset prior to the acquisition thereof by the Company or a Subsidiary and not created in contemplation of such acquisition;

(e)      any Lien on any asset securing Indebtedness incurred or assumed for the purpose of financing all or any part of the cost of acquiring such asset, provided that such Lien attaches to such asset concurrently with or within 180 days after the acquisition thereof;

(f)      any Lien arising out of the refinancing, extension, renewal or refunding of any Indebtedness secured by any Lien permitted by clauses (a) through (e) above, provided that such Indebtedness is not increased and is not secured by any additional assets;

(g)      Liens arising in the ordinary course of business which (i) do not secure Indebtedness, (ii) do not secure any obligation in an amount exceeding US$50,000,000 and (iii) do not otherwise in the aggregate materially detract from the value of the assets subject thereto or materially impair the use thereof in the operations of its business;

(h)      Liens on assets of a Subsidiary securing Indebtedness owed to the Company or a Wholly Owned Subsidiary;

(i)      Liens imposed by law for Taxes that are not yet due or are being contested as described in Section 6.02; and

(j)      Liens not otherwise permitted by the foregoing clauses securing Indebtedness in an aggregate principal amount at any time outstanding not to exceed 15% of Consolidated Net Worth; provided that the sum of the aggregate principal amount of Indebtedness permitted to be secured by this clause (j) plus the aggregate principal amount of Indebtedness incurred in accordance with Section 7.03(f) at any time outstanding shall not exceed 20% of Consolidated Net Worth.

SECTION 7.03. Indebtedness of Subsidiaries. The Company will not permit any Subsidiary to incur, create, assume or permit to exist any Indebtedness, howsoever evidenced, except:

(a)      Indebtedness of any Person outstanding at the time such Person becomes a Subsidiary (other than as a result of a Division) and not created in contemplation of such event;

(b)      Indebtedness of any Person outstanding at the time such Person is merged or consolidated with or into a Subsidiary and not created in contemplation of such event;

(c)      Indebtedness secured by a Lien permitted by Section 7.02 hereof;

(d)      Indebtedness owing to the Company or a Wholly Owned Subsidiary;

(e)      Refinancing Indebtedness in respect of Indebtedness permitted by clause (a), (b) or (c) above (other than, in the case of clause (c), Refinancing Indebtedness in respect of (i) Indebtedness referred to in Section 7.02(j) or (ii) Indebtedness referred to in Section 7.02(h) insofar as such Refinancing Indebtedness would be owed to a Person other than the Company or a Wholly Owned Subsidiary); and

(f)      Indebtedness not otherwise permitted by the foregoing clauses of this Section in an aggregate outstanding principal amount for all Subsidiaries at no time exceeding 15% of Consolidated Net Worth; <u>provided</u> that the sum of the aggregate principal amount of Indebtedness incurred in accordance with this clause (f) plus the aggregate principal amount of Indebtedness permitted to be secured in accordance with Section 7.02(j) at any time outstanding shall not exceed 20% of Consolidated Net Worth.

The foregoing is subject to the further limitation that for purposes of this Section, any preferred stock of a Subsidiary held by a Person other than the Company or a Wholly Owned Subsidiary shall be included, at the higher of its voluntary or involuntary liquidation value, in the Indebtedness of such Subsidiary.

SECTION 7.04. <u>Consolidations, Mergers and Sales of Assets.</u> The Company will not (a) consolidate with or merge with or into any other Person; <u>provided</u> that the Company may consolidate with or merge with or into another Person if (i) (A) the Company is the corporation surviving such merger and is not a subsidiary of another Person or (B) the Person surviving such merger (the "<u>Surviving Company</u>") is organized in the United States or a jurisdiction thereof, is not a subsidiary of another Person and assumes all of the obligations and liabilities of the Company under and in respect of this Agreement and each other Loan Document, (ii) immediately after giving effect to such merger, no Default or Event of Default shall have occurred and be continuing and (iii) in the case of clause (i)(B) above, the Administrative Agent shall have been given reasonable advance notice of such transaction and shall have received such documents and certificates as the Administrative Agent or its counsel shall reasonably have requested relating to the organization, existence and good standing of the Surviving Company and the authorization by the Surviving Company of such assumption of obligations and liabilities, all in form and substance reasonably satisfactory to the

Administrative Agent and its counsel; or (b) sell, lease or otherwise transfer, directly or indirectly, all or substantially all of its assets to any other Person, except for sales, leases and other transfers to a Wholly Owned Subsidiary.

        SECTION 7.05. <u>Use of Proceeds.</u> The Borrowers will not request any Borrowing or Letter of Credit, and the Borrowers shall not directly or, to the knowledge of the Borrowers, indirectly, use the proceeds of any Borrowing or Letter of Credit (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except to the extent licensed by the Office of Foreign Assets Control of the ~~U.S.~~US Department of the Treasury or otherwise authorized under ~~U.S.~~US law.

        ARTICLE VIII

Events of Default and Acceleration

        SECTION 8.01. <u>Events of Default.</u> If any one or more of the following events (herein called "<u>Events of Default</u>") shall occur for any reason whatsoever (and whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any Governmental Authority), that is to say:

(a)     if default shall be made in the due and punctual payment of the principal of any Loan when and as the same shall be due and payable, whether pursuant to any provision of Article II or Article III, at maturity, by acceleration or otherwise; or

(b)     if default shall be made in the due and punctual payment of any reimbursement obligation in respect of any L/C Disbursement or any amount of interest on any Loan or other Obligation or of any fees or other amounts payable to any of the Lenders, L/C Issuers or the Administrative Agent within five days of the date on which the same shall be due and payable; or

(c)     if default shall be made in the performance or observance of the covenants set forth in (i) Section 6.01(d) with respect to an Event of Default, (ii) Section 6.06 with respect to the legal existence of the Company or (iii) Article VII; or

(d)     if a default shall be made in the performance or observance of, or shall occur under, any covenant, agreement or provision contained in this Agreement or any other Loan Document (other than as described in clauses (a), (b) or (c) above) and such default shall continue for 30 or more days after receipt of notice of such default by an Authorized Representative from the Administrative Agent or the Required Lenders; or

(e)     if there shall occur (i) a default, which is not waived or cured within any applicable period of grace, in the payment of any principal with respect to any Indebtedness (other than the Loans and other Obligations and other than Indebtedness

owed to the Company or any Subsidiary) of the Company or any Subsidiary in an amount not less than US$100,000,000 in the aggregate outstanding, or (ii) any event or condition, including any default in the payment of interest, fees or other amounts, specified in any agreement or instrument under or pursuant to which any such Indebtedness may have been issued, created, assumed, guaranteed or secured, and such event or condition shall continue for more than the period of grace, if any, therein specified, and such event or condition shall permit the holder of any such Indebtedness (or any agent or trustee acting on behalf of one or more holders) to accelerate the maturity thereof; or

(f)     if any representation or warranty contained in any Loan Document, or any representation, warranty or statement of fact in any writing, certificate, report or statement at any time furnished to the Administrative Agent or any Lender by or on behalf of the Company or any Subsidiary pursuant to or in connection with any Loan Document, shall be false or misleading in any material respect when given; or

(g)     if the Company or any Significant Subsidiary shall be unable to pay its debts generally as they become due; file a petition to take advantage of any insolvency statute; make an assignment for the benefit of its creditors; commence a proceeding for the appointment of a custodian, receiver, trustee, liquidator or conservator of itself or of the whole or any substantial part of its property; or file a petition or answer seeking liquidation, reorganization, arrangement or similar relief any Debtor Relief Laws; or

(h)     if a court of competent jurisdiction shall enter an order, judgment or decree appointing a custodian, receiver, trustee, liquidator or conservator of the Company or any Significant Subsidiary or of the whole or any substantial part of its properties and such order, judgment or decree continues unstayed and in effect for a period of 60 days, or shall approve a petition filed against the Company or any Significant Subsidiary seeking liquidation, reorganization or arrangement or similar relief under any Debtor Relief Laws, which petition is not dismissed within 60 days; or if, under the provisions of any Debtor Relief Laws, a court of competent jurisdiction shall assume custody or control of the Company or any Significant Subsidiary or of the whole or any substantial part of its properties, which control is not relinquished within 60 days; or if there is commenced against the Company or any Significant Subsidiary any proceeding or petition seeking liquidation, reorganization, arrangement or similar relief under any Debtor Relief Laws, which proceeding or petition remains undismissed for a period of 60 days; or if the Company or any Significant Subsidiary takes any action to indicate its consent to or approval of any such proceeding or petition; or

(i)     if (i) any judgment or order where the amount not covered by insurance (or the amount as to which the insurer denies liability) is in excess of US$100,000,000 is rendered against the Company or any Subsidiary, or (ii) there is any attachment, injunction or execution against any of the Company's or the Subsidiaries' properties for any amount in excess of US$100,000,000, and such judgment, attachment, injunction or execution remains unpaid, unstayed, undischarged, unbonded or undismissed for a period of thirty (30) days; or

(j)     if any member of the ERISA Group shall fail to pay when due an amount or amounts aggregating in excess of US$100,000,000 which it shall have become liable to

pay under Title IV of ERISA; or notice of intent to terminate a Material Plan shall be filed under Title IV or ERISA by any member of the ERISA Group, any plan administrator or any combination of the foregoing; or the PBGC shall institute proceedings under Title IV of ERISA to terminate, to impose liability (other than for premiums under Section 4007 of ERISA) in respect of, or to cause a trustee to be appointed to administer any Material Plan; or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Material Plan must be terminated; or there shall occur a complete or partial withdrawal from, or a default, within the meaning of Section 4219(c)(5) of ERISA, with respect to, one or more Multiemployer Plans which could reasonably be expected to cause one or more members of the ERISA Group to incur a payment obligation in excess of US$100,000,000; or

(k)        if a Change of Control shall occur;

then, and in any such event and at any time thereafter during the continuance of such event, if such Event of Default or any other Event of Default shall have not been waived,

(i)        either or both of the following actions may be taken: the Administrative Agent may with the consent of the Required Lenders, and at the direction of the Required Lenders shall, (A) declare any obligation of the Lenders to make further Loans, and of the L/C Issuers to issue, extend or amend Letters of Credit, terminated, whereupon the obligation of each Lender to make further Loans hereunder, and of the L/C Issuers to issue, renew, extend or amend Letters of Credit hereunder, shall terminate immediately, and (B) declare by notice to the Company any or all of the Obligations to be immediately due and payable, and the same, including all interest accrued thereon and all other obligations of the Company and each Borrowing Subsidiary to the Administrative Agent, the Lenders and the L/C Issuers, shall forthwith become immediately due and payable without presentment, demand, protest, notice or other formality of any kind, all of which are hereby expressly waived, anything contained herein or in any instrument evidencing the Obligations to the contrary notwithstanding; provided, however, that notwithstanding the above, if there shall occur an Event of Default under clause (g) or (h) above with respect to a Borrower, then the obligation of the Lenders to make Loans hereunder, and of the L/C Issuers to issue, extend or amend Letters of Credit hereunder, shall automatically terminate and any and all of the Obligations shall be immediately due and payable without the necessity of any action by the Administrative Agent or the Required Lenders or notice to the Administrative Agent or the Lenders; and

(ii)        the Administrative Agent may with the consent of the Required Lenders, and at the direction of the Required Lenders shall, require that the Borrowers cash collateralize all L/C Exposure (in an amount equal to the then outstanding L/C Exposure) plus the Letter of Credit fees payable under Section 2.11(b) with respect to each then outstanding Letter of Credit (calculated at the rate then in effect for the period from the date of such cash collateralization until the expiry date of each such Letter of Credit) in accordance with the procedures set forth in Section 2.05(j); and

(iii)        the Administrative Agent and each of the Lenders and L/C Issuers shall have all of the rights and remedies available under the Loan Documents or under any applicable law.

