Matthew Monforton
MONFORTON LAW OFFICES, PLLC
32 Kelly Court
Bozeman, Montana 59718
Phone: (406) 570-2949
Fax: (406) 551-6919
matthewmonforton@yahoo.com

Nicholas R. Barry*
Ian Prior*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Avenue S.E. No. 231
Washington, D.C. 20003
Phone: (202) 964-3721
nicholas.barry@aflegal.org
ian.prior@aflegal.org

*Attorneys for Plaintiff Johnathan Talbot*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| Johnathan Talbot )<br><br>   *Plaintiff,* )<br><br>v. )<br><br><br><br>Manoah Ainuu, and The North<br>Face Apparel Corp., a Delaware<br>Company. )<br><br>   *Defendants* ) | Cause No. CV-23-66-BU-BMM<br><br>**PLAINTIFF'S RESPONSE TO<br>DEFENDANTS' MOTIONS TO<br>DISMISS** |

1

# TABLE OF CONTENTS

INTRODUCTION ...................................................................... 7

BACKGROUND ....................................................................... 7

   I.   MONTANA LAW GOVERNS THIS CASE .................................... 10

     A.   The Montana Constitution Requires the Jury to Determine the Choice of Law in Defamation Cases. ................................... 11

     B.   The Restatement Factors Tip Sharply Toward Applying Montana Law to this Case.................................................. 15

   II.  WASHINGTON'S ANTI-SLAPP LAW WOULD NOT APPLY TO THIS CASE EVEN IF WASHINGTON LAW GOVERNED .............. 18

   III.  THE ALLEGATIONS IN PLAINTIFF JOHNATHAN TALBOT'S COMPLAINT PLAUSIBLY GIVE RISE TO AN INFERENCE OF UNLAWFUL DEFAMATION ........................................................ 21

     A.   Mr. Ainuu's Defamatory Publications Were False and Defamatory Statements of Fact. ...................................... 22

     B.   Even if Mr. Ainuu's Statements Were "Opinion," They Were Based on Undisclosed and Incomplete Defamatory Facts and Are Thus Actionable. ..................................................... 24

   IV.  MR. TALBOT HAS ADEQUATELY PLED FACTS THAT SUPPORTS HIS CLAIMS FOR TORTIOUS INTERFERENCE AND PUNITIVE DAMAGES ........................................................... 36

   V.  MR. TALBOT HAS ADEQUATELY PLED FACTS SUPPORTING A CLAIM AGAINST NORTH FACE FOR VICARIOUS LIABILITY. 37

   VI.  CONCLUSION .......................................................... 42

# TABLE OF AUTHORITIES

## US SUPREME COURT CASES

*Snyder v. Phelps*, 562 U.S. 443 (2011)................................................. 19, 19

*Connick v. Myers*, 461 U.S. 138 (1983) .................................................. 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................. 21

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) .................. 24, 25, 28

*Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982)................................................................................................. 37

## STATE CASES

*Buckles v. BH Flowtest*, 476 P.3d 422 (Mont. 2020) ............................... 10

*Phillips v. General Motors Corp.*, 995 P.2d 1002 (Mont. 2000)........ 11, 15

*Lee v. Traxler*, 384 P.3d 82 (Mont. 2016)................................................. 12

*Madison v. Yunker*, 589 P.2d 126 (Mont. 1978) ...................................... 12

*McLeod v. State ex rel. Dept. of Transportation*, 206 P.3d 956 (Mont. 2009)................................................................................................... 13

*Hale v. City of Billings*, 986 P.2d 413 (Mont. 1999).......................... 13, 27

*Lewis v. Reader's Dig. Ass'n, Inc.*, 512 P.2d 702 (Mont. 1973).............. 22

*Roots v. Mont. Hum. Rights Network*, 913 P.2d 638 (Mont. 1996) ........ 23

*Keller v. Safeway Stores*, 108 P.2d 605 (Mont. 1940) .............................. 37

**OTHER CASES**

*Prima Exploration, Inc. v. Nova Energy, LLC*, 2023 WL 4872568 (D. Mont., July 12, 2023)........................................................................ 10

*Fields v. Legacy Health Sys.*, 413 F.3d 943 (9th Cir. 2005).................... 10

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005)..................................... 13

*Johnson v. Multnomah County*, 48 F.3d 420 (9th Cir. 1995)................. 19

*La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020) ........................................ 30

*Davis v. Cornely*, 2021 WL 4805119 (N.D. Ohio Oct. 14, 2021)............. 30

*Jorjani v. N.J. Institute of Tech.*, 2019 WL 1125594 (D.N.J. March 12, 2019)................................................................................................ 30

*O'Brien v. City of Saginaw*, 2011 WL 8143 (E.D. Mich. 2011)............... 30

*Puchalski v. Sch. Dist. of Springfield*, 161 F.Supp.2d 395 (E.D. Pa. 2001)................................................................................................ 31

*Cooper v. Templeton*, 629 F.Supp.3d 223 (S.D.N.Y 2022) ...................... 31

*Rapaport v. Barstool Sports, Inc*, 2021 WL 1178240 (S.D.N.Y, March 29, 2021)........................................................................................ 32

*Cummings v. City of New York*, 2020 WL 882335 (S.D.N.Y. February 24, 2020)........................................................................................ 32

*Ward v. Zelikovsky*, 643 A.2d 972 (N.J. 1994)........................................ 32

*Brimelow v. New York Times Co.*, 2020 WL 7405261 (S.D.N.Y, December 16, 2020) ........................................................................ 32

*Stevens v. Tillman*, 855 F.2d 394 (7th Cir. 1988) .................................. 32

