## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

JOHNATHAN TALBOT,

                    Plaintiff,

vs.

MANOAH AINUU, and THE
NORTH FACE APPAREL CORP., a
Delaware Company,

                    Defendants.

**CV-23-66-BU-BMM**

**ORDER**

## INTRODUCTION

Plaintiff Johnathan Talbot ("Talbot") filed this action against Defendants Manoah Ainuu ("Ainuu") and The North Face Apparel Corporation ("TNF"). (Doc. 1.) Talbot asserts claims for defamation and tortious interference against both Ainuu and TNF. (*Id.* at 35–48.) TNF and Ainuu filed motions to dismiss the claims against them for failure to state a claim. (Doc. 25; Doc. 27.) Talbot opposes the motions. (Doc. 34.) The Court held a hearing on the motion on February 1, 2024. (Doc. 37.)

## BACKGROUND

Talbot is a resident of Washington who worked for Outdoor Research LLC ("Outdoor Research"), a competitor of TNF. (Doc. 1, ¶ 8.) Ainuu resides in Bozeman, Montana and works as a professional mountain climber. (*Id.*, ¶ 9.) Ainuu

1

serves as a sponsored athlete for TNF and promotes TNF's brand and products on his social media. (Doc. 26 at 13–14.) TNF promotes diversity in the outdoor industry and has taken on initiatives to increase equity in outdoor recreation. (Doc. 1-7.)

Talbot's employer, Outdoor Research, sent Talbot to Bozeman, Montana to conduct a focus group. (Doc. 1, ¶ 54.) Talbot encountered Ainuu outside a bar in downtown Bozeman and engaged in conversation on the evening of June 20, 2023. (*Id.*, ¶¶ 55, 57.) The accounts of the conversation differ, but Ainuu became upset with Talbot at some point and called him "racist and entitled." (*Id.*, ¶ 58.) The argument carried into a nearby bar where the allegations again diverge. Talbot contends that he tried to speak to Ainuu to understand his allegations of racism. (Doc. 26 at 15.) Ainuu asserted later in social media posts that Talbot squared up to him, got in Ainuu's face, and seemed to be challenging Ainuu to a fight. (*Id.*)

Ainuu posted a video to Instagram and seven written statements about the incident. (*Id.* at 16.) These statements alleged that Talbot made racist remarks and tried to fight Ainuu. (Doc. 1-9 at 1–3.) Ainuu called for Outdoor Research to take action and make Talbot face consequences for his statements and conduct. (*Id.*) Dave Burleson, a Global Senior Athlete Coordinator for TNF, shared the statements on his personal social media account. (Doc. 26 at 16.) Social media users began commenting on Outdoor Research's social media page, tagging the social media page, and demanding that Outdoor Research take action against Talbot. (Doc. 1-11.)

2

Outdoor Research placed Talbot on administrative leave on June 23, 2023, and indicated its intent to terminate Talbot's employment on June 29, 2023. (Doc. 1, ¶¶ 74, 77.) Outdoor Research noted that Talbot "showed poor judgment, in [his] actions in Bozeman, both prior to and during [the] incident at the bar" as the reason for Talbot's termination. (*Id.*, ¶ 77.) Ainuu made a series of posts again on July 4, 2023, that targeted Outdoor Research for their failure to reprimand Talbot. Talbot's termination became effective on July 14, 2023. (*Id.*, ¶ 78.) Talbot filed this action on October 2, 2023, alleging libel and tortious interference against Ainuu. (*Id.*, ¶¶ 83–98.) Talbot's complaint also alleges libel and tortious interference against TNF under a theory of respondeat superior. (*Id.*, ¶¶ 99–121.)

## STANDARD OF REVIEW

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires claimants to include in their complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint under the plausibility pleading standard of Rule 8(a)(2). *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal proves appropriate under Rule 12(b)(6) where the complaint fails to state a claim upon which relief can be granted. *Mendiondo v. Centinela Hospital Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). A court may dismiss a complaint "based on the lack of a cognizable legal theory or the absence of sufficient facts

alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

A complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face to survive a Rule 12(b)(6) motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim proves plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The plausibility standard does not require probability, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* The Court must "take[] as true and construe[] in the light most favorable to plaintiffs" all factual allegations set forth in the complaint. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (internal quotation marks omitted).