[[6082021]]

SECTION 8.02. <u>Administrative Agent to Act.</u> In case any one or more Events of Default shall occur and not have been waived, the Administrative Agent may, and at the direction of the Required Lenders shall, proceed to protect and enforce their rights or remedies either by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein or in any other Loan Document, or to enforce the payment of the Obligations or any other legal or equitable right or remedy.

SECTION 8.03. <u>Cumulative Rights.</u> No right or remedy herein conferred upon the Lenders, the L/C Issuers or the Administrative Agent is intended to be exclusive of any other rights or remedies contained herein or in any other Loan Document, and every such right or remedy shall be cumulative and shall be in addition to every other such right or remedy contained herein and therein or now or hereafter existing at law or in equity or by statute, or otherwise.

SECTION 8.04. <u>No Waiver.</u> No course of dealing between the Company or any Borrowing Subsidiary, on the one hand, and any Lender, any L/C Issuer or the Administrative Agent, on the other hand, or any failure or delay on the part of any Lender, any L/C Issuer or the Administrative Agent in exercising any rights or remedies under any Loan Document or otherwise available to it, shall operate as a waiver of any rights or remedies, and no single or partial exercise of any rights or remedies shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder or of the same right or remedy on a future occasion.

SECTION 8.05. <u>Allocation of Proceeds.</u> If an Event of Default has occurred and not been waived, and the maturity of the Loans has been accelerated pursuant to this Article VIII, all payments received by the Administrative Agent hereunder in respect of any principal of or interest on the Obligations, or any other amounts payable by the Company or the Borrowing Subsidiaries hereunder, shall be applied by the Administrative Agent in the following order:

(a)    amounts due to the Administrative Agent, the Lenders and the L/C Issuers pursuant to Section 2.11 and Section 11.05;

(b)    payments of interest on Loans and interest on L/C Disbursements to be applied for the ratable benefit of the Lenders (based on the amounts accrued for the account of each Lender at such time) and the L/C Issuers;

(c)    payments of principal of Loans and reimbursement of L/C Disbursements, to be applied for the ratable benefit of the Lenders (based on the amounts owing to each Lender at such time) and the L/C Issuers;

(d)    amounts due to the Administrative Agent, the L/C Issuers and the Lenders pursuant to Section 11.09;

(e)    payments of all other amounts due under any of the Loan Documents, if any, to be applied for the ratable benefit of the parties entitled thereto;

(f)      any surplus remaining after application as provided for herein, to the applicable Borrowers or otherwise as may be required by applicable law.

ARTICLE IX

The Administrative Agent

SECTION 9.01. <u>Appointment and Authority.</u> Each of the Lenders and the L/C Issuers hereby irrevocably appoints JPMorgan to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and thereof, together with such actions and powers as are reasonably incidental thereto. Except as expressly set forth in Section 9.06, the provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the L/C Issuers, and the Borrowers shall have no rights as third party beneficiaries of any of such provisions.

SECTION 9.02. <u>Rights as Lenders.</u> The Person serving as the Administrative Agent hereunder shall, if it shall be a Lender or an L/C Issuer, have the same rights and powers in its capacity as a Lender or an L/C Issuer as any other Lender or L/C Issuer and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "L/C Issuer" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Company or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders or the L/C Issuers.

SECTION 9.03. <u>Exculpatory Provisions.</u> The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)      shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties);

(b)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); <u>provided</u> that the Administrative Agent shall not be required to take any

[[6082021]]

action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable law; and

(c)       shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Company or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in Sections 8.01 and 11.06) or (ii) in the absence of a court of competent jurisdiction having determined, in a final and non-appealable judgment, that the Administrative Agent's action or inaction constituted gross negligence or willful misconduct on the part of the Administrative Agent. The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice (stating it is a "notice of default") describing such Default or Event of Default is given to the Administrative Agent by a Borrower, a Lender or an L/C Issuer.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document (including, for the avoidance of doubt, in connection with the Administrative Agent's reliance on any Electronic Signature transmitted by emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page) or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items (which on their face purport to be such items) expressly required to be delivered to the Administrative Agent.

SECTION 9.04.  Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any e-mail transmission of a .pdf or similar electronic copy of any such document or other writing or any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a

Lender or L/C Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or L/C Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for a Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 9.05. <u>Delegation of Duties.</u> The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to the respective activities of all such Persons in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent.

SECTION 9.06. <u>Resignation of Administrative Agent.</u> The Administrative Agent may at any time give notice of its resignation to the Lenders, the L/C Issuers and the Company. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Company, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders and the L/C Issuers, and with the consent of the Company, appoint a successor Administrative Agent meeting the qualifications set forth above; <u>provided</u> that if the retiring Administrative Agent shall notify the Company and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (2) all payments, communications and determinations provided to be made by, to or through the retiring Administrative Agent instead be made by or to each Lender and L/C Issuer directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Company to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Company and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Sections 11.05 and 11.09 shall continue in effect for the benefit of the retiring Administrative Agent, its sub-agents and their respective Related

Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as the retiring Administrative Agent.

If the Person serving as the Administrative Agent has become, or any Person as to which the Administrative Agent is, directly or indirectly, a subsidiary has become, the subject of a Bankruptcy Event, the Required Lenders may, to the extent permitted by applicable laws, by notice in writing to the Company and such Person, remove such Person as Administrative Agent and, with the consent of the Company, appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

SECTION  9.07. Acknowledgments of Lenders and L/C Issuers. (a) Each Lender and L/C Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent, any Arranger or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and L/C Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent, any Arranger or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(b)       (i) Each Lender and L/C Issuer hereby agrees that (x) if the Administrative Agent notifies such Lender or L/C Issuer that the Administrative Agent has determined in its sole discretion that any funds received by such Lender or L/C Issuer from the Administrative Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Payment") were erroneously transmitted to such Lender or such L/C Issuer (whether or not known to such Lender or L/C Issuer), and demands the return of such Payment (or a portion thereof), such Lender or L/C Issuer, as the case may be, shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the applicable Overnight Rate, and (y) to the extent permitted by applicable law, such Lender or L/C Issuer shall not assert, and hereby waives, as to the Administrative Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine. A notice of the Administrative Agent to any Lender or L/C Issuer under this Section 9.07(b) shall be conclusive, absent manifest error.

(ii)      Each Lender and L/C Issuer hereby further agrees that if it receives a Payment from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Payment (a "Payment Notice") or (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has been made with respect to such Payment. Each Lender and L/C Issuer agrees that, in each such case, or if it otherwise becomes aware a Payment (or portion thereof) may have been sent in error, such Lender or L/C Issuer, as the case may be, shall promptly notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender or L/C Issuer to the date such amount is repaid to the Administrative Agent at the applicable Overnight Rate.

(iii)      Each of the Borrowers hereby agrees that (x) in the event an erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Payment (or portion thereof) for any reason (such unrecovered amount, an "Erroneous Payment Return Deficiency"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans (but not its Commitments) with respect to which such erroneous Payment was made ~~(the "Erroneous Payment Impacted Loan")~~ in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of ~~the~~such Loans (but not Commitments) ~~of the Erroneous Payment Impacted Loans~~, the "Erroneous Payment Deficiency Assignment") on a cashless basis at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Company) deemed to execute and deliver an Assignment and Assumption with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Loans to the Company or the Administrative Agent (but the failure of such Lender to deliver any such Notes shall not affect the effectiveness of the foregoing assignment), (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall relinquish its rights as a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments, which shall survive as to such assigning Lender, (iv) the Administrative Agent and the Company shall each be deemed to have waived any consents required under this Agreement to any such Erroneous Payment Deficiency Assignment and (v) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment; provided that, for the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement and (y) an erroneous Payment shall not pay, prepay,

repay, discharge or otherwise satisfy any Obligations owed by any Borrower; <u>provided</u> that, for the avoidance of doubt, clauses (x) and (y) above shall not apply to the extent any such Payment is, and solely with respect to the amount of such Payment that is, comprised of funds received by the Administrative Agent from any Borrower for the purpose of making such Payment.

(iv)     Subject to Section 11.01 (but excluding, in all events, any assignment consent or approval requirements (other than any required consent of the Company)), the Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). In addition, an Erroneous Payment Return Deficiency owing by the applicable Lender (x) shall be reduced by the proceeds of prepayments or repayments of principal and interest, or other distribution in respect of principal and interest, received by the Administrative Agent on or with respect to any such Loans acquired from such Lender pursuant to an Erroneous Payment Deficiency Assignment (to the extent that any such Loans are then owned by the Administrative Agent) and (y) may, in the sole discretion of the Administrative Agent, be reduced by any amount specified by the Administrative Agent in writing to the applicable Lender from time to time.

(v)     Each of the Borrowers hereby agrees that in the event an erroneous Payment (or portion thereof) is not recovered from any L/C Issuer that has received such Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such L/C Issuer with respect to such amount.

(vi)     Each party's obligations under this Section 9.07(b) shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all obligations under the Loan Documents.

SECTION  9.08. <u>No Other Duties, Etc.</u> Notwithstanding anything herein to the contrary, none of the Arrangers, Syndication Agents or Documentation Agents shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as Administrative Agent, a Lender, a Swing Line Lender or an L/C Issuer hereunder or thereunder, but all such Persons shall have the benefit of the indemnities and exculpatory provisions provided for hereunder and under the other Loan Documents.

SECTION  9.09. <u>Administrative Agent May File Proofs of Claim.</u> In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Borrower, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Disbursement shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the

Administrative Agent shall have made any demand on such Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Disbursements and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuers and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuers and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuers and the Administrative Agent hereunder) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and L/C Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuers, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and their agents and counsel, and any other amounts due the Administrative Agent hereunder.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or L/C Issuer to authorize the Administrative Agent to vote in respect of the claim of any Lender or L/C Issuer in any such proceeding.