*Edelman v. Croonquist*, 2010 WL 1816180 (D.N.J. May 4, 2010) ......... 32

*Nelsen v. Southern Poverty Law Center*, 2019 WL 12288374 (W.D. Mo., July 31, 2019) ........................................................................ 32

*Sandmann v. New York Times Company*, 78 F.4th 319 (6th Cir. 2023).................................................................................................. 33, 33

*Quigley v. Rosenthal*, 43 F.Supp.2d 1163 (D. Colo. 1999) ..................... 35

## STATE CONSTITUTIONAL PROVISIONS

Mont. Const. art. II § 7 ................................................................... 12, 12, 14

## STATE STATUTES

Wash. RCW 4.105.010 ....................................................................... 18, 20

Wash. RCW 4.105.060 ............................................................................ 18

## OTHER AUTHORITIES

Restatement (Second) of Conflict of Laws (1971) ................. 10, 11, 15, 17

Restatement (Second) of Torts (1977) ............................................... 25, 26

Restatement (First) of the Law of Agency (1933) .................................... 38

## INTRODUCTION

The Defendants Manoah Ainuu ("Mr. Ainuu") and The North Face ("North Face") (collectively "the Defendants") believe that calling someone a "racist" is categorically protected as opinion under the United States Constitution, even when this slur is used to falsely and maliciously defame someone to over 15,000 people and the speaker admits that he had no objective or subjective basis for doing so. Mr. Ainuu and North Face argue they should face no consequences for branding Mr. Talbot this way, despite their intention to maliciously damage him, destroy his reputation, and cost him his job for the purposes of increasing Mr. Ainuu's fame and credibility as a social activist and to hurt a North Face rival. This is not the law, and the Court should deny the Defendants' motions to dismiss.

## BACKGROUND

North Face is a well-known, international brand that sells outdoor apparel and recreational equipment designed for extreme winter sport activities. Compl. at ¶ 11. As part of its operations, North Face pays athletes to lend credibility to its products and to serve as brand

ambassadors to its customer base. Compl. at ¶ 17. North Face also utilizes its brand to insert itself into controversies related to social justice and it encourages its paid athletes and employees to do the same. Compl. at ¶¶ 17-22, 40-42. North Face-sponsored athletes like Mr. Ainuu and others have done just that, often creating controversies under the guise of social justice by attacking companies and individuals that are competitors of North Face and/or its sponsored athletes. Compl. at ¶¶ 23-29, 47-51. Those actions by its sponsored athletes are consistently met with tacit and implied approval from North Face. Compl. at ¶¶ 30, 52.

Since he became a North Face-sponsored athlete in 2018, Mr. Ainuu has gained international fame and a significant social media following, which he frequently utilizes to advocate for social justice and to condemn "systemic racism" in line with the stated mission of North Face. Compl. at ¶¶ 31-46.  On June 21, 2023, Mr. Ainuu made the decision to use that North Face platform to ruin the life of a man he had only just briefly met– the Plaintiff, Johnathan Talbot ("Mr. Talbot"). Mr. Ainuu executed this mission by making the false and defamatory statement in an Instagram post that Mr. Talbot "tried to fight [the Defendant] after saying racist

things" outside of a bar in Bozeman, Montana. Compl. at ¶ 66. This post was republished by Dave Burleson, the North Face executive charged with managing its sponsored athletes. Compl. at ¶ 67.

Though Mr. Ainuu later admitted to the HR Director of Mr. Talbot's employer, Outdoor Research, that he could not point to any "racist things" that Mr. Talbot said to him, Mr. Ainuu spent weeks maliciously posting additional defamatory statements that Mr. Talbot said racists things to him and was a racist, and that Mr. Talbot's employer, Outdoor Research, needed to "exterminate his employment," all while directing those posts to Outdoor Research and encouraging his followers to pressure Outdoor Research to terminate Mr. Talbot, which it eventually did. Compl. at ¶¶ 65-81.

The Defendants now ask this Court to apply Washington State law to this case and dismiss Mr. Talbot's claims on the grounds that Mr. Ainuu's statements, including that Mr. Talbot "tried to fight [Mr. Ainuu] after saying racist things," are not defamatory, and, even if they are, Mr. Ainuu cannot be liable because they represent his opinion. North Face also seeks dismissal on the grounds that it cannot be held vicariously

liable for the actions of its agent, despite encouraging those actions, promoting and benefitting from those actions.

The Defendants are wrong, on all counts. Montana law applies to this case, and Mr. Talbot has more than sufficiently stated a cause of action for defamation and tortious interference against both Defendants.

## I.   MONTANA LAW GOVERNS THIS CASE

It is well-settled that a "'[f]ederal court sitting in diversity cases must apply the forum state's choice of law rules to determine the controlling law.'" *Prima Exploration, Inc. v. Nova Energy, LLC*, 2023 WL 4872568 at *4 (D. Mont., July 12, 2023) (quoting *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005). When a potential choice of law issue exists, Montana applies the two-part rule established by the Restatement (Second) of Conflict of Laws (1971). *Buckles v. BH Flowtest*, 476 P.3d 422, 424 (Mont. 2020). The court should first consider "whether the forum state has a statutory directive concerning choice of law applicable to the underlying cause of action." *Id. (*citing Restatement (Second) of Conflict of L. § 6(1)). If such a provision does not exist, a court should consider the factors outlined in Restatement, § 6(2):

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in determination of a particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability, and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of L. § 6(2). Additionally, the Montana Supreme Court has emphasized that "[a]ny analysis under the Restatement approach is necessarily driven by the unique facts, issues, applicable law, and jurisdictions implicated in a particular case." *Phillips v. General Motors Corp.*, 995 P.2d 1002, 1007 (Mont. 2000).