## DISCUSSION

TNF argues that Talbot's claims against TNF fail because TNF did not publish any of the challenged statements and because the challenged statements represent matters of opinion that cannot support a claim for defamation. (Doc. 26 at 18.) TNF also notes that punitive damages prove unavailable under the applicable law. (*Id.*) Ainuu contends that Talbot's claims against him fail because his statements represented subjective opinions that are not "provably false." (Doc. 28 at 4–12.) Both Ainuu and TNF contend that the tortious interference claims duplicate Talbot's

defamation claims and must be dismissed given the subjective, opinion-like nature of Ainuu's statements. (*Id.* at 12–15.) The Court will address these arguments in turn, but the Court first must determine which state's law applies to the claims.

## I.     Whether Montana law or Washington law applies.

A federal court exercising diversity jurisdiction applies the choice of law rules of the forum state. *Aqua-Marine Constructors v. Banks*, 110 F.3d 663, 670 (9th Cir. 1997). The Court exercises jurisdiction over this case by virtue of diversity of citizenship among the parties. (Doc. 1, ¶ 12.) Montana represents the forum state. Accordingly, the Court must apply Montana's choice of law rules. Montana uses the approach from the Restatement (Second) of Conflict of Laws to resolve disputes over which state's substantive law applies to a particular action. *Buckles v. BH Flowtest, Inc.*, 476 P.3d 422, 424 (Mont. 2020).

The Court first must determine "whether the forum state has a statutory directive concerning choice of law applicable to the underlying cause of action." *Id.* (internal quotations omitted). If no statutory directive exists, the Court considers the principles set forth in § 6(2) of the Restatement along with the specific considerations identified by the Restatement for the alleged claim. *Id.* Talbot contends that a statutory directive exists that requires the Court to submit the choice of law question to the jury. Talbot notes that Montana's Constitution contains a provision that provides the following: "[i]n all suits and prosecutions for libel or

slander the truth thereof may be given in evidence; and the jury, under the direction of the court, shall determine the law and the facts." Mont. Const. Art. II, § 7.

The Montana Supreme Court has interpreted this provision as "plac[ing] the heart of any determination regarding defamatory libel directly within the province of the jury." *Lee v. Traxler*, 384 P.3d 82, 86 (Mont. 2016). The Montana Supreme Court recognized that "'there is no absolute prohibition against granting summary judgment in libel cases.'" *Id.* (quoting *Hale v. City of Billings*, 986 P.2d 413, 417 (Mont. 1999) (internal quotation omitted). The Montana Supreme Court cautioned, however, that "due to the unique nature of cases involving libel, a district court should take particular care when evaluating such motions." *Lee*, 384 P.3d at 86 (citing *Hale*, 986 P.2d at 417).

The Court disagrees with Talbot's contention that Mont. Const. Art. II § 7 provides a directive as to what law to apply to a defamation claim. The constitutional provision delineates the role of the jury and the court in a defamation case. The Montana Supreme Court has clarified, however, that "the function of the court and jury is not greatly different in the trial of libel from what it is in other cases." *Kurth v. Great Falls Tribune Co.*, 804 P.2d 393, 395 (Mont. 1991). The Montana Supreme Court has determined that most questions of law remain in the province of the Court despite Mont. Const. Art. II § 7: "it is for the court and not the jury to pass upon demurrers to the complaint; upon the admissibility of the evidence; upon motions

6

for nonsuit; upon motions for a directed verdict; upon motions for a new trial and upon motions to set aside verdicts or vacate judgments." *Id.* The Court finds no directive in Montana law as to which law should be applied to defamation cases. The Court will apply the principles set forth in § 6(2) of the Restatement along with the specific considerations identified by the Restatement for defamation.