SECTION 9.10. Certain ERISA Matters.

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of any Borrower, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class

exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)     In addition, unless either (1) sub-clause (i) in paragraph (a) of this Section is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in paragraph (a) of this Section, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of any Borrower, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

SECTION 9.11. Posting of Communications. (a) The Borrowers agree that the Administrative Agent may, but shall not be obligated to, make any Communications available to the Lenders and the L/C Issuers by posting the Communications on a Platform.

(b)     Although the Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Platform is secured through a per-deal authorization method whereby each user may access the Platform only on a deal-by-deal basis, each of the Lenders, the L/C Issuers and the Borrowers

[[6082021]]

acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Administrative Agent is not responsible for approving or vetting the representatives or contacts of any Lender or any L/C Issuer that are added to the Platform, and that there may be confidentiality and other risks associated with such distribution. Each of the Lenders, the L/C Issuers and the Borrowers hereby approves distribution of the Communications through the Platform and understands and assumes the risks of such distribution.

(c)     THE PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE PLATFORM AND THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT, THE ARRANGERS OR ANY OF THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "APPLICABLE PARTIES") HAVE ANY LIABILITY TO ANY BORROWER, ANY LENDER, ANY L/C ISSUER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE PLATFORM, EXCEPT TO THE EXTENT THAT SUCH LIABILITIES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY A FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH APPLICABLE PARTY; PROVIDED, HOWEVER, THAT IN NO EVENT SHALL ANY APPLICABLE PARTY HAVE ANY LIABILITY TO ANY BORROWER, ANY LENDER, ANY L/C ISSUER OR ANY OTHER PERSON FOR INDIRECT, SPECIAL, INCIDENT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES).

(d)     Each Lender and each L/C Issuer agrees that notice to it (as provided in the next sentence) specifying that Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender or L/C Issuer for purposes of the Loan Documents. Each Lender and L/C Issuer agrees (i) to notify the Administrative Agent in writing (which could be in the form of electronic communication) from time to time of such Lender's or L/C Issuer's (as applicable) email address to which the foregoing notice may be sent

by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

(e)     Each of the Lenders, the L/C Issuers and the Borrowers agrees that the Administrative Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Platform in accordance with the Administrative Agent's generally applicable document retention procedures and policies.

(f)     Nothing herein shall prejudice the right of the Administrative Agent, any Lender or any L/C Issuer to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

ARTICLE X

Guarantee

SECTION 10.01. <u>Guarantee.</u> (a) To induce the Lenders and the L/C Issuers to execute and deliver this Agreement and to make the Loans and to issue the Letters of Credit hereunder, and in consideration thereof, the Company hereby unconditionally and irrevocably guarantees to the Administrative Agent, for the ratable benefit of the Administrative Agent, the Lenders, the L/C Issuers and their respective successors, indorsees and assigns, the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations of the Borrowing Subsidiaries.

(b)     The guarantee contained in this Article X shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Company and the successors and assigns thereof, and shall inure to the benefit of the Administrative Agent, the Lenders, the L/C Issuers and their successors and permitted assigns, until all the Obligations of the Borrowing Subsidiaries shall have been satisfied by payment in full and the Commitments shall be terminated, notwithstanding that from time to time during the term of this Agreement the Borrowing Subsidiaries may be free from any Obligations.

(c)     The Company further agrees that the guarantee contained in this Article X constitutes a guarantee of payment when due and not of collection, and waives any right to require that any resort be had by the Administrative Agent, any Lender or any L/C Issuer to any security held for payment of the Obligations or to any balance of any deposit account or credit on the books of the Administrative Agent, any Lender or any L/C Issuer in favor of any Borrower or any other Person.

SECTION 10.02. <u>No Subrogation.</u> Notwithstanding any payment made by the Company hereunder or any set-off or application of funds of the Company by the Administrative Agent, any L/C Issuer or any Lender, the Company shall not be entitled to be subrogated to any of the rights of the Administrative Agent, any L/C Issuer or any Lender against any Borrowing Subsidiary or any collateral security or guarantee or

right of offset held by the Administrative Agent, any L/C Issuer or any Lender for the payment of the Obligations of the Borrowing Subsidiaries, nor shall the Company seek or be entitled to seek any contribution or reimbursement from any Borrowing Subsidiary in respect of payments made by the Company hereunder, until all amounts owing to the Administrative Agent, the L/C Issuers and the Lenders by any Borrowing Subsidiary on account of the Obligations of the Borrowing Subsidiaries are paid in full and the Commitments are terminated. If any amount shall be paid to the Company on account of such subrogation rights at any time when all of the Obligations of the Borrowing Subsidiaries shall not have been paid in full or the Commitments shall not have been terminated, such amount shall be held by the Company in trust for the Administrative Agent, the L/C Issuers and the Lenders and shall, forthwith upon receipt by the Company, be turned over to the Administrative Agent in the exact form received by the Company (duly indorsed by the Company to the Administrative Agent, if required), to be applied against the Obligations of the Borrowing Subsidiaries, whether matured or unmatured, in such order as the Administrative Agent may determine.

SECTION 10.03. <u>Amendments, etc. with respect to the Obligations.</u> The Company shall remain obligated hereunder notwithstanding that, without any reservation of rights against the Company and without notice to or further assent by the Company, any demand for payment of any of the Obligations of any Borrowing Subsidiary made by the Administrative Agent, any L/C Issuer or any Lender may be rescinded by the Administrative Agent, such L/C Issuer or such Lender and any of the Obligations of any Borrowing Subsidiary continued, and the Obligations of any Borrowing Subsidiary, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Administrative Agent, any L/C Issuer or any Lender, and this Agreement and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, including with respect to any condition precedent, as the Administrative Agent (or the Required Lenders or all of the Lenders and the L/C Issuers, as the case may be) may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by the Administrative Agent, any L/C Issuer or any Lender for the payment of the Obligations of any Borrowing Subsidiary may be sold, exchanged, waived, surrendered or released. None of the Administrative Agent, the L/C Issuers or the Lenders shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations of any Borrowing Subsidiary or for the guarantee contained in this Article X or any property subject thereto.

SECTION 10.04. <u>Guarantee Absolute and Unconditional.</u> Except as otherwise required by this Agreement, the Company waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations of any Borrowing Subsidiary and notice of or proof of reliance by the Administrative Agent, any L/C Issuer or any Lender upon the guarantee contained in this Article X or acceptance of the guarantee contained in this Article X; the Obligations of any Borrowing Subsidiary, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in

this Article X; and all dealings between the Borrowing Subsidiaries and the Company, on the one hand, and the Administrative Agent, the L/C Issuers and the Lenders, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Article X. To the fullest extent permitted by applicable law, the Company waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon any Borrowing Subsidiary or the Company with respect to the Obligations of any Borrowing Subsidiary. The Company understands and agrees that the guarantee contained in this Article X shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity or enforceability of the obligations of the Borrowing Subsidiaries under this Agreement, any of the Obligations of any of the Borrowing Subsidiaries or any other collateral security therefor or guarantee or right of set-off with respect thereto at any time or from time to time held by the Administrative Agent, any L/C Issuer or any Lender, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any Borrowing Subsidiary or any other Person against the Administrative Agent, any L/C Issuer or any Lender, (c) any law or regulation of any jurisdiction, or any other event, affecting any material term of any Obligation of the Borrowing Subsidiaries or (d) any other circumstance whatsoever (with or without notice to or knowledge of the Borrowing Subsidiaries or the Company) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Company or the Borrowing Subsidiaries for the Obligations of any Borrowing Subsidiary, or of the Company under the guarantee contained in this Article X, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against the Company, the Administrative Agent, any L/C Issuer or any Lender may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against any Borrowing Subsidiary or any other Person or against any collateral security or guarantee for the Obligations of any Borrowing Subsidiary or any right of offset with respect thereto, and any failure by the Administrative Agent, any L/C Issuer or any Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrowing Subsidiaries or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of any Borrowing Subsidiary or any other Person or any such collateral security, guarantee or right of offset, shall not relieve the Company of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Administrative Agent, any L/C Issuer or any Lender against the Company. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

SECTION 10.05. Reinstatement. The guarantee contained in this Article X shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations of any Borrowing Subsidiary is rescinded or must otherwise be restored or returned by the Administrative Agent, any L/C Issuer or any Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Borrowing Subsidiary, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Borrowing

Subsidiary or any substantial part of its property, or otherwise, all as though such payments had not been made.

SECTION 10.06. <u>Payments.</u> The Company hereby guarantees that payments hereunder will be paid to the Administrative Agent without set-off or counterclaim in the applicable currency at the office of the Administrative Agent set forth in Section 11.02.

SECTION 10.07. <u>Independent Obligations.</u> The obligations of the Company under the guarantee contained in this Article X are independent of the obligations of the Borrowing Subsidiaries, and a separate action or actions may be brought and prosecuted against the Company whether or not any Borrowing Subsidiary is joined in any such action or actions. The Company waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.

ARTICLE XI

Miscellaneous

SECTION 11.01. <u>Assignments and Participations.</u> (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of any L/C Issuer that issues any Letter of Credit), except that (i) other than, in the case of any Borrowing Subsidiary, as expressly provided in the last sentence of Section 2.14 or, in the case of the Company, pursuant to a consolidation or merger not prohibited under Section 7.04, no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and (ii) no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (A) to an Eligible Assignee in accordance with the provisions of subsection (b) of this Section, (B) by way of participation in accordance with the provisions of subsection (d) of this Section, or (C) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of any L/C Issuer that issues any Letter of Credit), Participants to the extent provided in subsection (e) of this Section and, to the extent expressly contemplated hereby, the sub-agents of the Administrative Agent and each of the Lender-Related Persons) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans and other amounts (including for purposes of this subsection (b), participations in L/C Exposures and in Swing Line Loans) at the time owing to it); <u>provided</u> that (i) except in the case of an assignment of the entire remaining amount of the assigning Lender's

Commitment of any Class and the Loans of such Class at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment of any Class (which for this purpose includes Loans of such Class outstanding thereunder) subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than US$10,000,000 or an integral multiple of US$5,000,000 in excess thereof, unless each of the Administrative Agent and, so long as no Event of Default under Section 8.01(a), (b), (g) or (h) has occurred and is continuing, the Company otherwise consents (each such consent not to be unreasonably withheld or delayed); (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans of a Class (including its participation interests in L/C Exposures and Swing Line Loans of such Class) and the Commitment of such Class assigned; <u>provided</u> that this clause (ii) shall not apply to Swing Line Loans in the event of any assignment by a Swing Line Lender; (iii) any assignment of a Commitment or L/C Exposure or Swing Line Exposure, as applicable, must be approved (which approval shall not be unreasonably withheld or delayed) by the Administrative Agent and each L/C Issuer and/or each Swing Line Lender (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); (iv) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of US$3,500; and (v) the assignee shall deliver to the Administrative Agent a completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder). Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 11.05 and 11.09 with respect to facts and circumstances occurring prior to the effective date of such assignment). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section. Notwithstanding the foregoing, the Administrative Agent shall not be obligated to consent to an assignment hereunder until it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to the assignment to such assignee Lender.