A. <u>The Montana Constitution Requires the Jury to Determine the Choice of Law in Defamation Cases.</u>

Under the Restatement, an applicable statutory directive governs a choice of law issue. Restatement (Second) of Conflict of L. § 6(1). Montana has not just a *statutory* directive but a *constitutional* directive concerning the choice of law in defamation cases. Unlike other tort cases, the Montana Constitution requires that "[i]n all suits … for libel or slander… *the jury*, under the direction of the court, shall determine *the law* and *the*

11

*facts.*" Mont. Const. art. II, § 7 (emphasis added).[1] This provision "places the heart of any determination regarding defamatory libel directly within the province of the jury, subject only to determinations envisioned by the phrase 'under the direction of the court.'" *Lee v. Traxler*, 384 P.3d 82, 86 (Mont. 2016). Thus, "we emphasize that, due to the unique nature of cases involving libel, a district court should take particular care" before dismissing such cases at the pre-trial stage. *Id.* For example, whether a defamation plaintiff is a "public figure" is "a question for the jury to determine, because of the constitutional provision that the jury under the instructions of the court is the judge of both the law and the fact." *Madison v. Yunker*, 589 P.2d 126, 133 (Mont. 1978) (citing Mont. Const. art. II, § 7). Simply put, a jury's authority under the Montana

---

[1] Article II, § 7, of the Montana Constitution states:

No law shall be passed impairing the freedom of speech or expression. Every person shall be free to speak or publish whatever he will on any subject, being responsible for all abuse of that liberty. In all suits and prosecutions for libel or slander the truth thereof may be given in evidence; and the jury, under the direction of the court, shall determine the law and the facts.

Constitution to "determine the law" in a defamation case necessarily includes authority to determine the choice of law.

Of course, the Montana Constitution does not provide defamation plaintiffs with an absolute right to a jury trial. Judges "may dispose of defamation claims where there are no issues of fact warranting a jury trial." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005) (citing Mont. Const. art. II, § 7). Thus, defamation claims lacking sufficient evidentiary support under Montana law may be dismissed at the pre-trial stage. See, *e.g.*, *McLeod v. State ex rel. Dept. of Transportation*, 206 P.3d 956, 962 (Mont. 2009) (upholding dismissal of defamation claims based upon statements that were privileged under Montana law). Conversely, the Montana Constitution entitles defamation plaintiffs to a jury trial if their claims have adequate evidentiary support under Montana law. *See, e.g.*, *Hale v. City of Billings*, 986 P.2d 413, 417-18 (Mont. 1999) (reversing dismissal of plaintiff's defamation claim because city's allegations that plaintiff was a fugitive and a "most-wanted" suspect were potentially false).

As explained below, Talbot has adequately pled a claim for defamation under Montana law. That is all he is required to do at this stage of the proceedings. He intends to show the jury that Montana law entitles him to damages resulting from Mr. Ainuu's defamatory remarks and North Face's participation in spreading and encouraging those remarks.

If the Defendants want Talbot's claims resolved under Washington law, they must ask the jury to apply Washington law, and "the jury, under the direction of the court, shall determine the law." Mont. Const. art. II, § 7. The Court may fashion instructions to guide the jury in that determination–instructions that would presumably inform the jury to consider the factors in Restatement, § 6(2). But the choice of law is the jury's choice, not the Court's. A pre-trial dismissal, based solely on Washington law, of defamation claims that Talbot has adequately pled under Montana law would deprive him of his constitutional right to have a jury determine whether Washington law should apply in the first place. Therefore, in ruling on Defendants' motions, the Court must limit its review to the application of Montana law to Talbot's defamation claims.

B. <u>The Restatement Factors Tip Sharply Toward Applying Montana Law to this Case.</u>

Not only does section 6(1) of the Restatement require the Court to apply Montana law to the Defendants' motions, section 6(2) does as well. Under the latter section, Montana courts turn to Restatement, §§ 145-46 to determine which state has "the most significant relationship to the occurrence and the parties." *Phillips,* 995 P.2d at 1007. This requires courts to analyze the place where the injury occurred, the place where the conduct causing the injury occurred, the domicil and residence of the parties, and the place where the relationship between the parties is centered. Restatement (Second) of Conflict of L. § 145.

Further, according to the Restatement, "[i]n the majority of instances, the actor's conduct, which may consist either of action or non-action, and the personal injury will occur in the same state. In such instances, the local law of this state will usually be applied to determine most issues involving the tort." *Id.* at §146 cmt. d. That is because "the state where the injury occurs will, usually at least, have the dominant interest in determining whether the interest affected is entitled to legal protection."

The relationship between Mr. Talbot and Mr. Ainuu is centered in Bozeman, Montana. They met there for the first time, outside of a bar on June 20, 2023, and that is where the conflict occurred. Compl. at ¶¶ 53-63. Additionally, Mr. Ainuu is a resident of Bozeman, Montana, his Instagram highlights his Montana residence, he used that same Instagram account to defame Mr. Talbot while both were physically present in Montana, and he directed his defamatory statements to damage Mr. Talbot to a Montana audience, as demonstrated by the repeated Instagram references Mr. Ainuu made in his posts about Mr. Talbot being from Montana. Compl. at ¶¶ 9, 64-66, 68, 81; Ex. 5 ("Ainuu Instagram Profile"). Mr. Talbot had only recently moved from his home of Bozeman to Washington State in June of 2023 for his new job at Outdoor Research. Compl. at ¶ 56; Ex. 8 ("Talbot Decl.") at ¶ 3.  These facts establish that the state with  most significant relationship to the occurrence and the parties is, therefore, Montana.