Section 6(2) of the Restatement provides the following factors that prove relevant to the choice of law:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in determination of a particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability, and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement 2d of Conflict of Laws, § 6(2). Section 149 and Section 150 of the Restatement provide specific guidance on the choice of law for defamation claims. Section 150 proves most relevant where, as here, publication of the alleged defamatory statements occurred on the Internet and thus across multiple states. Section 150 of the Restatement provides that in an action alleging multistate defamation, "the state of most significant relationship will usually be the state where the person [claiming defamation] was domiciled at the time." Restatement 2d of Conflict of Laws, § 150(2). The Restatement recognizes, however, that "[a] state,

which is not the state of the plaintiff's domicil [sic], may be that of most significant relationship if it is the state where the defamatory communication caused plaintiff the greatest injury to his reputation." *Id.*, cmt. e.

A Hawaii district court addressed a similar choice of law issue in *Ratner v. Kohler*. Civ. No. 17-00542 HG-KSC, 2018 U.S. Dist. LEXIS 30761 (D. Haw. Feb. 26, 2018). The claimant filed a defamation suit in Hawaii although the claimant lived and worked in California. *Id.* at *12. A woman located in Hawaii posted the allegedly defamatory statements on Facebook. The conduct cited in the Facebook post allegedly occurred in California. *Id.* at *12–14. Hawaii's choice of law provisions, like Montana's, applied the most significant relationships test from the Restatement (Second) of Conflict of Laws. *Id.* at *13. The Hawaii district court rejected the claimant's attempts to apply Hawaii's law. *Id.* at *12–15. The Hawaii district court instead applied California law when it emphasized that "purported damages would most likely occur in California where [the claimant] resides and conducts his business." *Id.* at *13–14.

The Court finds that Washington represents the state with the most significant relationship to this case. Talbot resided and worked in Washington at the time that Ainuu made the allegedly defamatory statements. Talbot alleges that Ainuu's statements caused him to lose his employment in Washington. Talbot argues that he suffered the greatest reputational harm in Bozeman, Montana, as he had just recently

8

moved from there. (Doc. 34 at 16.) Talbot failed to set forth any facts concerning this other reputational harm, however, that he experienced in Montana.

Talbot also highlights that the encounter about which Ainuu posted took place in Bozeman, Montana. (*Id.*) Talbot further claims that Ainuu targeted a Montana audience with his posts. (*Id.*) Ainuu lived in Montana and made the Instagram post from Montana. Ainuu's statements emphasized, however, Talbot's employment with Outdoor Research in Washington. (*See* Doc. 1, ¶¶ 66–68.) Ainuu's statements tagged Outdoor Research's Instagram account and called for Outdoor Research to take action, presumably by disciplining or discharging Talbot. (*Id.*) Talbot alleges the loss of employment as the primary harm caused to him by the posts. Talbot's loss of employment occurred in Washington. Talbot has failed to demonstrate that more significant consequences arose from his ties to Montana.

Furthermore, Washington possesses a strong interest in the issues in this case where one of its residents lost employment due to allegedly defamatory statements made by a Montana resident. Washington also maintains relevant policies pertaining to alleged defamation, including the Washington Anti-SLAPP statute. The Court finds that under § 150 and the factors set forth in § 6(2) of the Restatement (Second) of Conflict of Law, Washington has the most significant relationship to the case. The Court will apply Washington law.

## II.     Whether Washington's Anti-SLAPP statute applies.

Washington adopted its Uniform Public Expression Act (UPEA) in 2021 as a successor to its anti-SLAPP statute. *Jha v. Khan*, 520 P.3d 470, 476 (Wash. App. 2022). The UPEA, like its predecessor, seeks to provide protection against lawsuits based on a citizen's exercise of free speech. *Id.* A party seeking to dismiss an action pursuant to the UPEA bears the burden of proving that the UPEA applies. *Jha*, 520 P.3d at 477. Washington's UPEA statute "applies to a cause of action asserted in a civil action against a person based on the person's . . . [e]xercise of the right of freedom of speech or of the press . . . guaranteed by the United States Constitution or Washington state Constitution, on a matter of public concern." Rev. Code. Wash. § 4.105.010(2)(c).

Washington patterned its initial anti-SLAPP statute after California's anti-SLAPP statute. Washington courts "look[ed] to California cases for aid in interpreting the [statute]." *Spratt*, 324 P.3d, 707, 712 (Wash. App. 2014). Washington courts still rely on cases interpreting the predecessor anti-SLAPP statute in applying the UPEA. *Jha*, 520 P.3d at 478 (quoting *Spratt*, 324 P.3d at 712). "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Spratt*, 324 P.3d at 713 (Wash. App. 2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)) (internal quotation marks omitted); *Jha*, 520 P.3d at 478.