(c)      The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrowers, the Administrative Agent, the L/C Issuers and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers and, as to entries pertaining to it, any L/C Issuer or Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)      Any Lender may at any time, without the consent of, or (except as set forth below in this subsection (d)) notice to, any Borrower, any L/C Issuer, any Swing Line Lender or the Administrative Agent, sell participations to any Person (other than a natural person or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person, or any Borrower or any Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitments and the Loans (including such Lender's participations in L/C Exposures and/or Swing Line Loans) owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent, the L/C Issuers and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Each Lender selling a participation shall notify the Company of the identity of the Participant and the amount of the participation; provided that the failure of any Lender to give such notice shall not affect the validity of such sale or the rights of the Participant hereunder. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clause (ii) of the first proviso to Section 11.06(a) that directly affects such Participant. Subject to subsection (e) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.03 as though it were a Lender; provided such Participant agrees to be subject to Section 2.13(c) as though it were a Lender.

(e)      A Participant shall not be entitled to receive any greater payment under Sections 3.01 or 3.04 than the applicable Lender would have been entitled

to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Company's prior written consent. No Participant shall be entitled to the benefits of Section 3.05 unless the Company is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to provide such forms, certificates or other evidence, if any, with respect to withholding Tax matters as required under Section 3.05 and otherwise complies with the requirements of Section 3.05 as though it were a Lender.

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under any Note) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank; <u>provided</u> that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that, except as set forth in paragraph (d) of this Section, no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, Letters of Credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as such) shall not have any responsibility for maintaining a Participant Register.

SECTION  11.02. Notices; Effectiveness; Electronic Communication. (a) General. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by e-mail, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to the Company or any Borrowing Subsidiary, to V.F. Corporation, 105 Corporate Center Boulevard, Greensboro, North Carolina 27408, Attn: Anthony T.

Cottonaro, Vice President-Treasurer (Telephone: (716) 510-3529; e-mail address: Tony_Cottonaro@vfc.com);

(ii)     if to the Administrative Agent, to JPMorgan Chase Bank, N.A., Loan and Agency Services Group, 10 South Dearborn Street, Floor L2, Chicago, Illinois 60603, Attention of Charitra Shetty (Telephone: (312)-732-2007; e-mail address: JPM.Agency.CRI@JPMorgan.com);

(iii)    if to JPMorgan as a Swing Line Lender, to JPMorgan Chase Bank, N.A., Loan and Agency Services Group, 10 South Dearborn Street, Floor L2, Chicago, Illinois 60603, Attention of Charitra Shetty (Telephone: (312)-732-2007; e-mail address: JPM.Agency.CRI@JPMorgan.com);

(iv)     if to JPMorgan as an L/C Issuer, to JPMorgan Chase Bank, N.A., Loan and Agency Services Group, 10 South Dearborn Street, Floor L2, Chicago, Illinois 60603, Attention of Charitra Shetty (Telephone: (312)-732-2007; e-mail address: JPM.Agency.CRI@JPMorgan.com);

(v)      if to any other Swing Line Lender or L/C Issuer, to it at its address most recently specified by it in a notice delivered to the Administrative Agent and the Company (or, in the absence of any such notice, to the address set forth in the Administrative Questionnaire of the Lender that is serving as such Swing Line Lender or L/C Issuer or is an Affiliate thereof); and

(vi)     if to any other Lender, to it at its address set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices delivered through e-mail or other electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)      Electronic Communications. Notices and other communications to the Lenders and the L/C Issuers hereunder may be, in addition to e-mail, delivered or furnished by other electronic communication or using the Platform pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices under Article II to any Lender or L/C Issuer if such Lender or L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by such electronic communication. The Administrative Agent, the Company or any Borrowing Subsidiary may, in its discretion and in addition to e-mail, agree to accept notices and other communications to it hereunder by other electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the

"return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to the Platform shall be deemed received upon the receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     Change of Address, Etc. Each Borrower, the Administrative Agent, each L/C Issuer and each Swing Line Lender may change its address, telephone number or e-mail address for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telephone number or e-mail address for notices and other communications hereunder by notice to the Company, the Administrative Agent, each L/C Issuer and each Swing Line Lender. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number and e-mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Company Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain MNPI.

(d)     Reliance by Administrative Agent, L/C Issuers and Lenders. The Administrative Agent, the L/C Issuers and the Lenders shall be entitled to, but shall have no obligation to, rely and act upon any notices (including telephonic notices) purportedly given by the Company (on behalf of itself or any other Borrower) even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrowers shall indemnify the Administrative Agent, the L/C Issuers, each Lender and the Related Parties of each of them from all Liabilities and expenses resulting from the reliance by such Person on each notice purportedly given by the Company (on behalf of itself or any other Borrower), except to the extent that such Liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Person; provided that in no event shall any such Person have any Liability, on any theory of liability, to any Borrower, any Lender, any L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages). All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by

[[6082021]]

the Administrative Agent, and each of the parties hereto hereby consents to such recording.

SECTION 11.03. <u>Right of Set-off; Adjustments.</u> Upon the occurrence and during the continuance of any Event of Default and following notice to the Lenders from the Administrative Agent or the Required Lenders authorizing the exercise of the rights set forth in this Section 11.03, each Lender and L/C Issuer and each Affiliate of any of the foregoing shall hereby be authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or L/C Issuer, or by such an Affiliate, to or for the credit or the account of the Company or any Borrowing Subsidiary against any and all of the obligations of the Company or any Borrowing Subsidiary now or hereafter existing under this Agreement and any other Loan Document held by such Lender or L/C Issuer, irrespective of whether or not such Lender or L/C Issuer shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured. Each Lender and L/C Issuer agrees promptly to notify the Company after any such set-off and application made by such Lender or L/C Issuer; <u>provided, however</u> that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender and L/C Issuer under this Section 11.03 are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such Lender, L/C Issuer or Affiliate may have.

SECTION 11.04. <u>Survival.</u> All covenants, agreements, representations and warranties made herein shall survive the making by the Lenders of the Loans and the issuance by the L/C Issuers of Letters of Credit and the execution and delivery to the Lenders of this Agreement and the other Loan Documents and shall continue in full force and effect until the Facility Termination Date; <u>provided</u> that the provisions of Sections 3.05, 10.05, 11.05, 11.08 and 11.09 and Article IX shall survive and remain in full force and effect regardless of the occurrence of the Facility Termination Date.

SECTION 11.05. <u>Expenses.</u> The Borrowers agree to pay on demand all reasonable out-of-pocket costs and expenses of the Administrative Agent, the Arrangers and their respective Affiliates in connection with the preparation, execution, delivery, administration, modification, and amendment of this Agreement, the other Loan Documents, and the other documents to be delivered hereunder and the structuring, arrangement and syndication of the credit facilities established hereby, including, without limitation, the reasonable fees and expenses of counsel for the Administrative Agent with respect thereto and with respect to advising the Administrative Agent as to its rights and responsibilities under the Loan Documents. If an Event of Default occurs, the Borrowers further agree to pay on demand all reasonable out-of-pocket costs and expenses of the Administrative Agent, the L/C Issuers the L/C Issuers Letters and the Lenders (including, without limitation, reasonable attorneys' fees and expenses) in connection with the enforcement (whether through negotiations, legal proceedings, or otherwise) of the Loan Documents and the other documents to be delivered hereunder. For the avoidance of doubt, no amount shall be payable pursuant to this Section 11.05 in respect of Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

SECTION 11.06. <u>Amendments and Waivers.</u> (a) Except as provided in Section 11.06(b), any provision of this Agreement or any other Loan Document may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Company and the Required Lenders or, as to Loan Documents other than this Agreement, the Administrative Agent at the direction of and on behalf of the Required Lenders; <u>provided</u> that (i) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Company and the Administrative Agent to cure any ambiguity, omission, defect or inconsistency so long as, in each case, (A) such amendment does not adversely affect the rights of any Lender or (B) the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment and (ii) no such amendment or waiver shall (A) increase the Commitment of any Lender or change the currency in which Loans are available thereunder without the written consent of such Lender, (B) reduce the principal of or rate or amount of interest on any Loan or any L/C Disbursement or any fees or other amounts payable hereunder (in each case, other than as a result of any waiver of any default interest applicable pursuant to Section 2.12(e̶f)), without the written consent of each Lender affected thereby, (C) postpone any date fixed for the payment of any scheduled installment of principal of or interest on any Loan or any fees or other amounts payable hereunder, or the required date of reimbursement of any L/C Disbursement, or the scheduled date for termination or expiration of any Commitment, without the written consent of each Lender affected thereby, (D) change the percentage set forth in the definition of the term "Required Lenders" or the percentage of the Commitments or of the unpaid principal amount of the Loans, or the number of Lenders, which shall be required for the Lenders or any of them to take any action under this Section 11.06 or any other provision of this Agreement, without the written consent of each Lender, (E) change Section 2.08, 2.13 or 8.05 in a manner that would alter the pro rata sharing of payments or the pro rata reduction of the Commitments required thereby (or, in the case of Section 8.05, the order of the application of payments required thereby), without the written consent of each Lender, (F) release the Company from its Guarantee obligations hereunder, without the written consent of each Lender, (G) amend this Section 11.06, without the written consent of each Lender or (H) change any provision of any Loan Document in a manner that by its terms adversely affects the rights in respect of payments due to Lenders of any Class differently from those of the other Class, without the written consent of Lenders representing a majority in interest of such adversely affected Class; and, <u>provided further</u> that (x)(1) no amendment, waiver or consent shall, unless in writing and signed by such L/C Issuer in addition to the Lenders required above, affect the rights or duties of any L/C Issuer under this Agreement or under or in respect of any Letter of Credit issued or to be issued by it; (2) no amendment, waiver or consent shall, unless in writing and signed by such Swing Line Lender in addition to the Lenders required above, affect the rights or duties of any Swing Line Lender under this Agreement; and (3) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document and (y) any amendment, waiver or other modification of this Agreement or any other Loan Document that by its terms affects the

rights or duties thereunder of the Lenders of one Class (but not the Lenders of the other Class) may be effected by an agreement or agreements in writing entered into by the Company and the requisite number or percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section 11.06 if such Class of Lenders were the only Class of Lenders hereunder at the time.