Mr. Ainuu claims otherwise by quoting comment (e) of section 150 of the Restatement for the proposition that, in multistate defamation, courts should apply the law of the plaintiff's domicile "even though some

or all of the defamer's acts of communication were done in another state."
Doc. 28 at 3.  He neglects to mention the next paragraph in comment (e),
which reads: "[a] state which is not the state of the plaintiff's domicil,
may be that of most significant relationship if it is the state where the
defamatory communication caused the plaintiff the greatest injury to his
reputation. This may be so, for example, in situations where (a) the
plaintiff is better known in this state than in the state of his domicil, or
(b) the matter claimed to be defamatory related to an activity of the
plaintiff that is principally located in this state, or (c) the plaintiff
suffered greater special damages in this state than in the state of his
domicil, or (d) the place of principal circulation of the matter claimed to
be defamatory was in this state." Restatement (Second) of the Conflict of
L. § 150 cmt. e.

In this case, Mr. Talbot had just moved from Bozeman, Montana to
Washington State the very same month that Mr. Ainuu defamed him.
Clearly, Mr. Talbot was better known in Montana than he was in
Washington State, having resided in the latter state a mere matter of
days before Mr. Ainuu began defaming him. Further, the defamation

related to the activities of Mr. Talbot in Montana—introducing himself to and engaging in conversation with Mr. Ainuu outside of a bar in Bozeman. Finally, given that Mr. Ainuu himself is a Bozeman resident, and that he intentionally directed his posts to a Bozeman audience for the purpose of affecting Mr. Talbot in the place where he had a good reputation, the Court should conclude that the place of principal circulation of Mr. Ainuu's defamatory posts was Montana.

The Defendants's reliance upon Washington law is misplaced. The only tie this case has to Washington appears to be that Mr. Talbot moved from Montana to Washington a few days before Mr. Ainuu began defaming him, ultimately resulting in Mr. Talbot being fired from the job for which he left Montana in the first place.

## II.  WASHINGTON'S ANTI-SLAPP LAW WOULD NOT APPLY TO THIS CASE EVEN IF WASHINGTON LAW GOVERNED

Washington's anti-SLAPP law applies only if (1) the plaintiff's case is dismissed for failure to state a claim, and (2) the defendant was exercising the right to speak "on a matter of public concern." RCW 4.105.010 (2)(c); RCW 4.105.060. Mr. Talbot addresses the substance of his claims in the next section, but Washington's anti-SLAPP statute is

not controlling because Mr. Ainuu's speech is not "on a matter of public concern."

Whether or not speech is a matter of public concern turns on whether it can "be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). To determine whether speech is a matter of public concern, courts must look to the "content, form, and context of a given statement, as revealed by the whole record." *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995). Even speech that may broadly involve public matters to society or the community does not always qualify for Constitutional protection as a matter of public concern. *Snyder*, 562 U.S. at 455. Where the speech on a public matter appears instead as a mask to attack an individual over a private matter, the speech does not enjoy Constitutional protection. *Id.*; *see also Connick v. Myers*, 461 U.S. 138, 153 (1983) (speech on a public matter not deemed to be of public concern when its primary purpose was related to a personal grievance).

In this case, Mr. Ainuu's defamatory statements arose after a private conversation that took place between him and Mr. Talbot on a street in Bozeman, Montana. Compl. at ¶¶ 57-59. Moreover, the object of Mr. Ainuu's obsessive and defamatory posts was not to engage in a serious discussion with the community on the issue of race, but rather to punish and destroy Mr. Talbot's reputation because of a personal grievance,, then to use this fabricated feud to raise his personal profile, burnish North Face's "social justice" credentials, and injure the reputation of North Face's competitor, Outdoor Research.

Consequently, even if the Court were to find that Washington Law controls, and that Mr. Talbot has failed to state a claim, Mr. Ainuu's speech is not "on a matter of public concern" and the Defendants should not be awarded relief under RCW 4.105.010 (2)(c).[2]

---

[2] Defendants' anti-SLAPP motions are based upon a statute that "creates no substantive rights; it merely provides a procedural mechanism for vindicated existing rights." *Klocke v. Watson*, 936 F.3d 240, 247 (5th Cir. 2019), quoting *Makaeff v. Trump Univ.*, 715 F.3d 254, 273 (9th Cir. 2013) (Kozinski, C.J., concurring).  Mr. Talbot recognizes that the Ninth Circuit has subsequently made clear that anti-SLAPP

### III.   THE ALLEGATIONS IN PLAINTIFF JOHNATHAN TALBOT'S COMPLAINT PLAUSIBLY GIVE RISE TO AN INFERENCE OF UNLAWFUL DEFAMATION

The facts and allegations pleaded in the Complaint are more than adequate to create a plausible inference that Mr. Ainuu unlawfully defamed Mr. Talbot.

A court must deny a Defendants' Rule 12(b)(6) motion when a complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, in analyzing a Rule 12(b)(6) motion, a court must accept as true the factual allegations made by a plaintiff in the complaint. *Id*. Therefore, in this case, the Court must accept as true the facts alleged in Mr. Talbot's Complaint and determine whether those alleged facts state a plausible claim for relief pursuant to Montana defamation law.

The Montana Supreme Court has held that "[t]he underlying purpose of libel law is to furnish a means of redress for defamation. Every

---

motions can be applied in federal diversity cases. *CoreCivic, Inc. v. Candide Group*, 46 F.4th 1136, 1143 (9th Cir. 2022). Mr. Talbot further recognizes that this Court is bound by *CoreCivic* – he simply desires to preserve this issue for appeal.

person is entitled to enjoy his reputation unimpaired by false and defamatory remarks." *Lewis v. Reader's Dig. Ass'n, Inc.*, 512 P.2d 702, 705 (Mont. 1973).