Ainuu's statements contained allegations of racism. Racism constitutes a matter of public concern. *Dodge v. Evergreen Sch. Dist. No. 114*, 56 F.4th 767, 777 (9th Cir. 2022). The Court must analyze, however, more than just the content of the speech. The Court also must consider the context and form to determine whether speech pertains to a matter of public or private concern. *Snyder*, 562 U.S. at 453. A California court addressed a similar case in interpreting its anti-SLAPP statue, the predecessor of Washington's statutes. A California court of appeals determined in *Bernstein v. LaBeouf* that the anti-SLAPP statute did not apply to an action in which the defendant had called the plaintiff "racist" in a crowded bar. 43 Cal. App. 5th 15, 23–24 (Cal. App. 2019). The California court recognized that "[w]hile racism is undoubtedly an issue of public interest, a defendant cannot convert speech that would otherwise not be entitled to anti-SLAPP protection into protected activity by 'defining the[] narrow dispute by its slight reference to the broader public issue.'" *Id.* at 24.

The context and form of Ainuu's posts suggest that Ainuu spoke on a matter of private concern. Ainuu posted the comments to his Instagram a few hours after the interaction with Talbot. Ainuu specifically referenced the encounter with Talbot and called out Talbot's employer to notify them of the encounter. TNF contends that Ainuu's statements concerned racism and diversity in the outdoor industry. (Doc. 35 at 10.) Ainuu's posts make few references to the outdoor industry. Ainuu briefly

11

references his "role" in trying to change the outdoor industry. Ainuu's posts primarily emphasize, however, wanting Talbot to be held accountable and to face consequences for his "racist" and "aggressive" actions. (Doc. 1-9; Doc. 1-14.) Ainuu's statements focused on a personal interaction. The statements failed to contribute to or further any public debate or conversation on race or diversity. *See Bernstein*, 43 Cal. App. 5th at 24.

Ainuu made posts to Instagram late at night that predominantly referred to Talbot and Ainuu's encounter with Talbot. Ainuu's posts used emojis, selfies, hashtags, and animated language. The context and form of these statements support a finding that the statements concerned a matter of private concern rather than public concern. Ainuu's statements fail to trigger the protections contained in Rev. Code. Wash. § 4.105.010(2)(c).

### III.  Defamation Claims

The Court turns to the question of whether Ainuu's posts can serve as the basis for a defamation claim.

#### A. Whether TNF constitutes the "publisher" of the challenged statements or can be held vicariously liable for those statements

Talbot concedes that Ainuu serves as an independent contractor rather than an employee of TNF. Talbot argues, however that TNF can be held liable for Talbot's statements because TNF gave apparent authority to Ainuu to make the allegedly defamatory statements. Talbot relies on TNF's initiative for its athletes to "bring

social justice activism 'not only within the Company, but within the communities where we live and work.'" (Doc. 34 at 39 (quoting Doc. 1 at ¶¶ 16–17).) Talbot also relies on TNF's alleged failure to reprimand its athletes, including Ainuu, on two prior occasions where its athletes "called out" others for being racist. Talbot argues that TNF implicitly encouraged Ainuu's actions by failing to address and remedy similar behavior in the past.

The Fourth Circuit addressed the issue of apparent authority under similar facts in *Lokhova v. Halper*. 995 F.3d 134, 146–47. The claimant in *Lokhova* sued an independent contractor for MSNBC for tweets posted on the independent contractor's Twitter account. *Id.* at 139–40. The claimant also sued MSNBC on the basis that MSNBC proved vicariously liable for the independent contractor's statements. *Id.* at 140–41, 147. The Fourth Circuit determined that allegations that "MSNBC" appeared in the independent contractor's twitter bio proved insufficient to establish apparent authority. *Id.* at 147.