(b)     Notwithstanding anything to the contrary in paragraph (a) of this Section:

(i)     this Agreement and the other Loan Documents may be amended in a manner provided in Sections 2.05(i), 2.05(k), 2.08(d), 2.16 and 3.02(b);

(ii)     this Agreement and the other Loan Documents may be amended in the manner provided in Section 2.14 and, in connection with any Borrowing Subsidiary becoming a party hereto, this Agreement (including the Exhibits hereto) may be amended by an agreement in writing entered into by the Company and the Administrative Agent to provide for such technical modifications as they determine to be necessary or advisable in connection therewith;

(iii)     the term "L/C Commitment" or "Swing Line Commitment", as such term is used in reference to any L/C Issuer or Swing Line Lender, may be modified as contemplated by the definition of such term; and

(iv)     no consent with respect to any amendment, waiver or other modification of this Agreement or any other Loan Document shall be required of any Defaulting Lender, except with respect to any amendment, waiver or other modification referred to in clause (A), (B) or (C) of Section 11.06(a)(ii) and then only in the event such Defaulting Lender shall be affected by such amendment, waiver or other modification.

(c)     The Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, waivers or other modifications on behalf of such Lender. Any amendment, waiver or other modification effected in accordance with this Section 11.06 shall be binding upon each Person that is at the time thereof a Lender and each Person that subsequently becomes a Lender.

(d)     No notice to or demand on any Borrower in any case shall entitle any Borrower to any other or further notice or demand in similar or other circumstances, except as otherwise expressly provided herein. No failure, delay or omission by the Administrative Agent, any L/C Issuer or any Lender in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

SECTION  11.07. <u>Counterparts; Electronic Execution.</u> (a) This Agreement and any Loan Document may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and it shall

not be necessary in making proof of this Agreement or any Loan Document to produce or account for more than one such fully-executed counterpart.

(b)     Delivery of an executed counterpart of a signature page of (i) this Agreement, (ii) any other Loan Document and/or (iii) any document, amendment, approval, consent, information, notice (including, for the avoidance of doubt, any notice delivered pursuant to Section 11.02), certificate, request, statement, disclosure or authorization related to this Agreement, any other Loan Document and/or the transactions contemplated hereby and/or thereby (each, an "Ancillary Document") that is an Electronic Signature transmitted by emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement, such other Loan Document or such Ancillary Document, as applicable. The words "execution", "signed", "signature", "delivery" and words of like import in or relating to this Agreement, any other Loan Document and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that, without limiting the foregoing, (A) to the extent the Administrative Agent has agreed to accept any Electronic Signature, the Administrative Agent and each of the Lenders and the L/C Issuers shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of any Borrower without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (B) upon the request of the Administrative Agent or any Lender or L/C Issuer, any Electronic Signature shall be promptly followed by a manually executed counterpart. Without limiting the generality of the foregoing, each Borrower hereby (1) agrees that, for all purposes, including, without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders, the L/C Issuers and the Borrowers, Electronic Signatures transmitted by emailed .pdf or any other electronic means that reproduce an image of an actual executed signature page and/or any electronic images of this Agreement, any other Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original and (2) agrees that the Administrative Agent and each of the Lenders and L/C Issuers may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record).

SECTION 11.08. Termination. The termination of this Agreement shall not affect any rights of the Borrowers, the Lenders, the L/C Issuers or the Administrative Agent or any obligation of the Borrowers, the Lenders, the L/C Issuers or the Administrative Agent arising prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into or rights created or obligations incurred prior to such termination have been fully disposed

of, concluded or liquidated and the Obligations (other than Obligations in the nature of continuing indemnities or expense reimbursement obligations not yet due and payable, which shall continue) arising prior to or after such termination have been irrevocably paid in full. The rights granted to the Administrative Agent for the benefit of the Lenders under the Loan Documents shall continue in full force and effect, notwithstanding the termination of this Agreement, until all of the Obligations have been paid in full after the termination hereof (other than Obligations in the nature of continuing indemnities or expense reimbursement obligations not yet due and payable, which shall continue) or the Company has furnished the Lenders, the L/C Issuers and the Administrative Agent with an indemnification satisfactory to the Administrative Agent and each Lender and L/C Issuer with respect thereto. Notwithstanding the foregoing, if after receipt of any payment of all or any part of the Obligations, any Lender or L/C Issuer is for any reason compelled to surrender such payment to any Person because such payment is determined to be void or voidable as a preference, impermissible setoff, a diversion of trust funds or for any other reason, this Agreement shall continue in full force, and the Company shall be liable to, and shall indemnify and hold the Administrative Agent or such Lender or L/C Issuer harmless for, the amount of such payment surrendered until the Administrative Agent or such Lender or L/C Issuer shall have been finally and irrevocably paid in full. The provisions of the foregoing sentence shall be and remain effective notwithstanding any contrary action which may have been taken by the Administrative Agent, the L/C Issuers or the Lenders in reliance upon such payment, and any such contrary action so taken shall be without prejudice to the Administrative Agent or the Lenders' or L/C Issuers' rights under this Agreement and shall be deemed to have been conditioned upon such payment having become final and irrevocable.

SECTION 11.09. Indemnification; Limitation of Liability. (a) The Borrowers, to the maximum extent permitted by applicable law, agree to indemnify and hold harmless each Lender-Related Person (each such Person, an "Indemnified Party") from and against any and all Liabilities and expenses (including, without limitation, reasonable attorneys' fees) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any Proceeding or preparation of defense in connection therewith) (i) in the case of the Arrangers, the Administrative Agent and their Related Parties only, the structuring, arrangement or syndication of the credit facilities established hereby (and all related commitment and fee letters and the execution, delivery or performance thereof) and (ii) this Agreement and the other Loan Documents and the transactions contemplated herein or the actual or proposed use of the proceeds of the Loans or Letters of Credit, except, in each case, to the extent such Liabilities or expenses are found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Party or any Related Party of such Indemnified Party. In the case of a Proceeding to which the indemnity in this Section 11.09 applies, such indemnity shall be effective whether or not such Proceeding is brought by any Borrower or any of its directors, shareholders or creditors or an Indemnified Party or any other Person or any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. This paragraph shall not apply with respect to

Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

(b)     The Borrowers agree that no Lender-Related Person shall have any Liability (whether direct or indirect, in contract or tort or otherwise) to any of them, any of their Subsidiaries, any guarantor, or any security holders or creditors thereof arising out of, related to or in connection with the transactions contemplated herein, except, subject to the immediately following sentence, to the extent that such Liability is found in a final non-appealable judgment by a court of competent jurisdiction to have directly resulted from the gross negligence or willful misconduct of such Lender-Related Person or a Related Party of such Lender-Related Person. To the extent permitted by applicable law, each Borrower shall not assert, and each Borrower hereby waives, (i) any claim against any Lender-Related Person, on any theory of liability, for any Liabilities arising from the use by others of information or other materials (including any personal data) obtained through telecommunications, electronic or other information transmission systems (including the Internet), except to the extent such Liability is determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Lender-Related Person or its Affiliates or their officers, directors or employees and (ii) any Liabilities against any Lender-Related Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of or otherwise relating to this Agreement, any other Loan Document or any of the transactions contemplated herein or the actual or proposed use of the proceeds of the Loans or the Letters of Credit.

(c)     To the extent that the Borrowers fail to pay any amount required to be paid by them under Section 11.05 or 11.09(a) to the Administrative Agent (or any sub-agent thereof), any L/C Issuer, any Swing Line Lender or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), such L/C Issuer, such Swing Line Lender or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or Liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or such sub-agent), such L/C Issuer or such Swing Line Lender in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), any L/C Issuer or any Swing Line Lender in connection with such capacity. For purposes of this Section 11.09(c), a Lender's "pro rata share" shall be determined based upon the percentage of the aggregate Commitments represented by such Lender's Commitment or Commitments (or, if the Commitments shall have expired or been terminated, the Commitments most recently in effect).

SECTION 11.10. Severability. If any provision of this Agreement or the other Loan Documents shall be determined to be illegal or invalid as to one or more of the parties hereto, then such provision shall remain in effect with respect to all parties,

if any, as to whom such provision is neither illegal nor invalid, and in any event all other provisions hereof shall remain effective and binding on the parties hereto, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 11.11. <u>Integration.</u> This Agreement, together with the other Loan Documents and any separate agreements with respect to fees payable to the Administrative Agent, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter. In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; <u>provided</u> that the inclusion of supplemental rights or remedies in favor of the Administrative Agent, the Lenders or the L/C Issuers in any other Loan Document executed on or after the date of this Agreement shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

SECTION 11.12. <u>Governing Law; Waiver of Jury Trial.</u>

( a ) **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS EXECUTED, AND TO BE FULLY PERFORMED, IN SUCH STATE.**

(b) **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK AND THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, AND EACH OF THE BORROWERS HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT BY IT SHALL BE INSTITUTED IN, AND HEARD AND DETERMINED EXCLUSIVELY BY, SUCH FEDERAL COURT OR, IN THE EVENT SUCH FEDERAL COURT LACKS SUBJECT MATTER JURISDICTION, SUCH NEW YORK STATE COURT. EACH PARTY HERETO HEREBY EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE IN, OR TO THE EXERCISE OF JURISDICTION OVER IT AND ITS PROPERTY BY, ANY SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING.**

EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH SUIT, ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, ANY L/C ISSUER OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     EACH OF THE PARTIES HERETO IRREVOCABLY AGREES THAT SERVICE OF PROCESS MAY BE MADE BY PERSONAL SERVICE OF A COPY OF THE SUMMONS AND COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING, OR BY REGISTERED OR CERTIFIED MAIL (POSTAGE PREPAID) IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02. NOTHING IN THE AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT OR SUCH OTHER LOAN DOCUMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(d)     EACH BORROWING SUBSIDIARY HEREBY IRREVOCABLY DESIGNATES, APPOINTS AND EMPOWERS THE COMPANY, AND THE COMPANY HEREBY ACCEPTS SUCH APPOINTMENT, AS ITS DESIGNEE, APPOINTEE AND AGENT TO RECEIVE, ACCEPT AND ACKNOWLEDGE FOR AND ON ITS BEHALF, AND IN RESPECT OF ITS PROPERTY, SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND DOCUMENTS THAT MAY BE SERVED IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT. SUCH SERVICE MAY BE MADE BY MAILING OR DELIVERING A COPY OF SUCH PROCESS TO ANY BORROWING SUBSIDIARY IN CARE OF THE COMPANY AT THE COMPANY'S ADDRESS USED FOR PURPOSES OF GIVING NOTICE UNDER SECTION 11.02, AND EACH BORROWING SUBSIDIARY HEREBY IRREVOCABLY AUTHORIZES AND DIRECTS THE COMPANY TO ACCEPT, AND THE COMPANY AGREES TO ACCEPT, SUCH SERVICE ON ITS BEHALF.