The elements of an action to redress those rights under Montana law are "a false and unprivileged publication by writing, printing, effigy, or other fixed representation that exposes any person to hatred, contempt, ridicule, or obloquy or causes a person to be shunned or avoided or that has a tendency to injure a person in the person's occupation." Mont. Code Ann. § 27-1-802.

A. <u>Mr. Ainuu's Defamatory Publications Were False and Defamatory Statements of Fact.</u>

Mr. Talbot has more than adequately pled that Mr. Ainuu made a false publication that exposed him to hatred, contempt, ridicule, or obloquy or caused him to be shunned or avoided or that injured him in his occupation.

More specifically, Mr. Talbot alleges in his Complaint that Mr. Ainuu posted on Instagram that Mr. Talbot had approached him in Bozeman, "tried to fight [Mr. Ainuu] after saying racist things," "initiated a fight," and was one of "the racists in outdoor industry." Compl. at ¶¶

65-66, 81. He also published numerous other supplemental posts further implying that Mr. Talbot had made racist statements accompanied by threats of violence towards Mr. Ainuu. Compl. at ¶¶ 68, 72, 81.

The Complaint further alleges facts that demonstrate that Mr. Talbot was exposed to hatred, contempt, ridicule, or obloquy or caused him to be shunned or avoided or injured Mr. Talbot in his occupation. Those facts include the comments of Mr. Ainuu's Instagram followers, that Mr. Talbot was terminated from his position at Outdoor Research as a direct result of Mr. Ainuu's Instagram campaign, and that Mr. Talbot has been unable to secure employment since and because of Mr. Ainuu's Instagram campaign. Compl. at ¶¶ 69-78, 80, 82.

The Defendants claim, however, that his Instagram posts cannot legally be considered "false" because the Defendant's statements that Mr. Talbot "tried to fight [Mr. Ainuu] after saying racist things" and "initiated a fight [with Mr. Ainuu]" are statements of opinion that can never be actionable as defamatory.

Whether a statement is one of fact or opinion depends on if the statement contains "a provable false factual connotation." *Roots v. Mont.*

*Hum. Rights Network*, 913 P.2d 638, 640 (Mont. 1996). In this case, Mr. Ainuu's statements that Mr. Talbot "tried to fight [him] after saying racist things" are provably false–as alleged in the Complaint, Mr. Ainuu has already proven his own statement false when he admitted to Outdoor Research's HR Director that he "could not point to any racist or offensive statement" made to him by Mr. Talbot. Compl. at ¶¶ 75-76. The Defendants cannot reasonably claim that a factual allegation that Mr. Ainuu made, which he later admitted to be false, is not provably false.

B. <u>Even if Mr. Ainuu's Statements Were "Opinion," They Were Based on Undisclosed and Incomplete Defamatory Facts and Are Thus Actionable.</u>

If the Court were to consider Mr. Ainuu's statements to be "opinion," it is clear from the Complaint that they are properly considered "mixed opinion," as opposed to "pure opinion," and are thus actionable.

The United States Supreme Court has made clear that there is not "a wholesale exemption [from defamation liability] for anything that might be labeled 'opinion.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1,

18 (1990).[3] That is because such an interpretation would "ignore the fact that expressions of 'opinion' may often imply the assertion of objective fact." *Id.* at 18. Explaining itself further, the Court cited the Restatement (Second) of Torts, § 566, comment a (1977), for the rule that, if the facts upon which a speaker bases his opinion "are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact" and thus be actionable defamation. *Id.* at 19.

Indeed, the illustrations from § 566 of the Restatement demonstrate how different variations of a speaker's conclusion can lead to different results.

Illustration 3 reads: "A writes to B about his neighbor C: 'I think he must be an alcoholic.' A jury might find that this not just an expression

_____

[3] North Face argues that *Milkovich* stands for the proposition that opinions relating to matters of public concern will receive full constitutional protection. Doc. 26 at 18. Interestingly, North Face omits the key language from that case clearly stating that opinions do not receive a wholesale exemption from defamation and that opinions that imply the existence of undisclosed defamatory facts are indeed actionable as mixed opinion.

of opinion but that it implied that A knew undisclosed facts that would justify his opinion." Restatement (Second) of Torts § 566.

Illustration 4 reads: "A writes to B about his neighbor C: 'He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic.' The statement indicates the facts on which the expression of opinion was based and does not imply others. These facts are not defamatory and A is not liable for defamation." *Id.*

According to the Restatement, this distinction between opinion based on fully disclosed facts (pure opinion) and one based on undisclosed facts (mixed opinion) is significant:

> The distinction between the two types of expression of opinion, as explained in Comment b, therefore becomes constitutionally significant. The requirement that a plaintiff prove that the defendant published a defamatory statement of fact about him that was false can be complied with by proving the publication of an expression of opinion of the mixed type, if the comment is reasonably understood as implying the existence of undisclosed facts about the plaintiff that must be defamatory in character in order to justify the opinion. A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and

unreasonable the opinion may be or how derogatory it is. **But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently. <u>The difference lies in the effect upon the recipient of the communication.</u>** In the first case, the communication itself indicates to him that there is no defamatory factual statement. In the second, it does not, and **if the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability.** The defendant cannot insist that the undisclosed facts were not defamatory but that he unreasonably formed the derogatory opinion from them. This is like the case of a communication subject to more than one meaning. As stated in § 563, **the meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express.**

*Id.* at comment c.

The Montana Supreme Court explicitly adopted *Milkovich* and the Restatement in *Hale,* 986 Mont. at 419, holding that "if an opinion is not based on disclosed facts, and as a result creates the reasonable inference that the opinion is based on undisclosed defamatory facts, such an opinion is not afforded constitutional protection."