The same reasoning applies here. Ainuu's Instagram bio links to TNF's Instagram account. (Doc. 1-5.) Ainuu's bio likewise links to a company called Smart Wool and his posts link to many different companies from REI to Clif Bar to Patagonia. (Doc. 26-8 at 2.) Talbot makes no argument that those companies likewise should be held liable for statements made on Ainuu's personal Instagram account. TNF apparently supports social justice activism, but no facts exist in the

13

record to suggest that TNF encourages its athletes to "call out" individuals on social media for perceived racist behavior. More importantly, no facts in the record suggest that Ainuu posted on behalf of TNF. None of Ainuu's comments mentioned TNF products, his position as a TNF sponsored athlete, or TNF. Talbot's allegations fail to demonstrate apparent authority. *Lokhova*. 995 F.3d at 146–47.

TNF's prior failures to reprimand its athletes also prove insufficient to establish apparent authority. The incidents cited by Talbot resemble the present case only in their racial/ethnic justice component. It remains unclear whether TNF's athletes were representing TNF at the time that they allegedly took the actions. "It would hardly be possible for an employer to successfully police all employee interactions." *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 144 (4th Cir. 2018). It remains unclear whether TNF had authority to censor their sponsored athlete's conduct.

"Apparent authority 'depend[s] upon objective manifestations made by the principal.'" *T-Mobile USA, Inc. v. Selective Ins. Co. of Am.*, 450 P.3d 150, 154 (Wash. 2019) (quoting *King v. Riveland*, 886 P.2d 160, 165 (Wash. 1994)). The manifestations by the principal "'must cause the [third party] to actually, or subjectively, believe that the agent has authority to act for the principal' and '*be such that the [third party's] actual, subjective belief is objectively reasonable*.'" *Id.* (quoting *King*, 886 P.2d at 165) (alterations and emphasis in original). TNF's

mission statement and conduct committed by their independent contractors outside promotional TNF activities proves insufficient to establish apparent authority. Talbot has failed to plead sufficient facts to support a claim for relief against TNF for the statements made by Ainuu.

### B. Whether Ainuu's statements constitute statements of facts that can support a claim for defamation

TNF and Ainuu argue that Ainuu's statements concerned facts that are not "provably false." (Doc. 28 at 4; Doc. 26 at 29–30.) TNF and Ainuu argue that whether something or someone is racist cannot be proved because the term "racist" lacks a clearly identifiable definition. (Doc. 26 at 29.) TNF and Ainuu note that Ainuu's statements expressed his perception of the encounter with Talbot. (Doc. 35 at 14–17; Doc.  36 at 12–14.) TNF and Ainuu further argue that the context of Ainuu's statements, in the form of postings on social media, indicated that the statements represented expressions of opinions. (Doc. 35 at 13.) Talbot contends that Ainuu's statements—whether Talbot made racist remarks or attempted to fight Ainuu—remain provably false. Talbot further argues that even if the statements constitute opinions, the "opinions" were based on undisclosed facts that invite the reasonable inference of defamatory facts. (Doc. 34 at 27–28.)

For a statement to be actionable as defamation, the statement "must be capable of being proven true or false." *Dodge v. Evergreen Sch. Dist. No. 114*, CASE NO. 3:20-cv-05224-RBL, 2020 U.S. Dist. LEXIS 135581, at *17 (W.D. Wash. July 30,

2020) (citing *Lewis v. Time Inc.*, 710 F.2d 549, 555 (9th Cir. 1983)). Statements of opinion accordingly generally prove non-actionable. *Lewis*, 710 F.2d at 553. The U.S. Supreme Court has recognized, however, that "expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990).

Washington law requires the Court to "'examin[e] a statement in the totality of the circumstances in which it was made . . . to determine whether a statement should be characterized as nonactionable opinion.'" *Miller v. Sawant*, 660 F. Supp. 3d 1015, 1027 (W.D. Wash. 2023) (quoting *Dunlap v. Wayne*, 716 P.2d 842, 848 (Wash. 1986)). The Court must consider the following factors: "(1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts." *Dunlap*, 716 P.2d at 848.