(e)     IN ANY ACTION, SUIT OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES UNDER OR RELATED TO ANY LOAN DOCUMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR THAT MAY IN THE FUTURE BE DELIVERED IN CONNECTION THEREWITH, EACH

**BORROWER, THE ADMINISTRATIVE AGENT, EACH L/C ISSUER AND THE LENDERS HEREBY AGREE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THAT ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY AND HEREBY IRREVOCABLY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT SUCH PERSON MAY HAVE TO TRIAL BY JURY IN ANY SUCH ACTION, SUIT OR PROCEEDING.**

(f)     **EACH PARTY HERETO HEREBY EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION IT MAY HAVE THAT ANY COURT TO WHOSE JURISDICTION IT HAS SUBMITTED PURSUANT TO THE TERMS HEREOF IS AN INCONVENIENT FORUM.**

(g)     **IN THE EVENT ANY FOREIGN BORROWING SUBSIDIARY OR ANY OF ITS ASSETS HAS OR HEREAFTER ACQUIRES, IN ANY JURISDICTION IN WHICH JUDICIAL PROCEEDINGS MAY AT ANY TIME BE COMMENCED WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, ANY IMMUNITY FROM JURISDICTION, LEGAL PROCEEDINGS, ATTACHMENT (WHETHER BEFORE OR AFTER JUDGMENT), EXECUTION, JUDGMENT OR SETOFF, SUCH BORROWING SUBSIDIARY HEREBY IRREVOCABLY AGREES NOT TO CLAIM AND HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES SUCH IMMUNITY.**

SECTION 11.13. <u>Confidentiality.</u> Each of the Administrative Agent, the Lenders and the L/C Issuers agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Related Parties, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential or shall be subject to a professional obligation of confidentiality), (b) to the extent requested by any regulatory authority (including, for the avoidance of doubt, any central bank, the Federal Reserve Bank or self-regulatory authority), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under or any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its Related Parties) to any swap or derivative transaction relating to the Company or any Subsidiary and its obligations, (g) with the consent of the Company, (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent, any Lender, any L/C Issuer or any Affiliate of any of the foregoing on a nonconfidential basis from a source other

than a Borrower, (i) on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to this Agreement and (j) to market data collectors, including league table providers, and other services providers to the lending industry, in each case, information of the type routinely provided to such service providers. For the purposes of this Section, "Information" means all information received from the Company or any of its Subsidiaries relating to the Company, any Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent, any Lender or any L/C Issuer on a nonconfidential basis prior to disclosure by the Company or any of its Subsidiaries. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 11.14. "Know Your Customer" Checks; Certain Notices. (a) If (i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement, (ii) any change in the status of a Borrower after the date of this Agreement, or (iii) a proposed assignment or transfer by a Lender of any of its rights and/or obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer, obliges the Administrative Agent or any Lender (or, in the case of clause (iii) above, any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Company shall promptly upon the request of the Administrative Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Administrative Agent (for itself or on behalf of any Lender) or any Lender (for itself or, in the case of the event described in clause (iii) above, on behalf of any prospective new Lender) in order for the Administrative Agent, such Lender or, in the case of the event described in clause (iii) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Loan Documents.

(b)      Each Lender shall promptly upon the request of the Administrative Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Administrative Agent (for itself) in order for the Administrative Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Loan Documents.

(c)      Each Lender that is subject to the USA PATRIOT Act and/or the Beneficial Ownership Regulation and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Borrower that pursuant to the requirements of the USA PATRIOT Act and/or the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies such Borrower, which information includes the name and address of such Borrower and other information that will allow such Lender or Agent, as

applicable, to identify such Borrower in accordance with the USA PATRIOT Act and the Beneficial Ownership Regulation.

SECTION 11.15. <u>Conversion of Currencies.</u> (a) If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum owing hereunder in one currency into another currency, each party hereto (including any Foreign Borrowing Subsidiary) agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b)   The obligations of each Borrower in respect of any sum due to any party hereto or any holder of the obligations owing hereunder (the "<u>Applicable Creditor</u>") shall, notwithstanding any judgment in a currency (the "<u>Judgment Currency</u>") other than the currency in which such sum is stated to be due hereunder (the "<u>Agreement Currency</u>"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; <u>provided</u> that (i) if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, such Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Applicable Creditor against such loss and (ii) if the amount of the Agreement Currency so purchased is greater than the sum originally due to the Applicable Creditor in the Agreement Currency, such Applicable Creditor shall remit the excess to the applicable Borrower (but only if all amounts due and payable by the Company and the Subsidiaries hereunder shall have been paid in full).

SECTION 11.16. <u>Interest Rate Limitation.</u> Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 11.17. <u>No Fiduciary Relationship.</u> Each Borrower, on behalf of itself and its Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the

Borrowers and their Affiliates, on the one hand, and the Administrative Agent, the Arrangers, the Lenders, the L/C Issuers and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Arrangers, the Lenders, the L/C Issuers or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications. Each Borrower acknowledges that the Administrative Agent, the Arrangers, the Lenders, the L/C Issuers and their Affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies that have or may in the future have interests conflicting with each such Borrower's own interests.

SECTION 11.18. <u>Company as Agent of Borrowing Subsidiaries.</u> Each Borrowing Subsidiary hereby irrevocably appoints the Company as its agent for all purposes of this Agreement and the other Loan Documents, including (a) the giving and receipt of notices (including any Borrowing Notice and any Interest Election Request) and (b) the execution and delivery of all documents, instruments and certificates contemplated herein. Each Borrowing Subsidiary hereby acknowledges that any amendment or other modification to this Agreement or any other Loan Document may be effected as set forth in Section 11.06, that no consent of such Borrowing Subsidiary shall be required to effect any such amendment or other modification and that such Borrowing Subsidiary shall be bound by this Agreement or any other Loan Document (if it is theretofore a party thereto) as so amended or modified

SECTION 11.19. <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in this Agreement, any other Loan Document or any related agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of a Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by a Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any Resolution Authority.

SECTION 11.20. <u>Limitations for Swiss Borrowers</u>. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, the following limitations shall apply with respect to any Swiss Borrower:

(a)    If complying with the obligations of such Swiss Borrower created under this Agreement or any other Loan Document (including, for the avoidance of doubt, complying with any right of indemnity or right of set-off which the Administrative Agent or any of the L/C Issuers or Lenders or any of their Affiliates may have, but excluding, for the avoidance of doubt, its payment obligations under this Agreement or any other Loan Document with respect to the principal of and interest on Loans made to it and reimbursement of L/C Disbursements under Letters of Credit issued for its account) would constitute a repayment of capital (*Einlagerückgewähr*), a violation of the legally protected reserves (*gesetzlich geschützte Reserven*) or the payment of a (constructive) dividend (*Gewinnausschüttung*) by such Swiss Borrower or would otherwise be restricted under applicable Swiss law (the "<u>Restricted Obligations</u>"), the aggregate liability of such Swiss Borrower for Restricted Obligations shall not exceed an amount equal to the maximum amount that such Swiss Borrower can make as a dividend payment to its shareholder(s) in accordance with applicable Swiss law (the "<u>Maximum Amount</u>"). The foregoing limitation shall only apply to the extent that it is a requirement under applicable Swiss mandatory law (including case law) at the time such Swiss Borrower is required to perform its obligations under this Agreement or any other Loan Document. Such limitation shall not free the applicable Swiss Borrower from its Restricted Obligations in excess of the Maximum Amount, but merely postpone the performance date therefor until such time as performance is again permitted notwithstanding such limitation. The applicable Swiss Borrower shall take any action and pass any resolution (including, but not limited to, arranging for an interim audited balance sheet and holding a shareholders' meeting) to enable the fulfilment of the Restricted Obligations as soon as possible and in an amount as large as possible.

(b)    To the extent that the fulfilment of a Restricted Obligation is subject to Swiss Federal Withholding Tax, the applicable Swiss Borrower:

(i)    shall (A) use its best endeavors to procure that the fulfilment of the Restricted Obligation can be made without deduction of Swiss Federal Withholding Tax by discharging the liability of such Tax by notification pursuant to applicable law rather than payment of such Tax, (B) if the notification procedure pursuant to clause (A) above does not apply, deduct the Swiss Federal Withholding Tax at such rate (x) as in force from time to time or (y) as provided by any applicable double taxation treaties, from the applicable amount to be paid and promptly pay any such Swiss Federal Withholding Tax deducted to the Swiss Federal Tax Administration, and (C) provide (or cause the Company to provide) the Administrative Agent with evidence that such a notification of

[[6082021]]

the Swiss Federal Tax Administration has been made or, as the case may be, such Swiss Federal Withholding Tax deducted has been paid to the Swiss Federal Tax Administration;

(ii)     shall use its best endeavors to procure that any Person that is entitled to a full or partial refund of the Swiss Federal Withholding Tax deducted pursuant to this paragraph (b) (A) request a refund of the Swiss Federal Withholding Tax under applicable law as soon as possible, and (B) pay to the Administrative Agent upon receipt any amount so refunded to cover any outstanding part of the Restricted Obligation; and

(iii)    shall not be required to gross up, indemnify or hold harmless the Administrative Agent or any L/C Issuer or Lender or any Affiliate of any of the foregoing for the deduction of Swiss Federal Withholding Tax in an amount exceeding the Maximum Amount; <u>provided</u> that nothing in this Section 11.20 shall in any way limit any obligations of the Company or any other Borrowing Subsidiary under the Loan Documents to gross up, indemnify or hold harmless the Administrative Agent or any L/C Issuer or Lender or any Affiliate of any of the foregoing in respect of the deduction of the Swiss Federal Withholding Tax (including any such obligation under Section 3.05).

(c)     If the fulfilment of an obligation by a Swiss Borrower would be subject to the limitation set forth in paragraph (a) of this Section 11.20, then such Swiss Borrower shall, upon request of the Administrative Agent, to the extent permitted by applicable law, revalue upward or realize any of its assets that are shown in its balance sheet with a book value that is significantly lower than the market value of such assets, in case of realization, however, only if such assets are not necessary for such Swiss Borrower's business (*nicht betriebsnotwendig*) and do not have any negative tax consequences for such Swiss Borrower.

SECTION   11.21. <u>Waiver of Notice Period in Connection with Termination of Existing Credit Agreement</u>. Upon the effectiveness of this Agreement, the Existing Credit Agreement (except for the indemnification, yield protection and confidentiality provisions contained therein), and all Commitments under and as defined in the Existing Credit Agreement, are hereby terminated. Each Lender that is a party to the Existing Credit Agreement hereby waives the three Business Days notice required for the termination of the commitments under such Agreement.