The Complaint in this matter clearly states that Mr. Ainuu posted to Instagram that Mr. Talbot "tried to fight [him] after saying racist

27

things," while failing to articulate what Mr. Ainuu's statement was based upon, namely what Mr. Talbot specifically said to him.[4]

The Defendants attempt to argue, however, that those statements cannot be considered defamatory given "the totality of the circumstances." They claim that a reasonable audience would not take Mr. Ainuu's statements as facts because they were made online, or because his race and ethnicity make him especially sensitive to racism the average person would not see, or that the use of emojis make it clear that he didn't mean to be taken seriously, or that the statements were made in the heat of the moment. None of those arguments are supported by the allegations in the Complaint and should not be taken seriously.

---

[4] To the extent the Defendant claims that his vague description of Mr. Talbot "asking questions–very directly–about diversity" was the fact upon which he based his opinion, such a disclosure is still woefully "incomplete" in that it still fails to adequately disclose what questions Mr. Talbot said or did not say about diversity and the recipients of that information clearly came to the reasonable, but false, conclusion that Mr. Talbot must have said something racist. *See Milkovich*, 497 U.S. at 18-19 ("[e]ven if the speaker states the facts upon which he bases his opinion, **if those facts are either incorrect or incomplete, or if his assessment of them is erroneous**, the statement may still imply a false assertion of fact.")

The reality is that Mr. Ainuu's Instagram followers who viewed his Instagram posts, made over the course of weeks, drew the reasonable, but false, conclusion that Mr. Ainuu was justified in his statement based on assumed but undisclosed facts of what actually transpired. They concluded that Mr. Talbot was "an aggressive white racist," "questioned [Mr. Ainuu's] right to be there," made it difficult for Mr. Ainuu to live in Bozeman because he is "a person of color," that Mr. Talbot engaged in "bigotry and hatred," and that he "assaulted [a person] of color in [a] small town[]." Compl. at ¶ 69.

Further, as a result of the reasonable, but false, conclusions that Mr. Ainuu's Instagram followers made from his dangerously vague and incomplete false accusations against Mr. Talbot, those followers began a pressure campaign against Mr. Talbot's employer and a competitor of North Face, Outdoor Research, who came to a similarly reasonable, but false, conclusion that Mr. Talbot engaged in discriminatory conduct. This is aptly demonstrated by the fact that Outdoor Research felt the need to post the following on Instagram: "For those that have messaged our social accounts, emailed us, or contacted customer service, you are heard. OR

does not support discriminatory conduct based on race or any other reason, and we take these matters very seriously. We hope to get the chance to speak to Manoah directly about what transpired." Compl. at ¶ 70.

Courts throughout the country have routinely held that accusations that someone engaged in specific racist conduct or speech, where those accusations imply the existence of undisclosed defamatory facts, can be actionable defamation on the grounds that it is mixed opinion. *See La Liberte v. Reid,* 966 F.3d 79 (2d Cir. 2020) (accusation that someone engaged in concrete, racist conduct can be proven either true or false and is thus an actionable claim of defamation); *Davis v. Cornely*, 2021 WL 4805119 (N.D. Ohio Oct. 14, 2021) (plaintiff stated a claim for defamation where the defendant accused him of making racist and threatening remarks); *Jorjani v. N.J. Institute of Tech.,* 2019 WL 1125594 at *4 (D.N.J. March 12, 2019) ("if the statement falsely implies someone engaged in specific acts (**e.g., made racist statements or refused to employ a certain race**), it may be defamatory") (emphasis added); *O'Brien v. City of Saginaw*, 2011 WL 8143 (E.D. Mich. 2011) (denying

30

defendant's motion to dismiss on the grounds that the defamatory accusation of racism implied the existence of undisclosed defamatory facts); *Puchalski v. Sch. Dist. of Springfield,* 161 F.Supp.2d 395 (E.D. Pa. 2001) (stating that someone made a racist remark is capable of defamatory meaning and actionable); *see also Cooper v. Templeton,* 629 F.Supp.3d 223 (S.D.N.Y 2022) (recognizing that a statement that someone is racist based on undisclosed facts may be actionable defamation but finding that the undisclosed facts were well known to the public as the incident giving rise to the opinion made international news).

Conversely, the overwhelming majority of cases cited by the Defendants are easily distinguishable in that the statement at issue was not actionable defamation on the grounds that the speaker either did not imply the existence of undisclosed facts upon which the opinion was based, the speaker actually disclosed the detailed facts upon which the

opinion was based, or the facts were already well known to the public because of significant news coverage.[5]

The Defendants similarly attempt to claim that Mr. Ainuu's statements that Mr. Talbot "tried to fight [Mr. Ainuu]," and "initiated a

---

[5] *Rapaport v. Barstool Sports, Inc,* 2021 WL 1178240 (S.D.N.Y, March 29, 2021) (the speaker's statements are not mixed opinion because they do not imply existence of undisclosed facts); *Nelsen v. Southern Poverty Law Center,* 2019 WL 12288374 (W.D. Mo., July 31, 2019) (statements in an article that someone was a neo-Nazi, anti-immigrant, and racist were not based on undisclosed facts, but were based on statements made by the plaintiff which were quoted by the defendant in the same article); *Cummings v. City of New York,* 2020 WL 882335 (S.D.N.Y. February 24, 2020) (statement in news article that the plaintiff was racist not actionable because the defendant disclosed the specific facts upon which it based its statement); *Ward v. Zelikovsky*, 643 A.2d 972 (N.J. 1994) (alleged defamatory statement held to be non-actionable because it did not imply that statement was based on undisclosed facts); *Brimelow v. New York Times Co.* 2020 WL 7405261 (S.D.N.Y, December 16, 2020) (one statement by the defendant implied the existence of non-disclosed facts and was thus actionable, while another statement was not actionable because it disclosed the facts upon which the defendant's opinion was based); *Stevens v. Tillman,* 855 F.2d 394 (7th Cir. 1988) (defendant's statement was a non-actionable statement of opinion where the facts upon which the opinion was based were fully and specifically disclosed); *Edelman v. Croonquist*, 2010 WL 1816180 (D.N.J. May 4, 2010) (defendant's statements of opinion were non-actionable as he had disclosed the specific factual basis upon which his opinions were based).

fight [with Mr. Ainuu]" are protected opinion "given the highly-charged environment in which Talbot's nonverbal conduct took place, as explained in [The North Face's brief] and illustrated by *Sandmann v. New York Times*." Manoah Ainuu's Br. Supporting Mot. to Dismiss and Special Mot. for Expedited Relief, at p. 6.