Multiple district courts have addressed whether a statement that someone is "racist" or "made racist remarks" constitutes a statement of fact actionable as defamation. The Western District of Washington determined in *Dodge* that "[w]hether someone is racist, bigoted, and hateful in general is not a factual question." *Dodge*, 2020 U.S. Dist. LEXIS 135581, at *17. "[A] term like racist, while exceptionally negative, insulting, and highly charged—is not actionable under defamation-type claims because it is a word that lacks precise meaning." *Skidmore*

16

*v. Gilbert*, Case No. 20-cv-06415-BLF, 2022 U.S. Dist. LEXIS 27239, at *30 (N.D. Cal. Feb. 15, 2022). The District of Nebraska recognized that "calling an individual a 'racist' or characterizing a person's statements as being 'racist' or 'hateful,' standing along [sic], is not 'capable of proof or disproof.'" *Starks v. Tula Life, Inc.*, 8:23-CV-4, 2023 U.S. Dist. LEXIS 128760, at *9 (D. Neb. July 26, 2023)); *see also Tannous v. Cabrini Univ.*, No. 23-1115, 2023 U.S. Dist. LEXIS 179616, at *22 (E.D. Pa. Oct. 4, 2023) ("[a] statement characterizing someone as racist, like a non-actionable opinion, is a 'subjective assertion, not sufficiently susceptible to being proved true or false to constitute defamation.'")

Several circuits similarly have concluded that allegations that someone is a "racist" represent non-actionable opinions. The Seventh Circuit has noted that "[i]n daily life 'racist' is hurled about so indiscriminately that it is no more than a verbal slap in the face . . . [i]t is not actionable unless it implies the existence of undisclosed, defamatory facts." *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988) The Second Circuit determined in *Rapaport v. Barstool Sports Inc.*, that the accusations of racism and fraud that the defendant had posted to Twitter proved "non-actionable because they lack a clearly defined meaning." 22-2080-cv, 2024 U.S. App. LEXIS 556, at *7 (2d Cir. Jan. 9, 2024). The Second Circuit recognized that "no reasonable reader could find that the statements alleging racism or fraud" on Twitter conveyed facts as opposed to reflecting the opinion of the poster. *Id.*

The medium and audience of Ainuu's statements support a finding that Ainuu's statements constituted non-actionable opinion. Ainuu posted the statements to his social media followers via his social media page. Courts have recognized that "readers [] give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts" due to the "informal and unedited nature" of statements made on the Internet. *Ganske v. Mensch*, 480 F. Supp. 3d 542, 553 (S.D.N.Y. Aug. 20, 2020). Other courts have found that social media pages like Twitter and Instagram represent "forums that welcome opinions," *Jevremovic v. Courville*, No. 22-4969 (ZNQ) (RLS), 2023 U.S. Dist. LEXIS 139440, at *17 (D.N.J. Aug. 10, 2023) and "vehicles for the expression of individual opinion rather than the rigorous and comprehensive presentation of factual matter." *AG v. Polis*, 21-2108-cv, 2022 U.S. App. LEXIS 7992, at *4 (2d Cir. Mar. 28, 2022). The medium and audience of the publication supports a finding that a reasonable social media user would likely have interpreted the statements as opinion and perception rather than fact. *Ganske*, 480 F. Supp. 3d at 553.

The context of Ainuu's statements also proves important. Ainuu posted the comments around 2:00 a.m. after an encounter at a downtown bar. Ainuu's posts used hashtags and emojis. (Doc. 1-9 at 1–2.) The posts followed a picture of Tupac Shakur's album for the song "Hit 'Em Up." (*Id.* at 1.) Ainuu wrote his statements across Ainuu's late night selfies. (*Id.* at 1–2.) Ainuu's later posts used profanity and

indicated a desire for payback with statements like "he's lucky to have not learned physically" and "#telljohnathancomebacktobozemanIgothimthistime." (Doc. 1-14 at 1.) A reasonable reader would understand these statements as the opinionated rants of an upset person. A reasonable reader would not interpret Ainuu's statements made in this context as "a comprehensive presentation of factual matter." *AG*, 2022 U.S. App. LEXIS 7992, at *4. "[T]he context and tone of the post itself suggest[s] [a] snarky opinion, which is further bolstered by the fact that it appears in a social media post featuring a string of hashtags, colorful emojis, and snarky writing." *Pelkowski v. Hovermann*, 20-CV-1845 (ENV) (RLM), 2021 U.S. Dist. LEXIS 259784, at *12–13 (E.D.N.Y. Sept. 9, 2021).