[Signature Pages Intentionally Removed]

[FORM OF] BORROWING NOTICE

[Attached]

[[6082021]]

[FORM OF] BORROWING NOTICE

JPMorgan Chase Bank, N.A.,
Loan and Agency Services Group
10 South Dearborn, Floor L2
Chicago, IL 60603-2003
Attention: Charitra Shetty
Telephone: 312-732-2007
JPM.Agency.CRI@JPMorgan.com
[Date]
Ladies and Gentlemen:

   Reference is made to the Five-Year Revolving Credit Agreement dated as of November 24, 2021, among V.F. Corporation, VF International Sagl, the other Borrowing Subsidiaries from time to time party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, and the Lenders party thereto from time to time (as from time to time amended, restated, supplemented or otherwise modified, the "Credit Agreement"). Capitalized terms used but not otherwise defined herein shall have the meanings specified in the Credit Agreement.

   This notice constitutes a Borrowing Notice and the Company [on behalf of the Borrowing Subsidiary identified below] hereby gives you notice, pursuant to Section 2.03 of the Credit Agreement, that it requests a Borrowing under the Credit Agreement, and in that connection specifies the following information with respect to such Borrowing:

   (a) Borrower:

   (b) [Swing Line Lender:][1]

   (c) Class of Borrowing:[2]

   (d) Type of Borrowing:[3]

---

[1] In the case of a requested Borrowing of a Swing Line Loan of any Class, specify the Swing Line Lender (if there shall be more than one Swing Line Lender) requested to make such Loan.

[2] Specify US Tranche Revolving Borrowing, Global Tranche Revolving Borrowing, US Tranche Swing Line Borrowing or Global Tranche Swing Line Borrowing.

[3] In the case of a requested Borrowing of Revolving Loans denominated in US Dollars, specify Term SOFR or Alternate Base Rate. In the case of a requested Borrowing of Revolving Loans denominated in Euro, specify Adjusted EURIBO Rate. In the case of a requested Borrowing of a Swing Line Loan denominated in US Dollars, specify Alternate Base Rate. In the case of a requested Borrowing of a Swing Line Loan denominated in Euro, specify Daily Simple ESTR.

(e)   Aggregate principal amount of Borrowing denominated in [US Dollars][specify Alternative Currency] and in an amount equal to[4]: [US$][specify Alternative Currency]_____

(f)   Date of Borrowing (which is a Business Day): _____

(g)   Interest Period and the last day thereof[5]: _____

(h)   [Location and number of the applicable Borrower's account to which proceeds of the requested Borrowing are to be disbursed (give name of bank and account number): [ ] (Account No.: _____)]] [Name of the L/C Issuer that made the L/C Disbursements the reimbursement of which is intended to be made with the proceeds of the requested Borrowing:][6]

(i)   [Jurisdiction from which payments on the principal and interest on the requested Borrowing will be made:][7]

       The Company hereby certifies that, after giving effect to the Borrowing requested hereby, (i) [the Aggregate Global Tranche Revolving Credit Exposure shall not exceed the aggregate Global Tranche Commitments][the Aggregate US Tranche Revolving Exposure shall not exceed the aggregate US Tranche Commitments], (ii) the Aggregate Revolving Credit Exposure shall not exceed the aggregate Commitments and (iii) [the Swing Line Exposure shall not exceed US$100,000,000][8].

---

[4] Must comply with Section 2.02(c) of the Credit Agreement.

[5] Applicable to Term SOFR Borrowing or EURIBOR Borrowing only. Shall be subject to the definition of "Interest Period" and Section 2.02(d) of the Credit Agreement and can be a period of one, three or six months.

[6] Selection as applicable in accordance with Section 2.03 or 2.04 of the Credit Agreement.

[7] Specify only in the case of a Borrowing requested by a Foreign Borrowing Subsidiary.

[8] For any Swing Line Loan.

Very truly yours,

V.F. CORPORATION

by

_____
Name:
Title:

[FORM OF] INTEREST ELECTION REQUEST

[Attached]

[[6082021]]

## [FORM OF] INTEREST ELECTION REQUEST

JPMorgan Chase Bank, N.A.,
Loan and Agency Services Group
10 South Dearborn, Floor L2
Chicago, IL 60603-2003
Attention: Charitra Shetty
Telephone: 312-732-2007
JPM.Agency.CRI@JPMorgan.com
Ladies and Gentlemen:

The undersigned, V.F. Corporation, a Pennsylvania corporation (the "Company"), refers to the Five-Year Revolving Credit Agreement dated as of November 24, 2021, among the Company, VF International Sagl, the other Borrowing Subsidiaries from time to time party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, and the Lenders party thereto from time to time (as from time to time amended, restated, supplemented or otherwise modified, the "Credit Agreement"). Capitalized terms used and not otherwise defined herein have the meanings specified in the Credit Agreement.

This notice constitutes an Interest Election Request and the Company [on behalf of [NAME OF BORROWER]] (the "Borrower")] hereby gives notice, pursuant to Section 2.07 of the Credit Agreement, that it requests the conversion or continuation of a Borrowing under the Credit Agreement, and in that connection the Company specifies the following information with respect to such Borrowing and each resulting Borrowing:

1.    Borrowing to which this request applies:
          Principal Amount and Currency: _____
          Class:[1] _____
          Type: _____
          Interest Period:[2] _____
2.    Effective date of this election:[3] _____

3.    Resulting Borrowing[s][4]
          Principal Amount and Currency: _____
                Class: _____

---

[1] Specify US Tranche Revolving Borrowing or Global Tranche Revolving Borrowing.
[2]    In the case of a Term SOFR Borrowing or EURIBOR Borrowing, specify the last day of the current Interest Period therefor.
[3]    Must be a Business Day.
[4]    If different options are being elected with respect to different portions of the Borrowing, provide the information required by this item 3 for each resulting Borrowing. Each resulting Borrowing shall be in an aggregate amount that is an integral multiple of, and not less than, the amount specified for a Borrowing of such Type and Class in Section 2.02(c) of the Credit Agreement.

Type: _____

Interest Period:[5] _____

Very truly yours,

V.F. CORPORATION,

by

_____

Name:

Title:

---

[5]     Applicable only if the resulting Borrowing is to be a Term SOFR Borrowing or EURIBOR Borrowing. In the case of a Term SOFR Borrowing or EURIBOR Borrowing, shall be subject to the definition of "Interest Period" and Section 2.02(d) of the Credit Agreement and can be a period of one, three or six months. If an Interest Period is not specified, then the Company shall be deemed to have selected an Interest Period of one month's duration. In no case may such Borrowing extend beyond the Stated Termination Date.

Exhibit 21

**V.F. CORPORATION**

**SIGNIFICANT SUBSIDIARIES – Fiscal 2023**

| Entity Name | Jurisdiction |
|---|---|
| 1994 Inc. Ltd. | UK |
| 530 Park Ave 10-F, LLC | US |
| 530 Park Ave 14-H, LLC | US |
| Administradora Mexicana de Servicios S de RL de CV | Mexico |
| ALL'CROWN SA | Argentina |
| Altra LLC | US |
| Boulder Sagl | Switzerland |
| C.C.R.L., LLC | US |
| Chapter 4 Corp | US |
| Cherry SAS | France |
| Ciliegia Srl | Italy |
| Dickies de Parras S de RL de CV | Mexico |
| DSI Enterprises, LLC | US |
| GFYS, LLC | US |
| GREENSPORT MONTE BIANCO | Italy |
| Icebreaker Apparel LLC | US |
| Icebreaker Australia Pty | Australia |
| Icebreaker Australia Retail Pty | Australia |
| Icebreaker Europe Limited | New Zealand |
| Icebreaker Holdings | New Zealand |
| Icebreaker Licensing LLC | US |
| Icebreaker Merino Clothing Europe Ltd. | New Zealand |
| Icebreaker New Zealand Limited | New Zealand |
| Icebreaker Pure Merino GmbH | Germany |
| Industrial Laundry Services, LLC | US |
| Industrias Coahuila de Zaragosa S de RL de CV | Mexico |
| INVERSIONES INMOBILIARIES AUSTRALES SA | Argentina |
| INVERSIONES VF CHILE DOS LTDA | Chile |
| INVERSIONES VF CHILE LTDA | Chile |
| IW Holdings, LLC | US |
| JanSport Apparel Corp. | US |
| Kipling Apparel Corp. | US |
| Kipling Holdings LLC | US |
| Kirsche GmbH | Germany |
| Lee Bell, Inc. | US |
| Lucy Apparel LLC | US |
| North Elm Properties LLC | US |
| Pro Skate Park Organization, LLC | US |
| SERVICES PORTUGAL POURVF, UNIPESSOAL LDA | Portugal |
| SERVICIOS Y PROMOCIONES TEXTILES LTDA | Chile |
| South Cone, Inc | US |
| Supreme Holdings, Inc. | US |

| Entity Name | Jurisdiction |
|---|---|
| Supreme Intermediate Holdings, Inc. | US |
| T.I. Venture Group, Inc | US |
| TBL INVESTMENTS HOLDING GMBH | Switzerland |
| TBL LICENSING LLC | US |
| The North Face Apparel Corp | US |
| THE NORTH FACE SAGL | Switzerland |
| THE RECREATIONAL FOOTWEAR CO. | Cayman |
| TIMBERLAND ASIA LLC | US |
| TIMBERLAND EUROPE BV | Netherlands |
| TIMBERLAND HK TRADING LTD. | Hong Kong |
| Timberland International, LLC | US |
| USB RETC Fund 2022-10, LLC | US |
| VANS SPAIN SL | Spain |
| Vans, Inc | US |
| VF (Cambodia) Sourcing Co., Ltd. | Cambodia |
| VF (J) FRANCE SAS | France |
| VF (J) NEDERLAND BV | Netherlands |
| VF (J) NETHERLANDS SERVICES BV | Netherlands |
| VF Apollo Investments Limited | UK |
| VF Apollo Singapore Pte. Ltd. | Singapore |
| VF Apparel Espana S.L.U. (FKA VF JEANSWEAR ESPANA SL) | Spain |
| VF APPAREL PORTUGAL, LDA | Portugal |
| VF ASIA LTD | Hong Kong |
| VF Asia Sourcing Ltd | Hong Kong |
| VF AUSTRIA GMBH | Austria |
| VF Belgium BV (FKA VF BELGIUM BVBA) | Belgium |
| VF BRANDS MALAYSIA SDN BHD (f/k/a TIMBERLAND LIFESTYLE BRAND MALAYSIA SDA. BHD.) | Malaysia |
| VF BRANDS PTE. LTD. (f/k/a TIMBERLAND CO. (ASIA PAC) PTE. LTD.) | Singapore |
| VF BRANDS TAIWAN LTD. (f/k/a Timberland Taiwan Ltd.) | Taiwan |
| VF CH Apollo Sagl | Switzerland |
| VF CH HOLDINGS GMBH | Switzerland |
| VF CH MEXICO INVESTMENTS SAGL (FKA VF INTERNATIONAL HOLDINGS LLC) | Switzerland |
| VF CH SOURCING SAGL | Switzerland |
| VF CHINA LTD. | China |
| VF CH-MEX Holdings LLC | US |
| VF CIS LLC | Russia |
| VF COMERCIALIZADORA LTDA ( F.K.A. VF CHILE SA) | Chile |
| VF Corporation | US |
| VF CZECH SERVICES SRO | Czech Republic |
| VF CZECH SRO | Czech Republic |
| VF DE ARGENTINA SA | Argentina |
| VF DO BRAZIL LTDA | Brazil |
| VF EGE GIYIM SANAYI VE TICARET LIMITED SIRKETI | Turkey |
| VF EUROPE BV (FKA VF EUROPE BVBA) | Belgium |
| VF GERMANY SERVICES GMBH | Germany |