In that case, the plaintiff Nicholas Sandmann was a student at Covington Catholic High School and attended the March for Life event in Washington, D.C. *Sandmann v. New York Times Company*, 78 F.4th 319, 322-23 (6th Cir. 2023). At the same time and place, there was an unrelated political demonstration, the Indigenous Peoples March, attended by Nathan Phillips and significantly covered by the media. *Id.* At one point, Phillips stood face to face with Sandmann and began to play his drum and sing. *Id.* at 322. The video of the encounter went viral, and several news organizations reported on statements made by Phillips that Sandmann had "blocked" him, did not "allow" him to retreat, or "decided" he would not move aside and "positioned himself" to stop Phillips. *Id.*

In the ensuing defamation case brought by Sandmann, the Court distinguished between "pure opinion" and "mixed opinion," and held that

33

Phillps's statements were protected pure opinion because they were not based on undisclosed facts. *Id*. at 333. Rather, "the statements appeared in stories that provided multiple versions and descriptions of the events, putting a reasonable reader on notice that Phillips's statements were merely one perspective among many. The online articles at issue embedded or linked to some version of the video, effectively disclosing the facts upon which Phillip's opinion was based; readers were able to determine for themselves whether they interpreted the encounter as Sandmann deciding to block Phillips, positioning himself to stop him, or not allowing him to retreat." *Id.*

Conversely, in the case before the Court, the interaction between Mr. Ainuu and Mr. Talbot was not in "the highly charged environment" of thousands of people at competing political demonstrations in Washington D.C., but rather a one-on-one conversation on a street in Bozeman, Montana. Additionally, there were neither news articles from major media outlets describing the interaction, nor was there a viral video of the interaction. The only description was provided by Mr. Ainuu and that description created the reasonable, but false, inference that Mr.

Talbot not only directed racist statements towards Mr. Ainuu, but also that he assaulted him. Therefore, Mr. Talbot has an actionable claim against for Mr. Ainuu's false and defamatory statements that he "tried to fight [Mr. Ainuu]," and "initiated a fight [with Mr. Ainuu]." *See Quigley v. Rosenthal*, 43 F.Supp.2d 1163, 1178-79 (D. Colo. 1999) (statement that plaintiff "attempted to intimidate or threaten" defendants implied undisclosed defamatory facts and was thus "capable of being proven true or false).

Thus, given the standard set forth in *Milkovich* and the Restatement, explicitly adopted by the Montana Supreme Court in *Hale*, and the cases cited herein, because the recipients of Mr. Ainuu's Instagram posts drew the reasonable conclusion that his defamatory statements expressed in his posts must have been based on some undisclosed, vile, racist, and violent conduct and speech, Mr. Talbot has adequately pled a claim of defamation.[6]

---

[6] Of course, Mr. Ainuu could have avoided potential liability by specifically stating in his post what it was that Mr. Talbot said to him to

## IV.  MR. TALBOT HAS ADEQUATELY PLED FACTS THAT SUPPORTS HIS CLAIMS FOR TORTIOUS INTERFERENCE AND PUNITIVE DAMAGES

The Defendants also ask this Court to dismiss Mr. Talbot's claim for tortious interference on the grounds that he cannot satisfy the "wrongful conduct" element without stating a claim for defamation. As articulated above, Mr. Talbot has adequately stated a claim for defamation and thus the Court should deny the Defendants' Motion to Dismiss Count II of his Complaint.

Similarly, the Defendants seeks dismissal of Mr. Talbot's request for punitive damages on the grounds that he has failed to set forth a

---

cause him to claim that he had "said racist things," because such clarification would have given the recipient the opportunity to make the independent and fully formed judgment as to whether Mr. Ainuu's statement was or was not reasonable. For example, if Mr. Ainuu had posted that "Mr. Talbot tried to fight me after making the racist statement that Magic Johnson was a better basketball player than Larry Bird," there would be no cause of action, even if Mr. Talbot had never said such a thing. Why? Because it leaves nothing to the recipient's reasonable exercise of imagination and the factual statement upon which Mr. Ainuu relies for his opinion, while it may even be false, is not defamatory and would not lead a reasonable recipient to believe that Mr. Talbot "said racist things" of otherwise engaged in racist conduct directed at Mr. Ainuu.

cognizable defamation claim and, further, that punitive damages are disallowed under Washington law.

To the contrary, because Mr. Talbot has set forth a cognizable defamation claim, and because punitive damages are allowed under Montana law, a jury should decide whether to award them.

## V.   MR. TALBOT HAS ADEQUATELY PLED FACTS SUPPORTING A CLAIM AGAINST NORTH FACE FOR VICARIOUS LIABILITY

North Face argues that it cannot be held responsible for the actions of their sponsored athletes because they are not employees, but rather independent contractors. That is irrelevant. North Face vested Mr. Ainuu with apparent agency, and all corporations are liable for the defamatory statements of their actual or apparent agents, regardless of their status as contractors, when "conduct [is] of the same general nature as that authorized, or [it is] incidental to the conduct authorized." *Keller v. Safeway Stores*, 108 P.2d 605, 610 (Mont. 1940) (defamatory statements by an agent bind the company if they are incidental to the agent's employment); *see Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) ("if an agent is guilty of defamation, the principal is liable so long as the agent was apparently authorized to make the

defamatory statement * * * Finally, a principal is responsible if an agent acting with apparent authority tortiously injures the business relations of a third person.").