Talbot argues that whether he tried to fight Ainuu, as alleged in Ainuu's statements, remains provably false. The Sixth Circuit's decision in *Sandmann v. N.Y. Times Co.* proves instructive here. 78 F.4th 319 (6th Cir. 2023). A member of the Indigenous Peoples March had attempted to move through the crowd towards the Lincoln Memorial. *Id.* at 322. The member came face to face with the claimant, leading to a tense encounter subject to substantial media coverage. *Id.* The member of the Indigenous Peoples March later made statements to the media that the claimant had "blocked [his] way and wouldn't allow [him] to retreat." *Id.* at 323. The Sixth Circuit determined that it remained provably false whether the member of the Indigenous Peoples March physically could have moved past the claimant. The

member's statements, nevertheless, "expressed his subjective understanding of the situation" and "ascribed subjective intent to [the claimant's] conduct." *Id.* at 331–33. The Sixth Circuit concluded that the statement represented a non-actionable opinion. *Id.* at 333.

Ainuu's statements alleged that Talbot "tried to fight [him]" and "[got] in [his] face." (Doc. 1-9 at 1.) Like the statements in *Sandmann*, Ainuu's statements ascribe subjective intent to Talbot's actions. The statements represent Ainuu's perception of the encounter. *Sandmann*, 78 F.4th at 333. A reasonable reader would understand Ainuu's statements as an expression of Ainuu's feelings that Talbot wanted to fight him rather than a narration of facts. The context, audience, and form of the statements, as described above, further support the conclusion that a reasonable reader would interpret Ainuu's statements as his opinions/perception rather than facts.

The Court similarly rejects Talbot's argument that Ainuu's statements implied undisclosed facts. Talbot argues that Ainuu's statements left readers to speculate as to what Talbot could have said or done that could have been perceived as racist. An opinion may imply undisclosed defamatory facts. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990). For example, "[t]o say of a person that he is a thief without explaining why, may, depending upon the circumstances, be found to imply the assertion that he has committed acts that come within the common connotation of

20

thievery." Rest. 2d of Torts § 566. Ainuu's statements do not imply defamatory facts. The assertion that someone is a thief implies the provably false statement that the person stole something. The assertion that someone is a racist, on the other hand, at most implies that the person made racist remarks or engaged in racist conduct. Neither of these implications represent provably false statements because both still depend on the interpretation of the term "racist," which attaches no clearly defined meaning. *Rapaport*, 2024 U.S. App. LEXIS 556, at *7.

Moreover, even if Ainuu's statements did imply defamatory facts, Ainuu disclosed the facts on which he based his opinion. Ainuu's posts outlined the facts on which his opinions relied including the following: "[Talbot] incessantly trying to shake my hand;" "[Talbot] asking questions – very directly – about diversity . . . and [Talbot] kept cutting [Ainuu] off" when Ainuu answered those questions; "[a]n apology followed by an invitation to fight;" and "[Talbot] squared up to [Ainuu] got right in [his] face." (Doc. 1, ¶¶ 65–66.)

Ainuu's statements represent his perception that Talbot's remarks proved racist and that Talbot wanted to fight Ainuu. A reasonable reader would not interpret Ainuu's remarks as factual statements, or infer factual statements therefrom, in light of the content, context, and form of Ainuu's statements. *Rapaport*, 2024 U.S. App. LEXIS 556, at *7; *Ganske*, 480 F. Supp. 3d at 553. Ainuu's statements represent

non-actionable opinions. Accordingly, Talbot's claims for defamation against TNF
and Ainuu fail as a matter of law.

## IV.  Tortious Interference

TNF and Ainuu contend that Talbot's tortious interference claim duplicates
his defamation clam. TNF and Ainuu argue that Talbot, because he cannot show
defamation, cannot show wrongful or tortious conduct that interfered with Talbot's
employment. (Doc. 26 at 35–36; Doc. 28 at 12–15.) Talbot has admitted that his
claim for tortious interference depends on his claim for defamation such that if the
claim for defamation fails the claim for tortious interference likewise would fail.
(Doc. 34 at 36–37.)