| Entity Name | Jurisdiction |
|---|---|
| VF GERMANY TEXTILE-HANDELS GMBH | Germany |
| VF HELLAS EPE | Greece |
| VF HOLDING SAGL | Switzerland |
| VF HOLDINGS MEXICO LLC | US |
| VF HONG KONG LIMITED | Hong Kong |
| VF Intellectual Property Services, Inc | US |
| VF INTERNATIONAL HOLDING GmbH | Switzerland |
| VF INTERNATIONAL SAGL | Switzerland |
| VF Investments Holding GmbH | Switzerland |
| VF INVESTMENTS NETHERLANDS BV | Netherlands |
| VF IP Holdings LLC | US |
| VF ISRAEL (APPAREL) LTD | Israel |
| VF ITALIA SRL (FKA VF ITALY RETAIL S.R.L.) | Italy |
| VF JAPAN KK (f/k/a TIMBERLAND JAPAN INC) | Japan |
| VF JEANSWEAR ARGENTINA SRL | Argentina |
| VF KOREA LIMITED LIABILITY COMPANY (FKA VF KOREA LIMITED) | South Korea |
| VF LUXEMBOURG SARL | Luxembourg |
| VF Management Service Italy S.r.l. (FKA GS HOLDING SRL) | Italy |
| VF NL IMAGEWEAR B.V. | Netherlands |
| VF NORTHERN EUROPE LIMITED | UK |
| VF NORTHERN EUROPE SERVICES LIMITED | UK |
| VF NORWAY AS | Norway |
| VF OUTDOOR (CANADA) CO | Canada |
| VF Outdoor LLC | US |
| VF OUTDOOR MEXICO S DE RL DE CV (fka Vans Latinoamericana) | Mexico |
| VF OUTDOOR SERVICES S DE RL DE CV | Mexico |
| VF PANAMA SOURCING SERVICES S. DE R.L. | Panama |
| VF PLAYWEAR DOMINICANA SA | Dominican Republic |
| VF Playwear LLC | US |
| VF POLSKA DISTRIBUTION SP ZO O | Poland |
| VF Receivables LP | US |
| VF Receivables Services LLC | US |
| VF SAGEBRUSH ENTERPRISES LLC | US |
| VF SALES SAGL | Switzerland |
| VF SCANDINAVIA ApS | Denmark |
| VF Services, LLC | US |
| VF Servicios de Guatemala Srl | Guatemala |
| VF SERVICIOS DE HONDURAS S. DE R.L. DE C.V. | Honduras |
| VF Servicios de Nicaragua Srl. | Nicaragua |
| VF SERVICIOS EL SALVADOR LTDA. DE CV | El Salvador |
| VF Shanghai Enterprise Company | China |
| VF SHANGHAI LIMITED | China |
| VF SHANGHAI SOURCING LIMITED | China |
| VF Singapore Overseas Services Pte Ltd | Singapore |
| VF Solutions, LLC (FKA VF LSG Holdings, LLC) | US |
| VF SOURCING INDIA PRIVATE LIMITED | India |

| Entity Name | Jurisdiction |
|---|---|
| VF SWEDEN AB | Sweden |
| VF Switzerland Enterprises GmbH (fka Icebreaker Switzerland Sarl) | Switzerland |
| VF TAIWAN LIMITED | Taiwan |
| VF TRANSGLOBAL GMBH | Switzerland |
| VF Treasury Services LLC | US |
| VF UK Services Ltd. | United Kingdom |
| VF Venture Direct Investments, LLC | US |
| VF Venture Enterprises, LLC | US |
| VF Vietnam Sourcing Limited | Vietnam |
| VFC Servicios Dominicana, S.R.L. | Dominican Republic |
| VFSE Investments, LLC | US |
| VFSLA Commercial Services, LLC | US |
| W-D APPAREL COMPANY LLC | US |
| W-D Licensing, LLC | US |
| Williamson Industries Ltd. | Belize |
| Williamson-Dickie APAC Holding Company Ltd. | Hong Kong |
| Williamson-Dickie Apparel Trading (Shanghai) Ltd. | China |
| Williamson-Dickie Canada Co. | Canada |
| Williamson-Dickie Europe Holdings Ltd. | UK |
| Williamson-Dickie Europe Ltd. | UK |
| Williamson-Dickie HK Holding Company, Ltd. | Hong Kong |
| Williamson-Dickie Holding Co-Mexico S de RL de CV | Mexico |
| Wooster GK (FKA Supreme Japan Co., Ltd.) | Japan |
| World Jeans VF Asia Ltd | Egypt |
| Ying Tao Trading (Shanghai) Co. Ltd. | China |

VF Corporation is the ultimate sole beneficial owner of all of the subsidiaries listed above.

Exhibit 23

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We hereby consent to the incorporation by reference in the below listed Registration Statements of V. F. Corporation of our report dated May 25, 2023 relating to the financial statements and financial statement schedule and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

(1)  Post-Effective Amendment No. 1 to Registration Statement on Form S-8 (No. 333-32789), which constitutes Post-Effective Amendment No. 9 to Registration Statement on Form S-8 (No. 2-85579), Post-Effective Amendment No. 5 to Registration Statement on Form S-8 (No. 33-26566), Post-Effective Amendment No. 2 to Registration Statement on Form S-8 (No. 33-55014) and Post-Effective Amendment No. 2 to Registration Statement on Form S-8 (No. 33-60569);

(2)  Post-Effective Amendment No. 1 to Registration Statement on Form S-8 (No. 033-41241);

(3)  Registration Statement on Form S-8 (No. 333-72267);

(4)  Post-Effective Amendment No. 1 to Registration Statement on Form S-8 (No. 333-84193);

(5)  Registration Statement on Form S-8 (No. 333-94205);

(6)  Registration Statement on Form S-8 (No. 333-67502);

(7)  Registration Statement on Form S-8 (No. 333-118547);

(8)  Registration Statement on Form S-8 (No. 333-143077);

(9)  Registration Statement on Form S-8 (No. 333-166570);

(10)  Post-Effective Amendment No. 1 to Registration Statement on Form S-8 (No. 333-188437), which constitutes Post-Effective Amendment No. 1 to Registration Statement on Form S-8 (No. 333-59727), Post-Effective Amendment No. 1 to Registration Statement on Form S-8 (No. 333-138458), Post-Effective Amendment No. 2 to Registration Statement on Form S-8 (No. 33-33621), Post-Effective Amendment No. 2 to Registration Statement on Form S-8 (No. 333-49023), and Post-Effective Amendment No. 2 to Registration Statement on Form S-8 (No. 2-99945);

(11)  Registration Statement on Form S-8 (No. 333-188438);

(12)  Registration Statement on Form S-8 (No. 333-204098); and

(13)  Registration Statement on Form S-3ASR (No. 333-254093).

/s/ PricewaterhouseCoopers LLP
Greensboro, North Carolina
May 25, 2023

Exhibit 24

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that V.F. Corporation and the undersigned directors and officers of V.F. Corporation do hereby constitute and appoint Jennifer S. Sim, Matthew H. Puckett, and Benno Dorer, and each of them, true and lawful attorneys-in-fact of the undersigned to execute on their behalf the Annual Report of V.F. Corporation on Form 10-K (including any amendments thereof) for the fiscal year of V.F. Corporation ended April 1, 2023, to be filed with the Securities and Exchange Commission.

IN WITNESS WHEREOF, each of the undersigned has duly executed this Power of Attorney this 22nd day of May, 2023.

ATTEST:

V.F. CORPORATION

| /s/ Jennifer S. Sim | By: | /s/ Richard T. Carucci |
|---|---|---|
| Jennifer S. Sim<br>Secretary | | Richard T. Carucci<br>Interim Chair of the Board of Directors |

Principal Executive Officer:

Principal Financial Officer:

| /s/ Benno Dorer | /s/ Matthew H. Puckett |
|---|---|
| Benno Dorer<br>Interim President,<br>Chief Executive Officer and Director | Matthew H. Puckett<br>Executive Vice President and<br>Chief Financial Officer |

| /s/ Alexander K. Cho | /s/ W. Rodney McMullen |
|---|---|
| Alexander K. Cho, Director | W. Rodney McMullen, Director |

| /s/ Juliana L. Chugg | /s/ Clarence Otis, Jr. |
|---|---|
| Juliana L. Chugg, Director | Clarence Otis, Jr., Director |

| /s/ Mark S. Hoplamazian | /s/ Carol L. Roberts |
|---|---|
| Mark S. Hoplamazian, Director | Carol L. Roberts, Director |

| /s/ Laura W. Lang | /s/ Matthew J. Shattock |
|---|---|
| Laura W. Lang, Director | Matthew J. Shattock, Director |

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO 15 U.S.C. SECTION 10A, AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Benno Dorer, certify that:

1. I have reviewed this annual report on Form 10-K of V.F. Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

May 25, 2023

/s/ Benno Dorer
Benno Dorer
Interim President and Chief Executive Officer
(Principal Executive Officer)

Exhibit 31.2

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO 15 U.S.C. SECTION 10A, AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Matthew H. Puckett, certify that:

1. I have reviewed this annual report on Form 10-K of V.F. Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

May 25, 2023

/s/ Matthew H. Puckett
_____
Matthew H. Puckett
Executive Vice President and Chief Financial Officer
(Principal Financial Officer)

Exhibit 32.1

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of V.F. Corporation (the "Company") on Form 10-K for the period ending April 1, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Benno Dorer, Interim Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

May 25, 2023

/s/ Benno Dorer
Benno Dorer
Interim President and Chief Executive Officer

Exhibit 32.2

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of V.F. Corporation (the "Company") on Form 10-K for the period ending April 1, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Matthew H. Puckett, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

May 25, 2023

/s/ Matthew H. Puckett
Matthew H. Puckett
Executive Vice President and Chief Financial Officer