In *Keller,* the Montana Supreme Court adopted the Restatement (First) of the Law of Agency § 229 (1933) and held that the proper inquiry to determine whether a principal can be held liable for the defamatory statements of its agent depends on "(a) Whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (f) whether or not the master has reason to expect that such an act will be done; and (i) the extent of departure from the normal method of accomplishing an authorized result." *Id* at 611.[7]

As alleged in the Complaint, in April of 2020, North Face-sponsored skier Vasu Sojitra ("Sojitra") attacked the directors, producers, and sponsors of the 2019 film "Himalayan Ice: Adventures in India's Most Remote Valley," as exhibiting "white savior complex," despite many stars in the film being native to the Himalayas. Compl. at ¶¶ 24-27. The

---

[7] While the Restatement sets forth a list of considerations from (a) to (j), the court limited its inquiry to sections (a), (b), (f), and (i).

attacks garnered significant media coverage, to the benefit of Sojitra and North Face, and it was consistent with North Face's directive to its sponsored athletes and employees that they should bring social justice activism "not only within the Company, but within the communities where we live and work." Compl. at ¶¶ 16-17.

Sojitra's attacks also benefited North Face because it injured the reputation of several of its direct competitors, La Sportiva and Petzl. Compl. at ¶¶ 26-27. Yet, despite receiving complaints about Sojitra's unjustified attack, North Face showed its apparent approval of Sojitra's conduct by taking no action against him. Compl. at ¶ 30.

Mr. Ainuu also took previous action to fulfill North Face's mission to bring social justice "not only within the Company, but within the communities where we live and work." Compl. at ¶¶ 16-17. In February of 2020, Mr. Ainuu accused La Sportiva-sponsored climber Ari Novak ("Novak") of engaging in racist conduct because Novak had stopped an apparently intoxicated Mr. Ainuu from taking a 16-year-old girl night climbing at the Michigan Ice Festival. Compl. at ¶¶ 16-17. Again, North Face received notice of this incident when Novak informed North Face

Global Senior Athlete Coordinator Dave Burleson of Mr. Ainuu's conduct, but North Face showed its apparent approval of Mr. Ainuu's conduct by taking no action against him. Compl. at ¶ 52.

Following the same pattern of conduct as was known and encouraged by North Face, Mr. Ainuu manufactured a conflict with Mr. Talbot, used the significant public profile that came with being a North Face-sponsored athlete to spread, through his North Face-branded Instagram account, a viral campaign that Mr. Talbot "tried to fight [him] after saying racist things." Mr. Ainuu viewed his statements as promoting North Face's mission to bring social justice "not only within the Company, but within the communities where we live and work" and used the controversy he created to further attack Outdoor Research, Mr. Talbot's employer and a North Face competitor. Compl. at ¶¶ 65-81. When Dave Burleson, North Face's senior executive in charge of sponsored athletes, received notice of Mr. Ainuu's post, he reposted it on his own Instagram page. Compl. at ¶ 67.

Tellingly, the acts commonly done by North Face-sponsored athletes like Mr. Ainuu and Sujitra are very much comparable to North

Face's action to use its own public platform to attack Facebook for what North Face believed was the promotion of racist information. Compl. at ¶ 18.

In sum, Mr. Ainuu's attacks on Mr. Talbot, and the resultant social media pressure campaign he led against North Face's competitor Outdoor Research, are the latest in a common pattern of behavior by North Face's sponsored athletes and North Face itself. They engage in this activity knowing that it will benefit North Face's brand, that it is consistent with North Face's stated mission and actions to bring social justice "not only within the Company, but within the communities where we live and work," that North Face itself engages in such action through officially authorized action, and that conduct such as Mr. Ainuu's attacks on Mr. Talbot and Outdoor Research is approved of and even promoted by North Face.

Consequently, Mr. Talbot has adequately pled that Mr. Ainuu was acting within the scope of his apparent authority and that North Face may be liable for his actions, which include defamation and tortious interference.

## VI.   CONCLUSION

For the reason stated herein, the Court should deny the

Defendants' Motions to Dismiss.

Respectfully Submitted,

/s/ Matthew Monforton

Nicholas R. Barry*
Ian Prior*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Avenue S.E. No.
231
Washington, D.C. 20003
Phone: (202) 964-3721
nicholas.barry@aflegal.org
ian.prior@aflegal.org
*(pro hac vice granted)

Matthew Monforton
MONFORTON LAW OFFICES,
PLLC
32 Kelly Court
Bozeman, Montana 59718
Phone: (406) 570-2949
Fax: (406) 551-6919
matthewmonforton@yahoo.com

**CERTIFICATE OF COMPLIANCE PURSUANT TO L. R. 7.1(d)(2)(E)**

I hereby certify that this document, excluding caption, tables, and certificate of compliance, contains 6282 words, as determined by the word processing software used to prepare this document, specifically Microsoft Word 2007.

DATED: January 25, 2024                    Respectfully submitted,

                                           /s/ Matthew G. Monforton
                                           Matthew G. Monforton
                                           Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 25th day of January, 2023, that a copy of the foregoing will be delivered this day via the Court's ECF system to counsel for Defendants.

DATED: January 25, 2024            Respectfully submitted,

                                   /s/ Matthew G. Monforton
                                   Matthew G. Monforton
                                   Attorney for Plaintiffs