The Court has determined that Talbot's claim for defamation against TNF
fails because TNF had not published the statements and Ainuu had not acted with
apparent authority in publishing the statements. *Lokhova*. 995 F.3d at 146–47. The
defamation claims against TNF and Ainuu further fail because Ainuu's statements
constituted opinions, the falsity of which cannot be conclusively established.
*Sandmann*, 78 F.4th at 333. Talbot's tortious interference claims against Ainuu and
TNF also must fail.

## V.  Punitive Damages

Talbot's punitive damages claim must be dismissed given the dismissal of his
other claims. Further, even had Talbot's claims for defamation or tortious
interference survived the Defendants' motions to dismiss, punitive damages remain

unavailable under Washington law. "In a Washington defamation case, the plaintiff can recover compensatory damages, but 'under no circumstances will [the Washington Supreme Court] allow a jury to award punitive damages.'" *Schmalenberg v. Tacoma News*, 943 P.2d 350, 363 (Wash. Ct. App. 1997) (alteration in original). Talbot's punitive damages claim must be dismissed.

## VI.   Leave to Amend

The Court will dismiss Talbot's claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6). "'Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1072 (9th Cir. 2011) (quoting *Krainski v. Nev. ex rel. Bd. of Regents of Nev. System of Higher Educ.*, 616 F.3d 963, 972 (9th Cir. 2010)); *Smith v. Johnson*, No. 22-35766, 2023 U.S. App. LEXIS 27560, at *1 (9th Cir. Oct. 17, 2023) (remanding to correct judgment to dismissal without prejudice) (unpublished).

The claimant in *Dodge* sought leave to amend deficiencies in his complaint. 2020 U.S. Dist. LEXIS 135581, at *17–18. The Washington district court noted after finding the allegedly defamatory statements non-actionable that the "alleged statements could not support a defamation claim even if adequately pled." *Id.* The Washington district court determined that amendment would be futile because "[t]he

entire basis of [the claimant's] defamation claim is flawed and allowing him to amend would essentially allow him to assert a whole new claim." *Id.* at *18.

*Pelkowski* addressed a similar question regarding amendment. 2021 U.S. Dist. LEXIS 259784, at *28. The New York district court dismissed the claimant's defamation claims after determining that the allegedly defamatory statements constituted protected opinion. *Id.* at *15. The district court concluded that any attempt to amend [the claimant's] libel/defamation claim[] would be futile as a matter of law." *Id.* at *28. The district court allowed amendment of the claimant's tortious interference with contract claim. *Id.* at *28. The district court denied, however, leave to amend the claimant's tortious interference with business relations claim. *Id.* Importantly, the district court acknowledged that "having dismissed [the claimant's] defamation cause of action for failure to state a claim, defamation cannot form the basis of [the claimant's] tortious interference with business relations claim." *Id.* at *21.

Amendment cannot fix the deficiencies with Talbot's defamation claims where the Court has determined, as a matter of law, that the statements of which Talbot complains constitute opinions that cannot serve as a basis for a defamation claim. *Dodge*, 2020 U.S. Dist. LEXIS 135581, at *17–18; *Pelkowski*, 2021 U.S. Dist. LEXIS 259784, at *28. The Court also finds that given Talbot's admission at the hearing that the tortious interference claim would stand or fall with the defamation

claim, amendment likewise cannot fix the deficiencies with Talbot's tortious interference claim. The Court will dismiss this action with prejudice.

## CONCLUSION

The Court determines that Talbot has failed to state a claim upon which relief can be granted. Talbot's claims for defamation against Ainuu and TNF fail because the statements made by Ainuu represent opinions protected by the First Amendment and Ainuu's conduct cannot be attributed to TNF. Talbot's claims for tortious interference also fail due to their reliance on Talbot's claims for defamation.

## ORDER

Accordingly, **IT IS ORDERED:**

1.) TNF's Motion to Dismiss (Doc. 25) is **GRANTED**. TNF's request for costs and fees related to the motion is **DENIED**.

2.) Ainuu's Motion to Dismiss (Doc. 27) is **GRANTED**. Ainuu's request for costs and fees related to the motion is **DENIED**.

3.) Talbot's claims against TNF and Ainuu are hereby **DISMISSED** with prejudice.

DATED this 1st day of March, 2024.

Brian Morris, Chief District Judge
United States District Court